ROB BONTA
Attorney General of California
PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
DANIEL D. AMBAR (SBN 278853)
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6153
  Fax: (916) 731-3637
  Email: Daniel.Ambar@doj.ca.gov

*Attorneys for Plaintiff State of California*
Additional counsel identified on signature page

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF OREGON, AND THE STATE OF WASHINGTON, | Case No.: 4:26-cv-7116 |
| *Plaintiffs,* | **COMPLAINT** |
| v. | |
| PARAMOUNT SKYDANCE CORP., AND WARNER BROS. DISCOVERY, INC. | |
| *Defendants.* | |

COMPLAINT                                  1                            Case No.: 4:26-cv-7116

The State of California, the State of Arizona, the State of Colorado, the State of Connecticut, the Commonwealth of Massachusetts, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, and the State of Washington, by and through their respective Attorneys General (collectively, "Plaintiff States"), bring this civil action to enjoin Paramount Skydance Corp. ("Paramount") from acquiring Warner Bros. Discovery, Inc. ("Warner Bros.," collectively "Defendants").  Plaintiff States allege as follows.

## I.   INTRODUCTION

1.   This proposed $110 billion merger, the largest in Hollywood history, would extinguish competition between Paramount and Warner Bros. and inflict substantial harm on movie theatres, basic cable distributors, and, ultimately, audiences nationwide.  The merger combines two of the nation's five major film distributors, leaving only four to control over 85 percent of all wide-release theatrical films in the United States.  It combines two of the five major owners of basic cable channels, leaving only two (the combined company and Disney) to control 59 percent of all basic cable in the United States.  After this merger, for every dollar generated by wide-release theatrical films and basic cable channels in this country, the combined company will pocket more than a quarter.  This merger, in short, would create a media behemoth.

2.   Film and television are not commodities; they are a principal means by which Americans encounter stories, ideas, and perspectives beyond their own experience.  The competitive health of markets where professionally created media is produced, distributed, and exhibited determines not only price, quality, and output, but the breadth of voices and viewpoints that reach the public.  As Warner Bros. itself has explained, media "informs, entertains, and, when at its best, inspires" the viewing public.

3.   For more than a century, Paramount and Warner Bros. have stood astride the media and entertainment industry as independent sources of creativity and competition.  The films they have produced are among the all-time greats. Paramount and Warner Bros. have produced critically acclaimed and award-winning films, like *Titanic*, *Grease*, *Forrest Gump*, *Breakfast at Tiffany's*, *Sunset Boulevard*, *The Godfather* (from Paramount), and *The Departed*, *Before Sunset*, *The Matrix*,

*Goodfellas*, *Casablanca*, and *The Shining* (from Warner Bros.). And they control some of the most lucrative franchise film intellectual property, including *Top Gun*, *Mission: Impossible*, and *Star Trek* (from Paramount), and *Batman*, *Harry Potter*, and *Lord of the Rings* (from Warner Bros.). The basic cable television content they control, like CNN, MTV, HGTV, Comedy Central, Cartoon Network, and Nickelodeon, is among the nation's most popular.

4.      Paramount and Warner Bros. compete fiercely to create and disseminate new, different, and innovative film and television content to American audiences. To promote their films, they negotiate with thousands of movie theatres across the country. They bargain with those theatres to secure the most coveted screens. And they negotiate a range of terms, including box office revenue splits, minimum ticket prices, caps on discounts, limits on complimentary tickets, and theatrical exclusivity windows. Movie theatres rely on competition between Paramount and Warner Bros. Through this competition, theatres incentivize creativity and quality, and they secure competitive prices and terms for themselves and for audiences.

5.      Paramount and Warner Bros. compete to market their basic cable channels too. Today, distributors negotiate separately with each company for the right to carry its basic cable channels. In these negotiations, the threat of a blackout looms large. If a distributor refuses to cave to onerous demands from Paramount, for example, Paramount can withhold its basic cable channels from distribution, resulting in the temporary loss of these channels for subscribers. The existence of alternative sources of basic cable, like Warner Bros., enables the distributor to stand up to the threat of this blackout. In this way, an independent Warner Bros. limits Paramount's bargaining leverage.

6.      The merger will end this competition permanently. The likely result is higher prices, lower quality, and less content for film. ███████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████████████████████████ Diminished competition will also harm distributors of cable television programming and consumers. These harms will be felt throughout the country,

including in Plaintiff States.

7.      Theatres, especially, will pay the price. With fewer film distributors, theatres will likely be forced to pay the remaining distributors a greater split of their revenues. Theatres will likely face more onerous caps on discounts and on the number of complimentary tickets they can offer viewers. And theatres will likely receive fewer new releases from distributors, who will face less competition and therefore have less incentive to invest in new, creative, and distinctive theatrical films.

8.      Theatergoers, in turn, will suffer. With film distributors siphoning a greater portion of box office revenue, theatres will likely be forced to raise the price for a trip to the theatre and slash investments in the viewer experience (e.g., less investment in larger screens, luxury seating, concessions). Theatergoers will therefore likely face higher prices and degraded quality. With more stringent caps on discounts and complimentary tickets, theatergoers will likely pay full price more often. And with less investment in theatrical releases, the breadth of films available to theatergoers will likely decline.

9.      These harms will be especially acute with respect to anticipated top-grossing theatrical films—often referred to as anticipated "blockbusters," "event films," or "tentpoles." Theatres rely heavily on these films to drive traffic. Defendants and three other film distributors (Disney, Universal, and Sony) control nearly all these films. Over the last four years, those five distributors accounted for approximately 95 percent of all anticipated top-grossing theatrical films, as measured by box office revenue. This merger would reduce that number to four. Two distributors alone (Defendants and Disney) would control approximately 60 percent of this market. Because competition with respect to these films will be much diminished, theatres and theatergoers will likely face greater prices for this important subset of films.

10.     The merger will also likely harm distributors of basic cable television. After the merger, the combined company would control a portfolio of over 50 basic cable channels, including many of the most popular. The company would own rights to some of the most in-demand television programming, including March Madness and MLB games. Its portfolio would span all major genres: news, sports, general entertainment, kids and family, and lifestyle. No other

programmer would possess a portfolio of comparable breadth.

11.     The combined company's essential basic cable content would confer enormous bargaining power.  Few distributors could withstand the threat of a blackout of Defendants' more than 50 basic cable channels, leaving them little choice but to accept onerous terms.  ███████

████████████████████████████████████████████████████████

████████████████████████████████████████  With less leverage after the merger, cable television distributors and the subscribers they serve will likely face higher prices and reduced investment in content.

12.     Neither new entry nor expansion by existing competitors will replace the substantial competition eliminated by the merger.  Distributing theatrical motion pictures at scale requires nationwide theatre relationships and franchise intellectual property that Defendants have assembled over generations.  Basic cable programming requires launching multi-network portfolios of channels simply to obtain carriage by cable and satellite distributors.  Even if they could obtain carriage, new entrants would need to compete against the bundling leverage of established programmers.

13.     Nothing justifies these substantial harms to competition.  Defendants claim the merger will generate "synergies," █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

14.     Movie theatres, cable television distributors, filmmakers and workers who bring television and film to life, and audiences throughout the country, including in Plaintiff States, should not bear the risk and suffer the harm from this anticompetitive merger.  For the reasons set forth in this Complaint, Paramount's proposed acquisition of Warner Bros. is likely to substantially harm competition.  The merger violates Section 7 of the Clayton Act and should be enjoined.

## II.    JURISDICTION, INTERSTATE COMMERCE, AND VENUE

15.    Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. They do so as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents.  This Court has subject matter jurisdiction over this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337(a).

16.    Plaintiff States each have a quasi-sovereign interest in securing a competitive marketplace for the film and television content that their residents enjoy.  Plaintiff States are home to numerous movie theatres where residents enjoy films and where workers depend on steady employment—theatres whose viability and economic contribution will suffer from diminished competition in the distribution of theatrical films.  A substantial segment of each Plaintiff State's population purchases tickets to movies distributed by Defendants.  The merger will harm those consumers by raising ticket prices.  A substantial segment of each Plaintiff State's population subscribes to a cable, satellite, or internet service to access the basic cable channels distributed by Defendants.  Customers will similarly face higher subscription fees.  The merger is not only likely to harm consumers in each Plaintiff State; it could also harm the tens of thousands of production workers who reside in Plaintiff States.  This includes writers, actors, directors, crews, and craftspeople whose livelihoods are threatened by Defendants' planned content-spending cuts, and whose wages, opportunities, and working conditions are threatened as increased concentration reduces competition among employers for their labor.  These direct and indirect harms are expected to ripple through Plaintiff States' economies and substantially affect the general welfare of their residents.

17.    Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Paramount and Warner Bros. transact business throughout the United States, and in each of the Plaintiff States, including in California, where they maintain studio lots, television production facilities, and corporate offices employing thousands of California residents.

18.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22,

and 28 U.S.C. § 1391.  This Court also has personal jurisdiction over each Defendant.  Both Defendants are found and transact business, and the merger has effects, in this judicial district.

19.    This case is related to the lower-numbered action *Faust v. Paramount Skydance Corp.*, No. 4:26-cv-03790-AMO (N.D. Cal.), which is presently pending before the Hon. Araceli Martínez-Olguín of the Oakland division of this judicial district.

## III.    THE PARTIES AND THE PROPOSED MERGER

### A.    Plaintiff States

20.    Plaintiff State of California is a sovereign state of the United States.  This action is brought by and through its Attorney General, Rob Bonta, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of California has its principal offices at 1300 "I" Street, Sacramento, CA 95814.

21.    Plaintiff State of Arizona is a sovereign state of the United States.  This action is brought by and through its Attorney General, Kris Mayes, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Arizona has its principal offices at 2005 N. Central Avenue, Phoenix, AZ 85004.

22.    Plaintiff State of Colorado is a sovereign state of the United States.  This action is brought by and through its Attorney General, Philip J. Weiser, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Colorado has its principal offices at 1300 N. Broadway, Denver, CO 80203.

23.    Plaintiff State of Connecticut is a sovereign state of the United States.  This action is brought by and through its Attorney General, William Tong, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Connecticut has its principal offices at 165 Capitol Ave, Hartford, CT 06106.

24.    Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States.

This action is brought by and through its Attorney General, Andrea Joy Campbell, who is the chief law enforcement officer of the Commonwealth, with the authority to bring this action on behalf of the Commonwealth pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the Commonwealth of Massachusetts has its principal offices at One Ashburton Place, Boston, MA 02108.

25. Plaintiff State of Minnesota is a sovereign state of the United States. This action is brought by and through its Attorney General, Keith Ellison, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Minnesota has its principal offices at 75 Rev. Dr. Martin Luther King, Jr. Boulevard, Suite 102, Saint Paul, MN 55155.

26. Plaintiff State of Nevada is a sovereign state of the United States. This action is brought by and through its Attorney General, Aaron D. Ford, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Nevada Attorney General has its principal offices at 100 North Carson Street, Carson City, NV 89701.

27. Plaintiff State of New Jersey is a sovereign state of the United States. This action is brought by and through its Attorney General, Jennifer Davenport, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of New Jersey has its principal offices at 25 Market Street, Trenton, NJ 08611.

28. Plaintiff State of New Mexico is a sovereign state of the United States. This action is brought by and through its Attorney General, Raúl Torrez, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of New Mexico has its principal offices at 408 Galisteo Street, Santa Fe, NM 87501.

29. Plaintiff State of New York is a sovereign state of the United States. This action is brought by and through its Attorney General, Letitia James, who is the chief law enforcement

officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of New York has its principal offices at The Capitol, Albany, NY 12224.

30. Plaintiff State of Oregon is a sovereign state of the United States. This action is brought by and through its Attorney General, Dan Rayfield, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Oregon has its principal offices at 1162 Court Street NE, Salem, OR 97301.

31. Plaintiff State of Washington is a sovereign state of the United States. This action is brought by and through its Attorney General, Nicholas W. Brown, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Washington has its principal offices at 1125 Washington Street SE, Olympia, WA 98504-0100.

**B.    Defendants**

32. Paramount is one of the world's leading media and entertainment companies. Incorporated in Delaware and headquartered in New York, Paramount creates, distributes, and exhibits media and entertainment content, with its "powerful and unique portfolio" reaching audiences worldwide. Paramount's portfolio includes a major film studio, the leading broadcast television network, popular basic cable television channels, a top premium cable television channel, a streaming service, television production studios, video games, and other entertainment and media assets.

33. Warner Bros. is one of the world's leading media and entertainment companies. A Delaware corporation headquartered in New York, Warner Bros. "creates and distributes the world's most differentiated and complete portfolio of content and brands across television, film and streaming." The company's portfolio includes a major film studio, popular basic cable television channels, the top premium cable television channel, multiple subscription streaming services, television production studios, video games, and other entertainment and media assets.

**C.     The Proposed Merger**

34.     On February 27, 2026, Paramount agreed to acquire all outstanding shares of Warner Bros. for $31 per share, for a transaction value of approximately $110 billion.

35.     The proposed merger would create a combined company that controls, among other assets:

- Two of the "big five" major film studios;
  - Paramount Pictures, responsible for films and franchises such as *Top Gun*, *Titanic*, *Forrest Gump*, *Mission: Impossible*, and *Star Trek*;
  - Warner Bros. Motion Picture Group and DC Studios, responsible for films and franchises such as *Harry Potter*, *Lord of the Rings*, *The Matrix*, and *The Dark Knight*;
- One of the "big four" broadcast television networks;
  - CBS (Paramount), the most-watched network in America for 16 consecutive years, with top primetime, news, and sports content (like NFL, college football, Masters, PGA);
  - 15 owned-and-operated local CBS broadcast stations and local news in some of the nation's top markets, such as New York, Los Angeles, San Francisco, Boston, and Seattle;
- More than 50 basic cable television channels with top-rated news, children's, primetime, music, and sports content (like March Madness and MLB), including:
  - Nickelodeon, Comedy Central, MTV, BET, CMT, VH1, TV Land, Smithsonian (currently owned by Paramount);
  - CNN, TBS, TNT, HGTV, Food Network, Discovery Channel, Cartoon Network, Animal Planet, truTV, Turner Classic Movies, Travel Channel (currently owned by Warner Bros.);
- Two leading premium cable television channels;
  - Showtime (currently owned by Paramount);

COMPLAINT                                      10                          Case No.: 4:26-cv-7116

        ○  HBO (currently owned by Warner Bros.);

- Three subscription streaming services;

        ○  Paramount+;

        ○  HBO Max (currently owned by Warner Bros.);

        ○  Discovery+ (currently owned by Warner Bros.); and

- Three television production studios responsible for some of the most widely acclaimed programming in television history, including *Game of Thrones*, *The Big Bang Theory*, *Friends*, *The Late Show with David Letterman*, *The Late Show with Stephen Colbert*, and *NCIS*;

        ○  Paramount Television Studios;

        ○  CBS Studios (currently owned by Paramount);

        ○  Warner Bros. Television Studios.

## IV.  RELEVANT MARKETS

36.     Paramount's proposed acquisition of Warner Bros. will likely harm competition in many lines of commerce, but the harms will be particularly acute in at least three relevant product markets: (1) distribution of wide-release theatrical films; (2) distribution of anticipated top-grossing theatrical films; and (3) licensing of basic cable channels to distributors.  For each of these product markets, the United States is a relevant geographic market.

### A.     Distribution of Wide-Release Theatrical Films in the United States

#### a.     Product Market

37.     Wide-release theatrical films are feature-length films intended for broad initial exhibition in movie theatres.  They are distinct from films intended for initial exhibition through other channels, such as streaming, pay-per-view, or home video.  They are also distinct from films intended for initial exhibition in theatres through limited release—initial exhibition in only select cities or specialized venues.

38.     Theatergoing is a big business, and it is thriving.  Last year, theatergoers in the United States spent more than $8 billion at the box office, reflecting the unique experience that seeing a movie on the big screen provides.  This year, the industry projects domestic box office

earnings to reach $10 billion.  This would make 2026 the best year for movie-going since 2019, the last full year before the COVID pandemic.  To meet growing demand from the public, movie theatres are investing heavily in improvements, such as luxury seating, premium screens, and enhanced concessions.  Last year, they spent more than $1.5 billion on cinema improvements.

39.    Theatergoing provides a distinct consumer experience that streaming, pay-per-view, home video, and other channels cannot provide.  Other channels lack several characteristics of viewing a movie in a theatre, including the size of the screen, the sophistication of the sound system, and the social experience of viewing a movie with other patrons.  These differences are especially pronounced given the emergence of innovative theatre technologies such as IMAX, 4DX, and ScreenX, which cannot be replicated at home.  ██████████████████████████████

██████████████████████████████████████████████████████

40.    Reflecting the significant differences of viewing a movie in a theatre, ticket prices for films generally differ from prices for other forms of entertainment.  For example, live entertainment is typically significantly more expensive than a movie ticket, whereas home viewing through streaming, pay-per-view, and home video is usually less expensive than viewing a movie in a theatre.

41.    Defendants themselves acknowledge the importance of theatres as a distinct channel through which to distribute new films.  Other distribution channels, such as streaming, pay-per-view, and home video, cannot create the same cultural and franchise value for films as initial launches in theatres.  As Paramount's CEO explained this year, "large franchises and big pieces of intellectual property are launched in theatres, period."

42.    Theatres require a steady supply of new theatrical films.  Exhibiting other content, such as concerts, live performances, or older films, generally fails to generate traffic and revenue for theatres comparable to that generated by new theatrical films. As the major theatre chains have told their investors, their "ability to operate successfully" depends on the "availability, diversity and appeal of motion pictures."  A "consistent flow of new film content with varying genres and appeals" is important to their business.

43.    For theatres, wide-release theatrical films are not reasonably interchangeable with

other motion pictures.  The revenue potential of wide-release theatrical films is far greater, more predictable, and less risky for theatres than that of limited-release films.  One of the nation's largest theatre chains told its investors last year: "Our industry relies on a consistent cadence of high-quality, wide-release films with broad consumer appeal."  Another leading theatre chain told its investors: "Wide release films are what really drives our theater business."  Yet another has stated that its "core business is the exhibition of wide-release theatrical Hollywood movies."

44.     Limited-release films generally have narrower appeal, attract smaller audiences, and generate less box office revenue than wide-release films.  A theatre cannot reasonably replace a wide-release film with a limited-release film and expect to earn comparable revenue or attract comparable audiences.  Industry participants ███████████████████ distinguish between "wide-release" theatrical films and limited-release theatrical films that open in select cities or specialized venues.

45.     The principal industry tracking services often use "wide release" to describe a film released in at least 600 theatres during a film's first run.  Nielsen, a box office tracker, uses that definition.  IMDb uses that definition.  Other industry sources do too.

46.     By this measure, wide-release theatrical films accounted for 98 percent of box office revenue from all films over the past four years.  After the merger, only three film distributors will control 75 percent of these films by box office revenue, and only four distributors (Defendants, Disney, Universal, and Sony) will control 86 percent of these films by box office revenue.

47.     The hypothetical monopolist test is an analytical tool used to help define markets.  The test determines whether a group of products is sufficiently broad to be a properly defined antitrust product market.  If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and could profitably undertake a small but significant and non-transitory increase in price, then that group of products is a properly defined antitrust market.  *See* Fed. Trade Comm'n & U.S. Dep't of Justice, *Merger Guidelines* § 4.3.A (2023).

48.     Theatres would not substitute alternatives in a sufficient amount to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of all distribution of

wide-release theatrical films. Therefore, a hypothetical monopolist over all distribution of wide-release theatrical films could profitably increase its prices by at least a small but significant and non-transitory amount.

### b.    Geographic Market

49.    The United States is a relevant geographic market in which to assess the proposed merger's effect on the distribution of wide-release theatrical films. Film distributors negotiate separate distribution agreements for domestic versus international territories. Box office revenue, marketing campaigns, release dates, and distribution strategies are tracked and managed separately for domestic and international markets. Consumer demand for theatrical films depends on domestic audience preferences, which differ from international markets based on cultural preferences, language, and local competition. Theatres cannot reasonably substitute distribution of films outside the United States, given that the theatres and their audiences are located in the United States.

50.    Theatres would not substitute wide-release theatrical films distributed outside the United States in a sufficient amount to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of all distribution of wide-release theatrical films in the United States. Therefore, a hypothetical monopolist over all distribution of wide-release theatrical films in the United States could profitably increase its prices by at least a small but significant and non-transitory amount.

### B.    Distribution of Anticipated Top-Grossing Theatrical Films in the United States

### a.    Product Market

51.    Within the market for the distribution of wide-release theatrical films, a separate market exists for the distribution of anticipated top-grossing theatrical films. They are different from other films, as reflected in their distinct industry recognition, peculiar characteristics, pricing terms, other practical indicia, and the hypothetical monopolist test.

52.    The industry routinely distinguishes between anticipated top-grossing theatrical films and other films. Film distributors, theatres, trade publications, financial analysts, and Defendants all refer to anticipated top-grossing theatrical films, using similar terms such as

COMPLAINT    14    Case No.: 4:26-cv-7116

anticipated "blockbusters," "event films," or "tentpoles."  For example, ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Warner Bros. identifies a target number of "tentpole" films to produce each year, separate from other films it plans to produce. Defendants refer to "tentpole" motion pictures when communicating with their investors.

53.     Anticipated top-grossing theatrical films often have at least one of the following characteristics reflecting the industry's greater confidence in their box office performance relative to that of other films: (1) they have larger budgets; (2) they feature major intellectual property or well-known writers, directors, or actors; (3) they have event-level marketing campaigns, including mandatory placement in premium-format auditoriums, such as IMAX, 4DX, and ScreenX; and (4) unlike targeted releases designed for a specific demographic, they are engineered to attract audiences across all major demographics.

54.     Courts have repeatedly endorsed similar markets based on similar indicia. *See Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994–95 (9th Cir. 1986) (affirming a market for "anticipated top-grossing motion pictures" based on similar indicia, including "famous stars, directors and producers, booking in first class theatres, and lucrative terms offered for the pictures by exhibitors"); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 32–33 (D.D.C. 2022) (collecting cases and crediting the Ninth Circuit's analysis in *Syufy*, finding a relevant market for "anticipated top-selling books").

55.     The industry's confidence that anticipated top-grossing theatrical films will generate substantial box office revenue means that they command different price and distribution terms than other films.  Film distributors typically receive significantly higher splits of box office revenue for anticipated top-grossing theatrical films than for other releases.  Anticipated top-grossing theatrical films are more likely to command mandatory placement in premium-format auditoriums than other releases.  Anticipated top-grossing theatrical films tend to have longer guaranteed booking periods than other releases.

56.     Defendants themselves recognize the distinctive importance of anticipated top-grossing theatrical films and their value to theatres. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████████████████████████████

████

57.     Because theatrical films opening in at least 3,000 theatres account for nearly all top-grossing films, this threshold serves as a useful analytical tool for calculating shares in the relevant market.  Over the past four years, every film that has earned at least $100 million in box office revenue has been initially released in at least 3,000 theatres.  These films accounted for 88 percent of box office revenue for films released over the past four years.  After the merger, Defendants will control more than 30 percent of these films, and four studios (Defendants, Disney, Universal, and Sony) will control 93 percent of them, as measured by box office revenue.  ███████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

58.     Anticipated top-grossing theatrical films are essential to the financial viability of theatres.  They represent a small subset of releases, but they generate a disproportionate share of box office revenue.  Of all theatrical films released between 2022 and 2025, theatrical films released in over 3,000 theatres comprised 15 percent of releases by title count, but they generated 88 percent of total domestic box office revenue.  While films that are not anticipated to become top-grossing theatrical films can and do at times succeed at the box office, their success is significantly less predictable and theatres cannot rely on those movies to consistently fill seats.

59.     Theatres would not substitute alternatives in a sufficient amount to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of all distribution of anticipated top-grossing theatrical films.  Films that are expected to have less broad appeal and generate lower box office revenues and are therefore distributed less widely are not a substitute for anticipated top-grossing theatrical films like *Top Gun: Maverick* and *Barbie*.  Therefore, a hypothetical monopolist over all distribution of anticipated top-grossing theatrical films could profitably increase its prices by at least a small but significant and non-transitory amount.

### b.     Geographic Market

60.     The United States is a relevant geographic market for assessing the proposed merger's effect on the distribution of anticipated top-grossing theatrical films.  Film distributors

negotiate separate distribution agreements for domestic versus international territories.  Box office revenue, marketing campaigns, release dates, and distribution strategies are tracked and managed separately for domestic and international markets.  Consumer demand for anticipated top-grossing theatrical films depends on domestic audience preferences, which differ from international markets based on cultural preferences, language, and local competition.  Theatres cannot reasonably substitute distribution of anticipated top-grossing theatrical films outside the United States, given that the theatres and their audiences are located in the United States.

61.    Not enough theatres would substitute alternatives outside the United States to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of all distribution of anticipated top-grossing theatrical films in the United States.  Therefore, a hypothetical monopolist over all distribution of anticipated top-grossing theatrical films in the United States could profitably increase its prices by at least a small but significant and non-transitory amount.

**C.    Licensing of Basic Cable Channels to Distributors in the United States**

**a.    Product Market**

62.    Basic cable channels offer scheduled, real-time programming distributed through cable networks.  They require a cable, fiber, satellite, or equivalent internet-based subscription service.  They are not available over-the-air or as standalone direct-to-consumer services.

63.    Companies that distribute basic cable channels include cable companies, satellite television providers, and internet-based services that stream live television programming.  These firms aggregate basic cable channels into packages they sell to subscribers.  They pay programmers, such as Defendants, monthly per-subscriber affiliate fees to carry their basic cable channels.

64.    Basic cable channels are distinct from premium cable channels, broadcast channels, regional sports networks, and streaming services:

  a. *Premium cable channels* (HBO, Showtime, and Starz) are offerings that supplement, but do not replace, basic cable channels.  Distributors market premium channels to consumers as optional add-ons or as part of a "premium" cable package that already includes basic cable channels.  Distributors cannot

COMPLAINT                                    17                          Case No.: 4:26-cv-7116

reasonably offer a "premium channels-only" package. ████████████ ████████████████████████ To the extent consumers want only premium channels, they can already subscribe directly through direct-to-consumer streaming services.

b. *Broadcast channels* (CBS, NBC, ABC, Fox) are acquired by distributors, typically through retransmission consent negotiations governed by a distinct statutory framework with no analog in basic cable carriage. Unlike basic cable channels, broadcast channels hold FCC licenses and are subject to specific FCC rules. Consistent with the distinct local programming they offer, broadcast channels also distribute through local affiliate stations, requiring distributors to negotiate carriage with multiple broadcast stations, broadcast station groups, and national broadcast networks that own and operate local broadcast stations, rather than through a single national agreement.

c. *Regional sports networks* (NBC Sports California, NESN) carry geographically limited content—primarily local sports—that generally has significant value only to subscribers in the specific markets those teams serve. Distributors can add regional sports networks to their video programming packages, but they cannot offer regional sports networks to consumers on a standalone basis in lieu of nationally broadcast basic cable channels, given the significant difference in content.

d. *Streaming services* (Netflix, Disney+, Prime Video, and Apple TV) are direct-to-consumer subscription services that do not sell linear network feeds to distributors for redistribution. While some distributors can bundle streaming services with their video programming packages as promotional benefits for consumers, distributors cannot offer a "streaming service" package to consumers. ████████████████████████ Consumers who want only streaming services can subscribe directly.

65. Distributors cannot reasonably substitute any of these alternatives for basic cable

COMPLAINT                                        18                          Case No.: 4:26-cv-7116

channels.  Distributors depend on basic cable channel licenses to offer a broad range of scheduled, linear programming necessary to attract and retain subscribers.  Consumers subscribe to cable and satellite service in part to access basic cable channels offering news (CNN, MSNBC, Fox News), sports (ESPN, TNT, FS1), children's programming (Nickelodeon, Cartoon Network, Disney Channel), lifestyle content (HGTV, Food Network, TLC), and general entertainment (TBS, MTV, Comedy Central).

66.     Distributors would not substitute other content in a sufficient amount to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of licensing of basic cable channels.  Therefore, a hypothetical monopolist over all licensing of basic cable channels could profitably increase its prices by at least a small but significant and non-transitory amount.

### b.     Geographic Market

67.     The United States is a relevant geographic market for assessing the proposed merger's effect on the licensing of basic cable channels.  Basic cable programming is negotiated and distributed on a national basis.  The distributors' carriage agreements with programmers are limited to distribution only in the United States, meaning distributors are prohibited from distributing content outside the United States, and distributors outside the United States cannot distribute programming in the United States.  Distributors cannot reasonably replace national programming with programming from outside the United States, given differences in cultural preferences, language, and local competition.

68.     Distributors would not substitute licensing of basic cable channels outside the United States in a sufficient amount to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of licensing of basic cable channels in the United States. Therefore, a hypothetical monopolist over all licensing of basic cable channels in the United States could profitably increase its prices by at least a small but significant and non-transitory amount.

## V.     THE PROPOSED MERGER WILL LIKELY HARM COMPETITION

### A.     The Proposed Merger Is Presumptively Anticompetitive

69.     The Supreme Court has held that mergers that significantly increase concentration

COMPLAINT                                    19                              Case No.: 4:26-cv-7116

in a concentrated market are presumptively anticompetitive and therefore presumptively unlawful. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI").  HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.  Mergers that increase the HHI by more than 100 and result in an HHI above 1,800 in any relevant market are presumed to be anticompetitive.  *See* Fed. Trade Comm'n & U.S. Dep't of Justice, *Merger Guidelines* § 2.1 (2023); *In re Nexstar-Tegna Merger Litig.*, No. 2:26-cv-976-TLN-CKD, 2026 WL 1049295, at *15 (E.D. Cal. Apr. 17, 2026); *Fed. Trade Comm'n v. Kroger Co.*, No. 3:24-cv-347-AN, 2024 WL 5053016, at *16 (D. Or. Dec. 10, 2024); *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 382 (S.D.N.Y. 2024); *Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 412 & n.3 (S.D.N.Y. 2024).

70.    A merger need only harm competition in one market to be condemned as unlawful and enjoined.  15 U.S.C. § 18 (prohibiting any merger whose effect "may be substantially to lessen competition" in "any line of commerce").  This proposed merger is presumptively anticompetitive, and therefore presumptively unlawful, in at least *three* markets.

71.    In the market for the distribution of wide-release theatrical films in the United States, the proposed merger would increase the HHI by 359 and result in an HHI of 2,074.  This increase in concentration is more than three times that required to create a presumption of illegality.  After the merger, the combined company will possess a share of this market exceeding 27 percent.[1]

72.    In the market for distribution of anticipated top-grossing theatrical films in the United States, the proposed merger would increase the HHI by 445 and result in an HHI of 2,427.  This increase in concentration is more than four times that required to create a presumption of illegality.  After the merger, the combined company will possess a share of this market exceeding

---

[1] Calculations are based on box office revenue for theatrical films over the last four calendar years (2022–2025) released in 600 theatres or more within the first four weekends following the film's release date.

30 percent.[2]

73.    In the market for the licensing of basic cable channels in the United States, the proposed merger would increase the HHI by 321 and result in an HHI of 2,007.[3]  This increase in concentration is more than three times that required to create a presumption of illegality.  After the merger, the combined company will possess a share of this market exceeding 27 percent as measured by total affiliate fees.  In the alternative, as measured by viewership, the combined company will possess a market share of 34 percent.

**B.    The Proposed Merger Will Likely Harm Competition in Both Theatrical Film Distribution Markets**

74.    The proposed merger will likely substantially harm competition in the markets for the distribution of wide-release theatrical films and the distribution of anticipated top-grossing theatrical films, both relevant theatrical film markets.  This harm to competition is likely to increase the bargaining leverage of film distributors over theatres, reduce aggregate output of creative and distinctive theatrical films, and facilitate coordination among remaining film distributors.  The likely effects are higher prices, lower quality, reduced output, and diminished choice throughout the United States, including in Plaintiff States.

**a.    Worse Terms for Theatres**

75.    Paramount and Warner Bros. compete to distribute creative and distinctive theatrical films.  They bargain with theatres over a range of pricing and other terms.  They negotiate to split box office revenues between the film distributor and the theatre.  They negotiate the minimum prices theatres can charge for a ticket.  They negotiate caps on discounts and complimentary tickets.  And they negotiate to secure for their films the most desirable release dates and screens.

76.    The competitiveness of these markets is essential to theatres' financial health.  Competitive revenue splits ensure theatres can afford the improvements needed to attract and serve

---

[2] Calculations are based on box office revenue for theatrical films over the last four calendar years (2022–2025) released in 3,000 theatres or more within the first four weekends following the film's release date.

[3] Calculations are based on total affiliate fees during the last calendar year (2025), as reported by S&P Global.

theatergoers, such as premium screens, luxury seating, and enhanced concessions. Flexibility in discounting and complimentary tickets gives theatres financial incentives with which to attract theatergoers. And less onerous restrictions on film placement give theatres flexibility to maximize ticket sales by displaying the very best films that are in high demand, rather than having to bow to the scheduling requirements of film distributors.

77.     The merger will end this competition. As a result, theatres will likely face worse revenue splits, higher minimum ticket prices, less flexibility to discount and offer complimentary tickets, and less freedom to allocate screens to the most in-demand films. For some theatres, a worsening of terms or a decrease in output can fundamentally endanger their financial viability.

### b.     Reduced Output

78.     Today, Paramount and Warner Bros. compete to secure placement of their films during key windows throughout the year. Paramount is incentivized to invest in high-quality content and to release a steady stream of films throughout the year, even into windows when Warner Bros.' films are playing, and vice versa. By doing so, each can win sales from the other.

79.     The merger will eliminate this competition. The merger will place Paramount's and Warner Bros.' films under common ownership. The combined company will then avoid competitive pressure to release films into windows already occupied by its own titles, as doing so would "cannibalize" its own sales. As a result, the combined company will have less incentive to create and market new theatrical films, as this could cannibalize its own sales. █████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

80.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

81.     Audiences have seen this movie before. In 2019, Disney acquired 20th Century Fox, then one of six major Hollywood film distributors. Before the acquisition, 20th Century Fox had

been distributing 12 to 17 new theatrical releases per year.  On his first earnings call after closing, Disney's then-CEO announced that Disney would slash 20th Century Fox's theatrical slate by more than half to "5 or 6 films a year."  Disney's then-Chief Financial Officer confirmed that the merger would lead to "a reduction in output."  These plans predated the COVID pandemic.

82.    True to its word, Disney cut the combined theatrical output of the merged company by more than half after the acquisition.  From 2015 to 2018, the four-year period before Disney acquired Fox, the companies together distributed 112 wide-release theatrical films.  From 2022 to 2025, the combined company distributed only 54 wide-release theatrical films.[4]  A slow recovery from the COVID pandemic does not explain this decline: output from Disney/Fox decreased by 52 percent while the total output from the other major distributors decreased by only 13 percent during the same period.  Following closing, Disney terminated more than 4,000 Fox employees.

### c.    Coordinated Effects

83.    The proposed merger will likely facilitate coordination among the remaining film distributors.  The markets for theatrical film distribution will be vulnerable to coordination due to high levels of concentration.  Four distributors would control approximately 86 percent of wide-release theatrical films by box office revenue.  The market for anticipated top-grossing theatrical films would be even more highly concentrated, with four distributors controlling more than 93 percent of the market.

84.    The markets for theatrical film distribution are susceptible to coordination for other reasons, too.  Release date scheduling is transparent, as film distributors publicly announce release dates months or years in advance.  ███████████████ ████████████████████████████████ Deviations from coordinated behavior are easily detected:  A film distributor that unexpectedly moves an anticipated top-grossing theatrical film into a competitor's release window is immediately visible to all market participants.

85.    Reducing the number of major film distributors from five to four will materially

---

[4] Due to the impact of the COVID pandemic, this analysis omits the years 2020 to 2021.

increase the risk of coordination.  With fewer independent distributors, each film distributor can more easily observe and predict competitors' behavior.  The merger removes one of the distributors whose independent release decisions currently make anticompetitive coordination more difficult.  Eliminating that source of independent competitive decision-making reduces the competitive pressure that drives distributors to release films in crowded windows, fill underserved periods, and compete aggressively for screens and audiences.  As a result, theatres will likely face reduced output and higher prices.

**C.      The Proposed Merger Will Likely Harm Competition in the Market for Licensing of Basic Cable Channels**

86.      The proposed merger will eliminate competition between Warner Bros. and Paramount, the nation's second- and third-largest owners of basic cable channels.  The likely effects include higher fees throughout the United States, including in Plaintiff States, as well as reduced investment in content.

**a.      Higher Fees**

87.      Today, Paramount and Warner Bros. compete to market their basic cable channels to distributors.  Distributors negotiate separately with Paramount, Warner Bros., and other programmers for the rights to distribute basic cable channels to their subscribers.  If a programmer and distributor cannot agree on terms before an existing agreement expires, the distributor may face a blackout, during which time its subscribers will not be able to access that programmer's basic cable channels.

88.      The threat of a blackout is not theoretical.  During the Disney-Charter dispute of 2023, for example, Disney-owned channels went dark for Charter customers until the parties reached an agreement.  In 2025, Disney similarly imposed a blackout on YouTube TV when the parties failed to reach an agreement.  Disney removed all its channels, including ESPN, ABC, NatGeo, FX, Freeform, SEC Network, and ACC Network, from the platform for two weeks until the dispute was resolved.

89.      Following the merger, the combined company will control more than a quarter of all major basic cable channels in the United States by revenue.  Its programming will span every

COMPLAINT                                      24                              Case No.: 4:26-cv-7116

genre: news, sports, general entertainment, kids and family, film, and lifestyle. No other programmer will control a network with similar breadth.

90. The scale and breadth of the combined company's programming will substantially enhance its bargaining leverage over distributors. A distributor who rejects the combined company's fee demands would risk losing, for example, CNN for news viewers, Nickelodeon and Cartoon Network for family households, HGTV and Food Network for lifestyle audiences, and TNT and TBS for sports and entertainment viewers. Faced with this threat, distributors would likely be forced to accept higher fees to distribute basic cable channels than they would absent the proposed merger. Those higher fees will likely be passed on to their subscribers in the form of higher monthly bills.

### b. Reduced Content Investment

91. Content is king in this industry. Paramount and Warner Bros. today invest heavily in buying and developing in-demand content and do so in competition with each other. Last year alone, Paramount and Warner Bros. each invested billions in basic cable programming.

92. Following the merger, the combined company will likely reduce its investments in basic cable channels. In a competitive market, a programmer who reduced content quality would risk losing carriage to competing programmers offering better value. The proposed merger would weaken that competitive constraint by conferring on the combined company extraordinary bargaining leverage, even as its content investment declines.

93. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

94. As a result, viewers who subscribe to cable and satellite services to access the

combined company's basic cable channels will likely receive less original programming, fewer series, and access to less variety and fewer viewpoints, even as they pay higher fees.

## VI.    NO COUNTERVAILING FACTORS

### A.    Entry and Expansion by Existing Competitors Will Not Prevent Harm

#### a.    Distribution of Wide-Release Theatrical Films

95.    New entry and expansion or repositioning by existing competitors in the distribution of wide-release theatrical films in the United States would not be timely, likely, or sufficient to prevent or remedy the proposed merger's harms to competition.  Executing a wide release across hundreds of theatres simultaneously requires negotiated agreements with exhibitor chains, coordination of screen allocation and revenue sharing across markets, and marketing infrastructure to support release campaigns timed to opening weekends.  Executing a wide release also requires the financial wherewithal to absorb the impact of a film's high marketing and labor expenditures even if it underperforms at the box office.

96.    These barriers are compounded by the vertical integration of production and distribution among the five major film distributors.  The five majors produce much of the content they distribute, drawing on proprietary franchise intellectual property and an established production infrastructure.  A new entrant or existing competitor seeking to expand would need to obtain a slate of high-quality content to compete effectively, but incumbent film distributors may not be willing to provide content to a competitor on competitive terms.  A new entrant would struggle to realistically develop its own production capabilities at scale, even with a substantial investment of time and capital.

#### b.    Distribution of Anticipated Top-Grossing Theatrical Films

97.    New entry and expansion or repositioning by existing competitors in the distribution of anticipated top-grossing theatrical films in the United States would not be timely, likely, or sufficient to prevent or remedy the proposed merger's harm to competition.  In addition to those capabilities required for the wide release of any film, producing anticipated top-grossing theatrical films typically requires specialized large-scale visual-effects, sound stage, and physical-production resources at the volume necessary to support a sustained slate.  Anticipated top-grossing theatrical

films typically require ownership of intellectual property capable of generating lucrative film series and sustained audience interest across multiple releases.  Original intellectual property requires years of development and multiple successful releases before establishing franchise value, a timeline that exceeds any relevant entry horizon.

98.     The economics of production of anticipated top-grossing theatrical films also often depend on ancillary revenue streams that new entrants are unlikely to build at sufficient scale in a timely manner.  Major studios typically do not underwrite the production and marketing budgets that anticipated top-grossing theatrical films require based on domestic box office alone.  Anticipated top-grossing theatrical films often generate substantial additional revenue through international theatrical distribution, consumer products licensing, theme park attractions, or merchandise.  Capturing these revenues requires international distribution relationships spanning dozens of territories and consumer products licensing infrastructure built over decades.  A new entrant without these capabilities would capture only a fraction of the ancillary revenue that often underwrites these economics, making the investment case for the production of anticipated top-grossing theatrical films more challenging.

### c.     Licensing of Basic Cable Channels to Distributors

99.     New entry and expansion or repositioning by existing competitors in the licensing of basic cable channels in the United States would not be timely, likely, or sufficient to prevent or remedy the proposed merger's harm to competition.

100.     New entrants face two threshold barriers to entry: content and carriage.  A basic cable channel must have content viewers desire, and it must reach viewers by entering carriage agreements with cable and satellite television providers (and equivalent internet-based services), who distribute that content to viewers.  Distributors require basic cable channels to offer a portfolio of channels to justify inclusion in an already crowded channel lineup.  A new entrant seeking carriage must therefore acquire in-demand content and launch multiple channels simultaneously—each requiring substantial investment in content, brand development, and audience building—simply to enter the carriage agreements that are the prerequisite for any revenue.

101.     A basic cable channel must acquire content viewers want to watch so that

distributors are willing to pay fees to carry it. Sports rights are especially in demand, and competition between programmers to win these rights is fierce. A new basic cable channel would need to acquire sufficiently sought-after content to persuade distributors to carry its channel.

102. Launching a portfolio of channels demands a substantial and sustained content investment to build audience and brand recognition. The major basic cable channels have established their identities and audiences over decades. New entrants cannot re-create channels such as TBS (launched 1976), Nickelodeon (1979), CNN (1980), MTV (1981), TNT (1988), or Comedy Central (1991) within a reasonable time frame, even with a large deployment of capital.

103. Even if a new entrant could assemble a portfolio sufficient to attract adequate carriage, it would need to overcome the bundling leverage of incumbents. The major cable programmers—including Defendants—negotiate carriage for their entire portfolio of channels as a package, using the leverage of their most-watched channels to obtain favorable terms for their least-watched channels. A new entrant with no established channels could not replicate this leverage and would face content fees and carriage terms that make profitable operation difficult.

**B.    No Merger-Specific Efficiencies Outweigh the Harms to Competition**

104. The proposed acquisition will not result in verifiable, merger-specific efficiencies in the relevant markets sufficient to outweigh the proposed merger's likely harms to competition. Many of Defendants' purported efficiencies are, in fact, harms to competition. For example, ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ they come at the cost of valuable new content that theatres, distributors, and millions of Americans enjoy.

105. These content reductions also threaten the livelihoods of tens of thousands of workers across the production ecosystem—the writers, actors, directors, crews, and craftspeople who make this content, a significant portion of whom reside in Plaintiff States. Previous mergers in the entertainment industry have led to thousands of job losses, and Defendants admit they intend to "combine duplicative back-office functions, such as finance, legal, human resources, and corporate communications at the parent-company level." The harms suffered by displaced workers extend beyond immediate unemployment: lost opportunities for career advancement, the erosion

of vital industry relationships, and the upheaval of involuntary career transitions. Creative content that goes unproduced as a result of these disruptions is permanently lost.

106. Defendants' purported efficiencies are not cognizable for other reasons too. They are not verifiable. Defendants have not proven that cost savings, if any, would be shared by customers, rather than pocketed by Defendants. Many of the purported efficiencies do not relate to the relevant markets and, thus, cannot be credited to offset the harms to competition in those markets. *See Phila. Nat'l Bank*, 374 U.S. at 370 ("anticompetitive effects in one market [cannot] be justified by procompetitive consequences in another"). Other purported efficiencies are not merger-specific, as Defendants can achieve them even absent the proposed merger through standalone growth, or through less anticompetitive collaborations that do not fully eliminate competition between Defendants.

**C.    Unenforceable Promises from Executives Cannot Be Credited**

107. On March 22, 2026, Defendants publicly committed to release "at least 30 films annually." Defendants' commitment, made under threat of antitrust investigation, does nothing to prevent the likely harms to competition. First, the commitment fails to address the harms to competition in basic cable programming. Second, the commitment is not legally enforceable. Third, the commitment is not credible, given Defendants' failure to keep prior commitments. In April 2023, Warner Bros.' CEO publicly committed to create 16 theatrical films in 2023 and "more than 20" in 2024. In the end, Warner Bros. released only 11 in 2023 and 9 in 2024. Fourth, this proposal is inconsistent with Defendants' economic incentives and their obligations to maximize profits for the benefit of their shareholders. Fifth, ███████████████████████████████ ███████████████████████████████████████████████ Sixth, even if Defendants keep their commitment, it would still permit Defendants to harm competition by reducing investment and innovation, degrading quality, and raising the price of those 30 films they produce. Theatres, distributors, and the viewing public should not be forced to rely on Defendants' empty commitments to protect them from the effects of an unlawful merger. They are better served if Paramount and Warner Bros. continue to compete for their business.

## VII.   VIOLATION ALLEGED

108.   Plaintiff States allege and incorporate paragraphs 1 through 107 as if set forth fully herein.

109.   Unless enjoined, Paramount's proposed acquisition of Warner Bros. will likely substantially harm competition in each of the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

110.   Among other things, the proposed acquisition would:

    a.   Eliminate present and future competition between Paramount and Warner Bros.;

    b.   Likely cause prices in the relevant markets to be higher than they would be otherwise; and

    c.   Likely reduce output, quality, innovation, and choice.

## VIII.   RELIEF REQUESTED

111.   Plaintiff States respectfully request that this Court:

    a.   adjudge Paramount's proposed acquisition of Warner Bros. to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b.   permanently enjoin Paramount's proposed acquisition of Warner Bros. and the entry into or carrying out of any other transaction by which control of the assets or businesses of Paramount and Warner Bros. would be combined;

    c.   award Plaintiff States their costs of this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 26; and

    d.   grant Plaintiff States such other relief as the Court deems just and proper.

Dated:  July 13, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Daniel Ambar*

PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
DANIEL D. AMBAR (SBN 278853)
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6153
  Fax: (916) 731-3637
  Email: Daniel.Ambar@doj.ca.gov


RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*
forthcoming)
ADAM DI VINCENZO (*pro hac vice* forthcoming)
GRANT BERMANN (*pro hac vice* forthcoming)
ANASTASIA PASTAN (*pro hac vice* forthcoming)
JULIA MAY (*pro hac vice* forthcoming)
ALLISON CHESKY (*pro hac vice* forthcoming)
MILBANK LLP
  1101 New York Ave. NW
  Washington, DC 20005
  Telephone: (202) 835-7525
  Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice* forthcoming)
MILBANK LLP
  55 Hudson Yards
  New York, NY 10001
  Telephone: (212) 530-5871
  Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California*

COMPLAINT

31

Case No.: 4:26-cv-7116

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice* forthcoming)
Unit Chief Counsel
SARAH PELTON (*pro hac vice* forthcoming)
ALLISON WEBER (*pro hac vice* forthcoming)
Assistant Attorneys General
  2005 N. Central Avenue
  Phoenix, AZ 85004
  Telephone: (602) 542-3725
  Fax: (602) 542-4377
  Email: consumer@azag.gov

*Attorneys for Plaintiff State of Arizona*


FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice* forthcoming)
Assistant Attorney General
  1300 Broadway, 10th Floor
  Denver, CO 80203
  Telephone: (720) 508-6000
  Email: Bryn.Williams@coag.gov
          Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

COMPLAINT                          32                          Case No.: 4:26-cv-7116

FOR PLAINTIFF STATE OF
CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice* forthcoming)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice*
forthcoming)
FRANKLIN KANIN (*pro hac vice* forthcoming)
Assistant Attorneys General
  Office of the Connecticut Attorney General
  165 Capitol Avenue
  Hartford, CT 06106
  Telephone: (860) 808-5030
  Email: Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*


FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Anthony W. Mariano*

ANTHONY W. MARIANO (*pro hac vice*
forthcoming)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*
forthcoming)
Assistant Attorney General, Antitrust
Division
  Office of the Massachusetts Attorney
  General
  One Ashburton Place, 18th Floor
  Boston, MA 02108
  Telephone: (781) 835-7990
  Email: Anthony.Mariano@mass.gov
         William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of
Massachusetts*

| COMPLAINT | 33 | Case No.: 4:26-cv-7116 |

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jon M. Woodruff*

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice* forthcoming)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice* forthcoming)
Assistant Attorney General
  445 Minnesota Street, Suite 600
  Saint Paul, MN 55101-2130
  Telephone: (651) 300-7425
  Fax: (651) 296-9663
  Email: Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

ERNEST D. FIGUEROA (*pro hac vice* forthcoming)
Consumer Advocate

*/s/ Samantha B. Feeley*

SAMANTHA B. FEELEY (*pro hac vice* forthcoming)
Senior Deputy Attorney General
  Office of the Nevada Attorney General
  100 N. Carson St.
  Carson City, NV 89701
  Telephone: (775) 684-1100
  Email: sfeeley@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

COMPLAINT            34            Case No.: 4:26-cv-7116

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

*/s/ Ana Atta-Alla*

ANA ATTA-ALLA (*pro hac vice* forthcoming)
Deputy Attorney General
  State of New Jersey
  Office of the Attorney General
  Division of Law
  124 Halsey Street – 5th Floor
  Newark, NJ 07102
  Telephone: (973) 648-6835
  Email: Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*


FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Amanda Butler*

AMANDA BUTLER (*pro hac vice* forthcoming)
Senior Counsel
KALISTA M. WILSON (*pro hac vice* forthcoming)
Assistant Attorney General
  408 Galisteo St.
  Santa Fe, NM 87501
  Telephone: (505) 490-4060
  Fax: (505) 318-1050
  Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

COMPLAINT

35

Case No.: 4:26-cv-7116

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

*/s/ Elinor R. Hoffman*

ELINOR R. HOFFMAN (*pro hac vice* forthcoming)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice* forthcoming)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice* forthcoming)
MORGAN FEDER (*pro hac vice* forthcoming)
C. WILLIAM MARGRABE (*pro hac vice* forthcoming)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice* forthcoming)
Attorney General Fellow
  New York State Office of the Attorney General
  28 Liberty Street
  New York, NY 10005
  Telephone: (212) 416-8269
  Email: Elinor.Hoffman@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

/s/ Ian Van Loh

TIMOTHY D. SMITH (*pro hac vice* forthcoming)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice* forthcoming)
Senior Assistant Attorneys General
Economic Justice Section
  Oregon Department of Justice
  100 SW Market St.
  Portland, OR 97201
  Telephone: (503) 798-3297
  Telephone: (971) 239-7457
  Telephone: (503) 428-9482
  Email: tim.smith@doj.oregon.gov
  Email: ian.vanloh@doj.oregon.gov
  Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

/s/ Christina M. Black

JONATHAN A. MARK (*pro hac vice* forthcoming)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice* forthcoming)
Assistant Attorneys General
  800 Fifth Avenue, Suite 2000
  Seattle, WA 98104-3188
  Telephone: (206) 464-7744
  Fax: (206) 464-6451
  Email: Jonathan.Mark@atg.wa.gov
          Christina.Black@atg.wa.gov
          Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

COMPLAINT                    37                    Case No.: 4:26-cv-7116

## FILER'S ATTESTATION

I, Daniel Ambar, am the ECF User whose ID and password are being used to file this Complaint.  In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: */s/ Daniel Ambar*
Daniel Ambar