# EXHIBIT G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR** ☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 001-34177**

WARNER BROS. DISCOVERY

**Warner Bros. Discovery, Inc.**
**(Exact name of Registrant as specified in its charter)**

| | |
|---|---|
| **Delaware**<br>**(State or other jurisdiction of incorporation or organization)** | **35-2333914**<br>**(I.R.S. Employer Identification No.)** |
| **230 Park Avenue South**<br>**New York, New York**<br>**(Address of principal executive offices)** | **10003**<br>**(Zip Code)** |

**(212) 548-5555**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbols | Name of Each Exchange on Which Registered |
|---|---|---|
| Series A Common Stock | WBD | The Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of voting and non-voting common stock held by non-affiliates of the Registrant computed by reference to the last sales price of such stock, as of the last business day of the Registrant's most recently completed second fiscal quarter, which was June 30, 2022, was approximately $32 billion.

Total number of shares outstanding of each class of the Registrant's common stock as of February 9, 2023 was:

| | |
|---|---|
| Series A Common Stock, par value $0.01 per share | 2,430,029,982 |

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required in Item 10 through Item 14 of Part III of this Annual Report on Form 10-K is incorporated herein by reference to the Registrant's definitive Proxy Statement for its 2023 Annual Meeting of Stockholders, which shall be filed with the Securities and Exchange Commission pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended.

**WARNER BROS. DISCOVERY, INC.**
**FORM 10-K**
**TABLE OF CONTENTS**


| | Page |
|---|---|
| **PART I** | |
| ITEM 1. Business. | 5 |
| ITEM 1A. Risk Factors. | 13 |
| ITEM 1B. Unresolved Staff Comments. | 27 |
| ITEM 2. Properties. | 27 |
| ITEM 3. Legal Proceedings. | 28 |
| ITEM 4. Mine Safety Disclosures. | 29 |
| **PART II** | |
| ITEM 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 31 |
| ITEM 6. [Reserved.] | 32 |
| ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations. | 33 |
| ITEM 7A. Quantitative and Qualitative Disclosures about Market Risk. | 54 |
| ITEM 8. Financial Statements and Supplementary Data. | 57 |
| ITEM 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure. | 124 |
| ITEM 9A. Controls and Procedures. | 124 |
| ITEM 9B. Other Information. | 124 |
| ITEM 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections. | 124 |
| **PART III** | |
| ITEM 10. Directors, Executive Officers and Corporate Governance. | 125 |
| ITEM 11. Executive Compensation. | 125 |
| ITEM 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 125 |
| ITEM 13. Certain Relationships and Related Transactions, and Director Independence. | 125 |
| ITEM 14. Principal Accountant Fees and Services. | 125 |
| **PART IV** | |
| ITEM 15. Exhibits and Financial Statement Schedules. | 126 |
| ITEM 16. Form 10-K Summary. | 135 |
| **SIGNATURES** | 136 |

**PART I**

**CAUTIONARY NOTE CONCERNING FORWARD-LOOKING STATEMENTS**

Certain statements in this Annual Report on Form 10-K constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements regarding our business, marketing and operating strategies, integration of acquired businesses, new service offerings, financial prospects and anticipated sources and uses of capital. Words such as "anticipate," "assume," "believe," "continue," "estimate," "expect," "forecast," "future," "intend," "plan," "potential," "predict," "project," "strategy," "target" and similar terms, and future or conditional tense verbs like "could," "may," "might," "should," "will" and "would," among other terms of similar substance used in connection with any discussion of future operating or financial performance identify forward-looking statements. Where, in any forward-looking statement, we express an expectation or belief as to future results or events, such expectation or belief is expressed in good faith and believed to have a reasonable basis, but there can be no assurance that the expectation or belief will result or be accomplished. The following is a list of some, but not all, of the factors that could cause actual results or events to differ materially from those anticipated:

- potential unknown liabilities, adverse consequences or unforeseen increased expenses associated with the WarnerMedia Business or our efforts to integrate the WarnerMedia Business;
- inherent uncertainties involved in the estimates and assumptions used in the preparation of financial forecasts;
- our level of debt, including the significant indebtedness incurred in connection with the acquisition of the WarnerMedia Business, and our future compliance with debt covenants;
- more intense competitive pressure from existing or new competitors in the industries in which we operate;
- reduced spending on domestic and foreign television advertising, due to macroeconomic trends, industry trends or unexpected reductions in our number of subscribers;
- industry trends, including the timing of, and spending on, sports programming, feature film, television and television commercial production;
- market demand for foreign first-run and existing content libraries;
- negative publicity or damage to our brands, reputation or talent;
- uncertainties associated with product and service development and market acceptance, including the development and provision of programming for new television and telecommunications technologies, and the success of our HBO Max and discovery+ streaming products;
- realizing direct-to-consumer subscriber goals;
- general economic and business conditions, including the impact of the ongoing COVID-19 pandemic, fluctuations in foreign currency exchange rates, and political unrest in the international markets in which we operate;
- the possibility or duration of an industry-wide strike, player lock-outs or other job action affecting a major entertainment industry union, athletes or others involved in the development and production of our sports programming, television programming, feature films and interactive entertainment (e.g., games) who are covered by collective bargaining agreements;
- disagreements with our distributors or other business partners;
- continued consolidation of distribution customers and production studios;
- theft of our content and unauthorized duplication, distribution and exhibition of such content;
- threatened or actual cyber-attacks and cybersecurity breaches; and
- changes in, or failure or inability to comply with, laws and government regulations, including, without limitation, regulations of the Federal Communications Commission and similar authorities internationally and data privacy regulations and adverse outcomes from regulatory proceedings.

Forward-looking statements are subject to various risks and uncertainties which change over time, are based on management's expectations and assumptions at the time the statements are made and are not guarantees of future results.

These risks have the potential to impact the recoverability of the assets recorded on our balance sheets, including goodwill or other intangibles. Additionally, many of these risks are amplified by and may, in the future, continue to be amplified by the prolonged impact of the COVID-19 pandemic. Management's expectations and assumptions, and the continued validity of any forward-looking statements we make, cannot be foreseen with certainty and are subject to change due to a broad range of factors affecting the U.S. and global economies and regulatory environment, factors specific to Warner Bros. Discovery and other factors described below under Item 1A, "Risk Factors" and elsewhere in this Annual Report on Form 10-K, including under Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Actual outcomes and results may differ materially from what is expressed in our forward-looking statements and from our historical financial results due to the factors discussed in this section and elsewhere in this Annual Report on Form 10-K or disclosed in our other SEC filings. These forward-looking statements and such risks, uncertainties, and other factors speak only as of the date of this Annual Report on Form 10-K, and we expressly disclaim any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein, to reflect any change in our expectations with regard thereto, or any other change in events, conditions or circumstances on which any such statement is based.

**ITEM 1. Business.**

For convenience, the terms "Warner Bros. Discovery", "WBD", the "Company," "we," "us" or "our" are used in this Annual Report on Form 10-K to refer to both Warner Bros. Discovery, Inc. and collectively to Warner Bros. Discovery, Inc. and one or more of its consolidated subsidiaries, unless the context otherwise requires.

***Merger with the WarnerMedia Business of AT&T***

On April 8, 2022 (the "Closing Date"), Discovery, Inc. ("Discovery") completed its merger (the "Merger") with the WarnerMedia business (the "WarnerMedia Business", "WM Business" or "WM") of AT&T Inc. ("AT&T") and changed its name to Warner Bros. Discovery, Inc. On April 11, 2022, the Company's shares started trading on the Nasdaq Global Select Market ("Nasdaq") under the trading symbol WBD.

The Merger was executed through a Reverse Morris Trust type transaction, under which WM was distributed to AT&T's shareholders via a pro rata distribution, and immediately thereafter, combined with Discovery. (See Note 3 and Note 4 to the accompanying consolidated financial statements). Prior to the Merger, WarnerMedia Holdings, Inc. distributed $40.5 billion to AT&T (subject to working capital and other adjustments) in a combination of cash, debt securities, and WM's retention of certain debt. Discovery transferred purchase consideration of $42.4 billion in equity to AT&T shareholders in the Merger. In August 2022, the Company and AT&T finalized the post-closing working capital settlement process, pursuant to section 1.3 of the Separation and Distribution Agreement, which resulted in the Company receiving a $1.2 billion payment from AT&T in the third quarter of 2022 in lieu of adjusting the equity issued as consideration in the Merger. AT&T shareholders received shares of WBD Series A common stock ("WBD common stock") in the Merger representing 71% of the combined Company and the Company's pre-Merger shareholders continued to own 29% of the combined Company, in each case on a fully diluted basis.

Discovery was deemed to be the accounting acquirer of the WM Business for accounting purposes under U.S. generally accepted accounting principles ("U.S. GAAP"); therefore, Discovery is considered the Company's predecessor and the historical financial statements of Discovery prior to April 8, 2022, are reflected in this Annual Report on Form 10-K as the Company's historical financial statements. Accordingly, the financial results of the Company as of and for any periods prior to April 8, 2022 do not include the financial results of the WM Business and current and future results will not be comparable to historical results.

***Description of Business***

Warner Bros. Discovery is a premier global media and entertainment company that combines the WarnerMedia Business's premium entertainment, sports and news assets with Discovery's leading non-fiction and international entertainment and sports businesses, thus offering audiences a differentiated portfolio of content, brands and franchises across television, film, streaming and gaming. Some of our iconic brands and franchises include Warner Bros. Pictures Group, Warner Bros. Television Group, DC, HBO, HBO Max, Discovery Channel, discovery+, CNN, HGTV, Food Network, TNT, TBS, TLC, OWN, Warner Bros. Games, Batman, Superman, Wonder Woman, Harry Potter, Looney Tunes, Hanna-Barbera, Game of Thrones, and The Lord of the Rings.

We are home to a powerful creative engine and one of the largest collections of owned content in the world and have one of the strongest hands in the industry in terms of the completeness and quality of assets and intellectual property across sports, news, lifestyle, and entertainment in virtually every region of the globe and in most languages. Additionally, we serve audiences and consumers around the world with content that informs, entertains, and, when at its best, inspires.

Our asset mix positions us to drive a balanced approach to creating long-term value for shareholders. It represents the full entertainment eco-system, and the ability to serve consumers across the entire spectrum of offerings from domestic and international networks, premium pay-TV, streaming, production and release of feature films and original series, related consumer products and themed experience licensing, and interactive gaming.

We generate revenue from the sale of advertising on our networks and digital platforms (advertising revenue); fees charged to distributors that carry our network brands and programming, including cable, direct-to-home ("DTH") satellite, telecommunication and digital service providers, as well as through direct-to-consumer ("DTC") subscription services (distribution revenue); the release of feature films for initial exhibition in theaters, the licensing of feature films and television programs to various television, subscription video on demand ("SVOD") and other digital markets, distribution of feature films and television programs in the physical and digital home entertainment market, sales of console games and mobile in-game content, sublicensing of sports rights, and licensing of intellectual property such as characters and brands (content revenue); and other sources such as studio tours and production services (other revenue).

***Impact of COVID-19***

We continue to closely monitor the ongoing impact of COVID-19 on all aspects of our business and geographies; however, the nature and full extent of COVID-19's effects on our operations and results are not yet known and will depend on future developments, which are highly uncertain and cannot be predicted. Certain key sources of revenue for the Studios segment, including theatrical revenues, original television productions, studio operations, and themed entertainment, have been adversely impacted by governmentally imposed shutdowns and related labor interruptions and constraints on consumer activity, particularly in the context of public entertainment venues, such as cinemas and theme parks.

***Segments***

In connection with the Merger, the Company reevaluated and changed its segment presentation during 2022. As of December 31, 2022, we classified our operations in three reportable segments:

- **Studios** - Our Studios segment primarily consists of the production and release of feature films for initial exhibition in theaters, production and initial licensing of television programs to third parties and our networks/DTC services, distribution of our films and television programs to various third party and internal television and streaming services, distribution through the home entertainment market (physical and digital), related consumer products and themed experience licensing, and interactive gaming.
- **Networks** - Our Networks segment primarily consists of our domestic and international television networks.
- **DTC** - Our DTC segment primarily consists of our premium pay-TV and streaming services.

Our segment presentation aligns with our management structure and the financial information management uses to make decisions about operating matters, such as the allocation of resources and business performance assessments. Prior periods have been recast to conform to the current period presentation. Financial information for our segments and the geographical areas in which we do business is set forth in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 23 to the consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

***Studios***

WBD's Studios business includes the Warner Bros. Pictures Group ("WBPG"), DC Studios, Warner Bros. Television Group ("WBTVG"), Global Brands and Experiences ("GBE") (consumer products, themed entertainment, brand licensing, and publisher DC Comics), content licensing, home entertainment, studio operations, and interactive gaming.

WBPG is comprised of **Warner Bros. Pictures, New Line Cinema and Warner Animation Group**. WBPG partners with inspiring storytellers to create filmed entertainment for a global audience.

The recently launched **DC Studios,** tasked with developing properties licensed from DC Comics for film and television, continues the tradition of high-quality storytelling for the DC Universe across all audio-visual media, while building a sustainable growth business out of the iconic franchise.

WBTVG consists of **Warner Bros. Television,** the Company's flagship television production unit for live-action scripted programming, as well as **Warner Bros. Unscripted Television**, which produces unscripted and alternative programming through its four production units: **Warner Horizon Unscripted Television, Telepictures**, **Warner Bros. International Television Production** and **Shed Media**. WBTVG also includes **Warner Bros. Animation, Cartoon Network Studios,** and **Hanna-Barbera Studios Europe**.

Among the Studios' content highlights for 2022 are *The Batman*, *Elvis*, *Fantastic Beasts: The Secrets of Dumbledore* and *Black Adam* on the film side and TV titles such as *Abbott Elementary*, *Ted Lasso*, *The Sandman*, *The Flight Attendant*, Y*oung Sheldon*, *The Voice, The Bachelor* franchise, *The Jennifer Hudson Show,* and *Batwheels.*

Beyond its production operations, the Studios segment includes various businesses that facilitate consumer interaction with the intellectual property it creates.

**GBE** is the global division that drives opportunities for consumers to engage with leading entertainment brands and franchises. Through its strategic franchise development group and global commercial businesses, GBE creates lasting connections to WBD's iconic characters, talent, and storytelling. GBE operates **Global Consumer Products, Themed Entertainment and Brand Licensing,** and world-renowned comic and publishing powerhouse **DC Comics**.

Global distribution of most of WBD's award-winning content is handled by **Content Sales**, which provides content for viewers across streaming, cable, satellite and broadcast networks, local television stations, and airlines. **Warner Bros. Home Entertainment** oversees the global distribution of content through physical goods (Blu-ray Disc™ and DVD) and digital media in the form of electronic sell-through and video-on-demand via cable, satellite, online, and mobile channels.

The Studios segment also includes **Warner Bros. Games**, a worldwide publisher, developer, licensor, and distributor of content for the interactive space across all platforms, including console, handheld, mobile, and PC-based gaming for both internal and third-party game titles. There are currently 11 wholly owned game development studios under the Warner Bros. Games umbrella.

Part of the **Worldwide Studio Operations group**, Warner Bros. Studio Tour London – The Making of Harry Potter and Warner Bros. Studio Tour Hollywood attract visitors from around the world, giving fans the opportunity to get closer to the entertainment they love. In addition, Warner Bros. Studio Tour Tokyo – The Making of Harry Potter is set to open later in 2023.

For the year ended December 31, 2022, content and other revenues were 94% and 6%, respectively, of total revenues for this segment.

***Networks***

WBD's linear network operations include 30 U.S. general entertainment, lifestyle, and news networks, as well as a host of international networks and global and regional sports networks.

General entertainment networks in the U.S. include **TNT**, cable's #1 entertainment network; **TBS**, a top-rated destination for television among young adults; and **Turner Classic Movies (TCM)**, which presents classic films, uncut and commercial-free. WBD's other entertainment networks include **OWN, Discovery Channel, Cartoon Network, Adult Swim,** and **truTV** among many others.

Leading the lifestyle category are **Magnolia Network**, comprised of a collection of inspiring original series curated by Chip and Joanna Gaines featuring some of the U.S.'s most talented names in home and design, food, gardening and the arts; **HGTV**, with relatable stories, real estate and renovation experts and home transformations; and **Food Network**, which connects viewers to the power and joy of food. Additional lifestyle networks include **Travel Channel, Science Channel, TLC,** and **Hogar de HGTV** among many others.

**CNN** has been the #1 English-language news brand globally in multiplatform reach since at least 2018. In 2022, CNN had more unique digital visitors than any other news source in the U.S. and globally.

**WBD Sports** is a global leader in premium sports content across multiple platforms, engaging fans in the U.S. and internationally. WBD Sports' U.S. portfolio includes the National Basketball Association ("NBA"), Major League Baseball ("MLB"), National Collegiate Athletic Association ("NCAA"), National Hockey League ("NHL"), and United States Soccer Federation ("USSF"). **WBD Sports Europe** features Eurosport, a leading sport destination and the home of the Olympic Games in Europe, as well as the Global Cycling Network ("GCN"), and Global Mountain Bike Network ("GMBN"). In 2022, Eurosport UK combined with BT Sport to create an extensive collection of live sports coverage for fans in the UK and Ireland.

WBD Sports' owned-and-operated platforms include *Bleacher Report,* Eurosport.com, *House of Highlights, HighlightHER,* and a full suite of digital and social brands. **TNT Sports** is WBD's sports content brand in Argentina, Brazil, Chile and Mexico. Several regional sports networks, serving fans live sports in select U.S. markets, are also owned and/or operated by WBD Sports in the U.S.

In addition to the global networks described above, we operate networks internationally. **TVN** operates a portfolio of free-to-air and pay-TV lifestyle, entertainment, and news networks in Poland.

For the year ended December 31, 2022, advertising, distribution, content, and other revenues were 43%, 50%, 6%, and 1%, respectively, of total revenues for this segment.

***DTC***

WBD's DTC business includes our streaming services, such as **HBO Max** and **discovery+**, and premium pay-TV services, such as **HBO.** Our streaming services are available on most mobile and connected TV devices. As of December 31, 2022, we had 96.1 million DTC subscribers[1].

**HBO** is one of the most respected and innovative entertainment brands in the world, serving iconic, award-winning programming through the HBO linear channels and our DTC streaming platform, HBO Max.

**HBO Max** is a streaming platform that offers best in class quality entertainment, delivering an array of series, movies, and specials from the iconic brands of HBO, Warner Bros., and DC, as well as third-party series and blockbuster films. The platform launched in the U.S. in May 2020 and introduced a lower priced, advertising-supported tier in June 2021. Currently available in over 60 countries across the U.S., Latin America, and Europe, HBO Max began its global rollout launching in markets across Latin America and the Caribbean in the summer of 2021, followed by European launches in the Nordics, Iberia, the Netherlands and Central and Eastern Europe regions.

**discovery+** is WBD's non-fiction, real-life subscription streaming service. discovery+ features a wide range of exclusive, original series across popular passion verticals, including lifestyle and relationships; home and food; true crime; paranormal; adventure and natural history; science, tech, and the environment; and a slate of high-quality documentaries.

HBO Max and discovery+ currently feature both ad-free and ad-lite versions. We expect to rebrand and relaunch the HBO Max product in the U.S. during the first half of 2023 with an expanded content offering, including some of the content available on discovery+. A rollout of this expanded product is expected to follow in Latin America later in the year. European markets are planned to follow in 2024, with additional launches in key Asia-Pacific territories and some new European markets anticipated later in 2024. We expect to have both an ad-lite and an ad-free version of the expanded product in many markets. The company also intends to continue offering the standalone discovery+ service in the U.S. and international markets.

For the year ended December 31, 2022, advertising, distribution, and content revenues are 5%, 88%, and 7%, respectively, of total revenues for this segment.

**COMPETITION**

Providing content across various distribution platforms is a highly competitive business worldwide. We experience competition for the development and acquisition of content, distribution of our content, sale of commercial time on our networks and viewership. There is competition from other production studios, other television networks, and online-based content providers for the acquisition of content and creative talent such as writers, producers and directors. Our ability to produce and acquire popular content is an important competitive factor for the distribution of our content, attracting viewers and the sale of advertising. Our success in securing popular content and creative talent depends on various factors such as the number of competitors providing content that targets the same genre and audience, the distribution of our content, viewership, and the production, marketing and advertising support we provide.

Our networks compete with other television networks, including broadcast, cable and local, for the distribution of our content and fees charged to cable television operators, DTH satellite service providers, and other distributors that carry our content. Our ability to secure distribution agreements is necessary to ensure the retention of our audiences. Our contractual agreements with distributors are renewed or renegotiated from time to time in the ordinary course of business. Growth in the number of networks distributed, consolidation and other market conditions in the cable and satellite distribution industry, and increased popularity of other platforms may adversely affect our ability to obtain and maintain contractual terms for the distribution of our content that are as favorable as those currently in place. The ability to secure distribution agreements is dependent upon the production, acquisition and packaging of original content, viewership, the marketing and advertising support and incentives provided to distributors, the product offering across a series of networks within a region, and the prices charged for carriage.

---

[1] We define a "DTC Subscription" as:

(i) a retail subscription to discovery+, HBO or HBO Max for which we have recognized subscription revenue, whether directly or through a third party, from a direct-to-consumer platform; (ii) a wholesale subscription to discovery+, HBO, or HBO Max for which we have recognized subscription revenue from a fixed-fee arrangement with a third party and where the individual user has activated their subscription; (iii) a wholesale subscription to discovery+, HBO or HBO Max for which we have recognized subscription revenue on a per subscriber basis; and (iv) users on free trials who convert to a subscription for which we have recognized subscription revenue within the first seven days of the calendar month immediately following the month in which their free trial expires.

We may refer to the aggregate number of DTC Subscriptions as "subscribers."

The reported number of "subscribers" included herein and the definition of "DTC Subscription" as used herein excludes: (i) individuals who subscribe to DTC products, other than discovery+, HBO and HBO Max, that may be offered by us or by certain joint venture partners or affiliated parties from time to time; (ii) a limited number of international discovery+ subscribers that are part of non-strategic partnerships or short-term arrangements as may be identified by the Company from time to time; (iii) domestic and international Cinemax subscribers, and international basic HBO subscribers; and (iv) users on free trials except for those users on free trial that convert to a DTC Subscription within the first seven days of the next month as noted above.

Our networks and streaming services, which include HBO Max and discovery+ compete for the sale of advertising with other television networks, including broadcast, cable, local networks, and other content distribution outlets for their target audiences and the sale of advertising. Our success in selling advertising is a function of the size and demographics of our audiences, quantitative and qualitative characteristics of the audience of each network, the perceived quality of the network and of the particular content, the brand appeal of the network and ratings as determined by third-party research companies, prices charged for advertising and overall advertiser demand in the marketplace.

Our networks and streaming services also compete for their target audiences with all forms of content and other media provided to viewers, including broadcast, cable and local networks, streaming services, pay-per-view and VOD services, online activities and other forms of news, information and media entertainment.

## INTELLECTUAL PROPERTY

We are one of the world's leading creators, owners and distributors of intellectual property. Our intellectual property assets include copyrights in films, television programs, software, comic books and mobile apps; trademarks in names, logos and characters; patents or patent applications for inventions related to products and services; websites; and licenses of intellectual property rights of various kinds from third parties. We have made and will continue to make investments in developing technology platforms to support our digital products and DTC offerings, including HBO Max and discovery+, and consider these platforms to be intellectual property assets as well.

We are a global media and entertainment company and the protection of our content and brands is of primary importance. To protect our intellectual property assets, we rely upon a combination of copyright, trademark, patent, unfair competition, and internet/domain name statutes and laws, and contract provisions. However, there can be no assurance of the degree to which these measures will be successful. Moreover, effective intellectual property protection may be either unavailable or limited in certain foreign territories, and new legislative or regulatory initiatives could impact our operations.

We seek to limit unauthorized use of our intellectual property through a combination of approaches. However, the steps taken to prevent the infringement of our intellectual property by unauthorized third parties may not be effective. Piracy, which encompasses the theft of our signals, and the unauthorized use of our intellectual property in the digital environment, continues to present a threat to revenues from products and services based on our intellectual property. Piracy also includes the unauthorized use of our intellectual property on physical goods. We have a team dedicated to disrupting and curbing piracy and other forms of intellectual property infringement and use external vendors to detect and remove infringements. We also engage with intermediaries that facilitate piracy, leverage our membership in a range of industry groups, and initiate enforcement actions, including litigation, to address piracy issues. In general, policing unauthorized use of our products and services and related intellectual property is difficult and costly.

Third parties may challenge the validity or scope of our intellectual property from time to time, and the success of any such challenges could result in the limitation or loss of intellectual property rights. Irrespective of their validity, such claims may also result in substantial costs and diversion of resources which could have an adverse effect on our operations.

## REGULATORY MATTERS

Our businesses are subject to and affected by regulations of U.S. federal, state and local government authorities, and our international operations are subject to laws and regulations of the countries and international bodies, such as the E.U., in which we operate. Content networks, such as those owned by us, are regulated in certain limited respects by the Federal Communications Commission ("FCC"), including some regulations that only apply to content networks affiliated with a cable television operator. Other FCC regulations, although imposed on cable television operators and direct broadcast satellite ("DBS") operators and other distributors, affect content networks indirectly. The rules, regulations, policies and procedures affecting our businesses are constantly subject to change. These descriptions are summary in nature and describe only the most significant regulations we face; they do not purport to describe all present and proposed laws and regulations affecting our businesses.

### Program Access

The Communications Act (the "Act") and the FCC's program access rules prevent a satellite-delivered content vendor in which a cable operator has an "attributable" ownership interest from discriminating against unaffiliated multichannel video programming distributors ("MVPDs"), such as cable and DBS operators, in the rates, terms and conditions for the sale or delivery of content networks, on the basis of the non-affiliation. These rules permit the unaffiliated MVPD to initiate a complaint to the FCC against content networks if it believes this rule has been violated.

**Program Carriage**

The Act and the FCC's program carriage rules prohibit distributors from favoring their affiliated content networks over unaffiliated, similarly situated content networks in the rates, terms and conditions of carriage agreements between content networks and cable operators or other MVPDs. Recent regulatory changes and court decisions make it more difficult for us to challenge a distributor's decision to decline to carry one of our content networks or discriminate against one of our content networks.

**"Must-Carry"/Retransmission Consent**

The Act imposes "must-carry" regulations on cable systems, requiring them to carry the signals of most local broadcast television stations in their market if they elect mandatory carriage. DBS systems are also subject to their own must-carry rules. The FCC's implementation of "must-carry" obligations requires cable operators and DBS providers to give broadcasters preferential access to channel space and favorable channel positions. This reduces the amount of channel space that is available for carriage of our content networks by cable and DBS operators. The Act also gives broadcasters the choice of opting out of must-carry and invoking the right to retransmission consent, which refers to a broadcaster's right to require MVPDs, such as cable and satellite operators, to obtain the broadcaster's consent before distributing the broadcaster's signal to the MVPDs' subscribers, often at a substantial cost that reduces the content funds available for independent programmers not affiliated with broadcasters, such as us.

**Accessibility, Children's Advertising Restrictions, Emergency Alerts and CALM Act**

Certain of our content networks and some of our IP-delivered video content must provide closed-captioning and audio description of some of their programming and comply with other regulations designed to make our content more accessible to persons with disabilities. The U.S. Congress, the FCC, and the U.S. Department of Justice periodically consider proposals to implement additional accessibility requirements, some of which would increase our obligations substantially. Our content networks intended primarily for children 12 years of age and under must comply with certain limits on the amount and type of permissible advertising, and certain regulations extend to our digital products when they are referenced by web address in our content networks. We may not include emergency alert tones or signals in our content. Commercials embedded in our networks' television content stream also must adhere to certain standards for ensuring that those commercials are not transmitted at louder volumes than our program material.

**Obscenity Restrictions**

Network distributors are prohibited from transmitting obscene content, and our distribution agreements generally require us to refrain from including such content on our networks.

**Regulation of Digital Services**

We operate a variety of free, advertising-based and subscription-based digital products and streaming services providing information and entertainment to consumers in the U.S. and international markets via web, mobile and connected TV platforms. In some cases, those products and services are provided directly to consumers, and in other cases, they can be used and/or purchased through a third-party distributor, such as Xfinity or Hulu. Our digital products and services are subject to federal and state regulation in the U.S. relating to the privacy and security of personal information collected from our users, including laws pertaining to the acquisition of personal information from children under 16. Some examples of these laws include the federal Children's Online Privacy Protection Act (COPPA), the federal Controlling the Assault of Non-Solicited Pornography and Marketing Act, the Video Privacy Protection Act (VPPA), and the California Consumer Privacy Act ("CCPA"). Many additional U.S. state and federal regulations impose data security and data breach obligations on the Company. These laws and their public and private enforcement are continually evolving, with several comprehensive U.S. state privacy laws effective in 2023, many more introduced and expected to pass in the coming year, and novel litigation theories related to privacy advancing in the courts. Additional federal and state laws and regulations apply or may be adopted with respect to our digital products and services, covering such issues as data privacy and security, child safety, oversight of user-generated content, advertising, competition, pricing, content, copyrights and trademarks, access by persons with disabilities, distribution, taxation and characteristics and quality of products and services. The scope of regulation may differ depending on how these products and services are used and/or purchased. In addition, the FCC from time to time considers whether some or all digital services should be considered MVPDs and regulated as such.

**Intellectual Property Laws and Regulations**

Our intellectual property assets are discussed under "Business – Intellectual Property" above. Our content, whether distributed over broadcast, cable, DBS, wireless, or internet-based services, or through other means, is protected under intellectual property law, including copyright, trademark, patent, unfair competition, and internet/domain name statutes and laws and license agreements. Changes to these laws and regulations could either strengthen or weaken our ability to license and protect our content and combat its theft or misuse.

**Foreign Laws and Regulations**

The foreign jurisdictions in which our products and services are offered have, in varying degrees, laws and regulations governing our businesses, including relating to the production, monetization and distribution of content. By way of example, our digital offerings available to consumers in international jurisdictions are subject to laws and regulations relating to, without limitation, consumer protection, data privacy and security, advertising, competition, intellectual property, and content limitations.

Similar to the U.S., new laws and regulations in international jurisdictions may be adopted with respect to our intellectual property, products and services. In particular, we face increased efforts in international jurisdictions to regulate streaming services, which may constrain our offerings. Further, international laws and regulations around intellectual property could limit our ability to license and protect our content, as well as impose additional burdens on our business.

**HUMAN CAPITAL**

As of December 31, 2022, we had approximately 37,500 employees, including full-time and part-time employees of our wholly-owned subsidiaries and consolidated ventures. Our employees are located in 54 different countries, with 56% located in the U.S. and 44% located outside of the U.S.

We are a talent-driven business, aiming to attract, develop, and motivate top talent throughout our company. To support these objectives, our human resources programs are designed to provide competitive, locally-relevant benefits, performance-based pay, and nonfinancial support and incentives. We also strive to enhance our culture through efforts aimed at making our workplace diverse, engaging and inclusive, and to develop our talent to prepare them for critical roles and leadership positions for the future. We also provide opportunities for our employees to make an impact in their communities through social good initiatives around the world.

Some examples of our human resources programs and initiatives are described below.

**Compensation**

Our compensation philosophy is to pay for performance, encourage excellence and reward employees who innovate and deliver high-quality results. Our compensation programs are designed to implement our compensation philosophy by:

- paying competitively, across salary grades and geographies;
- applying compensation policies in an internally consistent manner; and
- incentivizing our employees to deliver on our short- and long-term objectives.

**Benefits**

We provide an array of benefits and programs that support our employees in their personal and professional lives. Highlights include:

- local medical, dental, and vision plans in many countries around the world to support our employees with access to health care, supplementing any state-provided health care;
- on-site wellness centers in our New York, Los Angeles, Atlanta and London offices, a fully-equipped fitness center in our New York, Los Angeles and Atlanta offices, and access to virtual fitness classes and wellbeing programs;
- family support programs, including on-site childcare in certain offices, childcare locator services, back-up childcare, maternity/paternity leave, adoption assistance and elder care;
- tools and resources to support the mental wellbeing of our employees and their families, including mental health counselors in our on-site wellness centers and a confidential, dedicated line for employees to contact and speak with a counselor in the event they need mental health support;

- products and services to support employees' financial wellbeing, including life, accident, and disability insurance plans, discount benefits, financial planning tools, a 401(k) savings plan in the U.S. and retirement/pension plans in over 20 countries, with competitive contributions from the Company for employees at all levels;
- offering an employee stock purchase plan, which allows certain employees globally (where legislation permits) an opportunity to buy WBD common stock at a discounted price through convenient after-tax payroll deductions with no commission charges; and
- flexible working arrangements around the globe to enable our employees to better balance work and personal commitments.

**Diversity, Equity and Inclusion ("DE&I")**

Our DE&I objective is to seek out diversity, remove barriers, and create space for all to share ideas and be heard. DE&I at WBD is overseen by our Chief Global Diversity, Equity & Inclusion Officer. We implement our DE&I initiatives and pipeline programs through global, regional and corporate councils that partner with internal and external stakeholders across our brands, business units and regions. We have also established a Creative Diversity Council to address DE&I in our content production businesses. We seek to support our employees through the sponsorship of 16 Business Resource Groups ("BRGs") globally, comprised of over 40 chapters. BRGs are intended to enable employees with shared pursuits, purpose, identities, and interests to lead, contribute and build community for all.

**Learning and Development**

Our Global Learning & Development ("L&D") team provides learning opportunities for employees around the world. The L&D team uses a variety of delivery methods suitable to the content and audience, including live in-person sessions, virtual workshops, webinars, and asynchronous online learning through our global learning management platform. The L&D team also provides tuition reimbursement for eligible courses.

## AVAILABLE INFORMATION

All of our filings with the U.S. Securities and Exchange Commission (the "SEC"), including reports on Form 10-K, Form 10-Q and Form 8-K, and all amendments to such filings are available free of charge at the investor relations section of our website, ir.wbd.com, as soon as reasonably practicable after such material is filed with, or furnished to, the SEC. Our annual report, corporate governance guidelines, code of business ethics, audit committee charter, compensation committee charter, and nominating and corporate governance committee charter are also available on our website. In addition, we will provide a printed copy of any of these documents, free of charge, upon written request to: Investor Relations, Warner Bros. Discovery, Inc., 230 Park Avenue South, New York, NY 10003. Additionally, the SEC maintains a website at www.sec.gov that contains quarterly, annual and current reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including the Company.

We also routinely post on our website news releases, announcements and other statements about our business and results of operations, some of which may contain information that may be deemed to be material to investors. Therefore, we encourage investors to monitor our website and review the information we post there.

The information contained on our website is not part of this Annual Report on Form 10-K and is not incorporated by reference herein.

**ITEM 1A. Risk Factors.**

Investing in our securities involves risk. In addition to the other information contained in this Annual Report on Form 10-K, you should consider the following risk factors before investing in our securities. Additional risks and uncertainties not presently known to us or that we currently believe not to be material may also adversely impact our business, results of operations, financial position and cash flows.

**Risks Related to Our Acquisition of the WarnerMedia Business**

**We have incurred and expect to continue to incur significant costs following the Merger.**

On April 8, 2022, we completed the Merger in which we acquired the business, operations and activities that constitute the WarnerMedia Business from AT&T. We incurred significant costs in connection with the signing and closing of the Merger, and expect to continue to incur approximately $1.0 - $1.5 billion of cash costs relating to organization restructuring, facility consolidation activities and other contract termination costs, which costs we believe will be necessary to realize the anticipated cost synergies from the Merger. Additional unanticipated costs may also be incurred in connection with the integration of the legacy business, operations and activities of Discovery prior to the Merger (the "Discovery Business") and the WarnerMedia Business. No assurances of the timing or amount of synergies able to be captured, or the timing or amount of costs necessary to achieve those synergies, can be provided. Some of the factors affecting the costs associated with the integration phase of the Merger include the resources required in integrating the WarnerMedia Business with the Discovery Business and the length of time during which transition services are provided to us by AT&T. The amount and timing of any such charges could materially adversely affect our business, financial condition and results of operations.

**If the results of operations of the WarnerMedia Business following the Merger continue to be below management's expectations, we may not achieve the increases in revenues and net earnings that management expects as a result of the Merger.**

In connection with our comprehensive business and strategic review which commenced following the Merger, we determined that certain WarnerMedia Business budget projections that were made available to us prior to the closing of the Merger varied from what we now view as the WarnerMedia Business's baseline post-closing. Because we derive a majority of our revenues and net earnings from the WarnerMedia Business, if the results of operations of the WarnerMedia Business continue to be below management's expectations, we may not achieve the increases in revenue and net earnings expected as a result of the Merger. Significant factors that could negatively impact the results of operations of the WarnerMedia Business, and therefore harm our results of operations, include:

- more intense competitive pressure from existing or new competitors;
- fluctuations in the exchange rates in the jurisdictions in which the WarnerMedia Business operates;
- increases in promotional and operating costs for the WarnerMedia Business;
- a decline in the viewership or consumption of content provided by the WarnerMedia Business; and
- additional material variations in the results of operations of the WarnerMedia Business from expectations or projections of such results of operations, any or all of which may prove to be incorrect or inaccurate.

**We may not realize the anticipated benefits of the Merger because of difficulties related to integration, the achievement of such synergies, and other challenges faced by the combined Company.**

The Discovery Business and the WarnerMedia Business previously operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of any or all anticipated financial or other benefits. If we are not able to successfully integrate the WarnerMedia Business with the Discovery Business, the anticipated benefits of the Merger may not be realized fully, if at all, or may take longer than expected to be realized. Our integration efforts could result in a loss of key Discovery Business or WarnerMedia Business employees, loss of customers, disruption of either or both of the Discovery Business's or the WarnerMedia Business's ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated. Specifically, the following issues, among others, must be addressed in combining the Discovery Business and the WarnerMedia Business in order to realize the anticipated benefits of the Merger:

- integrating the Discovery Business and the WarnerMedia Business in the time frame currently anticipated;
- maintaining existing agreements with customers, distributors, providers, talent and vendors and avoiding delays in entering into new agreements with prospective customers, distributors, providers, talent and vendors;
- integrating the businesses' administrative, accounting and information technology infrastructure;
- integrating employees and attracting and retaining key personnel, including talent;

- managing the expanded operations of a significantly larger and more complex company, particularly in light of the Discovery Business's limited prior experience in running a studio or producing scripted content;
- aligning the businesses' DTC streaming services for global customers; and
- resolving potential unknown liabilities, adverse consequences and unforeseen increased expenses associated with the Merger.

Even if the Discovery Business and the WarnerMedia Business are integrated successfully, the full benefits of the Merger may not be achieved within the anticipated time frame or at all.

Further, following the Merger, the size and complexity of the business of the combined Company increased significantly. Our future success depends, in part, upon our ability to manage this expanded business, which could pose substantial challenges for management, including challenges related to the management and monitoring of new, complex operations and associated increased costs. All of these factors could materially adversely affect our stock price, business, financial condition, results of operations or cash flows.

**Our consolidated indebtedness increased substantially following completion of the Merger. We have a significant amount of debt and may incur significant amounts of additional debt, which could adversely affect our financial health and our ability to react to changes in our business.**

Our consolidated indebtedness as of December 31, 2022 was approximately $49.3 billion, of which $363 million is current. We had outstanding debt prior to the Merger and upon completion of the Merger, we became responsible for approximately $41.5 billion of additional debt (at par value), including debt that was issued by WarnerMedia Holdings, Inc. in connection with its separation from AT&T as well as preexisting debt of the WarnerMedia Business. In addition, we have the ability to draw down on a $6.0 billion revolving credit facility in the ordinary course, which would have the effect of further increasing our debt to the extent drawn. We are also permitted, subject to certain restrictions under our existing debt agreements, to obtain additional long-term debt and working capital lines of credit to meet future financing needs. This would have the effect of further increasing our leverage.

As a result of our increased indebtedness, our corporate or debt-specific credit rating could be downgraded, which may increase our borrowing costs or subject us to more restrictive covenants when we incur new debt in the future, which could reduce profitability and diminish operational flexibility.

Our substantial leverage could have significant negative consequences on our financial condition and results of operations, including:

- impairing our ability to meet one or more of the financial ratio covenants contained in our term loan and revolving credit facility or to generate cash sufficient to pay the interest or principal, which could result in an acceleration of some or all of our outstanding debt in the event that an uncured default occurs;
- increasing our vulnerability to general adverse economic and market conditions;
- limiting our ability to obtain additional debt or equity financing;
- requiring the dedication of a substantial portion of our cash flow from operations to service our debt, thereby reducing the amount of cash flow available for other purposes such as capital expenditures, share repurchases, investments, and mergers and acquisitions;
- requiring us to sell debt or equity securities or to sell some of our core assets, possibly on unfavorable terms, to meet payment obligations;
- limiting our flexibility in planning for, or reacting to, changes in our business and the markets in which we compete; and
- placing us at a possible competitive disadvantage with less leveraged competitors and competitors that may have better access to capital resources.

**We have recognized, and could continue to recognize impairment charges, related to goodwill and other intangible assets.**

The Merger added a significant amount of goodwill and other intangible assets to our consolidated balance sheet. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired. Significant negative industry or economic trends, including the ongoing effects of the COVID-19 pandemic, disruptions to our business, inability to effectively integrate acquired businesses, underperformance of the WarnerMedia Business as compared to management's initial expectations, unexpected significant changes or planned changes in use of the assets, including in connection with our ongoing restructuring initiatives, divestitures and market capitalization declines may impair goodwill and other intangible assets. Any charges relating to such impairments could materially adversely affect our results of operations in the periods recognized.

**We may be unable to provide (or obtain from third parties) the same types and level of services to the WarnerMedia Business that historically have been provided (or obtained from third parties) by AT&T or may be unable to provide (or obtain) them at the same cost.**

Prior to the Merger, as part of a separate reporting segment of AT&T, the WarnerMedia Business was able to receive services from AT&T and was able to receive benefits from being a part of AT&T, including benefiting from AT&T's financial strength, extensive business relationships and purchasing power in negotiating third party services. Following the Merger, the WarnerMedia Business is not able to leverage AT&T's financial strength, does not have access to AT&T's extensive business relationships and may not have purchasing power similar to what it had benefited from by being a part of AT&T prior to the Merger. Following the Merger, we have had to replace the services previously provided, or obtained from third parties, by AT&T by either providing them internally or obtaining them from unaffiliated third parties, including AT&T. These services include AT&T bundling HBO Max with some of its wireless and broadband offerings, and certain administrative and operating functions of which effective and appropriate performance is critical to the operations of the WarnerMedia Business and the Company as a whole following the Merger. AT&T is providing certain services on a transitional basis pursuant to a Transition Services Agreement (the "TSA") with us. The duration of such services is subject to a limited term set out in the Services Schedule to the TSA. We may have difficulty enforcing the terms of the agreements governing the provision of these services or be unable to replace these services in a timely manner or on terms and conditions as favorable as those the WarnerMedia Business currently receives from AT&T under the TSA or from third party contracts that were obtained by AT&T prior to the Merger for the WarnerMedia Business. The costs for these services, or the costs associated with replacing these services, could in the aggregate be higher than the combination of our historical costs and those reflected in the historical financial statements of the WarnerMedia Business. If we are unable to replace the services provided by AT&T or obtained from third parties by AT&T or are unable to replace them at the same cost or are delayed in replacing the services provided by AT&T or obtained from third parties by AT&T, our business, financial condition, and results of operations may be materially adversely impacted by increasing costs or decreasing revenues.

**We are engaged in legal proceedings related to the Merger and could be subject to additional legal proceedings related to the Merger, the outcomes of which are uncertain and could negatively impact our business, financial condition and results of operations.**

Since the closing of the Merger, multiple putative class action lawsuits relating to the Merger have been filed on behalf of stockholders of the Company against the Company and/or certain of our directors and executive officers seeking damages and other relief. Additional lawsuits relating to the Merger, or disputes arising out of definitive agreements entered into in connection with the Merger, could arise in the future. The outcomes of Merger-related lawsuits are uncertain and even if we ultimately prevail in a lawsuit, defending against the claim could be time-consuming and costly and divert our management's attention and resources away from our business, which could negatively and materially impact our business, financial condition and results of operations.

**Risks Related to Our Business and Industry**

**Our businesses operate in highly competitive industries and if we are unable to compete effectively, our business, financial condition and results of operations could suffer.**

The media and entertainment industries in which we compete for viewers, distribution and advertising are highly competitive. We compete with other media and entertainment companies to attract creative talent and produce high-quality content and to make our content available to audiences on a variety of platforms.

Our traditional linear programming networks face increased competitive pressure from other television networks, subscription based streaming services, including our HBO Max and discovery+ products, and other forms of news, information and media entertainment, such as feature films, interactive games and entertainment, user-generated content, live sports and other events, social media and diverse on-line and mobile activities and other digital entertainment platforms and offerings all vying for consumer time, attention and discretionary spending. There has also been a shift in consumer behavior related to changes in content distribution and technological innovation, including a preference by consumers to watch content on demand and a decline in subscribers to the traditional cable bundle. The COVID-19 pandemic appears to have accelerated some existing trends. Lockdowns during the pandemic, for example, enabled households to experiment with digital offerings including subscription video-on-demand or to stack multiple streaming subscriptions. Although we expect these trends to continue in the coming years, our viewership and the profitability of our business may be impacted in unpredictable ways as a result thereof. Moreover, there can be no assurance of the continuation of these trends.

In order to respond to changing consumer behavior, increasing preferences to watch on demand, subscription declines and changes in content distribution models in our industry, we have invested in, developed and launched DTC products including our HBO Max and discovery+ products. We have incurred and will likely continue to incur significant costs to develop and market HBO Max and discovery+, including costs related to developing and implementing a go-to-market strategy for our DTC business that aligns our HBO Max and discovery+ products. There can be no assurance, however, that consumers and advertisers will embrace our offerings or that subscribers will activate or renew a subscription, particularly given the increase in DTC products in the marketplace. The WarnerMedia Business has in the past, and we could in the future, incur significant restructuring costs related to DTC products due to the rapidly and continuously-evolving DTC environment, in which consumer satisfaction, scale, differentiation and capacity to invest in content are crucial to streaming success.

Each distribution model has different risks and economic consequences for us, so the rapid evolution of consumer preferences may have an economic impact that is not ultimately predictable. Distribution windows are also evolving, potentially affecting revenues from other windows. If we are not able to access our targeted audience with appealing category-specific content and adapt to new technologies, distribution methods and platforms and business models, we may experience a decline in viewership and ultimately a decline in the demand for our programming, which could lead to lower distribution and advertising revenues, materially and adversely affecting our business, financial condition and results of operations.

**The success of our business depends on the acceptance of our content and brands by our U.S. and foreign viewers, which may be unpredictable and volatile**.

The production and distribution of television programs, feature films, sports and news content are inherently risky businesses because the revenue we derive and our ability to distribute our content depend primarily on consumer tastes and preferences that often change in unpredictable ways. Our success depends on our ability to consistently create and acquire content that meets the changing preferences of viewers in general, in special interest groups, in specific demographic categories and in various international marketplaces. For example, generally, feature films that perform well upon initial release also have commercial success in subsequent distribution channels. Therefore, the underperformance of a feature film, especially an “event” film, upon its public release can result in lower-than-expected revenues for our business which could limit our ability to create future content. We need to invest substantial amounts in the production or acquisition and marketing of our television programs, feature films, sports and news content before we learn whether such content will reach anticipated levels of popularity with consumers. Failing to gain the level of audience acceptance we expect for our content may negatively impact our business, financial condition and results of operations.

The commercial success of our content also depends upon the quality and acceptance of competing content available in the applicable marketplace. Other factors, including the availability of alternative forms of entertainment and leisure time activities, our ability to maintain or develop strong brand awareness and target key audiences, general economic conditions, piracy, and growing competition for consumer discretionary spending, time and attention may also affect the audience for our content. Audience sizes for our media networks are critical factors affecting both the volume and pricing of advertising revenue that we receive with respect to advertising-supported services, and the extent of distribution and penetration and the license fees we receive under agreements with our distributors with respect to subscription-based services. The appeal, success and performance of our content with consumers, as well as with third-party licensees and other distribution partners, are also critical factors that can affect the revenue that we receive with respect to our content-related business.

Consequently, reduced public acceptance of our television programs, feature films, sports and news content or negative publicity regarding individuals or operations associated with our content or brands may decrease our audience share and customer/viewer reach and adversely affect our business, financial condition and results of operations.

**If our DTC products fail to attract and retain subscribers, our business, financial condition and results of operations may be adversely impacted.**

Our HBO Max and discovery+ offerings are subscription-based streaming products and are among many such services in a crowded and competitive landscape. Their success will be largely dependent on our ability to initially attract, and ultimately retain, subscribers. If we are unable to effectively market our DTC products or if consumers do not perceive the pricing and related features of our DTC products to be of value versus our competitors, we may not be able to attract and retain subscribers. In particular, decreases in consumer discretionary spending where our DTC products are offered may reduce our ability to attract and retain subscribers to our services, which could have a negative impact on our business. Relatedly, a decrease in viewing subscribers on our advertising-supported DTC products could also have a negative impact on the rates we are able to charge advertisers for advertising-supported services. The ability to attract and retain subscribers will also depend in part on our ability to provide compelling content choices that are differentiated from that of our competitors and that are more attractive than other sources of entertainment that consumers could choose in their free time. Furthermore, our ability to provide a quality subscriber experience and our relative service levels, may also impact our ability to attract and retain subscribers. If existing subscribers, including those who receive subscriptions through wireless and broadband bundling arrangements with third parties, cancel or discontinue their subscriptions for any reason, including as a result of selecting an alternative wireless or broadband plan that does not bundle our products, or due to the availability of competing offerings that are perceived to offer greater value compared to our DTC products, our business may be adversely affected. We would need to add new subscribers both to replace subscribers who cancel or discontinue their subscriptions and to grow our business. If we are unable to attract and retain subscribers and offset the losses of subscribers who cancel or discontinue their subscriptions to our DTC products, our business, financial condition and results of operations could be adversely affected.

**Global economic conditions and other global events may have an adverse effect on our business.**

Our business is significantly affected by prevailing economic conditions, including inflation and fluctuations in interest rates, and by disruptions to financial markets. We derive substantial revenues from advertisers, and these expenditures are sensitive to general economic conditions and consumer buying patterns. Financial instability or a general decline in economic conditions in the U.S. and other countries where our content is distributed could adversely affect the businesses of our partners who might reduce their spending on advertising, which could result in a decrease in advertising rates and volume and our advertising revenues.

Decreases in consumer discretionary spending in the U.S. and other countries where our networks are distributed may affect cable television and other video service subscriptions, in particular with respect to digital service tiers on which certain of our programming networks are carried. This could lead to a decrease in the number of subscribers receiving our programming from multi-channel video programming distributors, which could have a negative impact on our viewing subscribers and distribution revenues. Similarly, a decrease in viewing subscribers would also have a negative impact on the number of viewers actually watching the programs on our programming networks, which could also impact the rates we are able to charge advertisers.

A downturn in global economic conditions, such as those caused by the COVID-19 pandemic, can also negatively affect our current and potential customers, vendors and others with whom we do business and their ability to satisfy their obligations to us. The general worsening of current global economic conditions could adversely affect our business, financial condition or results of operations, and the worsening of economic conditions in certain parts of the world, specifically, could impact the expansion and success of our businesses in such areas.

Our business is also impacted by other global events, including political, social, or economic unrest, terrorism, hostilities, or pandemics. For example, the COVID-19 pandemic negatively impacted movie theater attendance by consumers as movie theaters reduced seating capacity or closed for an extended period of time. There is no assurance that movie theater attendance will return to pre-pandemic levels or increase from current levels. Other global events in the future may impact our ability to distribute content or our viewership, which could negatively impact our business.

**We invest significant resources to acquire licenses to produce sports programming and there can be no assurance that we will continue to be successful in our efforts to obtain licenses to recurring sports events or recoup our investment when the content is distributed.**

We face significant competition to acquire licenses to sports programming, which leads to significant expenditure of funds and resources. As a result of an increasing number of market entrants in the programming space, we have seen upward pressure on programming costs in recent years, particularly in connection with the licensing and acquisition of sports content from third parties. We may also be impacted by such upward pressures driven by increasing investment in programming by competitors. In certain international markets, regulations concerning content quotas or content investment requirements may be a further factor driving increasing programming costs. In addition, businesses, including ours, that offer multiple services, or that may be vertically integrated and offer both video distribution and programming content, may face closer regulatory review from the competition authorities in the countries in which we currently have operations. If our distributors have to pay higher rates to holders of sports broadcasting rights, it might be difficult for us to negotiate higher rates for distribution of our networks. There can be no assurance that we will be able to compete successfully in the future against existing or new competitors to obtain licenses to recurring sports events, or that increasing competition for programming licenses and regulatory review from competition authorities will not have a material adverse effect on our business, financial condition or results of operations.

We also operate regional sports networks and have rights agreements with various professional sports teams that provide the regional sports networks with certain rights to produce and distribute their games. The revenue we derive from the regional sports networks can depend upon a number of factors including consumer tastes and preferences, the strength of advertising markets, subscription levels and rates for programming, and the size of viewer audiences.

There can also be no assurance that we will recoup our investment in sports programming. The impact of these contracts on our results of operations over the term of the contracts depends on a number of factors, including the strength of advertising markets, subscription levels and rates for programming, consumer acceptance of our content, and the size of viewer audiences. For example, as the home of the Olympic Games in Europe through 2032, we have been developing and innovating new forms of content in connection with the Olympic Games. Our success with the Olympics depends on audience acceptance of this content. If viewers do not find our Olympic Games content acceptable, we could see low viewership, which could lead to low distribution and advertising revenues and adversely affect our business, financial condition and results of operations.

**Failure to renew, renewal with less favorable terms, or termination of our content licenses and similar distribution agreements may cause a decline in our revenue.**

Because our content and pay-TV networks are licensed to and distributed through third parties, such as theatrical exhibitors (and in certain international territories, local theater distributors), traditional television and pay-TV broadcasters (such as cable and satellite operators) and operators of digital platforms, which in turn make such content available, directly and indirectly, to consumers, we are dependent upon the maintenance of such licensing and distribution agreements with such third parties. These agreements generally provide for the scope of licensed rights, including geographic territory, exploitation rights, holdbacks and/or other restrictions, including exclusivity or non-exclusivity, window(s) of exploitation (including first and second pay-TV and free to air broadcast), for the level of carriage our networks will receive, such as channel placement and programming package inclusion (widely distributed, broader programming packages compared to lesser distributed, specialized programming packages), and for payment of a license fee to us based on a number of factors, including the scope of the rights granted, the popularity of the content (as measured in the case of films, for example, by box office performance for certain downstream exploitation) and the date of its first theatrical or pay-TV exhibition.

While the number of subscribers associated with our networks impacts our ability to generate advertising revenue, subscription-based revenue also represents a significant portion of our revenue. Our agreements generally have a limited term which varies by territory and distributor, and there can be no assurance that these agreements will be renewed in the future or that they will be renewed on terms that are favorable to us. The license fees and other commercial terms that we receive are dependent, among other factors, on the acceptance and performance of our content with consumers. A reduction in the license fees that we receive or in the number of subscribers for which we are paid, including as a result of a loss or reduction in carriage for our networks or a reduction in distributor penetration, including as a result of changes in consumer habits, could adversely affect our distribution revenue. Such a loss or reduction in carriage could also decrease the potential audience for our programs thereby adversely affecting our advertising revenue. Changes in distribution strategy and variations on traditional theatrical distribution and other licensing models, such as shortening traditional windows or making simultaneous the availability of certain films theatrically and on-demand, and other hybrids, may also drive changes in the licensee fees that theatrical exhibitors and distributors and other downstream licensees in the value chain may be willing to pay for content, which may in turn negatively affect our content revenue. As a result of industry consolidation, our distributors have become and may continue to become larger, and as a result have gained or could gain additional market power. Such consolidation gives these distributors leverage in negotiating their distribution agreements with us which could subject our affiliate fee revenue to reduction or discounts, which could have an adverse effect on our financial condition.

In addition, content distribution and license agreements are complex and individually negotiated. For example, some of our distribution agreements contain "most favored nation" clauses, which typically provide that if we enter into an agreement with another distributor which contains certain more favorable terms, we must offer some of those terms to our existing distributors. If we were to disagree with one of the counterparties on the interpretation of a content distribution and license agreement, it could materially adversely impact our business, financial condition and results of operations as well as damage our relationship with that counterparty.

**We rely on platforms owned by our competitors for digital and linear distribution of our content**.

We rely on platforms owned by third parties, some of which compete directly with us or have investments in competing streaming products, to make our content available to our subscribers and viewers. If these third parties do not continue to provide access to our service on their platforms or are unwilling to do so on terms acceptable to us, our business could be adversely affected. If we are not successful in maintaining existing or creating new relationships with these third parties, our ability to retain subscribers and grow our business could be adversely impacted.

**Service disruptions or the failure of communications satellites or transmitter facilities we rely upon could adversely impact our business, financial condition and results of operations.**

We rely on communications satellites and transmitter facilities and other technical infrastructure, including fiber, to transmit programming to affiliates and other distributors. Shutdowns of communications satellites and transmitter facilities or service disruptions will pose significant risks to our operations. Such disruptions may be caused by power outages, natural disasters, extreme weather, terrorist attacks, war, failures or impairments of communications satellites or on-ground uplinks or downlinks or other technical facilities and services used to transmit programming, failure of service providers to meet contractual requirements, or other similar events. If a communications satellite or other transmission means (e.g., fiber) is not able to transmit our programming, or if any material component thereof fails or becomes inoperable, we may not be able to secure an alternative communications path in a timely manner because, among other factors, there are a limited number of service providers and other means available for the transmission of programming, and any alternatives may require lead time and additional technical resources and infrastructure to implement. If such an event were to occur, there could be a disruption in the delivery of our programming, which could harm our reputation and materially adversely affect our business, financial condition and results of operations.

**Our businesses may be subject to labor disruption.**

We and some of our suppliers and business partners retain the services of writers, directors, actors, announcers, athletes, technicians, trade employees and others involved in the development and production of our television programs, feature films and interactive entertainment (e.g., games) who are covered by collective bargaining agreements. If negotiations to renew expiring collective bargaining agreements are not successful or become unproductive, the affected unions could take actions such as strikes, work slowdowns or work stoppages. Strikes, work slowdowns, work stoppages or the possibility of such actions could result in delays in the production of our television programs, feature films and interactive entertainment. We could also incur higher costs from such actions, enter into new collective bargaining agreements or renew collective bargaining agreements on less favorable terms. Many of the collective bargaining agreements that cover individuals providing services to the Company are industry-wide agreements, and we may lack practical control over the negotiations and terms of these agreements. Union or labor disputes or player lock-outs relating to certain professional sports leagues may preclude us from producing and telecasting scheduled games or events and could negatively impact our promotional and marketing opportunities. Depending on their duration, union or labor disputes or player lock-outs could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Domestic and Foreign Laws and Regulations; Other Risks Related to International Operations**

**Changes in domestic and foreign laws and regulations and other risks related to international operations could adversely impact our business, financial condition and results of operations.**

Programming services like ours, and the distributors of our services, including cable operators, satellite operators and other multi-channel video programming distributors, are regulated by U.S. federal laws and regulations issued and administered by various federal agencies, including the FCC, as well as by state and local governments, in ways that affect the daily conduct of our video content business. These obligations and regulations, among other things, require closed captioning of programming for the hearing impaired, require certain content providers to make available audio descriptions of programming for the visually impaired, limit the amount and content of commercial matter that may be shown during programming aimed primarily at an audience of children aged 12 and under, and require the identification of (or the maintenance of lists of) sponsors of political advertising. See the discussion under "Business – Regulatory Matters" that appears above. The U.S. Congress, the FCC, the Federal Trade Commission ("FTC"), U.S. state legislatures, and the courts currently have under consideration, and may adopt or interpret in the future, new laws, regulations and policies regarding a wide variety of matters that could, directly or indirectly, affect the operations of our U.S. media properties or modify the terms under which we offer our services and operate.

Following the Merger, our operations through which we distribute programming outside the U.S. have increased significantly. As a result, our business is, and may increasingly be, subject to certain risks inherent in international business, many of which are beyond our control. These risks include:

- laws and policies affecting trade and taxes, including laws and policies relating to the repatriation of funds and withholding taxes, and changes in these laws;
- local regulatory requirements (and any changes to such requirements), including restrictions on content, censorship, imposition of local content quotas, local production levies and investment obligations, and restrictions or prohibitions on foreign ownership, outsourcing, consumer protection, targeted advertising, intellectual property and related rights, including copyright and rightsholder rights and remuneration;
- our ability to obtain the appropriate licenses and other regulatory approvals we need to distribute content in foreign countries as well as regulatory intervention on how we currently operate, including how we license and distribute content;
- differing degrees of protection for intellectual property and varying attitudes towards the piracy of intellectual property;
- significant fluctuations in foreign currency value;
- capital, currency exchange and central banking controls;
- the instability of foreign economies and governments;
- the potential for political, social, or economic unrest, terrorism, hostilities, cyber-attacks or war, including the war between Russia and Ukraine;
- anti-corruption laws and regulations such as the Foreign Corrupt Practices Act and the U.K. Bribery Act that impose stringent requirements on how we conduct our foreign operations and changes in these laws and regulations;
- sanction laws and regulations such as those administered by the Office of Foreign Assets Control that restrict our dealings with certain sanctioned countries, territories, individuals and entities; these laws and regulations are complex, frequently changing, and increasing in number, and may impose additional prohibitions or compliance obligations on our dealings in certain countries and territories, including sanctions imposed on Russia and certain Ukrainian territories as well as sanctions imposed on China;
- challenges implementing effective controls to monitor business activities across our expanded international operations;
- foreign privacy and data protection laws and regulations and changes in these laws and regulations; and
- shifting consumer preferences regarding the viewing of video programming.

Events or developments related to these and other risks associated with international trade could adversely affect our revenues from non-U.S. sources as well as our costs, which could have a material adverse effect on our business, financial condition and results of operations. Furthermore, some foreign markets where we and our partners operate may be more adversely affected by current economic conditions than the U.S. We also may incur substantial expense as a result of changes, including the imposition of new restrictions, in the existing regulatory, economic or political environment in the regions where we do business.

This is of particular concern in Poland, where we own and operate TVN, a portfolio of free-to-air and pay-TV lifestyle, entertainment, and news networks, which faces ongoing legislative and regulatory risk. In the past, said risk has manifested itself in draft legislation, now abandoned, which would have precluded non-EEA ownership of Polish national broadcasters, and in delays in renewing broadcast licenses. Such delays continue as well as regulatory pressure on some of TVN's journalism. Similar developments could, directly or indirectly, affect the future operations of our Polish media properties and/or modify the terms under which we offer our services and operate in that market in the future.

The evolving regulatory environment in international markets may also impact strategy, costs and results of operations, including with respect to local programming levies and investment obligations, satisfaction of local content quotas, access to local production incentive schemes, and direct and indirect digital taxes or levies on internet-based programming services.

**We are subject to domestic and international privacy and data protection laws, which impact our ability to collect, manage, and use personal information. Our efforts to comply with such laws, which are continually evolving, could impose costly obligations on us and generate additional regulatory and litigation risk.**

We are subject to domestic and international laws associated with the acquisition, storage, disclosure, use and protection of personal data, including under the E.U. General Data Protection Regulation (GDPR), several comprehensive U.S. state privacy laws, including the California Consumer Privacy Act (CCPA) and the California Privacy Rights Act (CPRA), and many other international laws and regulations. These laws and regulations are continually evolving and many more U.S. state and federal laws and international laws may pass this year. See the discussion above in "Business – Regulatory Matters". These evolving privacy, security, and data protection laws may require us to expend significant resources to implement additional data protection measures, and our actual or alleged failure to comply with such laws could result in legal claims, regulatory enforcement actions and significant fines and penalties.

**Environmental, social and governance laws and regulations may adversely impact our businesses.**

U.S. state and federal regulators, international regulators, investors, consumers and other stakeholders are increasingly focused on environmental, social, and governance (''ESG'') considerations. For example, the SEC has adopted regulations to require disclosures relating to public companies' management of human capital resources and has proposed rules to enhance and standardize climate-related disclosures; Nasdaq, the exchange where our stock is listed, has implemented board diversity disclosure requirements; the European Union has adopted specific conduct-based directives on ESG; and the U.K. has mandated climate-related disclosures for public companies. These increased disclosure obligations have required and may continue to require us to implement new practices and reporting processes, and have created and will continue to create additional compliance risk.

Additionally, our ESG initiatives and programs may not achieve their intended outcomes. If we are unable to meet our ESG goals or evolving stakeholder expectations and industry standards, or if we are perceived by consumers, stockholders or employees to have not responded appropriately to the growing concern for ESG issues, our reputation, and therefore our ability to sell our products and services, could be negatively impacted. If, as a result of their assessment of our ESG performance, certain investors are unsatisfied with our actions or progress, they may reconsider their investment in our Company. Providers of debt and equity financing may also consider our ESG performance and external ESG ratings (which we have limited ability to influence) in their decision involving our Company, which could impact our cost of capital and adversely affect our business.

**Foreign exchange rate fluctuations may adversely affect our operating results and financial conditions.**

We have significant operations in a number of foreign jurisdictions and certain of our operations are conducted and certain of our debt obligations are denominated in foreign currencies. The value of these foreign currencies fluctuates relative to the U.S. dollar. As a result, we have exposure to foreign currency risk as we enter into transactions and make investments denominated in multiple currencies. Adverse business performance and financial results from unforeseen changes in foreign currency exchange rates could increase our cost of borrowing or make it more difficult for us to obtain future financing, which could materially adversely affect our operating results and financial conditions. We manage our exposure to foreign currency risk by entering into derivative instruments with counterparty banks, which exposes us to counterparty credit risk.

Our consolidated financial statements are denominated in U.S. dollars, and to prepare those financial statements we must translate the amounts of the assets, liabilities, net sales, other revenues and expenses of our operations outside of the U.S. from local currencies into U.S. dollars using exchange rates for the current period. This exposure to exchange rate fluctuations could have an adverse effect on our reported results of operations and net asset balances.

**Increasing complexity of global tax policy and regulations could increase our tax liability and adversely impact our business and results of operations.**

We continue to face the increasing complexity of operating a global business, and we are subject to ever-changing tax policy and regulations around the world. Many foreign jurisdictions are contemplating additional taxes and/or levies on over-the-top services, as well as on media advertising. In addition, many foreign jurisdictions have increased scrutiny and have either changed, or plan to change, their international tax systems due to the Organisation for Economic Co-operation and Development's Base Erosion and Profit Shifting recommendations. These recommendations include, among other things, profit reallocation rules and a 15% global minimum corporate income tax rate. Such recommendations, if implemented, could have a material effect on our income tax liability.

Additional complexity has also arisen with respect to state aid: i.e., state resources used to provide recipients an advantage on a selective basis that has or could distort competition and affect trade between European member states. In recent years the European Commission has increased their scrutiny of state aid and has deviated from historical E.U. state aid practices. We receive material amounts of financial incentives for conducting our content production activities in various jurisdictions that offer such incentives. If the E.U. were to restrict our ability to receive these incentives, such restrictions could have a material impact on our results of operations.

Other changes in tax laws and the interpretation thereof could have a material impact on our tax liability. For example, in August 2022, the U.S. government enacted the Inflation Reduction Act which, among other changes, created a new corporate alternative minimum tax ("CAMT") of 15% for corporations whose average annual adjusted financial statement income for any consecutive 3 tax year periods ending after December 31, 2021 and preceding the tax year exceeds $1 billion, and a 1% excise tax on stock repurchases made by publicly traded U.S. companies. The effective date of these provisions was January 1, 2023, although we await further guidance from the U.S. government on the calculation of the CAMT. Based on that forthcoming guidance, it is possible that the CAMT could result in a material additional tax liability.

**Risks Related to Our Financial, Capital and Corporate Structure**

**Forecasting our financial results requires us to make judgements and estimates which may differ materially from actual results.**

Given the dynamic nature of our business, the current uncertain economic climate and the inherent limitations in predicting the future, forecasts of our revenues, adjusted earnings before interest, taxes, depreciation, and amortization (as defined in Note 23 to the accompanying consolidated financial statements, "Adjusted EBITDA"), free cash flow and subscriber growth, and other financial and operating data, may differ materially from actual results, including as a result of events outside of our control and other risks and uncertainties described herein. Such discrepancies could cause a decline in the trading price of our common stock.

**Our ability to incur debt and the use of our funds could be limited by the restrictive covenants in the loan agreements for our term loan and revolving credit facility.**

The loan agreements for our term loan and revolving credit facility contain restrictive covenants, as well as requirements to comply with certain leverage and other financial maintenance tests. These covenants and requirements could limit our ability to take various actions, including incurring additional debt, guaranteeing indebtedness and engaging in various types of transactions, including mergers, acquisitions and sales of assets, or taking advantage of other opportunities, which could have an adverse effect on our business.

In addition, credit ratings actions could impact the terms of our loan agreements. A ratings downgrade may increase our borrowing costs, which could diminish operational flexibility and reduce profitability.

**We could be unable to obtain cash in amounts sufficient to meet our financial obligations or other commitments.**

Our ability to meet our financial obligations and other contractual commitments will depend upon our ability to access cash. We are a holding company, and our sources of cash include our available cash balances, net cash from the operating activities of our subsidiaries, any dividends and interest we may receive from our investments, availability under our credit facilities or any credit facilities that we may obtain in the future and proceeds from any asset sales we may undertake in the future. The ability of our operating subsidiaries, including WarnerMedia Holdings, Inc., Scripps Networks Interactive, Inc., and Discovery Communications, LLC to pay dividends or to make other payments or advances to us will depend on their individual operating results and any statutory, regulatory or contractual restrictions, including restrictions under our credit facilities, to which they may be or may become subject. Under the 2017 Tax Cuts and Jobs Act, we were subject to U.S. taxes for the deemed repatriation of certain cash balances held by foreign corporations. The Company intends to continue to permanently reinvest these funds outside of the U.S., and current plans do not demonstrate a need to repatriate them to fund our U.S. operations.

**Financial performance for our equity method investments and investments without readily determinable fair value may differ from current estimates.**

We have equity investments in several entities and the accounting treatment applied for these investments varies depending on a number of factors, including, but not limited to, our percentage ownership and the level of influence or control we have over the relevant entity. Any losses experienced by these entities could adversely impact our results of operations and the value of our investment. In addition, if these entities were to fail and cease operations, we may lose the entire value of our investment and the stream of any shared profits. Some of our ventures may require additional uncommitted funding. We also have significant investments in entities that we have accounted for as investments without readily determinable fair value. If these entities experience significant losses or were to fail and cease operations, our investments could be subject to impairment and the loss of a part or all of our investment value.

**Certain of our businesses are conducted through joint ventures or partnerships with one or more third parties, in which we share ownership, management and profits of the business operation to varying degrees.**

Certain of our businesses are conducted through joint ventures or partnerships with one or more third parties, where we have varying degrees of ownership and influence. From time to time, we may disagree with our joint venture partners on the strategy or management of a joint venture business, but may be constrained in our ability to make decisions unilaterally as a result of legal or contractual obligations to our joint venture partners, which could adversely affect our business, financial condition and results of operations.

**We have directors that are also related persons of Advance/Newhouse Programming Partnership ("Advance/Newhouse") and that overlap with those of Liberty Media Corporation ("Liberty Media"), Liberty Global plc ("Liberty Global"), Qurate Retail Group f/k/a Liberty Interactive Corporation ("Qurate Retail"), Liberty Broadband Corporation ("Liberty Broadband"), and Liberty Latin America Ltd ("LLA"), which may lead to conflicting interests for those directors or result in the diversion of business opportunities or other potential conflicts.**

Advance/Newhouse owns shares representing approximately 8% of our outstanding common stock. Our board of directors includes Steven A. Miron, the Chief Executive Officer of Advance/Newhouse and Steven O. Newhouse, Co-President of Advance Publications, Inc., which holds interests in Advance/Newhouse and Charter Communications, Inc. ("Charter"). Pursuant to a consent agreement entered into between Advance/Newhouse and the Company in connection with the Merger, the Company designated Mr. Miron and Mr. Newhouse to our board of directors with terms ending in 2025. Mr. Miron is also a member of the board of directors of Charter, of which Liberty Broadband and Advance Publications, Inc. own equity interests.

In addition, Dr. John C. Malone, chairman of Liberty Media, Liberty Global and Liberty Broadband and member of the board of directors of Qurate Retail, serves on our board of directors. Our board of directors also currently includes one other person who is currently a member of the board of directors of Liberty Media, one other person who is currently a member of the board of directors of Liberty Global, and one person who is a currently a member of the board of directors of LLA.

The respective parent companies of Advance/Newhouse and of Liberty Media, Liberty Global, Qurate Retail, Liberty Broadband, and LLA (together, the "Liberty Entities") own interests in various U.S. and international media, communications and entertainment companies, such as Charter, that have subsidiaries that own or operate domestic or foreign content services that may compete with the content services we offer. We have no rights in respect of U.S. or international content opportunities developed by or presented to the subsidiaries of any Liberty Entities, and the pursuit of these opportunities by such subsidiaries may adversely affect our interests and those of our stockholders.

None of the Liberty Entities own any interest in us. Dr. Malone beneficially owns: shares of Liberty Media representing approximately 48% of the aggregate voting power of its outstanding stock, shares representing approximately 30% of the aggregate voting power of Liberty Global, shares representing approximately 7% of the aggregate voting power of Qurate Retail, shares representing approximately 47% of the aggregate voting power of Liberty Broadband and shares representing less than 1% of our outstanding common stock. Our other directors who are also directors of the Liberty Entities hold stock and stock-based compensation in the Liberty Entities and hold our stock and stock-based compensation.

These ownership interests and/or business positions could create conflicts of interest or the appearance of conflicts of interest when these individuals are faced with decisions that could have different implications for us, Advance/Newhouse and/or the Liberty Entities. For example, there may be the potential for a conflict of interest when we, on the one hand, or Advance/Newhouse and/or one or more of the Liberty Entities, on the other hand, consider acquisitions and other corporate opportunities that may be suitable for the other.

The members of our board of directors have fiduciary duties to us and our stockholders. Likewise, those persons who serve in similar capacities at Advance/Newhouse or a Liberty Entity have fiduciary duties to those companies. Therefore, such persons may have conflicts of interest or the appearance of conflicts of interest with respect to matters involving or affecting both respective companies, and there can be no assurance that the terms of any transactions will be as favorable to us or our subsidiaries as would be the case in the absence of a conflict of interest.

**It may be difficult for a third party to acquire us, even if such acquisition would be beneficial to our stockholders.**

In connection with the Merger, we agreed with AT&T that for a two-year period following the Merger, we would not, among other things and subject to certain exceptions, enter into any transaction or series of transactions as a result of which one or more persons would acquire an amount of stock of our Company that, when combined with certain other changes in ownership of our stock (including the Merger), would equal or exceed 45% of the outstanding stock of our Company. Further, certain provisions of our charter and bylaws may discourage, delay or prevent a change in control that a stockholder may consider favorable. These provisions include the following:

- authorizing the issuance of "blank check" preferred stock without stockholder approval, which could be issued by our board of directors to increase the number of outstanding shares and thwart a takeover attempt;
- classifying our board of directors with staggered three-year terms until the election of directors at our 2025 annual meeting of stockholders, which may lengthen the time required to gain control of our board of directors;
- limiting who may call special meetings of stockholders;
- prohibiting stockholder action by written consent, thereby requiring stockholder action to be taken at a meeting of the stockholders;

- establishing advance notice requirements for nominations of candidates for election to our board of directors or for proposing matters that can be acted upon by stockholders at stockholder meetings;
- the existence of authorized and unissued stock which would allow our board of directors to issue shares to persons friendly to current management, thereby protecting the continuity of our management, or which could be used to dilute the stock ownership of persons seeking to obtain control of us.

In addition, under our charter, we have not opted out of the protections of Section 203 of the Delaware General Corporation Law (the "DGCL"), and we are therefore governed by Section 203. Accordingly, it is expected that Section 203 will have an anti-takeover effect with respect to transactions that our board of directors does not approve in advance and that Section 203 may discourage takeover attempts that might result in a premium over the market price of WBD capital stock.

These provisions are intended to protect our stockholders from coercive or otherwise unfair takeover tactics by requiring potential acquirers to negotiate with our board of directors and by providing our board of directors with more time to assess any acquisition proposal. These provisions are not intended to make us immune from takeovers. As noted above, these provisions apply even if the offer may be considered beneficial by some stockholders and could delay or prevent an acquisition that our board of directors determines is not in our best interests and the best interests of our stockholders. Accordingly, if our board of directors determines that a potential business combination transaction is not in our best interests and the best interests of our stockholders, but certain stockholders believe that such a transaction would be beneficial to us and our stockholders, such stockholders may elect to sell their shares in WBD and the market price of WBD common stock could decrease.

**If Advance/Newhouse were to sell its shares following the exercise of its registration rights, it may cause a significant decline in our stock price, even if our business is doing well.**

Advance/Newhouse and Advance Newhouse Partnership ("ANP") have been granted registration rights covering all of the shares of common stock now held or hereafter acquired by them. Subject to certain limitations and restrictions, including customary "blackout periods", Advance/Newhouse and ANP have the right to assign any or all of their registration rights to their affiliates and successors, as well as a specified family foundation. The shares held by Advance/Newhouse and ANP are registered for resale pursuant to our registration statement on Form S-3 filed April 22, 2022. Any future exercise of registration rights or sale of large amounts of our common stock in the public market could materially and adversely affect the market price of our common stock.

**General Risks**

**We face cybersecurity and similar risks, which could result in the disclosure of confidential information, disruption of our programming services, damage to our brands and reputation, legal exposure and financial losses.**

We and our partners rely on various technology systems in connection with the production, distribution and broadcast of our programming, and our on-line, mobile and app offerings, as well as our internal systems, involve the storage and transmission of personal and proprietary information. Consistently, cyber criminals and other malicious actors target us and our service providers. Our systems and our service providers' systems have been breached in the past due to cybersecurity attacks. These systems may continue to be breached in the future due to employee error or misconduct, system vulnerabilities, malicious code, hacking and phishing attacks, or otherwise. If our information security systems or data are compromised in a material way, such compromises could result in a disruption of services or a reduction of the revenues we are able to generate from such services, damage to our brands and reputation, a loss of confidence in the security of our offerings and services, and significant legal and financial exposure, each of which could potentially have an adverse effect on our business.

The risk of cyberattacks has also increased and will continue to increase in connection with Russia's invasion of Ukraine. In light of the Ukraine war and other geopolitical events and dynamics, including ongoing tensions with Russia, China, North Korea, Iran and other states, state-sponsored parties or their supporters may launch retaliatory cyberattacks, and may attempt to cause supply chain disruptions, or carry out other geopolitically motivated retaliatory actions that may adversely disrupt or degrade our operations and may result in data compromise. These security attacks can originate from a wide variety of sources/malicious actors, including, but not limited to, persons who constitute an insider threat, who are involved with organized crime, or who may be linked to terrorist organizations or hostile foreign governments. Those same parties may also attempt to fraudulently induce employees, customers, or other users of our systems to disclose sensitive information in order to gain access to our data or that of our customers or clients through social engineering, phishing, mobile phone malware, and other methods.

**Theft of our intellectual property and unauthorized duplication, distribution and exhibitions of our intellectual property may decrease revenues and adversely affect our business, financial condition, and results of operations.**

The success of our business depends in part on effective and deterrent laws efficiently implemented by law enforcement to enable our ability to maintain and enforce the intellectual property rights underlying our content and brands. We are a global media and entertainment company, and piracy or other infringement of our intellectual property (including digital content, feature films, television programming, gaming, and other content), brands and other intellectual property has the potential to materially adversely affect us. Piracy is particularly prevalent in parts of the world that do not effectively enforce intellectual property rights and laws. Even in territories like the U.S. that have stronger intellectual property laws, legal frameworks that are unresponsive to modern realities, combined with the lack of effective technological prevention and enforcement measures, may impede our enforcement efforts. Our enforcement activities depend in part on third parties, including technology and platform providers, whose cooperation and effectiveness cannot be assured to any degree. In addition, technological advances that allow the almost instantaneous unauthorized copying and downloading of content into digital formats without any degradation of quality from the original facilitate the rapid creation, transmission, and sharing of high-quality unauthorized copies. This is also true for broadcast signals, which can be retransmitted without any degradation of quality from the original via unauthorized services. Unauthorized distribution of copyrighted material over the internet is a threat to copyright owners' ability to maintain the exclusive control over their copyrighted material and thus the value of their property. The proliferation of unauthorized use of our content may have a material adverse effect on our business and profitability. For example, it may reduce the revenue that we potentially could receive from the legitimate sale and distribution of our content. We may also need to spend significant amounts of money on improvement of technological platform security and enforcement activities, including litigation, to protect our intellectual property rights.

Any impairment of our intellectual property rights, including due to changes in U.S. or foreign laws, the absence of effective legal protections or enforcement measures, or the inability to negotiate license or distribution agreements with third parties, could materially adversely impact our business, financial condition, and results of operations. As a global company, we are subject to laws in the U.S. and abroad, as well as trade agreements which may limit our ability to exploit our intellectual property. For example, in certain countries, including China, laws and regulations limit the number of foreign films exhibited in such countries in a calendar year.

From time to time, third parties may also challenge the validity or scope of our intellectual property and may assert infringement claims against us, and the success of any such challenges could result in the limitation or loss of intellectual property rights. Irrespective of their validity, such claims may result in substantial costs and diversion of resources which could have an adverse effect on our operations.

**Our success depends on attracting, developing, motivating and retaining key employees and creative talent within our business. Significant shortfalls in recruitment or retention, or failure to adequately motivate or compensate employees or creative talent, could adversely affect our ability to compete and achieve our strategic goals.**

Attracting, developing, motivating and retaining talented employees are essential to the successful delivery of our products and services and success in the marketplace. Our business depends upon the continued efforts, abilities and expertise of our corporate and divisional executive teams and entertainment personalities, and the ability to attract and retain these talented employees and personalities is critical in the development and delivery of products and services, which is an integral component of our growth strategy. Competition for employees and personalities can be intense and if we are unable to successfully integrate, motivate and reward our current employees, we may not be able to retain them. If we are unable to retain these employees or attract new employees in the future, our ability to effectively compete with our competitors and to grow our business could be materially adversely affected. Additionally, following the Merger, we have undertaken a number of restructuring and transformation initiatives, including headcount reduction. This headcount reduction and other restructuring initiatives could disrupt our operations, adversely impact employee morale and our reputation as an employer, which could make it more difficult for us to retain existing employees and hire new employees in the future, distract management and harm our business overall.

In addition, we employ or contract with talent who may have loyal audiences. These individuals are important to audience endorsement of our programs and other content. There can be no assurance that these individuals will remain with us or retain their current audiences. If we fail to retain or attract key individuals or if our talent loses their current audience base or suffer negative publicity, our business, financial condition and results of operations could be materially adversely affected.

**The market price of our common stock has been highly volatile and may continue to be volatile due to circumstances beyond our control.**

The market price of our common stock has fluctuated, and may continue to fluctuate, widely, due to many factors, some of which may be beyond our control. These factors include, without limitation:

- actual or anticipated fluctuations in our financial and operating results;

- comments by or expectations of securities analysts or other third parties, including blogs, articles, message boards, and social and other media relating to the Merger or otherwise;
- public perception of us, our on-air talent, our competitors, or industry;
- development and provision of programming for new television and telecommunications technologies and the success of our HBO Max and discovery+ streaming products;
- spending on domestic and foreign television advertising;
- changes in the distribution and viewing of television programming, including the expanded deployment of personal video recorders, subscription video on demand, internet protocol television, mobile personal devices, and personal tablets and their impact on television advertising revenue;
- fluctuations in foreign currency exchange rates; and
- overall general market fluctuations.

**Strategic transactions and acquisitions present many risks and we may not realize the financial and strategic goals that were contemplated at the time of any transaction.**

From time to time we may enter into strategic transactions, make investments or make acquisitions, such as the Merger. Our success may depend on opportunities to buy other businesses or technologies that could complement, enhance or expand our current business or products or that might otherwise offer us growth opportunities. Such transactions may result in dilutive issuances of our equity securities, use of our cash resources, and incurrence of debt and amortization expenses related to intangible assets. We may also incur unanticipated expenses, fail to realize anticipated benefits, have difficulty integrating the acquired businesses, disrupt relationships with current and new employees, subscribers, affiliates and vendors, incur significant debt, or have to delay or not proceed with announced transactions.

Additionally, regulatory agencies, such as the FCC or U.S. Department of Justice may impose additional restrictions on the operation of our business as a result of our seeking regulatory approvals for any strategic transactions and significant acquisitions. The occurrence of any of these events could have an adverse effect on our business.

**Our participation in multiemployer defined benefit pension plans could subject us to liabilities that could adversely affect our business, financial condition and results of operations.**

We contribute to various multiemployer defined benefit pension plans (the “multiemployer plans”) under the terms of collective bargaining agreements that cover certain of our union-represented employees. Following the completion of the Merger, we assumed certain of the obligations under these multiemployer plans with respect to transferred employees from the WarnerMedia Business. The risks of participation in these multiemployer plans are different from single-employer pension plans in that: (1) contributions made by us to the multiemployer plans may be used to provide benefits to employees of other participating employers; (2) if we choose to stop participating or substantially reduce participation in certain of these multiemployer plans, we may be required to pay those plans an amount based on the underfunded status of the plan, which is referred to as a withdrawal liability; and (3) actions taken by any participating employer that lead to a deterioration of the financial health of a multiemployer plan may result in the unfunded obligations of the multiemployer plan being borne by its remaining participating employers, including us. While we do not expect any of the multiemployer plans to which we contribute to be individually significant to us as a whole, as of December 31, 2022, we were an employer that provided more than 5% of total contributions to certain of the multiemployer plans in which we participate.

To the extent that U.S.-registered multiemployer plans are underfunded, the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (collectively, “ERISA”), may subject us to substantial liabilities in the event of a complete or partial withdrawal from, or upon termination of, such plans. We currently contribute to, and in the past the WarnerMedia Business has contributed to, multiemployer plans that are underfunded, and, therefore, could have potential liability associated with a voluntary or involuntary withdrawal from, or termination of, such plans. In addition, for a multiemployer plan in endangered, seriously endangered or critical status, additional required contributions, generally in the form of surcharges on contributions otherwise required, and benefit reductions may apply if such plan is determined to be underfunded, which could adversely affect our business, financial condition and results of operations if we are unable to adequately mitigate these costs.

As of December 31, 2022, two of the multiemployer plans in which we participate were underfunded, but neither plan was considered to be in endangered, seriously endangered or critical status. The amount of funds we may be obligated to contribute to multiemployer plans in the future cannot be estimated, as these amounts are based on future levels of work of the union-represented employees covered by the multiemployer plans, investment returns and the funding status of such plans. We do not currently intend to withdraw from the multiemployer plans in which we participate, and we are not aware of circumstances that would reasonably lead to material claims against the us in connection with the multiemployer plans in which we participate. There can be no assurance, however, that we will not be assessed liabilities in the future. Potential withdrawal liabilities, requirements to pay increased contributions, and/or surcharges in connection with any multiemployer plans in which we participate could materially adversely affect our business, financial condition and results of operations.

**Our business, financial condition and results of operations may be negatively impacted by the outcome of uncertainties related to litigation.**

From time to time, we may be involved in a number of legal claims, regulatory investigations, litigation actions (asserted individually and/or on behalf of a class), and arbitration proceedings. We may be subject to a number of lawsuits both in the U.S. and in foreign countries, including, at any particular time, claims relating to antitrust, intellectual property, employment, wage and hour, consumer privacy, regulatory and tax proceedings, contractual and commercial disputes, and the production, distribution, and licensing of our content. We may also spend substantial resources complying with various government standards, which may entail related investigations and litigation. We may incur significant expenses defending such suits or government charges and may be required to pay amounts or otherwise change our operations in ways that could materially adversely affect our business, financial condition and results of operations. This could result in an increase in our cost for defense or settlement of claims or indemnification obligations if we were to be found liable in excess of our historical experience. Even if we believe a claim is without merit, and/or we ultimately prevail, defending against the claim could be time-consuming and costly and divert our management's attention and resources away from our business.

In addition, our insurance may not be adequate to protect us from all material expenses related to pending and future claims and our current levels of insurance may not be available in the future at commercially reasonable prices. Any of these factors could materially adversely affect our business, financial condition and results of operations.

## ITEM 1B. Unresolved Staff Comments.

None.

## ITEM 2. Properties.

The Company's headquarters are located in New York City at 230 Park Ave. South. The Company owns and leases approximately 21 million square feet of offices; studios; technical, production and warehouse spaces; communications facilities; and other properties in numerous locations in the U.S. and around the world for its businesses. Each property is considered to be in good condition, adequate for its purpose, and suitably utilized according to the individual nature and requirements of the relevant operations housed within. The following table sets forth information as of December 31, 2022 with respect to the Company's principal properties:

| Location | Principal Use | Approximate Square Footage | Type of Ownership; Expiration Date of Lease |
|---|---|---|---|
| New York, NY<br>230 Park Ave South | Studios, Networks, DTC, & Corporate | 360,000 | Leased; Lease expires in 2037. |
| New York, NY<br>30 Hudson Yards | Studios, Networks, DTC, & Corporate | 1,500,000 | Leased; Lease expires in 2034. |
| Burbank, CA<br>The Warner Bros. Studios | Studios | 2,600,000 | Owned. |
| Leavesden, UK<br>Leavesden Studios | Studios | 1,300,000 | Owned. |
| Atlanta, GA<br>1050 Techwood Dr. | Studios, Networks, DTC, & Corporate | 1,170,000 | Owned. |
| Atlanta, GA<br>One CNN Center | Studios, Networks, & Corporate | 1,150,000 | Leased; Lease expires in 2024. |
| Burbank, CA<br>Second Century Tower 1 & 2 | Studios & Corporate | 800,000 | Leased; Tower 1 lease expires in 2037 & Tower 2 lease expires in 2039. |

| Location | Principal Use | Approximate Square Footage | Type of Ownership; Expiration Date of Lease |
|---|---|---|---|
| Santiago, Chile<br>Pedro Montt 2354 | Studios & Networks | 610,000 | Owned. |
| Knoxville, TN<br>Knoxville Office & Tech Center | Studios, Networks, DTC, & Corporate | 344,000 | Owned. |
| Culver City, CA<br>Ivy Station | Networks & DTC | 244,000 | Leased; Lease expires in 2036. |
| Warsaw, Poland<br>TVN Warsaw HQ | Studios, Networks, DTC, & Corporate | 198,000 | Owned. |
| London, England<br>Warner House | Networks, DTC, & Corporate | 135,000 | Leased; Lease expires in 2034. |
| Buenos Aires, Argentina<br>599 & 533 Defensa St. | Studios, Networks, DTC, & Corporate | 129,000 | Owned. |
| London, England<br>Old Street | Studios, Networks, DTC, & Corporate | 116,000 | Leased; Lease expires in 2034. |
| Paris, France<br>LaMiral Zac Forum Seine | Networks, DTC, & Corporate | 116,000 | Leased; Lease expires in 2031. |
| Seattle, WA<br>1099 Stewart Street | DTC | 112,000 | Leased; Lease expires in 2025. |
| London, England<br>Chiswick Park, Bldg. 2 | Networks, DTC, & Corporate | 102,000 | Leased; Lease expires in 2034. |
| Washington, DC<br>820 First St. | Studios & Networks | 71,000 | Leased; Lease expires in 2031. |
| Auckland, New Zealand<br>2 & 3 Flower St. | Studios, Networks, DTC, & Corporate | 57,000 | Leased; Lease expires in 2025. |
| Sterling, VA<br>45580 Terminal Dr. | Studios, Networks, & DTC | 54,000 | Owned. |
| Silver Spring, MD<br>8403 Colesville Rd. | Networks & Corporate | 47,000 | Leased; Lease expires in 2030. |
| Tokyo, Japan<br>1-2-9, Nishi-Shinbashi | Networks & DTC | 47,000 | Leased; Lease expires in 2028. |
| Singapore, Singapore<br>1 Fusionopolis Walk | Networks & DTC | 40,000 | Leased; Lease expires in 2026. |

**ITEM 3. Legal Proceedings.**

From time to time, in the normal course of its operations, the Company is subject to various litigation matters and claims, including claims related to employees, stockholders, vendors, other business partners or intellectual property. However, a determination as to the amount of the accrual required for such contingencies is highly subjective and requires judgments about future events. Although the outcome of these matters cannot be predicted with certainty and the impact of the final resolution of these matters on the Company's results of operations in a particular subsequent reporting period is not known, management does not believe that the resolution of these matters will have a material adverse effect on our consolidated financial position, future results of operations, or cash flows.

Between September 23, 2022 and October 24, 2022, two purported class action lawsuits (*Collinsville Police Pension Board v. Discovery, Inc., et al*., Case No. 1:22-cv-08171; *Todorovski v. Discovery, Inc., et a*., Case No. 1:22-cv-09125) were filed in the United States District Court for the Southern District of New York. The complaints name Warner Bros. Discovery, Inc., Discovery, Inc., David Zaslav, and Gunnar Wiedenfels as defendants. The complaints generally allege that the defendants made false and misleading statements in SEC filings and in certain public statements relating to the Merger, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. The complaints seek damages and other relief. On November 4, 2022, the court consolidated the *Collinsville* and *Todorovski* complaints under case number 1:22-CV-8171, and on December 12, 2022, the court appointed a lead plaintiff and lead counsel. The Company intends to vigorously defend these litigations.

On December 2, 2022, a purported class action and derivative lawsuit (*Monroe County Employees' Retirement System, Plumbers Local Union No. 519 Pension Trust Fund, and Davant Scarborough v. David M. Zaslav, et al.*, Case No. 2022-1115-JTL) was filed in the Delaware Court of Chancery (the "Monroe County Action"). The Monroe County Action names certain of the Company's directors and officers, Advance/Newhouse Partnership and Advance/Newhouse Programming Partnership (collectively, "Advance/Newhouse"), and AT&T as defendants. The Monroe County Action generally alleges that former directors and officers of Discovery and Advance/Newhouse breached their fiduciary duties in connection with the Merger, and that AT&T aided and abetted these alleged breaches of fiduciary duties. The Monroe County Action seeks damages and other relief.

Also on December 2, 2022, a separate purported class action lawsuit (*Bricklayers Pension Fund of Western Pennsylvania v. Advance/Newhouse Partnership*, Case No. 2022-1114-JTL) was filed in the Delaware Court of Chancery (the "Bricklayers Action"). The complaint in the Bricklayers Action names Advance/Newhouse and certain of the Company's current and former directors as defendants and generally alleges that former directors of Discovery and Advance/Newhouse breached their fiduciary duties in connection with the Merger, and that Advance/Newhouse aided and abetted these alleged breaches of fiduciary duties. The Bricklayers Action seeks damages and other relief.

On January 11, 2023, the Delaware Court of Chancery consolidated the Monroe County Action and the Bricklayers Action under the caption *In re Warner Bros. Discovery, Inc. Stockholders Litigation*, Consolidated Case No. 2022-1114-JTL. The Company intends to vigorously defend these litigations.

**ITEM 4. Mine Safety Disclosures.**

Not applicable.

**Executive Officers of Warner Bros. Discovery, Inc.**

As of February 24, 2023, the following individuals are the executive officers of the Company.

**David M. Zaslav, President, Chief Executive Officer, and a director**
Age: 63
Executive Officer since 2007

Mr. Zaslav has served as our President and Chief Executive Officer and a member of our board of directors since the closing of the Merger on April 8, 2022. Prior to the closing, Mr. Zaslav served as Discovery's President and Chief Executive Officer from January 2007 until April 2022 and a common stock director of Discovery from September 2008 until April 2022.

**Gunnar Wiedenfels, Chief Financial Officer**
Age: 45
Executive Officer since 2017

Mr. Wiedenfels has served as our Chief Financial Officer since the closing of the Merger on April 8, 2022. Prior to the closing, Mr. Wiedenfels served as Discovery, Inc.'s Chief Financial Officer from April 2017 until April 2022.

**Bruce L. Campbell, Chief Revenue and Strategy Officer**
Age: 55
Executive Officer since 2008

Mr. Campbell has served as our Chief Revenue and Strategy Officer since the closing of the Merger on April 8, 2022. Prior to the closing, he served as Discovery's Chief Development, Distribution and Legal Officer. Mr. Campbell has served in several senior executive roles at Discovery, including as Chief Distribution Officer from October 2015 to April 2022, Chief Development Officer from August 2010 to April 2022, General Counsel from December 2010 to April 2017, Digital Media Officer from August 2014 to October 2015 and President, Digital Media & Corporate Development from March 2007 to August 2010.

**David Leavy, Chief Corporate Affairs Officer**
Age: 53
Executive Officer since 2014

Mr. Leavy has served as our Chief Corporate Affairs Officer since the closing of the Merger on April 8, 2022. Prior to the closing, he served as Discovery's Chief Corporate Operating Officer from June 2019 to April 2022 and prior to that, its Chief Corporate Operations and Communications Officer from March 2016 to June 2019. Mr. Leavy has served in several other senior executive roles since joining in March 2000.

**Lori Locke, Chief Accounting Officer**
Age: 59
Executive Officer since 2019

Ms. Locke has served as our Chief Accounting Officer since the closing of the Merger on April 8, 2022. Prior to the closing, Ms. Locke served as Discovery's Chief Accounting Officer from June 2019 to April 2022. Prior to joining Discovery, Ms. Locke served as Vice President, Corporate Controller and Principal Accounting Officer for Gannett Co., Inc., a media company, from June 2015 to May 2019.

**Jean-Briac Perrette, CEO and President, Global Streaming and Games**
Age: 51
Executive Officer since 2014

Mr. Perrette has served as our CEO and President of Global Streaming and Games since the closing of the Merger on April 8, 2022. Prior to the closing, he served as President and CEO of Discovery International (formerly referred to as Discovery Networks International) from June 2016 until April 2022, and served as President of Discovery Networks International from March 2014 to June 2016. Prior to that, Mr. Perrette served as Discovery's Chief Digital Officer from October 2011 to February 2014.

**Adria Alpert Romm, Chief People and Culture Officer**
Age: 67
Executive Officer since 2008

Ms. Romm has served as our Chief People and Culture Officer since the closing of the Merger on April 8, 2022. Prior to the closing, Ms. Romm served as Discovery's Chief People and Culture Officer from April 2019 to April 2022. Prior to that, Ms. Romm served as Discovery's Chief Human Resources and Diversity Officer from March 2014 to March 2019 and Discovery's Senior Executive Vice President of Human Resources from March 2007 to February 2014.

**Savalle C. Sims, Executive Vice President and General Counsel**
Age: 52
Executive Officer since 2017

Ms. Sims has served as Executive Vice President and General Counsel since the closing of the Merger on April 8, 2022. Prior to the closing, Ms. Sims served as Discovery's Executive Vice President and General Counsel from April 2017 until April 2022. Prior to that, Ms. Sims served as Discovery's Executive Vice President and Deputy General Counsel from December 2014 to April 2017 and Discovery's Senior Vice President, Litigation and Intellectual Property from August 2011 to December 2014.

**Gerhard Zeiler, President, International**
Age: 67
Executive Officer since 2022

Mr. Zeiler has served as our President, International since the closing of the Merger on April 8, 2022. Prior to the closing, Mr. Zeiler served as President of WarnerMedia International from August 2020 to April 2022 and prior to that, Chief Revenue Officer of WarnerMedia from March 2019 to August 2020. Mr. Zeiler was President of Turner Broadcasting System International from May 2012 to February 2019.

## PART II

### ITEM 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

WBD common stock is listed and traded on Nasdaq under the symbol "WBD".

As of February 9, 2023, there were approximately 715,364 record holders of WBD common stock. This amount does not include the number of shareholders whose shares are held of record by banks, brokerage houses or other institutions, but includes each such institution as one shareholder.

We have not paid any cash dividends on WBD common stock and we have no present intention to do so. Payment of cash dividends, if any, will be determined by our board of directors after consideration of our earnings, financial condition and other relevant factors such as our credit facility's restrictions on our ability to declare dividends in certain situations.

**Stock Performance Graph**

The following graph shows a comparison of cumulative total shareholder return, calculated on a dividend-reinvested basis, for (a) WBD common stock (which began trading on April 11, 2022) and Discovery Series A common stock, Series B convertible common stock, and Series C common stock (which ceased trading on April 8, 2022), (b) the Standard and Poor's 500 Stock Index ("S&P 500 Index"), (c) the Standard & Poor's 500 Media and Entertainment Industry Group Index ("S&P 500 Media & Entertainment Index"), and (d) a peer group of companies (the "Prior Peer Group") for the five years ended December 31, 2022. The Prior Peer Group is comprised of The Walt Disney Company common stock, Paramount Global Class B common stock, Fox Corporation Class A common stock, and AMC Networks Inc. Class A common stock. The graph assumes $100 was invested in each of Discovery Series A common stock, Series B convertible common stock, and Series C common stock, the S&P 500 Index, the S&P 500 Media & Entertainment Index, and the stocks of the Prior Peer Group on December 31, 2017, and that $100 was invested in WBD common stock on April 11, 2022, the date on which it began trading. Note that historic stock price performance is not necessarily indicative of future stock price performance. The change from our Prior Peer Group to the S&P 500 Media & Entertainment Index was made to better reflect our business subsequent to the Merger.




NOTE: Peer group indices use beginning of period market capitalization weighting.
NOTE: Index Data: Copyright Standard and Poor's, Inc. Used with permission. All rights reserved.
NOTE: Prepared by Zacks Investment Research, Inc. Used with permission. All rights reserved. Copyright 1980-2023.

| | December 31, 2017 | December 31, 2018 | December 31, 2019 | December 31, 2020 | December 31, 2021 | April 8, 2022 | December 31, 2022 |
|---|---|---|---|---|---|---|---|
| WBD | | | | | | $ 100.00 | $ 38.80 |
| DISCA | $ 100.00 | $ 110.55 | $ 146.30 | $ 134.46 | $ 105.19 | $ 109.17 | $ — |
| DISCB | $ 100.00 | $ 135.08 | $ 146.21 | $ 130.65 | $ 119.96 | $ 98.59 | $ — |
| DISCK | $ 100.00 | $ 109.02 | $ 144.03 | $ 123.71 | $ 108.17 | $ 115.35 | $ — |
| S&P 500 | $ 100.00 | $ 95.62 | $ 125.72 | $ 148.85 | $ 191.58 | $ 181.13 | $ 156.88 |
| S&P 500 Media & Entertainment Index | $ 100.00 | $ 90.25 | $ 121.08 | $ 159.27 | $ 202.18 | $ 170.27 | $ 113.40 |
| Prior Peer Group | $ 100.00 | $ 100.13 | $ 129.45 | $ 153.94 | $ 134.50 | $ 119.40 | $ 77.93 |

**ITEM 6. [Reserved].**

**ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

Management's discussion and analysis of financial condition and results of operations is a supplement to and should be read in conjunction with the accompanying consolidated financial statements and related notes. This section provides additional information regarding our businesses, current developments, results of operations, cash flows, financial condition, contractual commitments, critical accounting policies, and estimates that require significant judgment and thus have the most significant potential impact on our consolidated financial statements. This discussion and analysis is intended to better allow investors to view the company from management's perspective.

This section provides an analysis of our financial results for the fiscal year ended December 31, 2022 compared to the fiscal year ended December 31, 2021. A discussion of our results of operations and liquidity for the fiscal year ended December 31, 2021 compared to the fiscal year ended December 31, 2020 can be found under Item 7 in our Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed on February 24, 2022, which is available free of charge on the SEC's website at www.sec.gov and our Investor Relations website at ir.wbd.com. The information contained on our website is not part of this Annual Report on Form 10-K and is not incorporated by reference herein.

**BUSINESS OVERVIEW**

On April 8, 2022, Discovery, a global media company that provides content across multiple distribution platforms, including linear, free-to-air, and broadcast television, authenticated GO applications, digital distribution arrangements, content licensing arrangements, and DTC subscription products, completed its Merger with the WM Business of AT&T and changed its name from "Discovery, Inc." to "Warner Bros. Discovery, Inc." On April 11, 2022, our shares started trading on Nasdaq under the trading symbol WBD. (See Note 3 and Note 4 to the accompanying consolidated financial statements.)

Warner Bros. Discovery is a premier global media and entertainment company that combines the WarnerMedia Business's premium entertainment, sports and news assets with Discovery's leading non-fiction and international entertainment and sports businesses, thus offering audiences a differentiated portfolio of content, brands and franchises across television, film, streaming and gaming. Some of our iconic brands and franchises include Warner Bros. Pictures Group, Warner Bros. Television Group, DC, HBO, HBO Max, Discovery Channel, discovery+, CNN, HGTV, Food Network, TNT, TBS, TLC, OWN, Warner Bros. Games, Batman, Superman, Wonder Woman, Harry Potter, Looney Tunes, Hanna-Barbera, Game of Thrones, and The Lord of the Rings. For a discussion of our global portfolio see our business overview set forth in Item 1, "Business" in this Annual Report on Form 10-K.

In connection with the Merger, we have announced and taken actions to implement projects to achieve cost synergies for the Company. We finalized the framework supporting our ongoing restructuring and transformation initiatives during 2022, which include, among other things, strategic content programming assessments, organization restructuring, facility consolidation activities, and other contract termination costs. We expect that we will incur approximately $4.1 - $5.3 billion in pre-tax restructuring charges. Of the total expected pre-tax restructuring charges, we expect total cash expenditures to be $1.0 - $ 1.5 billion. We incurred $3.8 billion of pre-tax restructuring charges during the year ended December 31, 2022. While our restructuring efforts are ongoing, the restructuring program is expected to be substantially completed by the end of 2024.

In connection with the Merger, we reevaluated and changed our segment presentation and reportable segments during 2022. As of December 31, 2022, we classified our operations in three reportable segments:

- **Studios,** consisting primarily of the production and release of feature films for initial exhibition in theaters, production and initial licensing of television programs to third parties and our networks/DTC services, distribution of our films and television programs to various third party and internal television and streaming services, distribution through the home entertainment market (physical and digital), related consumer products and themed experience licensing, and interactive gaming;
- **Networks,** consisting principally of our domestic and international television networks; and
- **DTC,** consisting primarily of our premium pay-TV and streaming services.

Our segment presentation was aligned with our management structure and the financial information management uses to make decisions about operating matters, such as the allocation of resources and business performance assessments. Prior periods have been recast to conform to the current period presentation.

During 2022, we exited our operations in Russia and removed all of our channels and services from the market. We do not expect these actions to have a material effect on our consolidated financial statements.

For further discussion of financial information for our segments and the geographical areas in which we do business, our content development activities, and revenues, see our business overview set forth in Item 1, "Business" and Note 23 to the consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

**Impact of COVID-19**

We continue to closely monitor the ongoing impact of COVID-19 on all aspects of our business and geographies; however, the nature and full extent of COVID-19's effects on our operations and results are not yet known and will depend on future developments, which are highly uncertain and cannot be predicted. Certain key sources of revenue for the Studios segment, including theatrical revenues, original television productions, studio operations, and themed entertainment, have been adversely impacted by governmentally imposed shutdowns and related labor interruptions and constraints on consumer activity, particularly in the context of public entertainment venues, such as cinemas and theme parks.

## RESULTS OF OPERATIONS

The discussion below compares our actual and pro forma combined results, as if the Merger occurred on January 1, 2021, for the year ended December 31, 2022 to the year ended December 31, 2021. Management believes reviewing our combined operating results in addition to actual operating results is useful in identifying trends in, or reaching conclusions regarding, the overall operating performance of our businesses. Our Studios, Networks, DTC, Corporate, and inter-segment eliminations information is based on the historical operating results of the respective segments and include, where applicable, adjustments for (i) additional costs of revenues from the fair value step-up of film and television library, (ii) additional amortization expense related to acquired intangible assets, (iii) additional depreciation expense from the fair value of property and equipment, (iv) transaction costs and other one-time non-recurring costs, (v) additional interest expense for borrowings related to the Merger and amortization associated with fair value adjustments of debt assumed, (vi) changes to align accounting policies, (vii) elimination of intercompany activity, and (viii) associated tax-related impacts of adjustments.

Adjustments do not include costs related to integration activities, cost savings or synergies that have been or may be achieved by the combined businesses. Pro forma amounts are not necessarily indicative of what our results would have been had we operated the combined businesses since January 1, 2021 and should not be taken as indicative of the Company’s future consolidated results of operations.

Actual amounts for the year ended December 31, 2022 include results of operations for Discovery for the entire period and WM for the period subsequent to the completion of the Merger on April 8, 2022.

### Foreign Exchange Impacting Comparability

In addition to the Merger, the impact of exchange rates on our business is an important factor in understanding period-to-period comparisons of our results. For example, our international revenues are favorably impacted as the U.S. dollar weakens relative to other foreign currencies, and unfavorably impacted as the U.S. dollar strengthens relative to other foreign currencies. We believe the presentation of results on a constant currency basis (“ex-FX”), in addition to results reported in accordance with U.S. GAAP provides useful information about our operating performance because the presentation ex-FX excludes the effects of foreign currency volatility and highlights our core operating results. The presentation of results on a constant currency basis should be considered in addition to, but not a substitute for, measures of financial performance reported in accordance with U.S. GAAP.

The ex-FX change represents the percentage change on a period-over-period basis adjusted for foreign currency impacts. The ex-FX change is calculated as the difference between the current year amounts translated at a baseline rate, which is a spot rate for each of our currencies determined early in the fiscal year as part of our forecasting process (the “2022 Baseline Rate”), and the prior year amounts translated at the same 2022 Baseline Rate. In addition, consistent with the assumption of a constant currency environment, our ex-FX results exclude the impact of our foreign currency hedging activities, as well as realized and unrealized foreign currency transaction gains and losses. Results on a constant currency basis, as we present them, may not be comparable to similarly titled measures used by other companies.

**Consolidated Results of Operations – 2022 vs. 2021**

Our consolidated results of operations for 2022 and 2021 were as follows (in millions).

| | Year Ended December 31, | | | | | | % Change | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | | | |
| | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual [a] | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Combined (Actual) | Combined (ex-FX) |
| Revenues: | | | | | | | | | |
| Advertising | $ 8,524 | $ 1,412 | $ 9,936 | $ 6,194 | $ 4,395 | $ 10,589 | 38 % | (6)% | (4)% |
| Distribution | 16,142 | 4,339 | 20,481 | 5,202 | 15,579 | 20,781 | NM | (1)% | — % |
| Content | 8,360 | 3,297 | 11,657 | 737 | 12,455 | 13,192 | NM | (12)% | (9)% |
| Other | 791 | 230 | 1,021 | 58 | 706 | 764 | NM | 34 % | 36 % |
| Total revenues | 33,817 | 9,278 | 43,095 | 12,191 | 33,135 | 45,326 | NM | (5)% | (3)% |
| Costs of revenues, excluding depreciation and amortization | 20,442 | 5,125 | 25,567 | 4,620 | 21,353 | 25,973 | NM | (2)% | 1 % |
| Selling, general and administrative | 9,678 | 1,745 | 11,423 | 4,016 | 8,987 | 13,003 | NM | (12)% | (10)% |
| Depreciation and amortization | 7,193 | 34 | 7,227 | 1,582 | 6,774 | 8,356 | NM | (14)% | (13)% |
| Restructuring | 3,757 | (90) | 3,667 | 32 | 90 | 122 | NM | NM | NM |
| Impairment and loss (gain) on disposition and disposal groups | 117 | — | 117 | (71) | 223 | 152 | NM | (23)% | (23)% |
| Total costs and expenses | 41,187 | 6,814 | 48,001 | 10,179 | 37,427 | 47,606 | NM | 1 % | 3 % |
| Operating (loss) income | (7,370) | 2,464 | (4,906) | 2,012 | (4,292) | (2,280) | NM | NM | NM |
| Interest expense, net | (1,777) | (515) | (2,292) | (633) | (2,026) | (2,659) | | | |
| Loss from equity investees, net | (160) | (20) | (180) | (18) | 14 | (4) | | | |
| Other income, net | 347 | 139 | 486 | 72 | 100 | 172 | | | |
| (Loss) income before income taxes | (8,960) | 2,068 | (6,892) | 1,433 | (6,204) | (4,771) | | | |
| Income tax benefit (expense) | 1,663 | (56) | 1,607 | (236) | 1,448 | 1,212 | | | |
| Net (loss) income | (7,297) | 2,012 | (5,285) | 1,197 | (4,756) | (3,559) | | | |
| Net income attributable to noncontrolling interests | (68) | — | (68) | (138) | — | (138) | | | |
| Net income attributable to redeemable noncontrolling interests | (6) | — | (6) | (53) | — | (53) | | | |
| Net (loss) income available to Warner Bros. Discovery, Inc. | $ (7,371) | $ 2,012 | $ (5,359) | $ 1,006 | $ (4,756) | $ (3,750) | | | |

[a] Prior year actual results have been recast to conform to the current period presentation as a result of the Merger and segment recast.

NM - Not meaningful

Unless otherwise indicated, the discussion through operating (loss) income below is on a pro-forma combined basis, ex-FX, since the actual increases year over year for revenues, cost of revenues, and selling, general and administrative expenses are substantially attributable to the Merger. The percent changes of line items below operating (loss) income in the table above are not included as the activity is principally in U.S. dollars.

*Revenues*

Advertising revenues are principally generated from the sale of commercial time on linear (television networks and authenticated TVE applications) and digital platforms (DTC subscription services and websites), and sold primarily on a national basis in the U.S. and on a pan-regional or local-language feed basis outside the U.S. Advertising contracts generally have a term of one year or less. Advertising revenue is dependent upon a number of factors, including the number of subscribers to our channels, viewership demographics, the popularity of our content, our ability to sell commercial time over a group of channels, the stage of development of television markets, and the popularity of FTA television. Revenue from advertising is subject to seasonality, market-based variations, the mix in sales of commercial time between the upfront and scatter markets, and general economic conditions. Advertising revenue is typically highest in the second and fourth quarters. In some cases, advertising sales are subject to ratings guarantees that require us to provide additional advertising time if the guaranteed audience levels are not achieved. We also generate revenue from the sale of advertising through our digital platforms on a stand-alone basis and as part of advertising packages with our television networks.

Advertising revenue decreased 4% in 2022, primarily attributable to declines in domestic general entertainment and news networks, partially offset by subscriber growth on our DTC ad-supported tiers and higher sports advertising in the U.S. due to the NCAA Men's Final Four and Championship games airing on our networks and the addition of the NHL starting in the fourth quarter of 2021.

Distribution revenues are generated from fees charged to network distributors, which include cable, DTH satellite, telecommunications and digital service providers, and DTC subscribers. The largest component of distribution revenue is comprised of linear distribution rights to our networks from cable, DTH satellite and telecommunication service providers. We have contracts with distributors representing most cable and satellite service providers around the world, including the largest operators in the U.S. and major international distributors. Distribution revenues are largely dependent on the rates negotiated in the agreements, the number of subscribers that receive our networks, the number of platforms covered in the distribution agreement, and the market demand for the content that we provide. From time to time, renewals of multi-year carriage agreements include significant year one market adjustments to re-set subscriber rates, which then increase at rates lower than the initial increase in the following years. In some cases, we have provided distributors launch incentives, in the form of cash payments or free periods, to carry our networks.

Distribution revenue was flat in 2022, primarily attributable to a decline in linear subscribers in the U.S. and lower contractual affiliate rates in some European markets, as well as a decline in wholesale revenues primarily due to the expiration of HBO Max on Amazon Channels in September 2021, offset by global retail subscriber gains on DTC platforms. HBO Max re-launched on Amazon Channels in December 2022.

Content revenues are generated from the release of feature films for initial exhibition in theaters, the licensing of feature films and television programs to various television, SVOD and other digital markets, distribution of feature films and television programs in the physical and digital home entertainment market, sales of console games and mobile in-game content, sublicensing of sports rights, and licensing of intellectual property such as characters and brands.

Content revenue decreased 9% in 2022, primarily attributable to lower TV licensing and home entertainment revenue, partially offset by higher theatrical film rental revenue and higher third-party licensing of HBO content.

Other revenue primarily consists of studio production services and tours.

Other revenue increased 36% in 2022, primarily attributable to a full year of results for the Warner Bros. Studio Tour London and Hollywood, as well as the Harry Potter flagship store in New York, which opened in June 2021, and services provided to the unconsolidated BT Sport joint venture.

*Costs of Revenues*

Our principal component of costs of revenues is content expense. Content expense includes television/digital series, specials, films, and sporting events. The costs of producing a content asset and bringing that asset to market consist of production costs, participation costs, and exploitation costs.

Costs of revenues increased 1% in 2022, primarily attributable to increased programming expenses on DTC platforms, higher theatrical product content expense, higher sports-related expense globally, and increased expense at CNN, partially offset by lower television product content expense and distribution fees.

*Selling, General and Administrative*

Selling, general and administrative expenses consist principally of employee costs, marketing costs, research costs, occupancy, and back office support fees.

Selling, general and administrative expenses decreased 10% in 2022, primarily attributable to lower marketing expenses.

*Depreciation and Amortization*

Depreciation and amortization expense includes depreciation of fixed assets and amortization of finite-lived intangible assets. Depreciation and amortization decreased 13% in 2022, primarily attributable to a change in amortization method from the straight-line method to the sum of the months' digits method for some of the WM assets acquired.

*Restructuring*

In connection with the Merger, the Company has announced and taken actions to implement projects to achieve cost synergies for the Company. Restructuring was $3,694 million and $121 million in 2022 and 2021, respectively. Restructuring in 2022 primarily related to strategic content programming assessments, organization restructuring, facility consolidation activities, and other contract termination costs. (See Note 6 to the accompanying consolidated financial statements.)

*Impairment and Loss (Gain) on Dispositions and Disposals Groups*

Impairment and loss (gain) on disposition and disposal groups was a $117 million and $152 million loss in 2022 and 2021, respectively. The loss in 2022 was primarily attributable to the write-down to the estimated fair value, less costs to sell, of the Ranch Lot and Knoxville office building and land in connection with the classification as assets held for sale. (See Note 18 to the accompanying consolidated financial statements.) The gain in 2021 was primarily attributable to the sale of our Great American Country network, partially offset by the WM sale of Hello Sunshine. (See Note 4 to the accompanying consolidated financial statements.)

*Interest Expense, net*

Actual interest expense, net increased $1,144 million in 2022, primarily attributable to debt assumed as a result of the Merger. (See Note 11 and Note 13 to the accompanying consolidated financial statements.)

*Loss from Equity Investees, net*

Actual losses from our equity method investees were $160 million and $18 million in 2022 and 2021, respectively. The changes are attributable to the Company's share of earnings and losses from its equity investees. (See Note 10 to the accompanying consolidated financial statements.)

*Other Income, net*

The table below presents the details of other income, net (in millions).

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Foreign currency (losses) gains, net | $ (150) | $ 93 |
| Gains (losses) on derivative instruments, net | 475 | (33) |
| Gain on sale of investment with readily determinable fair value | — | 15 |
| Change in the value of investments with readily determinable fair value | (105) | (6) |
| Change in fair value of equity investments without readily determinable fair value | (142) | (13) |
| Gain on sale of equity method investments | 195 | 4 |
| Loss on extinguishment of debt | — | (10) |
| Other income, net | 74 | 22 |
| Total other income, net | $ 347 | $ 72 |

*Income Taxes*

The following table reconciles our effective income tax rate to the U.S. federal statutory income tax rate.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | | 2021 | |
| Pre-tax income at U.S. federal statutory income tax rate | $ (1,881) | 21 % | $ 301 | 21 % |
| State and local income taxes, net of federal tax benefit | (218) | 3 % | 108 | 7 % |
| Effect of foreign operations | 246 | (3)% | 25 | 2 % |
| Preferred stock conversion premium charge | 166 | (2)% | — | — % |
| UK Finance Act legislative change | — | — % | (155) | (11)% |
| Noncontrolling interest adjustment | (17) | — % | (40) | (3)% |
| Other, net | 41 | — % | (3) | — % |
| Income tax (benefit) expense | $ (1,663) | 19 % | $ 236 | 16 % |

Income tax (benefit) expense was $(1,663) million and $236 million, and the Company's effective tax rate was 19% and 16% for 2022 and 2021, respectively. The decrease in the tax expense for the year ended December 31, 2022, was primarily attributable to a decrease in pre-tax book income, partially offset by an unfavorable tax adjustment related to the 2022 preferred stock conversion transaction expense that was not deductible for tax purposes (see Note 3), as well as the effect of foreign operations, including taxation and allocation of income and losses across multiple foreign jurisdictions. The decrease for the year ended December 31, 2022 was further offset by a deferred tax benefit of $155 million recorded in 2021 resulting from the UK Finance Act 2021 enacted in June 2021.

**Segment Results of Operations – 2022 vs. 2021**

The Company evaluates the operating performance of its operating segments based on financial measures such as revenues and Adjusted EBITDA. Adjusted EBITDA is defined as operating income excluding:

- employee share-based compensation;
- depreciation and amortization;
- restructuring and facility consolidation;
- certain impairment charges;
- gains and losses on business and asset dispositions;
- certain inter-segment eliminations;
- third-party transaction and integration costs;
- amortization of purchase accounting fair value step-up for content;
- amortization of capitalized interest for content; and
- other items impacting comparability.

The Company uses this measure to assess the operating results and performance of its segments, perform analytical comparisons, identify strategies to improve performance, and allocate resources to each segment. The Company believes Adjusted EBITDA is relevant to investors because it allows them to analyze the operating performance of each segment using the same metric management uses. The Company excludes employee share-based compensation, restructuring, certain impairment charges, gains and losses on business and asset dispositions, and transaction and integration costs from the calculation of Adjusted EBITDA due to their impact on comparability between periods. The Company also excludes the depreciation of fixed assets and amortization of intangible assets, amortization of purchase accounting fair value step-up for content, and amortization of capitalized interest for content, as these amounts do not represent cash payments in the current reporting period. Certain corporate expenses and inter-segment eliminations related to production studios are excluded from segment results to enable executive management to evaluate segment performance based upon the decisions of segment executives. Adjusted EBITDA should be considered in addition to, but not a substitute for, operating income, net income, and other measures of financial performance reported in accordance with U.S. GAAP.

The table below presents our Adjusted EBITDA by segment (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | % Change |
| Studios | $ 1,772 | $ 14 | NM |
| Networks | 8,725 | 5,533 | 58 % |
| DTC | (1,596) | (1,345) | (19)% |
| Corporate | (1,200) | (385) | NM |
| Inter-segment eliminations | 17 | — | NM |

**Studios Segment**

The following table presents, for our Studios segment, revenues by type, certain operating expenses, Adjusted EBITDA and a reconciliation of Adjusted EBITDA to operating (loss) income (in millions).

| | Year Ended December 31, | | | | | | % Change | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | | | |
| | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual [(a)] | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Combined (Actual) | Pro Forma Combined (ex-FX) |
| Revenues: | | | | | | | | | |
| Advertising | $ 15 | $ 9 | $ 24 | $ — | $ 123 | $ 123 | NM | (80)% | (80)% |
| Distribution | 12 | 6 | 18 | — | 14 | 14 | NM | 29 % | 29 % |
| Content | 9,156 | 3,898 | 13,054 | 20 | 14,336 | 14,356 | NM | (9)% | (7)% |
| Other | 548 | 154 | 702 | — | 516 | 516 | NM | 36 % | 36 % |
| Total revenues | 9,731 | 4,067 | 13,798 | 20 | 14,989 | 15,009 | NM | (8)% | (6)% |
| Costs of revenues, excluding depreciation and amortization | 6,310 | 2,392 | 8,702 | 3 | 9,589 | 9,592 | NM | (9)% | (7)% |
| Selling, general and administrative | 1,649 | 698 | 2,347 | 3 | 2,769 | 2,772 | NM | (15)% | (13)% |
| Adjusted EBITDA | 1,772 | 977 | 2,749 | 14 | 2,631 | 2,645 | NM | 4 % | 8 % |
| Depreciation and amortization | 501 | 39 | 540 | — | 691 | 691 | | | |
| Employee share-based compensation | 1 | 26 | 27 | — | 85 | 85 | | | |
| Restructuring | 1,050 | (38) | 1,012 | — | 38 | 38 | | | |
| Transaction and integration costs | 9 | — | 9 | — | — | — | | | |
| Inter-segment eliminations | 5 | — | 5 | — | — | — | | | |
| Impairment and loss on disposition and disposal groups | 30 | — | 30 | — | — | — | | | |
| Amortization of fair value step-up for content | 1,370 | (785) | 585 | — | 1,588 | 1,588 | | | |
| Operating (loss) income | $ (1,194) | $ 1,735 | $ 541 | $ 14 | $ 229 | $ 243 | | | |

(a) Prior year actual results have been recast to conform to the current period presentation as a result of the Merger and segment recast.

The discussion below is on a pro forma combined basis, ex-FX, since the actual increases year over year for revenues, cost of revenue, selling, general and administrative expenses and Adjusted EBITDA are substantially attributable to the Merger.

*Revenues*

Content revenue decreased 7% in 2022, primarily attributable to lower TV licensing and home entertainment revenue, partially offset by higher theatrical film rental revenue. TV licensing revenue decreased mainly due to large television licensing deals in the prior year and the timing of initial telecast revenue, as the prior year benefited from the ramp up of TV production following COVID-related delays in 2020. Home entertainment revenue was lower due to strong COVID-induced demand in the prior year and fewer new releases of theatrical products. Theatrical film rental revenue was favorably impacted by improved performance of our theatrical slate and improved audience attendance at movie theaters.

Other revenue increased 36% in 2022, primarily attributable to a full year of results for the Warner Bros. Studio Tour London and Hollywood, as well as the Harry Potter flagship store in New York, which opened in June 2021.

*Costs of Revenues*

Costs of revenues decreased 7% in 2022, primarily attributable to lower television product content expense and distribution fees related to the aforementioned television licensing deals, partially offset by higher theatrical product content expense.

*Selling, General and Administrative*

Selling, general and administrative expenses decreased 13% in 2022, primarily attributable to lower marketing expense due to fewer theatrical releases in 2022.

*Adjusted EBITDA*

Adjusted EBITDA increased 8% in 2022.

**Networks Segment**

The table below presents, for our Networks segment, revenues by type, certain operating expenses, Adjusted EBITDA and a reconciliation of Adjusted EBITDA to operating income (in millions).

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | % Change | | |
| | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual [(a)] | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Combined (Actual) | Pro Forma Combined (ex-FX) |
| Revenues: | | | | | | | | | |
| Advertising | $ 8,224 | $ 1,380 | $ 9,604 | $ 6,063 | $ 4,330 | $ 10,393 | 36 % | (8)% | (5)% |
| Distribution | 9,759 | 2,183 | 11,942 | 4,486 | 7,843 | 12,329 | NM | (3)% | (1)% |
| Content | 1,120 | 220 | 1,340 | 706 | 568 | 1,274 | 59 % | 5 % | 7 % |
| Other | 245 | 55 | 300 | 56 | 178 | 234 | NM | 28 % | 35 % |
| Total revenues | 19,348 | 3,838 | 23,186 | 11,311 | 12,919 | 24,230 | 71 % | (4)% | (2)% |
| Costs of revenues, excluding depreciation and amortization | 8,006 | 2,148 | 10,154 | 3,926 | 6,098 | 10,024 | NM | 1 % | 4 % |
| Selling, general and administrative | 2,617 | 364 | 2,981 | 1,852 | 1,367 | 3,219 | 41 % | (7)% | (5)% |
| Adjusted EBITDA | 8,725 | 1,326 | 10,051 | 5,533 | 5,454 | 10,987 | 58 % | (9)% | (7)% |
| Depreciation and amortization | 4,687 | 4 | 4,691 | 1,212 | 4,151 | 5,363 | | | |
| Employee share-based compensation | — | 9 | 9 | — | 41 | 41 | | | |
| Restructuring | 1,003 | (5) | 998 | 30 | 5 | 35 | | | |
| Transaction and integration costs | 2 | — | 2 | 4 | — | 4 | | | |
| Amortization of fair value step-up for content | 73 | 425 | 498 | — | 476 | 476 | | | |
| Inter-segment eliminations | 17 | — | 17 | — | — | — | | | |
| Impairment and loss (gain) on disposition and disposal groups | 24 | — | 24 | (72) | (1) | (73) | | | |
| Operating income | $ 2,919 | $ 893 | $ 3,812 | $ 4,359 | $ 782 | $ 5,141 | | | |

[(a)] Prior year actual results have been recast to conform to the current period presentation as a result of the Merger and segment recast.

The discussion below is on a pro forma combined basis, ex-FX, since the actual increases year over year for revenues, cost of revenue, selling, general and administrative expenses and Adjusted EBITDA are substantially attributable to the Merger.

*Revenues*

Advertising revenue decreased 5% in 2022, primarily attributable to declines in domestic general entertainment and news networks, partially offset by higher sports advertising in the U.S. due to the NCAA Men's Final Four and Championship games airing on our networks and the addition of the NHL starting in the fourth quarter of 2021.

Distribution revenue decreased 1% in 2022, primarily attributable to a decline in linear subscribers in the U.S. and lower contractual affiliate rates in some European markets, partially offset by an increase in contractual affiliate rates in the U.S. and certain Latin American markets and premium sports packages in Latin America.

Content revenue increased by 7% in 2022, primarily attributable to higher inter-segment licensing of content to DTC, partially offset by overall net lower sub-licensing revenue for the Winter Olympics in 2022 compared to the Summer Olympics in 2021.

Other revenue increased 35% in 2022, primarily attributable to services provided to the unconsolidated BT Sport joint venture.

*Costs of Revenues*

Costs of revenues increased 4% in 2022, primarily attributable to higher sports-related expense globally, increased expense at CNN, and costs associated with providing services to the unconsolidated BT Sport joint venture, partially offset by lower content expense due to the previously announced restructuring program and lower international sports rights driven by the Winter Olympics in 2022 (as compared to the Summer Olympics in 2021).

*Selling, General and Administrative*

Selling, general and administrative expenses decreased 5% in 2022, primarily attributable to lower personnel and marketing expenses.

*Adjusted EBITDA*

Adjusted EBITDA decreased 7% in 2022.

**DTC Segment**

The following table presents, for our DTC segment, revenues by type, certain operating expenses, Adjusted EBITDA and a reconciliation of Adjusted EBITDA to operating loss (in millions).

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | % Change | | |
| | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual [(a)] | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Combined (Actual) | Pro Forma Combined (ex-FX) |
| Revenues: | | | | | | | | | |
| Advertising | $ 371 | $ 36 | $ 407 | $ 131 | $ 49 | $ 180 | NM | NM | NM |
| Distribution | 6,371 | 2,150 | 8,521 | 716 | 7,722 | 8,438 | NM | 1 % | 3 % |
| Content | 522 | 230 | 752 | 11 | 622 | 633 | NM | 19 % | 19 % |
| Other | 10 | 3 | 13 | 2 | 12 | 14 | NM | (7)% | — % |
| Total revenues | 7,274 | 2,419 | 9,693 | 860 | 8,405 | 9,265 | NM | 5 % | 6 % |
| Costs of revenues, excluding depreciation and amortization | 6,211 | 1,977 | 8,188 | 691 | 6,166 | 6,857 | NM | 19 % | 21 % |
| Selling, general and administrative | 2,659 | 909 | 3,568 | 1,514 | 2,759 | 4,273 | 76 % | (16)% | (16)% |
| Adjusted EBITDA | (1,596) | (467) | (2,063) | (1,345) | (520) | (1,865) | (19)% | (11)% | (11)% |
| Depreciation and amortization | 1,733 | 31 | 1,764 | 275 | 1,757 | 2,032 | | | |
| Employee share-based compensation | (1) | — | (1) | — | 16 | 16 | | | |
| Restructuring | 1,551 | (3) | 1,548 | 2 | 3 | 5 | | | |
| Transaction and integration costs | 2 | — | 2 | 1 | — | 1 | | | |
| Amortization of fair value step-up for content | 390 | (52) | 338 | — | 293 | 293 | | | |
| Inter-segment eliminations | 9 | — | 9 | — | — | — | | | |
| Impairment and loss on disposition and disposal groups | 13 | — | 13 | 1 | — | 1 | | | |
| Operating loss | $ (5,293) | $ (443) | $ (5,736) | $ (1,624) | $ (2,589) | $ (4,213) | | | |

[(a)] Prior year actual results have been recast to conform to the current period presentation as a result of the Merger and segment recast.

The discussion below is on a pro forma combined basis, ex-FX, since the actual increases year over year for revenues, cost of revenue, selling, general and administrative expenses and Adjusted EBITDA are substantially attributable to the Merger.

*Revenues*

As of December 31, 2022, we had 96.1 million DTC subscribers.[2]

Advertising revenue increased $229 million in 2022, primarily attributable to subscriber growth on our DTC ad-supported tiers.

Distribution revenue increased 3% in 2022, primarily attributable to global retail subscriber gains, partially offset by a decline in wholesale revenues primarily due to the expiration of HBO Max on Amazon Channels in September 2021. HBO Max re-launched on Amazon Channels in December 2022.

Content revenue increased 19% in 2022, primarily attributable to higher third-party licensing of HBO content.

---

[2] We define a "DTC Subscription" as:

(i) a retail subscription to discovery+, HBO or HBO Max for which we have recognized subscription revenue, whether directly or through a third party, from a direct-to-consumer platform; (ii) a wholesale subscription to discovery+, HBO, or HBO Max for which we have recognized subscription revenue from a fixed-fee arrangement with a third party and where the individual user has activated their subscription; (iii) a wholesale subscription to discovery+, HBO or HBO Max for which we have recognized subscription revenue on a per subscriber basis; and (iv) users on free trials who convert to a subscription for which we have recognized subscription revenue within the first seven days of the calendar month immediately following the month in which their free trial expires.

We may refer to the aggregate number of DTC Subscriptions as "subscribers."

The reported number of "subscribers" included herein and the definition of "DTC Subscription" as used herein excludes: (i) individuals who subscribe to DTC products, other than discovery+, HBO and HBO Max, that may be offered by us or by certain joint venture partners or affiliated parties from time to time; (ii) a limited number of international discovery+ subscribers that are part of non-strategic partnerships or short-term arrangements as may be identified by the Company from time to time; (iii) domestic and international Cinemax subscribers, and international basic HBO subscribers; and (iv) users on free trials except for those users on free trial that convert to a DTC Subscription within the first seven days of the next month as noted above.

*Costs of Revenues*

Cost of revenues increased 21% in 2022, primarily attributable to increased programming expenses, which were moderated by the previously announced restructuring program.

*Selling, General, and Administrative Expenses*

Selling, general and administrative expenses decreased 16% in 2022, primarily attributable to more efficient marketing-related spend.

*Adjusted EBITDA*

Adjusted EBITDA decreased 11% in 2022.

**Corporate**

The following table presents our Adjusted EBITDA and a reconciliation of Adjusted EBITDA to operating loss (in millions):

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | % Change | | |
| | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Combined (Actual) | Pro Forma Combined (ex-FX) |
| Adjusted EBITDA | $ (1,200) | $ (353) | $ (1,553) | $ (385) | $ (966) | $ (1,351) | NM | (15)% | (17)% |
| Employee share-based compensation | 410 | (11) | 399 | 167 | 177 | 344 | | | |
| Depreciation and amortization | 272 | (40) | 232 | 95 | 175 | 270 | | | |
| Restructuring | 195 | (44) | 151 | — | 44 | 44 | | | |
| Transaction and integration costs | 1,182 | (564) | 618 | 90 | 1,138 | 1,228 | | | |
| Impairment and loss on disposition and disposal groups | 50 | — | 50 | — | 224 | 224 | | | |
| Inter-segment eliminations | (31) | — | (31) | — | — | — | | | |
| Operating loss | $ (3,278) | $ 306 | $ (2,972) | $ (737) | $ (2,724) | $ (3,461) | | | |

Corporate operations primarily consist of executive management and administrative support services, which are recorded in selling, general and administrative expense, as well as substantially all of our share-based compensation and third-party transaction and integration costs.

Adjusted EBITDA decreased 17% for 2022, primarily attributable to increased securitization costs from higher interest rates, partially offset by lower personnel costs.

As reported transaction and integration costs for 2022 included the impact of the issuance of additional shares of WBD common stock to Advance/Newhouse Programming Partnership of $789 million upon the closing of the Merger. (See Note 3 to the accompanying consolidated financial statements.)

**Inter-segment Eliminations**

The following table presents our inter-segment eliminations by revenue and expense, Adjusted EBITDA and a reconciliation of Adjusted EBITDA to operating loss (in millions):

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | % Change | | |
| | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Adjustments | Pro Forma Combined | Actual | Pro Forma Combined (Actual) | Pro Forma Combined (ex-FX) |
| Inter-segment revenue eliminations | $ (2,566) | $ (1,065) | $ (3,631) | $ — | $ (3,219) | $ (3,219) | NM | (13)% | (13)% |
| Inter-segment expense eliminations | (2,583) | (1,038) | (3,621) | — | (3,229) | (3,229) | NM | (12)% | (12)% |
| Adjusted EBITDA | 17 | (27) | (10) | — | 10 | 10 | NM | NM | NM |
| Restructuring | (42) | — | (42) | — | — | — | | | |
| Amortization of fair value step-up for content | 583 | — | 583 | — | — | — | | | |
| Operating (loss) income | $ (524) | $ (27) | $ (551) | $ — | $ 10 | $ 10 | | | |

Inter-segment revenue and expense eliminations primarily represent inter-segment content transactions and marketing and promotion activity between reportable segments. In our current segment structure, in certain instances, production and distribution activities are in different segments. Inter-segment content transactions are presented “gross” (i.e. the segment producing and/or licensing the content reports revenue and profit from inter-segment transactions in a manner similar to the reporting of third-party transactions, and the required eliminations are reported on the separate “Eliminations” line when presenting our summary of segment results). Generally, timing of revenue recognition is similar to the reporting of third-party transactions. The segment distributing the content, e.g. via our DTC or linear services, capitalizes the cost of inter-segment content transactions, including “mark-ups” and amortizes the costs over the shorter of the license term, if applicable, or the expected period of use. The content amortization expense related to the inter-segment profit is also eliminated on the separate “Eliminations” line when presenting our summary of segment results.

**LIQUIDITY AND CAPITAL RESOURCES**

**Liquidity**

***Sources of Cash***

Historically, we have generated a significant amount of cash from operations. During 2022, we funded our working capital needs primarily through cash flows from operations. As of December 31, 2022, we had $3.7 billion of cash and cash equivalents on hand. We are a well-known seasoned issuer and have the ability to conduct registered offerings of securities, including debt securities, common stock and preferred stock, on short notice, subject to market conditions. Access to sufficient capital from the public market is not assured. We have a $6.0 billion revolving credit facility and commercial paper program described below. We also participate in a revolving receivables program and an accounts receivable factoring program described below.

- *Debt*

  *Revolving Credit Facility and Commercial Paper*

  In June 2021, Discovery Communication, LLC ("DCL") entered into a multicurrency revolving credit agreement (the "Revolving Credit Agreement"), replacing the existing $2.5 billion credit agreement, dated February 4, 2016, as amended, among DCL, the Company, certain lenders from time to time party thereto, and Bank of America, N.A., as administrative agent. DCL has the capacity to borrow up to $6.0 billion under the Revolving Credit Agreement (the "Credit Facility"). The Revolving Credit Agreement includes a $150 million sublimit for the issuance of standby letters of credit. DCL may also request additional commitments up to $1.0 billion from the lenders upon the satisfaction of certain conditions. Obligations under the Revolving Credit Agreement are unsecured and are fully and unconditionally guaranteed by the Company, Scripps Networks, and WarnerMedia Holdings, Inc. The Credit Facility will be available on a revolving basis until June 2026, with an option for up to two additional 364-day renewal periods subject to the lenders' consent. The Revolving Credit Agreement contains customary representations and warranties as well as affirmative and negative covenants. As of December 31, 2022, DCL was in compliance with all covenants and there were no events of default under the Revolving Credit Agreement.

  Additionally, the Company's commercial paper program is supported by the Credit Facility. Under the commercial paper program, the Company may issue up to $1.5 billion, including up to $500 million of euro-denominated borrowings. Borrowing capacity under the Credit Facility is reduced by any outstanding borrowings under the commercial paper program.

  As of December 31, 2022 and 2021, the Company had no outstanding borrowings under the Credit Facility or the commercial paper program.

- *Revolving Receivables Program*

  The Company has a revolving agreement to transfer up to $5.7 billion of certain receivables through its bankruptcy-remote subsidiary, Warner Bros. Discovery Receivables Funding, LLC, to various financial institutions on a recurring basis in exchange for cash equal to the gross receivables transferred. The Company services the sold receivables for the financial institution for a fee and pays fees to the financial institution in connection with this revolving agreement. As customers pay their balances, the Company's available capacity under this revolving agreement increases and typically the Company transfers additional receivables into the program. In some cases, the Company may have collections that have not yet been remitted to the bank, resulting in a liability. The outstanding portfolio of receivables derecognized from our consolidated balance sheets was $5,366 million as of December 31, 2022.

- *Accounts Receivable Factoring*

  The Company has a factoring agreement to sell certain of its non-U.S. trade accounts receivable on a non-recourse basis to a third-party financial institution. Total trade accounts receivable sold under the Company's factoring arrangements was $477 million as of December 31, 2022.

- *Derivatives*

  We received investing proceeds of $752 million during the year ended December 31, 2022 from the unwind and settlement of derivative instruments. (See Note 13 to the accompanying consolidated financial statements.)

- *Investments and Business Combinations*

  In addition to other investments, we completed the sale of our minority interests in Discovery Education and Golden Maple Limited (known as Tencent Video VIP) and received cash of $306 million during the year ended December 31, 2022.

Additionally, we acquired $3.6 billion of cash in connection with the Merger and the post-closing working capital settlement process.

***Uses of Cash***

Our primary uses of cash include the creation and acquisition of new content, business acquisitions, income taxes, personnel costs, costs to develop and market HBO Max and discovery+, principal and interest payments on our outstanding senior notes, funding for various equity method and other investments, and repurchases of our capital stock.

- *Content Acquisition*

  We plan to continue to invest significantly in the creation and acquisition of new content, as well as certain sports rights. Subsequent to the Merger, our contractual commitments to acquire content have increased significantly. Additional information regarding contractual commitments to acquire content is set forth in “Material Cash Requirements from Known Contractual and Other Obligations” in Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

- *Debt*

  *Term Loan*

  During the year ended December 31, 2022, we repaid $6.0 billion of aggregate principal amount outstanding of our term loans prior to the due dates of October 2023 and April 2025.

  *Senior Notes*

  During the year ended December 31, 2022, we repaid in full at maturity $327 million of aggregate principal amount outstanding of our 2.375% Euro Denominated Senior Notes due March 2022 and issued notices for the redemption in full of all $192 million of aggregate principal amount outstanding of our 3.250% senior notes due in 2023 and all $796 million of aggregate principal amount outstanding of our 2.950% senior notes due 2023 (collectively the “2023 Notes”). The 2023 Notes were redeemed in December 2022 for an aggregate redemption price of $988 million, plus accrued interest. During 2022, we also assumed $41.5 billion of senior notes (at par value) and term loans in connection with the Merger.

  In addition, we have $363 million of senior notes coming due in 2023.

- *Capital Expenditures and Investments in Next Generation Initiatives*

  We effected capital expenditures of $987 million in 2022, including amounts capitalized to support our next generation platforms, such as HBO Max and discovery+. In addition, we expect to continue to incur significant costs to develop and market our combined streaming service in the future.

- *Investments and Business Combinations*

  Our uses of cash have included investments in equity method investments and equity investments without readily determinable fair value. (See Note 10 to the accompanying consolidated financial statements.) We provide funding to our investees from time to time. We contributed $168 million and $184 million in 2022 and 2021, respectively, for investments in and advances to our investees.

  We have and expect to continue to incur significant, one-time transaction and integration costs during the first year following the Merger. (See Note 4 to the accompanying consolidated financial statements.)

- *Redeemable Noncontrolling Interest and Noncontrolling Interest*

  Due to business combinations, we also had redeemable equity balances of $318 million at December 31, 2022 which may require the use of cash in the event holders of noncontrolling interests put their interests to us. In 2022, GoldenTree exercised its put right and we are required to purchase GoldenTree’s noncontrolling interest. (See Note 19 to the accompanying consolidated financial statements.) Distributions to noncontrolling interests and redeemable noncontrolling interests totaled $300 million and $251 million in 2022 and 2021, respectively.

- *Common Stock Repurchases*

  Historically, we have funded our stock repurchases through a combination of cash on hand, cash generated by operations and the issuance of debt. In February 2020, our board of directors authorized additional stock repurchases of up to $2 billion upon completion of our existing $1 billion authorization announced in May 2019. Under the new stock repurchase authorization, management is authorized to purchase shares from time to time through open market purchases at prevailing prices or privately negotiated purchases subject to market conditions and other factors. (See Note 3 to the accompanying consolidated financial statements.) There were no common stock repurchases during 2022 or 2021.

- *Income Taxes and Interest*

We expect to continue to make payments for income taxes and interest on our outstanding senior notes. During 2022 and 2021, we made cash payments of $1,027 million and $643 million for income taxes and $1,539 million and $664 million for interest on our outstanding debt, respectively. Cash required for interest payments has increased significantly as a result of the Merger.

**Cash Flows**

The following table presents changes in cash and cash equivalents (in millions).

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Cash, cash equivalents, and restricted cash, beginning of period | $ 3,905 | $ 2,122 |
| Cash provided by operating activities | 4,304 | 2,798 |
| Cash provided by (used in) investing activities | 3,524 | (56) |
| Cash used in financing activities | (7,742) | (853) |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | (61) | (106) |
| Net change in cash, cash equivalents, and restricted cash | 25 | 1,783 |
| Cash, cash equivalents, and restricted cash, end of period | $ 3,930 | $ 3,905 |

***Operating Activities***

Cash provided by operating activities was $4,304 million and $2,798 million in 2022 and 2021, respectively. The increase in cash provided by operating activities was primarily attributable to an increase in net income, excluding non-cash items, and working capital initiatives, partially offset by other negative fluctuations in working capital activity.

***Investing Activities***

Cash provided by (used in) investing activities was $3,524 million and $(56) million in 2022 and 2021, respectively. The increase in cash provided by investing activities was primarily attributable to proceeds received from cash acquired during the Merger and the post-closing working capital settlement process and cash received from the unwind and settlement of derivative instruments, partially offset by increased purchases of property and equipment and a reduction in cash received from the sales and maturities of investments during the year ended December 31, 2022.

***Financing Activities***

Cash used in financing activities was $7,742 million and $853 million in 2022 and 2021, respectively. The increase in cash used in financing activities was primarily attributable to principal repayments made on our term loans during the year ended December 31, 2022.

**Capital Resources**

As of December 31, 2022, capital resources were comprised of the following (in millions).

| | December 31, 2022 | | |
|---|---|---|---|
| | Total Capacity | Outstanding Indebtedness | Unused Capacity |
| Cash and cash equivalents | $ 3,731 | $ — | $ 3,731 |
| Revolving credit facility and commercial paper program | 6,000 | — | 6,000 |
| Term loans | 4,000 | 4,000 | — |
| Senior notes [(a)] | 45,276 | 45,276 | — |
| Total | $ 59,007 | $ 49,276 | $ 9,731 |

[(a)] Interest on senior notes is paid annually or semi-annually. Our senior notes outstanding as of December 31, 2022 had interest rates that ranged from 1.900% to 9.150% and will mature between 2023 and 2062.

We expect that our cash balance, cash generated from operations and availability under the Credit Agreement will be sufficient to fund our cash needs for both the short-term and the long-term. Our borrowing costs and access to capital markets can be affected by short and long-term debt ratings assigned by independent rating agencies which are based, in part, on our performance as measured by credit metrics such as interest coverage and leverage ratios.

As of December 31, 2022, we held $3.1 billion of our $3.7 billion of cash and cash equivalents in our foreign subsidiaries. The 2017 Tax Act features a participation exemption regime with current taxation of certain foreign income and imposes a mandatory repatriation toll tax on unremitted foreign earnings. Notwithstanding the U.S. taxation of these amounts, we intend to continue to reinvest these funds outside of the U.S. Our current plans do not demonstrate a need to repatriate them to the U.S. However, if these funds were to be needed in the U.S., we would be required to accrue and pay non-U.S. taxes to repatriate them. The determination of the amount of unrecognized deferred income tax liability with respect to these undistributed foreign earnings is not practicable.

**MATERIAL CASH REQUIREMENTS FROM KNOWN CONTRACTUAL AND OTHER OBLIGATIONS**

As of December 31, 2022, our significant contractual and other obligations were as follows (in millions).

| | Total | Short-term | Long-term |
|---|---|---|---|
| Long-term debt: | | | |
| Principal payments | $ 49,276 | $ 363 | $ 48,913 |
| Interest payments | 35,537 | 2,267 | 33,270 |
| Purchase obligations: | | | |
| Content | 29,732 | 7,969 | 21,763 |
| Other | 3,047 | 1,597 | 1,450 |
| Finance lease obligations | 282 | 82 | 200 |
| Operating lease obligations | 4,304 | 465 | 3,839 |
| Pension and other employee obligations | 1,378 | 501 | 877 |
| Total | $ 123,556 | $ 13,244 | $ 110,312 |

***Long-term Debt***

Principal payments on long-term debt reflect the repayment of our outstanding senior notes, at face value, assuming repayment will occur upon maturity. Interest payments on our outstanding senior notes are projected based on their contractual interest rates and maturity dates.

Additionally, DCL's revolving credit facility allows DCL and certain designated foreign subsidiaries of DCL to borrow up to $6.0 billion, including a $150 million sublimit for the issuance of standby letters of credit. DCL may also request additional commitments up to $1.0 billion from the lenders upon the satisfaction of certain conditions. Additionally, the Company's commercial paper program is supported by the Credit Facility. Under the commercial paper program, the Company may issue up to $1.5 billion, including up to $500 million of euro-denominated borrowings. Borrowing capacity under the Credit Facility is effectively reduced by any outstanding borrowings under the commercial paper program. As of December 31, 2022, we had no outstanding borrowings under the Credit Facility or the commercial paper program. (See Note 11 to the accompanying consolidated financial statements.)

***Purchase Obligations***

Content purchase obligations include commitments and liabilities associated with third-party producers and sports associations for content that airs on our television networks and DTC services. Production and licensing contracts generally require: purchase of a specified number of episodes; payments during production or over the term of a license; and include both programs that have been delivered and are available for airing and programs that have not yet been produced or sporting events that have not yet taken place. If the content is ultimately never produced, our commitments expire without obligation. The commitments exclude content liabilities recognized on the consolidated balance sheet. We expect to enter into additional production contracts and content licenses to meet our future content needs.

Other purchase obligations include agreements with certain vendors and suppliers for the purchase of goods and services whereby the underlying agreements are enforceable, legally binding and specify all significant terms. Significant purchase obligations include transmission services, television rating services, marketing commitments and research, equipment purchases, and information technology and other services. Some of these contracts do not require the purchase of fixed or minimum quantities and generally may be terminated with a 30-day to 60-day advance notice without penalty, and are not included in the table above past the 30-day to 60-day advance notice period.

***Finance Lease Obligations***

We acquire satellite transponders and other equipment through multi-year finance lease arrangements. Principal payments on finance lease obligations reflect amounts due under our finance lease agreements. Interest payments on our outstanding finance lease obligations are based on the stated or implied rate in our finance lease agreements. (See Note 12 to the accompanying consolidated financial statements.)

***Operating Lease Obligations***

We obtain office space and equipment under multi-year lease arrangements. Most operating leases are not cancelable prior to their expiration. Payments for operating leases represent the amounts due under the agreements assuming the agreements are not canceled prior to their expiration. (See Note 12 to the accompanying consolidated financial statements.)

***Pension and Other Employee Obligations***

We sponsor a qualified defined benefit pension plan (“Pension Plan”) that covers certain U.S.-based employees. We also have a non-qualified Supplemental Executive Retirement Plan (“SERP”). In connection with the Merger, the Company assumed four U.S. nonqualified pension plans that are noncontributory and unfunded and several non-U.S. pension plans (See Note 17 to the accompanying consolidated financial statements.)

Contractual commitments include payments to meet minimum funding requirements of our Pension Plan in 2023 and estimated benefit payments for our SERP that exceed plan assets. Payments for the SERP have been estimated over a ten-year period. While benefit payments under these plans are expected to continue beyond 2031, we believe it is not practicable to estimate payments beyond this period.

We are unable to reasonably predict the ultimate amount of any payments due to cash-settled share-based compensation awards. As of December 31, 2022, the current portion of the liability for cash-settled share-based compensation awards was $4 million.

***Unrecognized Tax Benefits***

We are unable to reasonably predict the ultimate amount or timing of settlement of our unrecognized tax benefits because, until formal resolutions are reached, reasonable estimates of the amount and timing of cash settlements with the respective taxing authorities are not practicable. Our unrecognized tax benefits totaled $1,929 million as of December 31, 2022.

***Six Flags Guarantee***

In connection with WM’s former investment in the Six Flags (as defined below) theme parks located in Georgia and Texas (collectively, the “Parks”), in 1997, certain subsidiaries of the Company agreed to guarantee (the “Six Flags Guarantee”) certain obligations of the partnerships that hold the Parks (the “Partnerships”) for the benefit of the limited partners in such Partnerships, including, annual payments made to the Parks or to the limited partners and additional obligations at the end of the respective terms for the Partnerships in 2027 and 2028 (the “Guaranteed Obligations”). The aggregate gross undiscounted estimated future cash flow requirements covered by the Six Flags Guarantee over the remaining term (through 2028) are $544 million. To date, no payments have been made by us pursuant to the Six Flags Guarantee.

Six Flags Entertainment Corporation (formerly known as Six Flags, Inc. and Premier Parks Inc.) (“Six Flags”), which has the controlling interest in the Parks, has agreed, pursuant to a subordinated indemnity agreement (the “Subordinated Indemnity Agreement”), to guarantee the performance of the Guaranteed Obligations when due and to indemnify the Company, among others, if the Six Flags Guarantee is called upon. If Six Flags defaults on its indemnification obligations, we have the right to acquire control of the managing partner of the Parks. Six Flags’ obligations to us are further secured by its interest in all limited partnership units held by Six Flags.

Based on our evaluation of the current facts and circumstances surrounding the Guaranteed Obligations and the Subordinated Indemnity Agreement, we are unable to predict the loss, if any, that may be incurred under the Guaranteed Obligations, and no liability for the arrangements has been recognized as of December 31, 2022. Because of the specific circumstances surrounding the arrangements and the fact that no active or observable market exists for this type of financial guarantee, we are unable to determine a current fair value for the Guaranteed Obligations and related Subordinated Indemnity Agreement.

***Other Contingent Commitments***

Other contingent commitments primarily include contingent payments for post-production term advance obligations on certain co-financing arrangements, as well as operating lease commitment guarantees, letters of credit, bank guarantees, and surety bonds, which generally support performance and payments for a wide range of global contingent and firm obligations, including insurance, litigation appeals, real estate leases, and other operational needs.

The Company's other contingent commitments at December 31, 2022 were $283 million, with $279 million estimated to be due in 2026. For other contingent commitments where payment obligations are outside our control, the timing of amounts represents the earliest period in which the payment could be requested. For the remaining other contingent commitments, the timing of the amounts presented represents when the maximum contingent commitment will expire but does not mean that we expect to incur an obligation to make any payments within that time period. In addition, these amounts do not reflect the effects of any indemnification rights we might possess.

***Put Rights***

We have granted put rights to certain consolidated subsidiaries, but we are unable to reasonably predict the ultimate amount or timing of any payment. We recorded the carrying value of the noncontrolling interest in the equity associated with the put rights as a component of redeemable noncontrolling interest in the amount of $318 million. (See Note 19 to the accompanying consolidated financial statements.)

***Noncontrolling Interest***

The Food Network and Cooking Channel are operated and organized under the terms of the TV Food Network Partnership (the “Partnership”). We hold interests in the Partnership, along with another noncontrolling owner. The Partnership agreement specifies a dissolution date of December 31, 2023. If the term of the Partnership is not extended prior to that date, the Partnership agreement permits us, as holder of 80% of the applicable votes, to reconstitute the Partnership and continue its business. If for some reason the Partnership is not continued, it will be required to limit its activities to winding up, settling debts, liquidating assets and distributing proceeds to the partners in proportion to their partnership interests.

**Summarized Guarantor Financial Information**

***Basis of Presentation***

As of December 31, 2022 and December 31, 2021, all of the Company’s outstanding $13.8 billion registered senior notes have been issued by DCL, a wholly owned subsidiary of the Company, and guaranteed by the Company, Scripps Networks, and WarnerMedia Holdings, Inc. As of December 31, 2022, the Company also has outstanding $30.0 billion of senior notes issued by WarnerMedia Holdings, Inc. and guaranteed by the Company, Scripps and DCL; $1.5 billion of senior notes issued by the legacy WarnerMedia Business (not guaranteed); and approximately $23 million of un-exchanged senior notes issued by Scripps Networks (not guaranteed). (See Note 11 to the accompanying consolidated financial statements.) DCL primarily includes the Discovery Channel and TLC networks in the U.S. DCL is a wholly owned subsidiary of the Company. Scripps Networks is also wholly owned by the Company.

The tables below present the summarized financial information as combined for Warner Bros. Discovery, Inc. (the “Parent”), Scripps Networks, DCL, and WarnerMedia Holdings, Inc. (collectively, the “Obligors”). All guarantees of DCL and WarnerMedia Holdings, Inc.'s senior notes (the “Note Guarantees”) are full and unconditional, joint and several and unsecured, and cover all payment obligations arising under the senior notes.

Note Guarantees issued by Scripps Networks, DCL or WarnerMedia Holdings, Inc., or any subsidiary of the Parent that in the future issues a Note Guarantee (each, a “Subsidiary Guarantor”) may be released and discharged (i) concurrently with any direct or indirect sale or disposition of such Subsidiary Guarantor or any interest therein, (ii) at any time that such Subsidiary Guarantor is released from all of its obligations under its guarantee of payment, (iii) upon the merger or consolidation of any Subsidiary Guarantor with and into DCL, WarnerMedia Holdings, Inc. or the Parent or another Subsidiary Guarantor, as applicable, or upon the liquidation of such Subsidiary Guarantor and (iv) other customary events constituting a discharge of the Obligors’ obligations.

***Summarized Financial Information***

The Company has included the accompanying summarized combined financial information of the Obligors after the elimination of intercompany transactions and balances among the Obligors and the elimination of equity in earnings from and investments in any subsidiary of the Parent that is a non-guarantor (in millions). The summarized balance sheet information as of December 31, 2022 does not include information with respect to WarnerMedia Holdings, Inc., as WarnerMedia Holdings, Inc. was a wholly-owned subsidiary of AT&T with *de minimis* assets and no operating activities for the year ended December 31, 2022. The summarized income statement information for the year ended December 31, 2022 includes information with respect to WarnerMedia Holdings, Inc. beginning subsequent to the close of the Merger.

| | December 31, 2022 |
|---|---|
| Current assets | $ 1,949 |
| Non-guarantor intercompany trade receivables, net | 112 |
| Noncurrent assets | 5,785 |
| Current liabilities | 1,095 |
| Noncurrent liabilities | 48,839 |

| | Year Ended December 31, 2022 |
|---|---|
| Revenues | $ 2,066 |
| Operating loss | (574) |
| Net loss | (1,672) |
| Net loss available to Discovery, Inc. | (1,680) |

Additional information regarding the changes in our outstanding indebtedness and the significant terms and provisions of our revolving credit facility and outstanding indebtedness is discussed in Note 11 to the accompanying consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

**RELATED PARTY TRANSACTIONS**

In the ordinary course of business, we enter into transactions with related parties, primarily the Liberty Entities and our equity method investees. Information regarding transactions and amounts with related parties is discussed in Note 21 to the accompanying consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

**NEW ACCOUNTING AND REPORTING PRONOUNCEMENTS**

We adopted certain accounting and reporting standards during 2022. Information regarding our adoption of new accounting and reporting standards is discussed in Note 2 to the accompanying consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

**CRITICAL ACCOUNTING ESTIMATES**

Our consolidated financial statements are prepared in accordance with U.S. GAAP, which requires management to make estimates, judgments and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosure of contingent assets and liabilities.

On an ongoing basis, we evaluate our estimates and assumptions, including those related to uncertain tax positions, goodwill and intangible assets, content rights, consolidation and revenue recognition. We base our estimates on historical experience, current developments and on various other assumptions that we believe to be reasonable under these circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that cannot readily be determined from other sources. There can be no assurance that actual results will not differ from those estimates.

Management considers an accounting estimate to be critical if it required assumptions to be made that were uncertain at the time the estimate was made and changes in the estimate or different estimates could have a material effect on our results of operations.

The development and selection of these critical accounting estimates have been determined by management and the related disclosures have been reviewed with the Audit Committee of the board of directors of the Company. We believe the following accounting estimates are critical to our business operations and the understanding of our results of operations and involve the more significant judgments and estimates used in the preparation of our consolidated financial statements.

**Uncertain Tax Positions**

We are subject to income taxes in numerous U.S. and foreign jurisdictions. From time to time, we engage in transactions or take filing positions in which the tax consequences may be uncertain and may recognize tax liabilities based on estimates of whether additional taxes and interest will be due. We establish a reserve for uncertain tax positions unless we determine that such positions are more likely than not to be sustained upon examination based on their technical merits, including the resolution of any appeals or litigation processes. We include interest and where appropriate, potential penalties, as a component of income tax expense on the consolidated statement of operations. This assessment relies on estimates and assumptions and may involve a series of complex judgments about future events including the status and results of income tax audits with the relevant tax authorities. Significant judgment is exercised in evaluating all relevant information, the technical merits of the tax positions, and the accurate measurement of uncertain tax positions when determining the amount of reserve and whether positions taken on our tax returns are more likely than not to be sustained. This also involves the use of significant estimates and assumptions with respect to the potential outcome of positions taken on tax returns that may be reviewed by tax authorities. At December 31, 2022, the reserve for uncertain tax positions was $1,929 million, and it is reasonably possible that the total amount of unrecognized tax benefits related to certain of our uncertain tax positions could decrease by as much as $316 million within the next twelve months as a result of ongoing audits, foreign judicial proceedings, lapses of statutes of limitations or regulatory developments.

**Goodwill and Intangible Assets**

Goodwill is allocated to our reporting units, which are our operating segments or one level below our operating segments (the component level). Reporting units are determined by the discrete financial information available for the component and whether it is regularly reviewed by segment management. Components are aggregated into a single reporting unit if they share similar economic characteristics. Our reporting units are Studios, Networks, and DTC.

We evaluate our goodwill for impairment annually as of October 1 or earlier upon the occurrence of substantive unfavorable changes in economic conditions, industry trends, costs, cash flows, or ongoing declines in market capitalization. If we believe that as a result of our qualitative assessment it is not more likely than not that the fair value of a reporting unit is greater than its carrying amount, a quantitative impairment test is required. The quantitative impairment test requires significant judgment in determining the fair value of the reporting units. We determine the fair value of our reporting units by using a combination of the income approach, which incorporates the use of the discounted cash flow ("DCF") method and the market multiple approach, which incorporates the use of EBITDA multiples based on market data. For the DCF method, we use projections specific to the reporting unit, as well as those based on general economic conditions, which require the use of significant estimates and assumptions. Determining fair value specific to each reporting unit requires us to exercise judgment when selecting the appropriate discount rates, control premiums, terminal growth rates, relevant comparable company earnings multiples and the amount and timing of expected future cash flows, including revenue growth rates and profit margins. The cash flows employed in the DCF analysis for each reporting unit are based on the reporting unit's budget, long range plan, and recent operating performance. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the respective reporting unit and market conditions.

*2022 Impairment Analysis*

As of October 1, 2022, we performed a quantitative goodwill impairment assessment for all reporting units consistent with our accounting policy. The estimated fair value of each reporting unit exceeded its carrying value by at least 20% and, therefore, no impairment was recorded. Due to declining levels of global GDP growth and execution risk associated with anticipated growth in the Company's DTC reporting unit, which is the DTC segment, the Company will continue to monitor its reporting units for changes that could impact recoverability.

**Content Rights**

We capitalize the costs to produce or acquire feature films and television programs, and we amortize costs and test for impairment based on whether the content is predominately monetized individually, or as a group.

For films and television programs predominantly monetized individually, the amount of capitalized film and television production costs amortized and the amount of participations and residuals to be recognized as expense in a particular period are determined using the individual film forecast method. Under this method, the amortization of capitalized costs and the accrual of participations and residuals are based on the proportion of the film's or television program's revenues recognized for such period to the film's or television program's estimated remaining ultimate revenues (i.e., the total revenue to be received throughout a film's or television program's remaining life cycle).

For theatrical films, which are monetized on an individual basis, the process of estimating ultimate revenues requires us to make a series of judgments related to future revenue-generating activities associated with a particular film. Prior to the theatrical release of a film, our estimates are based on factors such as the historical performance of similar films, the star power of the lead actors, the rating and genre of the film, pre-release market research (including test market screenings), international distribution plans and the expected number of theaters in which the film will be released. Subsequent to release, ultimate revenues are updated to reflect initial performance, which is often predictive of future performance.

For television programs that are monetized on an individual basis, ultimate revenues are estimated based on factors including the performance of similar programs in each applicable market, firm commitments in hand from customers that license the program in the future, and the popularity of the program in its initial markets.

For a film or television program that is predominantly monetized on its own but also monetized with other films and/or programs (such as our DTC or linear services), we make a reasonable estimate of the value attributable to the film or program's exploitation while monetized with other films/programs, based on relative market rates, and expense such costs as the film or television program is exhibited.

Ultimates for content monetized on an individual basis are reviewed and updated (as applicable) on a quarterly basis; any adjustments are applied prospectively as of the beginning of the fiscal year of the change.

For programs monetized as a group, including licensed programming, amortization expense for network programs is generally based on projected usage, generally resulting in an accelerated or straight-line amortization pattern. Adjustments to projected usage are applied prospectively in the period of the change. Streaming and premium pay-TV content amortization is based on estimated viewing patterns, as there are generally limited to no direct revenues to associate to the individual content assets for premium pay-TV. As such, number of views is most representative of the use of the title.

Judgment is required to determine the useful lives and amortization patterns of our content assets that are predominately monetized as a group. Critical assumptions include: (i) the grouping of content with similar characteristics, (ii) the application of a quantitative revenue forecast model or historical viewership model based on the adequacy of historical data, (iii) determining the appropriate historical periods to utilize and the relative weighting of those historical periods in the forecast model, and (iv) incorporating secondary revenue streams. We then consider the appropriate application of the quantitative assessment given forecasted content use, expected content investment and market trends. Content use and future revenues may differ from estimates based on changes in expectations related to market acceptance, network affiliate fee rates, advertising demand, the number of cable and satellite television subscribers receiving our networks, the number of subscribers to our streaming services, and program usage. Accordingly, we review our estimates and planned usage at least quarterly and revise our assumptions if necessary.

**Consolidation**

We have ownership and other interests in and contractual arrangements with various entities, including corporations, partnerships, and limited liability companies. For each such entity, we evaluate our ownership, other interests and contractual arrangements to determine whether we should consolidate the entity or account for its interest as an investment at inception and upon reconsideration events. As part of its evaluation, we initially determine whether the entity is a variable interest entity ("VIE"). Management evaluates key considerations through a qualitative and quantitative analysis in determining whether an entity is a VIE including whether (i) the entity has sufficient equity to finance its activities without additional financial support from other parties, (ii) the ability or inability to make significant decisions about the entity's operations, and (iii) the proportionality of voting rights of investors relative to their obligations to absorb the expected losses (or receive the expected returns) of the entity. If the entity is a VIE and if we have a variable interest in the entity, we use judgment in determining if we are the primary beneficiary and are thus required to consolidate the entity. In making this determination, we evaluate whether we or another party involved with the VIE (1) has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and (2) has the obligation to absorb losses of or receive benefits from the VIE that could be significant to the VIE.

If it is concluded that an entity is not a VIE, we consider our proportional voting interests in the entity and consolidate majority-owned subsidiaries in which a controlling financial interest is maintained. A controlling financial interest is determined by majority ownership and the absence of substantive third-party participation rights. Key factors we consider in determining the presence of substantive third-party participation rights include, but are not limited to, control of the board of directors, budget approval or veto rights, or operational rights that significantly impact the economic performance of the business such as programming, creative development, marketing, and selection of key personnel. Ownership interests in unconsolidated entities for which we have significant influence are accounted for as equity method.

We evaluated reconsideration events during the year ended December 31, 2022 and concluded there were no changes to our consolidation assessments.

**Revenue Recognition**

As described in Note 2, revenue is recognized upon transfer of control of promised services or goods to customers in an amount that reflects the consideration that we expect to receive in exchange for those services or goods. Significant estimates and judgements are applied in determining the timing of revenue recognition for certain types of transactions, such as bundled arrangements for advertising sales and content licensing arrangements.

A substantial portion of the advertising contracts in the U.S. and certain international markets guarantee the advertiser a minimum audience level that either the program in which their advertisements are aired or the advertisement will reach. These advertising campaigns are considered to represent a single, distinct performance obligation. For such contracts, judgment is required in measuring progress across our single performance obligation. Various factors such as pricing specific to the channel, daypart and targeted demographic, as well as audience guarantees, are considered in determining how to appropriately measure progress across the campaigns. Revenues are ultimately recognized based on the guaranteed audience level delivered multiplied by the average price per impression.

Our content licensing arrangements often include fixed license fees from the licensing of feature films and television programs in the off-network cable, premium pay, syndication, streaming, and international television and streaming markets. For arrangements that include multiple titles and/or staggered availabilities across geographical regions, the availability of each title and/or each region is considered a separate performance obligation, and the fixed fee is allocated to each title/region based on comparable market rates and recognized as revenue when the title is available for use by the licensee.

Our games sometimes include digital offerings such as in-game purchases or other online features. In these cases, we determine the timing of satisfaction of our performance obligations based on the nature of the deliverable (e.g., whether the type of in-game purchase can be consumed by the player right away (“consumable good”, or used by the player over time “durable good”)), and if recognized over time, we estimate the duration of consumer game play based on available game play, historical, or market data.

See Item 1A, “Risk Factors” for details on significant risks that could impact our ability to successfully grow our cash flows. For an in-depth discussion of each of our significant accounting policies, including our critical accounting policies and further information regarding estimates and assumptions involved in their application, see Note 2 to the accompanying consolidated financial statements included in Item 8, “Financial Statements and Supplementary Data” in this Annual Report on Form 10-K.

**ITEM 7A. Quantitative and Qualitative Disclosures about Market Risk.**

Our financial position, earnings and cash flows are exposed to market risks and can be affected by, among other things, economic conditions, interest rate changes, foreign currency fluctuations, and changes in the market values of investments. We have established policies, procedures and internal processes governing our management of market risks and the use of financial instruments to manage our exposure to such risks.

**Interest Rates**

We are exposed to the impact of interest rate changes primarily through our actual and potential borrowing activities. During the year ended December 31, 2022, we had access to a $6.0 billion multicurrency revolving credit facility. We had no outstanding borrowings as of December 31, 2022. We also have access to a commercial paper program, which had no outstanding borrowings as of December 31, 2022. The interest rate on borrowings under the revolving credit facility is based on a floating rate based on the applicable currency of the borrowing plus a margin. The revolving credit facility matures in June 2026, with the option for up to two additional 364-day renewal periods. As of December 31, 2022, we had $44.8 billion of fixed-rate senior notes, at par value.

Our current objectives in managing exposure to interest rate changes are to limit the impact of interest rates on earnings and cash flows. To achieve these objectives, we may enter into derivative instruments, effectively converting fixed rate borrowings to variable rate borrowings indexed to benchmark interest rates in order to reduce the amount of interest paid, or to limit the impact of volatility in interest rates on future issuances of fixed rate debt. (See Note 13 to the accompanying consolidated financial statements.)

As of December 31, 2022, the fair value of our outstanding senior notes, including accrued interest, was $38.0 billion. The fair value of our long-term debt may vary as a result of market conditions and other factors. A change in market interest rates will impact the fair market value of our fixed rate debt. The potential change in fair value of these senior notes from a 100 basis-point increase in quoted interest rates across all maturities, often referred to as a parallel shift in the yield curve, would be a decrease in fair value of approximately $2.6 billion as of December 31, 2022.

**Foreign Currency Exchange Rates**

We transact business globally and are subject to risks associated with changing foreign currency exchange rates. Market risk refers to the risk of loss arising from adverse changes in foreign currency exchange rates. The risk of loss can be assessed from the perspective of adverse changes in fair values, cash flows, and future earnings. We operate from hubs in EMEA, Latin America, and Asia, with net earnings reinvested locally and working capital requirements met from existing liquid funds. To the extent such funds are not sufficient to meet working capital requirements, drawdowns in the appropriate local currency are available from intercompany borrowings or from our revolving credit facility. The earnings of certain international operations are expected to be reinvested in those businesses indefinitely.

The functional currency of most of our international subsidiaries is the local currency. We are exposed to foreign currency risk to the extent that we enter into transactions denominated in currencies other than our subsidiaries' respective functional currencies ("non-functional currency risk"). Such transactions include affiliate and ad sales arrangements, content arrangements, equipment and other vendor purchases, and intercompany transactions. Changes in exchange rates with respect to amounts recorded in our consolidated balance sheets related to these items will result in unrealized foreign currency transaction gains and losses based upon period-end exchange rates. We also record realized foreign currency transaction gains and losses upon settlement of the transactions. Moreover, we will experience fluctuations in our revenues and expenses solely as a result of changes in foreign currency exchange rates.

We also are exposed to unfavorable and potentially volatile fluctuations of the U.S. dollar, which is our reporting currency, against the currencies of our operating subsidiaries when their respective financial statements are translated into U.S. dollars for inclusion in our consolidated financial statements. Cumulative translation adjustments are recorded in accumulated other comprehensive loss as a separate component of equity. Any increase or decrease in the value of the U.S. dollar against any foreign functional currency of one of our operating subsidiaries will cause us to experience unrealized foreign currency translation gains or losses with respect to amounts already invested in such foreign currencies. Accordingly, we may experience a negative impact on our net income, other comprehensive (loss) income and equity with respect to our holdings solely as a result of changes in foreign currency.

The majority of our foreign currency exposure is tied to Europe and Latin America. We may enter into derivative instruments that change in value as foreign currency exchange rates change to hedge certain exposures associated with affiliate revenue, the cost of producing or acquiring content, certain intercompany transactions, or in connection with forecasted business combinations. These contracts hedge forecasted foreign currency transactions in order to mitigate fluctuations in our earnings and cash flows associated with changes in foreign currency exchange rates. Our objective in managing exposure to foreign currency fluctuations is to reduce volatility of earnings and cash flows. Most of our non-functional currency risks related to our revenue, operating expenses and capital expenditures were not hedged as of December 31, 2022. We generally do not hedge against the risk that we may incur non-cash losses upon the translation of the financial statements of our subsidiaries and affiliates into U.S. dollars. (See Note 13 to the accompanying consolidated financial statements.)

**Derivatives**

We may use derivative financial instruments to modify our exposure to exogenous events and market risks from changes in foreign currency exchange rates and interest rates. We do not use derivatives unless there is an underlying exposure. While derivatives are used to mitigate cash flow risk and the risk of declines in fair value, they also limit potential economic benefits to our business in the event of positive shifts in foreign currency exchange rates and interest rates. We do not hold or enter into financial instruments for speculative trading purposes. (See Note 13 to the accompanying consolidated financial statements.)

**Market Values of Investments and Liabilities**

In addition to derivatives, we had investments in entities accounted for as equity method investments, equity investments, and other highly liquid instruments, such as money market funds and mutual funds, that are accounted for at fair value. We also have liabilities, such as deferred compensation, that are accounted for at fair value (See Note 10 and Note 14 to the accompanying consolidated financial statements). Investments in mutual funds include both fixed- and floating-rate interest earning securities that carry a degree of interest rate risk. Fixed-rate securities may have their fair market value adversely impacted by a rise in interest rates, while floating-rate securities may produce less income than predicted if interest rates fall. Due in part to these factors, our income from such investments may decrease in the future. Liabilities carried at fair value, such as deferred compensation, may experience capital gains that result in increased liabilities and expenses as the capital gains occur. We may enter into derivative financial instruments to hedge the risk of these market value changes. (See Note 13 to the accompanying consolidated financial statements.)

**ITEM 8. Financial Statements and Supplementary Data.**


| | Page |
|---|---|
| Management's Report on Internal Control Over Financial Reporting. | 58 |
| Report of Independent Registered Public Accounting Firm. (PCAOB ID 238) | 59 |
| Consolidated Financial Statements of Warner Bros. Discovery, Inc. | 62 |
| Consolidated Statements of Operations. | 62 |
| Consolidated Statements of Comprehensive (Loss) Income. | 63 |
| Consolidated Balance Sheets. | 64 |
| Consolidated Statements of Cash Flows. | 65 |
| Consolidated Statements of Equity. | 66 |
| Notes to Consolidated Financial Statements. | 68 |

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management of Warner Bros. Discovery, Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) and Rule 15d-15(f) of the Securities Exchange Act of 1934, as amended. The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and provide reasonable assurance that receipts and expenditures of the Company are being made only in accordance with authorizations of management and the directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements prepared for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management, with the participation of its Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2022 based on the framework set forth in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its evaluation, management concluded that, as of December 31, 2022, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

On April 8, 2022, Discovery completed its Merger with the WM Business. In accordance with the SEC's guidance that a recently acquired business may be omitted from the scope of management's assessment for up to one year from the date of acquisition, the Company's management has excluded the WM Business from its evaluation of its internal control over financial reporting as of December 31, 2022. As of and for the year ended December 31, 2022, total assets of the WM Business represented 29% of consolidated total assets of the Company, and total revenues of the WM business represented 66% of total revenues of the Company.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2022 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report in Item 8 of Part II of this Annual Report on Form 10-K under the caption "Report of Independent Registered Public Accounting Firm."

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Warner Bros. Discovery, Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Warner Bros. Discovery, Inc. and its subsidiaries (the "Company") as of December 31, 2022 and 2021, and the related consolidated statements of operations, of comprehensive income (loss), of equity and of cash flows for each of the three years in the period ended December 31, 2022, including the related notes and schedule of valuation and qualifying accounts for each of the three years in the period ended December 31, 2022 appearing under Item 15(a)(2) (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Management's Report on Internal Control Over Financial Reporting, management has excluded the WarnerMedia business from its assessment of internal control over financial reporting as of December 31, 2022 because it was acquired by the Company in a purchase business combination during 2022. We have also excluded the WarnerMedia business from our audit of internal control over financial reporting. The WarnerMedia business is a wholly-owned subsidiary whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting represent 29% and 66%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2022.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Merger with WarnerMedia - Determination of Accounting Acquirer*

As described in Note 4 to the consolidated financial statements, on April 8, 2022, the Company completed a merger with the WarnerMedia business of AT&T. The merger was executed as a Reverse Morris Trust transaction, under which WarnerMedia was distributed to AT&T's shareholders via a pro-rata distribution, and immediately thereafter, combined with Discovery, Inc. (Discovery), with Discovery being identified as the accounting acquirer based primarily upon the following facts: (1) Discovery initiated the merger, was the legal acquirer of Magallanes, Inc., ("Spinco"), and transferred equity consideration to Spinco stockholders, (2) AT&T received $40.5 billion of consideration (subject to working capital and other adjustments) as part of its disposition of the WarnerMedia business, (3) the Chief Executive Officer of Discovery continued as Chief Executive Officer of the combined Company after the merger and was primarily responsible for appointing the rest of the executive management team of the combined Company, and the Chief Financial Officer of Discovery will continue as Chief Financial Officer of the combined Company, (4) no stockholder or group of stockholders held a controlling interest in WBD and a key Discovery stockholder was the largest minority interest in WBD, after the completion of the merger and (5) AT&T had no input on the strategic direction and management of the combined Company after the completion of the merger. The above facts were deemed to outweigh the fact that the holders of shares of Spinco common stock that received shares of WBD common stock in the merger in the aggregate own a majority of WBD common stock on a fully diluted basis and associated voting rights after the merger.

The principal considerations for our determination that performing procedures relating to determination of the accounting acquirer in the merger with the WarnerMedia business is a critical audit matter are (i) the significant judgment by management in determining the appropriate accounting acquirer and (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating audit evidence related to management's determination of the accounting acquirer considering the facts above. Addressing this matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the merger accounting, including the control over management's determination of the accounting acquirer. These procedures also included, among others, (i) reading the merger agreement and other relevant transaction documents and (ii) evaluating management's assessment of the facts considered in the identification of the accounting acquirer.

*Acquisition of WarnerMedia - Valuation of Trade Names and Affiliate Relationships Intangible Assets*

As described in Note 4 to the consolidated financial statements, on April 8, 2022, the Company completed its merger with WarnerMedia business for a purchase consideration of $42.4 billion. The Company applied the acquisition method of accounting to WarnerMedia business, which resulted in the recognition of intangible assets, including $21.1 billion of trade names and $14.7 billion of affiliate, advertising and subscriber relationships, the primary component of which relates to the affiliate relationships. The fair value of the trade names was estimated by management using the relief from royalty valuation method and the fair value of the affiliate relationships was estimated by management using the multi-period excess earnings valuation method. Significant inputs used in the discounted cash flow analyses and other areas of judgment by management include (i) historical and projected financial information, (ii) discount rates used to present value future cash flows, (iii) royalty rates, (iv) projected revenue attributable to affiliate contracts and related renewals, (v) synergies, including cost savings, (vi) tax rates, (vii) economic useful life of assets, and (viii) attrition rates, as relevant, that market participants would consider when estimating fair values.

The principal considerations for our determination that performing procedures relating to the valuation of the trade names and affiliate relationships intangible assets acquired in the acquisition of WarnerMedia business is a critical audit matter are (i) the significant judgment by management when developing the fair value estimates of the trade names and affiliate relationships intangible assets, (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to royalty rates used in the valuation of the trade names and projected revenue attributable to affiliate contracts and related renewals used in the valuation of the affiliate relationships, and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the application of acquisition accounting, including controls over management's valuation of the trade names and affiliate relationships intangible assets and the development of the underlying assumptions related to the royalty rates for the trade names and projected revenue attributable to affiliate contracts and related renewals for the affiliate relationships. These procedures also included, among others, (i) reading the purchase agreement, (ii) testing management's process for developing the fair value estimates of the trade names and affiliate relationships intangible assets, (iii) evaluating the appropriateness of the relief from royalty and multi-period excess earnings valuation methods, (iv) testing the completeness and accuracy of underlying data used in the valuation methods, and (v) evaluating the reasonableness of the significant assumptions used by management related to royalty rates used in the valuation of the trade names and the projected revenue attributable to affiliate contracts and related renewals used in the valuation of the affiliate relationships. Evaluating the reasonableness of the royalty rates used in the valuation of the trade names involved considering observable royalty rates of comparable businesses and other industry factors. Evaluating the reasonableness of the projected revenue attributable to affiliate contracts and related renewals used in the valuation of the affiliate relationships involved considering the pre-existing contractual arrangements of WarnerMedia, as well as economic and industry forecasts. Professionals with specialized skill and knowledge were used to assist in the evaluation of the appropriateness of the valuation method and the reasonableness of the royalty rates used in the valuation of the trade names.

*Goodwill Impairment Assessment - DTC Reporting Unit*

As described in Notes 2 and 5 to the consolidated financial statements, the Company's consolidated goodwill balance was $34.4 billion as of December 31, 2022, and the goodwill associated with the DTC reporting unit was $7.9 billion. The Company evaluates goodwill for impairment annually as of October 1, or if an event or other circumstance indicates that it may not recover the carrying value of the asset. If a qualitative assessment indicates that it is more likely than not that the carrying value of a reporting unit goodwill or other indefinite-lived intangible asset exceeds its fair value, a quantitative impairment test is performed. If the carrying amount of the reporting unit exceeds the fair value of the reporting unit, an impairment charge is recorded for the amount by which the carrying amount exceeds the fair value, not to exceed the amount of goodwill recorded for that reporting unit. As of October 1, 2022, the Company performed a quantitative goodwill impairment assessment for all reporting. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded. Significant judgments and assumptions for all quantitative goodwill tests performed include discount rates, control premiums, terminal growth rates, relevant comparable company earnings multiples, and the amount and timing of expected future cash flows, including revenue growth rates and profit margins.

The principal considerations for our determination that performing procedures relating to the goodwill impairment assessment of the DTC reporting unit is a critical audit matter are (i) the significant judgment by management when developing the fair value of the DTC reporting unit, (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumption related to the revenue growth rates.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's goodwill impairment assessment, including controls over the valuation of the DTC reporting unit. These procedures also included, among others, (i) testing management's process for developing the fair value estimate of the DTC reporting unit, (ii) evaluating the appropriateness of the discounted cash flow model, (iii) testing the completeness and accuracy of underlying data used in the model, and (iv) evaluating the reasonableness of the significant assumption used by management related to the revenue growth rates. Evaluating management's significant assumption related to the revenue growth rates involved evaluating whether the assumption is reasonable considering (i) the current and past performance of the reporting unit, (ii) the consistency with external market and industry data, and (iii) whether the assumption is consistent with evidence obtained in other areas of the audit.

/s/ PricewaterhouseCoopers LLP
Washington, District of Columbia
February 24, 2023

We have served as the Company's auditor since 2008.

**WARNER BROS. DISCOVERY, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in millions, except per share amounts)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Revenues: | | | |
| Advertising | $ 8,524 | $ 6,194 | $ 5,572 |
| Distribution | 16,142 | 5,202 | 4,686 |
| Content | 8,360 | 737 | 355 |
| Other | 791 | 58 | 58 |
| Total revenues | 33,817 | 12,191 | 10,671 |
| Costs and expenses: | | | |
| Costs of revenues, excluding depreciation and amortization | 20,442 | 4,620 | 3,860 |
| Selling, general and administrative | 9,678 | 4,016 | 2,722 |
| Depreciation and amortization | 7,193 | 1,582 | 1,359 |
| Restructuring | 3,757 | 32 | 91 |
| Impairment and loss (gain) on disposition and disposal groups | 117 | (71) | 124 |
| Total costs and expenses | 41,187 | 10,179 | 8,156 |
| Operating (loss) income | (7,370) | 2,012 | 2,515 |
| Interest expense, net | (1,777) | (633) | (648) |
| Loss from equity investees, net | (160) | (18) | (105) |
| Other income (expense), net | 347 | 72 | (34) |
| (Loss) income before income taxes | (8,960) | 1,433 | 1,728 |
| Income tax benefit (expense) | 1,663 | (236) | (373) |
| Net (loss) income | (7,297) | 1,197 | 1,355 |
| Net income attributable to noncontrolling interests | (68) | (138) | (124) |
| Net income attributable to redeemable noncontrolling interests | (6) | (53) | (12) |
| Net (loss) income available to Warner Bros. Discovery, Inc. | $ (7,371) | $ 1,006 | $ 1,219 |
| Net (loss) income per share available to Warner Bros. Discovery, Inc. Series A common stockholders: | | | |
| Basic | $ (3.82) | $ 1.55 | $ 1.82 |
| Diluted | $ (3.82) | $ 1.54 | $ 1.81 |
| Weighted average shares outstanding: | | | |
| Basic | 1,940 | 588 | 599 |
| Diluted | 1,940 | 664 | 672 |

The accompanying notes are an integral part of these consolidated financial statements.

**WARNER BROS. DISCOVERY, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME**
**(in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Net (loss) income | $ (7,297) | $ 1,197 | $ 1,355 |
| Other comprehensive income (loss) adjustments, net of tax: | | | |
| Currency translation | (653) | (290) | 292 |
| Pension plan and SERP | (26) | 2 | (8) |
| Derivatives | (14) | 109 | (113) |
| Comprehensive (loss) income | (7,990) | 1,018 | 1,526 |
| Comprehensive income attributable to noncontrolling interests | (68) | (138) | (124) |
| Comprehensive income attributable to redeemable noncontrolling interests | (6) | (53) | (12) |
| Comprehensive (loss) income attributable to Warner Bros. Discovery, Inc. | $ (8,064) | $ 827 | $ 1,390 |

The accompanying notes are an integral part of these consolidated financial statements.

**WARNER BROS. DISCOVERY, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in millions, except par value)**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 3,731 | $ 3,905 |
| Receivables, net | 6,380 | 2,446 |
| Prepaid expenses and other current assets | 3,888 | 913 |
| Total current assets | 13,999 | 7,264 |
| Film and television content rights and games | 26,652 | 3,832 |
| Property and equipment, net | 5,301 | 1,336 |
| Goodwill | 34,438 | 12,912 |
| Intangible assets, net | 44,982 | 6,317 |
| Other noncurrent assets | 8,629 | 2,766 |
| Total assets | $ 134,001 | $ 34,427 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,454 | $ 412 |
| Accrued liabilities | 11,504 | 2,230 |
| Deferred revenues | 1,694 | 478 |
| Current portion of debt | 365 | 339 |
| Total current liabilities | 15,017 | 3,459 |
| Noncurrent portion of debt | 48,634 | 14,420 |
| Deferred income taxes | 11,014 | 1,225 |
| Other noncurrent liabilities | 10,669 | 1,927 |
| Total liabilities | 85,334 | 21,031 |
| Commitments and contingencies (See Note 22) | | |
| Redeemable noncontrolling interests | 318 | 363 |
| Equity: | | |
| Warner Bros. Discovery, Inc. stockholders' equity: | | |
| Series A common stock: $0.01 par value; 10,800 and 0 shares authorized; 2,660 and 0 shares issued; and 2,430 and 0 shares outstanding | 27 | — |
| Preferred stock: $0.01 par value; 1,200 and 0 shares authorized, 0 shares issued and outstanding | — | — |
| Discovery Series A-1 convertible preferred stock: $0.01 par value; 0 and 8 shares authorized, issued and outstanding | — | — |
| Discovery Series C-1 convertible preferred stock: $0.01 par value; 0 and 6 shares authorized; 0 and 4 shares issued and outstanding | — | — |
| Discovery Series A common stock: $0.01 par value; 0 and 1,700 shares authorized; 0 and 170 shares issued; and 0 and 169 shares outstanding | — | 2 |
| Discovery Series B convertible common stock: $0.01 par value; 0 and 100 shares authorized; 0 and 7 shares issued and outstanding | — | — |
| Discovery Series C common stock: $0.01 par value; 0 and 2,000 shares authorized; 0 and 559 shares issued; and 0 and 330 shares outstanding | — | 5 |
| Additional paid-in capital | 54,630 | 11,086 |
| Treasury stock, at cost: 230 and 230 shares | (8,244) | (8,244) |
| Retained earnings | 2,205 | 9,580 |
| Accumulated other comprehensive loss | (1,523) | (830) |
| Total Warner Bros. Discovery, Inc. stockholders' equity | 47,095 | 11,599 |
| Noncontrolling interests | 1,254 | 1,434 |
| Total equity | 48,349 | 13,033 |
| Total liabilities and equity | $ 134,001 | $ 34,427 |

The accompanying notes are an integral part of these consolidated financial statements.

**WARNER BROS. DISCOVERY, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in millions)**

| | Year Ended December 31, 2022 | 2021 | 2020 |
|---|---|---|---|
| **Operating Activities** | | | |
| Net (loss) income | $ (7,297) | $ 1,197 | $ 1,355 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Content rights amortization and impairment | 14,161 | 3,501 | 2,956 |
| Content restructuring impairments and write-offs | 2,808 | — | — |
| Depreciation and amortization | 7,193 | 1,582 | 1,359 |
| Deferred income taxes | (2,842) | (511) | (186) |
| Preferred stock conversion premium | 789 | — | — |
| Equity in losses of equity method investee companies and cash distributions | 211 | 63 | 167 |
| Loss on extinguishment of debt | — | 10 | 76 |
| Share-based compensation expense | 412 | 178 | 110 |
| Impairment and loss (gain) on disposition and disposal groups | 116 | (71) | 126 |
| (Gain) loss from derivative instruments, net | (501) | 49 | (36) |
| Gain on sale of investments | (199) | (19) | (103) |
| Other, net | 435 | 56 | 14 |
| Changes in operating assets and liabilities, net of acquisitions and dispositions: | | | |
| Receivables, net | 181 | 47 | 105 |
| Film and television content rights, games and payables, net | (12,562) | (3,381) | (3,053) |
| Accounts payable, accrued liabilities, deferred revenues and other noncurrent liabilities | 1,529 | 185 | (131) |
| Foreign currency, prepaid expenses and other assets, net | (130) | (88) | (20) |
| Cash provided by operating activities | 4,304 | 2,798 | 2,739 |
| **Investing Activities** | | | |
| Purchases of property and equipment | (987) | (373) | (402) |
| Cash acquired from business acquisition and working capital settlement | 3,612 | (2) | (39) |
| Purchases of investments | — | (103) | (250) |
| Investments in and advances to equity investments | (168) | (184) | (181) |
| Proceeds from sales and maturities of investments | 306 | 599 | 69 |
| Proceeds from (payments for) derivative instruments, net | 752 | (86) | 85 |
| Other investing activities, net | 9 | 93 | 15 |
| Cash provided by (used in) investing activities | 3,524 | (56) | (703) |
| **Financing Activities** | | | |
| Principal repayments of debt, including premiums to par value and discount payment | (1,315) | (574) | (2,193) |
| Borrowings from debt, net of discount and issuance costs | — | — | 1,979 |
| Repurchases of stock | — | — | (969) |
| Repayments under revolving credit facility | (125) | — | (500) |
| Borrowings under revolving credit facility | 125 | — | 500 |
| Distributions to noncontrolling interests and redeemable noncontrolling interests | (300) | (251) | (254) |
| Borrowings under commercial paper program | 2,268 | — | — |
| Principal repayments of term loans | (6,000) | — | — |
| Repayments under commercial paper program | (2,270) | — | — |
| Other financing activities, net | (125) | (28) | (112) |
| Cash used in financing activities | (7,742) | (853) | (1,549) |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | (61) | (106) | 83 |
| Net change in cash, cash equivalents, and restricted cash | 25 | 1,783 | 570 |
| Cash, cash equivalents, and restricted cash, beginning of period | 3,905 | 2,122 | 1,552 |
| Cash, cash equivalents, and restricted cash, end of period | $ 3,930 | $ 3,905 | $ 2,122 |

The accompanying notes are an integral part of these consolidated financial statements.

**WARNER BROS. DISCOVERY, INC.**
**CONSOLIDATED STATEMENTS OF EQUITY**
**(in millions)**

| | Discovery, Inc. Preferred Stock | | Discovery, Inc. Common Stock | | Warner Bros. Discovery, Inc. Common Stock | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Par Value | Shares | Par Value | Shares | Par Value | Additional Paid-In Capital | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Loss | Warner Bros. Discovery, Inc. Stockholders' Equity | Noncontrolling Interests | Total Equity |
| December 31, 2019 | 13 | $ — | 715 | $ 7 | — | $ — | $ 10,747 | $ (7,374) | $ 7,333 | $ (822) | $ 9,891 | $ 1,633 | $ 11,524 |
| Cumulative effect of accounting changes | — | — | — | — | — | — | — | — | 2 | — | 2 | — | 2 |
| Cumulative effect of accounting changes of an equity method investee | — | — | — | — | — | — | — | — | (3) | — | (3) | — | (3) |
| Net income available to Warner Bros. Discovery, Inc. and attributable to noncontrolling interests | — | — | — | — | — | — | — | — | 1,219 | — | 1,219 | 124 | 1,343 |
| Other comprehensive income | — | — | — | — | — | — | — | — | — | 171 | 171 | — | 171 |
| Share-based compensation | — | — | — | — | — | — | 94 | — | — | — | 94 | — | 94 |
| Repurchases of stock | — | — | — | — | — | — | — | (965) | — | — | (965) | — | (965) |
| Tax settlements associated with share-based plans | — | — | — | — | — | — | (32) | — | — | — | (32) | — | (32) |
| Equity exchange with Harpo for step acquisition of OWN | — | — | — | — | — | — | (45) | 95 | 9 | — | 59 | — | 59 |
| Dividends paid to noncontrolling interests | — | — | — | — | — | — | — | — | — | — | — | (223) | (223) |
| Issuance of stock in connection with share-based plans | — | — | 2 | — | — | — | 43 | — | — | — | 43 | — | 43 |
| Redeemable noncontrolling interest adjustments to redemption value | — | — | — | — | — | — | — | — | (17) | — | (17) | — | (17) |
| Other adjustments to stockholders' equity | — | — | — | — | — | — | 2 | — | — | — | 2 | 2 | 4 |
| December 31, 2020 | 13 | — | 717 | 7 | — | — | 10,809 | (8,244) | 8,543 | (651) | 10,464 | 1,536 | 12,000 |
| Net income available to Warner Bros. Discovery, Inc. and attributable to noncontrolling interests | — | — | — | — | — | — | — | — | 1,006 | — | 1,006 | 138 | 1,144 |
| Other comprehensive loss | — | — | — | — | — | — | — | — | — | (179) | (179) | — | (179) |
| Share-based compensation | — | — | — | — | — | — | 158 | — | — | — | 158 | — | 158 |
| Preferred stock conversion | (1) | — | 11 | — | — | — | — | — | — | — | — | — | — |
| Tax settlements associated with share-based plans | — | — | — | — | — | — | (71) | — | — | — | (71) | — | (71) |
| Dividends paid to noncontrolling interests | — | — | — | — | — | — | — | — | — | — | — | (240) | (240) |
| Issuance of stock in connection with share-based plans | — | — | 8 | — | — | — | 198 | — | — | — | 198 | — | 198 |
| Redeemable noncontrolling interest adjustments to redemption value | — | — | — | — | — | — | (8) | — | 31 | — | 23 | — | 23 |
| December 31, 2021 | 12 | — | 736 | 7 | — | — | 11,086 | (8,244) | 9,580 | (830) | 11,599 | 1,434 | 13,033 |
| Net (loss) income available to Warner Bros. Discovery, Inc. and attributable to noncontrolling interests | — | — | — | — | — | — | — | — | (7,371) | — | (7,371) | 68 | (7,303) |
| Other comprehensive loss | — | — | — | — | — | — | — | — | — | (693) | (693) | — | (693) |
| Share-based compensation | — | — | — | — | — | — | 399 | — | — | — | 399 | — | 399 |

**WARNER BROS. DISCOVERY, INC.**
**CONSOLIDATED STATEMENTS OF EQUITY**
**(in millions)**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conversion and issuance of common stock and noncontrolling interest in connection with the acquisition of the WarnerMedia Business | (12) | — | (739) | (7) | 2,658 | 27 | 43,173 | — | — | — | 43,193 | 2 | 43,195 |
| Tax settlements associated with share-based plans | — | — | — | — | — | — | (54) | — | — | — | (54) | — | (54) |
| Dividends paid to noncontrolling interests | — | — | — | — | — | — | — | — | — | — | — | (250) | (250) |
| Issuance of stock in connection with share-based plans | — | — | 3 | — | 2 | — | 26 | — | — | — | 26 | — | 26 |
| Redeemable noncontrolling interest adjustments to redemption value | — | — | — | — | — | — | — | — | (4) | — | (4) | — | (4) |
| December 31, 2022 | — | $ — | — | $ — | 2,660 | $ 27 | $ 54,630 | $ (8,244) | $ 2,205 | $ (1,523) | $ 47,095 | $ 1,254 | $ 48,349 |

The accompanying notes are an integral part of these consolidated financial statements.

**NOTE 1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

**Description of Business**

Warner Bros. Discovery is a premier global media and entertainment company that combines the WarnerMedia Business's premium entertainment, sports and news assets with Discovery's leading non-fiction and international entertainment and sports businesses, thus offering audiences a differentiated portfolio of content, brands and franchises across television, film, streaming and gaming. Some of our iconic brands and franchises include Warner Bros. Pictures Group, Warner Bros. Television Group, DC, HBO, HBO Max, Discovery Channel, discovery+, CNN, HGTV, Food Network, TNT, TBS, TLC, OWN, Warner Bros. Games, Batman, Superman, Wonder Woman, Harry Potter, Looney Tunes, Hanna-Barbera, Game of Thrones, and The Lord of the Rings.

**Merger with the WarnerMedia Business of AT&T**

On April 8, 2022 (the "Closing Date"), Discovery, Inc. ("Discovery") completed its merger (the "Merger") with the WarnerMedia business (the "WarnerMedia Business", "WM Business" or "WM") of AT&T, Inc. ("AT&T") and changed its name to Warner Bros. Discovery, Inc. On April 11, 2022, the Company's shares started trading on Nasdaq under the trading symbol WBD.

The Merger was executed through a Reverse Morris Trust type transaction, under which WM was distributed to AT&T's shareholders via a pro rata distribution, and immediately thereafter, combined with Discovery. (See Note 3 and Note 4). Prior to the Merger, WarnerMedia Holdings, Inc. distributed $40.5 billion to AT&T (subject to working capital and other adjustments) in a combination of cash, debt securities, and WM's retention of certain debt. Discovery transferred purchase consideration of $42.4 billion in equity to AT&T shareholders in the Merger. In August 2022, the Company and AT&T finalized the post-closing working capital settlement process, pursuant to section 1.3 of the Separation and Distribution Agreement, which resulted in the Company receiving a $1.2 billion payment from AT&T in the third quarter of 2022 in lieu of adjusting the equity issued as purchase consideration in the Merger. AT&T shareholders received shares of WBD Series A common stock ("WBD common stock") in the Merger representing 71% of the combined Company and the Company's pre-Merger shareholders continued to own 29% of the combined Company, in each case on a fully diluted basis.

Discovery was deemed to be the accounting acquirer of the WM Business for accounting purposes under U.S. generally accepted accounting principles ("U.S. GAAP"); therefore, Discovery is considered the Company's predecessor and the historical financial statements of Discovery prior to April 8, 2022, are reflected in this Annual Report on Form 10-K as the Company's historical financial statements. Accordingly, the financial results of the Company as of and for any periods prior to April 8, 2022 do not include the financial results of the WM Business and current and future results will not be comparable to historical results.

**Segments**

In connection with the Merger, the Company reevaluated and changed its segment presentation during 2022. As of December 31, 2022, we classified our operations in three reportable segments:

- **Studios** - Our Studios segment primarily consists of the production and release of feature films for initial exhibition in theaters, production and initial licensing of television programs to third parties and our networks/DTC services, distribution of our films and television programs to various third party and internal television and streaming services, distribution through the home entertainment market (physical and digital), related consumer products and themed experience licensing, and interactive gaming.
- **Networks** - Our Networks segment primarily consists of our domestic and international television networks.
- **DTC** - Our DTC segment primarily consists of our premium pay-TV and streaming services.

**Impact of COVID-19**

We continue to closely monitor the ongoing impact of COVID-19 on all aspects of our business and geographies; however, the nature and full extent of COVID-19's effects on our operations and results are not yet known and will depend on future developments, which are highly uncertain and cannot be predicted. Certain key sources of revenue for the Studios segment, including theatrical revenues, original television productions, studio operations, and themed entertainment, have been adversely impacted by governmentally imposed shutdowns and related labor interruptions and constraints on consumer activity, particularly in the context of public entertainment venues, such as cinemas and theme parks.

**Basis of Consolidation**

The consolidated financial statements include the accounts of the Company and its majority-owned subsidiaries in which a controlling interest is maintained, including variable interest entities ("VIE") for which the Company is the primary beneficiary. For each non-wholly owned subsidiary, the Company evaluates its ownership and other interests to determine whether it should consolidate the entity or account for its ownership interest as an unconsolidated investment. As part of its evaluation, the Company makes judgments in determining whether the entity is a VIE and, if so, whether it is the primary beneficiary of the VIE and is thus required to consolidate the entity. (See Note 10.) If it is concluded that an entity is not a VIE, then the Company considers its proportional voting interests in the entity. The Company consolidates majority-owned subsidiaries in which a controlling financial interest is maintained. A controlling financial interest is determined by majority ownership and the absence of significant third-party participating rights. Ownership interests in entities for which the Company has significant influence that are not consolidated are accounted for as equity method investments.

Intercompany accounts and transactions between consolidated entities have been eliminated.

**Use of Estimates**

The preparation of financial statements in accordance with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results may differ from these estimates.

Significant estimates and judgments inherent in the preparation of the consolidated financial statements include accounting for asset impairments, revenue recognition, estimated credit losses, content rights, leases, depreciation and amortization, the determination of ultimate revenues as they relate to amortization of capitalized content rights and accruals of participations and residuals, business combinations, share-based compensation, income taxes, other financial instruments, contingencies, estimated defined benefit plan liabilities, and the determination of whether the Company should consolidate certain entities.

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Foreign Currency**

The reporting currency of the Company is the U.S. dollar. Financial statements of subsidiaries whose functional currency is not the U.S. dollar are translated at exchange rates in effect at the balance sheet date for assets and liabilities and at average exchange rates for revenues and expenses for the respective periods. Translation adjustments are recorded in accumulated other comprehensive loss. Cash flows from the Company's operations in foreign countries are generally translated at the weighted average rate for the respective periods.

The Company is exposed to foreign currency risk to the extent that it enters into transactions denominated in currencies other than its subsidiaries' respective functional currencies. Transactions denominated in currencies other than subsidiaries' functional currencies are recorded based on exchange rates at the time such transactions arise. Such transactions include affiliate and ad sales arrangements, content licensing arrangements, equipment and other vendor purchases and intercompany transactions. Changes in exchange rates with respect to amounts recorded in the Company's consolidated balance sheets related to these items will result in unrealized foreign currency transaction gains and losses based upon period-end exchange rates. The Company also records realized foreign currency transaction gains and losses upon settlement of the transactions. Foreign currency transaction gains and losses resulting from the conversion of the transaction currency to functional currency are included in other income (expense), net.

**Cash and Cash Equivalents**

Cash and cash equivalents include cash on hand and highly liquid investments with original maturities of 90 days or less.

**Receivables**

The Company's accounts receivable balances and the related credit losses arise primarily from distribution, advertising and content revenue. Receivables include amounts billed and currently due from customers and are presented net of an estimate for credit losses. To assess collectability, the Company analyzes market trends, economic conditions, the aging of receivables and customer specific risks, and records a provision for estimated credit losses expected over the lifetime of receivables. The corresponding expense for the expected credit losses is reflected in selling, general and administrative expenses. The Company does not require collateral with respect to trade receivables.

***Revolving Receivables Program***

The Company has a revolving agreement to transfer up to $5,700 million of certain receivables through its bankruptcy-remote subsidiary, Warner Bros. Discovery Receivables Funding, LLC, to various financial institutions on a recurring basis in exchange for cash equal to the gross receivables transferred. The Company services the sold receivables for the financial institution for a fee and pays fees to the financial institution in connection with this revolving agreement. The agreement is a continuation of the agreement the WarnerMedia Business had in place prior to the Merger. This agreement is subject to renewal on an annual basis and the transfer limit may be expanded or reduced from time to time. As customers pay their balances, the Company's available capacity under this revolving agreement increases and typically the Company transfers additional receivables into the program.

The gross value of the proceeds received results in derecognition of receivables and the obligations assumed are recorded at fair value. The obligations assumed when proceeds are received relate to expected credit losses on sold receivables and estimated fee payments made on outstanding sold receivables already transferred. The obligations are subsequently adjusted for changes in estimated expected credit losses and interest rates, which are considered Level 3 fair value measurements since the inputs are unobservable (See Note 8). In some cases, the Company may have collections that have not yet been remitted to the bank, resulting in a liability.

***Accounts Receivable Factoring***

The Company has a factoring agreement to sell certain of its non-U.S. trade accounts receivable on a non-recourse basis to a third-party financial institution. The Company accounts for these transactions as sales in accordance with ASC 860, "Transfers and Servicing", as its continuing involvement subsequent to the transfer is limited to providing certain servicing and collection actions on behalf of the purchaser of the designated trade accounts receivable. Proceeds from amounts factored are recorded as an increase to cash and cash equivalents and a reduction to receivables, net in the consolidated balance sheets. Cash received is also reflected as cash provided by operating activities in the consolidated statements of cash flows. The accounts receivable factoring program is separate and distinct from the revolving receivables program.

**Film and Television Content Rights**

The Company capitalizes costs to produce television programs and feature films, including direct production costs, production overhead, interest, acquisition costs and development costs, as well as advances for live programming rights, such as sports. Costs to acquire licensed television series and feature film programming rights are capitalized when the license period has begun and the program is accepted and available for airing. Production incentives received from various jurisdictions where the Company produces content are recorded as a reduction to capitalized production costs. All capitalized content and prepaid license fees are classified as noncurrent assets, with the exception of content acquired with an initial license period of 12 months or less and prepaid sports rights expected to air within 12 months.

The Company groups its film and television content rights by monetization strategy: content that is predominately monetized individually, and content that is predominately monetized as a group.

***Content Monetized Individually***

For films and television programs predominantly monetized individually, the amount of capitalized film and television production costs (net of incentives) amortized and the amount of participations and residuals to be recognized as expense in a particular period are determined using the individual film forecast method. Under this method, the amortization of capitalized costs and the accrual of participations and residuals are based on the proportion of the film's or television program's revenues recognized for such period to the film's or television program's estimated remaining ultimate revenues (i.e., the total revenue to be received throughout a film's or television program's remaining life cycle).

The process of estimating ultimate revenues requires us to make a series of judgments related to future revenue-generating activities associated with a particular film. Prior to the theatrical release of a film, the Company's estimates are based on factors such as the historical performance of similar films, the star power of the lead actors, the rating and genre of the film, pre-release market research (including test market screenings), international distribution plans and the expected number of theaters in which the film will be released. Subsequent to release, ultimate revenues are updated to reflect initial performance, which is often predictive of future performance. For a film or television program that is predominantly monetized on its own but also monetized with other films and/or programs (such as the Company's DTC or linear services), the Company makes a reasonable estimate of the value attributable to the film or program's exploitation while monetized with other films/programs and expense such costs as the film or television program is exhibited. For theatrical films, the period over which ultimate revenues from all applicable sources and exhibition windows are estimated does not exceed 10 years from the date of the film's initial release. For television programs, the ultimate period does not exceed 10 years from delivery of the first episode, or, if still in production, five years from delivery of the most recent episode, if later. For games, the ultimate period does not exceed two years from the date of the game's initial release. Ultimates for produced content monetized on an individual basis are reviewed and updated (as applicable) on a quarterly basis; any adjustments are applied prospectively as of the beginning of the fiscal year of the change.

***Content Monetized as a Group***

For programs monetized as a group, including licensed programming, the Company's film groups are generally aligned along the Company's networks and digital content offerings, except for certain international territories wherein content assets are shared across the various networks in the territory and therefore, the territory is the film group. Program costs, including licensed programming, that are predominantly monetized as a group are amortized based on projected usage, generally resulting in an accelerated or straight-line amortization pattern. Adjustments to projected usage are applied prospectively in the period of the change. Participations and residuals are generally expensed in line with the pattern of usage. Streaming content and premium pay-TV amortization for each period is recognized based on estimated viewing patterns as there are generally little to no direct revenues to associate to the individual content assets. As such, number of views is most representative of the use of the title. Licensed rights to film and television programming are typically amortized over the useful life of the program's license period on a straight-line basis (or per-play basis, if greater, for certain programming on the Company's ad-supported networks), or accelerated basis for licensed original programs. The Company allocates the cost of multi-year sports programming arrangements over the contract period to each event or season based on its projected advertising revenue and an allocation of affiliate revenue (estimated relative value). If annual contractual payments related to each season approximate each season's estimated relative value, the Company expenses the related contractual payments during the applicable season. Amortization of sports rights takes place when the content airs.

Quarterly, the Company prepares analyses to support its content amortization expense. Critical assumptions used in determining content amortization for programming predominately monetized as a group include: (i) the grouping of content with similar characteristics, (ii) the application of a quantitative revenue forecast model or historical viewership model based on the adequacy of historical data, (iii) determining the appropriate historical periods to utilize and the relative weighting of those historical periods in the forecast model, and (iv) incorporating secondary revenue streams. The Company then considers the appropriate application of the quantitative assessment given forecasted content use, expected content investment and market trends. Content use and future revenues may differ from estimates based on changes in expectations related to market acceptance, network affiliate fee rates, advertising demand, the number of cable and satellite television subscribers receiving the Company's networks, the number of subscribers to its streaming services, and program usage. Accordingly, the Company reviews its estimates and planned usage at least quarterly and revises its assumptions if necessary. Any material adjustments from the Company's review of the amortization rates for assets in film groups are applied prospectively in the period of the change.

***Unamortized Film Costs Impairment Assessment***

Unamortized film costs are tested for impairment whenever events or changes in circumstances indicate that the fair value of a film (or television program) predominately monetized on its own, or a film group, may be less than its unamortized costs. In addition, a change in the predominant monetization strategy is considered a triggering event for impairment testing before a title is accounted for as part of a film group. If the carrying value of an individual feature film or television program, or film group, exceeds the estimated fair value, an impairment charge will be recorded in the amount of the difference. For content that is predominately monetized individually, the Company utilizes estimates including ultimate revenues and additional costs to be incurred (including exploitation and participation costs), in order to determine whether the carrying value of a film or television program is impaired.

***Game Development Costs***

Game development costs are expensed as incurred before the applicable game reaches technological feasibility, or for online hosted arrangements, before the preliminary project phase is complete and it is probable the project will be completed and the software will be used to perform the function intended. Upon release, the capitalized game development costs are amortized based on the proportion of the game's revenues recognized for such period to the game's total current and anticipated revenues. Unamortized capitalized game production and development costs are stated at the lower of cost, less accumulated amortization, or net realizable value and reported in "Film and television content rights and games" on the consolidated balance sheets.

**Investments**

The Company holds investments in equity method investees and equity investments with and without readily determinable fair values. (See Note 10.)

***Equity Method Investments***

Investments in equity method investees are those for which the Company has the ability to exercise significant influence but does not control and is not the primary beneficiary or the entity is not a VIE and the Company does not have a controlling financial interest. Under this method of accounting, the Company typically records its proportionate share of the net earnings or losses of equity method investees and a corresponding increase or decrease to the investment balances. Cash payments to equity method investees such as additional investments, loans and advances and expenses incurred on behalf of investees, as well as payments from equity method investees such as dividends, distributions and repayments of loans and advances are recorded as adjustments to investment balances.

The Company evaluates its equity method investments for impairment whenever events or changes in circumstances indicate that the carrying amounts of such investments may not be recoverable. (See "Asset Impairment Analysis" below.)

***Equity Investments with Readily Determinable Fair Values***

Investments in entities or other securities in which the Company has no control or significant influence and is not the primary beneficiary, and have a readily determinable fair value are recorded at fair value based on quoted market prices and are classified as equity securities or equity investments with readily determinable fair value. The investments are measured at fair value based on a quoted market price per unit in active markets multiplied by the number of units held without consideration of transaction costs (Level 1). Gains and losses are recorded in other income (expense), net on the consolidated statements of operations. (See Note 10 and Note 18.)

***Equity Investments without Readily Determinable Fair Values***

Equity investments without readily determinable fair values include ownership rights that either (i) do not meet the definition of in-substance common stock or (ii) do not provide the Company with control or significant influence and these investments do not have readily determinable fair values. Equity investments without readily determinable fair values are recorded at cost and adjusted for subsequent observable price changes as of the date that an observable transaction takes place. Adjustments for observable price changes are recorded in other income (expense), net. (See Note 10 and Note 18.)

**Property and Equipment**

Property and equipment are stated at cost less accumulated depreciation and impairments. Internal use software costs are capitalized during the application development stage; software costs incurred during the preliminary project and post implementation stages are expensed as incurred. Repairs and maintenance expenditures that do not enhance the use or extend the life of property and equipment are expensed as incurred. Depreciation for most property and equipment is recognized using the straight-line method over the estimated useful lives of the assets. (See Note 18.)

**Leases**

The Company determines if an arrangement is a lease at its inception. Operating lease right-of-use ("ROU") assets are included in other noncurrent assets. Finance lease ROU assets are included in property and equipment, net. Operating and finance lease liabilities are included in accrued liabilities and other noncurrent liabilities in the consolidated balance sheets.

A rate implicit in the lease when readily determinable is used in arriving at the present value of lease payments. As most of the Company's leases do not provide an implicit rate, the Company uses an incremental borrowing rate based on information available at lease commencement date for most of its leases. The incremental borrowing rate is based on the Company's U.S. dollar denominated senior unsecured borrowing curves using public credit ratings adjusted down to a collateralized basis using a combination of recovery rate and credit notching approaches and translated into major contract currencies as applicable.

The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company does not separate lease components from non-lease components across all lease categories. Instead, each separate lease component and non-lease component are accounted for as a single lease component. In addition, variable lease payments that are based on an index or rate are included in measurement of ROU assets and lease liabilities at lease inception. All other variable lease payments are expensed as incurred and are not included in the measurement of ROU assets and lease liabilities. Lease expense for operating leases is recognized on a straight-line basis. For finance leases, the Company recognizes interest expense on lease liabilities using the effective interest method and amortization of ROU assets on a straight-line basis.

**Defined Benefit Plans**

The Company maintains defined benefit pension plans covering certain U.S. employees and several non-U.S. pension plans. Defined benefit plan obligations are based on various assumptions used by the Company's actuaries in calculating these amounts. These assumptions include discount rates, compensation rate increases, expected return on plan assets, retirement rates and mortality rates. Actual results that differ from the assumptions and changes in assumptions could affect future expenses and obligations.

**Asset Impairment Analysis**

***Goodwill and Indefinite-lived Intangible Assets***

Goodwill is allocated to the Company's reporting units, which are its operating segments or one level below its operating segments. The Company evaluates goodwill and other indefinite-lived intangible assets for impairment annually as of October 1, or earlier if an event or other circumstance indicates that it may not recover the carrying value of the asset. If the Company believes that, as a result of its qualitative assessment, it is more likely than not that the fair value of a reporting unit or other indefinite-lived intangible asset is greater than its carrying amount, a quantitative impairment test is not required. If a qualitative assessment indicates that it is more likely than not that the carrying value of a reporting unit goodwill or other indefinite-lived intangible asset exceeds its fair value, a quantitative impairment test is performed. If the carrying amount of the reporting unit exceeds the fair value of the reporting unit, an impairment charge is recorded for the amount by which the carrying amount exceeds the fair value, not to exceed the amount of goodwill recorded for that reporting unit. The Company typically performs a quantitative impairment test every three years, irrespective of the outcome of the Company's qualitative assessment.

***Long-lived Assets***

Long-lived assets such as amortizing trademarks and trade names; affiliate, advertising, and subscriber relationships; franchises and other intangible assets; and property and equipment are not required to be tested for impairment annually, but rather whenever circumstances indicate that the carrying amount of the asset may not be recoverable. If an impairment analysis is required, the impairment test employed is based on whether the Company's intent is to hold the asset for continued use or to hold the asset for sale.

- If the intent is to hold the asset for continued use, the impairment test requires a comparison of undiscounted future cash flows to the carrying value of the asset. If the carrying value of the asset exceeds the undiscounted cash flows, an impairment loss would be recognized equal to the excess of the asset's carrying value over its fair value, which is typically determined by discounting the future cash flows associated with that asset.
- If the intent is to hold the asset for sale and certain other criteria are met, the impairment test involves comparing the asset's carrying value to its estimated fair value less costs to sell. If the carrying value of the asset exceeds the fair value, an impairment loss would be recognized equal to the difference.

Significant judgments used for long-lived asset impairment assessments include identifying the appropriate asset groupings and primary assets within those groupings, determining whether events or circumstances indicate that the carrying amount of the asset may not be recoverable, determining the future cash flows for the assets involved and assumptions applied in determining fair value, which include reasonable discount rates, growth rates, market risk premiums and other assumptions about the economic environment.

***Equity Method Investments and Equity Investments Without Readily Determinable Fair Value***

Equity method investments are reviewed for indicators of other-than-temporary impairment on a quarterly basis. Equity method investments are written down to fair value if there is evidence of a loss in value that is other-than-temporary. The Company may estimate the fair value of its equity method investments by considering recent investee equity transactions, DCF analysis, recent operating results, comparable public company operating cash flow multiples and, in certain situations, balance sheet liquidation values. If the fair value of the investment has dropped below its carrying amount, management considers several factors when determining whether an other-than-temporary decline has occurred, such as the length of the time and the extent to which the estimated fair value or market value has been below the carrying value, the financial condition and the near-term prospects of the investee, the intent and ability of the Company to retain its investment in the investee for a period of time sufficient to allow for any anticipated recovery in market value, and general market conditions. The estimation of fair value and whether an other-than-temporary impairment has occurred requires the application of significant judgment and future results may vary from current assumptions. If declines in the value of the equity method investments are determined to be other-than-temporary, a loss is recorded in earnings in the current period as a component of loss from equity investees, net on the consolidated statements of operations.

For equity investments without readily determinable fair value, investments are recorded at cost and adjusted for subsequent observable price changes as of the date that an observable transaction takes place. The Company performs a qualitative assessment on a quarterly basis to determine if any observable price changes have occurred. If the qualitative assessment indicates that an observable price change has occurred, a gain or loss is recorded equal to the difference between the fair value and carrying value in the current period as a component of other income (expense), net. (See Note 10.)

**Derivative Instruments**

The Company uses derivative financial instruments to modify its exposure to market risks from changes in foreign currency exchange rates, interest rates, and from market volatility related to certain investments measured at fair value. At the inception of a derivative contract, the Company designates the derivative based on the Company's intentions and expectations as to the likely effectiveness as a hedge (see Note 13), as follows:

- a hedge of a forecasted transaction or the variability of cash flows to be received or paid related to a recognized asset or liability ("cash flow hedge");
- a hedge of net investments in foreign operations ("net investment hedge"); or
- an instrument with no hedging designation.

***Cash Flow Hedges***

The Company may designate derivative instruments as cash flow hedges to mitigate foreign currency risk arising from third-party revenue agreements, intercompany licensing agreements, production expenses and rebates, or to hedge the interest rate risk for certain senior notes and forecasted debt issuances as cash flow hedges. For instruments accounted for as cash flow hedges, the change in the fair value of the forward contract is recorded in other comprehensive (loss) income and reclassified into the statement of operations in the same line item in which the hedged item is recorded and in the same period as the hedged item affects earnings.

***Net Investment Hedges***

The Company may designate derivative instruments as hedges of net investments in foreign operations. The Company assesses the effectiveness of net investment hedges utilizing the spot-method. The entire change in the fair value of derivatives that qualify as net investment hedges is initially recorded in the currency translation adjustment component of other comprehensive (loss) income. While the change in fair value attributable to hedge effectiveness remains in accumulated other comprehensive loss until the net investment is sold or liquidated, the change in fair value attributable to components excluded from the assessment of hedge effectiveness (e.g., forward points, cross currency basis, etc.) is reflected as a component of interest expense, net in the current period.

***No Hedging Designation***

The Company may also enter into derivative instruments that do not qualify for hedge accounting or are not designated as hedges. These instruments are intended to mitigate economic exposures due to exogenous events and changes in foreign currency exchange rates, interest rates, and from market volatility related to certain investments measured at fair value. The changes in fair value of derivatives not designated as hedges are recorded in the statement of operations in the same line item where the hedged risk occurs.

***Financial Statement Presentation***

Unsettled derivative contracts are recorded at their gross fair values on the consolidated balance sheets. The portion of the fair value that represents cash flows occurring within one year is classified as current, and the portion related to cash flows occurring beyond one year is classified as noncurrent.

Cash flows from designated derivative instruments used as hedges are classified in the consolidated statements of cash flows in the same section as the cash flows of the hedged item. Premiums paid for these instruments and associated settlements are reflected as components of investing cash flows. Cash flows from periodic settlement of interest on cross currency swaps and derivative contracts not designated as hedges are reported as investing activities in the consolidated statements of cash flows.

**Treasury Stock**

When stock is acquired for purposes other than formal or constructive retirement, the purchase price of the acquired stock is recorded in a separate treasury stock account, which is separately reported as a reduction of equity. Treasury stock held by Discovery prior to the Merger was not retired.

When stock is retired or purchased for formal or constructive retirement, the purchase price is initially recorded as a reduction to the par value of the shares repurchased, with any excess purchase price over par value recorded as a reduction to additional paid-in capital related to the series of shares repurchased and any remaining excess purchase price recorded as a reduction to retained earnings. If the purchase price exceeds the amounts allocated to par value and additional paid-in capital related to the series of shares repurchased and retained earnings, the remainder is allocated to additional paid-in capital related to other series of shares.

To determine the cost of treasury stock that is either sold or reissued, the Company uses the last in, first out method. If the proceeds from the re-issuance of treasury stock are greater than the cost, the excess is recorded as additional paid-in capital. If the proceeds from re-issuance of treasury stock are less than the cost, the excess cost first reduces any additional paid-in capital arising from previous treasury stock transactions for that class of stock, and any additional excess is recorded as a reduction of retained earnings.

**Revenue Recognition**

Revenue is recognized upon transfer of control of promised services or goods to customers in an amount that reflects the consideration that the Company expects to receive in exchange for those services or goods. Revenues do not include taxes collected from customers on behalf of taxing authorities such as sales tax and value-added tax. However, certain revenues include taxes that customers pay to taxing authorities on the Company's behalf, such as foreign withholding tax. Revenue recognition for each source of revenue is also based on the following policies.

***Advertising***

Advertising revenues are principally generated from the sale of commercial time on linear (television networks and authenticated TVE applications) and digital platforms (DTC subscription services and websites). A substantial portion of the linear and digital advertising contracts in the U.S. and certain international markets guarantee the advertiser a minimum audience level that either the program in which their advertisements are aired or the advertisement will reach. On the linear platform, the Company provides a service to deliver an advertising campaign which is satisfied by the provision of a minimum number of advertising spots in exchange for a fixed fee over a contract period of one year or less. The Company delivers spots in accordance with these contracts during a variety of day parts and programs. In the agreements governing these advertising campaigns, the Company has also promised to deliver to its customers a guaranteed minimum number of viewers ("impressions") on a specific television network within a particular demographic (e.g. men aged 18-35). These advertising campaigns are considered to represent a single, distinct performance obligation. Revenues are recognized based on the guaranteed audience level multiplied by the average price per impression. The Company provides the advertiser with advertising until the guaranteed audience level is delivered, and invoiced advertising revenue receivables may exceed the value of the audience delivery. As such, revenues are deferred until the guaranteed audience level is delivered or the rights associated with the guarantee lapse, which is typically less than one year. Audience guarantees are initially developed internally, based on planned programming, historical audience levels, the success of pilot programs, and market trends. Actual audience and delivery information is published by independent ratings services.

Digital advertising contracts typically contain promises to deliver guaranteed impressions in specific markets against a targeted demographic during a stipulated period of time. If the specified number of impressions is not delivered, the transaction price is reduced by the number of impressions not delivered multiplied by the contractually stated price per impression. Each promise is considered a separate performance obligation. For digital contracts with an audience guarantee, advertising revenues are recognized as impressions are delivered. Actual audience delivery is typically reported by independent third parties.

For contracts without an audience guarantee, advertising revenues are recognized as each spot airs. The airing of individual spots without a guaranteed audience level are each distinct, individual performance obligations. The Company allocates the consideration to each spot based on its relative standalone selling price.

***Distribution***

Distribution revenues are generated from fees charged to network distributors, which include cable, direct-to-home (“DTH”) satellite, telecommunications and digital service providers, and DTC subscribers. Cable operators, DTH satellite operators and telecommunications service providers typically pay royalties via a per-subscriber fee for the right to distribute the Company’s programming under the terms of distribution contracts. The majority of the Company’s distribution fees are collected monthly throughout the year and distribution revenue is recognized over the term of the contracts based on contracted programming rates and reported subscriber levels. The amount of distribution fees due to the Company is reported by distributors based on actual subscriber levels. Such information is generally not received until after the close of the reporting period. In these cases, the Company estimates the number of subscribers receiving the Company’s programming to estimate royalty revenue. Historical adjustments to recorded estimates have not been material. Distribution revenue from fixed-fee contracts is recognized over the contract term based on the continuous delivery of the content to the affiliate. Any monetary incentives provided to distributors other than for distinct goods or services acquired at fair value are recognized as a reduction of revenue over the term.

Although the delivery of linear feeds and digital products, such as video-on-demand (“VOD”) and authenticated TVE applications, are considered distinct performance obligations within a distribution arrangement, on-demand offerings generally match the programs that are airing on the linear network. Therefore, the Company recognizes revenue for licensing arrangements as the license fee is earned and based on continuous delivery for fixed fee contracts.

Revenues associated with digital distribution arrangements are recognized when the Company transfers control of the programming and the rights to distribute the programming to the customer.

For DTC subscription services, the Company recognizes revenue as the service fee is earned over the subscription period.

***Content***

Content revenues are generated from the release of feature films for initial exhibition in theaters, the licensing of feature films and television programs to various television, SVOD and other digital markets, distribution of feature films and television programs in the physical and digital home entertainment market, sales of console games and mobile in-game content, sublicensing of sports rights, and licensing of intellectual property such as characters and brands.

In general, fixed payments for the licensing of intellectual property are recognized as revenue at either the inception of the license term or as sales-based royalties as underlying sales occur if the intellectual property has significant standalone functionality (“functional IP,” such as a produced film or television series), or over the corresponding license term if the licensee’s ability to derive utility is dependent upon our continued support of the intellectual property throughout the license term (“symbolic IP,” such as a character or a brand). Feature films may be produced or acquired for initial exhibition in theaters or direct release on our streaming service. Arrangements with theaters for exhibiting a film over a certain period are generally sales-based royalties and recorded as revenue as the underlying sales of the exhibitors occur.

Television programs are initially produced for broadcast networks, cable networks, premium pay services, first-run syndication or streaming services; revenues are recognized when the programs are available for use by the licensee. Fixed license fee revenues from the subsequent licensing of feature films and television programs in the off-network cable, premium pay, syndication, streaming and international television and streaming markets are also recognized upon availability of the content for use by the licensee. For television/streaming service licenses that include multiple titles with a fixed license fee across all titles, the availability of each title is considered a separate performance obligation, and the fixed fee is allocated to each title and recognized as revenue when the title is available for use by the licensee. When the term of an existing agreement is renewed or extended, revenues are recognized when the licensed content becomes available under the renewal or extension. Certain arrangements (e.g., certain pay-TV/SVOD licenses) may include variable license fees that are based on sales of the licensee; these are recognized as revenue as the applicable underlying sales occur.

Revenues from home entertainment sales of feature films and television programs in physical format are generally recognized at the later of the delivery date or the date when made widely available for sale or rental by retailers (“street date”) based on gross sales less a provision for estimated returns, rebates and pricing allowances. The provision is based on management’s estimates by analyzing vendor sales of our product, historical return trends, current economic conditions and changes in customer demand. Revenues from the licensing of television programs and films for electronic sell-through or video-on-demand are recognized when the product has been purchased by and made available to the consumer to either download or stream.

Revenues from sales of console games generally follow the same recognition methods as film and television programs in the home entertainment market. Revenues from digital sales of in-game purchases are assessed for deferral based on type of digital item purchased (e.g., consumable vs. durable) and estimated life of consumer game play and recognized upon purchase or over time as applicable.

Revenues from the licensing of intellectual property such as characters or brands (e.g., for merchandising or theme parks) are recognized either straight-line over the license term or as the licensee's underlying product sales occur (sales-based royalty) depending on which method is most reflective of the earnings process.

***Contract Assets and Liabilities***

A contract asset is recorded when revenue is recognized in advance of the Company's right to bill and receive consideration and that right is conditioned upon something other than the passage of time. A contract liability, such as deferred revenue, is recorded when the Company has recorded billings in conjunction with its contractual right or when cash is received in advance of the Company's performance.

Deferred revenue primarily consists of TV/SVOD content licensing arrangements where the content has not yet been made available to the customer, consumer products and themed experience licensing arrangements with fixed payments, advance payment for DTC subscriptions, and cash received for television advertising for which the guaranteed viewership has not been provided. The amounts classified as current are expected to be earned within the next year.

Payment terms vary by the type and location of the customer and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customer types, the Company requires payment before the products or services are delivered to the customer.

**Share-Based Compensation Expense**

The Company has incentive plans under which performance-based restricted stock units ("PRSUs"), service-based restricted stock units ("RSUs"), stock options, and stock appreciation rights ("SARs") may be issued. In addition, the Company offers an Employee Stock Purchase Plan (the "ESPP"). Share-based compensation expense for all awards is recorded as a component of selling, general and administrative expense. Forfeitures for all awards are recognized as incurred. Excess tax benefits realized from the exercise of stock options and vested RSUs, PRSUs and the ESPP are reported as cash inflows from operating activities on the consolidated statements of cash flows.

***PRSUs***

PRSUs represent the contingent right to receive shares of WBD common stock, and vest over one year based on continuous service and the attainment of qualitative and quantitative performance targets. The number of PRSUs that vest typically ranges from 0% to 100% based on a sliding scale where achieving or exceeding the performance target will result in 100% of the PRSUs vesting and achieving less than 70% of the target will result in no portion of the PRSUs vesting. Additionally, for certain PRSUs, the Company's Compensation Committee has discretion in determining the final number of units that vest, but may not increase the amount of any PRSU award above 100%. Upon vesting, each PRSU becomes convertible into one share of WBD common stock. Holders of PRSUs do not receive payments of dividends in the event the Company pays a cash dividend until such PRSUs are converted into shares of WBD common stock.

Compensation expense for PRSUs is based on the fair value of WBD common stock on the date of grant. Compensation expense for PRSUs that vest based on achieving subjective operating performance conditions or in situations where the executive may withhold taxes in excess of the maximum statutory requirement, is remeasured at fair value each reporting period until the award is settled. Compensation expense for all PRSUs is recognized ratably over the vesting period only when it is probable that the operating performance conditions will be achieved. The Company records a cumulative adjustment to compensation expense for PRSUs if there is a change in the determination of the probability that the operating performance conditions will be achieved.

***RSUs***

RSUs represent the contingent right to receive shares of WBD common stock, substantially all of which vest ratably each year over periods of three to five years based on continuous service. Compensation expense for RSUs is based on the fair value of the award on the date of grant and is recognized ratably during the vesting period.

***Stock Options and SARs***

Stock options are granted with an exercise price equal to or in excess of the closing market price of WBD common stock on the date of grant. Stock options vest ratably over four years from the grant date based on continuous service and expire seven years from the date of grant. Stock option awards generally provide for accelerated vesting upon retirement or after reaching a specified age and years of service. Compensation expense for stock options is based on the fair value of the award on the date of grant and is recognized ratably during the vesting period.

SARs are cash-settled and entitle the holder to receive a cash payment for the amount by which the price of WBD common stock exceeds the base price established on the grant date. Cash-settled SARs are granted with a base price equal to or greater than the closing market price of WBD common stock on the date of grant. Compensation expense for SARs is based on the fair value of the award. Because SARs are cash-settled, the Company remeasures the fair value of these awards each reporting period until settlement. Compensation expense for SARs, including changes in fair value, is recognized during the vesting period in proportion to the requisite service that has been rendered as of the reporting date. For awards with graded vesting, the Company measures fair value and records compensation expense separately for each vesting tranche.

The fair values of stock options and SARs are estimated using the Black-Scholes option-pricing model. Because the Black-Scholes option-pricing model requires the use of subjective assumptions, changes in these assumptions can materially affect the fair value of awards. For SARs, the expected term is the period from the grant date to the end of the contractual term of the award unless the terms of the award allow for cash-settlement automatically on the date the awards vest, in which case the vesting date is used. For stock options the simplified method is utilized to calculate the expected term, since the Company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected term. The simplified method considers the period from the date of grant through the mid-point between the vesting date and the end of the contractual term of the award. Expected volatility is based on a combination of implied volatilities from traded options on WBD common stock and historical realized volatility of WBD common stock. The dividend yield is assumed to be zero because the Company has no history of paying cash dividends and no present intention to pay dividends. The risk-free interest rate is based on U.S. Treasury zero-coupon issues with a remaining term equal to the expected term of the award.

***ESPP***

The ESPP enables eligible employees to purchase shares of WBD common stock through payroll deductions or other permitted means. The Company recognizes the fair value of the discount associated with shares purchased under the ESPP as share-based compensation expense.

**Advertising Costs**

Advertising costs are expensed as incurred and are presented in selling, general and administrative expenses. Advertising costs paid to third parties totaled $2,519 million, $1,247 million and $412 million for years ended December 31, 2022, 2021 and 2020, respectively.

**Collaborative Arrangements**

The Company's collaborative arrangements primarily relate to arrangements entered into with third parties to jointly finance and distribute certain theatrical and television productions and an arrangement entered into with CBS Broadcasting, Inc. ("CBS") surrounding The National Collegiate Athletic Association (the "NCAA").

The arrangement among Turner, CBS and the NCAA provides Turner and CBS with rights to the NCAA Division I Men's Basketball Championship Tournament (the "NCAA Tournament") in the U.S. and its territories and possessions through 2032. The aggregate programming rights fee, production costs, advertising revenues and sponsorship revenues related to the NCAA Tournament and related programming are shared equally by the Company and CBS. However, if the amount paid for the programming rights fee and production costs in any given year exceeds advertising and sponsorship revenues for that year, CBS' share of such shortfall is limited to specified annual caps. No amounts were recorded pursuant to the loss cap during the year ended December 31, 2022 since the most recent cap was finalized prior to the Merger. In accounting for this arrangement, the Company records advertising revenue for the advertisements aired on its networks and amortizes its share of the programming rights fee based on the estimated relative value of each season over the term of the arrangement.

Co-financing arrangements generally represent the assignment of an economic interest in a film or television series to a producing partner. The Company generally records the amounts received for the assignment of an interest as a reduction of production cost, as the partner assumes the risk for their share of the film or series asset. The substance of these arrangements is that the third-party partner owns an interest in the film or series; therefore, in each period, the Company reflects in the consolidated statements of operations either a charge or benefit to cost of revenues, excluding depreciation and amortization to reflect the estimate of the third-party partner's interest in the profits or losses incurred on the film or series using the individual film forecast method, based on the terms of the arrangement. On occasion, the Company acquires the economic interest in a film from a producing partner; in this case, the Company capitalizes the acquisition cost as a content asset in film and television content rights and games and accounts for the third-party partner's share in applicable distribution results as described above. For our collaborative arrangements entered into with third parties to jointly finance and distribute certain theatrical and television productions, net participation costs of $276 million were recorded in cost of revenues, excluding depreciation and amortization for the year ended December 31, 2022.

**Income Taxes**

Income taxes are recorded using the asset and liability method of accounting for income taxes. Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Deferred taxes are measured using rates the Company expects to apply to taxable income in years in which those temporary differences are expected to reverse. A valuation allowance is provided for deferred tax assets if it is more likely than not such assets will be unrealized.

From time to time, the Company engages in transactions in which the tax consequences may be uncertain. Significant judgment is required in assessing and estimating the tax consequences of these transactions. The Company prepares and files tax returns based on its interpretation of tax laws and regulations. In the normal course of business, the Company's tax returns are subject to examination by various taxing authorities. Such examinations may result in future tax and interest assessments by these taxing authorities.

In determining the Company's tax provision for financial reporting purposes, the Company establishes a reserve for uncertain tax positions unless the Company determines that such positions are more likely than not to be sustained upon examination based on their technical merits, including the resolution of any appeals or litigation processes. The Company includes interest and where appropriate, penalties, as a component of income tax expense on the consolidated statements of operations. There is significant judgment involved in determining the amount of reserve and whether positions taken on the Company's tax returns are more likely than not to be sustained, which involve the use of significant estimates and assumptions with respect to the potential outcome of positions taken on tax returns that may be reviewed by tax authorities. The Company adjusts its tax reserve estimates periodically because of ongoing examinations by, and settlements with, various taxing authorities, as well as changes in tax laws, regulations and interpretations.

**Concentrations Risk**

***Customers***

No individual customer accounted for more than 10% of total consolidated revenues for 2022, 2021 or 2020. The Company had two customers that represented more than 10% of distribution revenue in 2022, which in aggregate totaled 26%. As of December 31, 2022 and 2021, the Company's trade receivables do not represent a significant concentration of credit risk as the customers and markets in which the Company operates are varied and dispersed across many geographic areas.

***Financial Institutions***

Cash and cash equivalents are maintained with several financial institutions. The Company has deposits held with banks that exceed the amount of insurance provided on such deposits. Generally, these deposits may be redeemed upon demand and are maintained with financial institutions of reputable credit and, therefore, bear minimal credit risk.

***Counterparty Credit Risk***

The Company is exposed to the risk that the counterparties to outstanding derivative financial instruments will default on their obligations. The Company manages these credit risks through the evaluation and monitoring of the creditworthiness of, and concentration of risk with, the respective counterparties. In this regard, credit risk associated with outstanding derivative financial instruments is spread across a relatively broad counterparty base of banks and financial institutions. The Company also has a limited number of arrangements where collateral is required to be posted in the instance that certain fair value thresholds are exceeded. As of December 31, 2022, the Company had posted $49 million of collateral under these arrangements. As of December 31, 2022, the Company's exposure to counterparty credit risk included derivative assets with an aggregate fair value of $186 million. (See Note 13.)

**Accounting and Reporting Pronouncements Adopted**

***LIBOR***

In March 2020, the Financial Accounting Standards Board ("FASB") issued guidance providing optional expedients and exceptions for applying U.S. GAAP to contract modifications, hedging relationships, and other transactions associated with the expected market transition away from the London Interbank Offered Rate (LIBOR) and other interbank offered rates to alternative reference rates. The guidance is for March 12, 2020 through December 31, 2022 and may not be applied to contract modifications made and hedging relationships entered into or evaluated after December 31, 2022. The Company applied the relevant provisions of the guidance to hedge relationships that were subsequently terminated in the first quarter of 2022.

***Convertible Instruments***

In August 2020, the FASB issued guidance simplifying the accounting for convertible instruments by reducing the number of accounting models available for convertible debt instruments and convertible preferred stock. The guidance amends the derivatives scope exception for contracts in an entity's own equity to reduce form-over-substance-based accounting conclusions, requires the use of the if-converted method for calculating earnings per share for convertible instruments, and makes targeted improvements to the disclosures for convertible instruments and related earnings per share guidance. The Company adopted the guidance effective January 1, 2022 and there was no material impact on its consolidated financial statements.

***Government Assistance***

In November 2021, the FASB issued guidance requiring disclosure for transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy to other guidance. The annual disclosures include the nature of the transactions, significant terms and conditions, accounting treatment and impacted financial statement lines reflecting the impact of the transactions. The Company adopted the guidance effective January 1, 2022, and no additional disclosures were required. The Company receives production incentives that are analogous to investment tax credits. (See Film and Television Content Rights policy above.)

**Accounting and Reporting Pronouncements Not Yet Adopted**

***Supplier Finance Programs***

In September 2022, the FASB issued guidance updating the disclosure requirements for supplier finance program obligations. This guidance provides specific authoritative guidance for disclosure of supplier finance programs, including key terms of such programs, amounts outstanding, and where the obligations are presented in the statement of financial position. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods, except for the disclosure of roll forward information, which is effective for annual periods beginning after December 15, 2023. Certain components of this guidance must be applied retrospectively, while others may be applied prospectively. Early adoption is permitted. The Company is currently evaluating the impact this guidance will have on its consolidated financial statements and related disclosures.

## NOTE 3. EQUITY AND EARNINGS PER SHARE

**Common Stock Issued in Connection with the WarnerMedia Merger**

Prior to the Merger, Discovery had three series of common stock authorized, issued, and outstanding - Series A common stock, Series B convertible common stock, and Series C common stock - and two series of preferred stock authorized, issued, and outstanding - Series A-1 convertible preferred stock and Series C-1 convertible preferred stock. In connection with the Merger, each issued and outstanding share of Discovery Series A common stock, Discovery Series B convertible common stock, and Discovery Series C common stock, was reclassified and automatically converted into one share of WBD common stock, and each issued and outstanding share of Discovery Series A-1 convertible preferred stock ("Series A-1 Preferred Stock") and Series C-1 convertible preferred stock was reclassified and automatically converted into 13.1135 and 19.3648 shares of WBD common stock, respectively.

The Merger required the consent of Advance/Newhouse Programming Partnership under Discovery's certificate of incorporation as the sole holder of the Series A-1 Preferred Stock. In connection with Advance/Newhouse Programming Partnership's entry into the consent agreement and related forfeiture of the significant rights attached to the Series A-1 Preferred Stock in the reclassification of the shares of Series A-1 Preferred Stock into common stock, it received an increase to the number of shares of common stock of the Company into which the Series A-1 Preferred Stock converted. The impact of the issuance of such additional shares of common stock was $789 million and was recorded as a transaction expense in selling, general and administrative expense upon the closing of the Merger.

On April 8, 2022, the Company issued 1.7 billion shares of WBD common stock as consideration paid for the acquisition of WM. (See Note 4).

**Repurchase Programs**

***Common Stock***

Under the Company's stock repurchase program, management is authorized to purchase shares of WBD common stock from time to time through open market purchases, privately negotiated transactions at prevailing prices, pursuant to one or more accelerated stock repurchase agreements, or other derivative arrangements as permitted by securities laws and other legal requirements, and subject to stock price, business and market conditions and other factors.

In February 2020, the Company's board of directors authorized additional stock repurchases of up to $2 billion upon completion of its existing $1 billion repurchase authorization announced in May 2019. All common stock repurchases, including prepaid common stock repurchase contracts, have been made through open market transactions and have been recorded as treasury stock on the consolidated balance sheets. During the years ended December 31, 2022 and 2021, the Company did not repurchase any of its common stock. During the year ended December 31, 2020, the Company repurchased 41.6 million shares of its common stock for $965 million. Over the life of the Company's repurchase programs and prior to the Merger and conversion of Discovery common stock to WBD common stock, the Company had repurchased 3 million and 229 million shares of Discovery Series A and Discovery Series C common stock, respectively, for the aggregate purchase price of $171 million and $8.2 billion, respectively.

**Earnings Per Share**

All share and per share amounts have been retrospectively adjusted to reflect the reclassification and automatic conversion into WBD common stock, except for Series A-1 Preferred Stock, which has not been recast because the conversion of Series A-1 Preferred Stock into WBD common stock in connection with the Merger was considered a discrete event and treated prospectively.

The table below sets forth the Company's calculated earnings per share (in millions). Earnings per share amounts may not recalculate due to rounding.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Numerator: | | | |
| Net (loss) income | $ (7,297) | $ 1,197 | $ 1,355 |
| Less: | | | |
| Allocation of undistributed income to Series A-1 convertible preferred stock | (49) | (110) | (128) |
| Net income attributable to noncontrolling interests | (68) | (138) | (124) |
| Net income attributable to redeemable noncontrolling interests | (6) | (53) | (12) |
| Redeemable noncontrolling interest adjustments of carrying value to redemption value (redemption value does not equal fair value) | — | 16 | — |
| Net (loss) income allocated to Warner Bros. Discovery, Inc. Series A common stockholders for basic and diluted net (loss) income per share | $ (7,420) | $ 912 | $ 1,091 |
| | | | |
| Add: | | | |
| Allocation of undistributed income to Series A-1 convertible preferred stockholders | — | 110 | 128 |
| Net (loss) income allocated to Warner Bros. Discovery, Inc. Series A common stockholders for diluted net (loss) income per share | $ (7,420) | $ 1,022 | $ 1,219 |
| | | | |
| Denominator — weighted average: | | | |
| Common shares outstanding — basic | 1,940 | 588 | 599 |
| Impact of assumed preferred stock conversion | — | 71 | 71 |
| Dilutive effect of share-based awards | — | 5 | 2 |
| Common shares outstanding — diluted | 1,940 | 664 | 672 |
| | | | |
| Basic net (loss) income per share allocated to common stockholders | $ (3.82) | $ 1.55 | $ 1.82 |
| Diluted net (loss) income per share allocated to common stockholders | $ (3.82) | $ 1.54 | $ 1.81 |

The table below presents the details of share-based awards that were excluded from the calculation of diluted earnings per share (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Anti-dilutive share-based awards | 49 | 17 | 24 |

## NOTE 4. ACQUISITIONS AND DISPOSITIONS

### Acquisitions

***WarnerMedia***

On April 8, 2022, the Company completed its Merger with the WarnerMedia Business of AT&T. The Merger was executed through a Reverse Morris Trust type transaction, under which WM was distributed to AT&T's shareholders via a pro-rata distribution, and immediately thereafter, combined with Discovery.

Discovery was deemed to be the accounting acquirer of WM. In identifying Discovery as the accounting acquirer, the Company's conclusion was based primarily upon the following facts: (1) Discovery initiated the Merger, was the legal acquirer of Magallanes, Inc., ("Spinco"), and transferred equity consideration to Spinco stockholders, (2) AT&T received $40.5 billion of consideration (subject to working capital and other adjustments) as part of its disposition of the WarnerMedia Business, (3) the Chief Executive Officer of Discovery continued as Chief Executive Officer of the combined Company after the Merger and was primarily responsible for appointing the rest of the executive management team of the combined Company, and the Chief Financial Officer of Discovery continued as Chief Financial Officer of the combined Company, (4) no stockholder or group of stockholders held a controlling interest in WBD and a key Discovery stockholder was the largest minority interest in WBD after the completion of the Merger, and (5) AT&T had no input on the strategic direction and management of the combined Company after the completion of the Merger. The above facts were deemed to outweigh the fact that the holders of shares of Spinco common stock that received shares of WBD common stock in the Merger in the aggregate owned a majority of WBD common stock on a fully diluted basis and associated voting rights after the Merger.

The Merger combined WM's premium entertainment, sports, and news assets with Discovery's leading non-fiction and international entertainment and sports businesses. The Company expects this broad, worldwide portfolio of brands, coupled with its DTC potential and the attractiveness of the combined assets, to result in increased market penetration globally. The Merger is also expected to create significant cost synergies for the Company.

*Purchase Price*

The following table summarizes the components of the aggregate purchase consideration paid to acquire WM (in millions).

| | | |
|---|---|---|
| Fair value of WBD common stock issued to AT&T shareholders [1] | $ | 42,309 |
| Estimated fair value of share-based compensation awards attributable to pre-combination services [2] | | 94 |
| Settlement of preexisting relationships [3] | | (27) |
| Purchase consideration | $ | 42,376 |

[1] The fair value of WBD common stock issued to AT&T shareholders represents approximately 1,732 million shares of WBD common stock multiplied by the closing share price for Discovery Series A common stock of $24.43 on Nasdaq on the Closing Date. The number of shares of WBD common stock issued in the Merger was determined based on the number of fully diluted shares of Discovery, Inc. common stock immediately prior to the closing of the Merger, multiplied by the quotient of 71%/29%.

[2] This amount represents the value of AT&T restricted stock unit awards that were not vested and were replaced by WBD restricted stock unit awards with similar terms and conditions as the original AT&T awards. The conversion was based on the ratio of the volume-weighted average per share closing price of AT&T common stock on the ten trading days prior to the Closing Date and the volume-weighted average per share closing price of WBD common stock on the ten trading days following the Closing Date. The fair value of replacement equity-based awards attributable to pre-Merger service was recorded as part of the consideration transferred in the Merger. See Note 15 for additional information.

[3] The amount represents the effective settlement of outstanding payables and receivables between the Company and WM. No gain or loss was recognized upon settlement as amounts were determined to be reflective of fair market value.

Balances reflect rounding of dollar and share amounts to millions, which may result in differences for recalculated standalone amounts compared with the amounts presented above. In August 2022, the Company and AT&T finalized the post-closing working capital settlement process, pursuant to section 1.3 of the Separation and Distribution Agreement, which resulted in the Company receiving a $1.2 billion payment from AT&T in the third quarter of 2022. The working capital settlement was recorded in other current assets in the preliminary purchase price allocation.

*Purchase Price Allocation*

The Company applied the acquisition method of accounting to WM, whereby the excess of the fair value of the purchase price paid over the fair value of identifiable net assets acquired and liabilities assumed was allocated to goodwill. Goodwill reflects the assembled workforce of WM as well as revenue enhancements, cost savings and operating synergies that are expected to result from the Merger. The goodwill recorded as part of the Merger has been provisionally allocated to the Studios, Networks and DTC reportable segments in the amounts of $9,047 million, $7,076 million and $5,618 million, respectively, and is not deductible for tax purposes.

The purchase price allocation is preliminary and subject to change. The Company is still refining certain estimates related to income taxes and other limited areas. The Company reflects measurement period adjustments in the period in which the adjustments occur, and the Company will finalize its accounting for the Merger within one year of the Closing Date. The measurement period adjustments were primarily related to content, taxes, investments, capitalized interest and the true-up of accrued liabilities. The preliminary allocation of the purchase price to the assets acquired and liabilities assumed, measurement period adjustments, and a reconciliation to total consideration transferred is presented in the table below (in millions).

| | Preliminary April 8, 2022 | Measurement Period Adjustments | Updated Preliminary April 8, 2022 |
|---|---|---|---|
| Cash | $ 2,419 | $ (10) | $ 2,409 |
| Accounts receivable | 4,224 | (62) | 4,162 |
| Other current assets | 4,619 | (148) | 4,471 |
| Film and television library | 28,729 | (343) | 28,386 |
| Property and equipment | 4,260 | 13 | 4,273 |
| Goodwill | 21,513 | 228 | 21,741 |
| Intangible assets | 44,889 | 100 | 44,989 |
| Other noncurrent assets | 5,206 | 337 | 5,543 |
| Current liabilities | (10,544) | (1) | (10,545) |
| Debt assumed | (41,671) | (9) | (41,680) |
| Deferred income taxes | (13,264) | 532 | (12,732) |
| Other noncurrent liabilities | (8,004) | (637) | (8,641) |
| Total consideration paid | $ 42,376 | $ — | $ 42,376 |

The fair values of the assets acquired and liabilities assumed were determined using the income, cost, and market approaches. The fair value measurements were primarily based on significant inputs that are not observable in the market, such as discounted cash flow analyses, and thus represent a Level 3 measurement. Significant inputs used in the discounted cash flow analyses and other areas of judgment include (i) historical and projected financial information, (ii) discount rates used to present value future cash flows, (iii) royalty rates, (iv) projected revenue attributable to affiliate contracts and related renewals, (v) synergies, including cost savings, (vi) tax rates, (vii) economic useful life of assets, and (viii) attrition rates, as relevant, that market participants would consider when estimating fair values. The following are the fair value approaches followed:

| Category | Valuation Method |
|---|---|
| Trade names | Relief from royalty method of the income approach |
| Film and TV content library | Multi-period excess earnings method of the income approach; net book value |
| Affiliate relationships | Multi-period excess earnings method of the income approach |
| Franchises | Multi-period excess earnings method of the income approach |
| Other intangible assets | Multi-period excess earnings method of the income approach |
| Licensed content | Net book value method |
| Licensed sports rights | Differential method, a form of the incremental income approach |
| Recovery rate for advertiser relationships | With-or-without method, a form of the income approach, recovery rate of 4 years |
| In-place advertising networks | With-or-without method, a form of the income approach |
| Subscriber relationships | Replacement cost method of the cost approach |
| Real estate, property and equipment | Cost approach or the income approach, which estimates the value of property based on the income it generates or the market approach, which determines values based on comparable assets purchased under similar conditions |
| Current and noncurrent debt assumed comprising existing debt of WM, the Term Loan, and the Notes | Quoted prices for identical or similar securities in active markets |

The table below presents a summary of intangible assets acquired, exclusive of content assets, and the weighted average useful life of these assets.

| | Fair Value | Weighted Average Useful Life in Years |
|---|---|---|
| Trade names | $ 21,084 | 34 |
| Affiliate, advertising and subscriber relationships | 14,800 | 6 |
| Franchises | 7,900 | 35 |
| Other intangible assets | 1,205 | |
| Total intangible assets acquired | $ 44,989 | |

The Company incurred transaction-related costs of $406 million for the year ended December 31, 2022. These costs were associated with legal and professional services and were recognized as operating expenses on the consolidated statement of operations. Additionally, the expense related to the issuance of additional shares of common stock in connection with the conversion of Advance/Newhouse Programming’s Series A-1 Preferred Stock was $789 million and was recorded as a transaction expense in selling, general and administrative expense upon the closing of the Merger. (See Note 3.)

As a result of the Merger, WM's assets, liabilities, and operations were included in the Company's consolidated financial statements from the Closing Date. The following table presents WM revenue and earnings as reported within the consolidated financial statements (in millions).

| | Year Ended December 31, 2022 |
|---|---|
| Revenues: | |
| Advertising | $ 2,849 |
| Distribution | 10,980 |
| Content | 10,001 |
| Other | 720 |
| Total revenues | 24,550 |
| Inter-segment eliminations | (2,225) |
| Net revenues | $ 22,325 |
| Net loss available to Warner Bros. Discovery, Inc. | $ (7,202) |

*Pro Forma Combined Financial Information*

The following unaudited pro forma combined financial information presents the combined results of the Company and WM as if the Merger had been completed on January 1, 2021. The unaudited pro forma combined financial information is presented for informational purposes and is not indicative of the results of operations that would have been achieved if the Merger had occurred on January 1, 2021, nor is it indicative of future results. The following table presents the Company's pro forma combined revenues and net loss (in millions).

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Revenues | $ 43,095 | $ 45,326 |
| Net loss available to Warner Bros. Discovery, Inc. | (5,359) | (3,750) |

The unaudited pro forma combined financial information includes, where applicable, adjustments for (i) additional costs of revenues from the fair value step-up of film and television library, (ii) additional amortization expense related to acquired intangible assets, (iii) additional depreciation expense from the fair value of property and equipment, (iv) transaction costs and other one-time non-recurring costs, (v) additional interest expense for borrowings related to the Merger and amortization associated with fair value adjustments of debt assumed, (vi) changes to align accounting policies, (vii) elimination of intercompany activity, and (viii) associated tax-related impacts of adjustments. These pro forma adjustments are based on available information as of the date hereof and upon assumptions that the Company believes are reasonable to reflect the impact of the Merger with WM on the Company's historical financial information on a supplemental pro forma basis. Adjustments do not include costs related to integration activities, cost savings or synergies that have been or may be achieved by the combined business.

**Dispositions**

In October 2022, the Company sold its 49% stake in Golden Maple Limited (known as Tencent Video VIP) for proceeds of $143 million and recorded a gain of $55 million, and in April 2022 completed the sale of its minority interest in Discovery Education for proceeds of $138 million and recorded a gain of $133 million.

Also, in September 2022, the Company sold 75% of its interest in The CW Network to Nexstar Media Inc. ("Nexstar"), in exchange for Nexstar agreeing to fund a majority of The CW Network's expenses and the retention of the Company's share of certain receivables that existed prior to the transaction. There was no cash consideration exchanged in the transaction. The Company recorded an immaterial gain and retained a 12.5% ownership interest in The CW Network, which is accounted for as an equity method investment.

In June 2021, the Company completed the sale of its Great American Country network to Hicks Equity Partners for a sale price of $90 million and recorded a gain of $76 million.

## NOTE 5. GOODWILL AND OTHER INTANGIBLE ASSETS

### Goodwill

The carrying value and changes in the carrying value of goodwill attributable to each business unit were as follows (in millions).

| | U.S. Networks | International Networks | Studios | Networks | DTC | Total |
|---|---|---|---|---|---|---|
| December 31, 2020 | $ 10,813 | $ 2,257 | $ — | $ — | $ — | $ 13,070 |
| Dispositions (See Note 4) | — | (3) | — | — | — | (3) |
| Foreign currency translation and other adjustments | — | (155) | — | — | — | (155) |
| December 31, 2021 | $ 10,813 | $ 2,099 | $ — | $ — | $ — | $ 12,912 |
| Segment recast (See Note 23) | (10,813) | (2,059) | — | 10,555 | 2,317 | — |
| Acquisitions (See Note 4) | — | — | 9,047 | 7,081 | 5,618 | 21,746 |
| Foreign currency translation and other adjustments | — | (40) | (84) | (79) | (17) | (220) |
| December 31, 2022 | $ — | $ — | $ 8,963 | $ 17,557 | $ 7,918 | $ 34,438 |

The carrying amount of goodwill at the Networks segment included accumulated impairments of $1.6 billion as of December 31, 2022 and 2021. The Studios and DTC segments did not include any accumulated impairments as of December 31, 2022 and 2021.

### Intangible Assets

Finite-lived intangible assets subject to amortization consisted of the following (in millions, except years).

| | | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|---|
| | Weighted Average Amortization Period (Years) | Gross | Accumulated Amortization | Net | Gross | Accumulated Amortization | Net |
| Trademarks and trade names | 32 | $ 22,876 | $ (1,494) | $ 21,382 | $ 1,716 | $ (858) | $ 858 |
| Affiliate, advertising and subscriber relationships | 8 | 24,136 | (9,458) | 14,678 | 9,433 | (4,303) | 5,130 |
| Franchises | 35 | 7,900 | (164) | 7,736 | — | — | — |
| Character rights | 14 | 995 | (53) | 942 | — | — | — |
| Other | 6 | 568 | (324) | 244 | 395 | (227) | 168 |
| Total | | $ 56,475 | $ (11,493) | $ 44,982 | $ 11,544 | $ (5,388) | $ 6,156 |

Amortization expense for finite-lived intangible assets reflects the pattern in which the assets' economic benefits are consumed over their estimated useful lives. During the fourth quarter of 2021, the Company reassessed the useful lives and amortization methods for acquired customer relationships and concluded the economic benefits would be consumed in greater proportion earlier in their life with gradual decline; accordingly, we changed the amortization method for these assets from the straight-line method to the sum of the months' digits method effective October 1, 2021. This change was considered a change in estimate, was accounted for prospectively, and resulted in incremental amortization expense of $196 million in 2021. Amortization expense related to finite-lived intangible assets was $6.2 billion, $1.3 billion and $1.1 billion for the years ended December 31, 2022, 2021 and 2020, respectively.

Amortization expense relating to intangible assets subject to amortization for each of the next five years and thereafter is estimated to be as follows (in millions).

| | 2023 | 2024 | 2025 | 2026 | 2027 | Thereafter |
|---|---|---|---|---|---|---|
| Amortization expense | $ 6,510 | $ 4,989 | $ 3,614 | $ 2,608 | $ 1,965 | $ 25,296 |

Indefinite-lived intangible assets not subject to amortization (in millions):

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Trademarks | $ — | $ 161 |

**Impairment Analysis**

Significant judgments and assumptions for all quantitative goodwill tests performed include discount rates, control premiums, terminal growth rates, relevant comparable company earnings multiples and the amount and timing of expected future cash flows, including revenue growth rates and profit margins.

*2022 Impairment Analysis*

As of October 1, 2022, the Company performed a quantitative goodwill impairment assessment for all reporting units consistent with the Company's accounting policy. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded. Due to declining levels of global GDP growth and execution risk associated with anticipated growth in the Company's DTC reporting unit, which is the DTC segment, the Company will continue to monitor its reporting units for changes that could impact recoverability.

*2021 Impairment Analysis*

For the 2021 annual impairment test, the Company performed a qualitative goodwill impairment assessment for all reporting units and determined that it was more likely than not that the fair value of those reporting units exceeded their carrying values, therefore, no quantitative goodwill impairment analysis was performed.

*2020 Impairment Analysis*

For the 2020 annual impairment test, the Company performed its annual qualitative goodwill impairment assessment for all reporting units and determined that it was more likely than not that the fair value of those reporting units exceeded their carrying values, except for its Europe and Asia-Pacific reporting units. For its Europe and Asia-Pacific reporting units, the Company performed a quantitative goodwill impairment analysis for each using a DCF valuation model. A market-based valuation model was not weighted in the analysis due to significant volatility in the reporting units' equity markets.

The quantitative goodwill impairment analysis for the Company's Europe reporting unit indicated that its estimated fair value exceeded its carry value by approximately 20% and, therefore, no impairment was recorded.

The quantitative impairment analysis for the Company's Asia-Pacific reporting unit indicated that its estimated fair value did not exceed its carrying value, which resulted in a pre-tax impairment charge to write-off the $121 million goodwill balance, of which $36 million was written off in the second quarter of 2020. The impairment charge was not deductible for tax purposes. The determination of fair value of the Company's Asia-Pacific reporting unit represented a Level 3 fair value measurement in the fair value hierarchy due to its use of internal projections and unobservable measurement inputs.

**NOTE 6. RESTRUCTURING**

In connection with the Merger, the Company has announced and has taken actions to implement projects to achieve cost synergies for the Company. The Company finalized the framework supporting its ongoing restructuring and transformation initiatives during the year ended December 31, 2022, which include, among other things, strategic content programming assessments, organization restructuring, facility consolidation activities, and other contract termination costs. While the Company's restructuring efforts are ongoing, the restructuring program is expected to be substantially completed by the end of 2024.

Restructuring by reportable segment and corporate, inter-segment eliminations, and other were as follows (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Studios | $ 1,050 | $ — | $ 6 |
| Networks | 1,003 | 30 | 84 |
| DTC | 1,551 | 2 | 1 |
| Corporate | 195 | — | — |
| Inter-segment eliminations | (42) | — | — |
| Total restructuring | $ 3,757 | $ 32 | $ 91 |

During the year ended December 31, 2022, restructuring charges primarily included charges related to strategic content programming initiatives, inclusive of content impairments, content development costs and write-offs, content contract terminations, and other content related charges of $3,133 million. In addition, there were restructuring charges related to organization restructuring of $607 million and facility consolidation activities and other contract terminations of $17 million.

During the years ended December 31, 2021 and December 31, 2020, restructuring charges primarily included charges related to employee relocation and termination costs. During 2020, the Company implemented various cost-saving initiatives as a result of the COVID-19 pandemic.

Changes in restructuring and other liabilities recorded in accrued liabilities and other noncurrent liabilities by major category and by reportable segment and corporate were as follows (in millions).

| | U.S. Networks | International Networks | Studios | Networks | DTC | Corporate and Inter-Segment Eliminations | Total |
|---|---|---|---|---|---|---|---|
| December 31, 2020 | $ 23 | $ 20 | $ — | $ — | $ — | $ 15 | $ 58 |
| Employee termination accruals, net | 4 | 26 | — | — | — | 2 | 32 |
| Cash paid | (23) | (33) | — | — | — | (15) | (71) |
| December 31, 2021 | 4 | 13 | — | — | — | 2 | 19 |
| Segment recast (See Note 23 ) | (4) | (13) | — | 15 | — | 2 | — |
| Acquisitions (See Note 4 ) | — | — | 40 | — | 14 | 55 | 109 |
| Contract termination accruals, net | — | — | 36 | 168 | 121 | — | 325 |
| Employee termination accruals, net | — | — | 114 | 213 | 87 | 184 | 598 |
| Cash paid | — | — | (34) | (35) | (34) | (84) | (187) |
| December 31, 2022 | $ — | $ — | $ 156 | $ 361 | $ 188 | $ 159 | $ 864 |

## NOTE 7. REVENUES

### Disaggregated Revenue

The following table presents the Company's revenues disaggregated by revenue source (in millions). Management uses these categories of revenue to evaluate the performance of its businesses and to assess its financial results and forecasts.

| | Year Ended December 31, 2022 | | | | |
|---|---|---|---|---|---|
| | Studios | Networks | DTC | Corporate and Inter-segment Eliminations | Total |
| Revenues: | | | | | |
| Advertising | $ 15 | $ 8,224 | $ 371 | $ (86) | $ 8,524 |
| Distribution | 12 | 9,759 | 6,371 | — | 16,142 |
| Content | 9,156 | 1,120 | 522 | (2,438) | 8,360 |
| Other | 548 | 245 | 10 | (12) | 791 |
| Totals | $ 9,731 | $ 19,348 | $ 7,274 | $ (2,536) | $ 33,817 |

| | Year Ended December 31, 2021 | | | | |
|---|---|---|---|---|---|
| | Studios | Networks | DTC | Corporate and Inter-segment Eliminations | Total |
| Revenues: | | | | | |
| Advertising | $ — | $ 6,063 | $ 131 | $ — | $ 6,194 |
| Distribution | — | 4,486 | 716 | — | 5,202 |
| Content | 20 | 706 | 11 | — | 737 |
| Other | — | 56 | 2 | — | 58 |
| Totals | $ 20 | $ 11,311 | $ 860 | $ — | $ 12,191 |

| | Year Ended December 31, 2020 | | | | |
|---|---|---|---|---|---|
| | Studios | Networks | DTC | Corporate and Inter-segment Eliminations | Total |
| Revenues: | | | | | |
| Advertising | $ — | $ 5,547 | $ 25 | $ — | $ 5,572 |
| Distribution | — | 4,496 | 190 | — | 4,686 |
| Content | 12 | 340 | 3 | — | 355 |
| Other | — | 56 | 2 | — | 58 |
| Totals | $ 12 | $ 10,439 | $ 220 | $ — | $ 10,671 |

### Accounts Receivable and Credit Losses

The allowance for credit losses was not material at December 31, 2022 and 2021.

### Contract Assets and Liabilities

The following table presents contract liabilities on the consolidated balance sheets (in millions).

| Category | Balance Sheet Location | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| Contract liabilities | Deferred revenues | $ 1,694 | $ 478 |
| Contract liabilities | Other noncurrent liabilities | 361 | 95 |

The change in deferred revenue for the year ended December 31, 2022 primarily reflects an increase of $1,476 million related to the Merger and cash payments received or contracted billings recorded for which the performance obligations were not satisfied prior to the end of the period, partially offset by $411 million of revenues recognized that were included in the deferred revenue balance at December 31, 2021. Revenue recognized for the year ended December 31, 2021 related to the deferred revenue balance at December 31, 2020 was $456 million. Contract assets were not material as of December 31, 2022 and 2021.

**Transaction Price Allocated to Remaining Performance Obligations**

Most of the Company’s distribution contracts are licenses of functional intellectual property where revenue is derived from royalty-based arrangements, for which revenues are recorded as a function of royalties earned to date instead of estimating incremental royalty contract revenue. Accordingly, revenue for these arrangements is recognized based on the royalties earned to date. However, there are certain other distribution arrangements that are fixed price or contain minimum guarantees that extend beyond one year. The Company recognizes revenue for fixed fee distribution contracts on a monthly basis based on minimum monthly fees by calculating one twelfth of annual license fees specified in its distribution contracts, or based on the pro-rata fees earned calculated on the license fees specified in the distribution contract. The transaction price allocated to remaining performance obligations within these fixed price or minimum guarantee distribution revenue contracts was $4.8 billion as of December 31, 2022 and is expected to be recognized through 2031.

The Company’s content licensing contracts and sports sublicensing deals are licenses of functional intellectual property. The transaction price allocated to remaining performance obligations on these contracts was $4.6 billion as of December 31, 2022 and is expected to be recognized through 2025.

The Company’s brand licensing contracts are licenses of symbolic intellectual property. The transaction price allocated to remaining performance obligations on these contracts was $2.3 billion as of December 31, 2022 and is expected to be recognized through 2043.

The Company’s advertising contracts are principally generated from the sale of advertising campaigns comprised of multiple commercial units. In contracts with guaranteed impressions, we have identified the overall advertising campaign as the performance obligation to be satisfied over time, and impressions delivered against the satisfaction of our guarantee as the measure of progress. Certain of these arrangements extend beyond one year. The transaction price allocated to remaining performance obligations on these long-term contracts was $646 million as of December 31, 2022 and is expected to be recognized through 2025.

The value of unsatisfied performance obligations disclosed above does not include: (i) contracts involving variable consideration for which revenues are recognized in accordance with the sales or usage-based royalty exception, and (ii) contracts with an original expected length of one year or less, such as most advertising contracts; however for content licensing revenues, including revenues associated with the licensing of theatrical and television product for television and streaming services, the Company has included all contracts regardless of duration.

## NOTE 8. SALES OF RECEIVABLES

**Revolving Receivables Program**

Our bankruptcy-remote consolidated subsidiary held $3,468 million of pledged receivables as of December 31, 2022 in connection with the Company’s revolving receivables program. For the year ended December 31, 2022, the Company recognized $256 million in selling, general and administrative expense from the revolving receivables program in the consolidated statements of operations. The outstanding portfolio of receivables derecognized from our consolidated balance sheets was $5,366 million as of December 31, 2022.

The following table presents a summary of receivables sold (in millions).

| | Year Ended December 31, 2022 |
|---|---|
| Gross receivables sold/cash proceeds received | $ 9,857 |
| Collections reinvested under revolving agreement | (10,491) |
| Net cash proceeds received | $ (634) |
| Net receivables sold | $ 9,797 |
| Obligations recorded | $ 377 |

The following table presents a summary of the amounts transferred or pledged (in millions):

| | December 31, 2022 |
|---|---|
| Gross receivables pledged as collateral | $ 3,468 |
| Restricted cash pledged as collateral | $ 150 |
| **Balance sheet classification:** | |
| Receivables, net | $ 3,015 |
| Prepaid expenses and other current assets | $ 150 |
| Other noncurrent assets | $ 453 |

**Accounts Receivable Factoring**

Total trade accounts receivable sold under the Company's factoring arrangements was $477 million as of December 31, 2022. The impact to the consolidated statements of operations was immaterial for the year ended December 31, 2022.

**NOTE 9. CONTENT RIGHTS**

For purposes of amortization and impairment, capitalized content costs are comprised of produced content grouped based on predominant monetization strategy: individually or as a group. Programming rights include content licensed from third parties, such as film, television, and sports rights. The table below presents the components of content rights (in millions).

| | December 31, 2022 | | |
|---|---|---|---|
| | Predominantly Monetized Individually | Predominantly Monetized as a Group | Total |
| **Theatrical film production costs:** | | | |
| Released, less amortization | $ 3,544 | $ — | $ 3,544 |
| Completed and not released | 507 | — | 507 |
| In production | 1,700 | — | 1,700 |
| In development | 95 | — | 95 |
| **Television production costs:** | | | |
| Released, less amortization | 2,200 | 6,513 | 8,713 |
| Completed and not released | 939 | 310 | 1,249 |
| In production | 427 | 4,424 | 4,851 |
| In development | 30 | 15 | 45 |
| **Total theatrical film and television production costs** | $ 9,442 | $ 11,262 | $ 20,704 |
| Programming rights, less amortization | | | 5,843 |
| Game development costs, less amortization | | | 650 |
| **Total film and television content rights and games** | | | 27,197 |
| Less: Current content rights and prepaid license fees, net | | | (545) |
| **Total noncurrent film and television content rights and games** | | | $ 26,652 |

| | December 31, 2021 | | |
|---|---|---|---|
| | Predominantly Monetized Individually | Predominantly Monetized as a Group | Total |
| **Television production costs:** | | | |
| Released, less amortization | $ 9 | $ 2,495 | $ 2,504 |
| In production | — | 770 | 770 |
| In development | — | 17 | 17 |
| **Total television production costs** | $ 9 | $ 3,282 | $ 3,291 |
| Programming rights, less amortization | | | 786 |
| **Total film and television content rights [(a)]** | | | 4,077 |
| Less: Current content rights and prepaid license fees, net | | | (245) |
| **Total noncurrent film and television content rights [(a)]** | | | $ 3,832 |

[(a)] As of December 31, 2021, the Company had no theatrical film production or game development costs.

Content amortization consisted of the following (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Predominately monetized individually | $ 5,175 | $ 541 | $ 55 |
| Predominately monetized as a group | 8,935 | 2,955 | 2,853 |
| **Total content amortization** | $ 14,110 | $ 3,496 | $ 2,908 |

Content expense includes amortization, impairments, and development expense and is generally a component of costs of revenues on the consolidated statements of operations. For the year ended December 31, 2022, total content impairments were $2,807 million, of which $2,756 million was due to the strategic realignment of content following the Merger and are reflected in restructuring. (See Note 6.) Content impairments of $5 million and $48 million for the years ending December 31, 2021 and December 31, 2020, respectively, were recorded as cost of revenues in the consolidated statements of operations. No content impairments were recorded as a component of restructuring for the years ended December 31, 2021 and 2020.

Additionally, there were $377 million of content development costs/write-offs, content contract terminations, and other content related charges for the year ended December 31, 2022 in connection with the strategic realignment of content following the Merger that are reflected in restructuring. (See Note 6.)

The table below presents the expected future amortization expense of the Company's investment in film and television content and programming rights as of December 31, 2022 (in millions).

| | Year Ending December 31, | | |
|---|---|---|---|
| | 2023 | 2024 | 2025 |
| Released investment in films and television content: | | | |
| Monetized individually | $ 2,736 | $ 1,700 | $ 966 |
| Monetized as a group | 2,937 | 1,416 | 776 |
| Programming rights | 1,586 | 1,216 | 866 |
| | | | |
| Completed and not released investment in films and television content: | | | |
| Monetized individually | $ 1,235 | | |
| Monetized as a group | 58 | | |

At December 31, 2022, acquired film and television libraries are being amortized using straight-line or other accelerated amortization methods through 2033.

## NOTE 10. INVESTMENTS

The Company's equity investments consisted of the following, net of investments recorded in other noncurrent liabilities (in millions).

| Category | Balance Sheet Location | Ownership | December 31, 2022 | December 31, 2021 |
|---|---|---|---|---|
| Equity method investments: | | | | |
| The Chernin Group (TCG) 2.0-A, LP | Other noncurrent assets | 44% | $ 313 | $ — |
| nC+ | Other noncurrent assets | 32% | 135 | 151 |
| Other | Other noncurrent assets | | 614 | 390 |
| Total equity method investments | | | 1,062 | 541 |
| | | | | |
| Total investments with readily determinable fair values | Other noncurrent assets [a] | | 28 | 120 |
| | | | | |
| Investments without readily determinable fair values | Other noncurrent assets [a] | | 498 | 496 |
| Total investments | | | $ 1,588 | $ 1,157 |

[a] Investments with readily determinable values include $40 million as of December 31, 2021 that were included in prepaid expense and other current assets. Investments without readily determinable fair values include $10 million as of December 31, 2022 that were included in prepaid expenses and other current assets.

***Equity Method Investments***

In connection with the Merger, the Company acquired $807 million of equity method investments. Impairment losses are recorded in loss from equity investees, net on the consolidated statements of operations. Impairment losses were not material for the years ended December 31, 2022, 2021 and 2020.

During the year ended December 31, 2022, the Company entered into an agreement with British Telecommunications Plc ("BT") to form a 50:50 joint venture to create a new premium sports offering for the United Kingdom and Ireland. The Company has determined the joint venture is a VIE and accounts for its investment in the joint venture as an equity method investment. Additionally, the Company has a call option to obtain the remaining 50% equity interest in September 2024 and September 2026, at the then fair market value plus the expected earnings that BT would have received in the two years following the call option. As of December 31, 2022, the carrying value of the joint venture was $96 million.

As of December 31, 2022, the Company's maximum exposure for all its unconsolidated VIEs, including the investment carrying values and unfunded contractual commitments made on behalf of VIEs, was approximately $744 million. The Company's maximum estimated exposure excludes the non-contractual future funding of VIEs. The aggregate carrying values of these VIE investments were $720 million and $126 million as of December 31, 2022 and 2021, respectively. The Company's portion of VIE operating results for the years ended December 31, 2022, 2021 and 2020 was not material and is included in loss from equity investees, net, on the consolidated statements of operations.

***Investments with Readily Determinable Fair Value***

The gains and losses related to the Company's investments with readily determinable fair values for the years ended December 31, 2022, 2021 and 2020 are summarized in the table below (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Net (losses) gains recognized during the period on equity securities | $ (78) | $ 9 | $ 129 |
| Less: Net gains recognized on equity securities sold | — | 15 | 101 |
| Unrealized (losses) gains recognized during reporting period on equity securities still held at the reporting date | $ (78) | $ (6) | $ 28 |

***Equity Investments Without Readily Determinable Fair Values Assessed Under the Measurement Alternative***

During 2022, the Company concluded that its other equity method investments without readily determinable fair values had decreased $142 million in fair value as a result of observable price changes in orderly transactions for the identical or similar investment of the same issuer. The decrease in fair value as a result of observable price change is recorded in other income (expense), net on the consolidated statements of operations. (See Note 18). As of December 31, 2022, the Company had recorded cumulative impairments of $229 million for its equity method investments without readily determinable fair values.

## NOTE 11. DEBT

The table below presents the components of outstanding debt (in millions).

| | Weighted-Average Interest Rate as of December 31, 2022 | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| Term loans with maturities of 3 years or less | 5.42 % | $ 4,000 | $ — |
| Floating rate senior notes with maturities of 5 years or less | 5.08 % | 500 | — |
| Senior notes with maturities of 5 years or less | 3.65 % | 12,759 | 4,314 |
| Senior notes with maturities between 5 and 10 years | 4.25 % | 10,373 | 4,128 |
| Senior notes with maturities greater than 10 years | 5.11 % | 21,644 | 6,745 |
| Total debt | | 49,276 | 15,187 |
| Unamortized discount, premium, debt issuance costs, and fair value adjustments for acquisition accounting, net | | (277) | (428) |
| Debt, net of unamortized discount, premium, debt issuance costs, and fair value adjustments for acquisition accounting | | 48,999 | 14,759 |
| Current portion of debt | | (365) | (339) |
| Noncurrent portion of debt | | $ 48,634 | $ 14,420 |

During the year ended December 31, 2022, in connection with the Merger, the Company assumed $41.5 billion of senior notes (at par value) and term loans.

During the year ended December 31, 2022, the Company repaid $6.0 billion of aggregate principal amount outstanding of its term loans prior to the due dates of October 2023 and April 2025 and repaid in full at maturity $327 million of aggregate principal amount outstanding of its 2.375% Euro Denominated Senior Notes due March 2022. In addition, the Company redeemed in full and prior to maturity all $192 million of aggregate principal amount outstanding of its 3.250% senior notes due in 2023 and all $796 million of aggregate principal amount outstanding of its 2.950% senior notes due 2023 (collectively the “2023 Notes”). The 2023 Notes were redeemed in December 2022 for an aggregate redemption price of $988 million, plus accrued interest.

For the year ended December 31, 2021, the Company redeemed in full and prior to maturity all $168 million of aggregate principal amount outstanding of 3.300% Senior Notes due May 2022 and $62 million of aggregate principal amount outstanding of its 3.500% Senior Notes due June 2022 (collectively, the “2022 Notes”). The 2022 Notes were redeemed in July 2021 for an aggregate redemption price of $235 million, plus accrued interest. In addition, the Company redeemed in full all $335 million of aggregate principal amount outstanding of its 4.375% Senior Notes due June 2021 (the “2021 Notes”). The 2021 Notes were redeemed in March 2021 for an aggregate redemption price of $339 million, plus accrued interest.

The redemptions during 2022 and 2021 resulted in an immaterial loss on extinguishment of debt.

As of December 31, 2022, all senior notes are fully and unconditionally guaranteed by the Company, Scripps Networks Interactive, Inc. (“Scripps Networks”), DCL (to the extent it is not the primary obligor on such senior notes), and WarnerMedia Holdings, Inc. (to the extent it is not the primary obligor on such senior notes), except for $1.5 billion of senior notes of the legacy WarnerMedia Business assumed by the Company in connection with the Merger and $23 million of un-exchanged senior notes issued by Scripps Networks. Additionally, the term loans of WarnerMedia Holdings, Inc., made under the $10.0 billion term loan credit agreement (the “Term Loan Credit Agreement”), are fully and unconditionally guaranteed by the Company, Scripps Networks, and DCL.

**Revolving Credit Facility and Commercial Paper Programs**

In June 2021, DCL entered into a multicurrency revolving credit agreement (the "Revolving Credit Agreement"), replacing the existing $2.5 billion credit agreement, dated February 4, 2016, as amended, among DCL, the Company, certain lenders from time to time party thereto, and Bank of America, N.A., as administrative agent. DCL has the capacity to borrow up to $6.0 billion under the Revolving Credit Agreement (the "Credit Facility"). The Revolving Credit Agreement includes a $150 million sublimit for the issuance of standby letters of credit. DCL may also request additional commitments up to $1.0 billion from the lenders upon the satisfaction of certain conditions. Obligations under the Revolving Credit Agreement are unsecured and are fully and unconditionally guaranteed by the Company, Scripps Networks, and WarnerMedia Holdings, Inc. The Credit Facility will be available on a revolving basis until June 2026, with an option for up to two additional 364-day renewal periods subject to the lenders' consent. The Revolving Credit Agreement contains customary representations and warranties as well as affirmative and negative covenants.

Additionally, the Company's commercial paper program is supported by the Credit Facility. Under the commercial paper program, the Company may issue up to $1.5 billion, including up to $500 million of euro-denominated borrowings. Borrowing capacity under the Credit Facility is effectively reduced by any outstanding borrowings under the commercial paper program.

As of December 31, 2022 and 2021, the Company had no outstanding borrowings under the Credit Facility or the commercial paper program.

***Credit Agreement Financial Covenants***

The Revolving Credit Agreement and Term Loan Credit Agreement (together, the "Credit Agreements") include financial covenants that require the Company to maintain a minimum consolidated interest coverage ratio of 3.00 to 1.00 and a maximum adjusted consolidated leverage ratio of 5.75 to 1.00 following the closing of the Merger, with step-downs to 5.00 to 1.00 and 4.50 to 1.00 on the first and second anniversaries of the closing, respectively. As of December 31, 2022, DCL and WarnerMedia Holdings, Inc. were in compliance with all covenants and there were no events of default under the Credit Agreements.

**Long-term Debt Repayment Schedule**

The following table presents a summary of scheduled debt and estimated interest payments, excluding the revolving credit facility and commercial paper borrowings, for the next five years based on the amount of the Company's debt outstanding as of December 31, 2022 (in millions).

| | 2023 | 2024 | 2025 | 2026 | 2027 | Thereafter |
|---|---|---|---|---|---|---|
| Long-term debt repayments | $ 363 | $ 4,267 | $ 7,147 | $ 789 | $ 4,693 | $ 32,017 |
| Interest payments | $ 2,267 | $ 2,183 | $ 1,870 | $ 1,730 | $ 1,634 | $ 25,853 |

**NOTE 12. LEASES**

The Company has operating and finance leases for transponders, office space, studio facilities, and other equipment. The Company's leases were reflected in the Company's consolidated balance sheets as follows (in millions).

| | | December 31, | |
|---|---|---|---|
| | | 2022 | 2021 |
| **Operating Leases** | **Location on Balance Sheet** | | |
| Operating lease right-of-use assets | Other noncurrent assets | $ 3,189 | $ 535 |
| Operating lease liabilities (current) | Accrued liabilities | $ 345 | $ 62 |
| Operating lease liabilities (noncurrent) | Other noncurrent liabilities | 2,990 | 567 |
| Total operating lease liabilities | | $ 3,335 | $ 629 |
| **Finance Leases** | | | |
| Finance lease right-of-use assets | Property and equipment, net | $ 244 | $ 249 |
| Finance lease liabilities (current) | Accrued liabilities | $ 82 | $ 58 |
| Finance lease liabilities (noncurrent) | Other noncurrent liabilities | 186 | 197 |
| Total finance lease liabilities | | $ 268 | $ 255 |

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Weighted average remaining lease term (in years): | | |
| Operating leases | 12 | 12 |
| Finance leases | 5 | 5 |
| Weighted average discount rate | | |
| Operating leases | 4.13 % | 2.94 % |
| Finance leases | 3.23 % | 3.57 % |

The Company's leases have remaining lease terms of up to 30 years, some of which include options to extend the leases for up to 10 years. Most leases are not cancellable prior to their expiration. In conjunction with the Merger, the Company acquired $2,493 million and $47 million of operating and finance lease right-of-use assets, respectively.

The components of lease cost were as follows (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Operating lease cost | $ 372 | $ 103 |
| Finance lease cost: | | |
| Amortization of right-of-use assets | $ 78 | $ 61 |
| Interest on lease liabilities | 8 | 7 |
| Total finance lease cost | $ 86 | $ 68 |
| Variable lease cost | $ 66 | $ 7 |
| Total lease cost | $ 524 | $ 178 |

Supplemental cash flow information related to leases was as follows (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows from operating leases | $ (360) | $ (107) |
| Operating cash flows from finance leases | $ (15) | $ (7) |
| Financing cash flows from finance leases | $ (70) | $ (65) |
| Right-of-use assets obtained in exchange for lease obligations: | | |
| Operating leases | $ 490 | $ 53 |
| Finance leases | $ 39 | $ 104 |

Maturities of lease liabilities as of December 31, 2022 were as follows (in millions):

| | Operating Leases | Finance Leases |
|---|---|---|
| 2023 | $ 465 | $ 82 |
| 2024 | 427 | 67 |
| 2025 | 367 | 49 |
| 2026 | 338 | 33 |
| 2027 | 318 | 25 |
| Thereafter | 2,389 | 26 |
| Total lease payments | 4,304 | 282 |
| Less: Imputed interest | (969) | (14) |
| Total | $ 3,335 | $ 268 |

As of December 31, 2022, the Company has additional leases that have not yet commenced with total minimum lease payments of approximately $474 million, primarily related to facility leases. The remaining leases will commence in fiscal year 2023, have lease terms of 3 to 17 years, and include options to extend the terms for up to 10 additional years.

## NOTE 13. DERIVATIVE FINANCIAL INSTRUMENTS

The Company employs a variety of derivative financial instruments to manage its exposure to market risks primarily from changes in foreign currency exchange rates and interest rates. The Company does not enter into or hold derivative financial instruments for speculative trading purposes.

*Cash Flow Hedges*

The Company is exposed to foreign currency risk related to revenues, production rebates and production expenses. As such, we have entered into foreign exchange forward contracts designated as cash flow hedges to mitigate this risk. These cash flow hedges are carried at fair market value on the Company's consolidated balance sheets. Hedge effectiveness is assessed using the spot method, with fair market value changes recorded in other comprehensive (loss) income until the hedged item affects earnings. Excluded components, including forward points, are included in current earnings.

The Company is exposed to foreign currency risk associated with its British Pound Sterling denominated debt. During 2022, the Company executed a fixed-to-fixed cross-currency swap to mitigate this risk.

The Company is exposed to interest rate risk associated with future issuances of debt and has unwound the forward starting swap derivatives designated as hedging instruments to mitigate this risk in 2022. The realized gain from these derivatives will remain in other comprehensive (loss) income until the debt is issued during the hedging window, which extends through 2025, and interest payments are made.

*Net Investment Hedges*

The Company is exposed to foreign currency risk associated with the net assets of non-USD functional entities and entered into fixed-to-fixed cross currency swaps to mitigate this risk. The Company is also exposed to foreign currency risk stemming from foreign denominated debt. In connection with the Merger, the Company acquired Euro denominated debt that was designated as the hedging instrument in a net investment hedge. Additionally, the Company de-designated its British Pound Sterling denominated debt that was previously designated as a net investment hedge. Subsequently, the Company executed the aforementioned fixed-to-fixed cross currency swap to mitigate the foreign currency exchange risk associated with this debt issuance.

*No Hedging Designation*

Prior to the Merger, the Company was exposed to interest rate risk associated with the expected issuance of debt related to the Merger. Prior to the Merger, the Company unwound all interest rate derivatives entered into during 2021 and entered into new treasury lock derivatives, which were subsequently unwound to mitigate this risk. The Company does not have any interest rate derivatives as of December 31, 2022.

As part of the Merger, the Company acquired deferred compensation plans that have risk related to the fair market value gains and losses on these investments and entered into total return swaps to mitigate this risk. The gains and losses associated with these swaps are recorded to selling, general and administrative expenses, offsetting the deferred compensation investment gains and losses.

Once production spend is completed, the aforementioned forward contracts designated as cash flow hedges for production rebates and production expenses are de-designated. After de-designation, gains and losses on these derivatives directly impact earnings in the same line as the hedged risk.

The following table summarizes the impact of derivative financial instruments on the Company's consolidated balance sheets (in millions). There were no amounts eligible to be offset under master netting agreements as of December 31, 2022 and 2021. The fair value of the Company's derivative financial instruments at December 31, 2022 and 2021 was determined using a market-based approach (Level 2).

| | December 31, 2022 | | | | | December 31, 2021 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Fair Value | | | | | Fair Value | | | |
| | Notional | Prepaid expenses and other current assets | Other non-current assets | Accrued liabilities | Other non-current liabilities | Notional | Prepaid expenses and other current assets | Other non-current assets | Accrued liabilities | Other non-current liabilities |
| Cash flow hedges: | | | | | | | | | | |
| Foreign exchange | $ 1,382 | $ 49 | $ 35 | $ 42 | $ 25 | $ 777 | $ 14 | $ — | $ 2 | $ — |
| Cross-currency swaps | 482 | 3 | 58 | — | — | — | — | — | — | — |
| Interest rate swaps | — | — | — | — | — | 2,000 | 44 | — | 11 | — |
| Net investment hedges: [(a)] | | | | | | | | | | |
| Cross-currency swaps | 1,778 | 20 | 12 | — | 73 | 3,512 | 54 | 61 | 20 | 76 |
| No hedging designation: | | | | | | | | | | |
| Foreign exchange | 976 | 5 | 1 | 3 | 96 | 1,020 | — | — | 34 | 66 |
| Cross-currency swaps | 139 | 3 | — | — | 3 | 139 | 3 | — | — | 5 |
| Interest rate swaps | — | — | — | — | — | 15,000 | 126 | 28 | 9 | 5 |
| Total return swaps | 291 | — | — | 13 | — | — | — | — | — | — |
| Total | | $ 80 | $ 106 | $ 58 | $ 197 | | $ 241 | $ 89 | $ 76 | $ 152 |

[(a)] Excludes €164 million of euro-denominated notes ($174 million equivalent at December 31, 2022) designated as net investment hedges and £400 million of sterling notes designated as a net investment hedges at December 31, 2021 (dedesignated in 2022). (See Note 11.)

The following table presents the pretax impact of derivatives designated as cash flow hedges on income and other comprehensive (loss) income (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Gains (losses) recognized in accumulated other comprehensive loss: | | | |
| Foreign exchange - derivative adjustments | $ 7 | $ 57 | $ 14 |
| Interest rate - derivative adjustments | — | 112 | (124) |
| Gains (losses) reclassified into income from accumulated other comprehensive loss: | | | |
| Foreign exchange - advertising revenue | 1 | 1 | 1 |
| Foreign exchange - distribution revenue | (1) | 4 | 30 |
| Foreign exchange - costs of revenues | 25 | — | 2 |
| Interest rate - interest expense, net | (2) | (2) | 1 |
| Foreign exchange - other income (expense), net | — | 30 | — |

If current fair values of designated cash flow hedges as of December 31, 2022 remained static over the next twelve months, the amount the Company would reclassify from accumulated other comprehensive loss into income in the next twelve months would not be material for the current fiscal year. The maximum length of time the Company is hedging exposure to the variability in future cash flows is 33 years.

The following table presents the pretax impact of derivatives designated as net investment hedges on other comprehensive (loss) income (in millions). Other than amounts excluded from effectiveness testing, there were no other gains (losses) reclassified from accumulated other comprehensive loss to income during the years ended December 31, 2022, 2021 and 2020.

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Amount of gain (loss) recognized in AOCI | | | Location of gain (loss) recognized in income on derivative (amount excluded from effectiveness testing) | Amount of gain (loss) recognized in income on derivative (amount excluded from effectiveness testing) | | |
| | 2022 | 2021 | 2020 | | 2022 | 2021 | 2020 |
| Cross currency swaps | $ 46 | $ 114 | $ (61) | Interest expense, net | $ 33 | $ 42 | $ 43 |
| Foreign exchange contracts | — | 5 | (2) | Other income (expense), net | — | — | — |
| Euro denominated notes (foreign denominated debt) | 4 | — | — | N/A | — | — | — |
| Sterling notes (foreign denominated debt) | 112 | 6 | (20) | N/A | — | — | — |
| Total | $ 162 | $ 125 | $ (83) | | $ 33 | $ 42 | $ 43 |

The following table presents the pretax gains (losses) on derivatives not designated as hedges and recognized in other income (expense), net and selling, general and administrative costs in the consolidated statements of operations (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Interest rate swaps | $ 512 | $ (2) | $ — |
| Cross-currency swaps | — | 8 | (10) |
| Foreign exchange derivatives | (37) | (39) | 32 |
| Equity | — | — | 7 |
| Total in other income (expense), net | $ 475 | $ (33) | $ 29 |
| Total return swaps (Selling, general and administrative expense) | 5 | — | — |
| Total | $ 480 | $ (33) | $ 29 |

## NOTE 14. FAIR VALUE MEASUREMENTS

Fair value is defined as the amount that would be received for selling an asset or paid to transfer a liability in an orderly transaction between market participants. Assets and liabilities carried at fair value are classified in the following three categories:

Level 1 – Quoted prices for identical instruments in active markets.

Level 2 – Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets.

Level 3 – Valuations derived from techniques in which one or more significant inputs are unobservable.

The table below presents assets and liabilities measured at fair value on a recurring basis (in millions).

| Category | Balance Sheet Location | December 31, 2022 | | | |
|---|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | | |
| Cash equivalents: | | | | | |
| Time deposits | Cash and cash equivalents | $ — | $ 50 | $ — | $ 50 |
| Equity securities: | | | | | |
| Money market funds | Cash and cash equivalents | 20 | — | — | 20 |
| Mutual funds | Prepaid expenses and other current assets | 14 | — | — | 14 |
| Company-owned life insurance contracts | Prepaid expenses and other current assets | — | 1 | — | 1 |
| Mutual funds | Other noncurrent assets | 243 | — | — | 243 |
| Company-owned life insurance contracts | Other noncurrent assets | — | 94 | — | 94 |
| Time deposits | Other noncurrent assets | — | 8 | — | 8 |
| Total | | $ 277 | $ 153 | $ — | $ 430 |
| **Liabilities** | | | | | |
| Deferred compensation plan | Accrued liabilities | $ 73 | $ — | $ — | $ 73 |
| Deferred compensation plan | Other noncurrent liabilities | 590 | — | — | 590 |
| Total | | $ 663 | $ — | $ — | $ 663 |

| Category | Balance Sheet Location | December 31, 2021 | | | |
|---|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | | |
| Cash equivalents: | | | | | |
| Time deposits | Cash and cash equivalents | $ — | $ 426 | $ — | $ 426 |
| Equity securities: | | | | | |
| Money market funds | Cash and cash equivalents | 425 | — | — | 425 |
| Mutual funds | Prepaid expenses and other current assets | 12 | — | — | 12 |
| Company-owned life insurance contracts | Prepaid expenses and other current assets | — | 1 | — | 1 |
| Mutual funds | Other noncurrent assets | 215 | — | — | 215 |
| Company-owned life insurance contracts | Other noncurrent assets | — | 32 | — | 32 |
| Total | | $ 652 | $ 459 | $ — | $ 1,111 |
| **Liabilities** | | | | | |
| Deferred compensation plan | Accrued liabilities | $ 21 | $ — | $ — | $ 21 |
| Deferred compensation plan | Other noncurrent liabilities | 238 | — | — | 238 |
| Total | | $ 259 | $ — | $ — | $ 259 |

Equity securities include money market funds, time deposits, investments in mutual funds held in separate trusts, which are owned as part of the Company's supplemental retirement plans, and company-owned life insurance contracts. (See Note 17.) The fair value of Level 1 equity securities was determined by reference to the quoted market price per share in active markets multiplied by the number of shares held without consideration of transaction costs. The fair value of the deferred compensation plan liability was determined based on the fair value of the related investments elected by employees. Changes in the fair value of the investments are recorded in other (expense) income, net and changes in the deferred compensation liability are recorded in selling, general and administrative expense. Company-owned life insurance contracts are recorded at their cash surrender value, which approximates fair value (Level 2).

In addition to the financial instruments listed in the tables above, the Company holds other financial instruments, including cash deposits, accounts receivable, accounts payable, term loans, and senior notes. The carrying values for such financial instruments, other than the senior notes, each approximated their fair values as of December 31, 2022 and 2021. The estimated fair value of the Company's outstanding senior notes, including accrued interest, using quoted prices from over-the-counter markets, considered Level 2 inputs, was $38.0 billion and $17.2 billion as of December 31, 2022 and 2021, respectively.

The Company's derivative financial instruments are discussed in Note 13, its investments with readily determinable fair value are discussed in Note 10, and the obligation for its revolving receivable program is discussed in Note 8.

## NOTE 15. SHARE-BASED COMPENSATION

The Company has various incentive plans under which PRSUs, RSUs, stock options, and SARs have been issued. In connection with the Merger, AT&T RSUs subject to time or performance based vesting and restricted stock held by WM employees were replaced with WBD RSUs granted on comparable terms (other than any performance based vesting requirements) upon the closing of the Merger, increasing RSU expense, grants and unrecognized compensation expense for the year ended December 31, 2022 compared to the years ended December 31, 2021 and 2020. As of December 31, 2022, the Company has reserved a total of 237 million shares of its common stock for future exercises, vesting, and grants of stock options, stock-settled SARs, PRSUs, and RSUs. Upon exercise or vesting of stock awards, the Company issues new shares from its existing authorized but unissued shares. As of December 31, 2022, there were 173 million shares of common stock in reserves that were available for future issuance under the incentive plans.

### Share-Based Compensation Expense

The table below presents the components of share-based compensation expense (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| PRSUs | $ 2 | $ 10 | $ 8 |
| RSUs | 337 | 110 | 76 |
| Stock options | 71 | 58 | 30 |
| SARs | 2 | — | (4) |
| Total share-based compensation expense | $ 412 | $ 178 | $ 110 |
| Tax benefit recognized | $ 79 | $ 29 | $ 18 |

Liability-classified share-based compensation awards include certain PRSUs and SARs. The Company recorded total liabilities for cash-settled and other liability-classified share-based compensation awards of $6 million and $22 million as of December 31, 2022 and 2021, respectively. The current portion of the liability for cash-settled and other liability-classified awards was $4 million and $17 million as of December 31, 2022 and 2021, respectively.

### Share-Based Award Activity

***PRSUs***

The table below presents PRSU activity (in millions, except years and weighted-average grant price).

| | PRSUs | Weighted-Average Grant Date Fair Value | Weighted-Average Remaining Contractual Term (years) | Aggregate Fair Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2021 | 0.9 | $ 34.84 | 0.0 | $ 20 |
| Granted | 0.4 | $ 28.11 | | |
| Converted | (0.6) | $ 32.42 | | $ 16 |
| Outstanding as of December 31, 2022 | 0.7 | $ 32.80 | 0.0 | $ 6 |
| Vested and expected to vest as of December 31, 2022 | 0.7 | $ 32.80 | 0.0 | $ 6 |
| Convertible as of December 31, 2022 | 0.2 | $ 41.36 | 0.0 | $ 2 |

As of December 31, 2022, there was no unrecognized compensation cost related to PRSUs.

***RSUs***

The table below presents RSU activity (in millions, except years and weighted-average grant price).

| | RSUs | Weighted-Average Grant Date Fair Value | Weighted-Average Remaining Contractual Term (years) | Aggregate Fair Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2021 | 8.1 | $ 35.56 | 2.3 | $ 192 |
| Granted | 33.5 | $ 23.51 | | |
| Vested | (7.0) | $ 29.31 | | $ 139 |
| Forfeited | (3.4) | $ 25.25 | | |
| Outstanding as of December 31, 2022 | 31.2 | $ 25.14 | 2.3 | $ 296 |
| Vested and expected to vest as of December 31, 2022 | 31.2 | $ 25.14 | 2.3 | $ 296 |

As of December 31, 2022, there was $498 million of unrecognized compensation cost related to RSUs, of which $36 million is related to cash settled RSUs. Stock settled RSUs are expected to be recognized over a weighted-average period of 1.9 years, and cash settled RSUs are expected to be recognized over a weighted-average period of 2.5 years.

***Stock Options***

The table below presents stock option activity (in millions, except years and weighted-average exercise price).

| | Stock Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2021 | 30.4 | $ 34.93 | 5.0 | $ 0.4 |
| Granted | 0.3 | $ 32.90 | | |
| Forfeited | (0.2) | $ 30.46 | | |
| Outstanding as of December 31, 2022 | 30.5 | $ 34.95 | 4.0 | $ — |
| Vested and expected to vest as of December 31, 2022 | 30.5 | $ 34.95 | 4.0 | $ — |
| Exercisable as of December 31, 2022 | 12.0 | $ 29.87 | 2.6 | $ — |

The Company received cash payments from the exercise of stock options totaling $1 million, $159 million, and $8 million during 2022, 2021 and 2020, respectively. As of December 31, 2022, there was $158 million of unrecognized compensation cost related to stock options, which is expected to be recognized over a weighted-average period of 3.3 years.

The fair value of stock options is estimated using the Black-Scholes option-pricing model. The weighted-average assumptions used to determine the fair value of stock options as of the date of grant during 2022, 2021 and 2020 were as follows.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Risk-free interest rate | 1.46 % | 1.03 % | 0.89 % |
| Expected term (years) | 5.0 | 5.9 | 5.0 |
| Expected volatility | 42.15 % | 42.45 % | 31.86 % |
| Dividend yield | — | — | — |

The weighted-average grant date fair value of options granted during 2022, 2021 and 2020 was $9.60, $14.08 and $7.57, respectively, per option. The total intrinsic value of options exercised during 2022, 2021 and 2020 was $0 million, $145 million and $3 million, respectively.

***SARs***

The table below presents SAR award activity (in millions, except years and weighted-average grant price).

| | SARs | Weighted-Average Grant Price | Weighted-Average Remaining Contractual Term (years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2021 | 0.9 | $ 22.46 | 0.1 | $ 1 |
| Settled | (0.9) | $ 22.37 | | $ 3 |
| Outstanding as of December 31, 2022 | — | $ — | 0.0 | $ — |

***Employee Stock Purchase Plan***

The ESPP enables eligible employees to purchase shares of WBD common stock through payroll deductions or other permitted means. Unless otherwise determined by the Company's Compensation Committee, the purchase price for shares offered under the ESPP is 85% of the closing price of WBD common stock on the purchase date. The Company's board of directors has authorized 8 million shares of WBD common stock to be issued under the ESPP. During the years ended December 31, 2022, 2021 and 2020 the Company issued 526 thousand, 203 thousand and 254 thousand shares under the ESPP, respectively, and received cash totaling $7 million, $6 million and $5 million, respectively.

**NOTE 16. INCOME TAXES**

The income tax balances as of December 31, 2022 are inclusive of the WM Business as a result of the Merger.

The domestic and foreign components of (loss) income before income taxes were as follows (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Domestic | $ (8,747) | $ 1,598 | $ 1,916 |
| Foreign | (213) | (165) | (188) |
| (Loss) income before income taxes | $ (8,960) | $ 1,433 | $ 1,728 |

The components of the provision for income taxes were as follows (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Current: | | | |
| Federal | $ 629 | $ 451 | $ 422 |
| State and local | 143 | 130 | 12 |
| Foreign | 407 | 166 | 125 |
| | 1,179 | 747 | 559 |
| Deferred: | | | |
| Federal | (2,367) | (250) | (14) |
| State and local | (418) | 6 | (24) |
| Foreign | (57) | (267) | (148) |
| | (2,842) | (511) | (186) |
| Income tax (benefit) expense | $ (1,663) | $ 236 | $ 373 |

The following table reconciles the Company's effective income tax rates to the U.S. federal statutory income tax rates.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | |
| Pre-tax income at U.S. federal statutory income tax rate | $ (1,881) | 21 % | $ 301 | 21 % | $ 363 | 21 % |
| State and local income taxes, net of federal tax benefit | (218) | 3 % | 108 | 7 % | (10) | — % |
| Effect of foreign operations | 246 | (3)% | 25 | 2 % | 58 | 3 % |
| Preferred stock conversion premium charge | 166 | (2)% | — | — % | — | — % |
| UK Finance Act legislative change | — | — % | (155) | (11)% | (51) | (3)% |
| Noncontrolling interest adjustment | (17) | — % | (40) | (3)% | (29) | (2)% |
| Impairment of goodwill | — | — % | — | — % | 25 | 2 % |
| Deferred tax adjustment | — | — % | — | — % | (22) | (1)% |
| Other, net | 41 | — % | (3) | — % | 39 | 2 % |
| Income tax (benefit) expense | $ (1,663) | 19 % | $ 236 | 16 % | $ 373 | 22 % |

Income tax (benefit) expense was $(1,663) million and $236 million, and the Company's effective tax rate was 19% and 16% for 2022 and 2021, respectively. The decrease in the tax expense for the year ended December 31, 2022, was primarily attributable to a decrease in pre-tax book income, partially offset by an unfavorable tax adjustment related to the 2022 preferred stock conversion transaction expense that was not deductible for tax purposes (see Note 3), as well as the effect of foreign operations, including taxation and allocation of income and losses across multiple foreign jurisdictions. The decrease for the year ended December 31, 2022 was further offset by a deferred tax benefit of $155 million recorded in the year ended December 31, 2021 resulting from the UK Finance Act 2021 enacted in June 2021.

Income tax expense was $236 million and $373 million, and the Company's effective tax rate was 16% and 22% for 2021 and 2020, respectively. The decrease in income tax expense for the year ended December 31, 2021 was primarily attributable to a decrease in pre-tax book income and an increase in the deferred tax benefit from the UK Finance Act 2021 that was enacted in June 2021. Those decreases were partially offset by an increase in the state and local income tax expense recorded in 2021.

Components of deferred income tax assets and liabilities were as follows (in millions).

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Deferred income tax assets: | | |
| Accounts receivable | $ (78) | $ 8 |
| Tax attribute carry-forward | 2,557 | 445 |
| Accrued liabilities and other | 1,274 | 548 |
| Total deferred income tax assets | 3,753 | 1,001 |
| Valuation allowance | (1,849) | (305) |
| Net deferred income tax assets | 1,904 | 696 |
| Deferred income tax liabilities: | | |
| Intangible assets | (9,509) | (395) |
| Content rights | (1,389) | (138) |
| Equity method and other investments in partnerships | (522) | (413) |
| Noncurrent portion of debt | (6) | (87) |
| Other | (803) | (133) |
| Total deferred income tax liabilities | (12,229) | (1,166) |
| Net deferred income tax liabilities | $ (10,325) | $ (470) |

As of December 31, 2022, the tax attribute carry-forward balance includes $1,105 million of net operating loss deferred tax assets established in Luxembourg during the year. Prior to 2022, the Company concluded that the likelihood of utilizing these net operating losses was remote and the deferred tax assets associated with these operating losses were worthless, leading to no deferred tax assets established for these net operating losses. However, as a result of recent changes in the company's global tax profile upon the Merger, the Company believes the likelihood that these net operating losses would be utilized is no longer remote and has established deferred tax assets of $1,105 million during the year ended December 31, 2022 for the cumulative balance of these net operating losses. The Company also recorded a full valuation allowance of $1,105 million to offset the associated deferred tax assets after weighing all available evidence for realizability.

The Company's net deferred income tax assets and liabilities were reported on the consolidated balance sheets as follows (in millions).

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Noncurrent deferred income tax assets (included within other noncurrent assets) | $ 689 | $ 755 |
| Deferred income tax liabilities | (11,014) | (1,225) |
| Net deferred income tax liabilities | $ (10,325) | $ (470) |

The Company's loss carry-forwards were reported on the consolidated balance sheets as follows (in millions).

| | Federal | State | Foreign |
|---|---|---|---|
| Loss carry-forwards | $ 129 | $ 1,194 | $ 7,842 |
| Deferred tax asset related to loss carry-forwards | 27 | 61 | 1,948 |
| Valuation allowance against loss carry-forwards | (6) | (58) | (1,477) |
| Earliest expiration date of loss carry-forwards | 2028 | 2023 | 2023 |

A reconciliation of the beginning and ending amounts of unrecognized tax benefits (without related interest and penalty amounts) is as follows (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Beginning balance | $ 420 | $ 348 | $ 375 |
| Additions based on tax positions related to the current year | 302 | 68 | 31 |
| Additions for tax positions of prior years | 35 | 64 | 4 |
| Additions for tax positions acquired in business combinations | 1,353 | — | — |
| Reductions for tax positions of prior years | (114) | (27) | (5) |
| Settlements | (20) | (5) | (9) |
| Reductions due to lapse of statutes of limitations | (34) | (25) | (51) |
| Changes due to foreign currency exchange rates | (13) | (3) | 3 |
| Ending balance | $ 1,929 | $ 420 | $ 348 |

On April 8, 2022, the Company completed its Merger with the WM Business. In connection with the Merger, the Company entered into a tax matters agreement ("TMA") with AT&T. Pursuant to the TMA, the Company is responsible for tax liabilities of the WM Business related to the periods prior to AT&T's ownership of the WM Business (June 14, 2018), and AT&T is responsible for tax liabilities of the WM Business related to the period for which they owned the WM Business (June 15, 2018 through April 8, 2022). The Company is indemnified by AT&T for any tax liabilities of the WM Business arising for the period June 15, 2018 through April 8, 2022. As of December 31, 2022, the Company has recorded reserves for uncertain tax positions and the associated interest and penalties payable related to the WM Business of $1,353 million and $322 million, respectively, through purchase accounting. Indemnification receivables of $388 million were also recorded through purchase accounting during the year ended December 31, 2022.

With respect to uncertain tax positions related to jurisdictions that have joint and several liability among members of the AT&T tax filing group during the AT&T ownership period, the Company recognizes only the amount they expect to pay to the taxing authorities after considering the TMA with AT&T and AT&T's ability to settle any disputed positions with the taxing authorities. As of December 31, 2022, the Company has not recorded any liabilities for uncertain tax positions or indemnification receivables related to matters that were attributable to jurisdictions that have joint and several liability among members of the AT&T filing group since AT&T was determined to be the primary obligor.

The balances as of December 31, 2022, 2021 and 2020 included $1,929 million, $420 million, and $348 million, respectively, of unrecognized tax benefits that, if recognized, would reduce the Company's income tax expense and effective tax rate after giving effect to interest deductions and offsetting benefits from other tax jurisdictions. The increase in the reserve for unrecognized tax benefits for the year ended December 31, 2022 was primarily attributable to the Merger.

The Company and its subsidiaries file income tax returns in the U.S. and various state and foreign jurisdictions. The Company is currently under audit by the Internal Revenue Service for its 2011 to 2019 consolidated federal income tax returns. It is difficult to predict the final outcome or timing of resolution of any particular tax matter. With few exceptions, the Company is no longer subject to audit by any jurisdiction for years prior to 2008. Adjustments that arose from the completion of audits for certain tax years have been included in the change in uncertain tax positions in the table above.

It is reasonably possible that the total amount of unrecognized tax benefits related to certain of the Company's uncertain tax positions could decrease by as much as $316 million within the next twelve months as a result of ongoing audits, foreign judicial proceedings, lapses of statutes of limitations, or regulatory developments.

As of December 31, 2022, 2021 and 2020, the Company had accrued approximately $413 million, $60 million, and $53 million, respectively, of total interest and penalties payable related to unrecognized tax benefits. The increase in the accrual for interest and penalties payable at December 31, 2022 is primarily attributable to the Merger. The Company recognizes interest and penalties related to unrecognized tax benefits as a component of income tax expense.

The 2017 Tax Act features a participation exemption regime with current taxation of certain foreign income and imposes a mandatory repatriation toll tax on unremitted foreign earnings. Notwithstanding the U.S. taxation of these amounts, we intend to continue to reinvest these funds outside of the U.S. Our current plans do not demonstrate a need to repatriate them to the U.S. However, if these funds were to be needed in the U.S., we would be required to accrue and pay non-U.S. taxes to repatriate them. The determination of the amount of unrecognized deferred income tax liability with respect to these undistributed foreign earnings is not practicable.

In August 2022, the U.S. government enacted the Inflation Reduction Act ("IRA"), which, among other changes, created a new corporate alternative minimum tax ("CAMT") of 15% for corporations whose average annual adjusted financial statement income for any consecutive 3 tax year periods ending after December 31, 2021, and preceding the tax year exceeds $1 billion, and a 1% excise tax on stock repurchases made by publicly traded U.S. corporations. The effective date of these provisions was January 1, 2023. The Company will continue to monitor for additional IRA guidance to determine whether there is a material impact to the Company's financial statements.

## NOTE 17. RETIREMENT SAVINGS PLANS

The Company has defined contribution, defined benefit, and other savings plans for the benefit of its employees that meet eligibility requirements.

### Defined Contribution Plans

Eligible employees may contribute a portion of their compensation to the plans, which may be subject to certain statutory limitations. For these plans, the Company also makes contributions, including discretionary contributions, subject to plan provisions, which vest immediately. The Company made total contributions of $188 million, $50 million, and $47 million for the years ended December 31, 2022, 2021 and 2020, respectively. The Company's contributions were recorded in cost of revenues and selling, general and administrative expense on the consolidated statements of operations.

**Executive Deferred Compensation Plans**

The Company has deferred compensation plans through which certain senior-level employees may elect to defer a portion of their eligible compensation. Distributions from the deferred compensation plans are generally made following separation from service or other events as specified in the plan. While these plans are unfunded, the Company has established separate rabbi trusts used to provide for certain of these benefits. The accounts of the separate rabbi trusts are included in the Company's consolidated financial statements. The investments are included in prepaid expenses and other current assets and other noncurrent assets on the consolidated balance sheets. The deferred compensation obligation is included in accrued liabilities and other noncurrent liabilities in the consolidated balance sheets. The values of the investments and deferred compensation obligation are recorded at fair value. Changes in the fair value of the investments are included as a component of other income (expense), net, on the consolidated statements of operations. Changes in the fair value of the deferred compensation obligation are recorded in earnings as a component of selling, general and administrative expenses on the consolidated statements of operations. (See Note 14 and Note 18.)

**Multiemployer Benefit Plans**

The Company contributes to a number of multiemployer defined benefit pension plans under the terms of collective-bargaining agreements that cover certain of our union-represented employees. The risks of participating in these multiemployer pension plans are different from single-employer pension plans in that (i) contributions made by the Company to the multiemployer pension plans may be used to provide benefits to employees of other participating employers; (ii) if the Company chooses to stop participating in certain of these multiemployer pension plans, it may be required to pay those plans an amount based on the underfunded status of the plan, which is referred to as a withdrawal liability; and (iii) actions taken by a participating employer that lead to a deterioration of the financial health of a multiemployer pension plan may result in the unfunded obligations of the multiemployer pension plan being borne by its remaining participating employers. While no multiemployer pension plan that the Company contributed to is individually significant to it, the Company was listed on certain Form 5500s as providing more than 5% of total contributions based on the current information available. The financial health of a multiemployer plan is indicated by the zone status, as defined by the Pension Protection Act of 2006, which represents the funded status of the plan as certified by the plan's actuary. In general, plans in the red zone are less than 65% funded, plans in the yellow zone are between 65% and 80% funded, and plans in the green zone are at least 80% funded. We are listed as providing more than 5% of total contributions to the Motion Picture Industry Pension Plan (the "MPI Plan") and the Directors Guild of America Producer Pension Plan (the "DGA Plan"). The DGA Plan was funded at 90.7% for the most recent available plan year. The MPI Plan and the Screen Actors Guild – Producers Pension Plan were funded at 68.9% and 74.7%, respectively, for the most recent available plan year, but neither of these plans was considered to be in endangered, critical, or critical and declining status in the most recent plan year. Total contributions made by us to multiemployer pension plans for the year ended December 31, 2022 were $112 million. Our share of contributions to plans whose zone status is below green is not material. Since these plans were acquired as part of the Merger, there were no contributions for the years ended December 31, 2021 and 2020.

We also contribute to various other multiemployer benefit plans that provide health and welfare benefits to active and retired participants. Total contributions made by us to these other multiemployer benefit plans for the year ended December 31, 2022 were $182 million.

**Defined Benefit Plans**

The Company has defined benefit pension plans that cover certain U.S. based employees (the "U.S. Pension Plans") and a non-qualified unfunded Supplemental Executive Retirement Plan ("SERP") that provides defined pension benefits to eligible executives.

Under the existing Scripps Networks Interactive pension plan, no additional service benefits have been earned by participants since December 31, 2009, and the amount of eligible compensation that is used to calculate a plan participant's pension benefit includes compensation earned by the employee through December 31, 2019, after which time all plan participants have a frozen pension benefit.

In connection with the Merger, the Company assumed four U.S. nonqualified pension plans that are noncontributory and unfunded and several non-U.S. pension plans. The acquired U.S. pension plans consist of the Time Warner Excess Benefit Plan (the "Excess plan"), the Retirement Accumulation Plan ("RAP"), the Supplemental Executive Retirement Plan ("SERP") and the Wealth Accumulation Plan ("WAP"). The acquired U.S. pension plans were closed to new entrants during 2010. The Excess plan and RAP are both frozen to new benefit accruals. SERP and WAP only have retirees remaining. The pension formula for the Excess plan captured pay above compensation limits or benefit limits. RAP is a cash balance type formula and now provides only interest credits.

The Company also holds net assets and net liabilities on behalf of other U.S. and non-U.S. pension plans. The plan provisions vary by plan and by country. Some of these plans are unfunded and all are noncontributory. Assets are recorded in other noncurrent assets, and liabilities are recorded in accrued liabilities and other noncurrent liabilities on the consolidated balance sheets.

Discount rates, long-term rate of return on plan assets, increases in compensation levels, and mortality rates are key assumptions used in determining the benefit obligation. The table below describes how the assumptions are determined.

| Assumption | Description |
| --- | --- |
| Discount rate | Based on a bond portfolio approach that includes high-quality debt instruments with maturities matching the Company's expected benefit payments from the plans. |
| Long-term rate of return on plan assets | Based on the weighted-average expected rate of return and capital market forecasts for each asset class employed and also considers the Company's historical compounded return on plan assets for 10 and 15-year periods. |
| Increase in compensation levels | Based on past experience and the near-term outlook. |
| Mortality | Various mortality tables adjusted and projected using mortality improvement rates. |

***Net Periodic Pension Cost***

Expense recognized in relation to the Pension Plans and SERP is based upon actuarial valuations. Inherent in those valuations are key assumptions, including discount rates and, where applicable, expected returns on assets. The service cost component of net periodic pension cost is recorded in operating expenses on the consolidated statements of operations, while the remaining components are recorded in other income (expense), net. Net periodic pension cost was not material for the years ended December 31, 2022, 2021 and 2020.

***Obligations and Funded Status***

The following tables present information about plan assets and obligations of the Pension Plan and SERP based upon a valuation as of December 31, 2022 and 2021, respectively (in millions).

| | Year Ended December 31, 2022 | |
|---|---|---|
| | Pension Plan | SERP |
| Accumulated benefit obligation | $ 746 | $ 16 |
| Change in projected benefit obligation: | | |
| Projected benefit obligation at beginning of year | $ 82 | $ 22 |
| Amounts assumed upon acquisition (See Note 4) | 907 | 1 |
| Service cost | 2 | — |
| Interest cost | 21 | — |
| Benefits paid | (35) | (1) |
| Actuarial gains | (225) | (6) |
| Settlement charges | (6) | — |
| Projected benefit obligation at end of year | 746 | 16 |
| Plan assets: | | |
| Fair value at beginning of year | 63 | — |
| Amounts assumed upon acquisition (See Note 4) | 756 | — |
| Actual return on plan assets | (268) | — |
| Company contributions | 23 | 1 |
| Benefits paid | (35) | (1) |
| Settlement charges | (6) | — |
| Fair value at end of year | 533 | — |
| Under funded status | $ (213) | $ (16) |
| Amounts recognized as assets and liabilities on the consolidated balance sheets: | | |
| Other noncurrent assets | $ 92 | $ — |
| Accrued liabilities | (27) | (2) |
| Other noncurrent liabilities | (278) | (14) |
| Total | $ (213) | $ (16) |
| Amounts recognized in accumulated other comprehensive (gain) loss consist of: | | |
| Net loss (gain) | $ 97 | $ (3) |

The weighted average assumptions used to determine benefit obligations were as follows.

| | December 31, 2022 | |
|---|---|---|
| | Pension | SERP |
| Discount rate | 4.70 % | 5.03 % |
| Rate of compensation increases | 3.11 % | — % |

| | December 31, 2021 | |
|---|---|---|
| | Pension Plan | SERP |
| Accumulated benefit obligation | $ 82 | $ 22 |
| Change in projected benefit obligation: | | |
| Projected benefit obligation at beginning of year | $ 94 | $ 25 |
| Interest cost | 2 | 1 |
| Benefits paid | (1) | — |
| Actuarial gains | (3) | (1) |
| Settlement charges | (10) | (3) |
| Projected benefit obligation at end of year | 82 | 22 |
| Plan assets: | | |
| Fair value at beginning of year | 70 | — |
| Actual return on plan assets | 1 | — |
| Company contributions | 3 | 3 |
| Benefits paid | (1) | — |
| Settlement charges | (10) | (3) |
| Fair value at end of year | 63 | — |
| Under funded status | $ (19) | $ (22) |
| Amounts recognized as assets and liabilities on the consolidated balance sheets: | | |
| Accrued liabilities | $ — | $ (2) |
| Other noncurrent liabilities | (19) | (20) |
| Total | $ (19) | $ (22) |
| Amounts recognized in accumulated other comprehensive (gain) loss consist of: | | |
| Net loss | $ 14 | $ 4 |

The weighted average assumptions used to determine benefit obligations were as follows.

| | December 31, 2021 | |
|---|---|---|
| | Pension | SERP |
| Discount rate | 2.42 % | 2.13 % |
| Rate of compensation increases [(a)] | N/A | N/A |

[(a)] The Scripps Networks Interactive pension plan reached their scheduled freeze date on December 31, 2019.

***Plan Assets***

The Company's investment policy is to maximize the total rate of return on plan assets to meet the long-term funding obligations of the pension plans. There are no restrictions on the types of investments held in the pension plans, which are invested using a combination of active management and passive investment strategies. Risk is controlled through diversification among multiple asset classes, managers, styles, and securities. Risk is further controlled both at the manager and asset class levels by assigning return targets and evaluating performance against these targets. The following table presents the pension plans asset allocations by asset category (in millions).

| | December 31, 2022 | |
|---|---|---|
| **Investment Type** | **Target** | **Actual** |
| Equity securities | 12 % | 13 % |
| Fixed income securities | 75 % | 74 % |
| Multi-asset credit fund | 5 % | 4 % |
| Real assets | 4 % | 4 % |
| Hedge funds | 2 % | 4 % |
| Cash | 2 % | 1 % |
| **Total** | 100 % | 100 % |

***Fair Value Measurements***

Fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. See Note 14 for a discussion of the fair value hierarchy that prioritizes the inputs to the valuation techniques used to measure fair value (in millions).

| | December 31, 2022 | | | |
|---|---|---|---|---|
| | **Total** | **Level 1** | **Level 2** | **Level 3** |
| Equity securities | $ 69 | $ 34 | $ 35 | $ — |
| Fixed income securities | 532 | 14 | 446 | 72 |
| Multi-asset credit fund | 21 | — | 21 | — |
| Cash | 5 | 5 | — | — |
| Total plan assets measured at fair value | $ 627 | $ 53 | $ 502 | $ 72 |
| Assets held at net asset value practical expedient | | | | |
| Real assets | $ 22 | | | |
| Hedge funds | 20 | | | |
| Total assets held at net asset value practical expedient | $ 42 | | | |
| Liabilities: | | | | |
| Derivatives | (136) | — | (136) | — |
| Total plan assets | $ 533 | | | |

The table below sets forth a summary of changes in the fair value of the Level 3 pension assets for the year ended December 31, 2022 (in millions).

| | Fixed income funds |
|---|---|
| Fair value at beginning of year | $ 98 |
| Unrealized losses | (26) |
| Balance at end of year | $ 72 |

| | December 31, 2021 | | | |
|---|---|---|---|---|
| | Total | Level 1 | Level 2 | Level 3 |
| Equity Securities | $ 48 | $ 48 | $ — | $ — |
| Fixed income securities | 12 | 12 | — | — |
| Cash | 3 | 3 | — | — |
| Total plan assets measured at fair value | $ 63 | $ 63 | $ — | $ — |

***Estimated Benefit Payments***

The following table presents the estimated future benefit payments expected to be paid out for the defined benefits plans over the next ten years (in millions).

| | Pension Plan | SERP |
|---|---|---|
| 2023 | $ 46 | $ 2 |
| 2024 | 44 | 2 |
| 2025 | 46 | 2 |
| 2026 | 45 | 2 |
| 2027 | 46 | 2 |
| Thereafter | 238 | 4 |

**NOTE 18. SUPPLEMENTAL DISCLOSURES**

**Property and equipment**

Property and equipment consisted of the following (in millions).

| | | December 31, | |
|---|---|---|---|
| | Useful Lives | 2022 | 2021 |
| Equipment, furniture, fixtures and other [(a)] | 3 - 5 years | $ 1,682 | $ 1,139 |
| Capitalized software costs | 2 - 5 years | 1,855 | 904 |
| Land, buildings and leasehold improvements [(b)] | 15- 39 years | 3,251 | 481 |
| Property and equipment, at cost | | 6,788 | 2,524 |
| Accumulated depreciation | | (2,055) | (1,329) |
| | | 4,733 | 1,195 |
| Assets under construction | | 568 | 141 |
| Property and equipment, net | | $ 5,301 | $ 1,336 |

[(a)] Property and equipment includes assets acquired under finance lease arrangements. Assets acquired under finance lease arrangements are amortized using the straight-line method over the lesser of the estimated useful lives of the assets or the terms of the related leases. (See Note 12.)

[(b)] Land has an indefinite life and is not depreciated. Leasehold improvements generally have an estimated useful life equal to the lease term.

Capitalized software costs are for internal use. The net book value of capitalized software costs was $949 million and $371 million as of December 31, 2022 and 2021, respectively.

Depreciation expense for property and equipment totaled $957 million, $311 million and $267 million for the years ended December 31, 2022, 2021 and 2020, respectively.

**Prepaid expenses and other current assets**

Prepaid expenses and other current assets consisted of the following (in millions).

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Production receivables | $ 1,231 | $ — |
| Other current assets | 2,657 | 913 |
| Total prepaid expenses and other current assets | $ 3,888 | $ 913 |

**Accrued liabilities**

Accrued liabilities consisted of the following (in millions).

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Accrued participation and residuals | $ 2,986 | $ — |
| Accrued production and content rights payable | 3,153 | 776 |
| Accrued payroll and related benefits | 2,292 | 533 |
| Other accrued liabilities | 3,073 | 921 |
| Total accrued liabilities | $ 11,504 | $ 2,230 |

**Other income (expense), net**

Other income (expense), net, consisted of the following (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Foreign currency (losses) gains, net | $ (150) | $ 93 | $ (115) |
| Gains (losses) on derivative instruments, net | 475 | (33) | 29 |
| Gain on sale of investment with readily determinable fair value | — | 15 | 101 |
| Change in the value of investments with readily determinable fair value | (105) | (6) | 28 |
| Change in the value of equity investments without readily determinable fair value | (142) | (13) | — |
| Gain on sale of equity method investments | 195 | 4 | 2 |
| Loss on extinguishment of debt | — | (10) | (76) |
| Other income (expense), net | 74 | 22 | (3) |
| Total other income (expense), net | $ 347 | $ 72 | $ (34) |

**Supplemental Cash Flow Information**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Cash paid for taxes, net | $ 1,027 | $ 643 | $ 641 |
| Cash paid for interest | 1,539 | 664 | 673 |
| Non-cash investing and financing activities: | | | |
| Equity issued for the acquisition of WarnerMedia | 42,309 | — | — |
| Receivable from sale of fuboTV Inc. shares | — | — | 124 |
| Non-cash consideration related to the sale of The CW Network | 126 | — | — |
| Accrued consideration for the joint venture with BT | 90 | — | — |
| Accrued purchases of property and equipment | 66 | 34 | 48 |
| Assets acquired under finance lease and other arrangements | 53 | 134 | 91 |
| Equity exchange with Harpo for step acquisition of OWN | — | — | 59 |

**Cash, Cash Equivalents, and Restricted Cash**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Cash and cash equivalents | $ 3,731 | $ 3,905 |
| Restricted cash - other current assets [(a)] | 199 | — |
| Total cash, cash equivalents, and restricted cash | $ 3,930 | $ 3,905 |

[(a)] Restricted cash primarily includes cash posted as collateral related to the Company's revolving receivables and hedging programs. (See Note 8 and Note 13).

**Assets Held for Sale**

As of December 31, 2022, the Company classified its Ranch Lot and Knoxville office building and land as assets held for sale. The Company reclassified $209 million to prepaid expenses and other current assets on the consolidated balance sheet at December 31, 2022 and stopped recording depreciation on the assets. An immaterial write-down to the estimated fair value, less costs to sell, was recorded during the year ended December 31, 2022, and is included in impairment and loss (gain) on disposition and disposal groups in the consolidated statements of operations.

**Other Comprehensive (Loss) Income**

The table below presents the tax effects related to each component of other comprehensive (loss) income and reclassifications made in the consolidated statements of operations (in millions).

| | Year Ended December 31, 2022 | | | Year Ended December 31, 2021 | | | Year Ended December 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pretax | Tax Benefit (Expense) | Net-of-tax | Pretax | Tax Benefit (Expense) | Net-of-tax | Pretax | Tax Benefit (Expense) | Net-of-tax |
| **Currency translation adjustments:** | | | | | | | | | |
| Unrealized gains (losses): | | | | | | | | | |
| Foreign currency | $ (743) | $ 2 | $ (741) | $ (404) | $ 17 | $ (387) | $ 357 | $ 33 | $ 390 |
| Net investment hedges | 145 | (55) | 90 | 105 | (8) | 97 | (109) | 11 | (98) |
| Reclassifications: | | | | | | | | | |
| Gain on disposition | (2) | — | (2) | — | — | — | — | — | — |
| Total currency translation adjustments | (600) | (53) | (653) | (299) | 9 | (290) | 248 | 44 | 292 |
| **Derivative adjustments:** | | | | | | | | | |
| Unrealized gains (losses) | 7 | (3) | 4 | 169 | (35) | 134 | (110) | 24 | (86) |
| Reclassifications from other comprehensive income to net income | (23) | 5 | (18) | (33) | 8 | (25) | (34) | 7 | (27) |
| Total derivative adjustments | (16) | 2 | (14) | 136 | (27) | 109 | (144) | 31 | (113) |
| **Pension plan and SERP liability:** | | | | | | | | | |
| Unrealized gains (losses) | (47) | 21 | (26) | 3 | (1) | 2 | (10) | 2 | (8) |
| Other comprehensive (loss) income adjustments | $ (663) | $ (30) | $ (693) | $ (160) | $ (19) | $ (179) | $ 94 | $ 77 | $ 171 |

**Accumulated Other Comprehensive Loss**

The table below presents the changes in the components of accumulated other comprehensive loss, net of taxes (in millions).

| | Currency Translation | Derivative Adjustments | Pension Plan and SERP Liability | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| December 31, 2019 | $ (847) | $ 32 | $ (7) | $ (822) |
| Other comprehensive income (loss) before reclassifications | 292 | (86) | (8) | 198 |
| Reclassifications from accumulated other comprehensive loss to net income | — | (27) | — | (27) |
| Other comprehensive income (loss) | 292 | (113) | (8) | 171 |
| December 31, 2020 | (555) | (81) | (15) | (651) |
| Other comprehensive income (loss) before reclassifications | (290) | 134 | 2 | (154) |
| Reclassifications from accumulated other comprehensive loss to net income | — | (25) | — | (25) |
| Other comprehensive income (loss) | (290) | 109 | 2 | (179) |
| December 31, 2021 | (845) | 28 | (13) | (830) |
| Other comprehensive income (loss) before reclassifications | (651) | 4 | (26) | (673) |
| Reclassifications from accumulated other comprehensive loss to net income | (2) | (18) | — | (20) |
| Other comprehensive income (loss) | (653) | (14) | (26) | (693) |
| December 31, 2022 | $ (1,498) | $ 14 | $ (39) | $ (1,523) |

## NOTE 19. REDEEMABLE NONCONTROLLING INTERESTS

Redeemable noncontrolling interests are presented outside of permanent equity on the Company's consolidated balance sheets when the put right is outside of the Company's control. Redeemable noncontrolling interests reflected as of the balance sheet date are the greater of the noncontrolling interest balances adjusted for comprehensive income items and distributions or the redemption values remeasured at the period end foreign exchange rates. Adjustments to the carrying amount of redeemable noncontrolling interests to redemption value as a result of changes in exchange rates are reflected in currency translation adjustments, a component of other comprehensive (loss) income. Such currency translation adjustments to redemption value are allocated to the Company's stockholders only. Redeemable noncontrolling interest adjustments of carrying value to redemption value are reflected in retained earnings. The adjustment of carrying value to the redemption value that reflects a redemption in excess of fair value is included as an adjustment to income from continuing operations available to the Company's stockholders in the calculation of earnings per share. (See Note 3.) The table below summarizes the Company's redeemable noncontrolling interests balances (in millions).

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Discovery Family | $ 173 | $ 213 |
| MotorTrend Group LLC ("MTG") | 112 | 114 |
| Other | 33 | 36 |
| Total | $ 318 | $ 363 |

The table below presents the reconciliation of changes in redeemable noncontrolling interests (in millions).

| | December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Beginning balance | $ 363 | $ 383 | $ 442 |
| Cash distributions to redeemable noncontrolling interests | (50) | (11) | (31) |
| Equity exchange with Harpo for step acquisition of OWN | — | — | (50) |
| Redemption of redeemable noncontrolling interest | — | (26) | — |
| Comprehensive income adjustments: | | | |
| Net income attributable to redeemable noncontrolling interests | 6 | 53 | 12 |
| Currency translation on redemption values | (5) | (5) | 3 |
| Retained earnings adjustments: | | | |
| Adjustments of carrying value to redemption value (redemption value does not equal fair value) | — | (16) | — |
| Adjustments of carrying value to redemption value (redemption value equals fair value) | 4 | (15) | 7 |
| Ending balance | $ 318 | $ 363 | $ 383 |

The significant arrangements for redeemable noncontrolling interests are described below:

***Discovery Family***

Hasbro Inc. (“Hasbro”) had the right to put the entirety of its remaining 40% interest in Discovery Family to the Company at any time during the one-year period beginning December 31, 2021, or in the event the Company’s performance obligation related to Discovery Family is not met. Embedded in the redeemable noncontrolling interest is also a Warner Bros. Discovery call right that is exercisable for one year after December 31, 2021. Neither the put nor call was exercised in 2022. In December 2022, Hasbro and WBD signed an amendment to the previous agreement extending the put-call election to the period January 31, 2025 to March 31, 2025. Upon the exercise of the put or call options, the price to be paid for the redeemable noncontrolling interest is a function of the then-current fair market value of the redeemable noncontrolling interest, to which certain discounts and redemption floor values may apply in specified situations depending upon the party exercising the put or call and the basis for the exercise of the put or call.

***MTG***

GoldenTree acquired a put right exercisable during 30-day windows beginning on each of March 25, 2021, September 25, 2022 and March 25, 2024, that requires the Company to either purchase all of GoldenTree's noncontrolling 32.5% interest in the joint venture at fair value or participate in an initial public offering for the joint venture. In 2022, GoldenTree exercised its irrevocable put right and the Company is required to purchase GoldenTree’s 32.5% noncontrolling interest. The Company performed an analysis of the redemption value as of December 31, 2022, and both parties have begun the process of determining a fair market value based on their own appraisals. The Company does not expect this process, which is one of potentially several steps to agreeing to a redemption value, will be completed until later in 2023, a date that is not certain. Accordingly, there has been no change in the classification of MTG as mezzanine equity since the date of the put is not certain.

## NOTE 20. NONCONTROLLING INTEREST

The Company has a controlling interest in the TV Food Network Partnership (the “Partnership”), which includes the Food Network and Cooking Channel. Food Network and Cooking Channel are operated and organized under the terms of the Partnership. The Company holds 80% of the voting interest and 68.7% of the economic interest in the Partnership. During the fourth quarter of 2022, the Partnership agreement was extended and specifies a dissolution date of December 31, 2023. If the term of the Partnership is not extended prior to the dissolution date of December 31, 2023, the Partnership agreement permits the Company, as holder of 80% of the applicable votes, to reconstitute the Partnership and continue its business. If for some reason the Partnership is not continued, it will be required to limit its activities to winding up, settling debts, liquidating assets and distributing proceeds to the partners in proportion to their partnership interests. Ownership interests attributable to the noncontrolling owner are presented as noncontrolling interests on the Company's consolidated financial statements. Under the terms of the Partnership agreement, the noncontrolling owner cannot force a redemption outside of the Company’s control. As such, the noncontrolling interests in the Partnership are reflected as a component of permanent equity in the Company's consolidated financial statements.

## NOTE 21. RELATED PARTY TRANSACTIONS

In the normal course of business, the Company enters into transactions with related parties. Related parties include entities that share common directorship, such as Liberty Global plc ("Liberty Global"), Liberty Broadband Corporation ("Liberty Broadband") and their subsidiaries (collectively the "Liberty Group"). The Company's board of directors includes Dr. John Malone, who is Chairman of the Board of Liberty Global and Liberty Broadband and beneficially owns approximately 30% and 48% of the aggregate voting power with respect to the election of directors of Liberty Global and Liberty Broadband, respectively. The majority of the revenue earned from the Liberty Group relates to multi-year network distribution arrangements. Related party transactions also include revenues and expenses for content and services provided to or acquired from equity method investees or minority partners of consolidated subsidiaries.

The table below presents a summary of the transactions with related parties (in millions).

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Revenues and service charges: | | | |
| Liberty Group | $ 1,758 | $ 671 | $ 686 |
| Equity method investees | 464 | 253 | 223 |
| Other | 311 | 169 | 103 |
| Total revenues and service charges | $ 2,533 | $ 1,093 | $ 1,012 |
| Expenses | $ 406 | $ 238 | $ 244 |
| Distributions to noncontrolling interests and redeemable noncontrolling interests | $ 300 | $ 251 | $ 254 |

The table below presents receivables due from and payables due to related parties (in millions).

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Receivables | $ 338 | $ 172 |
| Payables | $ 38 | $ 23 |

In September 2022, the Company sold 75% of its interest in The CW Network to Nexstar, a related party, and recorded an immaterial gain not included in the table above. (See Note 4.)

## NOTE 22. COMMITMENTS, CONTINGENCIES, AND GUARANTEES

### Commitments

In the normal course of business, the Company enters into various commitments, which primarily include programming and talent arrangements, operating and finance leases (see Note 12), arrangements to purchase various goods and services, long-term debt (see Note 11), pension funding and payments (see Note 17), and future funding commitments to equity method investees (see Note 10) (in millions).

| Year Ending December 31, | Content | Other Purchase Obligations | Other Employee Obligations | Total |
|---|---|---|---|---|
| 2023 | $ 7,969 | $ 1,597 | $ 453 | $ 10,019 |
| 2024 | 5,484 | 756 | 253 | 6,493 |
| 2025 | 3,966 | 352 | 112 | 4,430 |
| 2026 | 2,566 | 161 | 52 | 2,779 |
| 2027 | 2,448 | 90 | 20 | 2,558 |
| Thereafter | 7,299 | 91 | 9 | 7,399 |
| Total | $ 29,732 | $ 3,047 | $ 899 | $ 33,678 |

Content purchase obligations include commitments and liabilities associated with third-party producers and sports associations for content that airs on our television networks and DTC services. Production and licensing contracts generally require the purchase of a specified number of episodes, payments during production or over the term of a license, and include both programs that have been delivered and are available for airing and programs that have not yet been produced or sporting events that have not yet taken place. The commitments disclosed above exclude content liabilities recognized on the consolidated balance sheets.

Other purchase obligations include agreements with certain vendors and suppliers for the purchase of goods and services whereby the underlying agreements are enforceable, legally binding, and specify all significant terms. Significant purchase obligations include transmission services, television rating services, marketing commitments and research, equipment purchases, and information technology and other services. Some of these contracts do not require the purchase of fixed or minimum quantities and generally may be terminated with a 30-day to 60-day advance notice without penalty, and are not included in the table above past the 30-day to 60-day advance notice period. The commitments disclosed above exclude liabilities recognized on the consolidated balance sheets. Other purchase obligations also includes future funding commitments to equity method investees. Although the Company had funding commitments to equity method investees as of December 31, 2022, the Company may also provide uncommitted additional funding to its equity method investments in the future. (See Note 10.)

Other employee obligations are primarily related to employment agreements with creative talent for the WM broadcast networks.

***Six Flags Guarantee***

In connection with WM's former investment in the Six Flags (as defined below) theme parks located in Georgia and Texas (collectively, the "Parks"), in 1997, certain subsidiaries of the Company agreed to guarantee (the "Six Flags Guarantee") certain obligations of the partnerships that hold the Parks (the "Partnerships") for the benefit of the limited partners in such Partnerships, including annual payments made to the Parks or to the limited partners and additional obligations at the end of the respective terms for the Partnerships in 2027 and 2028 (the "Guaranteed Obligations"). The aggregate gross undiscounted estimated future cash flow requirements covered by the Six Flags Guarantee over the remaining term (through 2028) are $544 million. To date, no payments have been made by the Company pursuant to the Six Flags Guarantee.

Six Flags Entertainment Corporation (formerly known as Six Flags, Inc. and Premier Parks Inc.) ("Six Flags"), which has the controlling interest in the Parks, has agreed, pursuant to a subordinated indemnity agreement (the "Subordinated Indemnity Agreement"), to guarantee the performance of the Guaranteed Obligations when due and to indemnify the Company, among others, if the Six Flags Guarantee is called upon. If Six Flags defaults on its indemnification obligations, the Company has the right to acquire control of the managing partner of the Parks. Six Flags' obligations to the Company are further secured by its interest in all limited partnership units held by Six Flags.

Based the Company's evaluation of the current facts and circumstances surrounding the Guaranteed Obligations and the Subordinated Indemnity Agreement, it is unable to predict the loss, if any, that may be incurred under the Guaranteed Obligations, and no liability for the arrangements has been recognized as of December 31, 2022. Because of the specific circumstances surrounding the arrangements and the fact that no active or observable market exists for this type of financial guarantee, the Company is unable to determine a current fair value for the Guaranteed Obligations and related Subordinated Indemnity Agreement.

**Contingencies**

***Other Contingent Commitments***

Other contingent commitments primarily include contingent payments for post-production term advance obligations on certain co-financing arrangements, as well as operating lease commitment guarantees, letters of credit, bank guarantees, and surety bonds, which generally support performance and payments for a wide range of global contingent and firm obligations, including insurance, litigation appeals, real estate leases, and other operational needs.

The Company's other contingent commitments at December 31, 2022 were $283 million, with $279 million estimated to be due in 2026. For other contingent commitments where payment obligations are outside our control, the timing of amounts represents the earliest period in which the payment could be requested. For the remaining other contingent commitments, the timing of the amounts presented represents when the maximum contingent commitment will expire but does not mean that we expect to incur an obligation to make any payments within that time period. In addition, these amounts do not reflect the effects of any indemnification rights we might possess.

***Put Rights***

The Company has granted put rights to certain consolidated subsidiaries, but the Company is unable to reasonably predict the ultimate amount or timing of any payment. (See Note 19.)

***Legal Matters***

From time to time, in the normal course of its operations, the Company is subject to various litigation matters and claims, including claims related to employees, stockholders, vendors, other business partners or intellectual property. However, a determination as to the amount of the accrual required for such contingencies is highly subjective and requires judgment about future events. Although the outcome of these matters cannot be predicted with certainty and the impact of the final resolution of these matters on the Company's results of operations in a particular subsequent reporting period is not known, management does not believe that the resolution of these matters will have a material adverse effect on the Company's future consolidated financial position, future results of operations or cash flows.

***Guarantees***

There were no guarantees recorded under ASC 460 as of December 31, 2022 and 2021.

In the normal course of business, the Company may provide or receive indemnities that are intended to allocate certain risks associated with business transactions. Similarly, the Company may remain contingently liable for certain obligations of a divested business in the event that a third party does not fulfill its obligations under an indemnification obligation. The Company records a liability for its indemnification obligations and other contingent liabilities when probable and estimable. There were no material amounts for indemnifications or other contingencies recorded as of December 31, 2022 and 2021.

**NOTE 23. REPORTABLE SEGMENTS**

The Company's operating segments are determined based on: (i) financial information reviewed by its chief operating decision maker, the Chief Executive Officer ("CEO"), (ii) internal management and related reporting structure, and (iii) the basis upon which the CEO makes resource allocation decisions. In connection with the Merger, the Company reevaluated and changed its segment presentation and reportable segments during the quarter ended June 30, 2022. As of June 30, 2022, we classified our operations in three reportable segments: Studios, primarily consisting of the production and release of feature films for initial exhibition in theaters, production and initial licensing of television programs to third parties and our networks/DTC services, distribution of our films and television programs to various third party and internal television and streaming services, distribution through the home entertainment market (physical and digital), related consumer products and themed experience licensing, and interactive gaming; Networks, consisting primarily of our domestic and international television networks; and DTC, consisting primarily of our premium pay-TV and streaming services. Goodwill was reallocated to the new reporting units based on relative fair value. Prior periods have been recast to conform to the current period presentation.

The accounting policies of the reportable segments are the same as the Company's, except that certain inter-segment transactions that are eliminated for consolidation are not eliminated at the segment level. Inter-segment transactions primarily include advertising and content licenses. The Company records inter-segment transactions of content licenses at the gross amount. Prior year amounts have been recast to reflect the current presentation. The Company does not report assets by segment because it is not used to allocate resources or evaluate segment performance.

The Company evaluates the operating performance of its operating segments based on financial measures such as revenues and Adjusted EBITDA. Adjusted EBITDA is defined as operating income excluding:

- employee share-based compensation;
- depreciation and amortization;
- restructuring and facility consolidation;
- certain impairment charges;
- gains and losses on business and asset dispositions;
- certain inter-segment eliminations;
- third-party transaction and integration costs;
- amortization of purchase accounting fair value step-up for content;
- amortization of capitalized interest for content; and
- other items impacting comparability.

The Company uses this measure to assess the operating results and performance of its segments, perform analytical comparisons, identify strategies to improve performance, and allocate resources to each segment. The Company believes Adjusted EBITDA is relevant to investors because it allows them to analyze the operating performance of each segment using the same metric management uses. The Company excludes employee share-based compensation, restructuring, certain impairment charges, gains and losses on business and asset dispositions, and transaction and integration costs from the calculation of Adjusted EBITDA due to their impact on comparability between periods. The Company also excludes the depreciation of fixed assets and amortization of intangible assets, amortization of purchase accounting fair value step-up for content, and amortization of capitalized interest for content, as these amounts do not represent cash payments in the current reporting period. Certain corporate expenses and inter-segment eliminations related to production studios are excluded from segment results to enable executive management to evaluate segment performance based upon the decisions of segment executives. Adjusted EBITDA should be considered in addition to, but not a substitute for, operating income, net income, and other measures of financial performance reported in accordance with U.S. GAAP.

The tables below present summarized financial information for each of the Company's reportable segments and corporate, inter-segment eliminations, and other (in millions).

**Revenues**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Studios | $ 9,731 | $ 20 | $ 12 |
| Networks | 19,348 | 11,311 | 10,439 |
| DTC | 7,274 | 860 | 220 |
| Corporate | 30 | — | — |
| Inter-segment eliminations | (2,566) | — | — |
| Total revenues | $ 33,817 | $ 12,191 | $ 10,671 |

**Adjusted EBITDA**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Studios | $ 1,772 | $ 14 | $ 1 |
| Networks | 8,725 | 5,533 | 5,101 |
| DTC | (1,596) | (1,345) | (544) |
| Corporate | (1,200) | (385) | (362) |
| Inter-segment eliminations | 17 | — | — |
| Adjusted EBITDA | $ 7,718 | $ 3,817 | $ 4,196 |

**Reconciliation of Net Income (Loss) Available to Warner Bros. Discovery, Inc, to Adjusted EBITDA**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Net (loss) income available to Warner Bros. Discovery, Inc. | $ (7,371) | $ 1,006 | $ 1,219 |
| Net income attributable to redeemable noncontrolling interests | 6 | 53 | 12 |
| Net income attributable to noncontrolling interests | 68 | 138 | 124 |
| Income tax (benefit) expense | (1,663) | 236 | 373 |
| (Loss) income before income taxes | (8,960) | 1,433 | 1,728 |
| Other (income) expense, net | (347) | (72) | 34 |
| Loss from equity investees, net | 160 | 18 | 105 |
| Interest expense, net | 1,777 | 633 | 648 |
| Operating (loss) income | (7,370) | 2,012 | 2,515 |
| Impairment and loss (gain) on disposition and disposal groups | 117 | (71) | 126 |
| Restructuring | 3,757 | 32 | 91 |
| Depreciation and amortization | 7,193 | 1,582 | 1,359 |
| Employee share-based compensation | 410 | 167 | 99 |
| Transaction and integration costs | 1,195 | 95 | 6 |
| Amortization of fair value step-up for content | 2,416 | — | — |
| Adjusted EBITDA | $ 7,718 | $ 3,817 | $ 4,196 |

**Content Amortization and Impairment Expense**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Studios | $ 5,950 | $ — | $ — |
| Networks | 6,171 | 2,991 | 2,694 |
| DTC | 6,800 | 510 | 262 |
| Corporate | (1) | — | — |
| Inter-segment eliminations | (1,951) | — | — |
| Total content amortization and impairment expense | $ 16,969 | $ 3,501 | $ 2,956 |

Content expense is generally a component of costs of revenue on the consolidated statements of operations (see Note 9.)

**Revenues by Geography**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| U.S. | $ 22,697 | $ 7,728 | $ 7,025 |
| Non-U.S. | 11,120 | 4,463 | 3,646 |
| Total revenues | $ 33,817 | $ 12,191 | $ 10,671 |

Revenues are attributed to each country based on the customer or viewer location.

**Property and Equipment by Geography**

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| U.S. | $ 3,785 | $ 834 |
| U.K. | 1,002 | 164 |
| Other non-U.S. | 514 | 338 |
| Total property and equipment, net | $ 5,301 | $ 1,336 |

**ITEM 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

None.

**ITEM 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2022. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to provide reasonable assurance that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of December 31, 2022, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

**Management's Annual Report on Internal Control Over Financial Reporting**

Management's report on internal control over financial reporting is set forth in Item 8 of this Annual Report on Form 10-K under the caption "Management's Report on Internal Control Over Financial Reporting," which is incorporated herein by reference.

**Report of the Independent Registered Public Accounting Firm**

The report of our independent registered public accounting firm regarding internal control over financial reporting is set forth in Item 8 of this Annual Report on Form 10-K under the caption "Report of Independent Registered Public Accounting Firm," which is incorporated herein by reference.

**Changes in Internal Control Over Financial Reporting**

During the three months ended December 31, 2022, there were no changes in our internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f), that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B. Other Information.**

None.

**ITEM 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.

# PART III

Certain information required in Item 10 through Item 14 of Part III of this Annual Report on Form 10-K is incorporated herein by reference to our definitive Proxy Statement for our 2023 Annual Meeting of Stockholders ("2023 Proxy Statement"), which shall be filed with the SEC pursuant to Regulation 14A of the Exchange Act within 120 days of our fiscal year end.

## ITEM 10. Directors, Executive Officers and Corporate Governance.

Information regarding our directors, compliance with Section 16(a) of the Exchange Act, and our Audit Committee, including committee members and its financial expert, will be set forth in our 2023 Proxy Statement under the captions "Proposal 1: Election of Directors," "Delinquent Section 16 Reports," if applicable, and "Corporate Governance – Board Meetings and Committees – Audit Committee," respectively, which are incorporated herein by reference.

Information regarding our executive officers is set forth in Part I of this Annual Report on Form 10-K under the caption "Executive Officers of Warner Bros. Discovery, Inc." as permitted by General Instruction G(3) to Form 10-K.

We have adopted a Code of Ethics (the "Code") that is applicable to all of our directors, officers and employees. Our board of directors approved an updated Code in January 2023 and reviews it regularly. A copy of the Code and any amendments or waivers that would be required to be disclosed under applicable SEC rules are available free of charge at our Investor Relations website at ir.wbd.com. The information contained on our website is not part of this Annual Report on Form 10-K and is not incorporated by reference herein. In addition, we will provide a printed copy of the Code, free of charge, upon written request to: Investor Relations, Warner Bros. Discovery, Inc., 230 Park Avenue South, New York, NY 10003.

## ITEM 11. Executive Compensation.

Information regarding executive compensation will be set forth in our 2023 Proxy Statement under the captions "Executive Compensation – Compensation Discussion and Analysis" and "Executive Compensation – Executive Compensation Tables," which are incorporated herein by reference.

Information regarding compensation policies and practices as they relate to our risk management, director compensation, and compensation committee interlocks and insider participation will be set forth in our 2023 Proxy Statement under the captions "Executive Compensation – Compensation Discussion and Analysis – Other Compensation-Related Matters – Risk Considerations in our Compensation Programs," "Corporate Governance – Director Compensation," and "Corporate Governance – Board Meetings and Committees – Compensation Committee," respectively, which are incorporated herein by reference.

Information regarding the compensation committee report will be set forth in our 2023 Proxy Statement under the caption "Executive Compensation – Compensation Committee Report" which is incorporated herein by reference.

## ITEM 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

Information regarding securities authorized for issuance under equity compensation plans will be set forth in our 2023 Proxy Statement under the caption "Securities Authorized for Issuance under Equity Compensation Plans," which is incorporated herein by reference.

Information regarding security ownership of certain beneficial owners and management will be set forth in our 2023 Proxy Statement under the captions "Security Ownership of Certain Beneficial Owners and Management – Principal Stockholders" and "Security Ownership of Certain Beneficial Owners and Management – Directors and Executive Officers," which are incorporated herein by reference.

## ITEM 13. Certain Relationships and Related Transactions, and Director Independence.

Information regarding certain relationships and related transactions, and director independence will be set forth in our 2023 Proxy Statement under the captions "Corporate Governance – Transactions with Related Persons" and "Corporate Governance – Director Independence," respectively, which are incorporated herein by reference.

## ITEM 14. Principal Accountant Fees and Services.

Information regarding principal accountant fees and services will be set forth in our 2023 Proxy Statement under the captions "Audit Matters – Audit Firm Fees and Services" and "Audit Matters – Audit Committee Pre-Approval Procedures," which are incorporated herein by reference.

## PART IV

**ITEM 15. Exhibits and Financial Statement Schedules.**

(a) The following documents are filed as part of this Annual Report on Form 10-K:

(1) The following consolidated financial statements of Warner Bros. Discovery, Inc. are filed as part of Item 8 of this Annual Report on Form 10-K:


| | Page |
|---|---|
| Consolidated Statements of Operations. | 62 |
| Consolidated Statements of Comprehensive (Loss) Income. | 63 |
| Consolidated Balance Sheets. | 64 |
| Consolidated Statements of Cash Flows. | 65 |
| Consolidated Statements of Equity. | 66 |
| Notes to Consolidated Financial Statements | 68 |


(2) Financial Statement Schedule

Schedule II: Valuation and Qualifying Accounts

Changes in valuation and qualifying accounts consisted of the following (in millions):

| | Beginning of Year | Additions | Other [(a)] | Deductions | End of Year |
|---|---|---|---|---|---|
| **2022** | | | | | |
| Allowance for credit losses[(b)] | $ 54 | 165 | — | (96) | $ 123 |
| Deferred tax valuation allowance[(c)] | $ 305 | 1,617 | — | (73) | $ 1,849 |
| **2021** | | | | | |
| Allowance for credit losses | $ 59 | 21 | — | (26) | $ 54 |
| Deferred tax valuation allowance | $ 257 | 80 | — | (32) | $ 305 |
| **2020** | | | | | |
| Allowance for credit losses | $ 54 | 30 | (2) | (23) | $ 59 |
| Deferred tax valuation allowance | $ 307 | 51 | — | (101) | $ 257 |

(a) Amount relates to the impact of the adjustment recorded for adoption of ASU 2016-13.
(b) Increase in the allowance for credit losses is related to the acquisition of WM in the current year.
(c) Additions to the deferred tax valuation allowance include $343 million related to the acquisition of WM in the current year.

All other financial statement schedules required to be filed pursuant to Item 8 and Item 15(c) of Form 10-K have been omitted as the required information is not applicable, not material, or is set forth in the consolidated financial statements or notes thereto.

(3) The following exhibits are filed or furnished as part of this Annual Report on Form 10-K pursuant to Item 601 of SEC Regulation S-K and Item 15(b) of Form 10-K:

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated May 17, 2021, by and among Discovery, Inc., AT&T Inc., Magallanes, Inc. and Drake Subsidiary, Inc. (incorporated by reference to Exhibit 2.1 to the Form 8-K filed on May 20, 2021 (SEC File No. 001-34177)) |
| 2.2 | Letter agreement, dated as of July 1, 2021, by and between AT&T Inc. and Discovery, Inc. (incorporated by reference to Exhibit 2.1 to the Form 10-Q filed on November 3, 2021 (SEC File No. 001-34177)) |
| 2.3 | Letter agreement, dated as of July 7, 2021, by and between AT&T, Inc. and Discovery, Inc. (incorporated by reference to Exhibit 2.2 to the Form 10-Q filed on November 3, 2021 (SEC File No. 001-34177)) |
| 2.4 | Amendment No. 1 to Agreement and Plan of Merger, dated as of November 18, 2021, by and among Discovery, Inc., AT&T Inc., Magallanes, Inc. and Drake Subsidiary, Inc. (incorporated by reference to Exhibit 2.1.3 to the Registration Statement on Form S-4 filed on November 18, 2021 (SEC File No. 333-261188)) |
| 2.5 | Letter Agreement, dated as of March 29, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc., WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) and Drake Subsidiary, Inc. (incorporated by reference to Exhibit 2.2 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 2.6 | Amendment No. 2 to Agreement and Plan of Merger, dated as of April 8, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc., WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) and Drake Subsidiary, Inc. (incorporated by reference to Exhibit 2.1 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 2.7 | Letter Agreement, dated as of April 8, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc., WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) and Drake Subsidiary, Inc. (incorporated by reference to Exhibit 2.3 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 2.8 | Separation and Distribution Agreement, dated as of May 17, 2021, by and among Discovery, Inc., AT&T Inc. and Magallanes, Inc. (incorporated by reference to Exhibit 2.2 to the Form 8-K filed on May 20, 2021 (SEC File No. 001-34177)) |
| 2.9 | Amendment to Separation and Distribution Agreement, dated as of April 8, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc. and WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) (incorporated by reference to Exhibit 2.4 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 3.1 | Second Restated Certificate of Incorporation of Warner Bros. Discovery, Inc. (incorporated by reference to Exhibit 3.1 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 3.2 | Amended and Restated Bylaws of Warner Bros. Discovery, Inc. (incorporated by reference to Exhibit 3.2 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 4.1 | Description of Warner Bros. Discovery, Inc.'s securities registered pursuant to Section 12 of the Securities Exchange Act of 1934 (filed herewith) |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 4.2 | Form of Series A Common Stock Certificate of Warner Bros. Discovery, Inc. (incorporated by reference to Exhibit 4.1 to Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed on March 28, 2022 (SEC File No. 333-261188)) |
| 4.3 | Amended and Restated Registration Rights Agreement, dated as of April 11, 2022, by and among Warner Bros. Discovery, Inc., Advance/Newhouse Partnership and Advance/Newhouse Programming Partnership (incorporated by reference to Exhibit 4.6 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 4.4 | Registration Rights Agreement, dated as of March 15, 2022, by and among WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.), J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC (incorporated by reference to Exhibit 4.5 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 4.5 | Counterpart to Registration Rights Agreement, dated as of April 8, 2022, by and between Warner Bros. Discovery, Inc., Discovery Communications, LLC and Scripps Networks Interactive, Inc. (incorporated by reference to Exhibit 4.6 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 4.6 | Indenture, dated as of August 19, 2009, among Discovery Communications, LLC, Discovery Communications, Inc. and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on August 19, 2009 (SEC File No. 001-34177))**** |
| 4.7 | Second Supplemental Indenture dated as of June 3, 2010, among Discovery Communications LLC, Discovery Communications, Inc. and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on June 3, 2010 (SEC File No. 001-34177)) |
| 4.8 | Fifth Supplemental Indenture, dated as of March 19, 2013, among Discovery Communications, LLC, Discovery Communications, Inc. and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on March 19, 2013 (SEC File No. 001-34177)) |
| 4.9 | Sixth Supplemental Indenture, dated as of March 7, 2014, among Discovery Communications, LLC, Discovery Communications, Inc., U.S. Bank National Association, as trustee and Evalon Financial Services Limited, UK Branch, as London Paying Agent (incorporated by reference to Exhibit 4.1 to the Form 8-K/A filed on March 7, 2014 (SEC File No. 001-34177)) |
| 4.10 | Seventh Supplemental Indenture, dated as of March 2, 2015, among Discovery Communications, LLC, Discovery Communications, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on March 2, 2015 (SEC File No. 001-34177)) |
| 4.11 | Eighth Supplemental Indenture, dated as of March 19, 2015, among Discovery Communications, LLC, Discovery Communications, Inc., U.S. Bank National Association, as Trustee, and Elavon Financial Services Limited, UK Branch, as London Paying Agent (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on March 19, 2015 (SEC File No. 001-34177)) |
| 4.12 | Ninth Supplemental Indenture, dated as of March 11, 2016, among Discovery Communications, LLC, Discovery Communications, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on March 11, 2016 (SEC File No. 001-34177)) |
| 4.13 | Tenth Supplemental Indenture, dated as of March 13, 2017, among Discovery Communications, LLC, Discovery Communications, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on March 13, 2017 (SEC File No. 001-34177)) |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 4.14 | Eleventh Supplemental Indenture, dated as of September 21, 2017, among Discovery Communications, LLC, Discovery Communications, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on September 21, 2017 (SEC File No. 001-34177)) |
| 4.15 | Thirteenth Supplemental Indenture, dated as of September 21, 2017, among Discovery Communications, LLC, Discovery Communications, Inc., Elavon Financial Service DAC, UK Branch, as London Paying Agent, and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.3 to the Form 8-K filed on September 21, 2017 (SEC File No. 001-34177)) |
| 4.16 | Fourteenth Supplemental Indenture, dated as of April 2, 2018, among Discovery Communications, LLC, Discovery, Inc., Scripps Networks Interactive, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.3 to the Form 8-K filed on April 4, 2018 (SEC File No. 001-34177)) |
| 4.17 | Sixteenth Supplemental Indenture, dated as of June 29, 2018, among Discovery Communications, LLC, Discovery, Inc., Scripps Networks Interactive, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 10-Q filed November 9, 2018 (SEC File No. 001-34177)) |
| 4.18 | Seventeenth Supplemental Indenture, dated as of May 21, 2019, among Discovery Communications, LLC, Discovery, Inc., Scripps Networks Interactive, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on May 21, 2019 (SEC File No. 001-34177)) |
| 4.19 | Eighteenth Supplemental Indenture, dated as of May 18, 2020, among Discovery Communications, LLC, Discovery, Inc., Scripps Networks Interactive, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on May 18, 2020 (SEC File No. 001-34177)) |
| 4.20 | Nineteenth Supplemental Indenture, dated as of September 21, 2020, among Discovery Communications, LLC, Discovery, Inc., Scripps Networks Interactive, Inc. and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on September 21, 2020 (SEC File No. 001-34177)) |
| 4.21 | Twentieth Supplemental Indenture, dated as of April 8, 2022, by and among Discovery Communications, LLC, Warner Bros. Discovery, Inc., Magallanes, Inc. and U.S. Bank Trust Company, National Association, as trustee (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 4.22 | Twenty-First Supplemental Indenture, dated as of April 8, 2022, by and among Discovery Communications, LLC, Warner Bros. Discovery, Inc., Magallanes, Inc. and U.S. Bank Trust Company, National Association, as trustee (incorporated by reference to Exhibit 4.2 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 4.23 | Indenture, dated as of March 15, 2022, by and among Magallanes, Inc., AT&T Inc. and U.S. Bank Trust Company, National Association, as Trustee (incorporated by reference to Exhibit 4.3 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 4.24 | First Supplemental Indenture, dated as of April 8, 2022, by and among Magallanes, Inc., Warner Bros. Discovery, Inc., Discovery Communications, LLC, Scripps Networks Interactive, Inc., and U.S. Bank Trust Company, National Association, as Trustee (incorporated by reference to Exhibit 4.4 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 10.1 | Transition Services Agreement, dated as of April 8, 2022, by and between AT&T Services, Inc. and WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) (incorporated by reference to Exhibit 10.1 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) ** |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 10.2 | Intellectual Property Matters Agreement, dated as of April 8, 2022, by and among AT&T Inc., AT&T Intellectual Property LLC and WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) (incorporated by reference to Exhibit 10.2 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) ** *** |
| 10.3 | Credit Agreement, dated as of June 9, 2021, among Discovery Communications, LLC, certain wholly-owned subsidiaries of Discovery Communications, LLC, Discovery, Inc., as Facility Guarantor, Scripps Networks Interactive, Inc., as subsidiary guarantor, the lenders from time to time party thereto and Bank of America, N.A., as administrative agent, swing line lender and L/C issuer. (incorporated by reference to Exhibit 4.1 to the Form 8-K filed on June 10, 2021 (SEC File No. 001-34177)) |
| 10.4 | Amendment No. 1 to Credit Agreement, dated as of July 30, 2021, among Discovery Communications, LLC, Discovery, Inc., Scripps Networks Interactive, Inc., certain lenders party thereto and Bank of America, N.A. (incorporated by reference to Exhibit 10.9 to the Form 10-Q filed on August 3, 2021 (SEC File No. 001-34177)) |
| 10.5 | Amendment No. 2 to Credit Agreement, dated as of August 2, 2022, by and among Discovery Communications, LLC, Warner Bros. Discovery, Inc., Scripps Networks Interactive, Inc., WarnerMedia Holdings, Inc., certain lenders party thereto and Bank of America, N.A., as administrative agent (incorporated by reference to Exhibit 10.6 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 10.6 | Joinder Agreement, dated as of April 8, 2022, by and between WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) and Bank of America, N.A., as administrative agent (incorporated by reference to Exhibit 10.5 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 10.7 | Credit Agreement, dated as of June 4, 2021, by and among WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc., the lenders named therein and JPMorgan Chase Bank, N.A., as agent (incorporated by reference to Exhibit 10.3 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177)) |
| 10.8 | Joinder Agreement, dated as of April 8, 2022, by and between Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), Discovery Communications, LLC, Scripps Networks Interactive, Inc. and JPMorgan Chase Bank, N.A., as agent (incorporated by reference to Exhibit 10.4 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 10.9 | Amendment No. 1 to Credit Agreement, dated as of August 2, 2022, by and among WarnerMedia Holdings, Inc., Warner Bros. Discovery, Inc., Discovery Communications, LLC, Scripps Networks Interactive, Inc., certain lenders party thereto and JPMorgan Chase Bank, N.A., as agent (incorporated by reference to Exhibit 10.7 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.10 | Purchase and Sale Agreement, dated as of March 27, 2019, by and among Warner Bros. Discovery Receivables Funding, LLC (f/k/a AT&T Receivables Funding II, LLC), Turner Broadcasting System, Inc. and various entities party thereto as originators (incorporated by reference to Exhibit 10.8 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.11 | First Amendment and Joinder to Purchase and Sale Agreement, dated as of June 26, 2019, by and among Warner Bros. Discovery Receivables Funding, LLC (f/k/a AT&T Receivables Funding II, LLC), Turner Broadcasting System, Inc. and various entities party thereto as originators (incorporated by reference to Exhibit 10.9 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.12 | Second Amendment to Purchase and Sale Agreement, dated as of June 12, 2020, by and among Warner Bros. Discovery Receivables Funding, LLC (f/k/a AT&T Receivables Funding II, LLC), Turner Broadcasting System, Inc. and various entities party thereto as originators (incorporated by reference to Exhibit 10.10 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 10.13 | Joinder Agreement, dated as of June 30, 2020, by WarnerMedia Direct, LLC (incorporated by reference to Exhibit 10.11 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.14 | Joinder Agreement, dated as of July 5, 2022, by the various entities party thereto (incorporated by reference to Exhibit 10.12 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.15 | Third Amendment to Purchase and Sale Agreement, dated as of June 10, 2021, by and among Warner Bros. Discovery Receivables Funding, LLC (f/k/a AT&T Receivables Funding II, LLC), Turner Broadcasting System, Inc. and various entities party thereto as originators (incorporated by reference to Exhibit 10.13 to the Form 10-Q filed on August 5, 2022(SEC File No. 001-34177)) ** |
| 10.16 | Fourth Amended and Restated Receivables Purchase Agreement, dated as of August 30, 2022, by and among Warner Bros. Discovery Receivables Funding, LLC, the persons from time to time party thereto, PNC Bank, National Association, Turner Broadcasting System, Inc. and PNC Capital Markets LLC (incorporated by reference to Exhibit 10.5 to the Form 10-Q filed on November 4, 2022 (SEC File No. 001-34177)) ** |
| 10.17 | Performance Guaranty, dated as of April 7, 2022, by Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.) (incorporated by reference to Exhibit 10.6 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177) ** |
| 10.18 | Discovery, Inc. International Relocation Benefits, Long-Term Assignment Guidelines, effective January 1, 2022 (incorporated by reference to Exhibit 10.5 to the Form 10-K filed on February 24, 2022 (SEC File No. 34177))* |
| 10.19 | Discovery, Inc. Executive Benefit Summary (incorporated by reference to Exhibit 10.4 to the Form 10-K filed on February 22, 2021 (SEC File No. 001-34177))* |
| 10.20 | Warner Bros. Discovery, Inc. Incentive Compensation Program (filed herewith)* |
| 10.21 | Warner Bros. Discovery Supplemental Retirement Plan amended and restated effective January 1, 2023 (filed herewith)* |
| 10.22 | Warner Bros. Discovery, Inc. Stock Incentive Plan (incorporated by reference to Exhibit 10.7 to the Form 8-K filed on April 12, 2022 (SEC File No. 001-34177))* |
| 10.23 | Form of Warner Bros. Discovery, Inc. Restricted Stock Unit Grant Agreement for Employees (incorporated by reference to Exhibit 10.18 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177))* |
| 10.24 | Form of Warner Bros. Discovery, Inc. Performance Equity Program Nonqualified Stock Option Grant Agreement for Employees (incorporated by reference to Exhibit 10.19 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177))* |
| 10.25 | Form of Warner Bros. Discovery, Inc. Performance Restricted Stock Unit Agreement for Employees (filed herewith)* |
| 10.26 | Form of Warner Bros. Discovery, Inc. Enhanced Restricted Stock Unit Grant Agreement for Employees (filed herewith)* |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 10.27 | Warner Bros. Discovery, Inc. 2013 Incentive Plan (as amended and restated effective May 10, 2018) (as further amended April 22, 2022) (incorporated by reference to Exhibit 10.2 to the Registration Statement on Form S-8 filed on April 22, 2022 (SEC File No. 333-264461))* |
| 10.28 | Form of Discovery, Inc. Non-Qualified Stock Option Grant Agreement for Employees (incorporated by reference to Exhibit 10.31 to the Form 10-K filed on February 27, 2020 (SEC File No. 001-34177))* |
| 10.29 | Form of Letter from Discovery, Inc. dated December 15, 2021 amending certain Nonqualified Stock Option Grant Agreement for Employees (incorporated by reference to Exhibit 10.30 to the Form 10-K filed on February 24, 2022 (SEC File No. 001-34177))* |
| 10.30 | Form of Nonqualified Stock Option Grant Agreement for Employees updated as of January 1, 2022 (incorporated by reference to Exhibit 10.31 to the Form 10-K filed on February 24, 2022 (SEC File No. 001-34177))* |
| 10.31 | Form of Discovery, Inc. Restricted Stock Unit Grant Agreement for Employees (incorporated by reference to Exhibit 10.32 to the Form 10-K filed on February 27, 2020 (SEC File No. 001-34177))* |
| 10.32 | Form of Letter from Discovery, Inc. dated December 15, 2021 amending certain Restricted Stock Unit Grant Agreements (incorporated by reference to Exhibit 10.33 to the Form 10-K filed on February 24, 2022 (SEC File No. 001-34177))* |
| 10.33 | Form of Discovery, Inc. Restricted Stock Unit Grant Agreement for Employees updated as of January 1, 2022 (incorporated by reference to Exhibit 10.34 to the Form 10-K filed on February 24, 2022 (SEC File No. 001-34177))* |
| 10.34 | Form of Discovery, Inc. Enhanced Restricted Stock Unit Grant Agreement for Employees (incorporated by reference to Exhibit 10.36 to the Form 10-K filed on February 24, 2022 (SEC File No. 001-34177))* |
| 10.35 | Form of Restricted Stock Unit Award (Substitute WarnerMedia Award) for Employees of Warner Bros. Discovery, Inc. Outside of the United States (filed herewith)* |
| 10.36 | Summary of Non-Employee Director Compensation (filed herewith)* |
| 10.37 | Warner Bros. Discovery, Inc. 2005 Non-Employee Director Incentive Plan (as amended and restated effective May 20, 2015) (as further amended April 22, 2022 and December 14, 2022) (filed herewith)* |
| 10.38 | Warner Bros. Discovery, Inc. RSU Grant Agreement for Non-Employee Directors (filed herewith)* |
| 10.39 | Warner Bros. Discovery, Inc. Non-Employee Directors Deferral Plan (incorporated by reference to Exhibit 10.1 to the Form S-8 filed on December 16, 2022 (SEC File No. 001-34177))* |
| 10.40 | Warner Bros. Discovery, Inc. 2011 Employee Stock Purchase Plan (as amended April 22, 2022) (incorporated by reference to Exhibit 10.4 to the Registration Statement on Form S-8 filed on April 22, 2022 (SEC File No. 333-264461))* |
| 10.41 | Amended and Restated Employment Agreement, dated July 16, 2018, between David Zaslav and Discovery, Inc. (incorporated by reference to Exhibit 10.2 to the Form 8-K filed on July 18, 2018 (SEC File No. 001-34177))* |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 10.42 | Amended and Restated Employment Agreement, dated as of May 16, 2021, by and between David Zaslav and Discovery, Inc. (incorporated by reference to Exhibit 10.4 to the Form 8-K filed on May 20, 2021 (SEC File No. 001-34177))* |
| 10.43 | Form of David Zaslav Stock Option Agreement (incorporated by reference to Exhibit 10.1 to the Form 8-K filed on July 18, 2018 (SEC File No. 001-34177))* |
| 10.44 | Letter amendment dated December 20, 2021, by and between David Zaslav and Discovery, Inc., amending the Amended and Restated Employment Agreement dated as of May 16, 2021 (incorporated by reference to Exhibit 10.1 to the Form 8-K filed on December 27, 2021 (SEC File No. 001-34177))* |
| 10.45 | Form of David Zaslav Stock Option Grant Agreement (incorporated by reference to Exhibit 10.5 to the Form 8-K filed on May 20, 2021 (SEC File No. 001-34177))* |
| 10.46 | Discovery, Inc. Performance Restricted Stock Unit Grant Agreement for David Zaslav dated March 1, 2021 (filed herewith)* |
| 10.47 | Discovery, Inc. Performance Restricted Stock Unit Grant Agreement for David Zaslav dated March 1, 2022 (incorporated by reference to Exhibit 10.3 to the Form 10-Q filed on April 26, 2022 (SEC File No. 001-34177))* |
| 10.48 | Aircraft Time Sharing Agreement, dated as of January 4, 2014, by and between David Zaslav and Discovery Communications, LLC (filed herewith)* |
| 10.49 | Amendment to the Aircraft Time Sharing Agreement, dated as of August 1, 2018, by and between David Zaslav and Discovery Communications, LLC (filed herewith)* |
| 10.50 | Aircraft Time Sharing Agreement, dated as of August 1, 2022, by and between David Zaslav and Warner Media, LLC (incorporated by reference to Exhibit 10.8 to the Form 10-Q filed on November 4, 2022 (SEC File No. 001-34177))* |
| 10.51 | Employment Agreement, dated as of July 9, 2022, by and between Bruce Campbell and Discovery Communications, LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on July 14, 2022 (SEC File No. 001-34177))* ** |
| 10.52 | Employment Agreement, dated as of July 11, 2022, by and between Gunnar Wiedenfels and Discovery Communications, LLC (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on July 14, 2022 (SEC File No. 001-34177))* ** |
| 10.53 | Employment Agreement, dated as of July 13, 2022, by and between Gerhard Zeiler and Turner International, Inc. (filed herewith)* |
| 10.54 | Letter amendment to Employment Agreement, dated as of August 23, 2022, by and between Gerhard Zeiler and Turner International, Inc. (filed herewith)* |
| 10.55 | Employment Agreement, dated as of August 2, 2022, by and between JB Perrette and Discovery Communications, LLC (incorporated by reference to Exhibit 10.9 to the Form 10-Q filed on November 4, 2022 (SEC File No. 001-34177))* |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 10.56 | Employment Agreement, dated as of August 26, 2022, by and between David Leavy and Discovery Communications, LLC (incorporated by reference to Exhibit 10.10 to the Form 10-Q filed on November 4, 2022 (SEC File No. 001-34177))* |
| 10.57 | Employee Matters Agreement, dated as of May 17, 2021, by and among Discovery, Inc., AT&T Inc. and Magallanes, Inc. (incorporated by reference to Exhibit 10.3 to the Form 8-K filed on May 20, 2021 (SEC File No. 001-34177)) |
| 10.58 | First Addendum to Employee Matters Agreement, dated as of April 8, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc. and WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) (incorporated by reference to Exhibit 10.23 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.59 | Second Addendum to Employee Matters Agreement, dated as of April 8, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc. and WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) (incorporated by reference to Exhibit 10.24 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) ** |
| 10.60 | Tax Matters Agreement, dated as of May 17, 2021, between AT&T Inc., Magallanes, Inc. and Discovery, Inc. (incorporated by reference to Exhibit 10.7 to the Form 8-K filed on May 20, 2021 (SEC File No. 001-34177)) |
| 10.61 | Letter Agreement, dated as of April 8, 2022, by and among Warner Bros. Discovery, Inc. (f/k/a Discovery, Inc.), AT&T Inc. and WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) (filed herewith) ** |
| 21 | List of Subsidiaries of Warner Bros. Discovery, Inc. (filed herewith) |
| 22 | Table of Senior Notes, Issuer and Guarantors (incorporated by reference to Exhibit 22 to the Form 10-Q filed on August 5, 2022 (SEC File No. 001-34177)) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act of 1934, as Amended, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act of 1934, as Amended, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.1 | Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (furnished herewith) |
| 32.2 | Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (furnished herewith) |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document (filed herewith)† |

**EXHIBITS INDEX**

| Exhibit No. | Description |
|---|---|
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document (filed herewith)† |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document (filed herewith)† |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document (filed herewith)† |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document (filed herewith)† |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) |

* Indicates management contract or compensatory plan, contract or arrangement.

**Exhibits, schedules and annexes have been omitted pursuant to Item 601(a)(5) of Regulation S-K and will be supplementally provided to the SEC upon request.

***Certain provisions of this exhibit have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K and will be supplementally provided to the SEC upon request.

****Other instruments defining the rights of holders of long-term debt of the registrant and its consolidated subsidiaries may be omitted from Exhibit 4 in accordance with Item 601(b)(4)(iii)(A) of Regulation S-K. Copies of any such agreements will be supplementally provided to the SEC upon request.

†Attached as Exhibit 101 to this Annual Report on Form 10-K are the following formatted in Inline XBRL (Extensible Business Reporting Language): (i) Consolidated Balance Sheets as of December 31, 2022 and December 31, 2021, (ii) Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021, and 2020, (iii) Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2022, 2021, and 2020, (iv) Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021, and 2020, (v) Consolidated Statements of Equity for the Years Ended December 31, 2022, 2021, and 2020, and (vi) Notes to Consolidated Financial Statements.

**ITEM 16. Form 10-K Summary**

Not Applicable.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**WARNER BROS. DISCOVERY, INC.**
(Registrant)

| | | |
|---|---|---|
| Date: February 24, 2023 | By: | /s/ David M. Zaslav |
| | | David M. Zaslav |
| | | President and Chief Executive Officer |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ David M. Zaslav<br>David M. Zaslav | President and Chief Executive Officer, and Director<br>(Principal Executive Officer) | February 24, 2023 |
| /s/ Gunnar Wiedenfels<br>Gunnar Wiedenfels | Chief Financial Officer<br>(Principal Financial Officer) | February 24, 2023 |
| /s/ Lori C. Locke<br>Lori C. Locke | Executive Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) | February 24, 2023 |
| /s/ Robert R. Bennett<br>Robert R. Bennett | Director | February 24, 2023 |
| /s/ Li Haslett Chen<br>Li Haslett Chen | Director | February 24, 2023 |
| /s/ Samuel A. Di Piazza, Jr.<br>Samuel A. Di Piazza, Jr. | Director | February 24, 2023 |
| /s/ Richard W. Fisher<br>Richard W. Fisher | Director | February 24, 2023 |
| /s/ Paul A. Gould<br>Paul A. Gould | Director | February 24, 2023 |
| /s/ Debra L. Lee<br>Debra L. Lee | Director | February 24, 2023 |
| /s/ Dr. John C. Malone<br>Dr. John C. Malone | Director | February 24, 2023 |
| /s/ Fazal Merchant<br>Fazal Merchant | Director | February 24, 2023 |
| /s/ Steven A. Miron<br>Steven A. Miron | Director | February 24, 2023 |
| /s/ Steven O. Newhouse<br>Steven O. Newhouse | Director | February 24, 2023 |
| /s/ Paula A. Price<br>Paula A. Price | Director | February 24, 2023 |
| /s/ Geoffrey Y. Yang<br>Geoffrey Y. Yang | Director | February 24, 2023 |

DESCRIPTION OF WARNER BROS. DISCOVERY'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934

As of the end of the period covered by this report, the securities of Warner Bros. Discovery, Inc. ("WBD") that are registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") are Series A common stock, par value $0.01 per share ("WBD common stock").

The following description of the material terms of WBD common stock is a summary, does not purport to be complete and is qualified in its entirety by reference to WBD's second restated certificate of incorporation (the "WBD charter") and WBD's amended and restated bylaws (the "WBD bylaws") (which are incorporated by reference as exhibits to the Annual Report on Form 10-K of which this Exhibit is a part), and to the applicable provisions of the Delaware General Corporation Law ("DGCL").

*General*

WBD's authorized capital stock consists of 10,800,000,000 shares of a single class of WBD common stock and 1,200,000,000 shares of blank check preferred stock ("WBD preferred stock"). All issued and outstanding shares of WBD common stock are duly authorized, validly issued, fully paid and nonassessable. WBD currently has no issued and outstanding shares of preferred stock.

*Voting Rights*

The holders of WBD common stock are entitled to one vote for each share held on all matters voted on by stockholders, including elections of directors. Generally, subject to the rights of the holders of any series of preferred stock and except as otherwise provided by law, WBD's charter or WBD's bylaws, and except for the election of directors, all matters to be voted on by the stockholders of WBD must be approved by a majority of the combined voting power of the outstanding shares present in person or represented by proxy and entitled to vote on such matters.

Subject to the rights of the holders of any series of WBD preferred stock to elect a specified number of directors in certain circumstances, directors are elected by a plurality of the combined voting power of the outstanding shares of WBD common stock present in person or represented by proxy and entitled to vote on the election of directors as provided in the WBD charter. Additionally, subject to the rights of the holders of any series of preferred stock, WBD's bylaws may be adopted, amended or repealed by the affirmative vote of not less than two-thirds (66 2/3%) of the total voting power of the then outstanding shares of capital stock of WBD entitled to vote on such matters; provided, however, this voting requirement does not apply to the adoption, amendment or repeal of any provision of WBD's bylaws if a majority of the members of WBD's board of directors (the "WBD Board") then in office have approved such action.

*Classification of the Board*

Until the election of directors at WBD's annual meeting of stockholders in 2025, the WBD Board will be divided into three classes of directors with Class I consisting of four directors, Class II consisting of four directors and Class III consisting of five directors. Class I directors will have terms that expire at WBD's annual meeting of stockholders in 2023, Class II directors will have terms that expire at WBD's annual meeting of stockholders in 2024 and Class III directors will have terms that expire at WBD's annual meeting of stockholders in 2025. At WBD's annual meeting of stockholders in 2023, successors to the Class I directors whose terms expire at such meeting of stockholders will be elected for a term expiring

at WBD's annual meeting of stockholders in 2024. At WBD's annual meeting of stockholders in 2024, successors to the Class I directors whose terms expire at such meeting of stockholders and successors to the Class II directors whose terms expire at such meeting of stockholders will be elected for a term expiring at WBD's annual meeting of stockholders in 2025.

Starting with the election of directors at WBD's annual meeting of stockholders in 2025, the WBD Board will cease to be classified and all directors will have terms that expire at WBD's next annual meeting. At each subsequent annual meeting of stockholders, the successors of directors whose terms expire at that meeting will be elected to hold office for a term of one year expiring at the annual meeting of stockholders following the year of their election.

Neither WBD's charter nor WBD's bylaws provide for cumulative voting rights in the election of directors. The classification of the Board could make it more difficult for a third party to acquire, or discourage a third party from initiating a proxy contest, making a tender offer or otherwise seeking to gain control of WBD.

*Dividends*

Subject to the preferences and rights, if any, applicable to shares of WBD preferred stock, the holders of WBD common stock are entitled to receive such dividends as may be declared thereon by the WBD Board at any time and from time to time out of assets or funds of WBD legally available therefor and will share equally on a per share basis in such dividends.

*Distributions*

Subject to the preferences and rights, if any, applicable to shares of WBD preferred stock, the holders of WBD common stock are entitled to receive such distributions in cash, property, stock or otherwise as may be declared thereon by the WBD Board at any time and from time to time out of assets or funds of WBD legally available therefor and will share equally on a per share basis in such distributions.

*Conversion*

The WBD common stock is not convertible.

*Liquidation and Dissolution*

In the event of WBD's voluntary or involuntary liquidation, dissolution or winding-up, after payment or provision for payment of WBD's debts and other liabilities, and subject to the preferences and rights, if any, applicable to shares of WBD preferred stock, the holders of WBD common stock are entitled to receive all of the remaining assets of WBD available for distribution to WBD stockholders, ratably in proportion to the number of shares of WBD common stock held by them.

*Other Rights*

Shares of WBD common stock do not have any redemption provisions, preemption rights, liability for further calls or assessment by the Company, sinking fund provisions, restrictions on alienability or any provision discriminating against any existing or prospective holder of WBD common stock as a result of such holder owning a substantial amount of such stock.

*Certain Anti-Takeover Effects of WBD's Charter, WBD's Bylaws and Delaware Law*

Certain provisions of the WBD charter and the WBD bylaws, in addition to those relating to the voting rights of WBD common stock and the classification of the WBD Board, may discourage, delay or prevent a change in control of WBD, including:

- authorizing the issuance of "blank check" preferred stock without stockholder approval, which could be issued by the WBD Board to increase the number of outstanding shares and thwart a takeover attempt;
- limiting who may call special meetings of stockholders;
- prohibiting stockholder action by written consent, thereby requiring stockholder action to be taken at a meeting of stockholders;
- establishing advance notice requirements for nominations of candidates for election to the WBD Board or for proposing matters that can be acted upon by stockholders at stockholder meetings; and
- the existence of authorized and unissued stock which would allow the WBD Board to issue shares to persons friendly to current management, thereby protecting the continuity of WBD's management, or which could be used to dilute the stock ownership of persons seeking to obtain control of WBD.

In addition, under the WBD charter, WBD has not opted out of the protections of Section 203 of the DGCL, and is therefore governed by Section 203. In general, Section 203 of the DGCL prohibits a publicly held Delaware corporation from engaging in business combinations, such as mergers, sales and leases of assets, issuances of securities and similar transactions by a corporation or subsidiary with an interested stockholder, including a person or group who beneficially owns 15% or more of the corporation's voting stock for three years following the date that a person becomes an interested stockholder, unless (with certain exceptions) the business combination or the transaction in which the person became an interested stockholder is approved in a prescribed manner. Accordingly, Section 203 may have an anti-takeover effect with respect to transactions that the WBD Board does not approve in advance and may discourage takeover attempts that might result in a premium over the market price of WBD common stock.

Exhibit 10.20

# Warner Bros. Discovery

# INCENTIVE COMPENSATION PROGRAM

Adopted effective January 1, 2009,

as amended in 2010, 2011, 2012, 2013, 2015, 2016, 2018, 2019, 2020, and 2022

## ELIGIBILITY AND TERMS

Employees of Warner Bros. Discovery or a Participating Subsidiary ("the Company") who are classified as regular full-time employees of the Company are eligible to participate in the annual Incentive Compensation Program (the "ICP"), subject to the discretion of management. Eligibility for part-time, less-than-full time and temporary employees of the Company will be subject to the discretion of management and/or determined by local legislation, country by country, as appropriate. The determination of participation by any particular employee or subsidiary is made by the Company in its discretion. An employee who is eligible for another Company sales or annual incentive award program generally is not eligible to participate in the ICP, nor is an employee who begins employment in an ICP-eligible position on or after October 1 of the Program Year. In this document, an employee who meets these eligibility requirements is referred to as an "Eligible Employee." "Participating Subsidiary" includes entities at least 80% of the voting equity is owned by Warner Bros. Discovery or one or more of its 100% owned direct or indirect subsidiaries.

The ICP is an annual cash bonus program that rewards Eligible Employees for their individual performance contribution and Company performance (measured and treated separately in relation to revenue and profitability) for the entire Program Year, subject to the proration provisions set forth below. The target award opportunity is expressed as a percentage of base salary. The Company performance metrics may reflect Company-wide performance or a combination of overall Company performance and performance of a specific Company division or business unit. An Eligible Employee's payout, if any, is based on the applicable Company performance measures (both revenue and profitability, measured separately) and any other measures that may be applicable to an employee's job level or role. The calculated payout may be reduced if warranted by the employee's individual performance or other individual factors.

The ICP begins on January 1 and ends on December 31 each year (the "Program Year"). The Company will comply with local legal requirements and any applicable contractual provisions in implementing these Terms and Conditions; if a legal or contractual provision conflicts with this document, the legal or contractual requirement will govern. The payout, if any, under the ICP will occur in the first quarter of the calendar year following the Program Year and, in the United States, on or before March 15.

## TERMS AND CONDITIONS

1. Proration of Target or Payout: An Eligible Employee must be employed for the entire Program Year (i.e. from January 1 up to and including to December 31) to be eligible for a payout, unless one of the following exceptions applies to permit a prorated payout. The eligibility for and amount of any payout will continue to be subject to the other terms and conditions of the ICP and the applicable Company performance measures.
   a. New Hires: An employee who is hired into a role that is ICP-eligible before October 1 of the Program Year, will be eligible for a prorated payout under the ICP based on the date of hire, subject to the terms and conditions of the ICP. An employee hired on or after October 1 of the Program Year, will not be eligible to participate in that Program Year's ICP.
   b. Part-Time Employees: An Eligible Employee who works part-time or less-than- full time or who is hired during the Program Year and who otherwise meets the eligibility requirements of the Program will be eligible for an ICP target that is based on the percentage of applicable salary, at the part-time level, during the Program Year.
   c. Leave of Absence: An Eligible Employee who is in leave status for more than 90 consecutive days during the Program Year will be eligible for a prorated ICP payout, subject to the terms and conditions of the ICP. The proration calculation will be based on the number of days that the Eligible Employee was actively working (including leave for 90 days or less). An Eligible Employee who is in leave status for 90 consecutive days or less will not be subject to proration under this subsection.
   d. Termination for Cause: If an Eligible Employee's employment with the Company terminates prior to the date the ICP for the Program Year is actually paid out, for "Cause," the Eligible Employee will not be eligible for any payout, prorated or otherwise. "Cause" shall mean under this paragraph: (i) the conviction of, or nolo contendere or guilty plea, to a felony (whether any right to appeal has been or may be exercised); (ii) conduct constituting embezzlement, material misappropriation or fraud, whether or not related to the Eligible Employee's employment with the Company; (iii) conduct constituting a financial crime, material act of dishonesty or conduct in violation of Company's Code of Business Conduct and Ethics; (iv) improper conduct substantially prejudicial to the Company's business; (v) willful unauthorized disclosure or use of Company confidential information; (vi) material improper destruction of Company property; (vii) willful misconduct in connection with the performance of Executive's duties; and (vii) any other conduct that constitutes Cause under the Company's policies and procedures.
   e. Resignation: If an Eligible Employee resigns from their employment (and their employment ends) at any time in the Program Year, no payout prorated or otherwise shall be paid. For these purposes, unless an Eligible Employee who is working under a fixed term employment contract otherwise falls within one of the above exceptions set forth in these terms and conditions (as applied to a resignation), a separation at the end of a fixed-term assignment because of the natural expiration of the assignment shall be considered a resignation.
   f. Death, Disability, Retirement or Termination without Cause: If an Eligible Employee separates before December 31 due to death, disability, retirement, or to accept immediate employment with an "Affiliate," the employee will be eligible for a prorated payout if the employee was an Eligible Employee for 180 days or more during the Program Year. For these purposes, "retirement" means separation from the Company for any reason other than Cause at a point at

which an Eligible Employee is at least age 55 and has been employed by the Company, or any of its subsidiaries for at least ten years, where the Eligible Employee's period of service is determined using the Company's Prior Employment Service Policy or a successor policy chosen by the Administrator. Special treatment upon retirement shall be subject to local laws in those countries subject to any EU Directive on Discrimination. If an Eligible Employee's employment is terminated by the Company without Cause, the employee will be eligible for a prorated payout if the employee (a) was an Eligible Employee for 180 days or more during the Program Year, and (b) if applicable, meets any requirement to sign a release of claims under a Company-sponsored severance benefit plan or other applicable employment agreement or arrangement, provided that the arrangement does not exclude the payout of the ICP. For purposes of this Section, an "Affiliate" is an entity in which the Company has an ownership interest of 50% or more but which is not considered a Participating Subsidiary under the ICP (e.g., OWN LLC).

g. Termination and Rehire During a Single Program Year: If an Eligible Employee's employment is terminated by the Company without Cause and the Eligible Employee is rehired within the same Program Year, the employee will be eligible for a prorated payout for that Program Year provided that (i) the Eligible Employee has met any requirement to sign a release of claims associated with the termination, and (ii) the Eligible Employee was actively employed for 180 days or more during the Program Year, including service prior to the termination and after the rehire date. The Company will determine the applicable Company performance metrics based on the facts and circumstances of the Eligible Employee's role(s) and duties during the Program Year.

h. Transfer into Role under Separate Bonus Plan: If an Eligible Employee moves into a role that is not ICP-eligible because the role is covered by another bonus plan (e.g., an advertising sales role), the employee will be eligible for a prorated payout for that Program Year based on the length of time that the Eligible Employee was in the ICP-eligible role.

2. No Additional Rights: The ICP shall not confer or be deemed to confer any right with respect to continuance of employment by the Company, nor interfere in any way with the right of the Company to separate an employee from employment.

3. Discretionary Program: Unless contrary to the express and unequivocal terms of applicable law, regulations, or co determination rights, any ICP payout is a strictly discretionary and conditional payout, is made subject to the terms and conditions of these guidelines and the applicable ICP Company performance measures (based on revenue and profitability) for each Eligible Employee, and does not form a part of an employee's regular base salary compensation. The operation or continuance of the ICP through a Program Year gives no right or expectation to any ICP payout, whether in same or similar form or at all, in any future Program Year. Company management also reserves the sole discretion to determine the design, applicable criteria and the actual payout percentages for each component of each target grid as it deems appropriate.

4. Profit Sharing: For those countries that legally require participation in profit sharing programs, an addendum to these guidelines will be published. It is acknowledged that, for all countries, any ICP payout is funded by two separate elements: a) corporate revenue and b) a share of profits.

5. Timing of Payout: If an Eligible Employee terminates employment with the Company before the scheduled payout date of the ICP and is eligible for a prorated payout, the timing of any payout, if legally allowable, will be determined under the normal course of the ICP and delivered on the scheduled payment date for other Eligible Employees who remain employed by the Company. If local laws do not permit a delay of the payment until the scheduled payment date under the ICP, the Company at its sole discretion will determine the payment under the Program to be included in the pay for the last month of employment.

6. Administration: The Senior Vice President for Total Rewards ("Administrator") has the full power and authority to construe, interpret and administer the ICP and the determinations of the Administrator are final, conclusive and binding on all persons unless any such determination is otherwise expressly and unequivocally prohibited by local laws and regulations of co determination rights. For participants employed in the United States, the ICP shall be construed, administered and governed under the laws of the State of Maryland, without regard to its conflict of law rules.

7. Amendment, Modification, and Termination: The Company reserves the right to amend, modify or terminate the ICP at any time in its sole discretion and will implement those changes respecting the terms and conditions of local laws, works agreements or codetermination rights that expressly and unequivocally conflict, in whole or in part, with any such action or decision. The ICP will be implemented subject to and in accordance with local laws and regulations, which may require certain actions in particular circumstances.

8. Clawback Policy: In addition to any other remedies available to the Company (but subject to applicable law), if the Board, or the Compensation Committee, determines that an employee has engaged in fraud or misconduct that resulted in a financial restatement, the Company may recover, in whole or in part, any incentive compensation, equity award, and/or profit realized from the sale of Company securities, including any payment under the ICP, made or received in the 12 months after the filing of the financial statement that was found to be inaccurate.

Exhibit 10.21

# WARNER BROS. DISCOVERY SUPPLEMENTAL RETIREMENT PLAN (Amended and Restated Effective as of January 1, 2023)

## ARTICLE I ESTABLISHMENT AND PURPOSE

Discovery Communications, LLC previously maintained the Discovery Communications, LLC Supplemental Deferred Compensation Plan (the "Plan"). The sponsorship of the Plan was assumed by Warner Bros. Discovery, Inc. (the "Company"), effective January 1, 2023 (the "Restatement Date"). In connection with the assumption of the Plan sponsorship, the Company hereby amends and restates the Plan in its entirety as set forth herein, effective as of the Restatement Date, to change the name of the Plan to the "Warner Bros. Discovery Supplemental Retirement Plan" and to make certain other administrative changes. Except as otherwise provided herein, this amendment and restatement applies to all amounts previously or hereafter deferred under the Plan, including amounts deferred under the Plan prior to January 1, 2005.

The purpose of the Plan is to attract and retain key employees by providing Participants with an opportunity to defer receipt of a portion of their salary, bonus, and other specified compensation. The Plan is not intended to meet the qualification requirements of Section 401(a) of the Code, but is intended to meet the requirements of Section 409A of the Code, and shall be operated and interpreted consistent with that intent.

The Plan constitutes an unsecured promise by a Participating Employer to pay benefits in the future. Participants in the Plan shall have the status of general unsecured creditors of the Company or the Adopting Employer, as applicable. Each Participating Employer shall be solely responsible for payment of the benefits of its employees and their beneficiaries. The Plan is unfunded for federal tax purposes and is intended to be an unfunded arrangement for Eligible Employees who are part of a select group of management or highly compensated employees within the meaning of Sections 201(2), 301(a)(3), and 401(a)(1) of ERISA. Any amounts set aside to defray the liabilities assumed by the Company or an Adopting Employer will remain the general assets of the Company or the Adopting Employer and shall remain subject to the claims of the Company's or the Adopting Employer's creditors until such amounts are distributed to the Participants.

## ARTICLE II DEFINITIONS

For purposes of the Plan, the following words and phrases shall have the meanings set forth below, unless their context clearly requires a different meaning:

**2.1** "**Account**" means the bookkeeping account maintained by the Committee on behalf of each Participant pursuant to this Plan. The Account shall be a bookkeeping entry only and shall be used solely as a device to measure and determine the amounts, if any, to be paid to a Participant or the Participant's Beneficiary under the Plan. A Participant's account may include one or more sub-accounts, including, but not limited to, one or more sub-accounts attributable to deferrals for

Plan Years before 2021. Accounts are intended to constitute unfunded obligations within the meaning of Sections 201(2), 301(a)(3) and 401(a)(1) of ERISA.

**2.2** "**Adopting Employer**" means a member of the Affiliate Group that, with the consent of the Company, has adopted the Plan (or has been deemed to adopt this Plan) pursuant to Section 10.3 hereof for the benefit of its Eligible Employees.

**2.3** "**Affiliated Group**" means (a) the Company, and (b) all entities with whom the Company would be considered a single employer under Sections 414(b) and 414(c) of the Code, such that in applying Section 1563(a)(1), (2), and (3) of the Code for purposes of determining a controlled group of corporations under Section 414(b) of the Code, the language "at least 80 percent" shall be used each place it appears in Section 1563(a)(1), (2), and (3), and in applying Treasury Regulation Section 1.414(c)-2 for purposes of determining trades or businesses (whether or not incorporated) that are under common control for purposes of Section 414(c), the language "at least 80 percent" shall be used each place it appears in that regulation.

**2.4** "**Base Salary**" means the annual base rate of cash compensation payable by a Participating Employer to an Eligible Employee during a calendar year, excluding equity awards, Incentive Compensation, short-term incentives, bonuses, special/overtime pay bonuses, commissions, severance payments, Discretionary Company Credits, qualified plan contributions or benefits, expense reimbursements, fringe benefits and all other payments, and prior to reduction for any deferrals under this Plan or any other plan of the Affiliated Group under Sections 125 or 401(k) of the Code. For purposes of this Plan, Base Salary payable after the last day of a calendar year solely for services performed during the final payroll period described in Section 3401(b) of the Code containing December 31 of such year shall be treated as earned during the subsequent calendar year.

**2.5** "**Beneficiary**" or "**Beneficiaries**" means the person or persons, including one or more trusts, designated by a Participant in accordance with the Plan to receive payment of the remaining balance of the Participant's Account in the event of the death of the Participant prior to the Participant's receipt of the entire amount credited to the Participant's Account.

**2.6** "**Beneficiary Designation**" means a Participant's written designation of one or more Beneficiaries, made in such manner (which may include an electronic format or a paper form) as designated by Committee.

**2.7** "**Business Day**" means each day on which the United States securities markets are open for business.

**2.8** "**Change in Control**" means a "change in control event" within the meaning Treasury Regulation 1.409A-3(i)(5).

**2.9** "**Claimant**" means a Participant or Beneficiary filing a claim under Section 8.2 of this Plan.

**2.10** "**Code**" means the Internal Revenue Code of 1986, as amended.

**2.11** "**Committee**" means the Retirement Plan Committee or its successor, or such other committee appointed by the Board of Directors of the Company (or a committee thereof) to administer the Plan. If no designation is in effect, the Chief People and Culture Officer of the Company or his or her delegate shall have and exercise the powers of the Committee.

**2.12** "**Compensation**" means the total of Base Salary and Incentive Compensation, to the extent such amounts constitute U.S.-source income. Compensation shall not include any compensation that has been previously deferred under this Plan or any other arrangement subject to Code Section 409A.

**2.13** "**Company**" means Warner Bros. Discovery, Inc.

**2.14** "**Deferral Election**" means a Participant's written election, made in such manner as designated by the Committee (which may include an electronic format or a paper form), to defer a portion of the Participant's Base Salary and/or Incentive Compensation in accordance with the provisions of Article IV, which deferral election, once it has become effective, shall be irrevocable with respect to the Plan Year to which it applies.

**2.15** "**Discretionary Company Credit**" means a credit by a Participating Employer to a Participant's Account in accordance with the provisions of Article V of the Plan to implement the provisions of an employment, retention or other agreement between the Participating Employer and a Participant, or otherwise, other than a Restoration Credit. Discretionary Company Credits, if any, shall be credited at the sole discretion of the Participating Employer, and the fact that a Discretionary Company Credit may be credited to a Participant's Account in one year shall not obligate the Participating Employer to continue to make any such Discretionary Company Credit in any subsequent year.

**2.16** "**Effective Date**" means January 1, 2021.

**2.17** "**Employer**" means, with respect to Employees it employs, the Company and each other member of the Affiliated Group.

**2.18** "**Eligible Employee**" has the meaning given to such term in Section 3.1 hereof.

**2.19** "**Employee"** means an employee of a Participating Employer who is classified as a regular employee of a Participating Employer and is paid Compensation by the Participating Employer and issued a W-2 by the Participating Employer with respect to that Compensation.

**2.20** "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

**2.21** "**Incentive Compensation**" means any incentive compensation, including commissions under sales incentive plans, payable in cash to an Eligible Employee pursuant to any incentive compensation plan or program in which Eligible Employees are participants and that is designated by the Committee as an eligible source of compensation for deferral under this Plan.

**2.22** "**Participant**" means any Eligible Employee who (a) at any time has elected to defer the receipt of Base Salary and/or Incentive Compensation in accordance with the Plan or (b)

whose Account has been credited with a Discretionary Company Credit, and who, in any case, has not received complete payment of the amount credited to the Participant's Account.

**2.23** "**Participating Employer**" means the Company and each Adopting Employer.

**2.24** "**Performance-Based Compensation**" means Incentive Compensation that is based on services performed over a period of at least 12 months and that constitutes "performance-based compensation" within the meaning of Section 409A of the Code. In general, for purposes of Section 409A of the Code, "performance-based compensation" means compensation the amount of which, or the entitlement to which, is contingent on the satisfaction of pre-established organizational or individual performance criteria relating to a performance period of at least 12 consecutive months. For such purposes, organizational or individual performance criteria are considered pre-established if established in writing by not later than 90 days after the commencement of the period of service to which the criteria relate, provided that the outcome is substantially uncertain at the time the criteria are established. Performance-Based Compensation does not include any amount or portion of any amount that will be paid either regardless of performance or based upon a level of performance that is substantially certain to be met at the time the criteria are established.

**2.25** "**Plan**" means this Warner Bros. Discovery Supplemental Retirement Plan, as it may be amended from time to time.

**2.26** "**Plan Year**" means the calendar year.

**2.27** "**Qualified Plan**" means the Warner Bros. Discovery 401(k) Savings Plan, as amended from time to time.

**2.28** "**Restoration Credit**" means, for any period commencing on or after January 1, 2023, a credit by a Participating Employer to a Participant's Account in accordance with the provisions of Article V of the Plan that is intended to restore the Participant's "lost share" of matching contributions under the Qualified Plan for that same period. For this purpose, a Participant's "lost share" of matching contributions is the amount of contributions not allocated to Participant's Qualified Plan account solely as the result of the reduction in the Participant's eligible compensation (as defined under the Qualified Plan) by reason of deferrals of Compensation under this Plan. The amount of the Restoration Credit for any period shall be determined by the Participating Employer in its sole discretion.

**2.29** "**Separation from Service**" means a Participant's termination of employment or service with the Affiliated Group, other than as a result of the Participant's death, in such a manner as to constitute a "separation from service" as defined under Section 409A of the Code.

**2.30** "**Specified Employee**" means a "specified employee" as determined by the Company in accordance with Section 409A of the Code.

**2.31** "**Unforeseeable Emergency**" means an "unforeseeable emergency" as defined under Section 409A of the Code. In general, for purposes of Section 409A of the Code, an "unforeseeable emergency" means a severe financial hardship to a Participant resulting from an illness or accident of the Participant, the Participant's spouse, the Participant's Beneficiary, or the

Participant's dependent (as defined in Section 152 of the Code, without regard to Sections 152(b)(1), (b)(2), and (d)(1)(B)); loss of the Participant's property due to casualty (including the need to rebuild a home following damage to a home not otherwise covered by insurance, for example, not as a result of a natural disaster); or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant.

## ARTICLE III
## ELIGIBILITY AND PARTICIPATION

**3.1 Eligibility and Participation**. Participation in the Plan is limited to any Employee who (a) is selected by the Committee, in its sole discretion, as eligible to participate in the Plan, and (b) is a member of a "select group of management or highly compensated employees," within the meaning of Sections 201, 301 and 401 of ERISA (each an "Eligible Employee"). In lieu of designating individual Eligible Employees for Plan participation, the Committee may establish eligibility criteria (consistent with the requirements of this Section 3.1) providing for participation of all Eligible Employees who satisfy such criteria. The Committee may at any time, in its sole discretion, change the eligibility criteria for Eligible Employees, or determine that one or more Participants will cease to be an Eligible Employee. An Employee so selected shall become an Eligible Employee effective on the first day of the month immediately following the month in which the Employee is designated by the Committee or satisfies the eligibility criteria established by the Committee. An Eligible Employee becomes a Participant upon the earlier to occur of: (i) a credit of a Discretionary Company Credit under Article V, or (ii) the date that the Eligible Employee's initial election to defer Base Salary and/or Incentive Compensation to the Plan becomes irrevocable. An Eligible Employee who receives a credit of a Discretionary Company Credit shall not be eligible to defer Compensation to the Plan unless the Participant receives notice that he or she is eligible to defer.

**3.2 Enrollment Requirements**. Except as otherwise determined by the Committee, as a condition to participation, each Eligible Employee shall make a Deferral Election no later than the date or dates specified by the Committee in accordance with the Plan. In addition, the Committee may establish from time to time such other enrollment requirements as it determines in its sole discretion are necessary.

**3.3 Commencement Date**. Except as otherwise may be provided by the Committee pursuant to Section 4.1, each Eligible Employee first shall be eligible to commence participation in accordance with the terms and conditions of this Plan effective as of January 1 of the Plan Year next following the Plan Year in which he or she becomes an Eligible Employee pursuant to Section 3.1. Notwithstanding the foregoing, the Committee, in its sole discretion, may permit an Eligible Employee to commence participation in the Plan upon such earlier date as may be specified by the Committee, consistent with the Plan and Section 409A of the Code.

**3.4 Duration of Participation**. An individual shall remain a Participant for as long as he or she has an Account balance that has not yet been fully paid. If at any time prior to a Participant's Separation from Service the Participant ceases to be an Eligible Employee, the Participant's Deferral Election shall continue for the remainder of the Plan Year to which it relates. The Participant, however, shall become ineligible to defer compensation under the Plan effective with the next Plan Year, and the Participant shall not re-establish eligibility to defer compensation

until such time as he or she once again becomes an Eligible Employee. An individual shall cease to be a Participant when all benefits under the Plan to which he or she is entitled have been paid in full.

**3.5 Delay in or Suspension of Status as Eligible Employee**. An individual who would otherwise be in a category of Eligible Employees selected for participation by the Committee shall not be treated as an Eligible Employee for purposes of a Deferral Election under Section 4.1 or Section 4.2 if initially eligible in connection with a promotion that is coupled with a work assignment outside of the United States that is designated as "long-term" (under the Company's normal procedures with respect to non-U.S. employment) but will be treated as eligible for election under Section 4.1 when repatriated to the United States (if otherwise eligible for such status pursuant to Treas. Reg. § 1.409A-2(a)(7) as someone not previously or recently eligible to defer). An individual who is otherwise an Eligible Employee may not make an election under of Section 4.2 with respect to the following calendar year if he or she is expected to be on a "long-term" work assignment outside of the United States during that year.

## ARTICLE IV
## DEFERRAL ELECTIONS

**4.1 Certain Newly Eligible Participants**. Except as otherwise determined by the Committee, in its sole discretion, newly Eligible Employees shall not be permitted to make a Deferral Election with respect to Base Salary and/or Incentive Compensation earned during the Plan Year in which the Eligible Employee is first eligible to participate in the Plan. However, notwithstanding the foregoing, the Committee, in its sole discretion, may permit any Eligible Employee to make a Deferral Election with respect to Base Salary earned for services performed during the Plan Year in which the Eligible Employee is first eligible to participate in the Plan (and in any other plan that would be aggregated with the Plan under Section 409A of the Code), as determined in accordance with Treasury Regulation Section 1.409A-2(a)(7); provided, however, that such Deferral Election (a) is made and becomes irrevocable no later than the 30th day (or such earlier date as specified by the Committee) after the effective date that the Employee first becomes an Eligible Employee pursuant to Section 3.1 of the Plan, and (b) shall apply only to Base Salary earned for services performed after the date that the Deferral Election becomes irrevocable, as determined by the Committee in accordance with Section 409A.

**4.2 Annual Deferral Elections**. Unless the Committee determines to permit an election pursuant to Section 4.1, and except as otherwise determined by the Committee, each Eligible Employee may elect to defer Base Salary and/or Incentive Compensation for a Plan Year by filing a Deferral Election with the Committee only in accordance with the following rules:

(a) Base Salary. The Deferral Election with respect to Base Salary must be made by such date as specified by the Committee that is not later than December 31 of the Plan Year immediately preceding the Plan Year for which such Base Salary is earned.

(b) Incentive Compensation.

(i) In General. With respect to any Incentive Compensation to which neither Section 4.1 nor Section 4.2(b)(ii) applies, a Participant's Deferral Election must be made

by such date as specified by the Committee that is not later than December 31 of the Plan Year immediately preceding the Plan Year for which such Incentive Compensation is earned (meaning the Plan Year in which or with which the applicable performance period begins, or, in the case of Incentive Compensation consisting of sales commissions within the meaning of Treasury Regulation 1.409A-2(a)(12)(i), the Plan Year in which the applicable sale occurs).

(ii) Certain Elections with Respect to Performance-Based Compensation. To the extent permitted by the Committee in its sole discretion, a Deferral Election with respect to Incentive Compensation that constitutes Performance-Based Compensation may be made by such date as specified by the Committee that is not later than the date that is six (6) months before the end of the applicable performance period, provided that in no event may such Deferral Election be made after such Incentive Compensation has become "readily ascertainable" within the meaning of Section 409A of the Code. In order to make a Deferral Election under this Section 4.2(b)(ii), the Participant must perform services continuously from the later of the beginning of the performance period or the date the performance criteria are established through the date the Deferral Election is made under this Section 4.2(b)(ii). A Deferral Election made under this Section 4.2(b)(ii) shall not apply to any Incentive Compensation that becomes payable to a Participant without regard to the satisfaction of the applicable performance criteria.

**4.3 Amount Deferred**. A Participant shall designate on a Deferral Election, as applicable, the portion of his or her Base Salary and/or the portion of his or her Incentive Compensation that is to be deferred with respect to the applicable Plan Year (or other applicable performance period) in accordance with this Article IV. The Participant may specify a different portion to be deferred for each element of his or her deferrable Compensation (Base Salary and Incentive Compensation). For each Plan Year, an Eligible Employee may defer (in 1% increments) up to 50% of his or her Base Salary, and for each Plan Year (or other applicable performance period), an Eligible Employee may defer (in 1% increments) up to 50% of his or her Incentive Compensation. Deferrals of Compensation shall be calculated with respect to the gross cash Compensation payable to the Participant prior to any deductions or withholdings. Changes to payroll withholdings that affect the amount of Compensation being deferred to the Plan shall be allowed only to the extent permissible under Section 409A of the Code.

**4.4 Elections as to Time and Form of Payment**. Each Deferral Election will specify the time and form of payment for each element of Compensation (Base Salary and Incentive Compensation) deferred by the Participant for the applicable Plan Year, subject to the provisions of Article VII, as elected by the Participant from the following alternatives:

(a) Payment Following Separation from Service. A Participant may elect to receive payment of the amount deferred pursuant to the Deferral Election for a Plan Year in a single lump sum payment, in installments over five (5) years or in installments over ten (10) years, paid or commencing within ninety (90) days after one of the following dates, as elected by the Participant in the applicable Deferral Election:

(i) the date that is six (6) months after the Participant's Separation from Service with respect to Deferral Elections applicable to Plan Years commencing on or after January 1, 2023 (or the date of the Participant's Separation from Service, subject to Section 7.2 below,

with respect to Deferral Elections applicable to Plan Years commencing prior to January 1, 2023),

(ii) the first (1[st]) anniversary of the Participant's Separation from Service, or

(iii) the fifth (5[th]) anniversary of the Participant's Separation from Service.

(b) In-Service Payments. A Participant may elect to receive payment of the amount deferred pursuant to the Deferral Election for a Plan Year following the earlier of:

(i) the first day of a specified month of a calendar year that is at least two (2) calendar years after the Plan Year for which such Deferral Election is made, in which case payment will be made or commence within ninety (90) days thereafter in a single lump sum payment or in substantially equal annual installments over a period of two (2) to five (5) years, as elected by the Participant in the applicable Deferral Election; or

(ii) the Participant's Separation from Service, in which case payment will be made in a single lump sum payment, in installments over five (5) years or in installments over ten (10) years, paid or commencing within ninety (90) days after (A) the date that is six (6) months after the Participant's Separation from Service with respect to Deferral Elections applicable to Plan Years commencing on or after January 1, 2023 (or the date of the Participant's Separation from Service, subject to Section 7.2 below, with respect to Deferral Elections applicable to Plan Years commencing prior to January 1, 2023), (B) the first (1st) anniversary of the Participant's Separation from Service, or (C) the fifth (5th) anniversary of the Participant's Separation from Service, as elected by the Participant in the applicable Deferral Election.

(c) Default Time and Form of Payment. To the extent that a Participant does not designate the time and form of payment on a Deferral Election as provided in Section 4.4 (or such designation does not comply with the terms of the Plan), the Participant's deferrals pursuant to the applicable Deferral Election shall be paid, subject to the provisions of Article VII, in a single lump sum payment within ninety (90) days after the date that is six (6) months after the Participant's Separation from Service with respect to Deferral Elections applicable to Plan Years commencing on or after January 1, 2023 (or the date of the Participant's Separation from Service, subject to Section 7.2 below, with respect to Deferral Elections applicable to Plan Years commencing prior to January 1, 2023).

(d) Form of Installment Payments upon Separation from Service. If a Participant elects to receive all or a designated portion of the amount deferred pursuant to the Deferral Election for a Plan Year in installments over five (5) years or ten (10) years under Section 4.4(a) or Section 4.4(b)(ii) above, then the installment payments shall be made (i) on a monthly basis over the designated period (i.e., in sixty (60) substantially equal monthly installments if the five-year installment option is selected and in one hundred twenty (120) substantially equal monthly installments if the ten-year installment option is selected) with respect to Deferral Elections applicable to Plan Years commencing prior to January 1, 2023, and (ii) on an annual

basis over the designated period with respect to Deferral Elections applicable to Plan Years commencing on or after January 1, 2023, each as calculated under Section 7.11 below.

**4.5 Duration and Cancellation of Deferral Elections**.

(a) Duration. Once irrevocable, a Deferral Election shall be effective for the Plan Year (or other applicable performance period, as the case may be) with respect to which such election was timely filed with the Committee, except as otherwise provided in Section 4.5(b) below. Notwithstanding the preceding sentence, the Committee may provide, in its sole discretion, that any Deferral Elections shall continue to be applied to future Deferral Election periods, until terminated or modified prospectively by a Participant in accordance with the terms of this Article IV.

(b) Cancellation.

(i) The Committee may, in its sole discretion, cancel a Participant's Deferral Election where such cancellation occurs by the later of the end of the Plan Year in which the Participant incurs a "disability" or the 15th day of the third month following the date the Participant incurs a "disability." For purposes of this Section 4.5(b)(i), a "disability" refers to any medically determinable physical or mental impairment resulting in the Participant's inability to perform the duties of his or her position or any substantially similar position, where such impairment can be expected to result in death or can be expected to last for a continuous period of not less than six months.

(ii) The Committee may, in its sole discretion, cancel a Participant's Deferral Election due to an Unforeseeable Emergency, a hardship distribution pursuant to Treasury Regulation Section 1.401(k)-1(d)(3), or such other event or condition as may be permitted under Section 409A of the Code pursuant to generally applicable guidance published in the Internal Revenue Bulletin.

(iii) If a Participant's Deferral Election is cancelled with respect to a particular Plan Year in accordance with this Section 4.5(b), such Participant may make a new Deferral Election for a subsequent Plan Year, as the case may be, only in accordance with Section 4.2 hereof.

**4.6 Vesting**. Each Participant shall at all times have a fully vested interest in 100% of the deferrals of Base Salary and Incentive Compensation credited to his or her Account.

## ARTICLE V
## DISCRETIONARY COMPANY CREDITS AND RESTORATION CREDITS

**5.1 In General**. In any Plan Year, a Participating Employer, in its sole and absolute discretion, may, but shall not be required to, credit Discretionary Company Credits to a Participant's Account in any amount determined by the Participating Employer. In any Plan Year commencing on or after January 1, 2023, a Participating Employer shall credit Restoration Credits to a Participant's Account in an amount determined by the Participating Employer.

**5.2 Vesting**. Except as otherwise may be provided in a vesting schedule established by the Participating Employer that authorized the Discretionary Company Credits, in its sole and absolute discretion, any Discretionary Company Credits shall be 100% vested as of the date credited to a Participant's Account. In any event, notwithstanding any vesting schedule that may be established hereunder with respect to Discretionary Company Credits, any such unvested Discretionary Company Credits shall become fully vested upon the occurrence of a Change in Control. Any Restoration Credits shall be 100% vested as of the date credited to a Participant's Account.

**5.3 Time and Form of Payment**. Except as otherwise may be determined by the Participating Employer that authorized the Discretionary Company Credits no later than the time of crediting to the Participant's Account, any vested Discretionary Company Credits contributed to a Participant's Account for a Plan Year shall be payable, in accordance with the default time and form of payment set out in Section 4.4(c), in a single lump sum payment within ninety (90) days after the date that is six (6) months after the Participant's Separation from Service with respect to Discretionary Company Credits attributable to services performed in Plan Years commencing on or after January 1, 2023 (or the date of the Participant's Separation from Service, subject to Section 7.2 below, with respect to Discretionary Company Credits attributable to services performed in Plan Years commencing prior to January 1, 2023). Any Restoration Credits contributed to a Participant's Account for a Plan Year shall be payable, in accordance with the default time and form of payment set out in Section 4.4(c), in a single lump sum payment within ninety (90) days after the date that is six (6) months after the Participant's Separation from Service.

## ARTICLE VI
## CREDITING OF GAINS, LOSSES AND EARNINGS TO ACCOUNTS

Each Participant's Account will be credited with gains, losses and earnings based on notional investment directions made by the Participant in accordance with notional investment crediting options and procedures established from time to time by the Committee in its sole discretion. The Committee specifically retains the right in its sole discretion to change the notional investment crediting options and procedures from time to time. By electing to defer any amount under the Plan, each Participant acknowledges and agrees that the Company is not and shall not be required to make any investment in connection with the Plan, nor is it required to follow the Participant's notional investment directions in any actual investment it may make or acquire in connection with the Plan. Any amounts credited to a Participant's Account with respect to which a Participant does not provide notional investment direction shall be credited with gains, losses and earnings as if such amounts were invested in a notional investment option selected by the Committee in its sole discretion.

## ARTICLE VII
## PAYMENTS

**7.1 Payment of Participant Accounts**. Except as otherwise provided in this Article VII or Section 5.3, a Participant's vested Account shall commence to be paid in accordance with the applicable time and form of payment specified in the Participant's Deferral Election for the applicable Plan Year pursuant to Section 4.4.

**7.2 Mandatory Six-Month Delay for Specified Employees**. Notwithstanding any other provision of this Plan to the contrary, and only with respect deferrals credited to a Participant's Account with respect to Plan Years commencing prior to January 1, 2023, in no event may payments triggered by the Separation from Service of a Specified Employee be paid or commence prior to the first Business Day of the seventh month following the Specified Employee's Separation from Service (or if earlier, within 90 days after the Specified Employee's death), with such benefits being paid (if in a lump sum) or commencing (if in substantially equal installments) as soon as administratively practicable after such date.

**7.3 Death of Participant**. Notwithstanding any other provision of this Plan, in the event of the Participant's death, the vested balance of the Participant's Account shall be paid to the Participant's Beneficiary or Beneficiaries in accordance with the Participant's Beneficiary Designation (or, if there is no such Beneficiary, to the Participant's estate) in a single lump sum as soon as administratively practicable following the date of the Participant's death. A Participant's Beneficiary Designation may be changed at any time prior to his or her death by the execution and delivery of a new Beneficiary Designation. The Beneficiary Designation on file with the Committee that bears the latest date at the time of the Participant's death shall govern. If a Participant fails to properly designate a Beneficiary in accordance with this Section 7.3 or if all designated Beneficiaries have predeceased the Participant, then payment pursuant to this Section 7.3 shall be made to the Participant's surviving spouse, if living, or if none, to the Participant's estate.

**7.4 Unforeseeable Emergency**. The Committee may, in its sole discretion, provide for payment of the portion of a Participant's vested Account that is reasonably necessary to satisfy a need due to an Unforeseeable Emergency pursuant to Treasury Regulation Section 1.401(k)-3(i)(3)(iii). Any distributions because of Unforeseeable Emergency must be limited to the amount reasonably necessary to satisfy the emergency need (which may include amounts necessary to pay any federal, state, local, or foreign income taxes or penalties reasonably anticipated to result from the distribution), determined by taking into account the additional compensation upon cancellation of the Participant's Deferral Election pursuant to Section 4.5(b).

**7.5 Payment of Pre-2021 Deferrals**. Notwithstanding any other provisions of the Plan (other than Sections 7.6 and 7.7), any deferrals credited to a Participant's Account with respect to any Plan Year prior to 2021 (which deferrals, for example, may be credited to sub-accounts for "Retirement/Termination Accounts," "Specified Date Accounts," "Five Year Vesting Accounts" and "DAP Transfer Accounts") ("Pre-2021 Deferrals") will remain subject to the payment terms and Deferral Elections in effect under the terms of the Plan as in effect immediately prior to the Effective Date.

**7.6 Subsequent Deferral Elections**. A Participant may elect, subject to such administrative rules as may be prescribed by the Committee in accordance with this Section 7.6, to change the time and/or form of payment with respect to one or more of his or her Deferral Elections or Discretionary Company Credits for a Plan Year, to a later time in accordance with this Section 7.6 (a "Subsequent Deferral Election"). The Subsequent Deferral Election may not take effect until at least twelve (12) months after the date on which it is accepted by the Committee. A Participant may make no more than one (1) Subsequent Deferral Election with respect to each such Deferral Election or Discretionary Company Credit. Any such Subsequent Deferral Election

must be filed with the Committee at least twelve (12) months prior to the date that the payment would otherwise have been paid pursuant to the Deferral Election. On each such Subsequent Deferral Election, the Participant must delay the payment date for a period of at least five (5) years after the date that the amount pursuant to the Deferral Election would otherwise have been paid under the Plan, except with respect to payment in the event of the Participant's death. For the avoidance of doubt, a Participant shall not be entitled to make a Subsequent Deferral Election with respect to the payment terms applicable to a Restoration Credit.

**7.7 Small Balances of Pre-2021 Deferrals**. Solely with respect to Pre-2021 Deferrals, to the extent a Participant has elected to receive payment of his or her Retirement/ Termination Accounts in installments, then, as of the date payment from such Account is scheduled to begin, (i) the initial installment shall be no less than twenty-five thousand dollars ($25,000) or, if less, the balance of such Account and each subsequent installment shall be no less than one thousand dollars ($1,000) or, if less, the balance of such Account. In the event the balance of the Retirement/Termination Account as of the date of Separation from Service does not exceed twenty-five thousand dollars ($25,000), then such balance shall be paid in a single lump sum within ninety (90) days following Separation from Service or, with respect to a Participant who is a Specified Employee as of the date such Participant incurs a Separation from Service, in the seventh month following the month in which such Separation from Service occurs, if later. This Section 7.7 shall have no application to any deferrals for Plan Years after 2020.

**7.8 Discretionary Acceleration of Payments**. The Committee may, in its sole discretion, accelerate the time or schedule of a payment under the Plan to a time or form otherwise permitted under Section 409A of the Code in accordance with the requirements, restrictions and limitations of Treasury Regulation Section 1.409A-3(j).

**7.9 Discretionary Delay of Payments**. The Committee may, in its sole discretion, delay the time or form of a payment under the Plan to a time or form otherwise permitted under Section 409A of the Code in accordance with the requirements, restrictions and limitations of Treasury Regulation Section 1.409A-2(b)(7).

**7.10 Actual Date of Payment**. To the extent permitted by Section 409A of the Code, the Committee, in its sole discretion, may cause any payment under this Plan to be made or commence on any later date that occurs in the same calendar year as the date on which payment otherwise would be required to be made under this Plan, or, if later, by the 15th day of the third month after the date on which payment would otherwise be required to be made under this Plan. Further, to the extent permitted by Section 409A of the Code, the Committee may delay payment in the event that it is not administratively possible to make payment on the date (or within the periods) specified in this Article VII, or if making the payment would jeopardize the ability of the Company (or any entity which would be considered to be a single employer with the Company under Section 414(b) or Section 414(c) of the Code) to continue as a going concern. Notwithstanding the foregoing, payment must be made no later than the latest possible date permitted under Section 409A of the Code.

**7.11 Calculation of Installment Payments**. In the event that any of the Participant's Account is paid in installments: (i) the first installment shall commence at the time specified pursuant to Section 7.1, (ii) each subsequent installment shall be paid on or as soon as practicable

after the applicable anniversary of the payment commencement date (or, in the case of monthly installments, on or as soon as practicable after the same date of each subsequent calendar month on which the payment commencement date occurred), (iii) the amount of each installment shall equal the quotient obtained by dividing the applicable portion of the Participant's vested Account balance as of the date of such installment payment (or as of such earlier date as may be reasonably determined by the Committee to facilitate the administration of the Plan) by the number of installment payments remaining to be paid at the time of the calculation; and (iv) the amount remaining unpaid shall continue to be credited with gains, losses and earnings as provided in Article VI hereof. For purposes of Section 409A of the Code, each series of installment payments under the Plan shall be treated as right to a single payment.

**7.12 Discharge of Obligations**. The payment to a Participant (or to his or her Beneficiary, surviving spouse or estate) of an Account in a single lump sum or the number of installments as provided pursuant to this Plan shall discharge all obligations of the Company and any other Employer to such Participant (and such Participant's Beneficiary, surviving spouse or estate) under the Plan with respect to the Participant's Account. The Committee may require such Participant, surviving spouse or Beneficiary, as a condition precedent to such payment, to execute a receipt and release to such effect. In the event that a Participant, surviving spouse or Beneficiary is required to execute a release and the period to consider and revoke the release straddles two calendar years, payment shall be made in the second calendar year in accordance with Article VII of the Plan.

## ARTICLE VIII
## ADMINISTRATION AND CLAIMS PROCEDURES

**8.1 General**. The Committee shall be responsible for the general administration of the Plan and shall have the full power, discretion and authority to carry out the provisions of the Plan. Without limiting the foregoing, the Committee shall have full discretion to (a) interpret all provisions of the Plan; (b) resolve all questions relating to eligibility for participation in the Plan and the amount in the Account of any Participant and all questions pertaining to claims for benefits and procedures for claim review; (c) resolve all other questions arising under the Plan, including any factual questions and questions of construction; (d) determine all claims for benefits; and (e) adopt such rules, regulations or guidelines for the administration of the Plan and take such further action as the Company shall deem advisable in the administration of the Plan. Without limiting the foregoing, to the extent permitted by Section 409A of the Code, the Committee may, in its sole discretion, modify the rules applicable to Deferral Elections to the extent necessary to satisfy the requirements of the Uniformed Service Employment and Reemployment Rights Act of 1994, as amended, 38 U.S.C. 4301-4334. The actions taken and the decisions made by the Committee hereunder shall be final, conclusive, and binding on all persons, including the Company, all other Employers, Eligible Employees, Participants, and their estates and Beneficiaries. The Committee may delegate to one or more officers of the Company, subject to such terms as the Committee shall determine, the authority to administer all or any portion of the Plan, or the authority to perform certain functions, including administrative functions. In the event of such delegation, all references to the Committee in this Plan (other than such references in the immediately preceding sentence) shall be deemed references to such officers as it relates to those aspects of the Plan that have been delegated.

**8.2 Claims Procedure.**

(a) Filing a Claim. Any controversy or claim arising out of or relating to the Plan shall be filed in writing with the Committee which shall make all determinations concerning such claim. Any claim filed with the Committee and any decision by the Committee denying such claim shall be in writing and shall be delivered to the Participant or Beneficiary filing the claim (the "Claimant").

(i) In General. Notice of a denial of benefits will be provided within 90 days of the Committee's receipt of the Claimant's claim for benefits. If the Committee determines that it needs additional time to review the claim, the Committee will provide the Claimant with a notice of the extension before the end of the initial 90-day period. The extension will not be more than 90 days from the end of the initial 90-day period and the notice of extension will explain the special circumstances that require the extension and the date by which the Committee expects to make a decision.

(ii) Contents of Notice. If a claim for benefits is completely or partially denied, notice of such denial shall be in writing and shall set forth the reasons for denial in plain language. The notice shall: (A) cite the pertinent provisions of the Plan document, and (B) explain, where appropriate, how the Claimant can perfect the claim, including a description of any additional material or information necessary to complete the claim and why such material or information is necessary. The claim denial also shall include an explanation of the claims review procedures and the time limits applicable to such procedures, including a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse decision on review.

(b) Appeal of Denied Claims. A Claimant whose claim has been completely or partially denied shall be entitled to appeal the claim denial by filing a written appeal with the Committee. A Claimant who timely requests a review of the denied claim (or his or her authorized representative) may review, upon request and free of charge, copies of all documents, records and other information relevant to the denial and may submit written comments, documents, records and other information relevant to the claim to the Committee. All written comments, documents, records, and other information shall be considered "relevant" if the information: (x) was relied upon in making a benefits determination, (y) was submitted, considered or generated in the course of making a benefits decision regardless of whether it was relied upon to make the decision, or (z) demonstrates compliance with administrative processes and safeguards established for making benefit decisions. The Committee may, in its sole discretion and if it deems appropriate or necessary, decide to hold a hearing with respect to the claim appeal.

(i) In General. Appeal of a denied benefits claim must be filed in writing with the Committee no later than 60 days after receipt of the written notification of such claim denial. The Committee shall make its decision regarding the merits of the denied claim within 60 days following receipt of the appeal (or within 120 days after such receipt, in a case where there are special circumstances requiring extension of time for reviewing the appealed claim). If an extension of time for reviewing the appeal is required because of special circumstances, written notice of the extension shall be furnished to the Claimant prior to the commencement of the extension. The notice will indicate the special circumstances requiring the

extension of time and the date by which the Committee expects to render the determination on review. The review will take into account comments, documents, records and other information submitted by the Claimant relating to the claim without regard to whether such information was submitted or considered in the initial benefit determination.

(ii) Contents of Notice. If a benefits claim is completely or partially denied on review, notice of such denial shall be in writing and shall set forth the reasons for denial in plain language. The decision on review shall set forth: (A) the specific reason or reasons for the denial, (B) specific references to the pertinent Plan provisions on which the denial is based, (C) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant (as defined above) to the Claimant's claim, and (D) a statement describing any voluntary appeal procedures offered by the plan and a statement of the Claimant's right to bring an action under Section 502(a) of ERISA.

(c) Legal Action. A Claimant may not bring any legal action, including commencement of any arbitration, relating to a claim for benefits under the Plan unless and until the Claimant has followed the claims procedures under the Plan and exhausted his or her administrative remedies under such claims procedures. Any such legal action must be commenced within one year of a final determination hereunder with respect to such claim, and Claimant shall be prohibited from presenting in any such legal action any evidence that was not timely presented to the Committee as part of the Plan's administrative review process pursuant to the claims procedures set forth herein. If a Participant or Beneficiary prevails in a legal proceeding brought under the Plan to enforce the rights of such Participant or any other similarly situated Participant or Beneficiary, in whole or in part, the Participating Employer shall reimburse such Participant or Beneficiary for all legal costs, expenses, attorneys' fees and such other liabilities incurred as a result of such proceedings.

(d) Discretion of Committee. All interpretations, determinations and decisions of the Committee with respect to any claim shall be made in its sole discretion, and shall be final and conclusive.

(e) Arbitration. If any claim or controversy between a Participating Employer and a Participant or Beneficiary is not resolved through the claims procedure set forth in the preceding provisions of this Section 8.2, such claim shall be submitted to and resolved exclusively by expedited binding arbitration by a single arbitrator. Arbitration shall be conducted in accordance with the following procedures:

The complaining party shall promptly send written notice to the other party identifying the matter in dispute and the proposed remedy. Following the giving of such notice, the parties shall meet and attempt in good faith to resolve the matter. In the event the parties are unable to resolve the matter within 21 days, the parties shall meet and attempt in good faith to select a single arbitrator acceptable to both parties. If a single arbitrator is not selected by mutual consent within ten Business Days following the giving of the written notice of dispute, an arbitrator shall be selected from a list of nine persons each of whom shall be an attorney who is either engaged in the active practice of law or recognized arbitrator and who, in either event, is experienced in serving as an arbitrator in disputes between employers and employees, which list shall be provided by the main office of either JAMS, the American Arbitration Association ("AAA") or the Federal Mediation

and Conciliation Service. If, within three Business Days of the parties' receipt of such list, the parties are unable to agree on an arbitrator from the list, then the parties shall each strike names alternatively from the list, with the first to strike being determined by the flip of a coin. After each party has had four strikes, the remaining name on the list shall be the arbitrator. If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

Unless the parties agree otherwise, within 60 days of the selection of the arbitrator, a hearing shall be conducted before such arbitrator at a time and a place agreed upon by the parties. In the event the parties are unable to agree upon the time or place of the arbitration, the time and place shall be designated by the arbitrator after consultation with the parties. Within 30 days of the conclusion of the arbitration hearing, the arbitrator shall issue an award, accompanied by a written decision explaining the basis for the arbitrator's award.

In any arbitration hereunder, the Participating Employer shall pay all administrative fees of the arbitration and all fees of the arbitrator. Each party shall pay its own attorneys' fees, costs, and expenses, unless the arbitrator orders otherwise. The prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees. The arbitrator shall have no authority to add to or to modify this Plan, shall apply all applicable law, and shall have no lesser and no greater remedial authority than would a court of law resolving the same claim or controversy. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that it would be entitled to summary judgment if the matter had been pursued in court litigation.

Subject to Section 8.2(c) above, the parties shall be entitled to discovery as follows: Each party may take no more than three depositions. The Participating Employer may depose the Participant or Beneficiary plus two other witnesses, and the Participant or Beneficiary may depose the Participating Employer, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, plus two other witnesses. Each party may make such reasonable document discovery requests as are allowed in the discretion of the arbitrator.

The decision of the arbitrator shall be final, binding, and non-appealable, and may be enforced as a final judgment in any court of competent jurisdiction.

This arbitration provision of the Plan shall extend to claims against any parent, subsidiary, or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, Participant, Beneficiary, or agent of any party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law or under this Plan.

Notwithstanding the foregoing, and unless otherwise agreed between the parties, either party may apply to a court for provisional relief, including a temporary restraining order or preliminary injunction, on the ground that the arbitration award to which the applicant may be entitled may be rendered ineffectual without provisional relief.

Any arbitration hereunder shall be conducted in accordance with the Federal Arbitration Act: provided, however, that, in the event of any inconsistency between the rules and procedures of the Act and the terms of this Plan, the terms of this Plan shall prevail.

If any of the provisions of this Section 8.2(e) are determined to be unlawful or otherwise unenforceable, in the whole part, such determination shall not affect the validity of the remainder of this section and this section shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the provisions of this Section 8.2(e) are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact and treated as determinative to the maximum extent permitted by law.

The parties do not agree to arbitrate any putative class action or any other representative action. The parties agree to arbitrate only the claims(s) of a single Participant or Beneficiary.

## ARTICLE IX
## AMENDMENT AND TERMINATION

**9.1 Amendment**. The Company reserves the right to amend, terminate or freeze the Plan, in whole or in part. In no event shall any such action by the Company reduce the vested amount credited to any Participant's Account, or result in any change in the timing or manner of payment of the amount of any Account (except as otherwise permitted under the Plan, including under Sections 7.8, 7.9 and 7.10), without the consent of the Participant, unless the Company determines in good faith that such action is necessary to ensure compliance with Section 409A of the Code. Notwithstanding the foregoing, the Plan may not be terminated and liquidated within twelve (12) months after a Change in Control (and, for purposes of clarity, such limitation on termination and liquidation of the Plan shall not prevent the Company from otherwise amending or freezing the Plan at any time, including within twelve (12) months after a Change in Control).

**9.2 Payments Upon Termination of Plan**. Except as otherwise provided pursuant to Sections 7.8, 7.9 and 7.10, in the event that the Plan is terminated, the amounts credited to a Participant's Account shall be paid to the Participant or the Participant's Beneficiary, as applicable, on the dates on which the Participant or his or her Beneficiary would otherwise receive payments hereunder without regard to the termination of the Plan.

## ARTICLE X
## MISCELLANEOUS

**10.1 Non-Alienation of Deferred Compensation**. Except as permitted by the Plan, no right or interest under the Plan of any Participant or Beneficiary shall, without the written consent of the Company, be (a) assignable or transferable in any manner, (b) subject to alienation, anticipation, sale, pledge, encumbrance, attachment, garnishment or other legal process, or (c) in any manner liable for or subject to the debts or liabilities of the Participant or Beneficiary. Notwithstanding the foregoing, to the extent permitted by Section 409A of the Code and Sections 7.8 and 7.9 hereof, the Committee shall honor a judgment, order or decree from a state domestic

relations court which requires the payment of part or all of a Participant's or Beneficiary's interest under this Plan to an "alternate payee" as defined in Section 414(p) of the Code.

**10.2 Compliance with Section 409A of the Code**. It is intended that the Plan comply with the provisions of Section 409A of the Code, so as to prevent the inclusion in gross income of any amounts deferred hereunder in a taxable year that is prior to the taxable year or years in which such amounts would otherwise actually be paid or made available to Participants (or their Beneficiaries or estates). Although the Committee shall use its best efforts to avoid the imposition of taxation, interest and penalties under Section 409A of the Code, the tax treatment of deferrals under this Plan is not warranted or guaranteed. Neither the Company nor any other Employer nor the Committee shall be held liable for any taxes, interest, penalties or other monetary amounts owed by any Participant, Beneficiary or other taxpayer as a result of the Plan. Any reference in this Plan to Section 409A of the Code will also include any proposed, temporary or final regulations, or any other guidance, promulgated with respect to such Section 409A by the U.S. Department of Treasury or the Internal Revenue Service. For purposes of the Plan, the phrase "permitted by Section 409A of the Code," or words or phrases of similar import, shall mean that the event or circumstance shall only be permitted to the extent it would not cause an amount deferred or payable under the Plan to be includible in the gross income of a Participant or Beneficiary under Section 409A(a)(1) of the Code.

**10.3 Participation by Employees of Other Members of the Affiliated Group**. Any member of the Affiliated Group other than the Company may, by action of the Adopting Employer's board of directors or equivalent governing body and with the consent of the Committee, adopt the Plan; provided that the Committee may waive the requirement that such board of directors or equivalent governing body of the Adopting Employer effect such adoption. By its adoption of or participation in the Plan, such Adopting Employer shall be deemed to appoint the Company its exclusive agent to exercise on its behalf all of the power and authority conferred by the Plan upon the Company and accept the delegation to the Committee of all the power and authority conferred upon it by the Plan. The authority of the Company to act as such agent shall continue until the Plan is terminated as to the Adopting Employer. An Eligible Employee who is employed by an Adopting Employer and who elects to participate in the Plan shall participate on the same basis as an Eligible Employee of the Company. The Account of a Participant employed by an Adopting Employer shall be paid in accordance with the Plan solely by such member to the extent attributable to the Compensation that would have been paid by such Adopting Employer in the absence of deferral pursuant to the Plan, unless the Committee otherwise determines that the Company shall be the obligor.

**10.4 Interest of Participant**. The obligation of the Company and any Adopting Employer under the Plan to make payment of amounts reflected in an Account merely constitutes the unsecured promise of the Company (or, if applicable, the Adopting Employer) to make payments from their general assets, and no Participant or Beneficiary shall have any interest in, or a lien or prior claim upon, any property of Company or any other Employer. Nothing in the Plan shall be construed as guaranteeing continued employment to any Eligible Employee. It is the intention of the Company that the Plan be unfunded for tax purposes and for purposes of Title I of ERISA. The Company may, but shall not be required to, create a trust to hold funds to be used in payment of benefits under the Plan, and may fund such trust; provided, however, that any funds contained therein shall remain liable for the claims of the general creditors of the Company and

the other Participating Employers, and no assets shall be transferred to any such trust at a time or in a manner that would cause an amount to be included in the income of a Participant pursuant to Section 409A(b) of the Code.

**10.5 Claims of Other Persons**. The provisions of the Plan shall in no event be construed as giving any other person any legal or equitable right as against the Company or any other Employer or against the officers, employees or directors of the Company or any other Employer, except any such rights as are specifically provided for in the Plan or are hereafter created in accordance with the terms and provisions of the Plan.

**10.6 Severability**. The invalidity and unenforceability of any particular provision of the Plan shall not affect any other provision hereof, and the Plan shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**10.7 Governing Law**. Except to the extent preempted by federal law, the provisions of the Plan shall be governed, construed and interpreted in accordance with the laws of the State of Maryland, without reference to any conflicts or choice of law rule or principle that might otherwise refer governance, construction or interpretation of the Plan to the law of another jurisdiction.

**10.8 Successors**. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business and/or assets of the Company expressly to assume this Plan. This Plan shall be binding upon and inure to the benefit of the Company and any successor of or to the Company, including without limitation any persons acquiring directly or indirectly all or substantially all of the business and/or assets of the Company whether by sale, merger, consolidation, reorganization or otherwise (and such successor shall thereafter be deemed the "Company" for the purposes of this Plan), and the heirs, beneficiaries, executors and administrators of each Participant.

**10.9 Withholding of Taxes**. The Company or any other Employer may withhold or cause to be withheld from any amounts payable under the Plan, or to the extent permitted pursuant to Section 409A of the Code and Section 7.8 of the Plan, from any amounts deferred under the Plan, all federal, state, local and other taxes as shall be legally required to be withheld. Further, the Company and each other Employer shall have the right to (a) require a Participant to pay or provide for payment of the amount of any taxes that the Company other Employer may be required to withhold with respect to amounts credited to a Participant's Account under the Plan, or (b) deduct from any amount otherwise payable in cash to the Participant the amount of any taxes that the Company or other Employer may be required to withhold with respect to amounts credited to a Participant's Account under the Plan.

**10.10 Electronic or Other Media**. Notwithstanding any other provision of the Plan to the contrary, including any provision that requires the use of a written instrument, the Committee may establish procedures for the use of electronic or other media in communications and transactions between the Plan or the Committee and Participants and Beneficiaries. Electronic or other media may include, but are not limited to, e-mail, the Internet, intranet systems and automated telephonic response systems.

**10.11 Headings; Interpretation**. Headings in this Plan are inserted for convenience of reference only and are not to be considered in the construction of the provisions hereof. Unless the context clearly requires otherwise, the masculine pronoun wherever used herein shall be construed to include the feminine pronoun.

**10.12 Participants Deemed to Accept Plan**. By accepting any benefit under the Plan, each Participant and each person claiming under or through any such Participant shall be conclusively deemed to have indicated his or her acceptance and ratification of, and consent to, all of the terms and conditions of the Plan and any action taken under the Plan by the Committee, the Company and each other Employer, in any case in accordance with the terms and conditions of the Plan.

**IN WITNESS WHEREOF**, the Company has caused this Plan to be executed by its undersigned duly authorized officer, to be effective as of January 1, 2023.

WARNER BROS. DISCOVERY, INC.

By: [signature]
Name: Ralph Beidelman
Title: SVP, Global Total Rewards

 **Exhibit 10.25**

**EMPLOYEE PRSU FORM**

**<Participant Full Name>**

Dear **<Participant First Name>,**

Congratulations, you have been awarded a performance restricted stock unit ("***PRSU***") in recognition of your contributions to the success of Warner Bros. Discovery, Inc. (the "***Company***"). A PRSU entitles you to receive a specific number of shares of the Company's Series A common stock ("***Shares***") at a future date, assuming that you satisfy conditions of the Plan and the attached Performance Restricted Stock Unit Agreement for Employees (the "***Grant Agreement***"). We would like you to have an opportunity to share in the continued success of the Company through this PRSU under the Warner Bros. Discovery, Inc. Stock Incentive Plan (the "***Plan***").

The following represents a brief description of your PRSU. Additional details regarding your PRSU, including the specific performance metric(s) required to be met for the PRSU to vest, in whole or in part, are provided in the Grant Agreement and in the Plan. In addition, if you are located in a country other than the United States, you will receive an International Addendum with your award under the Plan that you must review and acknowledge. If you are subject to this requirement, the International Addendum is attached.

**PRSU Grant Summary**

| | |
|---|---|
| **Date of Grant** | **<Grant Date>** |
| **PRSU Shares** | **<Number of Shares Granted>** |
| **Vesting Schedule** | One Hundred Percent (100%) upon the third (3rd) anniversary of the Date of Grant (assuming achievement of the Performance Condition(s)), subject to the terms of the Plan and Grant Agreement. |
| **Performance Conditions** | See Appendix A attached to the Grant Agreement. |

- You have been granted a PRSU in respect of the number of Shares specified under "PRSU Shares" in the chart above.
- The potential value of your PRSU increases if the price of a Share increases, but you also have to continue to provide services for the Company (except as the Grant Agreement provides) to actually receive such value. Of course, the value of a Share may go up and down over time.
- You will not receive any Shares represented by the PRSU until the PRSU vests. Subject to the terms in the Grant Agreement and the Plan, your PRSU vests as provided in the chart above under "Vesting Schedule," assuming you remain an employee of the Company and the applicable performance metric(s) are met.
- Once you have received Shares, you will own those Shares and may decide whether to hold the Shares, sell the Shares or give the Shares to someone as a gift, subject to applicable law.
- Your ability to receive Shares under the PRSU is conditioned upon compliance with any laws that apply to you.

Please note the "Clawback" section of the Grant Agreement, which reflects an important policy of ours. The Compensation Committee of our Board of Directors (the "***Committee***") has determined that awards made under the Plan are subject to a clawback in certain circumstances. By accepting this PRSU, you agree that the Committee may change the Company's clawback policy from time to time without your further consent.

**WARNER BROS. DISCOVERY, INC.**
**PERFORMANCE RESTRICTED STOCK UNIT GRANT AGREEMENT**
**FOR EMPLOYEES**

Warner Bros. Discovery, Inc. (the "***Company***") has granted you a performance restricted stock unit (the "***PRSU***") under the Warner Bros. Discovery, Inc. Stock Incentive Plan (the "***Plan***"). The PRSU is in respect of a specified number of shares of the Company's Series A common stock (the "***PRSU Shares***") and entitles you to receive one share of the Company's Series A common stock (a "***Share***") for each PRSU Share as to which the conditions to receipt specified herein are satisfied.

The individualized communication you received (the "***Cover Letter***") provides the details of your PRSU award. It specifies the number of PRSU Shares you are eligible to receive, the Date of Grant, and the vesting schedule applicable to the PRSU.

The PRSU is subject in all respects to the applicable provisions of the Plan. This grant agreement (the "***Grant Agreement***") does not cover all of the rules that apply to the PRSU. Such other terms are included in the Plan document. Capitalized terms are defined either further below in this Grant Agreement or in the Plan.

---

The Plan document is available on the Fidelity web site. The Prospectus for the Plan, the Company's S-8, Annual Report on Form 10-K, and other filings the Company makes with the Securities and Exchange Commission are available for your review on the Company's web site. You may also obtain paper copies of these documents upon request to the Company's Human Resources department.

Neither the Company nor anyone else is making any representations or promises regarding the duration of your service, vesting of the PRSU, the value a Share or of the PRSU, or the Company's prospects. The Company is not providing any advice regarding tax consequences to you or regarding your decisions regarding the PRSU. You agree to rely only upon your own personal advisors.

**No one may sell, transfer, or distribute the PRSU Shares or any securities that may be received in respect of the PRSU Shares without an effective registration statement relating thereto or an opinion of counsel satisfactory to the Company or other information and representations satisfactory to it that such registration is not required.**

In addition to the Plan's terms and restrictions, the following terms and restrictions apply:

1. <u>**Vesting Schedule.**</u> Your PRSU becomes nonforfeitable ("***Vested***") as provided in the Cover Letter and this Grant Agreement assuming you remain employed by the Company or one of its Subsidiaries until the Vesting Date and the performance metric(s) are satisfied (each as reflected in <u>Appendix A</u> attached hereto). For purposes of this Grant Agreement, employment with the Company will include employment with any Subsidiary whose employees are then eligible to receive Awards under the Plan (provided that a later transfer of employment to an ineligible Subsidiary will not terminate employment unless the Compensation Committee of the Company's Board of Directors (the "***Committee***") determines otherwise).

If your employment is terminated due to your ***"Retirement"*** prior to the Vesting Date, so long as you have complied with the restrictions under Section 6 of this Grant Agreement. you shall be entitled to vest in (i) that number of the PRSU Shares that would have been earned under the payout matrix reflected in <u>Appendix A</u> (the "***Payout Matrix***"), determined as of the end of the performance period, had you continued to be employed, multiplied by (ii) a fraction, the numerator of which is the number of days you are employed during the applicable performance period and the denominator of which is the total number of days in such performance period. Any PRSU Shares that do not remain eligible to vest following your Retirement under the immediately preceding sentence will be forfeited at the date of your Retirement, and any PRSU Shares that do not become Vested by reason of the satisfaction of the performance metric(s) shall be cancelled effective as of the end of the applicable performance period. You will receive the Shares corresponding to the Vested PRSU Shares as provided in Section 3 of this Grant Agreement.

If your employment is terminated by your death or "***Disability***" prior to the Vesting Date, you (or your beneficiary or estate) shall be entitled to vest in that number of PRSU Shares that would have been earned under the Payout Matrix, determined as of the end of the performance period, had you continued to be employed. Any PRSU Shares that do not become Vested by reason of the satisfaction of the performance metric(s) shall be cancelled effective as of the end of the applicable performance period. You will receive the Shares corresponding to the Vested PRSU Shares as provided in Section 3 of this Grant Agreement.

If your employment is terminated without "***Cause***" prior to the Vesting Date, so long as you have complied with the restrictions under Section 6 of this Grant Agreement. you shall be entitled to vest in (i) that number of the PRSU Shares earned under the Payout Matrix, determined as of the end of the performance period, had you continued to be employed, multiplied by (ii) a fraction, the numerator of which is the number of days you are employed during the performance period plus the greater of (A) 90 days and (B) the number of days included in the period, if any, over which you receive base salary severance payments from the Company or any of its Subsidiaries pursuant to an applicable employment or severance agreement, plan or policy, and the denominator of which is the total number of days in the performance period. Any PRSU Shares that do not remain eligible to vest following your termination of employment under the immediately preceding sentence will be forfeited at the date of your termination of employment, and any PRSU Shares that do not become Vested by reason of the satisfaction of the performance metric(s) shall be cancelled effective as of the end of the performance period. You will receive the Shares corresponding to the Vested PRSU Shares as provided in Section 3 of this Grant Agreement.

"***Cause***" has the meaning provided in Section 11.2(b) of the Plan. "***Disability***" has the meaning provided in Section 2.1 of the Plan. "***Retirement***" means the termination of your employment for any reason other than Cause, your death or your Disability at a point at which (i) you are at least age 55, (ii) you have been employed by the Company, a Subsidiary, or any of the Company's current or future Subsidiaries or Affiliates, for at least ten years, where your employment service is determined using the applicable Company policy in effect as of the date of Retirement, or a successor policy chosen by the Committee, and (iii) you have been actively employed as described in the foregoing clause (iv) for at least six months since the Date of Grant (as set forth in the Cover Letter).

2. <u>**Change in Control**</u>. Notwithstanding the Plan's provisions, if an Approved Transaction, Control Purchase, or Board Change (each a "***Change in Control***") occurs before the Vesting Date and the Company terminates your employment other than for Cause or, if your employment agreement or another plan or agreement applicable to you permits you a right to effect a "Good Reason" resignation, you resign for Good Reason, in either case within 12 months after the Change in Control, you will become Vested at your date of termination in that number of PRSUs that would have become Vested had the Payout Matrix been achieved at target and the Baseline Goal (as defined in <u>Appendix A</u>) been achieved. Such Accelerated Vesting will only accelerate the Distribution Date if and to the extent permitted under

Section 409A of the Code ("***Section 409A***"). "***Good Reason***" has the meaning provided in the document that affords you a right to effect a Good Reason termination.

The Committee reserves its ability under Section 11.1(b) of the Plan to vary this treatment if the Committee determines there is an equitable substitution or replacement award in connection with a Change in Control.

**3. Distribution Date.** Subject to any overriding provisions in the Plan, you will receive a distribution of Shares in respect of your earned and Vested PRSU Shares as soon as practicable following the date on which such PRSU Shares become Vested (with the actual date being the "***Distribution Date***") and, in any event, no later than March 15 of the year following the calendar year in which the Vesting Date(s) occurred, unless the Committee determines that you may make a timely deferral election to defer distribution to a later date and you have made such an election (in which case the deferred date will be the "***Distribution Date***").

**4. Clawback.** If the Committee determines, in its sole discretion, that you engaged in fraud or misconduct as a result of which or in connection with which the Company is required to or decides to restate its financial statements or is otherwise required to seek recovery under the Company's clawback policy as in effect from time to time prior to a Change in Control, the Committee may, in its sole discretion, impose any or all of the following:

**(a)** Immediate expiration of the PRSU, whether Vested or not, if granted within the first 12 months after issuance or filing of any financial statement that is being restated (the "***Recovery Measurement Period***"); and

**(b)** Require payment or transfer to the Company of the Gain from the PRSU, where the "***Gain***" consists of the greatest of (i) the value of the Shares delivered in respect of Vested PRSU Shares on the Distribution Date, if occurring within the Recovery Measurement Period, (ii) the value of Shares received in respect of the PRSU during the Recovery Measurement Period, as determined on the date of the request by the Committee to pay or transfer, (iii) the gross (before tax) proceeds you received from any sale of the Shares received in respect of the PRSU during the Recovery Measurement Period, and (iv) if transferred without sale during the Recovery Measurement Period, the value of the Shares received in respect of the PRSU when so transferred.

This remedy is in addition to any other remedies that the Company may have available in law or equity.

Payment is due in cash or cash equivalents within 10 days after the Committee provides notice to you that it is enforcing this clawback. Payment will be calculated on a gross basis, without reduction for taxes or commissions. The Company may, but is not required to, accept retransfer of Shares in lieu of cash payments.

**5. Restrictions and Forfeiture.** You may not sell, assign, pledge, encumber, or otherwise transfer any interest ("***Transfer***") in the PRSU Shares. Any attempted Transfer that precedes the Distribution Date is invalid.

Unless the Committee determines otherwise or this Grant Agreement provides otherwise, if your employment or service with the Company or any of its Subsidiaries terminates for any reason before your PRSU is Vested, then you will forfeit the PRSU (and the corresponding PRSU Shares) as of your termination date, except to the extent that the PRSU becomes Vested at that date or remains eligible to vest on or after your termination pursuant to the rules stated in Section 1 of this Grant Agreement. Any portion of your PRSU Shares that remains eligible to vest following your termination of employment subject to the achievement of the applicable performance metric(s), but does not become Vested, shall be forfeited as of the end of the performance period. You shall forfeit any unvested portion of your PRSU immediately if the Company or any of its Subsidiaries terminates your employment for Cause or if you resign your employment (other than a resignation for Good Reason within 12 months following a Change in Control). You will receive no payment for the PRSU if you forfeit it.

Your employment or service with the Company or any of its Subsidiaries will be treated as terminating through a resignation that does not qualify for treatment applicable to terminations without Cause if either (i) the entity that employs you or you provide services to ceases to qualify as a Subsidiary because of its sale, distribution, or other disposition to an unrelated entity or (ii) because the entity that employs you sold a substantial portion of its assets and your employment or service ended for any reason at or in connection with the closing of that sale, distribution, or other disposition.

6. **Restrictive Covenants.** You agree that, if the Company or any of its Subsidiaries terminates your employment without Cause or due to Retirement before the final Vesting Date, you will not, for the remainder of the period before the final Vesting Date (the "***Restricted Period***"), perform any work on, related to, or involving nonfiction, scripted, sports, lifestyle, news, interactive games, or general entertainment television (whether in cable, broadcast, free to air, digital, streaming, film or any other distribution method) or engage in any activities on behalf of any company or any entity related to or involving nonfiction, scripted, sports, lifestyle, news, interactive games, or general entertainment television (whether in cable, broadcast, free to air, digital, streaming, film or any other distribution method) (any such company or entity, a "***Competitor***") in the "***Restricted Area***" (which means the United States and any other country (a) in which you provided services to the Company, or (b) for which you had substantive responsibility for Company operations or business matters, in the five years prior to separation from employment).

During the Restricted Period, you will not directly or indirectly solicit any employees of the Company or any of its Affiliates to leave their employment nor directly or indirectly aid in the solicitation of such employees.

You agree that compliance with the restrictions in this Section 6 is a material part of this Grant Agreement, breach of which will cause the Company and its Affiliates irreparable harm and damages, the loss of which cannot be adequately compensated at law. If these restrictions should ever be deemed to exceed the limitations permitted by applicable laws, you and the Company agree that such provisions shall be reformed to the maximum limitations permitted by the applicable laws.

*The Company agrees that its sole remedy for any violation of the obligations applicable under this Section 6 will be your forfeiture of any portion of the PRSU Shares that have not previously been forfeited.* You agree that these restrictions are in addition to and do not supersede, replace, or amend any other restrictions of a similar nature that apply to you, either by contract or common law, nor any of their related remedies (other than as apply to the PRSU).

7. **Limited Status.** You understand and agree that the Company will not consider you a shareholder for any purpose with respect to the PRSU Shares, unless and until the Shares have been issued to you on the Distribution Date. You will not receive dividends with respect to the PRSU.

8. **Voting.** You may not vote the PRSU. You may not vote the PRSU Shares. You will not have any rights as a shareholder in respect to the PRSU or the PRSU Shares, unless and until Shares are distributed to you at a Distribution Date.

9. **Taxes and Withholding.** The PRSU provides tax deferral, meaning that the PRSU Shares are not taxable until you actually receive Shares on or around the Distribution Date. You will then owe taxes at ordinary income tax rates as of the Distribution Date at the value of the Shares issued in settlement of the Vested PRSUs. As an employee of the Company, you may owe FICA, Social Security and Medicare taxes before the Distribution Date.

Issuing the Shares in respect of the PRSU is contingent on satisfaction of all obligations with respect to required tax or other required withholdings (for example, in the U.S., Federal, state, foreign and local taxes). The Company may take any action permitted under Section 11.9 of the Plan to satisfy such obligation, including, if the Committee so determines, satisfying the tax obligations by (i) reducing the number of Shares to be issued to you in respect of your PRSU by that number of Shares (valued at their Fair Market Value on the Distribution Date) that would equal all taxes required to be withheld (at their minimum withholding levels), (ii) accepting payment of the withholdings from a

broker in connection with a sale of the Shares or directly from you, or (iii) taking any other action under Section 11.9 of the Plan.

**10. <u>Compliance with Law</u>.** The Company will not issue any Shares if doing so would violate any applicable Federal, foreign or state securities laws or other laws or regulations. You may not sell or otherwise dispose of the any Shares issued in respect of the PRSU in violation of applicable law.

**11. <u>Additional Conditions to Receipt</u>.** The Company may postpone issuing and delivering any Shares in respect of the PRSU for so long as the Company determines to be advisable to satisfy the following:

**(a)** its completing or amending any securities registration or qualification of the Shares *or* its or your satisfying any exemption from registration under any Federal, foreign or state law, rule, or regulation;

**(b)** its receiving proof it considers satisfactory that a person seeking to receive rights in respect of the PRSU Shares after your death is entitled to do so;

**(c)** your complying with any requests for representations under the Plan; and

**(d)** your complying with any Federal, foreign, state, or local tax withholding obligations.

**12. <u>Additional Representations from You</u>.** If the vesting provisions of the PRSU are satisfied and you are entitled to receive Shares in respect of the PRSU at a time when the Company does not have a current registration statement (generally on Form S-8) under the Securities Act of 1933, as amended (the "***Act***"), that covers the issuance of Shares to you, you must comply with the following before the Company will issue the Shares to you. You must:

**(a)** represent to the Company, in a manner satisfactory to the Company's counsel, that you are acquiring the Shares for your own account and not with a view to reselling or distributing the Shares; and

**(b)** agree that you will not Transfer the Shares unless:

**(i)** a registration statement under the Act is effective at the time of disposition with respect to the Shares you propose to Transfer; or

**(ii)** the Company has received an opinion of counsel or other information and representations it considers satisfactory to the effect that, because of Rule 144 under the Act or otherwise, no registration under the Act is required.

**13. <u>No Effect on Employment or Other Relationship</u>.** Nothing in this Grant Agreement restricts the Company's rights or those of any of its Affiliates to terminate your employment or other relationship at any time and for any or no reason. The termination of employment or other relationship, whether by the Company or any of its Affiliates or otherwise, and regardless of the reason for such termination, has the consequences provided for under the Plan and any applicable employment or severance agreement, plan or policy.

**14. <u>No Effect on Running Business</u>.** You understand and agree that the existence of the PRSU will not affect in any way the right or power of the Company or its stockholders to make or authorize any adjustments, recapitalizations, reorganizations, or other changes in the Company's capital structure or its business, or any merger or consolidation of the Company or any of its Affiliates, or any issuance of bonds, debentures, preferred or other stock, with preference ahead of or convertible into, or otherwise affecting the Company's stock or the rights thereof, or the dissolution or

liquidation of the Company or any of its Affiliates, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether or not of a similar character to those described above.

15. **Section 409A.** The PRSU is intended to be exempt from or comply with the requirements of Section 409A and must be construed consistently with that section. Notwithstanding anything in the Plan or this Grant Agreement to the contrary, if the PRSU becomes Vested in connection with your "separation from service" within the meaning of Section 409A, as determined by the Company, and if (x) you are then a "specified employee" within the meaning of Section 409A at the time of such separation from service (as determined by the Company, by which determination you agree you are bound) and (y) the distribution of Shares under such accelerated PRSU will result in the imposition of additional tax under Section 409A if distributed to you within the six month period following your separation from service, then the distribution under such accelerated PRSU will not be made until the earlier of (i) the date that is six months and one day following the date of your separation from service or (ii) the 10th day after your date of death. Neither the Company nor you shall have the right to accelerate or defer the delivery of any such Shares or benefits except to the extent specifically permitted or required by Section 409A. In no event may the Company or you defer the delivery of the Shares beyond the date specified in the Distribution Date section, unless such deferral complies in all respects with Treasury Regulation Section 1.409A-2(b) related to subsequent changes in the time or form of payment of nonqualified deferred compensation arrangements, or any successor regulation. In any event, the Company makes no representations or warranty and shall have no liability to you or any other person, if any provisions of or distributions under this Grant Agreement are determined to constitute deferred compensation subject to Section 409A but not to satisfy the conditions of that section.

16. **Unsecured Creditor.** The PRSU creates a contractual obligation on the part of the Company to make a distribution of the Shares at the time provided for in this Grant Agreement. Neither you nor any other party claiming an interest in deferred compensation hereunder shall have any interest whatsoever in any specific assets of the Company and its Affiliates. Your right to receive distributions hereunder is that of an unsecured general creditor of Company.

17. **Governing Law.** The laws of the State of Delaware will govern all matters relating to the PRSU, without regard to the principles of conflict of laws.

18. **Notices**. Any notice you give to the Company must follow the procedures then in effect. If no other procedures apply, you must send your notice in writing by hand or by mail to the office of the Company's Secretary (or to the Chair of the Committee if you are then serving as the sole Secretary). If mailed, you should address it to the Company's Secretary (or the Chair of the Committee) at the Company's then corporate headquarters, unless the Company directs PRSU holders to send notices to another corporate department or to a third-party administrator or specifies another method of transmitting notice. The Company and the Committee will address any notices to you using its standard electronic communications methods or at your office or home address as reflected on the Company's personnel or other business records. You and the Company may change the address for notice by notice to the other, and the Company can also change the address for notice by general announcements to PRSU holders.

19. **Amendment.** Subject to any required action by the Committee or the stockholders of the Company, the Company may cancel the PRSU and provide a new Award under the Plan in its place, provided that the Award so replaced will satisfy all of the requirements of the Plan as of the date such new Award is made and no such action will adversely affect the PRSU to the extent then Vested.

20. **Plan Governs.** Wherever a conflict may arise between the terms of this Grant Agreement and the terms of the Plan, the terms of the Plan will control. The Committee may adjust the number of PRSU Shares and other terms of the PRSU from time to time as the Plan provides.

**EMPLOYEE ERSU FORM**

**#ParticipantName#**

Dear #ParticipantFirstName#,

Congratulations, you have been awarded an enhanced restricted stock unit ("***ERSU***") by Warner Bros. Discovery, Inc. (the "***Company***"). An enhanced restricted stock unit entitles you to receive a specific number of shares of the Company's Common Stock at a future date, assuming that you satisfy conditions of the Plan and the implementing agreement. We would like you to have an opportunity to share in the continued success of the Company through this ERSU under the Warner Bros. Discovery, Inc. Stock Incentive Plan (the "***Plan***"). The Company's general program to offer equity and equity-type awards to eligible employees is referred to as the Performance Equity Program ("***PEP***"). The following represents a brief description of your grant. Additional details regarding your ERSU are provided in the attached Enhanced Restricted Stock Unit Agreement (the "***Grant Agreement***") and in the Plan. In addition, if you are located in a country other than the United States, you will receive an International Addendum with your award under the Plan that you must review and acknowledge. If you are subject to this requirement, the International Addendum is attached.

**ERSU Grant Summary**

| | |
|---|---|
| **Date of Grant** | **#GrantDate#** |
| **ERSU Shares** | **#QuantityGranted#** |
| **Vesting Schedule** | **#VestingDateandQuantity#** |

- You have been granted an ERSU for shares ("***Shares***") of Warner Bros. Discovery, Inc. Common Stock for the number of Shares specified under "ERSU Shares" in the chart.
- The potential value of your ERSU increases if the price of the Company's stock increases, but you also have to continue to be employed by the Company or a Subsidiary (except as the Grant Agreement provides) to actually receive such value. Of course, the value of the stock may go up and down over time.
- You will not receive the Shares represented by the ERSU until the ERSU vests. Your ERSU vests as provided in the chart above under "Vesting Schedule" and "Vesting Dates," assuming you remain an employee or become and remain a member of the Company's Board of Directors and subject to the terms in the Grant Agreement.
- Once you have received the Shares, you will own the Shares and may decide whether to hold the Shares, sell the Shares or give the Shares to someone as a gift.
- Your ability to receive Shares under the ERSU is conditioned upon compliance with any local laws that apply to you.

Please note the Clawback section of the Grant Agreement, which reflects an important policy of ours. The Compensation Committee of our Board of Directors has determined that awards made under the Plan are subject to a clawback in certain circumstances. By accepting this award, you agree that the Compensation Committee may change the Clawback section of any or all of the grant agreements from time to time without your further consent to reflect changes in law or company policy.

You can access the People & Culture Portal and review the Equity Page for more information by clicking Compensation & Recognition and then Equity.

**WARNER BROS. DISCOVERY, INC.**
**ENHANCED RESTRICTED STOCK UNIT GRANT AGREEMENT FOR EMPLOYEES**

Warner Bros. Discovery, Inc. (the "***Company***") has granted you an enhanced restricted stock unit (the "***ERSU***") under the Warner Bros. Discovery, Inc. Stock Incentive Plan (the "***Plan***"). The ERSU lets

you receive a specified number (the "***ERSU Shares***") of shares ("***Shares***") of the Company's Common Stock upon satisfaction of the conditions to receipt.

The individualized communication you received (the "***Cover Letter***") provides the details for your ERSU. It specifies the number of ERSU Shares, the Date of Grant, the schedule for vesting (the "***Vesting Schedule***"), and the Vesting Date(s).

The ERSU is subject in all respects to the applicable provisions of the Plan. This grant agreement does not cover all of the rules that apply to the ERSU under the Plan; please refer to the Plan document. Capitalized terms are defined either further below in this grant agreement (the "***Grant Agreement***") or in the Plan. If you are located in a country other than the United States, you are also receiving (or previously have received) an International Addendum to this Grant Agreement (the "***International Addendum***"). The International Addendum is incorporated into the Grant Agreement by reference and supplements the terms of this Grant Agreement and future grants to you under the Plan.

The Plan document is available on the Fidelity web site. The Prospectus for the Plan, the Company's S-8, Annual Report on Form 10-K, and other filings the Company makes with the Securities and Exchange Commission are available for your review on the Company's web site. You may also obtain paper copies of these documents upon request to the Company's People and Culture department.

Neither the Company nor anyone else is making any representations or promises regarding the duration of your service, vesting of the ERSU, the value of the Company's stock or of this ERSU, or the Company's prospects. The Company is not providing any advice regarding tax consequences to you or regarding your decisions regarding the ERSU. You agree to rely only upon your own personal advisors.

**No one may sell, transfer, or distribute the ERSU or the securities that may be received under it without an effective registration statement relating thereto or an opinion of counsel satisfactory to Warner Bros. Discovery, Inc. or other information and representations satisfactory to it that such registration is not required.**

In addition to the Plan's terms and restrictions, the following terms and restrictions apply:

1. **Vesting Schedule.** Your ERSU becomes nonforfeitable ("***Vested***") as provided in the Cover Letter and the Grant Agreement assuming you remain employed (or serve as a member of the Company's Board of Directors ("***Board***") until the Vesting Date(s). For purposes of this Grant Agreement, employment with the Company will include employment with any Subsidiary whose employees are then eligible to receive Awards under the Plan (provided that a later transfer of employment to an ineligible Subsidiary will not terminate employment unless the Board determines otherwise).

   While you are employed (or serving as a member of the Board), vesting will accelerate fully on your death, Disability or Retirement. If your employment and, if applicable, Board service is terminated by the Company or a Subsidiary without Cause (other than by reason of your death or Disability) before the ERSU is fully vested and such termination does not constitute a Retirement, the ERSU will remain or become Vested on the original schedule as though you remained working through any Vesting Date(s) occurring during the period that is the greater of 90 days after the date of termination and the period over which you receive base salary severance payments from the Company pursuant to an applicable employment or severance agreement, plan or policy, if any.

   "***Cause***" has the meaning provided in Section 11.2(b) of the Plan. "***Disability***" has the meaning provided in Section 2.1 of the Plan. "***Retirement***" means your employment and, if applicable, board service ends for any reason other than Cause, your death or your Disability at a point at which (i) you are at least age 55, (ii) you have been employed by the Company or a Subsidiary (or served as a member of the Board), any of its current or future Subsidiaries or Affiliates, or Warner Bros. Discovery, Inc for at least ten years, where your period of service is determined using the Company's Prior Employment Service Policy or a successor policy chosen by the Committee, and (iii) you have been actively employed or actively served as a member of the Company's Board as described in the foregoing clause (ii) for at least six months since the Date of Grant.

2. **Change in Control.** Notwithstanding the Plan's provisions, if an Approved Transaction,
   Control Purchase, or Board Change (each a "***Change in Control***") occurs before the ERSU is fully Vested and while you remain actively employed by the Company or a Subsidiary (or serve as a member of the Board) (without reference to any deemed continuous employment or service following an involuntary a termination without Cause pursuant to the **Vesting Schedule** section above), and provided that there is an equitable substitution or replacement for the ERSU in connection with a Change in Control, the ERSU will have accelerated Vesting as a result of the Change in Control only if (i) within 12 months after the Change in Control, (A) the Company or a Subsidiary terminates your employment other than for Cause, or (B) if you are a party to an employment agreement with the Company or a Subsidiary that permits you to resign for Good Reason, you resign for Good Reason or (ii) during such 12-month period after the Change in Control, you are given notice by the Company that, in connection with a termination of your employment by the Company or a Subsidiary other than for Cause, you shall no longer be required to provide services for the Company or its affiliates or subsidiaries as an employee or member of the Board and you cease to provide such services, but due to the length of any statutorily or contractually required notice period, your employment actually terminates following the expiration of such 12-month period.

   "***Good Reason***" has the meaning provided in your employment agreement with the Company (or a Subsidiary), if any.

   Accelerated Vesting will accelerate the Distribution Date only if and to the extent permitted under Section 409A of the Code and the regulations thereunder ("***Section 409A***"); otherwise, any ERSUs that may become Vested on an accelerated basis, whether on or following a Change in Control (or

otherwise hereunder), will be settled pursuant to the original Vesting Schedule and its associated Distribution Date(s).

**3. <u>Distribution Date</u>.** Subject to any overriding provisions in the Plan or in Section 14 below, you will receive a distribution of the Shares equivalent to your Vested ERSU Shares as soon as practicable following the date on which you become Vested (with the actual date being the "***Distribution Date***") and, in any event, no later than 60 days following the Vesting Date(s) or other event hereunder on which the ERSUs become Vested (or, if earlier, December 31 of the calendar year in which an applicable Vesting Date occurred), unless the Board determines that you may make a timely deferral election to defer distribution to a later date and you have made such an election (in which case the deferred date will be the "***Distribution Date***").

**4. <u>Clawback</u>.** If the Company's Board of Directors or its Compensation Committee (the "***Committee***") determines, in its sole discretion, that you engaged in fraud or misconduct as a result of which or in connection with which the Company is required to or decides to restate its financial statements, the Committee may, in its sole discretion, impose any or all of the following:

(a) Immediate expiration of the ERSU, whether vested or not, if granted within the first 12 months after issuance or filing of any financial statement that is being restated (the "***Recovery Measurement Period***"); and

(b) Payment or transfer to the Company of the Gain from the ERSU, where the "***Gain***" consists of the greatest of (i) the value of the ERSU Shares on the applicable Distribution Date on which you received them within the Recovery Measurement Period, (ii) the value of ERSU Shares received during the Recovery Measurement Period, as determined on the date of the request by the Committee to pay or transfer, (iii) the gross (before tax) proceeds you received from any sale of the ERSU Shares during the Recovery Measurement Period, and (iv) if transferred without sale during the Recovery Measurement Period, the value of the ERSU Shares when so transferred.

This remedy is in addition to any other remedies that the Company may have available in law or equity. You expressly agree that the Company may take such actions as are necessary or appropriate to effectuate the foregoing (as applicable to you) or applicable law without further consent or action being required by you.

Payment is due in cash or cash equivalents within 10 days after the Committee provides notice to you that it is enforcing this clawback. Payment will be calculated on a gross basis, without reduction for taxes or commissions. The Company may, but is not required to, accept retransfer of shares in lieu of cash payments.

**5. <u>Restrictions and Forfeiture</u>.** You may not sell, assign, pledge, encumber, or otherwise transfer any interest ("***Transfer***") in the ERSU Shares until the ERSU Shares are distributed to you. Any attempted Transfer that precedes the Distribution Date is invalid.

Unless the Board determines otherwise or the Grant Agreement provides otherwise, if your employment or service with the Company (including its Subsidiaries) terminates for any reason before your ERSU is Vested, then you will forfeit the ERSU (and the Shares to which they relate) to the extent that the ERSU does not otherwise vest as a result of the termination, pursuant to the rules in the

**Vesting Schedule** or **Change in Control** section. You forfeit any unvested ERSU immediately if the Company or a Subsidiary terminates your employment for Cause or if you resign your employment (other than a resignation that would constitute a Retirement). The forfeited ERSU will then immediately revert to the Company. You will receive no payment for the ERSU if you forfeit it.

Your employment or service with the Company or a Subsidiary will be treated as terminating through a resignation that does not qualify for treatment applicable to terminations without Cause if either (i) the entity that employs you ceases to qualify as a Subsidiary because of its sale, distribution, or other disposition to an unrelated entity or (ii) because the entity that employs you sold a substantial portion of its assets and your employment ended for any reason at or in connection with the closing of that sale, distribution, or other disposition. For the avoidance of doubt, however, any termination of your employment or service by reason of either of the occurrences described in (i) and (ii) of the immediately preceding sentence may nevertheless qualify for treatment applicable to terminations upon Retirement to the extent such Retirement constitutes a “separation from service” under Section 409A.

6. **Limited Status.** You understand and agree that the Company will not consider you a shareholder for any purpose with respect to the ERSU Shares, unless and until the ERSU Shares have been issued to you on the Distribution Date. You will not receive dividends with respect to the ERSU.

7. **Voting**. You may not vote the ERSU. You may not vote the ERSU Shares unless and until the Shares are distributed to you.

8. **Taxes and Withholding.** The ERSU provides tax deferral, meaning that the ERSU Shares are not taxable to until you actually receive the ERSU Shares on or around the Distribution Date. You will then owe taxes at ordinary income tax rates as of the Distribution Date at the Shares' value. As an employee of the Company or a Subsidiary, you may owe FICA and HI (Social Security and Medicare) taxes before the Distribution Date.

Issuing the Shares under the ERSU is contingent on satisfaction of all obligations with respect to required tax or other required withholdings (for example, in the U.S., Federal, state, and local taxes). The Company may take any action permitted under Section 11.9 of the Plan to satisfy such obligation, including, if the Board so determines, satisfying the tax obligations by (i) reducing the number of ERSU Shares to be issued to you by that number of ERSU Shares (valued at their Fair Market Value on the Distribution Date) that would equal all taxes required to be withheld (at their minimum withholding levels), subject to approval by the Committee if you are subject to Section 16 of the Exchange Act, (ii) accepting payment of the withholdings from a broker in connection with a sale of the ERSU Shares or directly from you, or (iii) taking any other action under Section 11.9 of the Plan.

9. **Compliance with Law.** The Company will not issue the ERSU Shares if doing so would violate any applicable Federal or state securities laws or other laws or regulations. You may not sell or otherwise dispose of the ERSU Shares in violation of applicable law.

10. **Additional Conditions to Receipt.** The Company may postpone issuing and delivering any ERSU Shares for so long as the Company determines to be advisable to satisfy the following:

(a) its completing or amending any securities registration or qualification of the ERSU Shares *or* its or your satisfying any exemption from registration under any Federal or state law, rule, or regulation;

(b) its receiving proof it considers satisfactory that a person seeking to receive the ERSU Shares after your death is entitled to do so;

(c) your complying with any requests for representations under the Plan; and

(d) your complying with any Federal, state, or local tax withholding obligations.

**11. Additional Representations from You.** If the vesting provisions of the ERSU are satisfied and you are entitled to receive ERSU Shares at a time when the Company does not have a current registration statement (generally on Form S-8) under the Securities Act of 1933 (the "***Act***") that covers issuances of shares to you, you must comply with the following before the Company will issue the ERSU Shares to you. You must

**(a)** represent to the Company, in a manner satisfactory to the Company's counsel, that you are acquiring the ERSU Shares for your own account and not with a view to reselling or distributing the ERSU Shares; and

**(b)** agree that you will not sell, transfer, or otherwise dispose of the ERSU Shares unless:

**(i)** a registration statement under the Act is effective at the time of disposition with respect to the ERSU Shares you propose to sell, transfer, or otherwise dispose of; or

**(ii)** the Company has received an opinion of counsel or other information and representations it considers satisfactory to the effect that, because of Rule 144 under the Act or otherwise, no registration under the Act is required.

**12. No Effect on Employment or Other Relationship.** Nothing in this Grant Agreement restricts the Company's rights or those of any of its affiliates to terminate your employment or other relationship at any time and for any or no reason. The termination of employment or other relationship, whether by the Company or any of its affiliates or otherwise, and regardless of the reason for such termination, has the consequences provided for under the Plan, this Grant Agreement and any applicable employment or severance agreement or plan.

**13. No Effect on Running Business.** You understand and agree that the existence of the ERSU will not affect in any way the right or power of the Company or its stockholders to make or authorize any adjustments, recapitalizations, reorganizations, or other changes in the Company's capital structure or its business, or any merger or consolidation of the Company, or any issuance of bonds, debentures, preferred or other stock, with preference ahead of or convertible into, or otherwise affecting the Company's Common Stock or the rights thereof, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether or not of a similar character to those described above.

**14. Section 409A.** The ERSU is intended to comply with the requirements of Section 409A and must be construed consistently with that section. Notwithstanding anything in the Plan or this Grant Agreement to the contrary, if the ERSU Vests in connection with your "separation from service" within the meaning of Section 409A (as determined by the Company), and if (x) you are then a "specified employee" within the meaning of Section 409A at the time of such separation from service

(as determined by the Company, by which determination you agree you are bound) and (y) the distribution of ERSU Shares under such accelerated ERSU will result in the imposition of additional tax under Section 409A if distributed to you within the six month period following your separation from service, then the distribution under such accelerated ERSU will not be made until the earlier of (i) the date six months and one day following the date of your separation from service or (ii) the 10th day after your date of death. Neither the Company nor you shall have the right to accelerate or defer the delivery of any such ERSU Shares or benefits except to the extent specifically permitted or required by Section 409A. In no event may the Company or you defer the delivery of the ERSU Shares beyond the date specified in the **Distribution Date** section, unless such deferral complies in all respects with Treasury Regulation Section 1.409A-2(b) related to subsequent changes in the time or form of payment of nonqualified deferred compensation arrangements, or any successor regulation. In any event, the Company makes no representations or warranty and shall have no liability to you or any other person, if any provisions of or distributions under this Grant Agreement are determined to constitute deferred compensation subject to Section 409A but not to satisfy the conditions of that section.

**15. Unsecured Creditor.** The ERSU creates a contractual obligation on the part of the Company to make a distribution of the ERSU Shares at the time provided for in this Grant Agreement. Neither you nor any other party claiming an interest in deferred compensation hereunder shall have any interest whatsoever in any specific assets of the Company. Your right to receive distributions hereunder is that of an unsecured general creditor of Company.

**16. Governing Law**. The laws of the State of Delaware will govern all matters relating to the ERSU, without regard to the principles of conflict of laws.

**17. Notices.** Any notice you give to the Company must follow the procedures then in effect. If no other procedures apply, you must send your notice in writing by hand or by mail to the office of the Company's Secretary (or to the Chair of the Board if you are then serving as the sole Secretary). If mailed, you should address it to the Company's Secretary (or the Chair of the Board) at the Company's then corporate headquarters, unless the Company directs ERSU holders to send notices to another corporate department or to a third-party administrator or specifies another method of transmitting notice. The Company and the Board will address any notices to you using its standard electronic communications methods or at your office or home address as reflected on the Company's personnel or other business records. You and the Company may change the address for notice by notice to the other, and the Company can also change the address for notice by general announcements to ERSU holders.

**18. Amendment.** Subject to any required action by the Board or the stockholders of the Company, the Company may cancel the ERSU and provide a new Award under the Plan in its place, provided that the Award so replaced will satisfy all of the requirements of the Plan as of the date such new Award is made and no such action will adversely affect the ERSU to the extent then Vested.

**19. Plan Governs.** Wherever a conflict may arise between the terms of this Grant Agreement and the terms of the Plan, the terms of the Plan will control. The Board may adjust the number of ERSU Shares and other terms of the ERSU from time to time as the Plan provides.

**Discovery Communications, Inc. 2013 Incentive Plan (the "Plan")**
**Restricted Stock Units (Substitute WarnerMedia Awards)**

Restricted Stock Unit Award For employees of Warner Bros. Discovery, Inc. Outside the United States

*This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933.*

---

Name: #ParticipantName#

Grant Date: #GrantDate#

Restricted Stock Units Granted: #QuantityGranted#

Vesting Schedule: #VestingDateandQuantity#

---

1. General Terms. Pursuant to the terms of the Plan, the following terms and conditions shall apply to substitute grants of Restricted Stock Units ("Restricted Stock Units" or "RSUs") made to employees of Warner Bros. Discovery, Inc. (the "Company") outside the United States in connection with the closing of the merger in which WarnerMedia became a wholly-owned subsidiary of Discovery, Inc. (the "Merger").

2. Definitions. Capitalized terms used in this grant notice ("Grant Notice") shall have the meanings given to them in the Plan unless the context calls for another meaning or except as otherwise provided below.

(a) "Participant" means the grantee of this substitute Award.

(b) "WarnerMedia" means Warner Media, LLC or one of its subsidiaries.

(c) The definition of "Disability" in the Plan shall not apply and instead be replaced by the following: "Disability" means that the Participant would qualify to receive benefit payments under the long-term disability plan or policy, as it may be amended from time to time, of the Company or, if different, the Subsidiary of the Company employing the Participant (the "Employer"), regardless of whether the Participant is covered by such policy. If the Company or the Employer does not have a long-term disability plan or policy, for purposes of this Grant Notice, "Disability" means that the Participant is unable to carry out the responsibilities and functions of the position held by the Participant by reason of any medically determined physical or mental impairment for a period of not less than one hundred and eighty (180) consecutive days. The Participant shall not be considered to have incurred a Disability for purpose of the RSUs unless the Participant furnishes proof of such impairment sufficient to satisfy the Committee in its sole discretion.

(d) "Retirement" or to "Retire" means the Participant's Termination of Employment for any reason other than death, Disability, or for Cause, on or after the date the Participant is at least age fifty-five (55) and has completed 10 Years of Service.

(e) The definition of "cause" in the Plan shall not apply and instead be replaced by the following: "Cause" means "Cause" as defined in an employment agreement between WarnerMedia and the Participant or, if not defined therein or if there is no such agreement, "Cause" means (i) the Participant's continued failure substantially to perform such Participant's duties (other than as a result of total or partial incapacity due to physical or mental illness) for a period of ten (10) days following written notice by WarnerMedia or the Company to the Participant of such failure, (ii) dishonesty in the performance of the Participant's duties, (iii) the Participant's conviction of, or plea of nolo contendere to, a crime constituting (A) a felony under the laws of the United States or any state thereof or (B) a misdemeanor involving moral turpitude, (iv) the Participant's insubordination, willful malfeasance or willful misconduct in connection with the Participant's duties or any act or omission which is injurious to the financial condition or business reputation of WarnerMedia or the Company, or (v) the Participant's breach of any non-competition, non-solicitation or confidentiality provisions to which the Participant is subject. Unless otherwise provided in an employment agreement between WarnerMedia and the Participant, the determination of the Committee as to the existence of "Cause" will be conclusive on the Participant and the Company.

(f) "Severance Period" means the period of time following a Termination of Employment during which a Participant is entitled to receive salary continuation payments whether pursuant to an employment contract with, or a severance plan or other existing arrangement maintained by, WarnerMedia.

(g) "Years of Service" means the WarnerMedia service Participant was credited with under the terms of Participant's Award at the closing of the Merger plus any service with the Company thereafter.

(h) "Termination of Employment" or a similar reference means the event where the Participant is no longer an employee of the Company or any of its Subsidiaries, including but not limited to where the employing company ceases to be a Subsidiary of the Company. With respect to any Award that provides "nonqualified deferred compensation" within the meaning of Section 409A of the Code, "Termination of Employment" shall mean a "separation from service" as defined under Section 409A of the Code.

3. Incorporation of Terms of Plan. The RSUs are subject to the terms and conditions of the Plan, which are incorporated herein by reference, except for Sections 11.1, 11.2 and 11.20 of the Plan which shall not apply to RSUs granted under this Grant Notice. In the event of any other inconsistency between the Plan and this Grant Notice, the terms of the Plan shall control except as otherwise expressly set forth in this Grant Notice. For a summary of key plan terms, see Exhibit A to this Grant Notice. This grant is subject to the additional terms and conditions set forth on the Addendum attached hereto.

4. Vesting. Subject to Section 7 hereof, these RSUs will vest as noted above.

5. Form of Payment. Except as otherwise provided in the Plan, RSUs shall be payable in shares of Common Stock of the Company ("Shares").

6. Dividend Equivalents. If the Company pays any regular cash dividend on its Shares on any date while RSUs are outstanding, the Participant shall be paid, for each RSU held by the Participant on the record date, an amount of cash equal to the dividend paid on a Share at the time that such dividends are paid to holders of Shares.

7. Impact of Termination of Employment.

| Type of Termination | Award Treatment |
|---|---|
| **Termination of Employment for Cause** | Notwithstanding anything in this Grant Notice to the contrary, in the event of the Participant's Termination of Employment for Cause, all of the Participant's outstanding undistributed RSUs shall be immediately forfeited as of the effective date of Termination of Employment. |
| **Termination of Employment Due to Death or Disability** | In the event of the Participant's Termination of Employment due to death or Disability, all of the Participant's unvested RSUs will vest on the date of Termination of Employment and will pay out promptly. |
| **Voluntary Termination of Employment While Not Retirement Eligible** | In the event of the Participant's voluntary Termination of Employment while not Retirement eligible, all of the Participant's outstanding unvested RSUs shall be immediately forfeited as of the effective date of Termination of Employment. |

| | |
|---|---|
| **Termination of Employment While Retirement Eligible (including Voluntary or Involuntary Termination, but excluding Termination for Cause)** | If a Participant is eligible to Retire as of the Participant's Termination of Employment, then all of the Participant's RSUs shall become payable upon such Termination of Employment.<br><br>Notwithstanding the foregoing, if the Company receives an opinion of counsel that there has been a legal judgment and/or legal development in your jurisdiction that would likely result in the favorable treatment applicable to the RSUs pursuant to this section being deemed unlawful and/or discriminatory, then the Company or the Employer will not apply the favorable treatment at the time of Participant's Termination of Employment, and the RSUs will be treated as set forth in the other sections of this Grant Notice, as applicable. |
| **Involuntary Termination Scenarios (other than For Cause)** | |
| **Termination of Employment While Not Retirement Eligible and Participant Becomes Retirement Eligible During Severance Period** | If a Participant is not eligible to Retire as of the Participant's Termination of Employment but would be eligible to Retire by the last day of the Participant's Severance Period, then any unvested RSUs held by such Participant shall fully vest and become payable upon such Termination of Employment. |

| | |
|---|---|
| **Termination of Employment While Not Retirement Eligible and RSUs Are Scheduled to Vest During Severance Period** | If a Participant is not eligible to Retire as of Termination of Employment and will not be eligible to Retire by the end of the Participant's Severance Period, then any unvested RSUs that are scheduled to vest during the Severance Period will vest and become payable upon such Termination of Employment. Any unvested RSUs that have a vesting date that occurs after the end of a Participant's Severance Period shall be completely forfeited upon such Termination of Employment. |
| **Other Involuntary Terminations** | In the event of the Participant's involuntary Termination of Employment not listed above, all of the Participant's outstanding unvested RSUs shall be immediately forfeited as of the effective date of Termination of Employment. |

8. Electronic Delivery and Participation. The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on- line or electronic system established and maintained by the Company or a third party designated by the Company.

9. Copy of the Plan and Documents. In accepting the RSUs, the Participant acknowledges that he or she has received and read a copy of the Plan and the Addendum. The Participant acknowledges that the Participant may be entitled from time to time to receive certain other documents related to the Company, including the Company's annual report to stockholders and proxy statement related to its annual meeting of stockholders, and the Participant consents to receive such documents electronically through the Internet or as the Company otherwise directs.

10. Severability. The provisions of this Grant Notice are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Exhibit A

Key Plan Terms

1. Limited Status**. Participant understands and agrees that the Company will not consider Participant a shareholder for any purpose with respect to the Shares Participant receives upon vesting of the RSUs (such Shares, "RSU Shares"), unless and until the RSU Shares have been issued to Participant in accordance with the Plan and the Grant Notice. Participant will not receive dividends with respect to the Restricted Stock Units.**

2. Voting**. Participant may not vote the Restricted Stock Units. Participant may not vote the RSU Shares unless and until such shares are distributed to Participant.**

3. Taxes and Withholding**. The RSUs provide tax deferral, meaning that the RSU Shares are not taxable to Participant until Participant actually receives the RSU Shares on the date specified in the Grant Notice (such date, the "Distribution Date"). Participant will then owe taxes at ordinary income tax rates as of the Distribution Date at the value of the Shares received. As an employee of the Company, Participant may owe FICA and HI (Social Security and Medicare) taxes before the Distribution Date.**

**Issuing the Shares under the RSUs is contingent on satisfaction of all obligations with respect to required tax or other required withholdings (for example, in the U.S., Federal, state, and local taxes). The Company may take any action permitted under Section 11.9 of the Plan to satisfy such obligation, including, if the Board so determines, satisfying the tax obligations by (i) reducing the number of RSU Shares to be issued to Participant by that number of RSU Shares (valued at their Fair Market Value on the Distribution Date) that would equal all taxes required to be withheld (at their minimum withholding levels), (ii) accepting payment of the withholdings from a broker in connection with a sale of the RSU Shares or directly from Participant, or (iii) taking any other action under Section 11.9 of the Plan.**

4. Compliance with Law**. The Company will not issue the RSU Shares if doing so would violate any applicable Federal or state securities laws or other laws or regulations. Participant may not sell or otherwise dispose of the RSU Shares in violation of applicable law.**

5. No Effect on Employment or Other Relationship**. Nothing in the Grant Notice or this Exhibit A restricts the Company's rights or those of any of its affiliates to terminate Participant's employment or other relationship at any time and for any or no reason. The termination of employment or other relationship, whether by the Company or any of its affiliates or otherwise, and regardless of the reason for such termination, has the consequences provided for under the Grant Notice and any applicable employment or severance agreement or plan.**

6. No Effect on Running Business**. Participant understands and agrees that the existence of the RSUs will not affect in any way the right or power of the Company or its stockholders to make or authorize any adjustments, recapitalizations, reorganizations, or other changes in the Company's capital structure or its business, or any merger or consolidation of the Company, or any issuance of bonds, debentures, preferred or other stock, with preference ahead of or convertible into, or otherwise affecting the Company's Common Stock or the rights thereof, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether or not of a similar character to those described above.**

7. Section 409A**. The RSUs are intended to comply with the requirements of Section 409A and must be construed consistently with that section. Notwithstanding anything in the Plan or the Grant Notice to the contrary, if the RSUs vest in connection with Participant's "separation from service" within the meaning of Section 409A (as determined by the Company), and if (x) Participant is then a "specified employee" within the meaning of Section 409A at the time of such separation from service (as determined by the Company, by which determination Participant agrees Participant is bound) and (y) the distribution of RSU Shares under such accelerated RSUs will result in the imposition of additional tax under Section 409A if distributed to Participant within the six month period following Participant's separation from service, then the distribution under such accelerated RSUs will not be made until the earlier of (i) the date six months and one day following the date of Participant's separation from service or (ii) the 10th day after Participant's date of death. Neither the Company nor Participant shall have the right to accelerate or defer the delivery of any such RSU Shares or benefits except to the extent specifically permitted or required by Section 409A. In no event may the Company or Participant defer the delivery of the RSU Shares beyond the date specified in the Grant Notice, unless such deferral complies in all respects with Treasury Regulation Section 1.409A-2(b) related to subsequent changes in the time or form of payment of nonqualified deferred compensation arrangements, or any successor regulation. In any event, the Company makes no representations or warranty and shall have no liability to Participant or any other person, if any provisions of or distributions under the Grant Notice are determined to constitute deferred compensation subject to Section 409A but not to satisfy the conditions of that section.**

8. Unsecured Creditor**. The Restricted Stock Units create a contractual obligation on the part of the Company to make a distribution of the RSU Shares at the time provided for in the Grant Notice. Neither Participant nor any other party claiming an interest in deferred compensation hereunder shall have any interest whatsoever in any specific assets of the Company. Participant's right to receive distributions hereunder is that of an unsecured general creditor of Company.**

9. Governing Law**. The laws of the State of Delaware will govern all matters relating to the Restricted Stock Units, without regard to the principles of conflict of laws.**

10. Notices**. Any notice Participant gives to the Company must follow the procedures then in effect. If no other procedures apply, Participant must send Participant's notice in writing by hand or by mail to the office of the Company's Secretary (or to the Chair of the Board if Participant is then serving as the sole Secretary). If mailed, Participant should address it to the Company's Secretary (or the Chair of the Board) at the Company's then corporate headquarters, unless the Company directs RSU holders to send notices to another corporate department or to a third party administrator or specifies another method of transmitting notice. The Company and the Board will address any notices to Participant using its standard electronic communications methods or at Participant's office or home address as reflected on the Company's personnel or other business records. Participant and the Company may change the address for notice by notice to the other, and the Company can also change the address for notice by general announcements to Restricted Stock Unit holders.**

11. Amendment**. Subject to any required action by the Board or the stockholders of the Company, the Company may cancel the Restricted Stock Units and provide a new Award under the Plan in its place, provided that the Award so replaced will satisfy all of the requirements of the Plan as of the date such new Award is made and no such action will adversely affect the Restricted Stock Units to the extent then vested.**

12. Plan Governs**. Wherever a conflict may arise between the terms of the Grant Notice and the terms of the Plan, the terms of the Plan will control. The Board may adjust the number of RSU Shares and other terms of the Restricted Stock Units from time to time as the Plan provides.**

**INTERNATIONAL ADDENDUM TO**

**WARNER BROS. DISCOVERY, INC.**

**RESTRICTED STOCK UNIT (SUBSTITUTE WARNERMEDIA AWARD) GRANT NOTICE FOR EMPLOYEES**

**Special Terms and Conditions Applicable in Countries Outside the United States**

Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Restricted Stock Unit grant notice (the "***Grant Notice***") or the Discovery Communications, Inc. 2013 Incentive Plan (As Amended and Restated) (the "***Plan***"). This International Addendum (the "***Addendum***") is incorporated into the Grant Notice by reference and supplements the terms of the Grant Notice and future grants to you under the Plan.

This Addendum includes additional (or, if indicated, different) terms and conditions that govern an award granted under the program if you work and/or reside in one of the countries listed below. If you are a citizen or resident of a country other than that in which you are currently working and/or residing (or are considered as such for local law purposes) or if you transfer your service relationship and/or residence to another country after the award is granted, the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you. In addition, if you transfer your service relationship and/or residence to another country after the award is granted, any notifications contained herein may not be applicable to you in the same manner.

This Addendum may also include information regarding securities laws, exchange controls and certain other issues of which you should be aware with respect to participation in the Plan. The information is based on the securities, exchange control, and other laws in effect in the respective countries as of January 2022. Such laws are often complex and change frequently. As a result, the Company strongly recommends you not rely on the information contained herein as the only source of information relating to the consequences of your participation in the Plan because the information may be out of date at the time an RSU vests or you sell Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to your particular situation, and the Company is not in a position to assure you of a particular result. Accordingly, you should seek appropriate professional advice as to how the relevant laws in your country may apply to your particular situation.

**ALL COUNTRIES OUTSIDE THE UNITED STATES**

1. **Withholding Taxes.** You acknowledge that, regardless of any action taken by the Company or, if different, the Affiliate to which you provide services (the "***Employer***"), the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("***Tax-Related Items***") is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer, if any. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the RSU, including, but not limited to, the grant, vesting of the RSU, the subsequent sale of Shares acquired pursuant to such vesting, and the receipt of any dividends; and (ii) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSU to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you are subject to Tax-Related Items in more than one jurisdiction, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   In connection with the relevant taxable or tax withholding event, the Company may take any action permitted under Section 11.9 of the Plan to satisfy such obligation, including, if the Committee so determines, satisfying the tax obligations by (i) reducing the number of RSU Shares to be issued to you by that number of RSU Shares (valued at their Fair Market Value on the Distribution Date) that would equal all taxes required to be withheld (at their minimum withholding levels), (ii) accepting payment of the withholdings from a broker in connection with a sale of the RSU Shares or directly from you, (iii) withholding from your wages or other cash compensation payable to you by the Company and/or the Employer; or (iv) taking any other action under Section 11.9 of the Plan.

   The Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates in your jurisdiction(s), including maximum applicable rates. If the Company and/or the Employer withhold more than the amount necessary to satisfy the liability for Tax-Related Items, you may receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares or, if not refunded, you may be able to seek a refund from the applicable tax authorities. If the Company and/or the Employer withhold less than the amount necessary to satisfy the liability for Tax-Related Items, you may be required to pay additional Tax-Related Items directly to the applicable tax authorities or to the Company and/or the Employer. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes you are deemed to have been issued the full number of Shares, notwithstanding that a number of the Shares is held back solely for the purpose of paying the Tax-Related

Items due as a result of any aspect of your participation in the Plan. No fractional Shares will be withheld or issued pursuant to the issuance of Shares thereunder.

You agree to pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to allow to issue or deliver the Shares or the proceeds of the sale of Shares, if you fail to comply with your obligations in connection with the Tax-Related Items.

2. **Nature of Grant**. In accepting the RSUs, you acknowledge, understand and agree that:

   a. the grant of the RSUs is exceptional, voluntary and occasional and does not create any contractual or other right to receive future grants of RSUs, or benefits in lieu of RSUs, even if RSUs have been granted in the past;

   b. all decisions with respect to future RSUs or other grants, if any, will be at the sole discretion of the Company;

   c. you are voluntarily participating in the Plan;

   d. the RSUs and any Shares acquired under the Plan, and the income from and value of same, are not intended to replace any pension rights or compensation;

   e. unless otherwise agreed with the Company, the RSUs and any Shares acquired under the Plan, and the income from and value of same, are not granted as consideration for, or in connection with, the service you may provide as a director of any Affiliate;

   f. the RSUs and any Shares acquired under the Plan, and the income from and value of same, are not part of normal or expected compensation for any purpose, including for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement or welfare benefits or similar mandatory payments;

   g. the future value of the Shares underlying the RSUs is unknown, indeterminable, and cannot be predicted;

   h. if the Shares underlying the RSUs do not increase in value, the RSUs will have no value;

   i. For purposes of the RSUs, your employment or other service will be considered terminated as of the date you are no longer actively providing services to the Company or any Affiliate (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are providing services or the terms of your employment or service relationship, if any) and will not be extended by any notice period (*e.g.*, your period of employment or service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where you are providing services or the terms of your employment or service agreement, if any). The Committee shall

have the exclusive discretion to determine when you are no longer actively employed or providing services (*i.e.*, the termination date) for purposes of the RSUs (including whether you may still be considered to be employed or providing services while on a leave of absence).

j. neither the Company, the Employer nor any other Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the RSUs or of any amounts due to you pursuant to the vesting of the RSUs or the subsequent sale of any Shares acquired upon vesting; and

k. no claim or entitlement to compensation or damages shall arise from forfeiture of the RSUs resulting from the termination of your employment or other service relationship (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction, if any).

**3.** **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation or your acquisition or sale of the underlying Shares. You should consult with your own personal tax, legal and financial advisors regarding your participation before taking any action related to the award.

**4.** **Language**. You acknowledge and represent that you are proficient in the English language or have consulted with an advisor who is sufficiently proficient in English so as to allow you to understand the terms and conditions of this agreement, or any other document related to the award. Furthermore, if you have received the Grant Notice, or any other document related to the RSUs, and/or translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

**5.** **Imposition of Other Requirements**. The Company reserves the right to impose other requirements on participation in the Plan, RSUs or Shares acquired pursuant to the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the undersigned to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

**6.** **Compliance with Local Law**. Notwithstanding any other provision of the Plan or the Grant Notice, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting of the RSUs prior to the completion of any registration or qualification of the Shares under any U.S. or non-U.S. local, state or federal securities or other applicable law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other U.S. or non-U.S. governmental regulatory body, or prior to obtaining any approval or other clearance from any U.S. or non-U.S. local, state or federal governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. You understand that the Company is under no obligation to register or qualify the Shares subject to the RSUs with the SEC or any U.S. state or non-U.S. securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, you agree that the Company shall have unilateral authority to amend the Plan and this Grant Notice without your consent to the extent necessary to comply with securities or other laws applicable to the issuance of the Shares.

7. **Choice of Venue**. You agree to the exclusive venue and jurisdiction of the State and Federal Courts located in the State of Delaware and waive any objection based on lack of jurisdiction or inconvenient forum.

8. **Insider Trading / Market Abuse**. You may be subject to insider trading restrictions and/or market abuse laws which may affect your ability to accept, acquire, sell or otherwise dispose of the Shares, rights to Shares (*e.g.*, the RSUs) or rights linked to the value of shares (*e.g.*, phantom awards, futures) during such time(s) you are considered to have "inside information" regarding the Company as defined in the laws or regulations in the applicable jurisdictions. Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information. Furthermore, you could be prohibited from (i) disclosing the inside information to any third party (other than on a "need to know" basis) and (ii) "tipping" third parties or causing them otherwise to buy or sell securities. Keep in mind third parties includes fellow employees. Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable insider trading policy of the Company. You are responsible for complying with any restrictions and should speak to your personal advisor on this matter.

9. **Exchange Control, Tax and/or Foreign Asset / Account Reporting**. Certain tax, foreign asset and/or foreign account reporting requirements and exchange controls may affect your ability to hold Shares or funds received from participating in the program in a brokerage or bank account outside of your country. You may be required to report such accounts, assets or transactions to the tax or other authorities in your country. You may also be required to repatriate sale proceeds or other funds received as a result of your participation to your country through a designated bank or broker and/or within a certain time after receipt. You are responsible for complying with any applicable regulations and should consult with your personal legal and tax advisors for any details.

10. **Addendum.** Notwithstanding any provisions in the Grant Notice, the RSUs shall be subject to any additional terms and conditions set forth in this Addendum. Moreover, if you relocate to one of the countries included in the Addendum, the additional terms and conditions for such country will apply to you to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. The Addendum constitutes part of the Grant Notice.

11. **Waiver**. You acknowledge that a waiver by the Company or breach of any provision of the Grant Notice or Addendum shall not operate or be construed as a waiver of any other provision of the Grant Notice or Addendum, or of any subsequent breach by you or any other participant.

12. ***Data Privacy. If you would like to participate in the Plan, you will need to review the information provided in this section and, where applicable, declare consent to the processing and/or transfer of personal data as described below.***

    a) ***EEA+ Controller and Representative. If you are based in the European Union ("EU"), the European Economic Area, or the United Kingdom (collectively "EEA+"), you should note that the Company, with its address at 8403 Colesville Road, Silver Spring, MD 20910, United States of America, is the controller responsible for the processing of your personal data in connection with the agreement.***

    b) ***Data Collection and Usage. The Company collects, uses and otherwise processes certain personal data about you, including, but not limited to, your name, home***

*address and telephone number, email address, date of birth, social insurance number, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any Shares or directorships held in the Company, details of all options or any other awards or entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in your favor, which you receive from the Company, the Employer or otherwise in connection with the Plan ("Data"), for the purposes of implementing, administering and managing the RSU and allocating the Shares. The legal basis, where required, for the processing of Data by the Company is your consent, as further described below.*

c) *Stock Plan Administration Service Providers. The Company transfers Data to Fidelity Stock Plan Services, LLC, an independent service provider (the "Service Provider"), which is assisting the Company by performing recordkeeping and administration services for the award. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar manner. The Service Provider will open an account for you to receive and trade Shares. You may be asked to agree on separate terms and data processing practices with the Service Provider, with such agreement being a condition to the ability to participate in the program.*

d) *International Data Transfers. In the event you reside, work or are otherwise located outside of the U.S., Data will be transferred from your country to the U.S., where the Company and its service providers are based. You understand and acknowledge that the U.S. is not subject to an unlimited adequacy finding by the European Commission and might not provide a level of protection of personal data equivalent to the level of protection in your country. As a result, in the absence of the implementation of appropriate safeguards such as the Standard Contractual Clauses adopted by the EU Commission or binding corporate rules approved by the competent EU data protection authority, the processing of personal data might not be subject to substantive data processing principles or supervision by data protection authorities. In addition, data subjects might have no or less enforceable rights regarding the processing of their personal data. The onward transfer of Data from the Company to the Service Provider or, as the case may be, a different service provider of the Company is based solely on your consent.*

e) *Data Retention. The Company will hold and use the Data only as long as is necessary to implement, administer and manage your regulatory obligations, including under tax and security laws.*

f) *Data Subject Rights. You may have a number of rights under data privacy laws in your jurisdiction. Depending on where you are based, such rights may include the right to (i) request access or copies of Data the Company processes, (ii) the rectification or amendment of incorrect or incomplete Data, (iii) the deletion of Data, (iv) request restrictions on the processing of Data, (v) object to the processing of Data for legitimate interests, (vi) the portability of Data, (vi) lodge complaints with competent authorities in your jurisdiction, and/or to (viii) receive a list with the names and addresses of any potential recipients of Data. To receive additional information regarding these rights or to exercise these rights, you can contact the Company's data privacy office at privacy_office@discovery.com.*

g) *Necessary Disclosure of Personal Data. You understand that providing the Company with Data is necessary for the performance of the agreement and that*

***your refusal to provide Data would make it impossible for the Company to perform its contractual obligations and may affect your ability to participate in the Plan.***

*h)* ***Voluntariness and Consequences of Consent Denial or Withdrawal. Participation is voluntary and you are providing any consents referred to herein on a purely voluntary basis. You understand that you may withdraw any such consent at any time with future effect for any or no reason. If you do not consent, or if you later seek to withdraw your consent, your salary from or employment and career with the Employer will not be affected; the only consequence of refusing or withdrawing your consent is that the Company would not be able to grant awards to you or administer or maintain the RSU. For more information on the consequences of refusal to consent or withdrawal of consent, you should contact the Company's data privacy office at privacy_office@discovery.com.***

***Declaration of Consent. By participating in the Plan and indicating consent via the Company's online acceptance procedure, you explicitly declare your consent to the onward transfer of Data by the Company to the Service Provider or, as the case may be, a different service provider of the Company in the U.S. as described above.***

**ARGENTINA**

**Nature of Grant**. The following provision supplements Section 1 of this Addendum:

You acknowledge and agree that the RSU grant is made by the Company (not the Employer) in its sole discretion and that the value of the RSUs or any Shares acquired under the Plan shall not constitute salary or wages for any purpose under Argentine labor law, including, but not limited to, the calculation of (i) any labor benefits, such as vacation pay, thirteenth salary, compensation in lieu of notice, annual bonus, disability, and leave of absence payments, etc., or (ii) any termination or severance indemnities or similar payments.

If, notwithstanding the foregoing, any benefits under the Plan are considered for any purpose under Argentine labor law, you acknowledge and agree that such benefits shall not accrue more frequently than on each vesting date.

**Type of Offering**. Neither the RSUs nor the underlying Shares are publicly offered or listed on any stock exchange in Argentina.

**Exchange Control Information.** You are solely responsible for complying with the exchange control rules that may apply in connection with your participation in the Plan and/or the transfer of proceeds acquired under the Plan into Argentina. Prior to the vesting of the RSU or transferring proceeds into Argentina, you should consult your local bank and exchange control advisor to confirm the exchange control rules and required documentation.

**Foreign Asset/Account Reporting Information**. You must report holdings of any equity interest in a foreign company (*e.g*., Shares acquired under the Plan) on your annual tax return each year.

**AUSTRALIA**

**Impact of Termination of Employment**. This provision supplements Section 7 of the Grant Notice:

Notwithstanding anything contrary in Section 7 in the event of the Participant's voluntary or involuntary Termination of Employment while Retirement eligible, all of the Participant's outstanding unvested RSUs shall be immediately forfeited as of the effective date of Termination of Employment.

**Nature of Plan.** The Plan and the Grant Agreement is a plan to which Subdivision 83A-C of the Income Tax Assessment Act 1997 (Cth) (the "Act") applies (subject to the conditions in the Act).

**No payment constituting breach of law in Australia**. Notwithstanding anything else in the Plan or the Agreement, you will not be entitled to, and shall not claim any benefit (including without limitation a legal right) under the Plan if the provision of such benefit would give rise to a breach of Part 2D.2 of the Corporations Act 2001 (Cth), any other provision of that Act, or any other applicable statute, rule or regulation which limits or restricts the giving of such benefits. Further, the Employer is under no obligation to seek or obtain the approval of its shareholders in general meeting for the purpose of overcoming any such limitation or restriction.

**Exchange Control Information**. Exchange control reporting is required for cash transactions exceeding AUD10,000 and for international fund transfers. If an Australian bank is assisting with the transaction, the bank will file the report on your behalf, otherwise you will be responsible for complying with any exchange control reporting requirements.

**Nature of Plan.** The Plan and the Grant Notice is a plan to which Subdivision 83A-C of the Income Tax Assessment Act 1997 (Cth) (the "Act") applies (subject to the conditions in the Act).

**No payment constituting breach of law in Australia**. Notwithstanding anything else in the Plan or the Agreement, you will not be entitled to, and shall not claim any benefit (including without limitation a legal right) under the Plan if the provision of such benefit would give rise to a breach of Part 2D.2 of the Corporations Act 2001 (Cth), any other provision of that Act, or any other applicable statute, rule or regulation which limits or restricts the giving of such benefits. Further, the Employer is under no obligation to seek or obtain the approval of its shareholders in general meeting for the purpose of overcoming any such limitation or restriction.

**Exchange Control Information**. Exchange control reporting is required for cash transactions exceeding AUD10,000 and for international fund transfers. If an Australian bank is assisting with the transaction, the bank will file the report on your behalf, otherwise you will be responsible for complying with any exchange control reporting requirements.

**Australian Offer Document.**

The Company is pleased to provide you with this offer to participate in the Plan. This offer document sets out information regarding the RSU granted under the Plan for Australian resident employees of the Company and its Australian Affiliates. This information is provided by the Company to ensure compliance of the Plan with Australian Securities and Investments Commission ("***ASIC***") Class Order 14/1000 and relevant provisions of the Corporations Act 2001.

Additional Documents. In addition to the information set out in this Grant Notice, you are also being provided with copies of the following documents:

(a) the Plan;
(b) the Plan prospectus; and
(c) the Australia Employee Tax Guide (collectively, the "***Additional Documents***").

The Additional Documents provide further information to help you make an informed investment decision about participating in the Plan. Neither the Plan nor the Plan prospectus is a prospectus for the purposes of the Corporations Act 2001.

You should not rely upon any oral statements made in relation to this offer. You should rely only upon the statements contained in the Grant Notice and the Additional Documents when considering your participation in the Plan.

General Information Only. The information herein is general information only. It is not advice or information that takes into account your objectives, financial situation and needs.

You should consider obtaining your own financial product advice from a person who is licensed by ASIC to give such advice.

Risk Factors for Australian Residents. Investment in Shares involves a degree of risk. You should monitor your participation in the Plan and consider all risk factors relevant to the vesting or issuance of Shares under the Plan as set forth below and in the Additional Documents.

You should have regard to risk factors relevant to investment in securities generally and, in particular, to holding Shares. For example, the value at which an individual Share is quoted on the Nasdaq Global Select Market ("***Nasdaq***") may increase or decrease due to a number of factors. There is no guarantee that the value of a Share will increase. Factors that may affect the value of an individual Share include fluctuations in the domestic and international market for listed stocks, general economic conditions, including interest rates, inflation rates, commodity and oil prices, changes to government fiscal, monetary or regulatory policies, legislation or regulation, the nature of the markets in which the Company operates and general operational and business risks.

More information about potential factors that could affect the Company's business and financial results will be included in the Company's most recent Annual Report on Form 10-K and the Company's Quarterly Report on Form 10-Q. Copies of these reports are available at http://www.sec.gov/, on the Company's "Investor Relations" page at https://ir.corporate.discovery.com/investor-relations, and upon request to the Company.

In addition, you should be aware that the Australian dollar ("AUD") value of any Shares acquired under the Plan will be affected by the USD/AUD exchange rate. Participation in the Plan involves certain risks related to fluctuations in this rate of exchange.

Common Stock in a U.S. Corporation. Share of a U.S. corporation is analogous to ordinary shares of an Australian corporation. Each holder of a Share is entitled to one vote. Further, Shares are not liable to any further calls for payment of capital or for other assessment by the Company and have no sinking fund provisions, pre-emptive rights, conversion rights or redemption provisions.

Ascertaining the Market Value of Shares of Common Stock. You may ascertain the current market value of an individual Share as traded on the Nasdaq under the symbol "DISCA" at: https:// https://www.nasdaq.com/market-activity/stocks/disca. The AUD equivalent of that value can be obtained at: https://www.rba.gov.au/statistics/frequency/exchange-rates.html.

*Please note this will not be a prediction of the market value of an individual Share when such Shares are vested or issued under the Plan or of the applicable exchange rate on the vesting date or the date the Shares are issued.*

## BRAZIL

**Compliance with Law**. By accepting the RSU, you acknowledge that you agree to comply with applicable Brazilian laws and pay any and all applicable Tax-Related Items associated with the vesting of the RSU, the receipt of any dividends and the sale of Shares acquired under the Plan.

**Labor Law Acknowledgment.** By accepting the RSU, you understand, acknowledge and agree that, for all legal purposes (i) you are making an investment decision and (ii) the value of the underlying Shares are not fixed and may increase or decrease in value over the vesting period without compensation to you.

**Exchange Control Information.** Individuals who are resident or domiciled in Brazil are generally required to submit an annual declaration of assets and rights held outside Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is greater than US$1,000,000. If such amount is equal to or greater than US$100,000,000, the referenced declaration must be submitted quarterly, in the month following the end of each quarter. Assets and rights to be included in this annual declaration include Shares acquired under the Plan.

**Tax on Financial Transaction (IOF)**. Payments to foreign countries and the repatriation of funds (*e.g*., sale proceeds from the sale of Shares and/or dividends) into Brazil and the conversion between BRL and USD associated with such transfers may be subject to the Tax on Financial Transactions. It is your responsibility to comply with any applicable Tax on Financial Transactions arising from your participation in the Plan. You should consult with your personal tax advisor for additional details.

## BULGARIA

**Exchange Control Information.** You will be required to file statistical forms with the Bulgarian national bank annually regarding your receivables in bank accounts abroad as well as securities

held abroad (*e.g*., Shares acquired under the Plan) if the total sum of all such receivables and securities equals or exceeds BGN50,000 as of the previous calendar year end. The reports are due by March 31.

You should contact your bank in Bulgaria for additional information regarding these requirements.

## CANADA

***TERMS AND CONDITIONS***

**Form of Settlement.** RSUs granted to employee residents in Canada shall be paid in Shares only.

**Termination of Employment**. The following provision replaces Section 2(i) of the International Addendum:

Except as expressly required by applicable legislation, your employment with the Company shall be deemed to be terminated and vesting will terminate as of the date that is the earliest of: (1) the date the your employment with your Employer is terminated, or (2) the date you receive notice of termination of employment; regardless of the reason for such termination and whether or not later found to be invalid or in breach of any applicable law, including Canadian provincial employment law (including but not limited to statutory law, regulatory law and/or common law) or the terms of your employment or service agreement, if any. The Committee shall have the exclusive discretion to determine when you are no longer actively employed or providing services (*i.e.*, the termination date) for purposes of the RSU (including whether you may still be considered to be employed or providing services while on a leave of absence).

Notwithstanding the foregoing, if applicable employment standards legislation explicitly requires continued entitlement to vesting during a statutory notice period, your right to vest in the RSUs under the Plan, if any, will terminate effective as of the last day of your minimum statutory notice period. You will not earn or be entitled to pro-rated vesting for that portion of time before the date on which your right to vest terminates or if the vesting date falls after the end of your statutory notice period, nor will you be entitled to any compensation for lost vesting.

*The following provisions apply for participants resident in Quebec:*

**Data Privacy**. The following provision supplements Section 12 of the International Addendum:

You hereby authorize the Company and the Company's representatives to discuss with and obtain all relevant information from all personnel, professional or not, involved in the administration and operation of the Plan. You further authorize the Company and the administrator of the Plan to disclose and discuss the Plan with their advisors. You further authorize the Company to record such information and to keep such information in your employee file.

**Language Consent**. The parties acknowledge that it is their express wish that the Grant Notice, including this International Addendum, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

***Consentement relatif à la langue utilisée***. *Les parties reconnaissent avoir exigé la rédaction en anglais de cette convention, ainsi que de tous documents, avis et procédures judiciaires, exécutés, donnés ou intentés en vertu de, ou liés directement ou indirectement à, la présente convention.*

***NOTIFICATIONS***

**Securities Law Information.** You are permitted to sell Shares acquired under the Plan through the designated broker appointed under the Plan, if any, provided that the sale of such shares takes place outside Canada through the facilities of a stock exchange on which the Shares are listed (*i.e.*, the Nasdaq Global Select Market).

**Foreign Asset/Account Reporting Information.** You are required to report any specified foreign property (including Shares) annually on Form T1135 (Foreign Income Verification Statement) if the total cost of your specified foreign property exceeds C$100,000 at any time during the year. The form must be filed by April 30th of the following year. Specified foreign property includes Shares acquired under the Plan and may include RSUs. The RSUs must be reported–generally at a nil cost–if the $100,000 cost threshold is exceeded because of other specified foreign property you hold. If Shares are acquired, their cost generally is the adjusted cost base ("ACB") of the Shares. The ACB would normally equal the fair market value of the Shares at vesting, but if you own other Shares, this ACB may have to be averaged with the ACB of the other Shares owned by you. It is your responsibility to comply with applicable reporting obligations.

**CHILE**

**Securities Law Notice**. The offer of RSUs constitutes a private offering of securities in Chile. This offer of RSUs is made subject to general ruling N°336 of the Chilean Commission for the Financial Market ("CMF"). The offer refers to securities not registered at the securities registry or at the foreign securities registry of the CMF, and, therefore, such securities are not subject to oversight of the CMF. Given that the RSUs are not registered in Chile, the Company is not required to provide public information about the RSUs or the Shares in Chile. Unless the RSUs and/or the Shares are registered with the CMF, a public offering of such securities cannot be made in Chile.

*Esta oferta de Unidades de Acciones Restringidas ("RSU") constituye una oferta privada de valores en Chile. Esta oferta de RSU se acoge a las disposiciones de la Norma de Carácter General Nº 336 ("NCG 336") de la Comisión para el Mercado Financiero de Chile ("CMF"). Esta oferta versa sobre valores no inscritos en el Registro de Valores o en el Registro de Valores Extranjeros que lleva la CMF, por lo que tales valores no están sujetos a la fiscalización de ésta. Por tratarse las RSU de valores no registrados en Chile, no existe obligación por parte de la Compañía de entregar en Chile información pública respecto de las RSU o sus Acciones. Estos valores no podrán ser objeto de oferta pública en Chile mientras no sean inscritos en el Registro de Valores correspondiente.*

**COLOMBIA**

**Nature of Grant.** The following provision supplements Section 1 of this Addendum:

You acknowledge that pursuant to Article 128 of the Colombian Labor Code, the Plan and related benefits do not constitute a component of your "salary" for any legal purpose. Therefore, they will not be included and/or considered for purposes of calculating any and all labor benefits, such

as legal/fringe benefits, vacations, indemnities, payroll taxes, social insurance contributions and/or any other labor-related amounts, subject to the limitations provided in Law 1393/2010.

**Securities Law Information.** The Shares are not and will not be registered in the Colombian registry of publicly traded securities (*Registro Nacional de Valores y Emisores*) and therefore the Shares may not be offered to the public in Colombia. Nothing in this document should be construed as the making of a public offer of securities in Colombia.

**Exchange Control Information.** Colombian residents must register Shares acquired under the Plan, regardless of value, with the Central Bank of Colombia (*Banco de la República*) as foreign investment held abroad. You are responsible for ensuring compliance with all exchange control laws in Colombia and you should consult your legal advisor prior to the acquisition or sale of the Shares under the Plan to ensure compliance with current regulations.

**Foreign Asset/Account Reporting Information.** You must file an annual informative return with the Colombian Tax Office detailing any assets (*e.g*. Shares) held abroad. If the individual value of any of these assets exceeds a certain threshold, you must describe each asset and indicate the jurisdiction in which it is located, its nature and its value.

## CZECH REPUBLIC

**Exchange Control Information.** Czech residents may be required to fulfill certain notification duties in relation to the RSUs and the opening and maintenance of a foreign account, including reporting foreign financial assets with a value of CZK 200,000,000 or more. You should consult their personal legal advisor to ensure compliance with the applicable requirements.

## DENMARK

**Stock RSU Act**. You acknowledge that you have received an Employer Statement in Danish, which sets forth the additional terms of the RSUs to the extent that the Danish Stock RSU Act applies.

**Foreign Asset/Account Reporting Information.** You are required to report any accounts holding Shares or cash established outside Denmark to the Danish Tax Administration as part of your tax return under the section related to foreign affairs and income.

## FINLAND

**Foreign Asset/Account Reporting Information**. There are no specific reporting requirements with respect to foreign assets/accounts. However, please note that you must check your pre-completed tax return to confirm that the ownership of Shares and other securities (foreign or domestic) is correctly reported. If you find any errors or omissions, you must make the necessary corrections electronically or by sending specific paper forms to the local tax authorities.

## FRANCE

**Consent to Receive Information in English**. By accepting the grant, you confirm having read and understood the Plan and Grant Notice, including all terms and conditions included therein, which were provided in the English language. You accept the terms of those documents accordingly.

*En acceptant cette attribution, vous confirmez avoir lu et compris le Plan et le Contrat y relatifs, incluant tous leurs termes et conditions, qui ont été transmis en langue anglaise. Vous acceptez les dispositions de ces documents en connaissance de cause*.

**Foreign Asset/Account Reporting Information.** If you hold Shares outside France or maintain a foreign bank account, you are required to report such to the French tax authorities when filing your annual tax return, including any accounts that were closed during the year. Failure to comply could trigger significant penalties.

## GERMANY

**Exchange Control Information.** Cross-border payments in excess of €12,500 must be reported monthly to the German Federal Bank. In case of payments in connection with securities, the report must be made by the 5th day of the month following the month in which the payment was made/received. The report must be filed electronically. The form of report ("*Allgemeine Meldeportal Statistik*") can be accessed via the *Bundesbank's* website (www.bundesbank.de) and is available in both German and English. You are responsible for satisfying the reporting obligation.

**Foreign Asset/Account Reporting Information.** German residents holding Shares must notify their local tax office if the acquisition of Shares under the Plan leads to a so-called qualified participation at any point during the calendar year. A qualified participation is attained only in the unlikely event (i) you own at least 1% of the Company and the value of the Shares acquired exceeds €150,000, or (ii) you hold Shares exceeding 10% of the total capital of the Company.

## HONG KONG

**Form of Payment**. This provision supplements Section 5 of the Grant Notice:

The grant of the RSUs does not provide any right for the Participant to receive a cash payment and the RSUs will be settled in Shares only. Further, Shares received under the Plan are accepted as a personal investment. In the event the RSUs vest and Shares are issued to the

Participant within six months of the Grant Date, the Participant agrees that he or she will not dispose of the Shares acquired prior to the six-month anniversary of the Grant Date.

**Securities Law Notice**. *The RSUs and the Shares issued upon vesting of the RSUs do not constitute a public offering of securities under Hong Kong law and are available only to eligible employees of Warner Bros. Discovery, Inc.*

*The Grant Notice, including this Addendum, the Plan and other incidental communication materials have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, nor have the documents been reviewed by any regulatory authority in Hong Kong. The Grant Notice, including this Addendum, the Plan and other incidental communication materials are intended only for the personal use of each eligible employee and not for distribution to any other person. You are advised to exercise caution in relation to the RSUs. If you have questions about any of the contents of the Grant Notice, including this Addendum, or the Plan, you should contact a legal or other professional advisor.*

## HUNGARY

There are no country specific provisions.

## INDIA

**Exchange Control Restrictions**. You must repatriate any cash dividends paid on Shares and/or the proceeds from the sale of Shares to India within the required time periods specified under applicable Indian exchange control regulations. You must maintain the foreign inward remittance certificate received from the bank where the foreign currency is deposited in the event that the Reserve Bank of India or the Employer requests proof of repatriation. It is your responsibility to comply with applicable exchange control laws in India.

**Foreign Asset/Account Reporting Information**. You are required to declare foreign bank accounts and any foreign financial assets (including Shares held outside India) in your annual tax return. It is your responsibility to comply with this reporting obligation and you should consult with your personal tax advisor in this regard.

## IRAQ

There are no country specific provisions.

## IRELAND

**Director Notification Requirement.** If you are a director, shadow director or secretary of an Irish Affiliate, you must notify the Irish Affiliate in writing if (1) you receive or dispose of an interest exceeding 1% of the Company (*e.g.*, the RSUs, Shares, etc.), (2) you become aware of an event giving rise to a notification requirement, or (3) you become a director or secretary if such

an interest exists at that time. This notification requirement also applies with respect to the interests of a spouse or children under the age of 18 (whose interests will be attributed to the director, shadow director or secretary).

**ITALY**

**Plan Document Acknowledgment.** In accepting the grant of the RSUs, you acknowledge that you have received a copy of the Plan and the Grant Notice and have reviewed the Plan and the Grant Notice, including this Addendum, in their entirety and fully understand and accept all provisions of the Plan and the Grant Notice, including this Addendum.

You acknowledge that you have read and specifically and expressly approve the sections of the Grant Notice relating to vesting, taxes and withholding and governing law and Section 1 of the Addendum on Nature of the Grant; Section 3 of the Addendum on Language; Section 5 of the Addendum on Choice of Venue and Section 7 of the Addendum on Data Privacy.

**Foreign Asset/Account Reporting Information.** Italian residents who, during the fiscal year, hold investments abroad or foreign financial assets (*e.g.*, cash, Shares, RSUs) which may generate income taxable in Italy are required to report such on their annual tax returns (UNICO Form, RW Schedule) or on a special form if no tax return is due. The same reporting obligations apply to Italian residents who, even if they do not directly hold investments abroad or foreign financial assets (*e.g.*, cash, Shares, RSUs), are beneficial owners of the investment pursuant to Italian money laundering provisions.

**Foreign Financial Assets Tax.** The fair market value of any Shares held outside Italy is subject to a foreign assets tax. The fair market value is considered to be the value of the Shares on the Nasdaq Global Select Market on December 31 of each year or on the last day you held the shares (in such case, or when the Shares are acquired during the course of the year, the tax is levied in proportion to the actual days of holding over the calendar year). You should consult with your personal tax advisor about the foreign financial assets tax.

**JAPAN**

**Exchange Control Information**. If you acquire Shares valued at more than ¥100,000,000 in a single transaction, you must file a Securities Acquisition Report with the Ministry of Finance through the Bank of Japan within 20 days of the purchase of the Shares.

**Foreign Asset/Account Reporting Information**. You will be required to report details of any assets held outside Japan as of December 31st (including any Shares acquired under the Plan) to the extent such assets have a total net fair market value exceeding ¥50,000,000. Such report will be due by March 15th each year. You should consult with your personal tax advisor as to whether the reporting obligation applies to you.

**JERSEY**

There are no country-specific provisions.

**KOREA**

**Foreign Asset/Account Reporting Information**. Korean residents must declare all foreign financial accounts (*e.g.*, non-Korean bank accounts, brokerage accounts, etc.) to the Korean tax authority and file a report with respect to such accounts if the value of such accounts exceeds KRW 500 million (or an equivalent amount in foreign currency) on any month-end date during a calendar year. You should consult with your personal tax advisor to determine how to value your foreign accounts for purposes of this reporting requirement and whether you are required to file a report with respect to such accounts.

**MEXICO**

**Securities Law Information**. The RSUs and the Shares offered under the Plan have not been registered with the National Register of Securities maintained by the Mexican National Banking and Securities Commission and cannot be offered or sold publicly in Mexico. In addition, the Plan, the Grant Agreement and any other document relating to the RSUs may not be publicly distributed in Mexico. These materials are addressed to you only because of your existing relationship with the Company or the Employer and these materials should not be reproduced or copied in any form. The offer contained in these materials does not constitute a public offering of securities but rather constitutes a private placement of securities addressed specifically to individuals who are present employees of Discovery-Mexico made in accordance with the provisions of the Mexican Securities Market Law, and any rights under such offering shall not be assigned or transferred.

**Labor Law Policy.** In accepting the RSU grant, you expressly recognize that Discovery, Inc., with registered offices at 8403 Colesville Road, Silver Spring, MD 20910, U.S.A., is solely responsible for the administration of the Plan and that your participation in the Plan and acquisition of Shares do not constitute an employment relationship between you and Discovery, Inc. since you are participating in the Plan on a wholly commercial basis and your Employer is one of Discovery Mexico Holdings, LLC. or Discovery Networks Mexico S de RL de CV, as applicable ("Discovery-Mexico"). Based on the foregoing, you expressly recognize that the Plan and the benefits that you may derive from participating in the Plan do not establish any rights between you and the Employer, Discovery-Mexico and do not form part of the employment conditions and/or benefits provided by Discovery-Mexico and any modification of the Plan or its termination shall not constitute a change or impairment of the terms and conditions of the your employment.

You further understand that your participation in the Plan is as a result of a unilateral and discretionary decision of the Company; therefore, the Company reserves the absolute right to amend and/or discontinue your participation at any time without any liability to you.

**Plan Document Acknowledgment**. By accepting the RSUs, you acknowledge that you have received a copy of the Plan, have reviewed the Plan and the Grant Notice in their entirety and fully understand and accept all provisions of the Plan and the Grant Notice.

In addition, by accepting the Grant Notice, you further acknowledge that you have read and specifically and expressly approve the terms and conditions in Section 1 of the Addendum ("Nature of the Grant"), in which the following is clearly described and established: (i) participation in the Plan does not constitute an acquired right; (ii) the Plan and participation in the Plan is offered by the Company. on a wholly discretionary basis; (iii) participation in the Plan is voluntary; and (iv) neither the Company. nor any subsidiary or affiliate is responsible for any decrease in the value of the Shares underlying the RSU.

Finally, you hereby declare that you do not reserve any action or right to bring any claim against the Company for any compensation or damages regarding any provision of the Plan or the benefits derived under the Plan, and you therefore grant a full and broad release to the Company its affiliates, branches, representation offices, its shareholders, officers, agents or legal representatives with respect to any claim that may arise.

***TRADUCCIÓN***

**Política Laboral.** Al aceptar el otorgamiento de la Opción de Compra de Acciones, Usted expresamente reconoce que Discovery, Inc., con domicilio registrado ubicado en 8403 Colesville Road, Silver Spring, MD 20910, E.U.A., es la única responsable por la administración del Plan y que su participación en el Plan y en su caso la adquisición de Acciones no constituyen ni podrán interpretarse como una relación de trabajo entre Usted y Discovery, Inc., ya que Usted participa en el Plan en un marco totalmente comercial y su único Patrón lo es Discovery Mexico Holdings, LLC. o Discovery Networks Mexico S de RL de CV, según aplique, ("Discovery-Mexico"). Derivado de lo anterior, Usted expresamente reconoce que el Plan y los beneficios que pudieran derivar de la participación en el Plan no establecen derecho alguno entre Usted y el Patrón, Discovery-México, y no forma parte de las condiciones de trabajo y/o las prestaciones otorgadas por Discovery-México y que cualquier modificación al Plan o su terminación no constituye un cambio o impedimento de los términos y condiciones de su relación de trabajo.

Asimismo, Usted reconoce que su participación en el Plan es resultado de una decisión unilateral y discrecional de Discovery, Inc.; por lo tanto, Discovery, Inc. se reserva el absoluto derecho de modificar y/o terminar su participación en cualquier momento y sin responsabilidad alguna frente a Usted.

**Reconocimiento del Plan de Documentos.** Al aceptar el Otorgamiento de la Opción de Compra de Acciones, Usted reconoce que ha recibido copias del Plan, que ha revisado el Plan y el Acuerdo en su totalidad y que entiende y acepta completamente todas las disposiciones contenidas en el Plan y en el Acuerdo.

Adicionalmente, al firmar el Acuerdo, Usted reconoce que ha leído y que aprueba específica y expresamente los términos y condiciones contenidos en el párrafo 1 del Acuerdo ( "Naturaleza del Otorgamiento") en el cual se encuentra claramente descrito y establecido lo siguiente: (i) la participación en el Plan no constituye un derecho adquirido; (ii) el Plan y la participación en el mismo es ofrecido por Discovery, Inc. de forma completamente discrecional; (iii) la participación en el Plan es voluntaria; y (iv) ni Discovery, Inc. ni de cualquier Sociedad controlante, Subsidiaria o Filial son responsables por ninguna disminución en el valor de las Acciones subyacentes de la Opción de Compra de Acciones.

Finalmente, Usted por este medio declara que no se reserve derecho o acción alguna que ejercitar en contra de Discovery, Inc. por cualquier compensación o daño en relación con las disposiciones del Plan o de los beneficios derivados del Plan y por lo tanto, Usted otorga el más amplio finiquito que en derecho proceda a Discovery, Inc., sus afiliadas, subsidiarias, oficinas de representación, sus accionistas, funcionarios, agentes o representantes legales en relación con cualquier demanda que pudiera surgir.

## NETHERLANDS

There are no country-specific provisions.

## NEW ZEALAND

**Securities Law Information**. WARNING: You are being offered RSUs which allow you to purchase Shares in accordance with the terms of the Plan and the Grant Notice. The Shares, if purchased, give you a stake in the ownership of the Company. You may receive a return if dividends are paid.

If the Company runs into financial difficulties and is wound up, you will be paid only after all creditors and holders of preferred shares have been paid. You may lose some or all of your investment.

New Zealand law normally requires people who offer financial products to give information to investors before they invest. This information is designed to help investors to make an informed decision.

The usual rules do not apply to this offer because it is made under an employee share purchase scheme. As a result, you may not be given all the information usually required. You will also have fewer other legal protections for this investment.

You understand that you should ask questions, read all documents carefully, and seek independent financial advice before vesting in any RSUs under the Plan.

The Shares are quoted and approved for trading on the Nasdaq Global Select Market in the United States of America. This means that, if you purchase Shares under the Plan, you may be able to sell your investment on the Nasdaq if there are interested buyers. You understand that you may get less than your investment. The price will depend on the demand for the Shares.

For information on risk factors impacting the Company's business that may affect the value of the Shares, you should refer to the risk factors discussion in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, which are filed with the U.S. Securities and Exchange Commission and are available online at www.sec.gov, as well as on the Company's website at https://ir.corporate.discovery.com/investor-relations.

## NORWAY

There are no country specific provisions.

## PANAMA

**Securities Law Notice**. The RSUs granted pursuant to the Plan and the Shares which may be issued upon vesting and settlement of the RSUs are offered in a private transaction. This is not an offer to the public and the offer is not subject to the protections established by Panamanian securities laws.

## PERU

**Securities Law Notice**. The offer of the RSUs is considered a private offering in Peru; therefore, it is not subject to registration. For more information concerning this offer, please refer to the Plan, the Grant Notice and any other grant documents made available by the Company.

## POLAND

**Exchange Control Information.** Polish residents who maintain bank or brokerage accounts holding cash and foreign securities (including Shares) abroad must report information to the National Bank of Poland on transactions and balances of the securities deposited in such accounts if the value of such transactions or balances (calculated individually or together with other assets or liabilities held abroad) exceeds certain thresholds. If required, the reports are due on a quarterly basis. Polish residents are also required to transfer funds through a bank account in Poland if the transferred amount in any single transaction exceeds a specified threshold (currently €15,000, however, if the transfer of funds is connected with the business activity an entrepreneur, the threshold is PLN 15,000). Further, upon the request of a Polish bank, Polish residents are required to inform the bank about all foreign exchange transactions performed through such bank. In addition, Polish residents are required to store documents connected with any foreign exchange transaction for a period of five years from the date the transaction occurred.

## PORTUGAL

**Language Consent.** You hereby expressly declare that you have full knowledge of the English language and have read, understood and fully accepted and agreed with the terms and conditions established in the Plan and the Grant Agreement.

***Conhecimento da Lingua.*** *O Contratado, pelo presente instrumento, declara expressamente que tem pleno conhecimento da língua inglesa e que leu, compreendeu e livremente aceitou e concordou com os termos e condições estabelecidas no Plano e no Acordo de Atribuição ("Agreement" em inglês).*

**Exchange Control Information**. If you acquire Shares under the Plan and do not hold the Shares with a Portuguese financial intermediary, you may need to file a report with the Portuguese Central Bank. If the Shares are held by a Portuguese financial intermediary, it will file the report for you.

## ROMANIA

**Exchange Control Information.** If you deposit proceeds from the sale of Shares in a bank account in Romania, you may be required to provide the Romanian bank assisting with the transaction with appropriate documentation explaining the source of the income. You should consult with a personal legal advisor to determine whether you will be required to submit such documentation to the Romanian bank.

## SERBIA

**Exchange Control Information.** Pursuant to the Law on Foreign Exchange Transactions, you are permitted to acquire Shares under the Plan and hold the shares and any proceeds from the sale of Shares in a U.S. brokerage account or other foreign brokerage account. However, you need permission from the National Bank of Serbia to hold any proceeds from the sale of Shares in an offshore bank account. Because the exchange control regulations in Serbia may change without notice, you should consult with your personal advisor to ensure compliance with applicable exchange control laws.

**SINGAPORE**

**Sale Restriction.** You agree that any Shares acquired pursuant to the RSUs will not be offered for sale in Singapore prior to the six-month anniversary of the grant date, unless such sale or offer is made pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA"), or pursuant to, and in accordance with the conditions of, any applicable provisions of the SFA.

**Securities Law Information.** The grant of the RSUs is being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the SFA and is not made to you with a view to the RSUs being subsequently offered for sale to any other party. The Plan has not been lodged or registered as a prospectus with the Monetary Authority of Singapore.

**Director Notification Requirement.** The directors, associate directors and shadow directors of a Singapore Affiliate are subject to certain notification requirements under the Singapore Companies Act. The directors, associate directors and shadow directors must notify the Singapore Affiliate in writing of an interest (*e.g.*, RSUs, Shares, etc.) in the Company or any related companies within two business days of (i) its acquisition or disposal, (ii) any change in a previously disclosed interest (*e.g.,* when the Shares are sold), or (iii) becoming a director, associate director or shadow director.

**SLOVAK REPUBLIC**

There are no country specific provisions.

**SPAIN**

**Nature of Grant.** The following provision supplements Section 1 of the Addendum

In accepting the RSUs, you consent to participation in the Plan and acknowledge that you have received a copy of the Plan.

You understand and agree that, as a condition of the grant of the RSUs, except as provided for death Disability or Retirement as described in Section 7 of the Grant Notice, the termination of your employment for any reason (including for the reasons listed below) will automatically result in the loss of the RSUs that may have been granted to you and that have not vested on the date of termination.

In particular, you understand and agree that any unvested RSUs as of your termination date, unless otherwise specified in Section 7 of the Grant Notice, will be forfeited without entitlement to the underlying Shares or to any amount as indemnification in the event of a termination by reason of, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without good cause (*i.e*., subject to a "*despido improcedente*"), individual or collective layoff on objective grounds, whether adjudged to be with cause or adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, unilateral withdrawal by the Employer, and under Article 10.3 of Royal Decree 1382/1985.

Furthermore, you understand that the Company has unilaterally, gratuitously and discretionally decided to grant the RSUs under the Plan to individuals who may be employees of the Company or its Affiliates. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company on an ongoing basis other than to the extent set forth in the Grant Notice. Consequently, you understand that the RSU is granted on the assumption and condition that the RSUs and the Shares issued upon vesting shall not become a part of any employment or contract (with the Company, including the Employer) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. Furthermore, you understand and freely accept that there is no guarantee that any benefit whatsoever will arise from the RSUs, which are gratuitous and discretionary, since the future value of the RSUs and the underlying Shares is unknown and unpredictable. In addition, you understand that the grant of the RSUs would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant to you shall be null and void.

**Securities Law Information.** No "offer of securities to the public", as defined under Spanish law, has taken place or will take place in the Spanish territory. The Grant Agreement (including this Addendum) has not been nor will it be registered with the *Comisión Nacional del Mercado de Valores*, and does not constitute a public offering prospectus.

**Exchange Control Information.** You must declare the acquisition, ownership and disposition of Shares to the Spanish *Dirección General de Comercio e Inversiones* (the "DGCI") of the Ministry of Economy and Competitiveness on a Form D-6. Generally, the declaration must be made in January for Shares owned as of December 31 of the prior year and/or Shares acquired or disposed of during the prior year; however, if the value of the Shares acquired or disposed of or the amount of the sale proceeds exceeds €1,502,530 (or if you hold 10% or more of the share capital of the Company), the declaration must be filed within one month of the acquisition or disposition, as applicable.

In addition, you are required to declare electronically to the Bank of Spain any foreign accounts (including brokerage accounts held abroad), any foreign instruments (including any Shares acquired under the Plan) and any transactions with non-Spanish residents (including any payments of Shares made to you by the Company) depending on the value of such accounts and instruments and the amount of the transactions during the relevant year as of December 31 of the relevant year.

**Foreign Asset/Accounting Reporting Information.** If you hold rights or assets (*e.g.*, Shares or cash held in a bank or brokerage account) outside Spain with a value in excess of €50,000 per type of right or asset (*e.g.*, Shares, cash, etc.) as of December 31 each year, you are required to report certain information regarding such rights and assets on tax form 720. After such rights and/or assets are initially reported, the reporting obligation will apply for subsequent years only if

the value of any previously reported rights or assets increases by more than €20,000, or if ownership of the asset is transferred or relinquished during the year. If the value of such rights and/or assets does not exceed €50,000, a summarized form of declaration may be presented. The reporting must be completed by the March 31 each year. You should consult your personal tax advisor for details regarding this requirement.

## SWEDEN

**Withholding Taxes.** The following provision supplements Section 3 of Exhibit A to the Grant Notice:

Without limiting the Company's and the Employer's authority to satisfy their withholding obligations for Tax-Related Items as set forth in this Section 3, by accepting the RSUs, you authorize the Company and/or the Employer to withhold Shares or to sell Shares otherwise deliverable to you upon vesting to satisfy Tax-Related Items, regardless of whether the Company and/or the Employer have an obligation to withhold such Tax-Related Items.

## SWITZERLAND

**Securities Law Information.** Neither this document nor any other materials relating to the RSU (i) constitutes a prospectus according to articles 35 et seq. of the Swiss Federal Act on Financial Services ("FinSA"), (ii) may be publicly distributed or otherwise made publicly available in Switzerland to any person other than an employee of the Company or an Affiliate, or (iii) has been or will be filed with, approved or supervised by any Swiss reviewing body according to article 51 FinSA or any Swiss regulatory authority, including the Swiss Financial Market Supervisory Authority.

## TAIWAN

***TERMS AND CONDITIONS***

**Data Privacy Consent.** You hereby acknowledge that you have read and understood the terms regarding collection, processing and transfer of Data contained in Section 7 of this Addendum and by participating in the Plan, you agree to such terms. In this regard, upon request of the Company or the Employer, you agree to provide an executed data privacy consent form to the Employer or the Company (or any other agreements or consents that may be required by the Employer or the Company) that the Company and/or the Employer may deem necessary to obtain under the data privacy laws in your country, either now or in the future. You understand you will not be able to participate in the Plan if you fail to execute any such consent or agreement.

***NOTIFICATIONS***

**Securities Law Information.** The RSUs and the Shares to be issued pursuant to the Plan are available only to employees of the Company and its Affiliates. The grant of the RSUs does not constitute a public offer of securities.

**Exchange Control Information.** You may acquire and remit foreign currency (including the proceeds from the sale of Shares) into and out of Taiwan up to US$5,000,000 per year. If the transaction amount is TWD$500,000 or more in a single transaction, you must submit a foreign exchange transaction form and also provide supporting documentation to the satisfaction of the remitting bank. You should consult your personal advisor to ensure compliance with applicable exchange control laws in Taiwan.

**TURKEY**

**Securities Law Information**. Under Turkish law, you are not permitted to sell Shares acquired under the Plan in Turkey. The Shares are currently traded on the Nasdaq Global Select Market, which is located outside Turkey and the Shares may be sold through this exchange.

**Exchange Control Information.** You may be required to engage a Turkish financial intermediary to assist with the sale of Shares acquired under the Plan. To the extent a Turkish financial intermediary is required in connection with the sale of any Shares acquired upon vesting of the RSUs, you are solely responsible for engaging such Turkish financial intermediary. You should consult your personal legal advisor prior to the vesting of RSUs or any sale of Shares to ensure compliance with the current requirements.

**UNITED ARAB EMIRATES**

**Securities Law Information**. Participation in the Plan is being offered only to selected employees and is in the nature of providing equity incentives to employees in the United Arab Emirates. The Plan and the Grant Notice are intended for distribution only to such employees and must not be delivered to, or relied on by, any other person. Prospective purchasers of the securities offered should conduct their own due diligence on the securities.

If you do not understand the contents of the Plan and the Grant Notice, you should consult an authorized financial adviser. The Emirates Securities and Commodities Authority has no responsibility for reviewing or verifying any documents in connection with the Plan. Neither the Ministry of Economy nor the Dubai Department of Economic Development have approved the Plan or the Agreement nor taken steps to verify the information set out therein and have no responsibility for such documents.

**UNITED KINGDOM ("U.K.")**

**Withholding Taxes.** The following provision supplements Section 3 of Exhibit A to the Grant Notice:

Without limitation to this Section 3, you hereby agree that you are liable for all Tax-Related Items and hereby covenants to pay all such Tax-Related Items, as and when requested by the Company or the Employer, as applicable, or by Her Majesty's Revenue & Customs ("HMRC") (or any other tax authority or any other relevant authority). You also agree to indemnify and keep indemnified the Company and the Employer, as applicable, against any Tax-Related Items that

they are required to pay or withhold or have paid or will pay to HMRC (or any other tax authority or any other relevant authority) on your behalf.

Notwithstanding the foregoing, if you are a director or executive officer of the Company (within the meaning of Section 13(k) of the Exchange Act), you understand that you may not be able to indemnify the Company for the amount of any Tax-Related Items not collected from or paid by you, in case the indemnification could be considered to be a loan. In this case, the Tax-Related Items not collected or paid may constitute a benefit to you on which additional income tax and National Insurance Contributions ("NICs") may be payable. You understand that you will be responsible for reporting and paying any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for paying to the Company and/or the Employer (as appropriate) the amount of any NICs due on this additional benefit, which may also be recovered from you by any of the means referred to in this Section 3.

**Appendix A**

EMPLOYER STATEMENT FOR DANISH EMPLOYEES

Pursuant to Section 3(1) of the Danish Act on Stock Options in employment relations (the "***Stock Option Act***"), you are entitled to receive the following information regarding Warner Bros. Discovery, Inc. (the "***Company***") restricted stock unit program in a separate written statement.

This statement contains only the information required to be mentioned under the Stock Option Act while the other terms and conditions of your stock unit grant are described in detail in the 2013 Incentive Plan (As Amended and Restated) (the "***Plan***"), and the Grant Notice which have been given to you.

1. Date of grant of unfunded right to receive stock upon satisfying certain conditions

The grant date of your restricted stock units is the date that the Compensation Committee approved a grant for you and determined it would be effective.

2. Terms or conditions for grant of a right to future award of stock

The grant of restricted stock units will be at the sole discretion of the Board or the Compensation Committee of the Board. In its assessment, the Board or the Compensation Committee may consider a number of factors, including the Company's latest annual results, your personal performance and your value for the future operation and development of the Company. Notwithstanding your personal performance and the development of the Company, the Company may decide, in its sole discretion, not to make any grants of restricted stock units to you in the future. Under the terms of the Plan and the Restricted Stock Unit Agreement, you have no entitlement or claim to receive future restricted stock unit grants.

3. Vesting Date or Period

Generally, your restricted stock units will vest over a number of years, as provided in your Grant Notice. Your restricted stock units shall be converted into an equivalent number of

shares of the common stock of the Company upon vesting. Your vesting may accelerate in certain circumstances as defined in your Grant Notice.

4. Exercise Price

No exercise price is payable upon the vesting of your restricted stock units and the issuance of shares of the Company's common stock to you in accordance with the vesting schedule described above.

5. Your rights upon termination of employment

The treatment of your restricted stock units upon termination of employment will be determined in accordance with the termination provisions of the Section 7 of the Grant Notice.

6. Financial aspects of participating in the Plan

The grant of restricted stock units has no immediate financial consequences for you. The value of the restricted stock units is not taken into account when calculating holiday allowances, pension contributions or other statutory consideration calculated on the basis of salary.

Shares of stock are financial instruments and investing in stocks will always have financial risk. The future value of Company shares is unknown and cannot be predicted with certainty.

Warner Bros. Discovery Inc.

**Bilag A**

ARBEJDSGIVERERKLÆRING FOR DANSKE MEDARBEJDERE

I henhold til § 3, stk. 1, i lov om brug af køberet eller tegningsret m.v. i ansættelsesforhold, som ændret med virkning fra 1. januar 2019 ("***Aktieoptionsloven***") er du berettiget til i en særskilt skriftlig erklæring at modtage følgende oplysninger om aktieordningen vedrørende betingede aktier hos Warner Bros. Discovery Inc. ("***Selskabet***").

Denne erklæring indeholder kun de oplysninger, der er nævnt i Aktieoptionsloven, idet de øvrige vilkår og betingelser for tildelingen af betingede aktier er nærmere beskrevet i "2013 Incentive Plan" (revideret og genfremsat) ("***Ordningen***"), Medarbejderformularen vedrørende Betingede Aktier samt i Aftale om Betingede Aktier, som alle er udleveret til dig.

1. Tidspunkt for tildeling af en vederlagsfri ret til at modtage aktier mod opfyldelse af visse betingelser

Tidspunktet for tildelingen af dine betingede aktier er den dato, hvor Vederlagsudvalget godkendte din tildeling og besluttede, at denne skulle træde i kraft.

2. Kriterier eller betingelser for tildeling af retten til senere at få tildelt aktier

Tildelingen af betingede aktier sker efter Bestyrelsens eller det af Bestyrelsen nedsatte Vederlagsudvalgs eget skøn. Bestyrelsen eller Vederlagsudvalget vil i sin bedømmelse inddrage en række faktorer, herunder Selskabets seneste årsresultat, din personlige præstation og din betydning for Selskabets fremtidige drift og udvikling. Uagtet din personlige præstation og Selskabets udvikling kan Selskabet frit vælge ikke at tildele dig nogen betingede aktier. I henhold til bestemmelserne i Ordningen og Aftalen om Betingede Aktier har du ikke nogen ret til eller noget krav på fremover at få tildelt betingede aktier.

3. Modningstidspunkt eller -periode

Dine betingede aktier modnes som udgangspunkt over en årrække som anført i Medarbejderformularen vedrørende Betingede Aktier eller i Aftale om Betingede Aktier. Ved modning konverteres dine betingede aktier til et tilsvarende antal ordinære aktier i Selskabet. Modning kan under visse omstændigheder fremskyndes, jf. Aftale om Betingede Aktier.

4. Udnyttelseskurs

Der betales ingen udnyttelseskurs i forbindelse med modningen af dine betingede aktier og Selskabets udstedelse af ordinære aktier til dig i overensstemmelse med ovennævnte modningsplan.

5. Din retsstilling i forbindelse med fratræden

Dine betingede aktier vil i tilfælde af fratræden blive behandlet i overensstemmelse med fratrædelsesbestemmelserne i Aftale om Betingede Aktier.

6. Økonomiske aspekter ved at deltage i Ordningen

Tildelingen af betingede aktier har ingen umiddelbare økonomiske konsekvenser for dig. Værdien af dine betingede aktier indgår ikke i beregningen af feriepenge, pensionsbidrag eller andre lovpligtige, vederlagsafhængige ydelser.

Aktier er finansielle instrumenter, og investering i aktier vil altid være forbundet med en økonomisk risiko. Den fremtidige værdi af Selskabets aktier kendes ikke og kan ikke forudsiges med sikkerhed.

Warner Bros. Discovery Inc.

 **Exhibit 10.36**

**WARNER BROS. DISCOVERY, INC.**

**Non-Employee Director Compensation for Calendar 2023**

**Annual Cash Retainers**: Cash retainers to non-employee directors will be paid in equal quarterly installments in arrears on or around the last business day of each calendar quarter. Retainers will be pro-rated as appropriate.

- Board Member Retainer - $125,000
- Board Chair Retainer - $300,000*
- Audit Committee Chair - $35,000
- Audit Committee Member - $20,000
- Compensation Committee Chair - $35,000
- Compensation Committee Member - $20,000
- Nominating/Corporate Governance Committee Chair - $17,500
- Nominating/Corporate Governance Committee Member - $10,000

* *Board Chair doesn't receive Board Member Retainer*

**Annual Stock Retainer**: Each non-employee director shall receive an annual stock retainer for $220,000 of WBD restricted stock units. Stock retainers will be granted on the date of the Company's Annual Meeting of Stockholders, or such other date as may be determined by the Board. Stock retainers will be granted under the Warner Bros. Discovery, Inc. 2005 Non-Employee Director Incentive Plan and will be subject to a one-year vesting period. The number of restricted stock units will be determined by dividing $220,000 by the closing price of WBD on the last business day prior to the grant date, rounded up to the nearest whole share.

**Other Provisions**: Prior to the beginning of a calendar year, a non-employee director may elect to (i) receive shares of WBD stock in lieu of the cash portion of any retainer and/or (ii) defer all or a portion of any cash or stock retainer in accordance with the terms and conditions of the Warner Bros. Discovery, Inc. 2005 Non-Employee Director Incentive Plan and the Warner Bros. Discovery, Inc. Non-Employee Directors Deferral Plan.

**Exhibit 10.37**

**WARNER BROS. DISCOVERY, INC.**
**2005 NON-EMPLOYEE DIRECTOR INCENTIVE PLAN**

**(As Amended and Restated Effective May 20, 2015)**
**(As further amended April 22, 2022 and December 14, 2022)**

ARTICLE I
PURPOSE AND AMENDMENT OF PLAN

1.1 *Purpose*. The purpose of the Plan is to provide a method whereby eligible Nonemployee Directors of the Company may be awarded additional remuneration for services rendered and encouraged to invest in capital stock of the Company, thereby increasing their proprietary interest in the Company's businesses and increasing their personal interest in the continued success and progress of the Company. The Plan is also intended to aid in attracting Persons of exceptional ability to become Nonemployee Directors of the Company.

1.2 *Amendment and Restatement of Plan*. This amendment and restatement of the Plan was approved by the Board on February 5, 2015 and by the stockholders of the Company on May 20, 2015.

ARTICLE II
DEFINITIONS

2.1 *Certain Defined Terms*. Capitalized terms not defined elsewhere in the Plan shall have the following meanings (whether used in the singular or plural):

"***Affiliate***" of the Company means any corporation, partnership or other business association that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the Company.

"***Agreement***" means a stock option agreement, stock appreciation rights agreement, restricted shares agreement, stock units agreement or an agreement evidencing more than one type of Award, as any such Agreement may be supplemented or amended from time to time.

"***Approved Transaction***" means any transaction in which the Board (or, if approval of the Board is not required as a matter of law, the stockholders of the Company) shall approve (i) any consolidation or merger of the Company, or binding share exchange, pursuant to which shares of Common Stock of the Company would be changed or converted into or exchanged for cash, securities or other property, other than any such transaction in which the common stockholders of the Company immediately prior to such transaction have the same proportionate ownership of the Common Stock of, and voting power with respect to, the surviving corporation immediately after such transaction, (ii) any merger, consolidation or binding share exchange to which the Company is a party as a result of which the Persons who are common stockholders of the Company immediately prior thereto have less than a majority of the combined voting power of the outstanding capital stock of the Company ordinarily (and apart from the rights accruing under special circumstances) having the right to vote in the election of directors immediately following such merger, consolidation or binding share exchange, (iii) the adoption of any plan or proposal for the liquidation or dissolution of the Company, or (iv) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all, or substantially all, of the assets of the Company, provided that, with respect to clauses (i) through (iv), the Approved Transaction will not occur until the closing of the event described in such clause.

"***Award***" means a grant of Options, SARs, Restricted Shares, Restricted Stock Units, and/or cash under the Plan.

"***Board***" means the Board of Directors of the Company.

"***Board Change***" means, during any period of two consecutive years, individuals who at the beginning of such period constituted the entire Board cease for any reason to constitute a majority thereof unless the election, or the nomination for election, of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the beginning of the period.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute or statutes thereto. Reference to any specific Code section shall include any successor section.

"***Common Stock***" means the Series A common stock of the Company.

"***Company***" means Warner Bros. Discovery, Inc., a Delaware corporation.

"***Control Purchase***" means any transaction (or series of related transactions) in which (i) any person (as such term is defined in Sections 13(d)(3) and 14(d)(2) of the Exchange Act), corporation or other entity (other than the Company, any Subsidiary of the Company or any employee benefit plan sponsored by the Company or any Subsidiary of the Company) shall become the "beneficial owner" (as such term is defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 30% or more of the combined voting power of the then outstanding securities of the Company ordinarily (and apart from the rights accruing under special circumstances) having the right to vote in the election of directors (calculated as provided in Rule 13d-3(d) under the Exchange Act in the case of rights to acquire the Company's securities), other than in a transaction (or series of related transactions) approved by the Board.

"***Disability***" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"***Distribution Date***" means the date on which Discovery Holding Company ceased to be a wholly-owned subsidiary of Liberty Media Corporation, a Delaware corporation.

"***Dividend Equivalents***" means, with respect to Restricted Stock Units, to the extent specified by the Board only, an amount equal to all dividends and other distributions (or the economic equivalent thereof) which are payable to stockholders of record during the Restriction Period on a like number and kind of shares of Common Stock.

"***Domestic Relations Order***" means a domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act, or the rules thereunder.

"***Effective Date***" means May 20, 2015, the date on which the Plan was reapproved by the Company's stockholders.

"***Equity Security***" shall have the meaning ascribed to such term in Section 3(a)(11) of the Exchange Act, and an equity security of an issuer shall have the meaning ascribed thereto in Rule 16a-1 promulgated under the Exchange Act, or any successor Rule.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time, or any successor statute or statutes thereto. Reference to any specific Exchange Act section shall include any successor section.

"***Fair Market Value***" of a share of any series of Common Stock on any day means the last sale price (or, if no last sale price is reported, the average of the high bid and low asked prices) for a share of such series of Common Stock on such day (or, if such day is not a trading day, on the next preceding trading day) as reported on the consolidated transaction reporting system for the principal national securities exchange on which shares of such series of Common Stock are listed on such day or the Board can, in its sole discretion, use averages or weighted averages either on a daily basis or such longer period as complies with Code Section 409A. If for any day the Fair Market Value of a share of the applicable series of Common Stock is not determinable by any of the foregoing means, then the Fair Market Value for such day shall be determined in good faith by the Board on the basis of such quotations and other considerations as the Board deems appropriate.

"***Free Standing SAR***" has the meaning ascribed thereto in Section 7.1.

"***Holder***" means a person who has received an Award under the Plan that has not been fully satisfied or terminated.

"***Nonemployee Director***" means an individual who is a member of the Board and who is not an employee of the Company or any Subsidiary.

"***Nonqualified Stock Option***" means a stock option granted under Article VI.

"***Option***" means a Nonqualified Stock Option.

"***Person***" means an individual, corporation, limited liability company, partnership, trust, incorporated or unincorporated association, joint venture or other entity of any kind.

"***Plan***" means this Warner Bros. Discovery, Inc. 2005 Non-Employee Director Incentive Plan, as amended.

"***Restricted Shares***" means shares of any series of Common Stock awarded pursuant to Article VIII.

"***Restricted Stock Unit Awards***" has the meaning ascribed thereto in Section 9.1.

"***Restriction Period***" means a period of time beginning on the date of each Award of Restricted Shares or Restricted Stock Units and ending on the Vesting Date with respect to such Award.

"***Retained Distribution***" has the meaning ascribed thereto in Section 8.1.

"***SARs***" means stock appreciation rights, awarded pursuant to Article VII, with respect to shares of any specified series of Common Stock.

"***Subsidiary***" of a Person means any present or future subsidiary (as defined in Section 424(f) of the Code) of such Person or any business entity in which such Person owns, directly or indirectly, 50% or more of the voting, capital or profits interests. An entity shall be deemed a subsidiary of a Person for purposes of this definition only for such periods as the requisite ownership or control relationship is maintained.

"***Tandem SAR***" has the meaning ascribed thereto in Section 7.1.

"***Vesting Date*** ," with respect to any Restricted Shares or Restricted Stock Units awarded hereunder, means the date on which such Restricted Shares or Restricted Stock Units cease to be subject to a risk of forfeiture, as designated in or determined in accordance with the Agreement with respect to such Award of Restricted Shares pursuant to Article VIII or of Restricted Stock Units pursuant to Article IX. If more than one Vesting Date is designated for an Award, reference in the Plan to a Vesting Date in respect of such Award shall be deemed to refer to each part of such Award and the Vesting Date for such part.

## ARTICLE III
## ADMINISTRATION

3.1 *Administration*. The Plan shall be administered by the Board, provided that it may delegate to employees of the Company certain administrative or ministerial duties in carrying out the purposes of the Plan.

3.2 *Powers*. The Board shall have full power and authority to grant Awards to eligible persons, to determine the terms and conditions (which need not be identical) of all Awards so granted, to interpret the provisions of the Plan and any Agreements relating to Awards granted under the Plan and to supervise the administration of the Plan. The Board in making an Award may provide for the granting or issuance of additional, replacement or alternative Awards upon the occurrence of specified events, including the exercise of the original Award. The Board shall have sole authority in the selection of persons to whom Awards may be granted under the Plan and in the determination of the timing, pricing, and amount of any such Award, subject only to the express provisions of the Plan. In making determinations hereunder, the Board may take into account such factors as the Board in its discretion deems relevant.

3.3 *Interpretation*. The Board is authorized, subject to the provisions of the Plan, to establish, amend and rescind such rules and regulations as it deems necessary or advisable for the proper administration of the Plan and to take such other action in connection with or in relation to the Plan as it deems necessary or advisable. Each action and determination made or taken pursuant to the Plan by the Board, including any interpretation or construction of the Plan, shall be final and conclusive for all purposes and upon all persons.

## ARTICLE IV
## SHARES SUBJECT TO THE PLAN

4.1 *Number of Shares*. Subject to the provisions of this Article IV, the maximum number of shares of Common Stock with respect to which Awards may be granted during the term of the Plan shall be 9,886,851 shares.

Shares of Common Stock will be made available from the authorized but unissued shares of the Company or from shares reacquired by the Company, including shares purchased in the open market. The shares of Common Stock subject to (i) any Award granted under the Plan that shall expire, terminate or be annulled for any reason without having been exercised (or considered to have been exercised as provided in Section 7.2), (ii) any Award of any SARs granted under the Plan that shall be exercised for cash, and (iii) any Award of Restricted Shares or Restricted Stock Units that shall be forfeited prior to becoming vested (provided that the Holder received no benefits of ownership of such Restricted Shares or Restricted Stock Units other than voting rights and the accumulation of Retained Distributions and unpaid Dividend Equivalents that are likewise forfeited) shall again be available for purposes of the Plan. Notwithstanding the foregoing, (i) in the case of the exercise of a SAR for shares, the number of shares counted against the shares available under the Plan shall be the full number of shares subject to the SAR multiplied by the percentage of the SAR actually exercised, regardless of the number of shares actually used to settle such SAR upon exercise; (ii) shares of Common Stock delivered (either by actual delivery, attestation, or net exercise ) to the Company by a Holder to (I) purchase shares of Common Stock upon the exercise of an Award or (II) satisfy tax withholding obligations (including shares retained from the Award creating the tax obligation) shall not be added back to the number of shares available for the future grant of Awards; and (iii) shares of Common Stock repurchased by the Company on the open market using the proceeds from the exercise of an Award shall not increase the number of shares available for future grant of Awards.

4.2 *Adjustments*. If the Company subdivides its outstanding shares of any series of Common Stock into a greater number of shares of such series of Common Stock (by stock dividend, stock split, reclassification, or otherwise) or combines its outstanding shares of any series of Common Stock into a smaller number of shares of such series of Common Stock (by reverse stock split, reclassification, or otherwise) or if the Board determines that any stock dividend, extraordinary cash dividend, reclassification, recapitalization, reorganization, split-up, spin-off, combination, exchange of shares, warrants or rights offering to purchase such series of Common Stock or other similar corporate event (including mergers or consolidations other than those which constitute Approved Transactions, adjustments with respect to which shall be governed by Section 11.1(b)) affects any series of Common Stock so that an adjustment is required to preserve the benefits or potential benefits intended to be made available under the Plan, then the Board, in such manner as the Board, in its sole discretion, deems equitable and appropriate, shall make such adjustments to any or all of (a) the number and kind of shares of stock which thereafter may be awarded, optioned, or otherwise made subject to the benefits contemplated by the Plan, (b) the number and kind of shares of stock subject to outstanding Awards, and (c) the purchase or exercise price and the relevant appreciation base with respect to any of the foregoing, *provided, however,* that the number of shares subject to any Award shall always be a whole number. Notwithstanding the foregoing, if all shares of any series of Common Stock are redeemed, then each outstanding Award shall be adjusted to substitute for the shares of such series of Common Stock subject thereto the kind and amount of cash, securities or other assets issued or paid in the redemption of the equivalent number of shares of such series of Common Stock and otherwise the terms of such Award, including, in the case of Options or similar rights, the aggregate exercise price, and, in the case of Free Standing SARs, the aggregate base price, shall remain constant before and after the substitution (unless otherwise determined by the Board and provided in the applicable Agreement). The Board may, if deemed appropriate, provide for a cash payment to any Holder of an Award in connection with any adjustment made pursuant to this Section 4.2.

## ARTICLE V
## ELIGIBILITY

5.1 *General*. The persons who shall be eligible to participate in the Plan and to receive Awards under the Plan shall, subject to Section 5.2, be such persons who are Nonemployee Directors as the Board shall select. Awards may be made to Nonemployee Directors who hold or have held Awards under the Plan or any similar or other awards under any other plan of the Company or any of its Affiliates.

5.2 *Ineligibility*. No person who is not a Nonemployee Director shall be eligible to receive an Award.

## ARTICLE VI
## STOCK OPTIONS

6.1 *Grant of Options*. Subject to the limitations of the Plan, the Board shall designate from time to time those eligible persons to be granted Options, the time when each Option shall be granted to such eligible persons, the series and number of shares of Common Stock subject to such Option, and, subject to Section 6.2, the purchase price of the shares of Common Stock subject to such Option.

6.2 *Option Price.* The price at which shares may be purchased upon exercise of an Option shall be fixed by the Board and may be no less than the Fair Market Value of the shares of the applicable series of Common Stock subject to the Option as of the date the Option is granted.

6.3 *Term of Options.* Subject to the provisions of the Plan with respect to death, retirement and termination of service, the term of each Option shall be for such period as the Board shall determine as set forth in the applicable Agreement.

6.4 *Exercise of Options*. An Option granted under the Plan shall become (and remain) exercisable during the term of the Option to the extent provided in the applicable Agreement and the Plan and, unless the Agreement otherwise provides, may be exercised to the extent exercisable, in whole or in part, at any time and from time to time during such term; *provided, however,* that subsequent to the grant of an Option, the Board, at any time before complete termination of such Option, may accelerate the time or times at which such Option may be exercised in whole or in part.

6.5 *Manner of Exercise*.

(a) *Form of Payment.* An Option shall be exercised by notice to the Company upon such terms and conditions as the Agreement may provide and in accordance with such other procedures for the exercise of Options as the Board may establish from time to time. The method or methods of payment of the purchase price for the shares to be purchased upon exercise of an Option and of any amounts required by Section 11.9 shall be determined by the Board and may consist of (i) cash, (ii) check, (iii) whole shares of any series of Common Stock (whether by delivery or attestation), (iv) the withholding of shares of the applicable series of Common Stock issuable upon such exercise of the Option, (v) the delivery, together with a properly executed exercise notice, of irrevocable instructions to a broker to deliver promptly to the Company the amount of sale or loan proceeds required to pay the purchase price, or (vi) any combination of the foregoing methods of payment, or such other consideration and method of payment as may be permitted for the issuance of shares under the Delaware General Corporation Law. The permitted method or methods of payment of the amounts payable upon exercise of an Option, if other than in cash, shall be set forth in the applicable Agreement and may be subject to such conditions as the Board deems appropriate.

(b) *Value of Shares*. Unless otherwise determined by the Board and provided in the applicable Agreement, shares of any series of Common Stock delivered in payment of all or any part of the amounts payable in connection with the exercise of an Option, and shares of any series of Common Stock withheld for such payment, shall be valued for such purpose at their Fair Market Value as of the exercise date.

(c) *Issuance of Shares*. The Company shall effect the transfer of the shares of Common Stock purchased under the Option as soon as practicable after the exercise thereof and payment in full of the purchase price therefor and of any amounts required by Section 11.9, and within a reasonable time thereafter, such transfer shall be evidenced on the books of the Company. Unless otherwise determined by the Board and provided in the applicable Agreement, (i) no Holder or other person exercising an Option shall have any of the rights of a stockholder of the Company with respect to shares of Common Stock subject to an Option granted under the Plan until due exercise and full payment has been made, and (ii) no adjustment shall be made for cash dividends or other rights for which the record date is prior to the date of such due exercise and full payment.

6.6 *Limitation on Repricing.* Unless such action is approved by the Company's stockholders, the Company may not (except as provided for under Section 4.2): (1) amend any outstanding Option granted under the Plan to provide an exercise price per share that is lower than the then-current exercise price per share of such outstanding Option, (2) cancel any outstanding option (whether or not granted under the Plan) and grant in substitution therefor new Awards under the Plan (other than Awards granted pursuant to Section 4.3) covering the same or a different number of shares of Common Stock and having an exercise price per share lower than the then-current exercise price per share of the cancelled option, (3) cancel in exchange for a cash payment any outstanding Option with an exercise price per share above the then-current Fair Market Value, other than pursuant to Section 11.1(b), or (4) take any other action under the Plan that constitutes a "repricing" within the meaning of the rules of the NASDAQ Stock Market ("NASDAQ").

## ARTICLE VII
## SARS

7.1 *Grant of SARs*. Subject to the limitations of the Plan, SARs may be granted by the Board to such eligible persons in such numbers, with respect to any specified series of Common Stock, and at such times during the term of the Plan as the Board shall determine. A SAR may be granted to a Holder of an Option (hereinafter called a "***related Option***") with respect to all or a portion of the shares of Common Stock subject to the related Option (a "***Tandem SAR***") or may be granted separately to an eligible Nonemployee Director (a "***Free Standing SAR***"). Subject to the

limitations of the Plan, SARs shall be exercisable in whole or in part upon notice to the Company upon such terms and conditions as are provided in the Agreement.

7.2 *Tandem SARs*. A Tandem SAR may be granted either concurrently with the grant of the related Option or at any time thereafter prior to the complete exercise, termination, expiration or cancellation of such related Option. Tandem SARs shall be exercisable only at the time and to the extent that the related Option is exercisable (and may be subject to such additional limitations on exercisability as the Agreement may provide) and in no event after the complete termination or full exercise of the related Option. Upon the exercise or termination of the related Option, the Tandem SARs with respect thereto shall be canceled automatically to the extent of the number of shares of Common Stock with respect to which the related Option was so exercised or terminated. Subject to the limitations of the Plan, upon the exercise of a Tandem SAR and unless otherwise determined by the Board and provided in the applicable Agreement, (a) the Holder thereof shall be entitled to receive from the Company, for each share of the applicable series of Common Stock with respect to which the Tandem SAR is being exercised, consideration (in the form determined as provided in Section 7.4) equal in value to the excess of the Fair Market Value of a share of the applicable series of Common Stock with respect to which the Tandem SAR was granted on the date of exercise over the related Option purchase price per share, and (b) the related Option with respect thereto shall be canceled automatically to the extent of the number of shares of Common Stock with respect to which the Tandem SAR was so exercised.

7.3 *Free Standing SARs*. Free Standing SARs shall be exercisable at the time, to the extent and upon the terms and conditions set forth in the applicable Agreement. The base price of a Free Standing SAR may be no less than the Fair Market Value of the applicable series of Common Stock with respect to which the Free Standing SAR was granted as of the date the Free Standing SAR is granted. Subject to the limitations of the Plan, upon the exercise of a Free Standing SAR and unless otherwise determined by the Board and provided in the applicable Agreement, the Holder thereof shall be entitled to receive from the Company, for each share of the applicable series of Common Stock with respect to which the Free Standing SAR is being exercised, consideration (in the form determined as provided in Section 7.4) equal in value to the excess of the Fair Market Value of a share of the applicable series of Common Stock with respect to which the Free Standing SAR was granted on the date of exercise over the base price per share of such Free Standing SAR.

7.4 *Consideration*. The consideration to be received upon the exercise of a SAR by the Holder shall be paid in the applicable series of Common Stock with respect to which the SAR was granted (valued at Fair Market Value on the date of exercise of such SAR), as determined by the Board and provided in the applicable Agreement. No fractional shares of Common Stock shall be issuable upon exercise of a SAR, and unless otherwise provided in the applicable Agreement, the Holder will receive cash in lieu of fractional shares. Unless the Board shall otherwise determine, to the extent a Free Standing SAR is exercisable, it will be exercised automatically on its expiration date.

7.5 *Limitations*. The applicable Agreement may provide for a limit on the amount payable to a Holder upon exercise of SARs at any time or in the aggregate, for a limit on the time periods during which a Holder may exercise SARs, and for such other limits on the rights of the Holder and such other terms and conditions of the SAR, including a condition that the SAR may be exercised only in accordance with rules and regulations adopted from time to time, as the Board may determine. Unless otherwise so provided in the applicable Agreement, any such limit relating to a Tandem SAR shall not restrict the exercisability of the related Option. Such rules and regulations may govern the right to exercise SARs granted prior to the adoption or amendment of such rules and regulations as well as SARs granted thereafter.

7.6 *Exercise*. For purposes of this Article VII, the date of exercise of a SAR shall mean the date on which the Company shall have received notice from the Holder of the SAR of the exercise of such SAR (unless otherwise determined by the Board and provided in the applicable Agreement).

7.7 *Limitation on Repricing*. Unless such action is approved by the Company's stockholders, the Company may not (except as provided for under Section 4.2): (1) amend any outstanding SAR granted under the Plan to provide a base price per share that is lower than the then-current base price per share of such outstanding SAR, (2) cancel any outstanding stock appreciation right (whether or not granted under the Plan) and grant in substitution therefor new Awards under the Plan (other than Awards granted pursuant to Section 4.3) covering the same or a different number of shares of Common Stock and having a base price per share lower than the then-current base price per share of the cancelled stock appreciation right, (3) cancel in exchange for a cash payment any outstanding SAR with an exercise price per share above the then-current Fair Market Value, other than pursuant to Section 11.1(b), or (4) take any other action under the Plan that constitutes a “repricing” within the meaning of the rules of NASDAQ.

ARTICLE VIII

RESTRICTED SHARES

8.1 *Grant.* Subject to the limitations of the Plan, the Board shall designate those eligible persons to be granted Awards of Restricted Shares, shall determine the time when each such Award shall be granted, and shall designate (or set forth the basis for determining) the Vesting Date or Vesting Dates for each Award of Restricted Shares, and may prescribe other restrictions, terms and conditions applicable to the vesting of such Restricted Shares in addition to those provided in the Plan. The Board shall determine the price, if any, to be paid by the Holder for the Restricted Shares; *provided, however,* that the issuance of Restricted Shares shall be made for at least the minimum consideration necessary to permit such Restricted Shares to be deemed fully paid and nonassessable. All determinations made by the Board pursuant to this Section 8.1 shall be specified in the Agreement.

Unless otherwise provided in the applicable Award agreement, any dividends (whether paid in cash, stock or property) declared and paid by the Company with respect to shares of Restricted Shares ("***Retained Distributions***") shall be paid to the Holder only if and when such shares become free from the restrictions on transferability and forfeitability that apply to such shares. Each payment of Retained Distributions will be made no later than the end of the calendar year in which the dividends are paid to stockholders of that class of stock or, if later, the 15th day of the third month following the lapsing of the restrictions on transferability and the forfeitability provisions applicable to the underlying shares of Restricted Stock.

8.2 *Issuance of Restricted Shares*. When shares of the applicable series of Common Stock are issued at the beginning of the Restriction Period, the stock certificate or certificates representing such Restricted Shares shall be registered in the name of the Holder to whom such Restricted Shares shall have been awarded. During the Restriction Period, certificates representing the Restricted Shares and any securities constituting Retained Distributions shall bear a restrictive legend to the effect that ownership of the Restricted Shares (and such Retained Distributions), and the enjoyment of all rights appurtenant thereto, are subject to the restrictions, terms and conditions provided in the Plan and the applicable Agreement. Such certificates shall remain in the custody of the Company or its designee, and the Holder shall deposit with the custodian stock powers or other instruments of assignment, each endorsed in blank, so as to permit retransfer to the Company of all or any portion of the Restricted Shares and any securities constituting Retained Distributions that shall be forfeited or otherwise not become vested in accordance with the Plan and the applicable Agreement.

8.3 *Restrictions.* Restricted Shares issued at the beginning of the Restriction Period shall constitute issued and outstanding shares of the applicable series of Common Stock for all corporate purposes. The Holder will have the right to vote such Restricted Shares and to exercise all other rights, powers and privileges of a Holder of shares of the applicable series of Common Stock with respect to such Restricted Shares; *except, that* , unless otherwise determined by the Board and provided in the applicable Agreement, (i) the Holder will not be entitled to delivery of the stock certificate or certificates representing such Restricted Shares until the Restriction Period shall have expired and unless all other vesting requirements with respect thereto shall have been fulfilled or waived; (ii) the Company or its designee will retain custody of the stock certificate or certificates representing the Restricted Shares during the Restriction Period as provided in Section 8.2; (iii) the Holder may not sell, assign, transfer, pledge, exchange, encumber or dispose of the Restricted Shares or his or her interest in any of them during the Restriction Period; and (iv) a breach of any restrictions, terms or conditions provided in the Plan or established by the Board with respect to any Restricted Shares will cause a forfeiture of such Restricted Shares with respect thereto.

8.4 *Cash Payments.* In connection with any Award of Restricted Shares, an Agreement may provide for the payment of a cash amount to the Holder of such Restricted Shares after such Restricted Shares shall have become vested. Such cash amounts shall be payable in accordance with such additional restrictions, terms and conditions as shall be prescribed by the Board in the Agreement and shall be in addition to any other compensation payments which such Holder shall be otherwise entitled or eligible to receive from the Company.

8.5 *Completion of Restriction Period.* On the Vesting Date with respect to each Award of Restricted Shares and the satisfaction of any other applicable restrictions, terms and conditions, (i) all or the applicable portion of such Restricted Shares shall become vested, (ii) any Retained Distributions with respect to such Restricted Shares shall become vested to the extent that the Restricted Shares related thereto shall have become vested, and (iii) any cash amount to be received by the Holder with respect to such Restricted Shares shall become payable, all in accordance with the terms of the applicable Agreement. Any such Restricted Shares and Retained Distributions that shall not become vested shall be forfeited to the Company, and the Holder shall not thereafter have any rights (including dividend and voting rights) with respect to such Restricted Shares and Retained Distributions that shall have been so forfeited. The Board may, in its discretion, provide that the delivery of any Restricted Shares and Retained Distributions that shall have become vested, and payment of any related cash amounts that shall have become payable under this Article VIII, shall be deferred until such date or dates as the recipient may elect. Any election of a recipient pursuant to the preceding sentence shall be filed in writing with the Board in accordance with such rules

and regulations, including any deadline for the making of such an election, as the Board may provide, and shall be made in compliance with Section 409A of the Code.

## ARTICLE IX
## RESTRICTED STOCK UNITS

9.1 *Grant.* In addition to granting Awards of Options, SARs and Restricted Shares, the Board shall, subject to the limitations of the Plan, have authority to grant to eligible persons Awards of Restricted Stock Units which may be in the form of shares of any specified series of Common Stock or units, the value of which is based, in whole or in part, on the Fair Market Value of the shares of any specified series of Common Stock. Subject to the provisions of the Plan, including any rules established pursuant to Section 9.2, Awards of Restricted Stock Units shall be subject to such terms, restrictions, conditions, vesting requirements and payment rules as the Board may determine in its discretion, which need not be identical for each Award. The terms of each Award need not be identical, and the Board need not treat Holders uniformly. The determinations made by the Board pursuant to this Section 9.1 shall be specified in the applicable Agreement.

9.2 *Rules.* The Board may, in its discretion, establish any or all of the following rules for application to an Award of Restricted Stock Units:

(a) Any shares of Common Stock which are part of an Award of Restricted Stock Units may not be assigned, sold, transferred, pledged or otherwise encumbered prior to the date on which the shares are issued or, if later, the date provided by the Board at the time of the Award.

(b) Such Awards may provide for the payment of cash consideration by the person to whom such Award is granted or provide that the Award, and any shares of Common Stock to be issued in connection therewith, if applicable, shall be delivered without the payment of cash consideration; *provided, however,* that the issuance of any shares of Common Stock in connection with an Award of Restricted Stock Units shall be for at least the minimum consideration necessary to permit such shares to be deemed fully paid and nonassessable.

(c) Awards of Restricted Stock Units may provide for deferred payment schedules, vesting over a specified period of employment, the payment (on a current or deferred basis) of dividend equivalent amounts with respect to the number of shares of Common Stock covered by the Award, and elections by the employee to defer payment of the Award or the lifting of restrictions on the Award, if any, provided that any such deferrals shall comply with the requirements of Section 409A of the Code. Restricted Stock Units shall not constitute issued and outstanding shares of the applicable series of Common Stock, and the Holder shall not have any of the rights of a stockholder with respect to the shares of Common Stock covered by such an Award of Restricted Stock Units, in each case until Awards have paid out in shares of Common Stock after the end of the Restriction Period.

(d) *Dividend Equivalents*. The Awards of Restricted Stock Units may provide Holders with the right to receive Dividend Equivalents. Dividend Equivalents may be settled in cash and/or shares of Common Stock and will be subject to the same restrictions on transfer and forfeitability as the Restricted Stock Units with respect to which paid, in each case to the extent provided in the Award agreement.

(e) In such circumstances as the Board may deem advisable, the Board may waive or otherwise remove, in whole or in part, any restrictions or limitations to which a Restricted Stock Unit Award was made subject at the time of grant.

## ARTICLE X
## SHARE PURCHASE

10.1 *Share Purchase*. In addition to granting Awards of Options, SARs, Restricted Shares and Restricted Stock Units, the Board shall, subject to the limitations of the Plan, have authority to permit eligible persons who so elect to use all or any portion of the annual cash retainer received in respect of such eligible person's services as a Nonemployee Director to purchase shares of Common Stock at a purchase price equal to the Fair Market Value on the date of such purchase. Any Nonemployee Director who elects to purchase shares of Common Stock pursuant to this Section 10.1 shall execute in writing or electronically an election agreement for such purchase in accordance with rules and procedures established by the Board or its designee. Common Stock purchased pursuant to this Section 10.1 shall at all times be fully vested and nonforfeitable and shall constitute issued and outstanding shares of Common Stock for all corporate purposes and the holder thereof will have the right to vote such shares of Common Stock and to exercise all other rights, powers and privileges of a holder of shares of Common Stock.

ARTICLE XI
GENERAL PROVISIONS

11.1 *Acceleration of Awards.*

(a) *Death or Disability*. If a Holder's service shall terminate by reason of death or Disability, notwithstanding any contrary waiting period, installment period, vesting schedule or Restriction Period in any Agreement or in the Plan, unless the applicable Agreement provides otherwise: (i) in the case of an Option or SAR, each outstanding Option or SAR granted under the Plan shall immediately become exercisable in full in respect of the aggregate number of shares covered thereby; (ii) in the case of Restricted Shares, the Restriction Period applicable to each such Award of Restricted Shares shall be deemed to have expired and all such Restricted Shares and any related Retained Distributions shall become vested and any related cash amounts payable pursuant to the applicable Agreement shall be adjusted in such manner as may be provided in the Agreement; and (iii) in the case of Restricted Stock Units, each such Award of Restricted Stock Units and any unpaid Dividend Equivalents shall become vested in full.

(b) *Approved Transactions; Board Change; Control Purchase.*

In the event of any Approved Transaction, Board Change or Control Purchase, notwithstanding any contrary waiting period, installment period, vesting schedule or Restriction Period in any Agreement or in the Plan, unless the applicable Agreement provides otherwise: (i) in the case of an Option or SAR, each such outstanding Option or SAR granted under the Plan shall become exercisable in full in respect of the aggregate number of shares covered thereby; (ii) in the case of Restricted Shares, the Restriction Period applicable to each such Award of Restricted Shares shall be deemed to have expired and all such Restricted Shares, any related Retained Distributions and any unpaid Dividend Equivalents shall become vested and any related cash amounts payable pursuant to the applicable Agreement shall be adjusted in such manner as may be provided in the Agreement; and (iii) in the case of Restricted Stock Units, each such Award of Restricted Stock Units shall become vested in full, in each case effective upon the Board Change or Control Purchase or immediately prior to consummation of the Approved Transaction. Notwithstanding the foregoing, unless otherwise provided in the applicable Agreement, the Board may, in its discretion, determine that any or all outstanding Awards of any or all types granted pursuant to the Plan will not vest or become exercisable on an accelerated basis in connection with an Approved Transaction if effective provision has been made for the taking of such action which, in the opinion of the Board, is equitable and appropriate to substitute a new Award for such Award or to assume such Award and to make such new or assumed Award, as nearly as may be practicable, equivalent to the old Award (before giving effect to any acceleration of the vesting or exercisability thereof), taking into account, to the extent applicable, the kind and amount of securities, cash or other assets into or for which the applicable series of Common Stock may be changed, converted or exchanged in connection with the Approved Transaction.

Notwithstanding any provision of the Plan to the contrary, in the event of a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation, the Board shall be authorized, in its discretion, (i) to provide, prior to the transaction, for the acceleration of the vesting and exercisability of, or lapse of restrictions with respect to, the Award and, if the transaction is a cash merger, provide for the termination of any portion of the Award that remains unexercised at the time of such transaction, or (ii) to cancel any such Awards and to deliver to the Holders cash in an amount that the Board shall determine in its sole discretion is equal to the fair market value of such Awards on the date of such event, which in the case of Options or SARs shall be the excess of the Fair Market Value of Common Stock on such date over the purchase price of the Options or the base price of the SARs, as applicable.

No action pursuant to this Section 11.1(b) shall be made in a manner that results in noncompliance with the requirements of Section 409A of the Code, to the extent applicable.

11.2 *Termination of Service*.

(a) *General*. If a Holder's service shall terminate prior to an Option's or SAR's becoming exercisable or being exercised (or deemed exercised, as provided in Section 7.2) in full, or during the Restriction Period with respect to any Restricted Shares or prior to the vesting or complete exercise of any Restricted Stock Units, then such Option or SAR shall thereafter become or be exercisable, such Restricted Stock Units to the extent vested shall thereafter be exercisable, and the Holder's rights to any unvested Restricted Shares, Retained Distributions, unpaid Dividend Equivalents and related cash amounts, and any such unvested Restricted Stock Units shall thereafter vest, in each case solely to the extent provided in the applicable Agreement; provided, however, that, unless otherwise determined by the Board and provided in the applicable Agreement, (i) no Option or SAR may be exercised after the scheduled expiration date thereof; (ii) if the Holder's service terminates by reason of death or Disability, the Option or SAR shall remain exercisable for a period of at least one year following such termination (but not later than the

scheduled expiration of such Option or SAR); and (iii) any termination of the Holder's service for cause will be treated in accordance with the provisions of Section 11.2(b).

(b) *Termination for Cause*. If a Holder's service on the Board shall be terminated by the Company for "cause" during the Restriction Period with respect to any Restricted Shares, or prior to any Option or SAR becoming exercisable or being exercised in full or prior to the vesting or complete exercise of any Stock Unit (for these purposes, "***cause***" shall include dishonesty, incompetence, moral turpitude, other misconduct of any kind and the refusal to perform his duties and responsibilities for any reason other than illness or incapacity, then, unless otherwise determined by the Board and provided in the applicable Agreement, (i) all Options and SARs and all unvested or unexercised Restricted Stock Units held by such Holder shall immediately terminate, and (ii) such Holder's rights to all Restricted Shares, Retained Distributions, any unpaid Dividend Equivalents and any related cash amounts shall be forfeited immediately.

11.3 *Nonalienation of Benefits; Nontransferability of Awards.* Except as set forth below, no right or benefit under the Plan shall be subject to anticipation, alienation, sale, assignment, hypothecation, pledge, exchange, transfer, encumbrance or charge, and any attempt to anticipate, alienate, sell, assign, hypothecate, pledge, exchange, transfer, encumber or charge the same shall be void. No right or benefit hereunder shall in any manner be liable for or subject to the debts, contracts, liabilities or torts of the Person entitled to such benefits. Awards shall not be sold, assigned, transferred, pledged or otherwise encumbered by the person to whom they are granted, either voluntarily or by operation of law, except by will or the laws of descent and distribution or pursuant to a qualified domestic relations order, and, during the life of the Holder, shall be exercisable only by the Holder; provided, however, that the Board may permit or provide in an Award for the gratuitous transfer of the Award by the Holder to or for the benefit of any immediate family member, family trust or other entity established for the benefit of the Holder and/or an immediate family member thereof if the Company would be eligible to use a Form S-8 under the Securities Act for the registration of the sale of the Common Stock subject to such Award to such proposed transferee; provided further, that the Company shall not be required to recognize any such permitted transfer until such time as such permitted transferee shall, as a condition to such transfer, deliver to the Company a written instrument in form and substance satisfactory to the Company confirming that such transferee shall be bound by all of the terms and conditions of the Award. References to a Holder, to the extent relevant in the context, shall include references to authorized transferees. For the avoidance of doubt, nothing contained in this Section 11.3 shall be deemed to restrict a transfer to the Company.

11.4 *Documentation*. Each Award shall be evidenced in such form (written, electronic or otherwise) as the Board shall determine. Each Award may contain terms and conditions in addition to those set forth in the Plan. Any such documentation may contain (but shall not be required to contain) such provisions as the Board deems appropriate to insure that the penalty provisions of Section 4999 of the Code will not apply to any stock or cash received by the Holder from the Company. Any such Agreement may be supplemented or amended from time to time as approved by the Board as contemplated by Section 11.6(b).

11.5 *Designation of Beneficiaries*. Each person who shall be granted an Award under the Plan may designate a beneficiary or beneficiaries and may change such designation from time to time by filing a written designation of beneficiary or beneficiaries with the Board on a form to be prescribed by it, provided that no such designation shall be effective unless so filed prior to the death of such person.

11.6 *Termination and Amendment*.

(a) *General*. Unless the Plan shall theretofore have been terminated as hereinafter provided, no Awards may be made under the Plan on or after the tenth anniversary of the Effective Date. The Plan may be terminated at any time prior to the tenth anniversary of the Effective Date and may, from time to time, be suspended or discontinued or modified or amended if such action is deemed advisable by the Board.

(b) *Modification*. No termination, modification or amendment of the Plan may, without the consent of the person to whom any Award shall theretofore have been granted, materially adversely affect the rights of such person with respect to such Award, except as otherwise permitted by Section 11.17. No modification, extension, renewal or other change in any Award granted under the Plan shall be made after the grant of such Award, unless the same is consistent with the provisions of the Plan. With the consent of the Holder, or as otherwise permitted under Section 11.17, and subject to the terms and conditions of the Plan (including Section 11.6(a)), the Board may amend outstanding Agreements with any Holder, including any amendment which would (i) accelerate the time or times at which the Award may be exercised and/or (ii) extend the scheduled expiration date of the Award. Without limiting the generality of the foregoing, the Board may, but solely with the Holder's consent unless otherwise provided in the

Agreement, agree to cancel any Award under the Plan and grant a new Award in substitution therefor, provided that the Award so substituted shall satisfy all of the requirements of the Plan as of the date such new Award is made. Nothing contained in the foregoing provisions of this Section 11.6(b) shall be construed to prevent the Board from providing in any Agreement that the rights of the Holder with respect to the Award evidenced thereby shall be subject to such rules and regulations as the Board may, subject to the express provisions of the Plan, adopt from time to time or impair the enforceability of any such provision.

11.7 *Government and Other Regulations*. The obligation of the Company with respect to Awards shall be subject to all applicable laws, rules and regulations and such approvals by any governmental agencies as may be required, including the effectiveness of any registration statement required under the Securities Act of 1933, and the rules and regulations of any securities exchange or association on which the Common Stock may be listed or quoted. For so long as any series of Common Stock are registered under the Exchange Act, the Company shall use its reasonable efforts to comply with any legal requirements (a) to maintain a registration statement in effect under the Securities Act of 1933 with respect to all shares of the applicable series of Common Stock that may be issued to Holders under the Plan and (b) to file in a timely manner all reports required to be filed by it under the Exchange Act.

11.8 *Withholding*. The Company's obligation to deliver shares of Common Stock or pay cash in respect of any Award under the Plan shall be subject to applicable federal, state and local tax withholding requirements. Federal, state and local withholding tax due at the time of an Award, upon the exercise of any Option or SAR or upon the vesting of, or expiration of restrictions with respect to, Restricted Shares or Restricted Stock Units, as appropriate, may, in the discretion of the Board, be paid in shares of the applicable series of Common Stock already owned by the Holder or through the withholding of shares otherwise issuable to such Holder, upon such terms and conditions (including the conditions referenced in Section 6.5) as the Board shall determine. If the Holder shall fail to pay, or make arrangements satisfactory to the Board for the payment to the Company of, all such federal, state and local taxes required to be withheld by the Company, then the Company shall, to the extent permitted by law, have the right to deduct from any payment of any kind otherwise due to such Holder an amount equal to any federal, state or local taxes of any kind required to be withheld by the Company with respect to such Award.

11.9 *Nonexclusivity of the Plan*. The adoption of the Plan by the Board shall not be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including the granting of stock options and the awarding of stock and cash otherwise than under the Plan, and such arrangements may be either generally applicable or applicable only in specific cases.

11.10 *Treatment with Respect to Other Benefit Programs*. By acceptance of an Award, unless otherwise provided in the applicable Agreement or required by law, each Holder shall be deemed to have agreed that such Award is special incentive compensation that will not be taken into account, in any manner, as compensation or bonus in determining the amount of any payment under any pension, retirement or other benefit plan, program or policy of the Company or any Subsidiary of the Company. In addition, each beneficiary of a deceased Holder shall be deemed to have agreed that such Award will not affect the amount of any life insurance coverage, if any, provided by the Company on the life of the Holder which is payable to such beneficiary under any life insurance plan of the Company or any Subsidiary of the Company.

11.11 *Unfunded Plan*. Neither the Company nor any Subsidiary of the Company shall be required to segregate any cash or any shares of Common Stock which may at any time be represented by Awards, and the Plan shall constitute an "unfunded" plan of the Company. Except as provided in Article VIII with respect to Awards of Restricted Shares and except as expressly set forth in an Agreement, no Holder shall have voting or other rights with respect to the shares of Common Stock covered by an Award prior to the delivery of such shares. Neither the Company nor any Subsidiary of the Company shall, by any provisions of the Plan, be deemed to be a trustee of any shares of Common Stock or any other property, and the liabilities of the Company to any Holder pursuant to the Plan shall be those of a debtor pursuant to such contract obligations as are created by or pursuant to the Plan, and the rights of any Holder under the Plan shall be limited to those of a general creditor of the Company. In its sole discretion, the Board may authorize the creation of trusts or other arrangements to meet the obligations of the Company under the Plan, *provided, however* , that the existence of such trusts or other arrangements is consistent with the unfunded status of the Plan.

11.12 *Governing Law*. The Plan shall be governed by, and construed in accordance with, the laws of the State of Delaware.

11.13 *Accounts*. The delivery of any shares of Common Stock and the payment of any amount in respect of an Award shall be for the account of the Company or the applicable Subsidiary of the Company, as the case may be, and any such delivery or payment shall not be made until the recipient shall have paid or made satisfactory arrangements for the payment of any applicable withholding taxes as provided in Section 11.8.

11.14 *Legends*. Each certificate evidencing shares of Common Stock subject to an Award shall bear such legends as the Board deems necessary or appropriate to reflect or refer to any terms, conditions or restrictions of the Award applicable to such shares, including any to the effect that the shares represented thereby may not be disposed of unless the Company has received an opinion of counsel, acceptable to the Company, that such disposition will not violate any federal or state securities laws.

11.15 *Company's Rights*. The grant of Awards pursuant to the Plan shall not affect in any way the right or power of the Company to make reclassifications, reorganizations or other changes of or to its capital or business structure or to merge, consolidate, liquidate, sell or otherwise dispose of all or any part of its business or assets.

11.16 *Interpretation*. The words "***include*** ," "***includes*** ," "***included*** " and "***including***" to the extent used in the Plan shall be deemed in each case to be followed by the words "without limitation."

11.17 *Compliance with Section 409A of the Code.* Except as provided in individual Award agreements initially or by amendment, if and to the extent (i) any portion of any payment, compensation or other benefit provided to a Holder pursuant to the Plan in connection with his or her employment termination constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Code and (ii) the Holder is a specified employee as defined in Section 409A(a)(2)(B)(i) of the Code, in each case as determined by the Company in accordance with its procedures, by which determinations the Holder (through accepting the Award) agrees that he or she is bound, such portion of the payment, compensation or other benefit shall not be paid before the day that is six months plus one day after the date of "separation from service" (as determined under Section 409A of the Code) (the "***New Payment Date***" ), except as Section 409A of the Code may then permit. The aggregate of any payments that otherwise would have been paid to the Holder during the period between the date of separation from service and the New Payment Date shall be paid to the Holder in a lump sum on such New Payment Date, and any remaining payments will be paid on their original schedule.

The Company makes no representations or warranty and shall have no liability to the Holder or any other person if any provisions of or payments, compensation or other benefits under the Plan are determined to constitute nonqualified deferred compensation subject to Section 409A of the Code but do not to satisfy the conditions of that section.

11.18 *Limitations on Liability*. Notwithstanding any other provisions of the Plan, no individual acting as a director, officer, employee or agent of the Company will be liable to any Holder, former Holder, spouse, beneficiary, or any other person for any claim, loss, liability, or expense incurred in connection with the Plan, nor will such individual be personally liable with respect to the Plan because of any contract or other instrument he or she executes in his or her capacity as a director, officer, employee or agent of the Company. The Company will indemnify and hold harmless each director, officer, employee or agent of the Company to whom any duty or power relating to the administration or interpretation of the Plan has been or will be delegated, against any cost or expense (including attorneys' fees) or liability (including any sum paid in settlement of a claim with the Board's approval) arising out of any act or omission to act concerning the Plan unless arising out of such person's own fraud or bad faith.

**Exhibit 10.38**

**NON-EMPLOYEE DIRECTOR RSU FORM**

**#ParticipantName#**

Dear #ParticipantName#,

Congratulations, you have been awarded a restricted stock unit ("***RSU***") in recognition of your contributions to the success of Warner Bros. Discovery, Inc. (the "***Company***"). We would like you to have an opportunity to share in the continued success of the Company through this RSU under the Warner Bros. Discovery, Inc. 2005 Non-Employee Director Incentive Plan (As Amended and Restated) (the "***Plan***"). An RSU entitles you to receive a specific number of shares of the Company's Series A common stock at a future date, assuming that you satisfy conditions of the Plan and the implementing agreement. The following represents a brief description of your grant. Additional details regarding your RSU are reflected in the attached Restricted Stock Unit Agreement (the "***Grant Agreement***") and copy of the Plan.

**RSU Grant Summary:**

| | |
|---|---|
| **Date of Grant** | **#GrantDate#** |
| **RSU Shares** | **#QuantityGranted#** |
| **Vesting Schedule** | 100% of the RSU Shares on one year anniversary of the date of grant or the date of the Company's 2023 Annual Meeting of Stockholders, whichever is earlier (such date, the "***Vesting Date***"). |

- You have been granted an RSU for shares ("***Shares***") of Warner Bros. Discovery, Inc. Series A Common Stock for the number of Shares specified under "RSU Shares" in the chart.
- The potential value of your RSU increases if the price of the Company's stock increases, but you also have to continue to provide services for the Company (except as the Grant Agreement provides) to actually receive such value. Of course, the value of the stock may go up and down over time.
- You will not receive the Shares represented by the RSU until the RSU vests. Your RSU vests as provided in the chart above under "Vesting Schedule" and "Vesting Date," assuming you remain a director or become and remain an employee of the Company and subject to the terms in the Grant Agreement.
- Once you have received the Shares, you will own the Shares and may decide whether to hold the Shares, sell the Shares or give the Shares to someone as a gift.
- Your ability to receive Shares under the RSU is conditioned upon compliance with any local laws that apply to you.

**WARNER BROS. DISCOVERY, INC.**
**RESTRICTED STOCK UNIT GRANT AGREEMENT FOR NON-EMPLOYEE DIRECTORS**

Warner Bros. Discovery, Inc. (the "***Company***") has granted you a restricted stock unit (the "***RSU***") under the Warner Bros. Discovery, Inc. 2005 Non-Employee Director Incentive Plan (As Amended and Restated) (the "***Plan***"). The RSU lets you receive a specified number (the "***RSU Shares***") of shares ("***Shares***") of the Company's Series A common stock upon satisfaction of the conditions to receipt.

The individualized communication you received (the "***Cover Letter***") provides the details for your RSU. It specifies the number of RSU Shares, the Date of Grant, the schedule for vesting, and the Vesting Date.

The RSU is subject in all respects to the applicable provisions of the Plan. This Grant Agreement does not cover all of the rules that apply to the RSU under the Plan; please refer to the Plan document.
Capitalized terms are defined either further below in this grant agreement (the "***Grant Agreement***") or in the Plan.

---

The Plan document is available on the Fidelity website. The Prospectus for the Plan, the Company's S-4, Annual Report on Form 10-K, and other filings the Company makes with the Securities and Exchange Commission are available for your review on the Company's web site. You may also obtain paper copies of these documents upon request to the Company's Corporate Secretary or People and Culture Department.

Neither the Company nor anyone else is making any representations or promises regarding the duration of your service, vesting of the RSU, the value of the Company's stock or of this RSU, or the Company's prospects. The Company is not providing any advice regarding tax consequences to you or regarding your decisions regarding the RSU; you agree to rely only upon your own personal advisors.

**NO ONE MAY SELL, TRANSFER, OR DISTRIBUTE THE RSU OR THE SECURITIES THAT MAY BE RECEIVED UNDER IT WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATING THERETO OR AN OPINION OF COUNSEL SATISFACTORY TO WARNER BROS. DISCOVERY, INC. OR OTHER INFORMATION AND REPRESENTATIONS SATISFACTORY TO IT THAT SUCH REGISTRATION IS NOT REQUIRED.**

In addition to the Plan's terms and restrictions, the following terms and restrictions apply:

1. **Vesting Schedule.** The Grant becomes nonforfeitable ("***Vested***") as to the RSU as provided in the Cover Letter and the Grant Agreement if you continue your "Service-Providing Relationship" (as a member of the Company's board of directors (the "***Board***") or as an employee of the Company) with the Company until the Vesting Date. For purposes of this Grant Agreement, employment with the Company will include employment with any Subsidiary whose employees are then eligible to receive Awards under the Plan (provided that a later transfer of employment to an ineligible Subsidiary will not terminate employment unless the Board determines otherwise). Vesting will accelerate fully if your Service-Providing Relationship ends as a result of your death or Disability (as defined in the Plan).

2. **Change in Control.** Notwithstanding the Plan's provisions, if an Approved Transaction, Control Purchase, or Board Change (each a "***Change in Control***") occurs before the Vesting Date, the RSU will only have accelerated Vesting as a result of the Change in Control if (i) during your Service-Providing Relationship and after the Change in Control, the Company terminates such Service-Providing Relationship (other than for "cause" as determined under Section 10.2(b) of the Plan) and (ii) with respect to any Approved Transaction, the transaction actually closes before the Vesting Date. Accelerated Vesting will only accelerate the Distribution Date if and to the extent permitted under Section 409A of the Internal Revenue Code.

   The Board reserves its ability under Section 10.1(b) of the Plan to vary this treatment if the Board determines there is an equitable substitution or replacement award in connection with a Change in Control.

3. **Restrictions and Forfeiture.** You may not sell, assign, pledge, encumber, or otherwise transfer any interest ("***Transfer***") in the RSU Shares until the RSU Shares are distributed to you. Any attempted Transfer that precedes the Distribution Date is invalid.

   Unless the Board determines otherwise or the Grant Agreement provides otherwise, if your service with the Company terminates for any reason before your RSU is Vested, then you will forfeit the RSU (and the Shares to which they relate) to the extent that the RSU does not otherwise vest as a result of the termination. The forfeited RSU will then immediately revert to the Company. You will receive no payment for the RSU if you forfeit it.

4. **Distribution Date.** Subject to any overriding provisions in the Plan, you will receive a distribution of the Shares equivalent to your Vested RSU Shares as soon as practicable following the Vesting Date (with the actual date being the "***Distribution Date***") and, in any event, no later than March 15 of the year following the calendar year in which the Vesting Date occurred, unless you have made a timely deferral election to defer distribution to a later date (in which case the deferred date will be the "***Distribution Date***").

5. **Limited Status.** You understand and agree that the Company will not consider you a shareholder for any purpose with respect to the RSU Shares, unless and until the RSU Shares have been issued to you on the Distribution Date. You will not receive dividends with respect to the RSU.

6. **Voting**. You may not vote the RSU. You may not vote the RSU Shares unless and until the Shares are distributed to you.

7. **Taxes and Withholding.** The RSU provides tax deferral, meaning that the RSU Shares are not taxable to until you actually receive the RSU Shares on or around the Distribution Date. You will then owe taxes at ordinary income tax rates as of the Distribution Date at the Shares' value. (If you are or become a Company employee, you may owe FICA and HI (Social Security and Medicare) taxes before the Distribution Date.)

   Issuing the Shares under the RSU is contingent on satisfaction of all obligations with respect to required tax or other required withholdings (for example, in the U.S., Federal, state, and local taxes, if you are then an employee of the Company). The Company may take any action permitted under Section 10.8 of the Plan to satisfy such obligation, including, if the Board so determines, satisfying the tax obligations by (i) reducing the number of RSU Shares to be issued to you by that number of RSU Shares (valued at their Fair Market Value on the Distribution Date) that would equal all taxes required to be withheld (at their minimum withholding levels), (ii) accepting payment of the withholdings from a broker in connection with a sale of the RSU Shares or directly from you, or (iii) taking any other action under Section 10.8. If a fractional share remains after deduction for required withholding, the Company will pay you the value of the fraction in cash.

8. **Compliance with Law.** The Company will not issue the RSU Shares if doing so would violate any applicable Federal or state securities laws or other laws or regulations. You may not sell or otherwise dispose of the RSU Shares in violation of applicable law.

9. **Additional Conditions to Receipt.** The Company may postpone issuing and delivering any RSU Shares for so long as the Company determines to be advisable to satisfy the following:

   (a) its completing or amending any securities registration or qualification of the RSU Shares *or* its or your satisfying any exemption from registration under any Federal or state law, rule, or regulation;

   (b) its receiving proof it considers satisfactory that a person seeking to receive the RSU Shares after your death is entitled to do so;

   (c) your complying with any requests for representations under the Plan; and

   (d) your complying with any Federal, state, or local tax withholding obligations.

10. **Additional Representations from You.** If the vesting provisions of the RSU are satisfied and you are entitled to receive RSU Shares at a time when the Company does not have a current registration statement (generally on Form S-8) under the Securities Act of 1933 (the "***Act***") that covers issuances of shares to you, you must comply with the following before the Company will issue the RSU Shares to you. You must —

    **(a)** represent to the Company, in a manner satisfactory to the Company's counsel, that you are acquiring the RSU Shares for your own account and not with a view to reselling or distributing the RSU Shares; and

    **(b)** agree that you will not sell, transfer, or otherwise dispose of the RSU Shares unless:

    **(i)** a registration statement under the Act is effective at the time of disposition with

**(ii)** the Company has received an opinion of counsel or other information and representations it considers satisfactory to the effect that, because of Rule 144 under the Act or otherwise, no registration under the Act is required.

11. **No Effect on Board Service, Employment or Other Relationship.** Nothing in this Grant Agreement restricts the Company's rights or those of any of its affiliates to terminate your Service- Providing Relationship at any time and for any or no reason. The termination of your Service- Providing Relationship, whether by the Company or any of its affiliates or otherwise, and regardless of the reason for such termination, has the consequences provided for under the Plan and any applicable employment or severance agreement or plan.

12. **No Effect on Running Business.** You understand and agree that the existence of the RSU will not affect in any way the right or power of the Company or its stockholders to make or authorize any adjustments, recapitalizations, reorganizations, or other changes in the Company's capital structure or its business, or any merger or consolidation of the Company, or any issuance of bonds, debentures, preferred or other stock, with preference ahead of or convertible into, or otherwise affecting the Company's common stock or the rights thereof, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether or not of a similar character to those described above.

13. **Section 409A.** The RSU is intended to comply with the requirements of Section 409A of the Internal Revenue Code and must be construed consistently with that section. Notwithstanding anything in the Plan or this Grant Agreement to the contrary, if the RSU Vests in connection with your "separation from service" within the meaning of Section 409A, as determined by the Company), other than due to death, and if (x) you are then a "specified employee" within the meaning of Section 409A at the time of such separation from service (as determined by the Company, by which determination you agree you are bound) and (y) the distribution of RSU Shares under such accelerated RSU will result in the imposition of additional tax under Section 409A if distributed to you within the six month period following your separation from service, then the distribution under such accelerated RSU will not be made until the earlier of (i) the date six months and one day following the date of your separation from service or (ii) the 10th day after your date of death. Neither the Company nor you shall have the right to accelerate or defer the delivery of any such RSU Shares or benefits except to the extent specifically permitted or required by Section 409A. In no event may the Company or you defer the delivery of the RSU Shares beyond the date specified in the **Distribution Date** section, unless such deferral complies in all respects with Treasury Regulation Section 1.409A-2(b) related to subsequent changes in the time or form of payment of nonqualified deferred compensation arrangements, or any successor regulation. In any event, the Company makes no representations or warranty and shall have no liability to you or any other person, if any provisions of or distributions under this Agreement are determined to constitute deferred compensation subject to Code Section 409A but not to satisfy the conditions of that section.

14. **Unsecured Creditor.** The RSU creates a contractual obligation on the part of the Company to make a distribution of the RSU Shares at the time provided for in this Grant Agreement. Neither you nor any other party claiming an interest in deferred compensation hereunder shall have any interest whatsoever in any specific assets of the Company. Your right to receive distributions hereunder is that of an unsecured general creditor of Company.

15. **Governing Law**. The laws of the State of Delaware will govern all matters relating to the RSU, without regard to the principles of conflict of laws.

16. **Notices.** Any notice you give to the Company must follow the procedures then in effect. If no other procedures apply, you must send your notice in writing by hand or by mail to the office of the Company's Secretary (or to the Chair of the Board if you are then serving as the sole Secretary). If mailed, you should address it to the Company's Secretary (or the Chair of the Board) at the Company's then corporate headquarters, unless the Company directs RSU holders to send notices to another corporate department or to a third party administrator or specifies another method of transmitting notice. The Company and the Board will address any notices to you using its standard electronic communications methods or at your office or home address as reflected on the Company's personnel or other business records. You and the Company may change the address for notice by notice to the other, and the Company can also change the address for notice by general announcements to RSU holders.

17. **Amendment.** Subject to any required action by the Board or the stockholders of the Company, the Company may cancel the RSU and provide a new Award in its place, provided that the Award so replaced will satisfy all of the requirements of the Plan as of the date such new Award is made and no such action will adversely affect the RSU to the extent then Vested.

18. **Plan Governs.** Wherever a conflict may arise between the terms of this Grant Agreement and the terms of the Plan, the terms of the Plan will control. The Board may adjust the number of RSU Shares and other terms of the RSU from time to time as the Plan provides.

 **Exhibit 10.46**

**DISCOVERY, INC.**
**PERFORMANCE RESTRICTED STOCK UNIT GRANT AGREEMENT**
**FOR DAVID ZASLAV**

Discovery, Inc. (the "***Company***") has granted you a performance restricted stock unit (the "***PRSU***") under the Discovery Communications, Inc. 2013 Incentive Plan (the "***Plan***"). The PRSU lets you receive a specified number of shares ("***Shares***") of the Company's Series A Common Stock (the "***Series A PRSU Shares***") upon satisfaction of the conditions to receipt.

The individualized communication you received (the "***Cover Letter***") provides the details of your PRSU award. It specifies the number of PRSU Shares, the Date of Grant, the schedule for vesting, and the Vesting Date.

The PRSU is subject in all respects to the applicable provisions of the Plan. This Grant Agreement does not cover all of the rules that apply to the PRSU under the Plan; please refer to your 2018 Employment Agreement and the Plan document. Capitalized terms are defined either in the Cover Letter, further below in this grant agreement (the "***Grant Agreement***"), in the 2018 Employment Agreement, or in the Plan.

---

The Plan document is available on the Fidelity web site. The Prospectus for the Plan, the Company's S-8, Annual Report on Form 10-K, and other filings the Company makes with the Securities and Exchange Commission are available for your review on the Company's web site. You may also obtain paper copies of these documents upon request to the Company's People & Culture department.

Neither the Company nor anyone else is making any representations or promises regarding the duration of your service, vesting of the PRSU, the value of the Company's stock or of this PRSU, or the Company's prospects. The Company is not providing any advice regarding tax consequences to you or regarding your decisions regarding the PRSU. You agree to rely only upon your own personal advisors.

**No one may sell, transfer, or distribute the PRSU or the securities that may be received under it without an effective registration statement relating thereto or an opinion of counsel satisfactory to Discovery, Inc. or other information and representations satisfactory to it that such registration is not required.**

---

In addition to the Plan's terms and restrictions, the following terms and restrictions apply:

**1. Vesting Schedule.** Your PRSU becomes nonforfeitable ("***Vested***") as provided in the Cover Letter and the Grant Agreement assuming you remain employed by the Company until December 31, 2021 and the performance metric(s) for the one year period beginning January 1, 2021 and ending December 31, 2021 (the "***Performance Period***") are satisfied. For purposes of this Grant Agreement, employment with the Company will include employment with any Subsidiary whose employees are then eligible to receive Awards under the Plan (provided that a later transfer of employment to an ineligible Subsidiary will not terminate employment unless the Compensation Committee of the Board of Directors (the "***Committee***" of the "***Board***")) determines otherwise).

If your employment is terminated by the Company without "***Cause***" or by you for "***Good Reason***", in each case before the Vesting Date, the PRSU will become Vested on the original vesting schedule as though you remained working through the Vesting Date, subject to any applicable performance conditions. Payments under this PRSU as a result of termination will be subject to the Release requirements in the 2018 Employment Agreement, where applicable in connection with a termination without Cause, resignation for Good Reason, Change in Control or Disability. The PRSU will be frozen, if not already fully Vested, between the date your employment ends and the date your Release requirement is met (or the deadline for providing the Release expires), at which point the PRSU will be forfeited if the Release has not become irrevocable. Any Distribution Date falling between the date your employment ends and the deadline for providing an irrevocable Release will be delayed until the last day of the period for providing an irrevocable Release.

If your employment ends as a result of death or as a result of your Disability, you will become Vested, subject to any applicable performance conditions, and the payout will be prorated based on actual performance through the date of separation. In the case of death, the results will be certified by the Committee as soon as practicable after the date of death, with the date of potentially accelerated certification being the Vesting Date for this purpose. To be eligible for a prorated payout, the prorated performance must be at least 80% of the prorated target.

"***Cause,***" "***Good Reason***," and "***Disability***" have the meanings provided in your 2018 Employment Agreement.

**2. Change in Control**. Notwithstanding the Plan's provisions, if a "Change in Control" (as defined in the 2018 Employment Agreement) occurs before the PRSU is vested and before December 31, 2021, the PRSU shall be treated as follows. If you remain employed by the Company (or its successor) for thirty (30) days following a Change in Control, then the outstanding PRSUs (for which the performance period has not expired) will become fully vested as of the thirtieth day following the Change in Control and the PRSUs shall be earned regardless of actual performance. In the event your employment is terminated (i) other than for Cause or for Good Reason within sixty (60) days following a Change in Control, or (ii) you resign voluntarily within the 30 calendar days commencing on the thirty-first day following a Change in Control, then the outstanding PRSUs (for which the performance period has not expired) will become fully vested as of thirty days after the Change in Control, regardless of actual performance and the PRSUs shall be distributed immediately to the extent permissible under IRC 409A ("Section 409A").

**3. Distribution Date.** Subject to any overriding provisions in the Plan or Section 2 above, you will receive a distribution of the Shares equivalent to your Vested PRSU Shares based on the following schedule (each such delivery date being a "***Distribution Date***") unless, in each case, the Committee determines that you may make a timely deferral

election to defer distribution to a later date and you have made such an election (in which case the deferred date will be the Distribution Date):

(a) 50% of your Vested PRSU Shares will be paid in 2022 after the performance conditions are determined to be satisfied (pursuant to Appendix A);
(b) 25% of your Vested PRSU Shares will be paid in 2023, as soon as practicable after the beginning of the year; and
(c) 25% of your Vested PRSU Shares will be paid in 2024, as soon as practicable after the beginning of the year.

If the Vesting Date occurs because of your death, your designated beneficiary or estate will receive the PRSU Shares earned (i) no later than end of the calendar year in which your death occurs, if your death occurs on or before June 30 of such year, and (ii) in the following calendar year, for any later death.

**4. Adjustments.** Notwithstanding the foregoing, if within five years of the close of the Performance Period, the Company's audited financial statement for the Performance Period is restated, the Committee shall determine whether, and the extent to which, the performance conditions described in Appendix A were satisfied based on the restated financial statements. If the Committee determines that the Company delivered too few Shares to you on the original Distribution Date(s), you will be entitled to receive (without interest or other adjustment for the passage of time) additional Shares; such Shares, together with any previously distributed Shares, shall not exceed the total number of PRSU Shares granted under this Grant Agreement. If the Committee determines that the Company delivered too many Shares to you on the original Distribution Date(s), you will be required to deliver to the Company (without interest or other adjustment for the passage of time) the excess Shares previously delivered as soon as practicable after notice by the Committee. In the event the person (either you or the Company) required to deliver Shares under the foregoing provisions is entitled to receive future payments (other than payments constituting "deferred compensation" under Section 409A) from the person entitled to receive delivery of Shares under the foregoing provisions, then the person required to make the delivery of Shares under the foregoing provisions may reduce the number of Shares due under the foregoing provisions by a number of Shares which have a fair market value equal to the value of the future payment to be received from the other person. If you receive any additional Vested PRSU Shares pursuant to this section, such Shares will be distributed to you within 30 days after the Committee's determination based on the restated audited financial statements.

**5. Clawback.** Notwithstanding the provisions in Section 4 with respect to Adjustments, if the Company's Board of Directors or the Committee determines, in its sole discretion, that you engaged in fraud or misconduct as a result of which or in connection with which the Company is required to or decides to restate its financial statements, the Committee may, in its sole discretion, impose any or all of the following:

**(a)** Immediate expiration of the PRSU, whether vested or not, if granted within the first 12 months after issuance or filing of any financial statement that is being restated (the "***Recovery Measurement Period***"); and

**(b)** Payment or transfer to the Company of the Gain from the PRSU, where the "***Gain***" consists of the greatest of (i) the value of the PRSU Shares on the applicable Distribution Date on which you received them within the Recovery Measurement Period, (ii) the value of PRSU Shares received during the Recovery Measurement Period, as determined on the date of the request by the Committee to pay or transfer, (iii) the gross (before tax) proceeds you received from any sale of the PRSU Shares during the Recovery Measurement Period, and (iv) if transferred without sale during the Recovery Measurement Period, the value of the PRSU Shares when so transferred. The

amount paid or transferred to the Company shall be adjusted to reflect any adjustment to the number of Shares finally awarded after application of the "Adjustments" provisions above.

This remedy is in addition to any other remedies that the Company may have available in law or equity.

Payment is due in cash or cash equivalents within 10 days after the Committee provides notice to you that it is enforcing this clawback. Payment will be calculated on a gross basis, without reduction for taxes or commissions. The Company may, but is not required to, accept retransfer of Shares in lieu of cash payments.

**6. Restrictions and Forfeiture.** You may not sell, assign, pledge, encumber, or otherwise transfer any interest ("***Transfer***") in the PRSU Shares until the PRSU Shares are distributed to you. Any attempted Transfer that precedes the Distribution Date is invalid.

Unless the Board determines otherwise or the Grant Agreement provides otherwise, if your employment or service with the Company terminates for any reason before your PRSU is Vested, then you will forfeit the PRSU (and the Shares to which they relate) to the extent that the PRSU does not otherwise vest on or after your termination, pursuant to the rules in the **Vesting Schedule** section. You forfeit any unvested portions of the PRSU immediately if the Company terminates your employment for Cause or if you resign your employment other than for Good Reason. You also forfeit any unvested portion of the PRSU immediately upon the date for certification of the performance metrics for the Performance Period if and to the extent the performance metrics are not then satisfied and no Change in Control has occurred. The forfeited portions of the PRSU will then immediately revert to the Company. You will receive no payment for the PRSU if you forfeit it.

**7. Limited Status.** You understand and agree that the Company will not consider you a shareholder for any purpose with respect to the PRSU Shares, unless and until the PRSU Shares have been issued to you on the Distribution Date. You will not receive dividends with respect to the PRSU.

**8. Voting.** You may not vote the PRSU. You may not vote the PRSU Shares unless and until the Shares are distributed to you.

**9. Taxes and Withholding.** The PRSU provides tax deferral, meaning that the PRSU Shares are not taxable until you actually receive the PRSU Shares on or around the Distribution Date. You will then owe taxes at ordinary income tax rates as of the Distribution Date at the PRSU Shares' value. As an employee of the Company, you may owe FICA and HI (Social Security and Medicare) taxes before the Distribution Date.

Issuing the Shares under the PRSU is contingent on your satisfaction of all obligations with respect to required tax or other required withholdings (for example, in the U.S., Federal, state, and local taxes). You may satisfy the obligations by directing the Company to reduce the number of PRSU Shares to be issued to you by up to that number of PRSU Shares (valued at their Fair Market Value on the Distribution Date) that would equal all taxes required to be withheld (at their minimum withholding levels or such higher level as you request (up to 5% in excess of the minimum withholding level or your estimated marginal tax rate for the year of payment, whichever is greater)), providing that any minimum withholding requirements not satisfied in the foregoing manner must be satisfied in a manner acceptable to the Committee, which could include accepting payment of the withholdings from a broker in connection with a sale of the PRSU Shares or directly from you. If a fractional share remains after deduction for required withholding, the Company will pay you the value of the fraction in cash.

**10. <u>Compliance with Law</u>.** The Company will not issue the PRSU Shares if doing so would violate any applicable Federal or state securities laws or other laws or regulations. You may not sell or otherwise dispose of the PRSU Shares in violation of applicable law.

**11. <u>Additional Conditions to Receipt</u>.** The Company may postpone issuing and delivering any PRSU Shares for so long as the Company determines to be advisable to satisfy the following:

**(a)** its completing or amending any securities registration or qualification of the PRSU Shares *or* its or your satisfying any exemption from registration under any Federal or state law, rule, or regulation;

**(b)** its receiving proof it considers satisfactory that a person seeking to receive the PRSU Shares after your death is entitled to do so;

**(c)** your complying with any requests for representations under the Plan; and

**(d)** your complying with any Federal, state, or local tax withholding obligations.

**12. <u>Additional Representations from You</u>.** If the vesting provisions of the PRSU are satisfied and you are entitled to receive PRSU Shares at a time when the Company does not have a current registration statement (generally on Form S-8) under the Securities Act of 1933 (the "***Act***") that covers issuances of shares to you, you must comply with the following before the Company will issue the PRSU Shares to you. You must:

**(a)** represent to the Company, in a manner satisfactory to the Company's counsel, that you are acquiring the PRSU Shares for your own account and not with a view to reselling or distributing the PRSU Shares; and

**(b)** agree that you will not sell, transfer, or otherwise dispose of the PRSU Shares unless:

**(i)** a registration statement under the Act is effective at the time of disposition with respect to the PRSU Shares you propose to sell, transfer, or otherwise dispose of; or

**(ii)** the Company has received an opinion of counsel or other information and representations it considers satisfactory to the effect that, because of Rule 144 under the Act or otherwise, no registration under the Act is required.

**13. <u>No Effect on Employment or Other Relationship</u>.** Nothing in this Grant Agreement restricts the Company's rights or those of any of its affiliates to terminate your employment or other relationship at any time and for any or no reason. The termination of employment or other relationship, whether by the Company or any of its affiliates or otherwise, and regardless of the reason for such termination, has the consequences provided for under the Plan and any applicable employment or severance agreement or plan.

**14. <u>No Effect on Running Business</u>.** You understand and agree that the existence of the PRSU will not affect in any way the right or power of the Company or its stockholders to make or authorize any adjustments, recapitalizations, reorganizations, or other changes in the Company's capital structure or its business, or any merger or consolidation of the Company, or any issuance of bonds, debentures, preferred or other stock, with preference ahead of or convertible into, or otherwise affecting the Company's common stock or the rights thereof, or the dissolution or liquidation of the

Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether or not of a similar character to those described above.

**15. <u>Section 409A</u>.** The PRSU is intended to comply with the requirements of Section 409A and must be construed consistently with that section. Notwithstanding anything in the Plan or this Grant Agreement to the contrary, if the PRSU Vests in connection with your "separation from service" within the meaning of Section 409A, as determined by the Company), and if (x) you are then a "specified employee" within the meaning of Section 409A at the time of such separation from service (as determined by the Company, by which determination you agree you are bound) and (y) the distribution of PRSU Shares under such accelerated PRSU will result in the imposition of additional tax under Section 409A if distributed to you within the six month period following your separation from service, then the distribution under such accelerated PRSU will not be made until the earlier of (i) the date six months and one day following the date of your separation from service or (ii) the 10th day after your date of death. Neither the Company nor you shall have the right to accelerate or defer the delivery of any such PRSU Shares or benefits except to the extent specifically permitted or required by Section 409A. In no event may the Company or you defer the delivery of the PRSU Shares beyond the date specified in the **Distribution Date** section, unless such deferral complies in all respects with Treasury Regulation Section 1.409A-2(b) related to subsequent changes in the time or form of payment of nonqualified deferred compensation arrangements, or any successor regulation. In any event, the Company makes no representations or warranty and shall have no liability to you or any other person, if any provisions of or distributions under this Grant Agreement are determined to constitute deferred compensation subject to Section 409A but not to satisfy the conditions of that section.

**16. <u>Unsecured Creditor</u>.** The PRSU creates a contractual obligation on the part of the Company to make a distribution of the PRSU Shares at the time provided for in this Grant Agreement. Neither you nor any other party claiming an interest in deferred compensation hereunder shall have any interest whatsoever in any specific assets of the Company. Your right to receive distributions hereunder is that of an unsecured general creditor of Company.

**17. <u>Governing Law</u>.** The laws of the State of Delaware will govern all matters relating to the PRSU, without regard to the principles of conflict of laws.

**18. <u>Notices</u>**. Any notice you give to the Company must follow the procedures then in effect. If no other procedures apply, you must send your notice in writing by hand or by mail to the office of the Company's Secretary (or to the Chair of the Committee). If mailed, you should address it to the Company's Secretary (or the Chair of the Committee) at the Company's then corporate headquarters, unless the Company directs PRSU holders to send notices to another corporate department or to a third party administrator or specifies another method of transmitting notice. The Company and the Board will address any notices to you using its standard electronic communications methods or at your office or home address as reflected on the Company's personnel or other business records. You and the Company may change the address for notice by like notice to the other, and the Company can also change the address for notice by general announcements to PRSU holders.

**19. <u>Amendment</u>.** Subject to any required action by the Board or the stockholders of the Company, the Company may cancel the PRSU and provide a new Award under the Plan in its place, provided that the Award so replaced will satisfy all of the requirements of the Plan as of the date such new Award is made and no such action will adversely affect the PRSU to the extent then Vested.

**20. <u>Plan Governs</u>.** Wherever a conflict may arise between the terms of this Grant Agreement and the terms of the Plan, the terms of the Plan will control. The Board may adjust the number of PRSU Shares and other terms of the PRSU from time to time as the Plan provides.

Exhibit 10.48

EXECUTION

COPY

**AIRCRAFT TIME SHARING AGREEMENT**

This Aircraft Time Sharing Agreement ("Agreement") is effective as of the 2 day of January, 2014 ("Effective Date"), by and between Discovery Communications, LLC, with an address of One Discovery Place, Silver Spring, MD 20910 ("Discovery"), and David Zaslav, with an address of One Discovery Place, Silver Spring, MD 20910 ("Executive").

RECITALS

WHEREAS, Discovery is the lessee of that certain Dassault Falcon 900EX aircraft, bearing manufacturer's serial number 232, currently registered with the Federal Aviation Administration ("FAA") as N685DC (the "Aircraft") in the name of Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee;

WHEREAS, Discovery employs or retains a fully qualified flight crew to operate the Aircraft;

WHEREAS, Discovery desires to sublease the Aircraft to Executive and to provide a fully qualified flight crew for all operations on a periodic, non-exclusive time sharing basis, as defined in Section 91.501(c)(1) of the Federal Aviation Regulations ("FAR"); and

WHEREAS, the use of the Aircraft by Executive shall at all times be pursuant to and in full compliance with the requirements of FAR Sections 91.501 (b) (6), 91.501 (c) (1) and 91.501 (d).

NOW, THEREFORE, in consideration of the mutual promises and considerations contained in this Agreement, the parties agree as follows:

**1. Sublease; Term; Termination.** Discovery agrees to sublease the Aircraft to Executive on a periodic, non-exclusive basis, and to provide a fully qualified flight crew for all operations, pursuant and subject to the provisions of FAR Section 91.501 (c) (1) and the terms of this Agreement. The parties expressly acknowledge and agree that, regardless of any employment, contractual or other relationship of any kind or nature, at all times that the Aircraft is operated under this Agreement, Discovery, as the party furnishing the Aircraft and flight crew and exercising complete control over all phases of aircraft operation, shall be deemed to have operational control of the Aircraft as such term is defined in 14 C.F.R. Section 1.1. This Agreement shall commence on the Effective Date and continue so long as Executive is employed by Discovery under the Employment Agreement entered into on January 2, 2014.

**2. Payment Amount.** Executive shall pay Discovery an amount equal to 200% of the actual expenses for fuel for each flight conducted under this Agreement, as permitted by and in compliance with FAR Section 91.501 (d) (the "Time Sharing Charge").

EXECUTION

COPY

3. **Payment Timing.** Discovery will pay all expenses related to the operation of the Aircraft when incurred, and will bill Executive on a quarterly basis as soon as practicable after the last day of each calendar quarter for the Time Sharing Charge for any and all flights for the account of Executive pursuant to this Agreement during the preceding quarter. Executive shall pay Discovery for all flights for the account of Executive pursuant to this Agreement within thirty (30) days of receipt of the invoice therefor. For the avoidance of doubt, any federal excise tax that may be imposed under Internal Revenue Code Section 4261 or any similar excise taxes, if any, applicable to this Agreement will be paid by Executive to Discovery in addition to the Time Sharing Charge.

4. **Flight Requests.** Executive will provide Discovery with requests for flight time and proposed flight schedules as far in advance of any given flight as possible, and in any case, at least twenty-four (24) hours in advance of Executive's planned departure unless Discovery otherwise agrees. Requests for flight time shall be in a form, whether written or oral, mutually convenient to, and agreed upon by the parties. The parties intend that the use of the Aircraft pursuant to this Agreement will be for such purposes as Discovery and Executive may agree from time to time.

5. **Scheduling Authority.** Discovery shall have sole and exclusive authority over the scheduling of the Aircraft, including any limitations on the number of passengers on any flight; provided, however, that Discovery will use commercially reasonable efforts to accommodate Executive's needs and to avoid conflicts in scheduling.

6. **Aircraft Maintenance.** As between Discovery and Executive, Discovery shall be solely responsible for securing maintenance, preventive maintenance and required or otherwise necessary inspections on the Aircraft, and shall take such requirements into account in scheduling the Aircraft. No period of maintenance, preventative maintenance or inspection shall be delayed or postponed for the purpose of scheduling the Aircraft, unless said maintenance or inspection can be safely conducted at a later time in compliance with all applicable laws and regulations, and within the sound discretion of the pilot in command. The pilot in command shall have final and complete authority to cancel any flight for any reason or condition which in his judgment would compromise the safety of the flight.

7. **Flight Crew.** Discovery shall employ or retain, pay for and provide a qualified flight crew for each flight undertaken under this Agreement.

8. **Flight Crew Authority.** In accordance with applicable FARs, the qualified flight crew provided by Discovery will exercise all of its duties and responsibilities in regard to the safety of each flight conducted hereunder. Executive specifically agrees that the flight crew, in its sole discretion, may terminate any flight, refuse to commence any flight, or take other action which in the considered judgment of the pilot in command is necessitated by considerations of safety. No such action of the pilot in command shall create or support any liability for loss, injury, damage or delay to Executive or any other person. The parties further agree that Discovery shall not be liable for delay or failure to furnish the Aircraft and crew pursuant to this Agreement when such failure is caused by government regulation or authority, mechanical

difficulty, war, civil commotion, strikes or labor disputes, weather conditions, or acts of God or any other event or circumstance beyond the reasonable control of Discovery.

**9. Insurance.**

(a) At all times during the term of this Agreement, Discovery shall cause to be carried and maintained, at Discovery's cost and expense, aircraft public and passenger legal liability coverage, commercial general liability covering bodily injury, property damage and personal injury liability, and all risk hull insurance in such amounts and on such terms and conditions as Discovery shall determine in its sole discretion. Discovery shall also bear the cost of paying any deductible amount on any policy of insurance in the event of a claim or loss.

(b) Any policies of insurance carried in accordance with this Agreement: (i) shall name Executive as an additional insured; (ii) shall contain a waiver by the underwriter thereof of any right of subrogation against Executive; and (iii) shall require the insurers to provide at least 30 days' prior written notice (or at least seven days' in the case of any war-risk insurance) to Executive if the insurers cancel insurance for any reason whatsoever, provided that the insurers shall provide at least 10 days prior written notice if the same is allowed to lapse for non-payment of premium. Each liability policy shall be primary without right of contribution from any other insurance which is carried by Executive or Discovery and shall expressly provide that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured.

(c) Discovery shall obtain the approval of this Agreement by the insurance carrier for each policy of insurance on the Aircraft. If requested by Executive, Discovery shall arrange for a Certificate of Insurance evidencing the insurance coverage with respect to the Aircraft carried and maintained by Discovery to be given by its insurance carriers to Executive or will provide Executive with a copy of such insurance policies. Discovery will give Executive reasonable advance notice of any material modifications to insurance coverage relating to the Aircraft.

**10. Damages.**

**(a) Executive agrees that the proceeds of insurance will be Executive's sole recourse against Discovery with respect to any claims that Executive may have under this Agreement.**

**(b) IN NO EVENT SHALL DISCOVERY BE LIABLE TO EXECUTIVE OR HIS EMPLOYEES, AGENTS, GUESTS, OR INVITEES (AND THE LAWFUL SUCCESSORS AND ASSIGNS THEROF) FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL OR INCIDENTAL DAMAGES AND/OR PUNITIVE DAMAGES OF ANY KIND OR NATURE, UNDER ANY CIRCUMSTANCES OR FOR ANY REASON, INCLUDING AND NOT LIMITED TO ANY DELAY OR FAILURE TO FURNISH THE**

EXECUTION

COPY

**AIRCRAFT, OR CAUSED BY THE PERFORMANCE OR NON-PERFORMANCE BY DISCOVERY OF THIS AGREEMENT**.

**(c) The provisions of this Section 10 shall survive indefinitely the termination oR expiration of the Agreement**.

1. **Executive Warranties.** Executive warrants that:
2.

(a) He will not use the Aircraft for the purpose of providing transportation of passengers or cargo in air commerce for compensation or hire, for any illegal purpose, or in violation of any insurance policies with respect to the Aircraft;

(b) He will refrain from incurring any mechanics, international interest, prospective international interest or other lien and shall not attempt to convey, mortgage, assign, lease or grant or obtain an international interest or prospective international interest or in any way alienate the Aircraft or create any kind of lien or security interest involving the Aircraft or do anything or take any action that might mature into such a lien; and

(c) He will comply with all applicable laws, governmental and airport orders, rules and regulations, as shall from time to time be in effect relating in any way to the operation and use of the Aircraft under this Agreement.

(d)

(e) **12. Base of Operations.** For purposes of this Agreement, the base of operation of the Aircraft shall be White Plains, New York.

**13. Copies of Agreement.** A copy of this Agreement shall be carried in the Aircraft and available for review upon the request of the Federal Aviation Administration on all flights conducted pursuant to this Agreement.

**14. No Executive Further Sublease or Assignment.** Executive shall not assign this Agreement or its interest herein to any other person or entity, nor shall Executive enter into any further subleases or make any other disposition of the Aircraft, without the prior written consent of Discovery, which may be granted or denied in Discovery's sole discretion; provided, however, that Executive may permit members of his immediate family to use the Aircraft pursuant to this Agreement and will provide Discovery with advance notice of such permission being granted. Subject to the preceding sentence, this Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective heirs, representatives, successors and assigns, and does not confer any rights on any other person.

**15. Miscellaneous.** This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes any prior understandings and agreements between the parties respecting such subject matter. This Agreement may be amended or supplemented and any provision hereof waived only by a written instrument signed by all parties. The failure or delay on the part of any party to insist on strict performance of any of the terms and conditions of this Agreement or to exercise any rights or remedies hereunder shall not constitute a waiver of any such provisions, rights or remedies. This Agreement may be executed in counterparts, which shall, singly or in the aggregate, constitute a fully executed and binding Agreement.

EXECUTION

COPY

**16. Delivery of Notices.** Except as otherwise set forth in Section 4, all communications and notices provided for herein shall be in writing and shall become effective when delivered by facsimile transmission or by personal delivery, Federal Express or other overnight courier or four (4) days following deposit in the United States mail, with correct postage for first-class mail prepaid, addressed to Discovery or Executive at their respective addresses set forth above, or else as otherwise directed by the other party from time to time in writing.

**17. Enforceability.** If any one or more provisions of this Agreement shall be held invalid, illegal, or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal, or unenforceable provisions shall be replaced by a mutually acceptable provision, which, being valid, legal, and enforceable, comes closest to the intention of the parties underlying the invalid, illegal, or unenforceable provision. To the extent permitted by applicable law, the parties hereby waive any provision of law, which renders any provision of this Agreement prohibited or unenforceable in any respect.

**18. Governing Law.** This Agreement is entered into under, and is to be construed in accordance with, the laws of the State of Maryland, without reference to conflicts of laws.

1. **TRUTH IN LEASING STATEMENT UNDER FAR SECTION 91.23**

THE AIRCRAFT, A DASSAULT FALCON 900EX, MANUFACTURER'S SERIAL NO. 232, CURRENTLY REGISTERED WITH THE FEDERAL AVIATION ADMINISTRATION AS N685DC, HAS BEEN MAINTAINED AND INSPECTED UNDER FAR PART 91 DURING THE 12 MONTH PERIOD (OR PORTION THEREOF DURING WHICH THE AIRCRAFT HAS BEEN SUBJECT TO U.S. REGISTRATION) PRECEDING THE DATE OF THIS LEASE.

THE AIRCRAFT HAS BEEN AND WILL BE MAINTAINED AND INSPECTED UNDER FAR PART 91 FOR OPERATIONS TO BE CONDUCTED UNDER THIS LEASE. DURING THE DURATION OF THIS AIRCRAFT TIME SHARING AGREEMENT, DISCOVERY COMMUNICATIONS, LLC IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT.

AN EXPLANATION OF THE FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE.

THE "INSTRUCTIONS FOR COMPLIANCE WITH TRUTH IN LEASING REQUIREMENTS" ATTACHED HERETO ARE INCORPORATED HEREIN BY REFERENCE.

DISCOVERY COMMUNICATIONS, LLC THROUGH ITS UNDERSIGNED AUTHORIZED SIGNATORY BELOW, CERTIFIES THAT DISCOVERY IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT AND THAT IT UNDERSTANDS ITS

EXECUTION

COPY

RESPONSIBILITIES FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION REGULATIONS.

**20. Agreement Subject to Master Lease.** Discovery and Executive acknowledge and agree that: (i) the terms of this Agreement are in all cases subject to and subordinate to the terms and conditions of that certain Aircraft Lease (the "Master Lease") dated as of March 14, 2013, between Wells Fargo Northwest, National Association, Not In Its Individual Capacity But Solely As Owner Trustee ("Master Lessor") and Discovery covering the lease of the Aircraft by Discovery from Master Lessor; (ii) this Agreement will terminate automatically upon the expiration or earlier termination of the Master Lease; (iii) nothing herein permits the deregistration of the Aircraft from the US registry or the registration of the Aircraft with the aviation authority of any other country.

IN WITNESS WHEREOF, the parties have executed this Aircraft Time Sharing Agreement to be effective as of the date first above written.

**DISCOVERY** **EXECUTIVE**

DISCOVERY COMMUNICATIONS, LLC DAVID ZASLAV

By: /s/ Adria Alpert Romm By: /s/ David Zaslav

Name: Adria Alpert Romm Name: David Zaslav

Title: Senior EVP - Human Resources

EXECUTION

COPY

## INSTRUCTIONS FOR COMPLIANCE WITH "TRUTH IN LEASING" REQUIREMENTS

1. Mail a copy of the lease to the following address via certified mail, return receipt requested, immediately upon execution of the lease (14 C.F.R. 91.23 requires that the copy be sent within twenty four hours after it is signed):

   Federal Aviation Administration
   Aircraft Registration Branch
   ATTN: Technical Section
   P.O. Box 25724
   Oklahoma City, Oklahoma 73125

2. Telephone the nearest Flight Standards District Office at least forty-eight hours prior to the first flight under this lease.
3. Carry a copy of the lease in the aircraft at all times.

AMENDMENT TO THE AIRCRAFT TIME SHARING AGREEMENT

This AMENDMENT TO THE AIRCRAFT TIME SHARING AGREEMENT (the "Amendment") is made as of the 1st day of August, 2018 ("Amendment Effective Date") by and between DISCOVERY

COMMUNICATIONS, LLC, with an address of One Discovery Place, Silver Spring, Maryland 20910 ("DCL"), and DAVID ZASLA V, with an address of One Discovery Place, Silver Spring, Maryland ("Executive").

WHEREAS, the Discovery and Executive are party to that certain Aircraft Time Sharing Agreement dated January 2, 2014 (the "Agreement") pursuant to which the Discovery subleases the Aircraft to Executive; and

WHEREAS, Discovery is replacing the existing Aircraft with a different model.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. All capitalized words shall have the meanings given to them in the Agreement unless otherwise defined herein.

2. Effective as of September 25, 2018, the first paragraph of the Recitals shall be deleted and replaced with the following:

WHEREAS, Discovery is the lessee of that certain Dassault Falcon 7X aircraft,

bearing manufacturer's serial number 093, currently registered with the Federal Aviation Administration ("FAA") as N685DC (the "Aircraft") in the name of Bank of Utah Trustee, not in its individual capacity but solely as Owner Trustee;

3. Section 12 shall be amended by deleting the reference to "White Plains, New York" and replacing it with "Teterboro, New Jersey".

4. Section 19 shall be amended by deleting the reference to "A DASSAULT FALCON 900EX, MANUFACTURER'S SERIAL NO. 232" and replacing it with "A DASSAULT FALCON 7X, MANUFACTURER'S SERIAL NO. 093".

5. The definition of the Master Lease in Section 20 shall be amended by replacing "March 14, 2013" with "March 21, 2018", and "Wells Fargo Northwest, National Association" with "Bank of Utah".

6. Other than as amended herein, the Agreement is in all other aspects ratified and confirmed and all terms of the Agreement govern this Amendment.

By their execution below, the parties hereto have agreed to all the terms and conditions of this Amendment as of the date first set forth above. Signatures may be exchanged in Counterparts; signatures transmitted by facsimile or electronically by PDF shall be binding original signatures.

DISCOVERY COMMUNICATIONS, LLC

By: /s/Carrie Storer

Name: Carrier Storer

Title: Assistant Secretary

EXECUTIVE

By: /s/David Zaslav

Name: David Zaslav

Exhibit 10.53

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made this July 13, 2022 by and between Turner International, Inc. ("Company"), a subsidiary of Warner Bros Discovery, Inc. ("WBD") (collectively with respective affiliates "WBD group"), and GERHARD ZEILER ("Executive").

As a condition to and in consideration of the mutual promises and covenants set forth in this Agreement, Company hereby offers Executive, and Executive hereby accepts employment upon the terms and conditions set forth herein.

## I. DUTIES, ACCEPTANCE, LOCATION

**A.** Company hereby employs Executive to render exclusive and full-time services as Chairman, Warner Bros. Discovery International, on the terms and conditions set forth herein. Executive's duties shall be consistent with his title, including providing strategic advice to WBD group as requested, and as otherwise directed by Company. Executive's primary work location shall be Company's offices in London, but Executive shall make himself available for travel to other locations as business needs reasonably require. Notwithstanding the foregoing, Executive shall not have authorization to conclude contracts on behalf of the Company, its Parent and affiliates while working outside of the United States.

**B.** Subject to Section IV(D)(1) hereof, if Company deems it necessary, Company reserves the right to change the location where Executive works, and the individual and/or position to whom/which Executive reports. Notwithstanding this provision, the Company and Executive agree that Executive shall not be physically present in London for more than One Hundred and Eighty (180) days each year. Executive shall also be required to undertake reasonably required travel on business within both the UK and abroad.

**C.** Executive hereby accepts such employment and agrees to render the services described above. Throughout his employment with Company, Executive agrees to serve Company faithfully and to the best of his ability, and to devote his full business time and energy to perform the duties arising under this Agreement in a professional manner that does not discredit but furthers the interests of Company. Notwithstanding the foregoing, Executive shall be entitled, provided Executive obtains prior approval from the Company, to serve on the board of directors of any civic, charitable or professional organization, provided that such service does not interfere or conflict with Executive's duties or obligations under this Agreement and provided that such service is not inconsistent with the Company's policies and practices including the Company's applicable code of conduct.

**D.** In connection with the exercise of rights granted to the Company hereunder, Executive agrees that the Company shall have the right to use and authorize others to use Executive's professional name, voice, approved likeness and approved biography for the purpose of publicity and promotion of the Company, its Parent and affiliated entities in any and all media worldwide without any entitlement to additional renumeration or other compensation. Post-term use of Executive's name, voice, approved likeness and approved biography shall be limited to those materials that were created during the term of Executive's employment from which they cannot reasonably be redacted or deleted, however unintentional or inadvertent use that does not cause material damage to Executive shall not be considered a breach of this Agreement.

## II. TERM OF EMPLOYMENT

**A.** Subject to Section IV, Executive's term of employment under this Agreement shall be three (3) years beginning on April 8, 2022 and ending April 7, 2025 ("Term of Employment").

**B.** Company shall have the option to enter negotiations with Executive to renew this Agreement with Executive for an additional term. If Company wishes to exercise its option to enter negotiations with

PI

Executive to renew this Agreement, it shall give Executive written notice of its intent to enter such negotiations to renew no later than ninety (90) days prior to the end of the Term of Employment. Executive and Company agree then to negotiate with each other exclusively and in good faith until the end of the Term of Employment. The Term of Employment may not, however, be extended unless by mutual written agreement of Company and Executive as to all of the material terms and conditions of the extension. In the event the parties do not enter into an agreement to extend the Term of Employment for an additional term, this Agreement shall expire and the Term of Employment shall end on April 7, 2025 ; provided, however, that if Company does not make a Qualifying Renewal Offer (as defined below), Executive shall be eligible for a severance payment pursuant to Section IV(D)(2) herein in connection with his Separation from Service (as defined herein) at the end of the Term of Employment (and assuming that he was willing and able at the end of the Term of Employment to perform future services, whether for Company or any other party). For these purposes, a Qualifying Renewal Offer is an offer to renew the Term of Employment at terms that are at least as favorable in the aggregate as the material terms of this Agreement.

**III. COMPENSATION**

A. **Base Salary**. Company shall pay Executive an annual base salary of One Million Eight Hundred Dollars ($1,800,000.00), effective as of April 8, 2022. The Base Salary shall, with respect to each year during the Term of Employment, be paid over the course of twelve (12) months in increments paid on regular Company paydays, less such sums as law requires Company to deduct or withhold, payments will include the provision of both a 13th and 14th check. Executive's future Base Salary increases shall be reviewed and decided in accordance with Company's standard practices and procedures as generally applied to similarly situated senior executives of Company and WBD group ("Senior Executives"). The Chief Executive Officer of WBD shall not be considered a Senior Executive. The annual base salary payable to Executive under this Section III(A), as may be increased from time to time, shall hereinafter be referred to as the "Base Salary."

B. **Bonus/Incentive Payment**. In addition to the Base Salary paid to Executive pursuant to Section III(A), Executive shall be eligible to participate in the applicable then-effective annual incentive compensation plan with an annual incentive payment target of 178% of Base Salary ("Target"), effective as of April 8, 2022. The incentive compensation plan is fully discretionary. The portion of the incentive payment payable to Executive, if any, shall be determined and paid in accordance with the applicable annual incentive compensation plan (e.g., subject to reduction for Company/WBD under-performance and increase for Company/WBD over-performance).

C. **Benefits/Vacation**. During the Term of Employment, Executive shall be entitled to participate in and receive benefits under Company's employee benefit plans, programs and arrangements which Executive is eligible for participation in (and, for those plans which require a voluntary election, Executive elects to participate in). In addition, Executive shall be entitled to vacation days pursuant to Company's vacation policy, provide that Executive shall be eligible to receive no less than thirty (30) days of annual leave per full year. Executive will also be eligible for eight (8) public holidays annually. Leave entitlement cannot be carried over to a subsequent year and any untaken holiday will be forfeited.

D. **Equity Program**. Subject to the approval of the Compensation Committee of the Board of Directors of Warner Bros. Discovery, Inc., beginning in 2023 and for the balance of the Term of Employment, Executive shall receive an annual equity award under the Warner Bros. Discovery, Inc. Stock Incentive Plan or a successor plan (the "Stock Plan") at an annual target value of Six Million Dollars ($6,000,000) during the normal annual grant cycle in accordance with Company's then-standard practices and procedures for awards to Senior Executives (the "Annual Equity Grant"). The equity instruments, terms and conditions, and calculation of number of awards shall be based on Company's then-standard practices and procedures for awards to Senior Executives. In the award agreements granting any Annual Equity Grant, Company hereby agrees to provide that if an Approved Transaction,

Control Purchase, or Board Change, as such terms are defined in the Stock Plan (each a "Change in Control"), occurs before such equity award has vested and provided that there is an equitable substitution or replacement for the equity award in connection with a Change in Control, the vesting of the equity award shall fully accelerate as a result of the Change in Control only if (i) within 12 months after the Change in Control, (A) the Company or a Subsidiary (as defined in the Stock Plan) terminates Executive's employment other than for Cause, or (B) if Executive resigns for Good Reason, or (ii) during such 12-month period after the Change in Control, Executive is given notice by Company that, in connection with a termination of Executive's employment by Company other than for Cause, Executive shall no longer be required to provide services for Company or its affiliates or subsidiaries as an employee and Executive ceases to provide such services, but due to the length of any statutorily or contractually required notice period, Executive's employment actually terminates following the expiration of such 12-month period.

E. **Expenses.** Company shall reimburse Executive for business, travel and entertainment expenses reasonably and actually incurred during the performance of Executive's duties pursuant to this Agreement to the extent such reimbursement is sought in accordance with Company's business, travel, and entertainment policies and procedures.

F. **Travel**. Executive will be entitled to business travel benefits and opportunities under Company's travel policies.

G. **Director and Officer Liability Insurance.** Executive shall be eligible for and entitled to insurance coverage under Company and WBD's director and officer liability insurance and employment practices liability insurance policies in accordance with those policies and in amounts similar to coverage afforded other Senior Executives for activities on behalf of Company, WBD or any entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Company ("control" of Company or any other entity meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities or other interests, by contract or otherwise) (an "Affiliate"; provided, however, that no stockholder of Warner Bros. Discovery, Inc. shall be an Affiliate of Company for purposes of this Agreement) and otherwise shall be eligible for and entitled to indemnification in accordance with Company's corporate governance requirements.

H. **Tax Equalization and Preparation.** Executive will be tax-equalized to Executive's place of residence at the time taxes come due, probably Austria, in accordance with Company practice. The Company will provide tax preparation assistance to Executive at its cost and Executive agrees to use and cooperate with the Company's designated tax return preparer. All information gathered in association with this process shall be distributed only to those with a legitimate need to know in order to effectuate tax preparation and equalization.

## IV. TERMINATION OF EMPLOYMENT

A. **Death.** If Executive should die during the Term of Employment, the Term of Employment shall automatically terminate. No further amounts or benefits shall be payable except earned but unpaid Base Salary, accrued but unused annual leave, unreimbursed business expenses, and those benefits that may vest in accordance with the controlling documents for other relevant Company and WBD benefit programs, which shall be paid in accordance with the terms of this Agreement and such other Company benefit programs, including the terms governing the time and manner of payment (the "Accrued Benefits"). Company also shall pay a prorated portion of Executive's annual bonus Target for the calendar year of Executive's death based on the amount of time Executive was employed during that calendar year (and subject to achievement of any applicable performance metrics), payable at the time annual bonuses are ordinarily paid to Senior Executives in accordance with local law. Executive's then-outstanding equity awards under the Stock Plan shall be treated in accordance with the applicable plan documents and implementing award agreements.

RJ

B. **Inability To Perform Duties**. If, during the Term of Employment, Executive should become physically or mentally disabled, such that he is unable to perform his duties under Sections I (A) and (C) hereof for (i) a period of six (6) consecutive months or (ii) for shorter periods that add up to six (6) months in any eight (8)-month period, by written notice to Executive, Company may terminate the Term of Employment. Notwithstanding the foregoing, the Term of Employment shall terminate when the Executive ceases to provide services for the Company ("Separation from Service"). In such case, no further amounts or benefits shall be payable to Executive, except that Executive shall (i) receive the Accrued Benefits, (ii) receive a prorated portion of Executive's annual bonus at Target for the calendar year of Executive's based on the amount of time Executive was employed during that calendar year (and subject to achievement of any applicable performance metrics), payable at the time annual bonuses are ordinarily paid to Senior Executives, and (iii) be eligible to elect to receive continued coverage under Company's relevant medical or disability plans to the extent permitted by, and under the terms of, such plans and to the extent such benefits continue to be provided to other former Senior Executives generally or Executive's then-outstanding equity awards under the Stock Plan shall be treated in accordance with the applicable plan documents and implementing award agreements.

C. **Termination For Cause.**

1. Company may, subject to Section IV(C)(2), terminate the Term of Employment for Cause by written notice. "Cause" shall mean: (i) the conviction of, or nolo contendere or guilty plea, to a felony (whether any right to appeal has been or may be exercised); (ii) conduct constituting embezzlement, misappropriation or fraud, whether or not related to Executive's employment with Company; (iii) conduct constituting a financial crime, material act of dishonesty or conduct in material violation of Company's Code of Ethics or other Company written policies; (iv) improper conduct substantially prejudicial to Company's business (whether financial or otherwise); (v) willful unauthorized disclosure or use of Company confidential information; (vi) material improper destruction of Company property; or (vii) willful misconduct in connection with the performance of Executive's duties.

2. In the event that Executive materially neglects his duties under Section I(A) or Section I(C) hereof or engages in other conduct that constitutes a breach by Executive of this Agreement, including any conduct constituting Cause (collectively, "Breach"), Company shall so notify Executive in writing. Other than a Breach that is not susceptible to cure, Executive shall be afforded a one-time-only opportunity to cure the noted Breach within ten (10) days from receipt of such notice. If no cure is achieved within this time, or if Executive engages in the same Breach a second time after once having been given the opportunity to cure, Company may terminate the Term of Employment by written notice to Executive.

3. Any termination of the Term of Employment pursuant to Sections IV(C)(1) or Section IV(C)(2) hereof shall be considered a termination of Executive's employment for "Cause" and upon such termination, Executive shall only be entitled to receive any amounts or benefits hereunder that have been earned or vested at the time of such termination in accordance with the terms of the applicable governing Company plan(s) (including the provisions of such plan(s) governing the time and manner of payment), and/or as may be required by law. "Cause" as used in any such Company plan shall be deemed to mean solely the commission of acts described in Section IV(C)(1) or Section IV(C)(2) hereof (after giving effect to the cure opportunity described in Section IV(C)(2)).

D. **Termination Of Employment By Executive for Good Reason/Termination of Employment by Company Not For Cause/Garden Leave**.

1. Company may terminate the Term of Employment not For Cause (as defined above), and Executive may terminate the Term of Employment

for "Good Reason" as defined herein. "Good Reason" for purposes of this Agreement shall only mean the occurrence of any of the following events without Executive's consent: (a) a material reduction in Executive's duties or responsibilities; (b) Company's material change in the location of Company office where Executive works (i.e., relocation to a location outside the London metropolitan area); or (c) a material breach of this Agreement by Company; provided however, that Executive must provide Company with written notice of the existence of the reduction, change or breach constituting Good Reason within sixty (60) days of any such event having occurred, and allow Company thirty (30) days to cure the same. If Company so cures the reduction, change or breach, Executive shall have no basis for terminating the Term of Employment for Good Reason with respect to such cured reduction, change or breach. Executive must terminate his employment in writing within five (5) days following the expiration of Company's cure period for the termination to be on account of Good Reason or such right shall be deemed waived.

2. (i) If Company terminates the Term of Employment not for Cause, (ii) if Company elects not to renew the Term of Employment in circumstances that trigger Executive's entitlement to severance under Section II(B), or (iii) if Executive terminates the Term of Employment for Good Reason, then Company shall pay Executive the Accrued Benefits. In addition, Company shall make the following payments (collectively, the "Severance Payment"):

(a) Commencing on the Release Deadline (as defined below), Company shall pay Executive his Base Salary for the period beginning on Executive's termination date through the period which is the longest of (i) the balance of the Term of Employment up to a maximum of twenty-four (24) months, (ii) twelve (12) months, and (iii) the number of weeks of severance to which Executive would have been entitled had Company's then-current redundancy severance plan applied to Executive's termination, except that the first installment payment shall include any installments that would have been payable between the date of termination and the Release Deadline had the release requirement under Section (IV)(D)(3) hereof been satisfied on the date of termination (the "Base Salary Continuation"). For the avoidance of doubt, in no event shall the Base Salary Continuation period be longer than twenty-four (24) months. In the event the Base Salary Continuation period is calculated under Section 2(a)(ii) or 2(a)(iii) of this paragraph and Executive is subject to a period of Garden Leave under Section IV(D)(5) and relived of his work responsibilities for some period of time prior to the effective date of Executive's termination of employment, this period of "Garden Leave" shall be offset against the number of weeks of Base Salary Continuation.

Except as provided in this Section IV(D)(2) with respect to the first installment payment, the Base Salary Continuation shall be paid in substantially equal increments on regular Company paydays, less required deductions and withholdings, until the balance is paid in full.

(b) Notwithstanding anything in Company's then-effective annual incentive compensation plan to the contrary, Executive shall be paid a bonus at Target under Section III(B) for each full calendar year within the Base Salary Continuation period. For any partial calendar year within which the Base Salary Continuation period ends, Executive shall only be entitled to a prorated Target bonus based on the elapsed time from January 1 of such partial year through the last day of the Base Salary Continuation period. The bonus/incentive payment portions of the Severance Payment shall be paid to Executive in a single lump sum on the date that Company pays bonuses/incentive payments to its other Senior Executive for the applicable then-effective annual incentive compensation plan year.

3. No Severance Payment shall be made if Executive fails to sign a compromise agreement. Such agreement must be executed and become effective within the sixty (60) calendar day period following the date of Executive's last day of work. No Severance Payment shall be made if Executive violates Section VI hereof, in which case all Severance Payment shall cease, and those already made shall be forfeited.

PJ

4. If Executive terminates the Term of Employment before it has expired for a reason other than one or more of those stated in Section IV(D)(1) hereof, it shall be deemed a material breach of this Agreement. Executive agrees that, in that event, in addition to any other rights and remedies which Company may have as a result of such breach, he shall forfeit all rights to be compensated for any remaining portion of his base Salary, Severance Payment and/or bonus/incentive payment that may otherwise be due under this Agreement, pursuant to other Company plans or policies, or otherwise, except for Accrued Benefits or as may be required by law.

5. During all or any part of any period of notice given or which ought to have been given under this Agreement (by Executive or the Company), or during any unexpired period of the Term up to a maximum of one-hundred (120) days, the Company may, at its absolute discretion:

a. Require Executive not to attend at Executive's place(s) of work or any specific premises of the Company or its affiliates;

b. Require Executive not to undertake any part of Executive's duties and/or to carry out different duties of which Executive is reasonable capable in place of Executive's normal duties;

c. Require Executive not to communicate with any customers, suppliers, or officers of the Company or its affiliates; and/or

d. Terminate Executive's access to any of the Company's IT systems.

During the period described in this paragraph 5 ("Garden Leave") the Company will continue to pay Executive's full Base Salary and all contractual benefits. All other terms of employment will continue including, without limitation, Executive's obligations of good faither, fidelity, confidentiality, fiduciary duties and all of the express and implied obligations. Any annual leave which has accrued at the start of the Garden Leave period and any which accrues during that period will be deemed to be taken during that period. The Company may appoint another employee or officer to carry out some or all of the duties during any Garden Leave period. In the absence of Cause as defined herein, a termination by the Company at the end of a Garden leave period shall be considered to be a termination without cause as defined herein and shall be subject to the terms and conditions of that Section, including the payments to Executive as provided therein

E. **Right To Offset**. In the event that Executive secures employment or any consulting or contractor or business arrangement for services he performs during the period that any payment from Company is continuing or due under Section IV(D) hereof, Executive shall have the obligation to timely notify Company of the source and amount of payment ("Offset Income"). Company shall have the right to reduce the Severance Payment by the Offset Income. Executive acknowledges and agrees that any deferred compensation for his services from another source that are performed while receiving Severance Payments from Company will be treated as Offset Income (regardless of when Executive chooses to receive such compensation). In addition, to the extent that Executive's compensation arrangement for the services include elements that are required to be paid later in the term of the arrangement (e.g., bonus or other payments that are earned in full or part based on performance or service requirements for the period during which the Severance Payment is made), Company may calculate the Offset Income by annualizing or by using any other reasonable methodology to attribute the later payments to the applicable period of the Severance Payment. Executive agrees to provide Company with information sufficient to determine the calculation of the Offset Income, including compensation excerpts of any employment agreement or other contract for services, Form W-2s, and any other documentation that Company reasonably may require, and that failure to provide timely notice to Company of Offset Income or to respond to inquiries from Company regarding any such Offset Income shall be deemed a material breach of this Agreement. Executive also agrees that Company shall have the right to inquire of third-party individuals and entities regarding potential Offset Income and to inform such parties of Company's right of offset under this Agreement with Executive. Accordingly, Executive agrees that no further Severance Payment

from Company will be made until or unless this breach is cured and that all payments from Company already made to Executive, during the time he failed to disclose his Offset Income, shall be forfeited and must be returned to Company upon its demand, up to the amount of Offset Income attributable to such period. Any offsets made by Company pursuant to this Section IV(E) shall be made at the same time and in the same amount as a Severance Payment amount is otherwise payable (applying the Offset Income to Company's payments in the order each are paid) so as not to accelerate or delay the payment of any Severance Payment installment.

**F.** **Mitigation**. In the event of Executive's termination of employment pursuant to Section IV(D) herein, and during the period that any payment from Company is continuing or due under Section IV(D), Executive shall be under a continuing obligation to seek other employment, including taking all reasonable steps to identify and apply for any comparable, available jobs for which Executive is qualified. At Company's request, Executive may be required to furnish to Company proof that Executive has engaged in efforts consistent with this paragraph, and Executive agrees to comply with any such request. Executive further agrees that Company may follow-up with reasonable inquiries to third parties to confirm Executive's mitigation efforts. Should Company determine in good faith that Executive failed to take reasonable steps to secure alternative employment consistent with this paragraph, Company shall be entitled to cease any payments due to Executive pursuant to Section IV(D)(2).

**G.** Work Authorization. This Agreement and Executive's employment is conditional upon Executive having and maintaining proper and valid immigration and work authorization throughout the employment to work in the UK and to travel as needed for business. If, at any time Executive does not have sufficient work authorization to perform the role, Executive agrees to notify the Company immediately.

V. **CONFIDENTIAL INFORMATION**

**A.** Executive acknowledges his fiduciary duty to Company and the WBD group. As a condition of employment, Executive agrees to protect and hold in a fiduciary capacity for the benefit of Company and the WBD group all confidential information, knowledge or data, including the terms of this Agreement and, without limitation, all trade secrets relating to Company and the WBD group, and their respective businesses, (i) obtained by Executive during his employment by Company or otherwise and (ii) that is not otherwise publicly known (other than by reason of an unauthorized act by Executive). After termination of Executive's employment with Company, Executive shall not communicate or divulge any such information, knowledge or data to anyone other than Company, the WBD group and those designated by it, without the prior written consent of Company and WBD. For the avoidance of doubt, and notwithstanding the foregoing, nothing herein or in this Agreement shall (x) prohibit Executive from communicating with a government agency, regulator or legal authority concerning any possible violations of federal or state law or regulation, or (y) prevent or limit Executive from discussing his terms and conditions of employment. Nothing herein or in this Agreement, however, authorizes the disclosure of information Executive obtained through a communication that was subject to the attorney-client privilege, unless disclosure of the information would otherwise be permitted by an applicable law or rule. As a condition of employment, Executive is required to sign a Confidential Information and Assignment of Inventions Agreement, which is attached hereto as Exhibit B and incorporated herein by reference.

**B.** In the event that Executive is compelled, pursuant to a subpoena or other order of a court or other body having jurisdiction over such matter, to produce any information relevant to Company or the WBD group, whether confidential or not, Executive agrees to provide Company with such written notice of this subpoena or order so that Company may timely move to quash if appropriate unless such notice to Company is prohibited by law or procedure.

**C.** Executive also agrees to cooperate with Company in any legal action for which his participation is needed. Company agrees to try to schedule all such meetings so that they do not unduly interfere with Executive's pursuits after his is no longer in Company's employ.

VI. **RESTRICTIVE COVENANTS**

**A.** Executive covenants that during the Term of Employment and, for a period of twelve (12) months after the conclusion thereof (the "Restricted Period"), he shall not, directly or indirectly, on his own behalf or on behalf of any entity or individual, engage in any business his activities involving nonfiction, scripted, sports, lifestyle, news, interactive games, or general entertainment television (whether in cable, broadcast, free to air, digital, streaming, film, or any other distribution method) within the Restricted Territory ("Competitive Services"). The Restricted Territory is the United States, United Kingdom, Poland, France, Germany, Brazil, Argentina, Singapore and Japan. for which Executive had management responsibilities (e.g., supervised employees located in that country or was involved in business or programming operations in that country) at any time during the one (1) year prior to Executive's separation from employment. This provision shall not prevent Executive from owning stock in any publicly-traded company; provided, that, Executive's ownership is equal to or less than three (3) percent of such entity's outstanding stock. Executive agrees that this Section VI (A) is a material part of this Agreement, breach of which will cause Company and WBD irreparable harm and damages, the loss of which cannot be adequately compensated at law. In the event that the provisions of this paragraph should ever be deemed to exceed the limitations permitted by applicable laws, Executive and Company agree that such provisions shall be reformed to the maximum limitations permitted by the applicable laws. In the event that Executive is placed on "garden leave" pursuant to Section IV (D) prior to separation and the period of Base Salary Continuation is less than six months, the Restricted Period shall be six months or the period of Base Salary Continuation, whichever is shorter.

**B.** During Executive's employment and for a period of eighteen (18) months following the conclusion of Executive's employment with Company, Executive covenants that he will not directly or indirectly solicit, recruit, interfere with or otherwise attempt to entice, any employees of Company or any of its Affiliates to leave their employment with Company or such Affiliate.

**C.** During Executive's employment and for an eighteen (18) month period following the conclusion of Executive's employment with Company, Executive covenants that he will not directly or indirectly solicit, recruit, interfere with or otherwise attempt to entice, solicit, induce or encourage any vendor, producer, independent contractor, or business partner to terminate its business relationship with Company, WBD or its Affiliates.

**D.** During the period Executive is employed by Company, Executive covenants and agrees not to engage in any other business activities whatsoever, or to directly or indirectly render services of a business, commercial or professional in nature to any other business entity or organization, regardless of whether Executive is compensated for these services, unless Executive obtains the prior written consent of the Chief Executive Officer of Company and the Chief Executive Officer of WBD.

**E.** Throughout the period that Executive is an employee of Company, Executive agrees to disclose to Company any direct investments (i.e., any investment in which Executive has made the decision to invest in a particular company) he has in a company that is a competitor of Company, WBD or its Affiliates ("Competitor") or that Company, WBD or its Affiliates is doing business with during the Term of Employment ("Partner"), if such direct investments result in Executive or Executive's immediate family members, and/or a trust established by Executive or Executive's immediate family members, owning three (3) percent or more of such a Competitor or Partner. This Section VI(F) shall not prohibit Executive, however, from making passive investments (i.e., where Executive does not make the decision to invest in a particular mutual fund or similar entity, even if such entity, in turn, invests in such a Competitor or Partner). Regardless of the nature of Executive's investments, Executive herein agrees that his investments may not materially interfere with Executive's obligations and ability to provide services under this Agreement.

**F.** Prior to the conclusion of Executive's employment with Company, Executive shall return all Company and WBD property and materials, including equipment, such as laptop computers and mobile telephones, and documentation, such as files (including originals and copies), notes, e-mail accounts and computer disks. Executive agrees not to wipe/erase content from Company devices prior to returning.

**G.** In the event that Executive violates any provision of this Section VI, in addition

to any injunctive relief and damages to which Executive acknowledges Company would be entitled, all Severance Payments to Executive, if any, shall cease, and those already made will be forfeited.

VII. **ARBITRATION**

A. **Submission To Arbitration.** Company and Executive agree to submit to arbitration all claims, disputes, issues or controversies between Company and Executive or between Executive and other employees of Company, WBD or its Affiliates (collectively "Claims") directly or indirectly relating to or arising out of Executive's employment with Company or the termination of such employment including Claims under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the Americans With Disabilities Act of 1990, Section 1981 of the Civil Rights Act of 1966, as amended, the Family Medical Leave Act, the Employee Retirement Income Security Act, and any Claim arising under any similar federal, state or local law, statute, regulation or common law doctrine or out of this Agreement.

B. **Use Of AAA; Choice of Law.** All Claims for arbitration shall be presented to the American Arbitration Association ("AAA") in accordance with its applicable rules ("Rules"). The seat or place of arbitration shall be New York, New York. The arbitrator(s) shall be directed to apply the substantive law of federal and state courts sitting in New York, without regard to conflict of law principles. Any arbitration pursuant to this Agreement shall be deemed an arbitration proceeding subject to the Federal Arbitration Act.

C. **Binding Effect.** Arbitration shall be binding and shall afford parties the same options for damage awards as would be available in court. Executive and Company agree that discovery shall be allowed, and all discovery disputes shall be decided, exclusively by arbitration in accordance with the Rules.

D. **Damages and Costs.** Any damages shall be awarded only in accord with applicable law. The arbitrator may only order reinstatement of Executive if money damages are insufficient. The parties shall bear in equal shares all fees and expenses of arbitration. However, each party shall bear the expense of its own counsel, experts, witnesses and preparation and presentation of proof.

VIII. **CONTROLLING LAW AND ADDITIONAL COVENANTS**

A. The validity and construction of this Agreement or any of its provisions shall be determined under the laws of the State of New York. The invalidity or unenforceability of any provision of this Agreement shall not affect or limit the validity and enforceability of the other provisions.

B. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated. The section headings of this Agreement are for convenience only and shall not in any way affect the interpretation of any section hereof or of the Agreement itself. Any provision of this Agreement which refers to the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

C. Executive warrants that (1) his employment under this Agreement will not violate or conflict in any way with any other contract or agreement to which Executive is bound; (2) Executive will do nothing on behalf of Company that violates or conflicts with any such contract or agreement; and (3) Executive will indemnify Company for any liability, damages, costs, or attorneys' fees that Company suffers as a result of any such violation or conflict.

D. Executive expressly acknowledges that Company has advised Executive to consult with independent legal counsel of his choosing prior to Executive's signing this Agreement to review and explain to Executive the legal effect of the terms and conditions of this Agreement.

E. Without limiting anything to the contrary in this Agreement, Executive agrees not to disclose the terms hereof to any person or entity, other than Executive's attorneys, accountants, financial advisors, or members of Executive's immediate family who need to know this information and agree to keep it confidential.

F. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to the employment of Executive by Company, and contains all of the covenants and agreements between the

parties with respect to such employment in any manner whatsoever. Each party to this Agreement acknowledges that no representations, inducements, promises or agreements have been made, orally or otherwise, by any party, or anyone acting on behalf of any party, that are not stated in this Agreement, and that no other agreement, statement or promise not contained in this Agreement shall be valid or binding. Notwithstanding either of the foregoing sentences, or any other provision of this Agreement, this Agreement shall not supersede, replace, invalidate or otherwise modify or affect any restrictive covenants in any previous, subsequent or other agreements or documents between Executive and Company, including, without limitation, any covenants regarding confidentiality, intellectual property, confidential and proprietary information, non-competition, non-solicitation of customers, non-solicitation or no hire of employees, and the like (collectively, "Other Restrictive Covenants"), and any such Other Restrictive Covenants will remain in effect and Executive shall remain bound by such Other Restrictive Covenants. To the extent any of the restrictions or covenants contained in this Agreement conflict in any way with any such Other Restrictive Covenants, such conflict shall be resolved by giving effect to the provision that provides the greatest protection to Company that is enforceable under applicable law.

**G.** Any modifications to this Agreement shall be effective only if in writing and signed by both parties.

**H.** Any payments to be made by Company hereunder shall be made subject to applicable law, including required deductions and withholdings.

**I.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, heirs (in the case of Executive) and assigns. The rights or obligations under this Agreement may not be assigned or transferred by either party, except that such rights or obligations may be assigned or transferred pursuant to a merger or consolidation in which Company is not the continuing entity, or the sale or liquidation of all or substantially all of the assets of Company; provided, however, that the assignee or transferee is the successor to all or substantially all of the assets of Company and such assignee or transferee assumes the liabilities, obligations and duties of Company, as contained in this Agreement, either contractually or as a matter of law. Notwithstanding the foregoing, this Agreement may be assigned to WBD or any Affiliate of Company which employs Executive.

**J.** This Agreement may be executed with electronic signatures, in any number of counterparts. The electronically signed Agreement shall constitute one original agreement. Duplicates and electronically signed copies of this Agreement shall be effective and fully enforceable as of the date signed and sent.

**K.** All notices and other communications to be made or otherwise given hereunder shall be in writing and shall be deemed to have been given when the same are (i) addressed to the other party at the mailing address or email address indicated below, and (ii) either: (a) personally delivered or mailed, registered or certified mail, first class postage prepaid return receipt requested, (b) delivered by a reputable private overnight courier service utilizing a written receipt or other written proof of delivery, to the applicable party, or (c) sent by electronic email. Any such notice sent in the manner set forth above by United States Mail shall be deemed to have been given and received three (3) days after it has been so deposited in the United States Mail, and any notice sent in any other manner provided above shall be deemed to be given when received. The substance of any such notice shall be deemed to have been fully acknowledged in the event of refusal of acceptance by the party to whom the notice is addressed. Until further notice given in accordance with the foregoing, the respective addresses and email addresses for the parties are as follows:

<u>If to Company</u>:

Turner International, Inc.
c/o Kimmberly Bulkley
30 Hudson Yards
New York, New York 10019

If to Executive, at the home address then on file with Company.

*[signature page follows]*

In witness whereof, the parties have caused this Agreement to be duly executed as set forth below.

EXECUTIVE: [signature] DATE: 14. July 2022

GERHARD ZEILER

TURNER INTERNATIONAL. INC.: DATE: July 14, 2022

[signature]

Name: Joseph Song

Title: SVP, Human Resources

*[signature page to Employment Agreement]*



**Confidential Information and Assignment of Inventions Agreement**

As a condition of my employment with Turner International, Inc. (hereinafter, together with WBD and its Affiliates (as defined in the agreement to which this Exhibit B is attached), successors or assigns, referred to as the Company"), and in consideration of my employment with Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Confidential Information and Invention Assignment Agreement (this "Agreement"):

**1. Confidential Information and Compliance with Policy.** I acknowledge that I am subject to the requirements of the applicable Standards of Business Conduct/Code of Ethics and other policies during my employment with Company, which are available to me on Company's online portal and externally at www.wbd.com under Investor Relations/Corporate Governance. I agree that during and after my employment with Company I will hold in the strictest confidence, and will not use (except for the benefit of Company during my employment) or disclose to any person, firm, or corporation any Company Confidential Information (as defined below), including any non-public information that relates to the actual or anticipated business, research or development of Company, or to Company's proprietary data, trade secrets, or know-how, including research, content development plans, content ideas, product plans, or other information regarding Company's products or services and markets therefor, customer lists and customers, distribution agreements and arrangements, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information. For the avoidance of doubt, and notwithstanding the foregoing, nothing in this Agreement shall (x) prohibit me from communicating with any government agency, regulator or other legal authority of any nature

concerning any possible violations of federal, state or local law or regulation, or (y) prevent or limit me from discussing my terms and conditions of employment. Nothing in this Agreement, however, authorizes the disclosure of information I obtained through a communication that I was aware was subject to Company's attorney-client privilege, unless disclosure of the information would otherwise be permitted by an applicable law or rule. For the purposes of this Agreement, Company Confidential Information means any data or information, without regard to form, that is valuable to Company and is not generally known by or available to the public. To the extent consistent with the preceding sentence, Company Confidential Information includes: (i) the identities of Company's customers and the specific individual customer representatives with whom Company work, the details of Company's relationships with such customers and customer representatives, the identities of distributors, contractors and vendors utilized in Company's business, the details of Company's relationships with such distributors, contractors and vendors, and the nature of fees and charges made to Company's customers; (ii) non-public information and materials describing or relating to Company's business or financial affairs, including financial and/or investment performance information, personnel matters, products, operating procedures, organizational responsibilities, marketing matters, or policies or procedures of Company; or (iii) information and materials describing Company's existing or new products and services, including analytical data and techniques, and product, service or marketing concepts under development at or for Company, and the status of such development. Company Confidential Information does not include information that, other than as a result of a breach by Executive of this Agreement, (A) is or becomes generally known within the relevant industry, (B) is or becomes known to Executive other than through Executive's work for Company, or (C) is or becomes generally known by or available to the public.

2. **Inventions.**

A. **Assignment of Inventions.** Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with Company (collectively "Inventions") and I will promptly disclose all Inventions to Company. I hereby make all assignments necessary to accomplish the foregoing. I shall further assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned. I hereby irrevocably designate and appoint Company as my agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me. If I wish to clarify that something created by me prior to my employment that relates to Company's actual or proposed business is not within the scope of this Agreement, I have listed it on Appendix B in a manner that does not violate any third party rights. Without limiting Section 1 or Company's other rights and remedies, if, when acting within the scope of my employment or otherwise on behalf of Company, I use or disclose my own or any third party's confidential information or intellectual property (or if any Invention cannot be fully made, used, reproduced, distributed and otherwise exploited without using or violating the foregoing), Company will have and I hereby grant Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such confidential information and intellectual property rights.

B. **Maintenance of Records and Obligations.** I agree to keep and maintain adequate, current, accurate, and authentic written records for all Inventions made by me (solely or jointly with others) during the term of my employment with Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by Company. The records are and will be available to and shall remain the sole property of Company at all times. I agree to assist Company, or its designee, at Company's expense, in every proper way to secure Company's rights in the Inventions and any rights relating thereto in any and all countries, including the disclosure to Company of all my written records (if any) and other pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments or documents that Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to assign and convey to Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions and any rights relating thereto, and testifying in a suit or other proceeding relating to such Inventions and any rights relating thereto. I further agree that my obligations under this section shall continue after the termination of my employment with Company. If Company is unable because of my mental or physical incapacity, or for any other reason, to secure my signature with respect to any Inventions, including to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering such Inventions, then I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead, to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions with the same legal force and effect as if executed by me.

3. **Whistleblower Protections and Trade Secrets**. Nothing in this Agreement prohibits me from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such governmental agencies). In accordance with 18 U.S.C. Section 1833: (i) I shall not be in breach of this Agreement and shall not be held criminally or civilly liable under any federal or state trade secret law (A) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (B) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (ii) if I file a lawsuit for retaliation by Company for reporting a suspected violation of law, I may disclose the trade secret to my attorney, and may use the trade secret information in the court proceeding, if I file any document containing the trade secret under seal, and do not disclose the trade secret, except pursuant to court order.

4. I agree that my obligations under this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. Company may freely assign or transfer any or all of its rights or obligations hereunder.

Any provision of this Agreement which refers to the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

Accepted and agreed:

Print Name: GERHARD ZEILER

Signature: [signature]

Date: 14. JULY 2022

 **Exhibit 10.54**

TURNER INTERNATIONAL, INC.
30 HUDSON YARDS
NEW YORK, NY 10001

August 23, 2022

Gerhard Zeiler

Dear Gerhard:

Reference is made to your existing employment agreement with Turner International, Inc. (the "Company"), made July 13, 2022 (the "Employment Agreement"). You and the Company hereby agree that this letter amendment (this "Amendment") will modify the Employment Agreement as set forth herein. Unless otherwise expressly set forth in this Amendment, capitalized terms used herein but not otherwise defined in this Amendment shall have the meanings given such terms in the Employment Agreement, and all section references shall be to sections of the Employment Agreement.

The first sentence of Section III.A is revised as underlined below:

**A.** **Base Salary.** Company shall pay Executive an annual base salary of One Million Six Hundred Twenty-Two Thousand Euros (€1,622,000), effective as of April 8, 2022.

If the foregoing reflects our agreement, please sign this Amendment as indicated below. This Amendment may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission, by an e-mail which contains a portable document format (.pdf) file of an executed signature page or by means of "DocuSign" or other similar platform, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

Sincerely,

**Turner International, Inc.**

By: /s/Amy Girdwood

Name: Amy Girdwood

Title: Executive Vice President, People & Culture

Agreed and Accepted:

/s/Gerhard Zeiler

Gerhard Zeiler

**Exhibit 10.61**
EXECUTION VERSION
CONFIDENTIAL

AT&T Inc.
208 S. Akard Street
Dallas, TX 75202

April 8, 2022

Discovery, Inc.
230 Park Avenue South
New York, NY 10003
Attention: Bruce Campbell

With copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: Jeffrey J. Rosen
Jonathan E. Levitsky
Sue Meng

Ladies and Gentlemen:

Reference is made herein to the Tax Matters Agreement (the "TMA"), dated as of May 17, 2021, by and among AT&T Inc. ("Remainco"), a Delaware corporation, on behalf of itself and the members of the Remainco Group (as defined in the TMA), Magallanes, Inc. ("Spinco"), a Delaware corporation, on behalf of itself and the members of the Spinco Group, and Discovery, Inc.. ("RMT Partner"), a Delaware corporation, on behalf of itself and the members of the RMT Group (as defined in the TMA), including the Tax Receivable Annex set forth on Annex A of the TMA (the "TRA"). All capitalized terms used but not otherwise defined in this letter agreement shall have the meanings as set forth in the TMA or the TRA, as the case may be.

In accordance with the steps plan set forth on Annex A for effectuating the Internal Restructuring ("Internal Restructuring Steps"), AT&T expects the distribution described forth in Step [A12] of the Internal Restructuring Steps to give rise to an increase in Tax basis for U.S. federal, state or local income Tax purposes with respect to the WM Columbus Holdings NQPS (as defined in the Internal Restructuring Steps) (such increase in tax basis, the "NQPS Basis Step-Up").

This letter agreement sets forth the agreement of Remainco, Spinco and RMT Partner that the TRA shall apply as follows:

1. If the amount of Covered Attributes other than the NQPS Basis Step-Up (the "Other Covered Attributes") exceeds the Threshold Amount, Covered Attributes shall include both the NQPS Basis Step-Up and the Other Covered Attributes;

2. If the amount of Other Covered Attributes does not exceed the Threshold Amount, but the amount of the NQPS Basis Step-Up exceeds the Threshold Amount, (i) Covered Attributes shall include solely the NQPS Basis Step-Up and (ii) RMT

Partner shall not be required to obtain or provide Remainco with an RMT Partner Certification for any taxable period unless and until the RMT Group realizes an Income Tax Benefit with respect to the NQPS Basis Step-Up; and

3. If the amount of Other Covered Attributes does not exceed the Threshold Amount and the amount of the NQPS Basis Step-Up does not exceed the Threshold Amount, Covered Attributes shall be deemed to be zero.

Except as specifically provided in this letter agreement, the TMA (including the TRA) shall remain in full force and effect. This letter agreement is limited precisely as drafted and shall not constitute a modification, acceptance or waiver of any other provision of the TMA. Sections 14.03 (Modification or Amendment; Waiver), 14.04 (Counterparts), 14.05 (Governing Law and Venue; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury), 14.06 (Specific Performance), 14.13 (Severability) and 14.15 (Interpretation and Construction) of the TMA are hereby incorporated herein by reference, mutatis mutandis.

[*Signature Page Follows*]

Sincerely,

**AT&T INC.**

By: /s/ Stephen A. McGaw
Name: Stephen A. McGaw
Title: Senior Vice President – Corporate Strategy and Development

[*Signature Page to Letter Agreement regarding the Tax Receivable Annex*]

MAGALLANES, INC.

By: /s/ Stephen A. McGaw
Name: Stephen A. McGaw
Title: President

[*Signature Page to Letter Agreement regarding the Tax Receivable Annex*]

Acknowledged and agreed:

DISCOVERY, INC.

By: /s/ Bruce Campbell
Name: Bruce Campbell
Title: Chief Development, Distribution & Legal Officer

[*Signature Page to Letter Agreement regarding the Tax Receivable Annex*]

**Annex A**

**Internal Restructuring Steps**

[*See attached.*]

**Exhibit 21**

**LIST OF SUBSIDIARIES OF WARNER BROS. DISCOVERY, INC.**

| Entity | Place of Formation |
|---|---|
| "Zilpzalp" Vermögensverwaltung GmbH | Germany |
| 137 Production Services Inc. | Canada |
| 167g Productions LLC | United States |
| 17th Floor Productions, LLC | United States |
| 2601223 Ontario, Inc. | Canada |
| 26th Street Development, LLC | United States |
| 300 Pictures, Inc. | United States |
| 3253 Production Services Inc. | Canada |
| 4423 Productions LLC | United States |
| 7 Friends Pictures Inc. | United States |
| Abel Meet Cain Productions, LLC | United States |
| AC Holdings, Inc. | United States |
| Accent Light Productions LLC | United States |
| Achilles Distributing, LLC | United States |
| Adjacent Production Services Inc. | Canada |
| Adobe Pictures, Inc. | United States |
| Adrian Court Productions Inc. | United States |
| Adventure TV Channel Pty. Ltd | Australia |
| Affiliates Asia, L.L.C. | United States |
| AFN Productions, Inc. | United States |
| Airport Network LLC | United States |
| Airtime Sales AB | Sweden |
| Alameda Films LLC | United States |
| ALD Productions Inc. | United States |
| Alhambra Argentina Collections LLC | United States |
| Alhambra Collections LLC | United States |
| Alive and Kicking, Inc. | United States |
| Allegra Productions, L.L.C. | United States |
| Alliance Lumiere Limited | India |
| Alloy Entertainment, LLC | United States |
| Alloy Media Holdings, L.L.C. | United States |
| Alpha Theatres Inc. | United States |
| Ambient Sounds Productions LLC | United States |
| Ambleside Production Services Inc. | Canada |
| American Night Productions Limited | United Kingdom |
| AMHI, LLC | United States |
| AmLaw Enterprises Inc. | United States |
| AND Syndicated Productions Inc. | United States |
| ANE Productions, Inc. | United States |
| Animal Planet North America, Inc. | United States |
| Animal Planet Televizyon Yayincilik Anonim Sirketi | Turkey |
| Animal Planet, L.L.C. | United States |
| Animal Planet, LP | United States |

| | |
|---|---|
| AOP Inc. | United States |
| Applied Analytics Solutions, LLC | United States |
| AprodO Development, LLC | United States |
| AprodO, LLC | United States |
| ARB Productions Inc. | United States |
| Arctic Circle Productions Ltd. | Canada |
| Argentina Basic Networks, L.L.C | United States |
| Argentina Channels Distribution, L.L.C. | United States |
| Argentina Premium Networks L.L.C | United States |
| Articulated Productions Limited | United Kingdom |
| Assemble Productions LLC | United States |
| AT&T Sports Networks, LLC | United States |
| AT&T SportsNet Northwest Holdings, LLC | United States |
| AT&T SportsNet Pittsburgh, LLC | United States |
| AT&T SportsNet Rocky Mountain, LLC | United States |
| AT&T SportsNet Southwest, LLC | United States |
| Autonomy Productions, LLC | United States |
| Avery Pix, Inc. | United States |
| Avrupa Spor Televizyon Yayıncılık Anonim Şirketi | Turkey |
| B&D Finance, LLC | United States |
| Backlight Productions LLC | United States |
| Barham Productions LLC | United States |
| Base Light Productions LLC | United States |
| Bayou Film Funding, LLC | United States |
| B-Cam Productions LLC | United States |
| Bear Creek Canyon Home, LLC | United States |
| Beckmark Production Services Inc. | Canada |
| Beetlejuice Broadway, LLC | United States |
| BeMe Inc. | United States |
| Bernie Brillstein Productions, Inc. | United States |
| Big Bayou Productions, L.L.C. | United States |
| Big Medicine Productions, LLC | United States |
| Big Pixel Studios Limited | United Kingdom |
| Big Pond Productions Pty Limited | Australia |
| Big Sky Cottage, LLC | United States |
| BL Buster Production Services Inc. | Canada |
| Black Inc Media Limited | New Zealand |
| BlazHoffski Belgie BV | Belgium |
| BlazHoffski Holding B.V. | Netherlands |
| BlazHoffski Productions B.V. | Netherlands |
| Bleacher Report, Inc. | United States |
| Blue Blues Productions, LLC | United States |
| Blue Ribbon Content Inc. | United States |
| BNF Distributing, LLC | United States |
| Bonanza Productions Inc. | United States |
| Boomerang Plus, LLC | United States |
| Boswell Street Productions Limited | United Kingdom |
| Box Office Animation, Inc. | United States |

| | |
|---|---|
| Brasil Advertising, L.L.C. | United States |
| Brasil Channels Servicos Audiovisuais LTDA. | Brazil |
| Brasil Content, L.L.C. | United States |
| Brasil Distribution, L.L.C. | United States |
| Brasil Productions, L.L.C. | United States |
| Brasil Programming, L.L.C. | United States |
| Bravo TV New Zealand Limited | New Zealand |
| Bride Distributing, LLC | United States |
| Bride Leasing, LLC | United States |
| Broken Foot Productions, Inc. | United States |
| Broken Record Productions, LLC | United States |
| Brown Hill Productions, LLC | United States |
| BT Ninety-Five Limited | United Kingdom |
| Bumper Productions LLC | United States |
| Burbank Television Enterprises LLC | United States |
| Bwayne Distributing LLC | United States |
| Bwayne Leasing, LLC | United States |
| Cable News International France S.A.S. | France |
| Cable News International Israel Ltd. | Israel |
| Cable News International Limited | United Kingdom |
| Cable News International, Inc. | United States |
| Cable News Network, Inc. | United States |
| Cable Program Management Company, G.P. | United States |
| Caleb Theatre Productions, Inc. | United States |
| Calling Grace Productions, LLC | United States |
| Camdrew Productions LLC | United States |
| Canada Premiere Pictures Inc. | United States |
| Canadian AP Ventures Company | Canada |
| Canal del Futbol SpA | Chile |
| Cartoon Interactive Group, Inc. | United States |
| Cartoon Network Enterprises, Inc. | United States |
| Cartoon Network Productions, Inc. | United States |
| Cartoon Network Studios, Inc. | United States |
| Cartoon Network Ventures LLC | United States |
| Cash Quick Productions, LLC | United States |
| Cast Media Holdings, LLC | United States |
| Castle Rock Entertainment | United States |
| Castle Rock Entertainment, Inc. | United States |
| Castle Rock Pictures, Inc. | United States |
| Channels Collection Company, LLC | United States |
| Charlestown Productions LLC | United States |
| Charlotte Michele Production Services Limited | Canada |
| Cheeky Pint Productions Limited | United Kingdom |
| Chime Films, LLC | United States |
| Chime Productions, LLC | United States |
| Chocolate Distributing, LLC | United States |
| Chocolate Leasing, LLC | United States |
| Chori Perros Productions, LLC | United States |

| | |
|---|---|
| CHS34 Productions Inc. | United States |
| Classic Films Inc. | United States |
| Clear Sky Enterprises Inc. | United States |
| Closeup Productions LLC | United States |
| Clover Productions, LLC | United States |
| CNE Tours, Inc. | United States |
| CNN America, Inc. | United States |
| CNN Center Ventures | United States |
| CNN Chile Canal de Televisión Limitada | Chile |
| CNN Interactive Group, Inc. | United States |
| CNN Newsource Sales, Inc. | United States |
| CNN Productions, Inc. | United States |
| CNNMexico.com Holdings, Inc. | United States |
| Coastal Getaway Homes, LLC | United States |
| Cobranzas Alhambra Argentina SRL | Argentina |
| Cologne Film GmbH | Germany |
| Comida Holdings, LLC | United States |
| Confirmed Productions, LLC | United States |
| Cooking Channel, LLC | United States |
| Cooler Waters Productions, LLC | United States |
| COTT Productions LLC | United States |
| Court TV Music Publishing House LLC | United States |
| Court TV Music Publishing LLC | United States |
| Court TV Publishing House LLC | United States |
| Courtroom Television Network LLC | United States |
| CPMCO Holdings, LLC | United States |
| Crash For Gold Productions, LLC | United States |
| CRE GP Holdings LLC | United States |
| Cross Plains Productions Limited | United Kingdom |
| Crown City Pictures Inc. | United States |
| CTV Holdings III Inc. | United States |
| Cue Track Productions LLC | United States |
| Daft Productions Inc. | United States |
| DAWN Syndicated Productions, Inc. | United States |
| DC COMICS | United States |
| DCE Creative Group LLC | United States |
| Deep Blue Productions Limited | United Kingdom |
| Delta Blues Holdings LLC | United States |
| Delta Blues Pictures LLC | United States |
| Delta Blues Productions LLC | United States |
| Dena Films Limited | United Kingdom |
| Derelict Investments, L.L.C. | United States |
| DHC Discovery, Inc. | United States |
| DigitalO, LLC | United States |
| Discovery (Barbados) Finance Srl | Barbados |
| Discovery (Barbados) Holdings SRL | Barbados |
| Discovery Advertising Sales Taiwan Pte. Ltd. | Singapore |
| Discovery AP Acquisition, Inc. | United States |

| | |
|---|---|
| Discovery Asia, LLC | United States |
| Discovery Broadcasting Ireland Limited | Ireland |
| Discovery Channel (Mauritius) Private Limited | Mauritius |
| Discovery Child Entertainment (Beijing) Commercial Consultancy Co., Ltd. | China |
| Discovery Child Entertainment Limited | Hong Kong |
| Discovery Communications Argentina S.R.L. | Argentina |
| Discovery Communications Benelux B.V. | Netherlands |
| Discovery Communications Bulgaria EOOD | Bulgaria |
| Discovery Communications Chile Spa | Chile |
| Discovery Communications Colombia Ltda | Colombia |
| Discovery Communications Deutschland GmbH & Co KG | Germany |
| Discovery Communications Europe Limited | United Kingdom |
| Discovery Communications Holding, LLC | United States |
| Discovery Communications India | India |
| Discovery Communications Ltd., L.L.C. | United States |
| Discovery Communications, LLC | United States |
| Discovery Content Verwaltungs GmbH | Germany |
| Discovery Corporate Services Limited | United Kingdom |
| Discovery Czech Republic S.r.o | Czech Republic |
| Discovery Digital (Beijing) Commercial Consultancy Co., Ltd. | China |
| Discovery Digital Ventures, LLC | United States |
| Discovery doo Beograd-Stari grad | Serbia |
| Discovery Enterprises, LLC | United States |
| Discovery Extreme Holdings, LLC | United States |
| Discovery Foreign Holdings, Inc. | United States |
| Discovery France Holdings SAS | France |
| Discovery G9 Holdings, LLC | United States |
| Discovery Golf, Inc. | United States |
| Discovery Health NS, ULC | Canada |
| Discovery Health Ventures, LLC | United States |
| Discovery Holding Company | United States |
| Discovery Hungary Media Szolgltat Kft | Hungary |
| Discovery International Holdings Holdco, Inc. | United States |
| Discovery International Holdings LLC | United States |
| Discovery International Holdings LP | United Kingdom |
| Discovery International Jersey Limited | United Kingdom |
| Discovery International UK Holdings Limited | United Kingdom |
| Discovery Italia S.r.l. | Italy |
| Discovery Japan GK | Japan |
| Discovery Japan Inc. | Japan |
| Discovery Kids Entertainment Limited | Cayman Islands |
| Discovery Korea Holdings, LLC | Korea, Republic of |
| Discovery Korea Networks, LLC | Korea, Republic of |
| Discovery Latin America Holdings, LLC | United States |
| Discovery Latin America Investments, LLC | United States |
| Discovery Latin America, L.L.C. | United States |
| Discovery Licensing, Inc. | United States |
| Discovery Lightning Investments Ltd | United Kingdom |

| | |
|---|---|
| Discovery Luxembourg Holdings 1 S.a.r.l. | Luxembourg |
| Discovery Luxembourg Holdings 2 S.a.r.l. | Luxembourg |
| Discovery Media Ventures Limited | United Kingdom |
| Discovery Medya Hizmetleri Limited Sirketi | Turkey |
| Discovery Mexico Holdings, LLC | United States |
| Discovery Networks Asia-Pacific Pte. Ltd. | Singapore |
| Discovery Networks Brasil Agenciamento e Representação Ltda. | Brazil |
| Discovery Networks Caribbean, Inc. | Barbados |
| Discovery Networks Denmark ApS | Denmark |
| Discovery Networks Finland Oy | Finland |
| Discovery Networks International Holdings Limited | United Kingdom |
| Discovery Networks International LLC | United States |
| Discovery Networks Mexico S. de R.L. de C.V. | Mexico |
| Discovery Networks Norway AS | Norway |
| Discovery Networks OOO | Russian Federation |
| Discovery Networks Sweden AB | Sweden |
| Discovery Networks, S.L. | Spain |
| Discovery NZ Limited | New Zealand |
| Discovery OWN Holdings, LLC | United States |
| Discovery Polska Sp. Z.o.o. | Poland |
| Discovery Productions Group, Inc. | United States |
| Discovery Productions, LLC | United States |
| Discovery Romania S.r.l | Romania |
| Discovery Science Televizyon Yayincilik Anonim Sirketi | Turkey |
| Discovery Services Australia Pty Ltd | Australia |
| Discovery Services, Inc. | United States |
| Discovery Solar Ventures, LLC | United States |
| Discovery South America Holdings, LLC | United States |
| Discovery Sports Events Limited (f/k/a Eurosport Events Limited) | United Kingdom |
| Discovery Studios, LLC | United States |
| Discovery Talent Services, LLC | United States |
| Discovery Television Center, LLC | United States |
| Discovery Televizyon Yayincilik Anonim Sirketi | Turkey |
| Discovery Times Channel, LLC | United States |
| Discovery Trademark Holding Company, Inc. | United States |
| Discovery Wings, LLC | United States |
| Discovery.com, LLC | United States |
| Dissolve Productions LLC | United States |
| DLA Holdings LLC | United States |
| DLG Acquisitions Limited | United Kingdom |
| DLG Financing 1 Limited | United Kingdom |
| DLG Financing 2 Limited | United Kingdom |
| DMS Argentina, LLC | United States |
| DMS Media Services, L.L.C. | United States |
| DNAP Networks (Malaysia) Sdn. Bhd. | Malaysia |
| DNE Music Publishing Limited | United Kingdom |
| DNI Europe Holdings Limited | United Kingdom |
| DNI Foreign Holdings Limited | United Kingdom |

| | |
|---|---|
| DNI German Holdings I Limited | United Kingdom |
| DNI German Holdings II Limited | United Kingdom |
| DNI Group Holdings LLC | United States |
| DNI Licensing Ltd | United Kingdom |
| DNI Netherlands Holdings 1 Limited | Ireland |
| DNI Netherlands Holdings 2 Limited | Ireland |
| Dombey Street Productions Limited | United Kingdom |
| Dover Distributing, LLC | United States |
| Dplay Entertainment Limited | United Kingdom |
| Drive-On Productions LLC | United States |
| Dutch Boy Productions, LLC | United States |
| E.C. Publications, Inc. | United States |
| EDA Televizyon Yayincilik ve Porduksiyon Anonim Sirketi | Turkey |
| Egil Holdings Inc. | United States |
| Eldrick Productions Inc. | United States |
| Elementary Productions Limited | United Kingdom |
| Elf Broadway, Inc. | United States |
| Emporium Productions Limited | New Zealand |
| Empresa Argentina Generadora y Comercializadora de Senales, LLC | United States |
| End City Productions | New Zealand |
| End Slate Productions LLC | United States |
| Enduro Sports Organisation Limited | United Kingdom |
| Enformasyon Reklamcilik ve Filmcilik Sanayi ve Ticaret A.S | Turkey |
| Entertainment Merchandise Ltd | United Kingdom |
| Entertainment Merchandise NY, Inc. | United States |
| ESC Entertainment | United States |
| ESP Media Distribution Portugal S.A. | Portugal |
| Eurosport Media SA | Switzerland |
| Eurosport SAS | France |
| Eurosportnews Distribution Ltd | Hong Kong |
| Everwood Utah, Inc. | United States |
| Evolving Productions LLC | United States |
| Eyeworks 4K Holding S.A. | Argentina |
| Eyeworks Argentina S.A. | Argentina |
| Eyeworks B.V. | Netherlands |
| Eyeworks Byte S.A. | Argentina |
| Eyeworks Chile S.A. | Chile |
| Eyeworks do Brasil - Produtora de Programas Televisivos e Filmes Publicitários Ltda. | Brazil |
| Eyeworks Film & TV Drama BV | Belgium |
| Eyeworks Italia S.r.l. | Italy |
| Eyeworks Latam Holding B.V. | Netherlands |
| Eyeworks Scandinavia AB | Sweden |
| Eyeworks Vision S.A. | Argentina |
| Facil Productions Limited | United Kingdom |
| Factual Productions, Inc. | United States |
| FALCON 7X-75, LLC | United States |
| FALCON 900EX-304, LLC | United States |

| | |
|---|---|
| Farnsworth Entertainment Productions, LLC | United States |
| Farsight Films Ltd. | Canada |
| FCBC Leasing, LLC | United States |
| Featured Role Productions LLC | United States |
| Fire & Blood Productions Limited | United Kingdom |
| Flixster, Inc. | United States |
| Food Network Holdings, LLC | United States |
| Food Network Magazine, LLC | United States |
| Forest Productions Inc. | United States |
| Fortuna Felix Films S.r.l. | Italy |
| Four Bros. Films North Inc. | Canada |
| Four Bros. Louisiana Productions, LLC | United States |
| Fragrant Gumtree Entertainment Pty Limited | Australia |
| Fresh Out Pictures, Inc. | United States |
| Fudd Ink | United States |
| Fullscreen, LLC | United States |
| Funfair Films Limited | United Kingdom |
| Gabriel Simon Production Services Limited | Canada |
| GAC Holdings, LLC | United States |
| Gate 4 Productions Limited | United Kingdom |
| Gateway to the South Homes, LLC | United States |
| Ginkym Production Services Inc. | Canada |
| Girly Cove Production Services Inc. | Canada |
| GNH Productions Inc. | United States |
| Go There Productions, LLC | United States |
| Golden Moment Productions LLC | United States |
| Goodfeathers Pictures Inc. | United States |
| Got Talent, LLC | United States |
| Grande Order Productions, LLC | United States |
| Great Big Story, LLC | United States |
| Green Content Sp. z o.o. | Poland |
| GTC Management Services Inc. | United States |
| Guys With Books Entertainment Co. | United States |
| Half a Yogurt Productions, LLC | United States |
| Hampton Wave LLC | United States |
| Handheld Productions LLC | United States |
| Hanna-Barbera Productions, Inc. | United States |
| Hanna-Barbera Studios Europe Limited | United Kingdom |
| Hannah-Rachel Production Services Limited | Canada |
| Harry Potter Limited | United Kingdom |
| Hazardous Films, LLC | United States |
| Hazardous Productions, LLC | United States |
| HBO ADRIA društvo s ograničenom odgovornošću za promidžbu | Croatia |
| HBO Adria SRB d.o.o. Beograd-Novi Beograd | Serbia |
| HBO Asia Acquisitions, LLC | United States |
| HBO Asia Consultancy Services (Beijing) Co., Ltd | China |
| HBO Asia Holdings LLC | United States |
| HBO Brasil Holdings, LLC | United States |

| | |
|---|---|
| HBO Brasil Ltda | Brazil |
| HBO Brasil Partners | United States |
| HBO Bulgaria EOOD (ЕЙЧ БИ ОУ България ЕООД) | Bulgaria |
| HBO Canada Services, Inc. | Canada |
| HBO Central Europe Acquisitions, LLC | United States |
| HBO Code Labs International GmbH | Germany |
| HBO Digital Latin America Holdings LLC | United States |
| HBO Digital Latin America LLC | United States |
| HBO Digital Services, Inc. | United States |
| HBO Entertainment, Inc. | United States |
| HBO Europe Holdings, Inc. | United States |
| HBO Europe Original Programming Limited | United Kingdom |
| HBO Europe, LLC | United States |
| HBO Europe, s.r.o. | Czech Republic |
| HBO Film & Television Development Limited | United Kingdom |
| HBO Films, Inc. | United States |
| HBO Holding Management Consulting Group Private Limited Company | Hungary |
| HBO Home Entertainment, Inc. | United States |
| HBO Independent Productions, Inc. | United States |
| HBO International (Europe) Limited | United Kingdom |
| HBO LAG Servicios Internacionales, S.A.S. | Colombia |
| HBO Latin America Acquisitions, LLC | United States |
| HBO Latin America Holdings LLC | United States |
| HBO Latin America Production Services, L.C. | United States |
| HBO Mexico Holdco, LLC | United States |
| HBO Nordic AB | Sweden |
| HBO Nordic Services Denmark APS | Denmark |
| HBO Nordic Services Finland Oy | Finland |
| HBO Nordic Services Norway AS | Norway |
| HBO Ole Acquisitions, LLC | United States |
| HBO OLE Distribution I, A.V.V. | Aruba |
| HBO Ole Distribution, L.L.C. | United States |
| HBO Ole International Marketing Ltd. | Virgin Islands, British |
| HBO Ole International Sales Company, LTD. | Virgin Islands, British |
| HBO OLE MARKETING SERVICES, S. DE R.L. DE C.V. | Mexico |
| HBO Ole Partners | United States |
| HBO OLE PRODUCCIONES, C.A. | Venezuela, Bolivarian Republic of |
| HBO Pacific Partners V.O.F. | Netherlands Antilles |
| HBO Polska Sp. Z.O.O. | Poland |
| HBO Portugal, Unipessoal LDA | Portugal |
| HBO poslovne Storitve d.o.o. | Slovenia |
| HBO Registry Services, Inc. | United States |
| HBO Romania, S.R.L. | Romania |
| HBO Rome Holdings, Inc. | United States |
| HBO Service Corporation | United States |
| HBO Singapore Productions Private Limited | Singapore |
| Het ThuisHuis BV | Belgium |
| HeyDey Productions, LLC | United States |

| | |
|---|---|
| HGTV Magazine, LLC | United States |
| Historic AOL LLC | United States |
| Historic TBS Asia LLC | United States |
| Historic TW Inc. | United States |
| HLR Legacy Limited | United Kingdom |
| Hollands Licht B.V. | Netherlands |
| Hollands Licht Projects I B.V. | Netherlands |
| Hollands Licht Projects II B.V. | Netherlands |
| Hollands Licht Projects III B.V. | Netherlands |
| Holon Productions, LLC | United States |
| HOME Box Office (Singapore) PTE. LTD | Singapore |
| Home Box Office (Taiwan) Co. Ltd. | Taiwan |
| Home Box Office Nordic Investments AB | Sweden |
| Home Box Office Spain Ventures, S. L. | Spain |
| Home Box Office, Inc. | United States |
| Horizon Alternative Television Inc. | United States |
| Horizon Scripted Television Inc. | United States |
| Horseshoe Productions, Inc. | United States |
| HTV, LLC | United States |
| Hub Television Networks, LLC | United States |
| ICC Ventures, Inc. | United States |
| Imagen Satelital S.A. | Argentina |
| Imagine Pictures Private Limited | India |
| Imagined Sights Productions, LLC | United States |
| In Development, LLC | United States |
| In The Arena Sports, LLC | United States |
| Indy Ripple Oasis, LLC | United States |
| Informant Louisiana Pictures LLC | United States |
| International News Ad Sales, Inc. | United States |
| International Services and Company, LLC | United States |
| Interplanetary Productions Inc. | Canada |
| Inversiones ARB S.A. | Venezuela, Bolivarian Republic of |
| ISL International Company Services Ltd. | Virgin Islands, British |
| iStreamPlanet Co., LLC | United States |
| JASH Productions Limited | United Kingdom |
| Jay Squared Productions LLC | United States |
| Jellystone Films Inc. | Canada |
| Jettison Productions Limited | United Kingdom |
| Joshmax Production Services Limited | Canada |
| JTBC Discovery Inc. | Korea, Republic of |
| Juliett November Production Services Inc. | Canada |
| JUNO PIX, INC. | United States |
| JV Programs, L.L.C. | United States |
| Katja Motion Picture Corp. | United States |
| Keystone TV Productions LLC | United States |
| Kiki Bee Production Services Inc. | Canada |
| Kiki Tree Pictures Inc. | United States |
| L&M Distributing, LLC | United States |

| | |
|---|---|
| La Fille des Freres Srl | Belgium |
| LA International Ltd. | Virgin Islands, British |
| La Puerta Productions Inc. | United States |
| Latin America Golf SLU | Spain |
| Lavell Completion Guarantors, LLC | United States |
| Lazer Team Productions LLC | United States |
| Lennox House Pictures Inc. | United States |
| Letterbox Productions LLC | United States |
| LFN Productions Inc. | United States |
| Libbet Producing, LLC | United States |
| Liberty Animal, Inc. | United States |
| Lifestyle Domain Holdings, Inc. | United States |
| Lifestyle Newco Limited | United Kingdom |
| Lima Papa Production Services Inc. | Canada |
| Linear Productions LLC | United States |
| LIS DISTRIBUTION, INC. | United States |
| Little Rhodie Home, LLC | United States |
| London Film Experience (Baker Street) Ltd | United Kingdom |
| London Film Museum (Covent Garden) Limited | United Kingdom |
| Lorimar Music A Corp. | United States |
| Lorimar Music Bee Corp. | United States |
| Lorimar Music Publishing, Inc. | United States |
| Louisiana Post Productions, LLC | United States |
| Louisiana Premiere Films LLC | United States |
| Louisiana Premiere Productions LLC | United States |
| Louisiana Special Funds, LLC | United States |
| Love And War Distribution, Inc. | United States |
| Machinima, Inc. | United States |
| Mad Bunny Productions Inc. | Canada |
| Magical Beginnings Productions Limited | United Kingdom |
| Magnolia Discovery Ventures LLC | United States |
| Magnolia DTC Ventures, LLC | United States |
| Main Gate Productions LLC | United States |
| Main Lot Productions LLC | United States |
| Makenna Productions, Inc. | United States |
| Mammoth Productions Limited | United Kingdom |
| Manly Shore Production Services Inc. | Canada |
| Mansion Music Publishing, LLC | United States |
| Manu One Limited | New Zealand |
| MC Cable Holdings, LLC | United States |
| MC Cable TV Limited Partnership | United States |
| Mexico Advertising, L.L.C. | United States |
| Mexico Channels Advertising Services, S. de R.L. de C.V. | Mexico |
| Mil Colmillos, LLC | United States |
| Mission Control Productions Limited | Canada |
| Mitchell Entertainment, Inc. | United States |
| Mixed Bag Productions, LLC | United States |
| Monterey Productions Limited | United Kingdom |

| | |
|---|---|
| Motion Graphics Production Services Inc. | Canada |
| Motor Trend Group, LLC | United States |
| MTT Enterprises Inc. | United States |
| Musictown Home, LLC | United States |
| Mutiny Pictures Inc. | United States |
| Narrow Mark Films Limited | United Kingdom |
| Neon Black Productions, LLC | United States |
| Networks Holdings, Inc. | United States |
| New Line Cinema LLC | United States |
| New Line Cinema Picturehouse Holdings, Inc. | United States |
| New Line Distribution, Inc. | United States |
| New Line International Releasing, Inc. | United States |
| New Line Lor International Distribution, Inc. | United States |
| New Line New Media, Inc. | United States |
| New Line Productions (UK) Limited | United Kingdom |
| New Line Productions, Inc. | United States |
| New Line Theatricals, Inc. | United States |
| New Tricks TV Productions Limited | United Kingdom |
| New-Path Productions, Inc. | United States |
| Nicolas Entertainment, Inc. | United States |
| Nightfall Films, LLC | United States |
| Nightfall Productions, LLC | United States |
| Nimby Productions, LLC | United States |
| Ninjutsu Pictures Inc. | United States |
| Ninth Floor Fiji Productions, LLC | United States |
| Ninth Floor UK Productions Limited | United Kingdom |
| NM Talent Inc. | United States |
| Non-Precedential Productions, LLC | United States |
| NonStop Sales AB | Sweden |
| North Center Productions, Inc. | United States |
| NS Pictures, Inc. | United States |
| Number Three Films Limited | United Kingdom |
| NuprodO, LLC | United States |
| NZK Productions Inc. | United States |
| OLD ALM, L.P. | United States |
| Olive Avenue Productions LLC | United States |
| On Bells Productions, LLC | United States |
| On Budget Productions LLC | United States |
| On or About Productions LLC | United States |
| One Eighty Productions LLC | United States |
| One Point Productions LLC | United States |
| One Thirty Seven Productions Inc. | United States |
| Orange Cone Productions LLC | United States |
| Ospecials, LLC | United States |
| Overlay Productions LLC | United States |
| OWN Digital, LLC | United States |
| OWN LLC | United States |
| OWN Productions, LLC | United States |

| | |
|---|---|
| OWN: Oprah Winfrey Network LLC | United States |
| Pacing Productions LLC | United States |
| Painted Sky Homes, LLC | United States |
| Palladin Productions LLC | United States |
| Palm Retreat, LLC | United States |
| Paragon Communications | United States |
| Parallax TV Productions LLC | United States |
| Paris Leasing, LLC | United States |
| Pass Films LLC | United States |
| Patch Bay Productions LLC | United States |
| Peachy Clean Productions, LLC | United States |
| Pen and Paper Productions LLC | United States |
| Penny Lane Productions, LLC | United States |
| Plane Meets Paper Productions, LLC | United States |
| Platform 9 3/4 K1ngs Cross Ltd | United Kingdom |
| Platform 9 3/4 Retail Ltd | United Kingdom |
| Play Sports Group Limited | United Kingdom |
| Play Sports Network Limited | United Kingdom |
| Plead the Fifth Productions, LLC | United States |
| Polski Operator Telewizyjny sp. z o.o. | Poland |
| Potter Leasing, LLC | United States |
| PP21 Productions LLC | United States |
| Primetime Supplier Productions LLC | United States |
| PromO Productions, LLC | United States |
| Proximity Productions LLC | United States |
| PSN Leasing, LLC | United States |
| Railway Spine Productions, LLC | United States |
| Random Films Inc. | Canada |
| Random Pictures Inc. | United States |
| Random Productions, LLC | United States |
| Rebel Post Inc. | United States |
| Red Castle Productions Limited | United Kingdom |
| Red Zone Pictures, Inc. | United States |
| Redemption Pictures, Inc. | United States |
| Renegade Pictures (UK) Limited | United Kingdom |
| Renegade South Limited | United Kingdom |
| Renraw Production Services Inc. | Canada |
| Rent Now Productions, Inc. | United States |
| RET Music, Inc. | United States |
| Retro, Inc. | United States |
| Rettop I Leasing, LLC | United States |
| Rettop II Distributing, LLC | United States |
| Rettop II Leasing, LLC | United States |
| Rettop III Distributing, LLC | United States |
| Rettop III Leasing, LLC | United States |
| Rettop IV Distributing, LLC | United States |
| Rettop IV Leasing, LLC | United States |
| Ricochet Limited | United Kingdom |

| | |
|---|---|
| Ricochet Productions Limited | United Kingdom |
| Riverboat Films, LLC | United States |
| Riverboat Productions, LLC | United States |
| Riverside Avenue Distributing Inc. | United States |
| Riverside Olive Productions, Inc. | United States |
| Rocklock Films Limited | United Kingdom |
| Rocksteady Studios Limited | United Kingdom |
| Rooster Teeth Productions, LLC | United States |
| Rose City Pictures, Inc. | United States |
| Roundabout Productions Limited | United Kingdom |
| Rozar Pictures, LLC | United States |
| RTX Exhibitions LLC | United States |
| Ruby Lake Productions LLC | United States |
| Rush Hour Productions, Inc. | United States |
| S&K Pictures, Inc. | United States |
| Sarah Connor Pictures, Inc. | United States |
| Scope Productions, LLC | United States |
| Screaming Spirit Productions, LLC | United States |
| Screen Burn Productions LLC | United States |
| Scripps International Media Holdings, LLC | United States |
| Scripps Networks Interactive, Inc. | United States |
| Scripps Networks International (UK) Limited | United Kingdom |
| Scripps Networks Polska sp. z.o.o | Poland |
| Scripps Networks, LLC | United States |
| Second Breakfast Pictures Inc. | United States |
| Second In Command Productions, LLC | United States |
| Seven Curses Productions, LLC | United States |
| SF Guarantors, LLC | United States |
| Shawn Danielle Production Services Limited | Canada |
| Shed Media Limited | United Kingdom |
| Shed Media Scotland Limited | United Kingdom |
| Shed Media US Inc. | United States |
| Shoe Bucket Limited | United Kingdom |
| Shot List Productions LLC | United States |
| Shutter Productions LLC | United States |
| Silverstrand Production Services Inc. | Canada |
| Singular Productions LLC | United States |
| Site Five Productions Limited | United Kingdom |
| SL Patent Holdings LLC | United States |
| SLO Productions Inc. | United States |
| Sloane Square Films Limited | United Kingdom |
| Smallville Studios Inc. | United States |
| SMBBW Inc. | United States |
| SMBGM Inc. | United States |
| SMC Holdings, A.V.V. | Aruba |
| SMJT Inc. | United States |
| SMUS Inc. | United States |
| SMWD Inc. | United States |

| | |
|---|---|
| Snow Business Films Inc. | Canada |
| SNU Inc. | United States |
| Sourdough Productions, LLC | United States |
| Southbank Media Ltd. | United Kingdom |
| Southern Cone Networks, L.L.C. | United States |
| Sparky Productions Inc. | United States |
| Spencer Theatre Productions, LLC | United States |
| SporTV Medya Hizmetleri Anonim Sirketi | Turkey |
| Spot of Tea Productions Limited | United Kingdom |
| Square One Studios, LLC | United States |
| Stage 13 Inc. | United States |
| STAVKA sp. z o.o. | Poland |
| Stress Less Productions Inc. | United States |
| Studio Discovery Co. Ltd | South Korea |
| STZ Productions Inc. | United States |
| Sugar High Theatre Productions, Inc. | United States |
| Super Soul Sunday LLC | United States |
| Supernatural 5 Films Inc. | Canada |
| Superstation, Inc. | United States |
| Takhayal for Art Production JSC | Egypt |
| Takhayal Television FZ LLC | United Arab Emirates |
| TAPV, LLC | United States |
| TBS Interactive Group, Inc. | United States |
| TBS Istanbul Yayincilik ve Produksiyon Anonim Sirketi | Turkey |
| TBS Productions, Inc. | United States |
| TCM Interactive Group, Inc. | United States |
| Techwood Clearinghouse, Inc. | United States |
| Techwood Music, Inc. | United States |
| Telepictures Productions Inc. | United States |
| Television Food Network, G.P. | United States |
| Ten Fifty Music, Inc. | United States |
| TEN Network Holding, Inc. | United States |
| The Bountiful Company Limited | United Kingdom |
| The Cartoon Network, Inc. | United States |
| The Living Channel New Zealand Limited | New Zealand |
| The Night Of Productions, LLC | United States |
| The Travel Channel, L.L.C. | United States |
| Theoretical Pictures, Inc. | United States |
| Third Act Productions Inc. | Canada |
| Thompson Place Productions Limited | United Kingdom |
| Three Girl Singers Inc. | United States |
| Thumbprint Productions LLC | United States |
| Time Telepictures Television Inc. | United States |
| Time Warner CIMM Holdings LLC | United States |
| Time Warner Connect of San Antonio, Inc. | United States |
| Time Warner ContentGuard Holdings Inc. | United States |
| Time Warner EIS Technology LLC | United States |
| Time Warner Entertainment Limited | United Kingdom |

| | |
|---|---|
| Time Warner Holdings Limited | United Kingdom |
| Time Warner International Finance Limited | United Kingdom |
| Time Warner London Limited | United Kingdom |
| Time Warner Media Holdings B.V. | Netherlands |
| Time Warner Money Purchase Pension Plan Trustee Limited | United Kingdom |
| Time Warner Pension Trustee Limited | United Kingdom |
| Time Warner Realty Inc. | United States |
| Time Warner Services Inc. | United States |
| Time Warner SiTV Holdings Inc. | United States |
| Time Warner UK Limited | United Kingdom |
| Title Match Music, Inc. | United States |
| TNT Interactive Group, Inc. | United States |
| TNT Originals, Inc. | United States |
| TNT Productions, Inc. | United States |
| TNT Televizyon Produksiyon Limited Sirketi | Turkey |
| TopSports Ventures LTDA. | Brazil |
| TP PROMOTIONS INC. | United States |
| Triple Point Productions LLC | United States |
| Triton Films Limited | United Kingdom |
| TT Animation Limited | United Kingdom |
| TT Games Limited | United Kingdom |
| TT Games Studios Limited | United Kingdom |
| TTT West Coast, Inc. | United States |
| Turkey Liaison Office of Cable New International, Inc. (Tükiye Irtibat Bürosu) | Turkey |
| Turner 1050 Productions, Inc. | United States |
| Turner Asia Pacific Investments, Inc. | United States |
| Turner Broadcasting Sales Southeast Asia, Inc. | United States |
| Turner Broadcasting Sales Taiwan, Inc. | United States |
| Turner Broadcasting System Arabia FZ-LLC | United Arab Emirates |
| Turner Broadcasting System Asia Pacific, Inc. | United States |
| Turner Broadcasting System Denmark ApS | Denmark |
| Turner Broadcasting System Deutschland GmbH | Germany |
| Turner Broadcasting System Espana, S.L. | Spain |
| Turner Broadcasting System Europe Limited | United Kingdom |
| Turner Broadcasting System France SAS | France |
| Turner Broadcasting System Holdings (Europe) Limited | United Kingdom |
| Turner Broadcasting System Italia Srl | Italy |
| Turner Broadcasting System Limited Liability Company | Russian Federation |
| Turner Broadcasting System Poland SP z.o.o. | Poland |
| Turner Broadcasting System Romania SRL | Romania |
| Turner Broadcasting System, Inc. | United States |
| Turner China Ventures Limited | Hong Kong |
| Turner Classic Movies, Inc. | United States |
| Turner Commercial Consulting (Shanghai) Co., Ltd. | China |
| Turner Digital Basketball Services, Inc. | United States |
| Turner Entertainment Co. | United States |
| Turner Entertainment Holdings Asia Pacific Limited | Hong Kong |

| | |
|---|---|
| Turner Entertainment Networks International Limited | United Kingdom |
| Turner Entertainment Networks, Inc. | United States |
| Turner Feature Animation, Inc. | United States |
| Turner Festivals, Inc. | United States |
| Turner Films, Inc. | United States |
| Turner Financing Inc. | United States |
| Turner General Entertainment Networks India Private Limited | India |
| Turner Home Entertainment, Inc. | United States |
| Turner International Chile Holdings, LLC | United States |
| Turner International Colombia S.A.S. | Colombia |
| Turner International Holding LLC | United States |
| Turner International Latin America Networks LLC | United States |
| Turner International Latin America, Inc. | United States |
| Turner International Mexico SA de CV | Mexico |
| Turner International Panama, S.A. | Panama |
| Turner International, Inc. | United States |
| Turner Japan K.K. | Japan |
| Turner Mexico Holdco, LLC | United States |
| Turner Music Canada, Inc. | United States |
| Turner Music Publishing, Inc. | United States |
| Turner Network Television, Inc. | United States |
| Turner New Media Investments, Inc. | United States |
| Turner NOLA Productions, Inc. | United States |
| Turner Nordic & Baltic AB | Sweden |
| Turner Nordic Holding AB | Sweden |
| Turner Oh!K Limited | Hong Kong |
| Turner Omni Venture, Inc. | United States |
| Turner Original Productions, Inc. | United States |
| Turner OTT Limited | United Kingdom |
| Turner Philippines Inc. | Philippines |
| Turner Pictures Worldwide Distribution, Inc. | United States |
| Turner Private Networks, Inc. | United States |
| Turner Properties, Inc. | United States |
| Turner Retail Company | United States |
| Turner Second Generation, Inc. | United States |
| Turner Security, Inc. | United States |
| Turner Services, Inc. | United States |
| Turner South Africa (Pty) Limited | South Africa |
| Turner Sports Interactive, Inc. | United States |
| Turner Sports, Inc. | United States |
| TVN Media sp. z o.o. | Poland |
| TVN S.A. | Poland |
| TVN spokla jawa (f/k/a TVN Digital S.A.) | Poland |
| TW AOL Holdings LLC | United States |
| TW Global Properties LLC | United States |
| TW Media Holdings LLC | United States |
| TW NY Properties LLC | United States |
| TW Real Estate Services LLC | United States |

| | |
|---|---|
| TW Service Inc. | United States |
| TW UK Holdings Inc. | United States |
| TW Ventures Inc. | United States |
| TW/TT Holdings Limited | United Kingdom |
| TWC R&D Kft. | Hungary |
| Twenty Twenty Brighton Limited | United Kingdom |
| Twenty Twenty Production Services Limited | United Kingdom |
| Twenty Twenty Productions Limited | United Kingdom |
| TWI Visible World Holdings Inc. | United States |
| Two Shot Productions LLC | United States |
| TW-SF LLC | United States |
| TW-SPV Co. | United States |
| TXR Studios, LLC | United States |
| Tyler Distributing, LLC | United States |
| Ulysses U.K. Inc. | United States |
| UNDERDOWN PRODUCTIONS PTY LIMITED | Australia |
| Upside Down Productions Inc. | United States |
| Urban Retreat, LLC | United States |
| Velocity Productions Limited | United Kingdom |
| Vendetta Leasing, LLC | United States |
| Vermont Mountain Home, LLC | United States |
| Vertical Hold Productions LLC | United States |
| VirtuCon, Inc. | United States |
| VLK Management LLC | United States |
| W Cinemas Holding Inc. | United States |
| W Cinemas Inc. | United States |
| WAD Productions Inc. | United States |
| WAG Leasing, LLC | United States |
| WAG Pictures Inc. | United States |
| WAG Productions Canada Inc. | Canada |
| Walk Don't Run Productions, LLC | United States |
| Wall to Wall (Holdings) Limited | United Kingdom |
| Wall to Wall Drama Ltd | United Kingdom |
| Wall to Wall Media Limited | United Kingdom |
| Wall to Wall South Limited | United Kingdom |
| Wall to Wall Television Limited | United Kingdom |
| Warner Bros Turkey Film Limited Sirketi | Turkey |
| Warner Bros. (Asia/Pacific) LLC | United States |
| Warner Bros. (F.E.), Inc. | United States |
| Warner Bros. (Japan), Inc. | United States |
| Warner Bros. (Korea) Inc. | Korea, Republic Of |
| Warner Bros. (South), Inc. | United States |
| Warner Bros. (Transatlantic) France SAS | France |
| Warner Bros. (Transatlantic), Inc. | United States |
| Warner Bros. Advanced Media Services Inc. | United States |
| Warner Bros. Animation Inc. | United States |
| Warner Bros. Australian Productions Pty Ltd | Australia |
| Warner Bros. CC Productions Australia Pty | Australia |

| | |
|---|---|
| Warner Bros. Cinemas (Holdings) Limited | United Kingdom |
| Warner Bros. Consulting Services (Beijing) Co., Ltd. | China |
| Warner Bros. Consumer Products Inc. | United States |
| Warner Bros. Denmark ApS | Denmark |
| Warner Bros. Digital Networks Inc. | United States |
| Warner Bros. Digital Networks Labs Inc. | United States |
| Warner Bros. Discovery Receivables Funding, LLC (f/k/a AT&T Receivables Funding II, LLC) | United States |
| Warner Bros. Distributing Inc. | United States |
| Warner Bros. Enterprises LLC | United States |
| Warner Bros. Entertainment Australia Pty Limited | Australia |
| Warner Bros. Entertainment Canada Inc. | Canada |
| Warner Bros. Entertainment Espana S.L.U. | Spain |
| Warner Bros. Entertainment France S.A.S. | France |
| Warner Bros. Entertainment GmbH | Germany |
| Warner Bros. Entertainment Inc. | United States |
| Warner Bros. Entertainment Italia S.R.L. | Italy |
| Warner Bros. Entertainment Limited Liability Company | Russian Federation |
| Warner Bros. Entertainment Nederland B.V. | Netherlands |
| Warner Bros. Entertainment Nordic AB | Sweden |
| Warner Bros. Entertainment Norge AS | Norway |
| Warner Bros. Entertainment Polska Sp. z o.o. | Poland |
| Warner Bros. Entertainment Switzerland GmbH | Switzerland |
| Warner Bros. Entertainment UK Limited | United Kingdom |
| Warner Bros. Feature Productions Pty Limited | Australia |
| Warner Bros. Features NZ Limited | New Zealand |
| Warner Bros. Finland Oy | Finland |
| Warner Bros. Games Limited | United Kingdom |
| Warner Bros. Games Manchester Limited | United Kingdom |
| Warner Bros. Home Entertainment Inc. | United States |
| Warner Bros. International Cinemas Inc. | United States |
| Warner Bros. International Enterprises Inc. | United States |
| Warner Bros. International Television Distribution Inc. | United States |
| Warner Bros. International Television Production Australia Pty Ltd | Australia |
| Warner Bros. International Television Production Belgie BV | Belgium |
| Warner Bros. International Television Production Belgie Specials BV | Belgium |
| Warner Bros. International Television Production Danmark ApS | Denmark |
| Warner Bros. International Television Production Deutschland GmbH | Germany |
| Warner Bros. International Television Production Espana, S.L. | Spain |
| Warner Bros. International Television Production Finland Oy | Finland |
| Warner Bros. International Television Production France S.A.S. | France |
| Warner Bros. International Television Production Holding B.V. | Netherlands |
| Warner Bros. International Television Production Holding Nederland B.V. | Netherlands |
| Warner Bros. International Television Production Limited | United Kingdom |
| Warner Bros. International Television Production Nederland B.V. | Netherlands |
| Warner Bros. International Television Production New Zealand Limited | New Zealand |
| Warner Bros. International Television Production Norge AS | Norway |
| Warner Bros. International Television Production Projects Nederland B.V. | Netherlands |

| | |
|---|---|
| Warner Bros. International Television Production Sverige AB | Sweden |
| Warner Bros. International Television Production Sverige Drama AB | Sweden |
| Warner Bros. International Television Production Switzerland GmbH | Switzerland |
| Warner Bros. Investment (Holdings) Limited | United Kingdom |
| Warner Bros. ITVP NZ Projects 2 Limited | New Zealand |
| Warner Bros. ITVP NZ Projects 3 Limited | New Zealand |
| Warner Bros. ITVP NZ Projects 4 Limited | New Zealand |
| Warner Bros. ITVP NZ Projects 5 Limited | New Zealand |
| Warner Bros. ITVP NZ Projects 6 Limited | New Zealand |
| Warner Bros. ITVP NZ Projects Limited | New Zealand |
| Warner Bros. Japan LLC | Japan |
| Warner Bros. Literary Rights LLC | United States |
| Warner Bros. Malaysia Sdn. Bhd. | Malaysia |
| Warner Bros. Master Distributor Inc. | United States |
| Warner Bros. Pictures (B.C.), Inc. | Canada |
| Warner Bros. Pictures (India) Private Limited | India |
| Warner Bros. Pictures Ges.m.b.H. | Austria |
| Warner Bros. Productions (Boulet) Limited | United Kingdom |
| Warner Bros. Productions Limited | United Kingdom |
| Warner Bros. Programming Inc. | United States |
| Warner Bros. Singapore PTE Ltd. | Singapore |
| Warner Bros. Studios Japan LLC | Japan |
| Warner Bros. Studios Leavesden Limited | United Kingdom |
| Warner Bros. Technical Operations Inc. | United States |
| Warner Bros. Television (B.C.), Inc. | Canada |
| Warner Bros. Television Production (Fiji) Pte Ltd | Fiji |
| Warner Bros. Television Production Projects (Fiji) Pte Ltd | Fiji |
| Warner Bros. Television Production UK Limited | United Kingdom |
| Warner Bros. Theatre Ventures Inc. | United States |
| Warner Bros. Theatres (Australia) Pty. Limited | Australia |
| Warner Bros. Theatres (Holdings) Limited | United Kingdom |
| Warner Bros. Theatres (UK) Limited | United Kingdom |
| Warner Bros. Theatrical Enterprises LLC | United States |
| Warner Bros. TV Production Services Limited | United Kingdom |
| Warner Bros. UK Features Limited | United Kingdom |
| Warner Bros. Worldwide Television Distribution Inc. | United States |
| Warner Channel Brazil Inc. | United States |
| Warner Communications (Canada) Ltd. | Canada |
| Warner Communications LLC | United States |
| Warner Home Video (U.K.) Limited | United Kingdom |
| Warner Home Video Mexico, Sociedad Anónima de Capital Variable | Mexico |
| Warner Home Video Service Company, S.A. de C.V. | Mexico |
| Warner Horizon Television Inc. | United States |
| Warner Media (Barbados) Holdings SRL | Barbados |
| Warner Media (Barbados) Licensing SRL | Barbados |
| Warner Media 2.0 Investment Holdings, LLC | United States |
| Warner Media Care Limited | United Kingdom |
| Warner Media Content Holdings I, LLC | United States |

| | |
|---|---|
| Warner Media Content Holdings II, LLC | United States |
| Warner Media Content Holdings III, LLC (f/k/a AT&T Content Holdings I, LLC) | United States |
| Warner Media Content Holdings, L.P. | United States |
| Warner Media Digital Holdings, Inc. (f/k/a AT&T Media Holdings, Inc.) | United States |
| Warner Media Direct Televizyon Yayıncılık Anonim Şirketi | Turkey |
| Warner Media Entertainment Pages, Inc. | United States |
| Warner Media Europe Inc. | United States |
| Warner Media Hong Kong Limited | Hong Kong |
| Warner Media International Limited | United Kingdom |
| Warner Media, LLC | United States |
| Warner New Asia Inc. | United States |
| Warner Specialty Films Inc. | United States |
| Warner Specialty Productions Inc. | United States |
| Warner Specialty Video Productions Inc. | United States |
| Warner Theatre Productions Inc. | United States |
| Warner World Limited | United Kingdom |
| Warner-Barham Music LLC | United States |
| Warner-Hollywood Music LLC | United States |
| WarnerMedia (Malaysia) Sdn. Bhd. | Malaysia |
| WarnerMedia (Thailand) Limited | Thailand |
| WarnerMedia Advertising Sales, Inc. | United States |
| WarnerMedia Amsterdam B.V. | Netherlands |
| WarnerMedia Asia Pacific (HK) Limited | Hong Kong |
| WarnerMedia Asia Pacific Ventures, Inc. | United States |
| WarnerMedia Australia Pty. Limited | Australia |
| WarnerMedia Business Services LLC | United States |
| WarnerMedia Chile Inversiones Limitada | Chile |
| WarnerMedia Direct Asia Pacific, LLC | United States |
| WarnerMedia Direct France S.A.S. | France |
| WarnerMedia Direct Greece Ltd. | Greece |
| WarnerMedia Direct Latin America, LLC | United States |
| WarnerMedia Direct, LLC | United States |
| WarnerMedia Entertainment Networks Korea, Ltd | Korea, Republic Of |
| WarnerMedia Global Digital Services, LLC | United States |
| WarnerMedia Holdings, Inc. (f/k/a Magallanes, Inc.) | United States |
| WarnerMedia India Private Limited | India |
| WarnerMedia Korea, Ltd | Korea, Republic Of |
| WarnerMedia Network Sales, Inc. | United States |
| WarnerMedia Pakistan (Private) Limited | Pakistan |
| WarnerMedia Services, LLC | United States |
| WarnerMedia Studios, Inc. | United States |
| Warner-Olive Music LLC | United States |
| Wasu Discovery Consulting (HangZhou) Co. Ltd | China |
| Water Tower Production Services Inc. | Canada |
| Watershed Television Limited | United Kingdom |
| WAV Distribution LLC | United States |
| Waveform Productions LLC | United States |

| | |
|---|---|
| Wayne Enterprises Feature Productions Limited | United Kingdom |
| WB 100-PLUS STATION GROUP INC. | United States |
| WB Communications II LLC | United States |
| WB Communications Inc. | United States |
| WB Games Boston Inc. | United States |
| WB Games Inc. | United States |
| WB Games Montreal Inc. | Canada |
| WB Mexico Holdco I, LLC | United States |
| WB Mexico Holdco II, LLC | United States |
| WB Studio Enterprises Inc. | United States |
| WB/TT Holdings Limited | United Kingdom |
| WBDUK Sport Services Ltd. (f/k/a BT Ninety-Six Ltd.) | United Kingdom |
| WBShop.com Inc. | United States |
| WBTV Canada Productions Services Inc. | Canada |
| WBTVPUK Pictures (WR) Limited | United Kingdom |
| WBTVPUK Pictures Limited | United Kingdom |
| WBTVPUK WGA Writers Limited | United Kingdom |
| WCI Global Business Services Inc. | United States |
| WCI Record Club Inc. | United States |
| WCI Theater Inc. | United States |
| WCI/AmLaw, Inc. | United States |
| West of 7th Digital Productions, LLC | United States |
| Widescreen Productions LLC | United States |
| Williams Street Productions, LLC | United States |
| WM Columbus Holdings, Inc. | United States |
| WM Interactive Media Holdings, LLC | United States |
| WM Max Holdings II, LLC | United States |
| WM Max, LLC | United States |
| WM Mexico Holdco, LLC | United States |
| WML Services, LLC | United States |
| WMNS Transmission LLC | United States |
| WT Distributing, LLC | United States |
| WV Films II LLC | United States |
| WV Films III LLC | United States |
| WV Films IV LLC | United States |
| WV Films LLC | United States |
| WW Productions | United States |
| Xworks B.V. | Netherlands |
| Yalli Productions Limited | United Kingdom |
| YNFS Productions LLC | United States |
| You I Labs (US) Inc. | United States |
| You I Labs Inc. | Canada |

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 333-264453) and Form S-8 (Nos. 333-264461 and 333-268850) of Warner Bros. Discovery, Inc. of our report dated February 24, 2023 relating to the financial statements and financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Washington, District of Columbia
February 24, 2023

**EXHIBIT 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO RULE 13a - 14(a) AND RULE 15d - 14(a)
OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, David M. Zaslav, certify that:

1. I have reviewed this Annual Report on Form 10-K of Warner Bros. Discovery, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2023

By: /s/ David M. Zaslav
David M. Zaslav
President and Chief Executive Officer

**EXHIBIT 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO RULE 13a - 14(a) AND RULE 15d - 14(a)**
**OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Gunnar Wiedenfels, certify that:

1. I have reviewed this Annual Report on Form 10-K of Warner Bros. Discovery, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2023

By: /s/ Gunnar Wiedenfels
Gunnar Wiedenfels
Chief Financial Officer

**EXHIBIT 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Warner Bros. Discovery, Inc. ("Warner Bros. Discovery"), on Form 10-K for the year ended December 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David M. Zaslav, President and Chief Executive Officer of Warner Bros. Discovery, certify that to my knowledge:

1 the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2 the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Warner Bros. Discovery.

Date: February 24, 2023

By: /s/ David M. Zaslav
David M. Zaslav
President and Chief Executive Officer

**EXHIBIT 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Warner Bros. Discovery, Inc. (“Warner Bros. Discovery”), on Form 10-K for the year ended December 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the “Report”), I, Gunnar Wiedenfels, Chief Financial Officer of Warner Bros. Discovery, certify that to my knowledge:

1 the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2 the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Warner Bros. Discovery.

Date: February 24, 2023

By: /s/ Gunnar Wiedenfels
Gunnar Wiedenfels
Chief Financial Officer