ROB BONTA
Attorney General of California
PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
DANIEL D. AMBAR (SBN 278853)
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1230
 Telephone: (213) 269-6153
 Fax: (916) 731-3637
 Email: Daniel.Ambar@doj.ca.gov

*Attorneys for Plaintiff State of California*
Additional counsel identified on signature page

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF OREGON, AND THE STATE OF WASHINGTON, <br><br> *Plaintiffs,* <br><br> v. <br><br> PARAMOUNT SKYDANCE CORP., AND WARNER BROS. DISCOVERY, INC., <br><br> *Defendants.* | Case No.: 4:26-cv-7116 <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AS TO WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# TABLE OF CONTENTS

Page

I.    Introduction ............................................................................................................... 1

II.   Factual Background ................................................................................................... 2

    A.    The Parties and the Transaction ..................................................................... 2

    B.    The Entertainment Industry Has Been Consolidating ..................................... 4

    C.    Defendants' Planned Content Reductions ........................................................ 5

    D.    DOJ Clearance and Plaintiff States' Efforts to Agree on a TRO and Trial Date ................................................................................................................. 6

III.  Legal Standard .......................................................................................................... 7

IV.   Argument .................................................................................................................. 8

    A.    Plaintiff States Are Likely to Succeed on the Merits, and, at a Minimum, Present Serious Questions Going to the Merits ................................................ 8

        1.    There Are Three Relevant Antitrust Markets .................................... 9

            a.    Distribution of Wide-Release Theatrical Films ................... 10

            b.    Distribution of Anticipated Top-Grossing Theatrical Films ......... 12

            c.    Licensing of Basic Cable Channels to Distributors ..................... 14

        2.    The Transaction Is Presumptively Unlawful ..................................... 15

        3.    The Transaction Will Enable Paramount to Raise Prices and Reduce Output ................................................................................................. 17

    B.    There Is a Substantial Risk of Imminent, Irreparable Harm ................................ 22

    C.    The Public Interest and Balance of Equities Sharply Favor Enjoining the Transaction Until the Court Decides the Merits ................................................... 23

V.    Conclusion ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ................................................................................. 25

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .......................................................................... 7, 9, 25

*Apr. in Paris v. Becerra*,
  494 F. Supp. 3d 756 (E.D. Cal. 2021) ..................................................................... 23

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ................................................................................ 23

*Betschart v. Oregon*,
  103 F.4th 607 (9th Cir. 2024) ................................................................................... 7

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ............................................................................ *passim*

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ........................................................................................... 8, 10

*Cal. Hosp. Ass'n v. Maxwell-Jolly*,
  776 F. Supp. 2d 1129 (E.D. Cal. 2011) .................................................................. 24

*California v. Am. Stores, Inc.*,
  495 U.S. 271 (1990) ............................................................................................... 8

*Colorado v. DeJoy*,
  487 F. Supp. 3d 1061 (D. Colo. 2020) ................................................................... 24

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) .................................................................................. 23

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ................................................................................... 7

*Epic Games, Inc. v. Apple Inc.*,
  No. 4:20-cv-564-YGR, 2020 WL 5073937 (N.D. Cal. Aug. 24, 2020) ............................ 9, 25

*F.T.C v. Weyerhaeuser*,
  665 F.2d 1072 (D.D.C. 1981) ............................................................................ 23, 24

*Fed. Trade Comm'n v. Dean Foods Co.*,
  384 U.S. 597 (1966) .............................................................................................. 23

*Fed. Trade Comm'n v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ................................................................................................. 9

*Fed. Trade Comm'n v. Kroger Co.*,
No. 3:24-cv-347, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ........................................ *passim*

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) ........................................................................... 1, 9, 18, 22

*Fed. Trade Comm'n v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ................................................................................................. 9

*Fed. Trade Comm'n v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................................................... 24

*Fed. Trade Comm'n v. Tapestry, Inc.*,
755 F. Supp. 3d 386 (S.D.N.Y. 2024) ...................................................................... *passim*

*Fed. Trade Comm'n v. Warner Commc'ns Inc.*,
742 F.2d 1156 (9th Cir. 1984) (per curiam) .................................................................. 8, 24

*Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA*,
341 F. Supp. 3d 27 (D.D.C. 2018) ....................................................................................... 11

*Flynt Distrib. Co. v. Harvey*,
734 F.2d 1389 (9th Cir. 1984) ............................................................................................... 7

*FTC v. IQVIA Holdings Inc.*,
710 F. Supp. 3d 329 (S.D.N.Y. 2024) .................................................................................. 17

*Gateway City Church v. Newsom*,
516 F. Supp. 3d 1004 (N.D. Cal. 2021) ................................................................................. 7

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ................................................................................................ 9

*Hospital Corp. of America v. Fed. Trade Comm'n*,
807 F.2d 1381 (7th Cir. 1986) ............................................................................................. 16

*Houdini Inc. v. Goody Baskets LLC*,
166 F. App'x 946 (9th Cir. 2006) ........................................................................................... 7

*Isho v. D. Marin*,
--- F. Supp. 3d ----, No. 5:26-cv-764, 2026 WL 855746 (C.D. Cal. Mar. 4,
2026) ....................................................................................................................................... 7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ............................................................................................... 24

*Kottaras v. Whole Foods Mkt., Inc.*,
  281 F.R.D. 16 (D.D.C. 2012)..........................................................................................20

*In re Nexstar-Tegna Merger Litig.*,
  No. 2:26-cv-976-TLN-CKD, 2026 WL 1049295 (E.D. Cal. Apr. 17, 2026) ....................9, 24

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)............................................................................................................8

*RSR Corp v. Fed Trade Comm'n*,
  602 F.2d 1317 (9th Cir. 1979).........................................................................................16

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015)............................................................................. 8, 9, 10, 15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001)..............................................................................................7

*Syufy Enters. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986).............................................................................................12

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)..............................................................................................13

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016)..............................................................................................10

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017) ..................................................................................11

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) ..........................................................................................17

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018) ..................................................................................14

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ............................................................................................9

*United States v. Bertelsmann SE & Co. KGaA*,
  646 F. Supp. 3d 1 (D.D.C. 2022) ................................................................................11, 12

*United States v. BNS Inc.*,
  858 F.2d 456 (9th Cir. 1988)....................................................................................7, 8, 24

*United States v. E. I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957)..........................................................................................................10

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ..............................................................................16, 18

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ............................................................................................. 9, 16, 17, 20

*United States v. Trib. Publ'g Co.*,
    No. 16-cv-1822-AB, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ...................................... 23

*Washington v. Franciscan Health Sys.*,
    388 F. Supp. 3d 1296 (W.D. Wash. 2019) ............................................................................ 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................................... 7

**Statutes**

15 U.S.C. § 18 ................................................................................................................................ 6, 8

**Other Authorities**

*Faust v. Paramount*, No. 4:26-cv-03790 (N.D. Cal. Jun. 3, 2026), Dkt. No. 33 ......................... 25

*Fed. Trade Comm'n v. Intercontinental Exch., Inc*., No. 3:23-cv-1710 (N.D. Cal.
    Apr. 21, 2023), Dkt. No. 37 .................................................................................................... 6

*Fed. Trade Comm'n v. Kroger Co.*, No. 3:24-cv-347 (D. Or. Feb. 26, 2024), Dkt.
    No. 4-1 ..................................................................................................................................... 6

*Fed. Trade Comm'n v. Meta Platforms Inc.*,
    No. 5:22-cv-4325 (N.D. Cal. July 28, 2022), Dkt. No. 18 ...................................................... 6

Fed. Trade Comm'n & U.S. Dep't of Justice, *Merger Guidelines* § 2.1 (2023) ...................... 9, 17

Justin Kroll, *Warner Bros. Shelves 'Batgirl' With No Plans To Release Theatrically
    Or On HBO Max*, Deadline (Aug. 2, 2022) ............................................................................ 5

Mckinley Franklin, *Netflix Film Head Says Streamer Has "Accepted" They Won't
    Work With "Filmmakers Who Still Want Theatrical" Releases*, Hollywood
    Reporter (June 5, 2026) ......................................................................................................... 21

Meg James, *Paramount credit downgraded to 'junk' status over debt worries*, L.A.
    Times (Mar. 3, 2026) ............................................................................................................... 4

Nellie Andreeva, *TBS Comedy Series 'Kill The Orange-Faced Bear' Axed As
    Warner Bros. Discovery Leadership Examines Slate*, Deadline (Apr. 26, 2022) .................... 5

Off. of Pub. Affs., U.S. Dep't of J., *Statement of the Department of Justice
    Antitrust Division on the Closing of Its Investigation of the Merger of
    Paramount Skydance and Warner Bros* (June 12, 2026) ........................................................ 6

Rob Wile et al., *Paramount Skydance begins layoffs, plans to slash about 2,000
    jobs*, NBC News (Oct. 29, 2025) ............................................................................................. 5

## I.    INTRODUCTION

On February 27, 2026, Paramount Skydance Corp. ("Paramount") and Warner Bros. Discovery, Inc. ("Warner Bros.") entered into a $110 billion merger agreement (the "Transaction"). If allowed to proceed, the Transaction will eliminate competition between two of only five remaining major Hollywood studios, giving these studios unprecedented leverage over movie theatres that depend on a competitive supply of films to survive. With respect to cable television, the Transaction will combine two of the largest basic cable programmers to create a portfolio of over fifty cable channels covering every genre, leaving cable and satellite providers with virtually no alternative but to accept the combined entity's terms. Consumers across the United States will ultimately bear the burden of higher prices, lower quality, and less content for film and television.

Accordingly, the State of California, State of Arizona, State of Colorado, State of Connecticut, State of Massachusetts, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, and State of Washington (collectively, "Plaintiff States") respectfully move for both a temporary restraining order and preliminary injunction prohibiting Paramount and Warner Bros. from closing or otherwise consummating the Transaction before this Court decides whether the Transaction is unlawful. The Transaction will increase market concentration to *presumptively unlawful* levels in three relevant antitrust markets. Once consummated, layoffs, content cancellations, and harms to competition would commence immediately. If the Court subsequently determines that the Transaction is unlawful, it will then be "extraordinarily difficult to unscramble the egg" and "too late to preserve competition if no preliminary injunction has issued." *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352–53 (3d Cir. 2016) (citation modified).

A temporary restraining order is appropriate because each of the *Winter* factors weighs decisively in Plaintiff States' favor. Most critically, Plaintiff States are likely to prevail on the merits. As detailed in the accompanying Complaint, the Transaction violates Section 7 of the Clayton Act, 15 U.S.C. § 18, because it is likely to substantially lessen competition in the (1) distribution of wide-release theatrical films, (2) distribution of anticipated top-grossing theatrical films, and (3) licensing of basic cable channels to distributors. In these markets, Paramount and

Warner Bros. compete as sellers—supplying theatrical films to theatres and basic cable channels to cable television distributors. The Transaction will eliminate competition between Paramount and Warner Bros. and enable the combined entity to raise prices and reduce output. In fact, in all three markets, the resulting market concentration levels exceed the thresholds at which a merger is presumed to be illegal. At trial, Plaintiff States will prove, consistent with the presumption, that the Transaction is likely to substantially reduce competition.

The balance of equities and the public interest similarly compel relief. Plaintiff States have an interest in enforcing antitrust laws and their citizens face the risk of profound and irreversible injury in the absence of an injunction. For example, ██████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████ In contrast, there is no cognizable harm to Paramount and Warner Bros. from pausing their merger while the Court adjudicates this case. The merger agreement sets an outside date of March 4, 2027, which automatically extends to June 4, 2027 if antitrust review is still pending. The agreement also imposes a $7 million daily ticking fee on Paramount beginning September 30, 2026. The Defendants thus agreed to an outside date that contemplates more than eight months of accumulated ticking fees as part of the price of completing a transaction that might face antitrust scrutiny. Paramount's interest in completing the Transaction now to spare it the costs of its own agreement is not a cognizable equity interest.

Before filing this motion, Plaintiff States requested Defendants' agreement to refrain from consummating the Transaction until after this Court has ruled on the merits. Defendants declined. Defendants have cleared all U.S. regulatory hurdles other than judicial review and may close the Transaction as early as July 22, 2026. This Court can and should act before July 22, 2026, to prevent irreparable harm while its review of the Transaction is pending.

## II.    FACTUAL BACKGROUND

### A.    The Parties and the Transaction

Defendant Paramount Skydance Corp. is a global media conglomerate registered in Delaware and headquartered in New York. Paramount's portfolio includes Paramount Pictures (one of the "big five" Hollywood film studios, responsible for films and film franchises such as *Top*

*Gun*, *Titanic*, *Forrest Gump*, *Mission: Impossible*, and *Star Trek*); the CBS broadcast network (the most-watched network in America for over sixteen consecutive years); basic cable channels (including Nickelodeon, Comedy Central, MTV, and BET); the Showtime premium cable channel; and the Paramount+ streaming service. Compl. ¶¶ 32, 35.

Defendant Warner Bros. Discovery, Inc. is a global media conglomerate also registered in Delaware and headquartered in New York. Warner Bros.'s portfolio includes Warner Bros. Pictures studio (responsible for films and film franchises such as *Harry Potter*, *Lord of the Rings*, *The Matrix*, and *The Dark Knight*); basic cable channels (including CNN, TNT, TBS, HGTV, Food Network, Discovery Channel, and Cartoon Network); the HBO premium cable channel; and the HBO Max and Discovery+ streaming services. Compl. ¶¶ 33, 35. Both Paramount and Warner Bros. maintain studio lots and production facilities in California, where they also employ thousands of California residents. Compl. ¶ 17.

On February 27, 2026, Paramount and Warner Bros. agreed that Paramount would acquire all Warner Bros.'s outstanding shares for $31 per share for a total transaction value of approximately $110 billion. Compl. ¶ 34. The combined entity would control two of the "big five" film studios (Paramount Pictures and Warner Bros. Pictures), more than fifty basic cable channels spanning every major programming genre, the leading premium cable television channels (HBO and Showtime), the most-watched broadcast network (CBS), three subscription streaming services (Paramount+, HBO Max, and Discovery+), and three of the most prolific television production studios (Paramount Television Studios, CBS Studios, and Warner Bros. Television Studios). Compl. ¶ 35; Lee Decl. ¶¶ 9, 42–43, 127–128, fig. 17. As a result, for every dollar generated by U.S. theatrical movies and basic cable channels, this media behemoth will pocket more than a quarter. Lee Decl. ¶¶ 83–84, fig. 10; 143, fig, 18.

The combined entity is expected to carry approximately $78 billion in net debt at closing. Compl. ¶ 107. To put that figure in context, it is approximately $29 billion *more* than the $49 billion in net debt that Warner Bros. carried when it was formed in 2022 following the merger of Warner Bros. and Discovery—a debt burden that triggered thousands of layoffs and dozens of canceled projects at Warner Bros. within months of closing. *See* Weingarten Decl. Ex. A at 1. Two major

credit rating agencies downgraded Paramount's credit rating to "junk" status (i.e., below investment grade) as a response to the announced merger, signaling that the combined company faces a materially elevated risk of financial distress.[1] A junk credit rating increases the combined entity's borrowing costs, intensifying the pressure to cut spending to service its debt.

### B.   The Entertainment Industry Has Been Consolidating

Recent entertainment mergers have followed a similar sequence: the acquiring company publicly commits to maintaining or expanding content output, privately plans to make content reductions a significant source of savings, and then delivers cuts that exceed even its own internal projections. When Disney acquired Fox in 2019, the number of major Hollywood studios fell from six to five. Disney told investors it would "expand iconic movie franchises" through its acquisition of Fox, Weingarten Decl. Ex. B at 5, but within weeks of closing, its CEO disclosed that Fox's theatrical slate would be more than halved, from twelve to seventeen commercially significant films per year to just five or six. Weingarten Decl. Ex. C at 16; Compl. ¶ 81. Disney's $2 billion cost synergy target, which "included a reduction in output," Weingarten Decl. Ex. C at 21, ultimately resulted in more than 4,000 Fox employees losing their jobs. Compl. ¶¶ 81–82.

When Discovery acquired WarnerMedia to form Warner Bros. in April 2022, Warner Bros.'s CEO announced $3 billion in projected annual synergies. Weingarten Decl. Ex. D at 38. Then, in April 2023, he publicly committed to robust theatrical output, pledging sixteen films in 2023 and more than twenty in 2024. Compl. ¶ 107. Reality diverged sharply from that promise. Within a year, the synergy target rose to $4 billion. Weingarten Decl. Ex. E at 10. ██████ ████████████████████████ Weingarten Decl. Ex. F at 79. And to service the staggering $49 billion debt the combined entity carried, Warner Bros. turned to content destruction. By the end of 2022, Warner Bros. identified approximately $2.8 billion in content impairment and $377 million in development write-offs. Weingarten Decl. Ex. G at 92. It shelved *completed* films and television series for tax benefits and canceled substantial in-development projects before

---

[1] Meg James, *Paramount Credit Downgraded to 'Junk' Status Over Debt Worries*, L.A. TIMES (Mar. 3, 2026), https://perma.cc/H4ZT-ZDVT.

production began.[2] Warner Bros. ultimately released only eleven and nine films in 2023 and 2024, respectively. Compl. ¶ 107. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████ Weingarten Decl. Ex. H at 1.

Most recently, Skydance acquired Paramount in August 2025. ███████████████████████████████████████████████████████████████████████████████████ Weingarten Decl. Ex. I at 6; Ex. J at 28, 38–39. The newly formed company laid off more than 2,000 employees within a few months of the merger.[3]

As a result of this trend towards consolidation, the theatrical film distribution market is highly concentrated, with only five major studios—Paramount, Disney, Universal, Warner Bros., and Sony—accounting for approximately 80 percent of domestic box office revenue. Lee Decl. ¶ 44; Ex. 1 ¶ 8; Ex. 2 ¶ 8. The Transaction would reduce the "big five" to four. In the basic cable channel market, five major programmers—Paramount, Disney, Warner Bros., Fox, and Versant (spun off from NBCUniversal in 2026)—account for approximately 80 percent of the market measured by affiliate fee revenue. Lee Decl. ¶ 143, fig. 18. The Transaction would combine two of the largest basic cable programmers into a single entity.

**C.      Defendants' Planned Content Reductions**

███████████████████████████████████████████████████████████████████████████████ Weingarten Decl. Ex. J at 34, 38, 69. ███████████████████████████████████████████████████████████████████████████████████████ Weingarten Decl. Ex. K at 7 (███████████████████████████████████ (capitalization altered)). █



---

[2] Justin Kroll, *Warner Bros. Shelves 'Batgirl' with No Plans to Release Theatrically or on HBO Max*, DEADLINE (Aug. 2, 2022), https://perma.cc/6U69-BKZ8; Nellie Andreeva, *TBS Comedy Series 'Kill The Orange-Faced Bear' Axed as Warner Bros. Discovery Leadership Examines Slate*, Deadline (Apr. 26, 2022), https://perma.cc/CWH7-MJ9K.

[3] Rob Wile et al., *Paramount Skydance Begins Layoffs, Plans to Slash About 2,000 Jobs*, NBC NEWS (Oct. 29, 2025), https://perma.cc/E6V8-CS7N (laying off "more than 1,000 employees" "just months after the . . . merger with Skydance," and planning to lay off "[a]bout 1,000 more employees . . . in the near future").

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████ Weingarten Decl. Ex. K

at 4, 8.

**D.      DOJ Clearance and Plaintiff States' Efforts to Agree on a TRO and Trial Date**

On December 8, 2025, Paramount submitted a pre-merger notification filing with the U.S. Department of Justice ("DOJ") in connection with the tender offer it made for Warner Bros. stock. Weingarten Decl. Ex. L. On February 27, 2026, after terminating a prior deal to merge with Netflix, Warner Bros. entered into a definitive merger agreement with Paramount. Compl. ¶ 34. The Hart-Scott-Rodino Antitrust Improvements Act required the parties to observe a statutory waiting period before closing, during which the DOJ could investigate the Transaction's competitive effects and, if warranted, seek to enjoin it. 15 U.S.C. § 18a(a), (b)(1). The DOJ issued a Second Request for Additional Information and Documentary Material and held two investigative hearings. The statutory waiting period expired on February 19, 2026. Weingarten Decl. Ex. M at 2.

On June 12, 2026, the DOJ announced that it would not challenge the Transaction.[4] It imposed no conditions and required no divestitures.

On July 13, Plaintiff States notified Defendants' counsel that they had filed this action challenging the Transaction and requested that Defendants enter into a stipulated TRO to preserve the status quo while this case is pending. Such stipulations are standard practice in merger challenges because they allow for an orderly review of a merger without requiring courts to act on an emergency basis. *See, e.g.*, Pl. Fed. Trade Comm'n's Emergency Mot. for TRO at 2, *Fed. Trade Comm'n v. Intercontinental Exch., Inc.*, No. 3:23-cv-1710 (N.D. Cal. Apr. 21, 2023), Dkt. No. 37 (moving for "entry of the parties' stipulated [TRO]"); Joint Stipulation & Proposed Order re TRO, *Fed. Trade Comm'n v. Meta Platforms Inc.*, No. 5:22-cv-4325 (N.D. Cal. July 28, 2022), Dkt. No. 18; Stipulated TRO, *Fed. Trade Comm'n v. Kroger Co.*, No. 3:24-cv-347, (D. Or. Feb. 26, 2024),

---

[4] Off. of Pub. Affs., U.S. Dep't of J., *Statement of the Department of Justice Antitrust Division on the Closing of Its Investigation of the Merger of Paramount Skydance and Warner Bros* (June 12, 2026), https://perma.cc/5DUP-3DZV.

Dkt. No. 4-1. Defendants declined to stipulate, necessitating this motion.

## III.    LEGAL STANDARD

The purpose of interim injunctive relief is not to conclusively determine the rights of the parties, but instead "to preserve the status quo ante litem pending a determination of the action on the merits." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (citation omitted). In deciding whether to grant injunctive relief, this Court may consider a broad range of evidence because the "urgency of obtaining a preliminary injunction necessitates a prompt determination," *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984), and therefore, "the rules of evidence do not strictly apply to preliminary injunction proceedings," *Gateway City Church v. Newsom*, 516 F. Supp. 3d 1004, 1009 n.3 (N.D. Cal. 2021) (quoting *Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006)). The standard for a temporary restraining order is generally the same as for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Isho v. D. Marin*, --- F. Supp. 3d ----, No. 5:26-cv-764, 2026 WL 855746, at *2 (C.D. Cal. Mar. 4, 2026). Interim injunctive relief is particularly appropriate in merger challenges because "the unwinding of a completed merger would present mammoth obstacles." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988).

To be entitled to a preliminary injunction or a temporary restraining order, a plaintiff must demonstrate that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a government is a party, the third and fourth *Winter* factors merge. *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020); *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024) (describing merger elements when a state is a party). These factors are evaluated on a "sliding scale," meaning that the showing required for each factor is flexible. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). For example, if there are so much as "serious questions" going to the merits of a plaintiff's claims, injunctive relief is appropriate if the plaintiff has also satisfied the remaining factors and demonstrated that the balance of equities tips "sharply" in their favor. *Id.* at 1134–35 (citation omitted).

This Court has the authority to issue a temporary restraining order prohibiting Paramount and Warner Bros. from closing the merger, regardless of the federal government's decision not to challenge it. *See*, *e.g.*, *California v. Am. Stores, Inc.*, 495 U.S. 271, 274–76 (1990) (holding that § 16 of the Clayton Act authorizes private parties, including states, to obtain injunctive relief against anticompetitive mergers, notwithstanding the FTC's prior clearance of the transaction); *BNS*, 858 F.2d at 460–61 (upholding district court's authority to issue a preliminary injunction preserving the status quo pending antitrust review, even over the government's objection).

## IV.    ARGUMENT

### A.    Plaintiff States Are Likely to Succeed on the Merits, and, at a Minimum, Present Serious Questions Going to the Merits

Plaintiff States are likely to prevail on their claim that the merger violates Section 7 of the Clayton Act, which prohibits mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Congress was concerned "with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). To prevail, Plaintiff States need only demonstrate "a *reasonable probability*" that Paramount's acquisition of Warner Bros. would substantially lessen competition in a relevant market. *Boardman*, 822 F.3d at 1023 (emphasis added); *see also Fed. Trade Comm'n v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (per curiam) (a plaintiff need only demonstrate a "reasonable probability of anticompetitive effect"). The Supreme Court has defined anticompetitive effects to include "reduced output, increased prices, or decreased quality." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). A plaintiff "need not prove" that a merger has had such effects; "rather, '[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future.'" *Boardman*, 822 F.3d at 1021 (quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015)).

Paramount and Warner Bros. are both vertically integrated media giants closely competing in multiple, already-concentrated markets. The Transaction will substantially lessen competition in three well-defined markets for the (1) distribution of wide-release theatrical films, (2) distribution of anticipated top-grossing theatrical films, and (3) licensing of basic cable channels to distributors.

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER

8

Case No.: 4:26-cv-7116

Compl. ¶ 36; Lee Decl. ¶¶ 11, 13–15, 38. In fact, in each market, the Transaction will produce "a firm controlling an undue percentage share of the relevant market," *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963), and increase the Herfindahl-Hirschman Index ("HHI") of market concentration well above the levels required to deem the Transaction presumptively unlawful. Fed. Trade Comm'n & U.S. Dep't of Justice, *Merger Guidelines* § 2.1 (2023); *see Phila. Nat'l Bank*, 374 U.S. at 363 (such mergers "must be enjoined" pending full adjudication); *Fed. Trade Comm'n v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) ("Sufficiently large HHI figures establish the [plaintiff's] prima facie case that a merger is anti-competitive."). Although showing a likelihood of success with respect to a single relevant market suffices, this Transaction is presumptively unlawful in not one, but three, different markets.

Once Plaintiff States have made a prima facie showing of illegality, the burden shifts to the Defendants to rebut the presumption. *Saint Alphonsus*, 778 F.3d at 788. Defendants cannot meet this burden. "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) (Thomas, J.). Defendants' █████████████████ consist substantially of content reductions that are not efficiencies but anticompetitive output reductions. *See Penn State Hershey*, 838 F.3d at 349 (efficiencies "must not arise from anticompetitive reductions in output or service.").

In any event, Plaintiff States' complaint alone raises "serious questions" going to the merits, a lesser showing that warrants preliminary relief. *All. for the Wild Rockies*, 632 F.3d at 1134–35. Courts routinely grant injunctions on this basis. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-564-YGR, 2020 WL 5073937, at *3 (N.D. Cal. Aug. 24, 2020) (existence of serious questions suffice when remaining factors weigh in favor of a TRO); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1197 (9th Cir. 2022) (affirming grant of preliminary injunction where plaintiff raised serious questions going to the merits); *In re Nexstar-Tegna Merger Litig.,* No. 2:26-cv-976-TLN-CKD, 2026 WL 1049295 (E.D. Cal. Apr. 17, 2026), at *5.

### 1.   There Are Three Relevant Antitrust Markets

"The first step of antitrust analysis is to define the relevant market." *Fed. Trade Comm'n v. Kroger Co.*, No. 3:24-cv-347, 2024 WL 5053016, at *6 (D. Or. Dec. 10, 2024) (citing *Fed. Trade*

*Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)). "Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act" because the threat of substantially lessened competition "can be determined only in terms of the market affected." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957). A relevant product market under Section 7 is defined by "reasonable interchangeability of use . . . between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325; *see Kroger*, 2024 WL 5053016, at *6 ("[T]he relevant market consists of what customers consider to be reasonable substitutes for a company's products."). The boundaries of a market "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. But the market need not "be measured by metes and bounds," and defendants' own documents are often the strongest evidence of the markets they compete in. *Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 415 (S.D.N.Y. 2024) (citation omitted) (collecting cases). Courts also employ the hypothetical monopolist test to define a relevant market. *Saint Alphonsus*, 778 F.3d at 784. Under this test, if a hypothetical monopolist could profitably impose "a small but significant nontransitory increase in price" within a proposed market without losing sufficient sales to products outside it, then the proposed market constitutes the relevant market. *United States v. Am. Express Co.*, 838 F.3d 179, 199 (2d Cir. 2016), *aff'd sub nom., Ohio,* 585 U.S. at 552.

Here, Plaintiff States have identified three relevant antitrust markets.

### a.        Distribution of Wide-Release Theatrical Films

Paramount and Warner Bros. (along with the three other major Hollywood studios) compete in the distribution of wide-release films to theatres. Wide-release theatrical films are feature-length films intended for broad initial exhibition in movie theatres. Compl. ¶ 37. Wide-release films are how studios launch "large franchises and big pieces of intellectual property" and how movie theatres attract enough customers to "operate successfully." Compl. ¶¶ 29–30. For theatre operators, wide-release theatrical films are not reasonably interchangeable with other kinds of films, not least because more limited-release films cannot earn comparable revenues or attract

comparable audiences. Compl. ¶¶ 43–44. To wit: one of the nation's largest theatre operators told its investors last year that "Our industry relies on a consistent cadence of high-quality, wide-release films with broad consumer appeal." Compl. ¶ 43. Another leading theatre operator told its investors: "Wide-release films are what really drives our theater business." *Id*.

Theatrical distribution of wide-release films is not reasonably interchangeable with other forms of entertainment: theatre operators require first-run theatrical content to attract audiences, generate ticket and concession revenue, and justify billions of dollars in annual investments in premium screens, luxury seating, and enhanced concessions. Compl. ¶¶ 37–45; Lee Decl. ¶¶ 60–61; Ex. 3 ¶¶ 4, 11; Ex. 2 ¶ 3. Likewise, limited-release films, arthouse films, and platform films—which, like the recent box office hit, *Obsession*, expand to a wider number of theatres following early commercial success—are not in this market because they are not made with the same expectation of comparable revenue generation.

For analytical purposes, this market comprises films that are released simultaneously in 600 or more theatres nationwide. Compl. ¶ 45; *see* Lee Decl. ¶¶ 47–48. The 600-theatre release metric is a well-recognized proxy in the entertainment industry for the threshold above which a film is a wide release. Compl. ¶ 45. Such thresholds are a "useful" "analytical tool" to help define a market and are "not intended to be a rigid bright line." *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 27 (D.D.C. 2022). Courts regularly credit such industry-recognized market thresholds. *See id.* at 33 (accepting a $250,000 advance threshold to identify the market of "anticipated top-selling books"); *Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA,* 341 F. Supp. 3d 27, 51–54 (D.D.C. 2018) (accepting a market of "fleets of 10 or more globally trading vessels" even though the "choice of ten globally trading vessels was arbitrary in the sense that the number ten is not compelled by any specific market reality," because such fleets "are a distinct group with distinct needs" (citation modified)); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 195 (D.D.C. 2017) (accepting a market of companies with 5,000 or more employees).

By this measure, wide-release theatrical films accounted for 99 percent of box office revenue over the past four years. Lee Decl. ¶¶ 48, 89 & fig. 12; Compl. ¶ 46. Only the major Hollywood studios can regularly supply wide-release films because they require significant upfront

production budgets, substantial marketing investment, and the theatre relationships necessary to support simultaneous national rollout. Ex. 3 ¶ 11; Ex. 2 ¶ 8; *see* Compl. ¶ 96. After the merger, only three film distributors will control 76 percent of these films, and only four (Defendants, Disney, Universal, and Sony) will control 86 percent of them. Lee Decl. ¶ 84, fig. 10; Compl. ¶ 46. ███

████████████████████████████

████████████████████████████

████████████████████ Ex. 3 ¶ 9. Thus, a theatre facing a price increase from a hypothetical monopolist of wide-release films could not turn to the speculative possibility that a limited-release film may eventually gain popularity as a meaningful competitive substitute.

The United States is the relevant geographic market because film distributors negotiate separate distribution agreements for domestic versus international territories, and consumer demand depends on domestic audience preferences. Compl. ¶ 49.

### b. Distribution of Anticipated Top-Grossing Theatrical Films

In the film industry, certain movies are anticipated to have the highest box office performance and an outsized impact on the financial performance of film distributors and movie theatres. These films—referred to in the entertainment industry as anticipated "blockbusters," "event films," or "tentpoles"—are characterized by larger production budgets, simultaneous release in 3,000 or more movie theatres, high-value franchise intellectual property, well-known actors and directors, placement in premium-format auditoriums such as IMAX and 4DX, and nationwide marketing campaigns designed to attract audiences from all major demographics. Compl. ¶¶ 52–53, 57; Ex. 2 ¶¶ 9–10. Only the "big five" studios have the "financial ability, distribution power, marketing resources, IP rights, and history" to make anticipated top-grossing movies. Ex. 2 ¶ 8. The Ninth Circuit has previously affirmed a jury's finding that there is a market for the exhibition of "anticipated top-grossing films" defined by qualitative, industry-observable characteristics including "national advertising support, . . . famous stars, directors and producers, [and] booking in first class theatres." *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994–95 (9th Cir. 1986); *see also Bertelsmann*, 646 F. Supp. 3d at 33 (analogizing anticipated blockbuster films in *Syufy* to anticipated top-selling books identified by "more substantial marketing, publicity, and

sales support; authors who are prominent or have a track record of success; and higher advances").

The *Brown Shoe* indicia all support recognizing the distribution of anticipated top-grossing films as a relevant antitrust market. "Tentpoles" are recognized as a distinct film category by film distributors, theatres, trade publications, and financial analysts. Compl. ¶ 52; Lee Decl. ¶ 72 Ex. 3 ¶ 10. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ Lee Decl. ¶ 72. Courts give particular weight to such ordinary-course documents when defining the relevant market because "economic actors usually have accurate perceptions of economic realities." *Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) (citation omitted) (Sotomayor, J.).

By virtue of their unique characteristics, anticipated top-grossing films are the backbone of the movie theatre business. For analytical purposes, this market comprises films released in 3,000 or more theatres within the first four weekends following the film's release. Compl. ¶ 57; Lee Decl. ¶¶ 49–50, 74–76; Ex. 2 ¶ 7. Although films released in 3,000 or more theatres represent just 15 percent of all releases, they accounted for 88 percent of all box office revenue between 2022 and 2025. Compl. ¶ 58; Lee Decl. ¶ 49. The industry's greater confidence that these films will generate substantial box office revenues means that anticipated top-grossing theatrical films command different price and distribution terms than other theatrical films. Film distributors typically receive significantly higher splits of box office revenue for anticipated top-grossing theatrical films than for other releases. ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ Weingarten Decl. Ex. N at 4. Anticipated top-grossing theatrical films are essential to the financial viability of theatres, too, ███████████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 3 ¶ 10. Though other kinds of films (including limited- and platform-releases) may succeed at the box office, they are significantly less predictable and therefore pose greater risk for theatres. Compl. ¶ 58; Lee Decl. ¶¶ 61, 72; Ex. 2 ¶ 10.

A hypothetical monopolist controlling all distribution of anticipated top-grossing theatrical films in the United States would likely be able to impose an increase in price. Theatres could not defeat that increase because there is no substitute for anticipated top-grossing films commanding comparable revenue-generation potential, premium-format placement, and audience traffic. Lee Decl. ¶ 81.

### c.    Licensing of Basic Cable Channels to Distributors

The licensing of basic cable channels to distributors also constitutes a relevant market. Basic cable channels—including CNN, Nickelodeon, MTV, Discovery Channel, and Comedy Central—are scheduled, real-time programming sold to distributors, including cable companies (Comcast, Charter, Cox), satellite television providers (DirecTV, Dish), and internet-based services that stream live television programming (YouTube TV, Hulu Live TV, Sling TV). Compl. ¶¶ 62–63. These distributors aggregate basic cable channels into packages they sell to consumers, and they pay programmers, such as Paramount and Warner Bros., monthly per-subscriber affiliate fees to carry their basic cable channels. Compl. ¶ 63; Lee Decl. ¶ 122; *see also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 168 (D.D.C. 2018) (explaining that programmers receive "payments from distributors, known as 'affiliate fees,' in exchange for granting distributors the rights to display the programmers' content").

Basic cable channels are recognized by the industry as a distinct product. *See, e.g.*, Weingarten Decl. Ex. O at 109 (███████████████████████████████████████ ████████). Distributors depend on basic cable channel licenses to offer the breadth of scheduled, linear programming necessary to attract and retain subscribers. Consumers subscribe to cable and satellite services in significant part to access basic cable channels offering news (CNN, MSNBC, Fox News), sports (ESPN, TNT, FS1), children's programming (Nickelodeon, Cartoon Network, Disney Channel), lifestyle content (HGTV, Food Network, TLC), and general entertainment (TBS, MTV, Comedy Central). Often these channels have dedicated audiences that have been developed over decades and cannot be easily displaced by new channels. *See, e.g.*, Weingarten Decl. Ex. P at 3 (███████████████████████████████████████).

Basic cable channels are also distinct in that they are sold exclusively through distributors

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

14

Case No.: 4:26-cv-7116

rather than direct-to-consumer, meaning that they command distinct prices in the form of per-subscriber affiliate fees negotiated between programmers and distributors. In 2025, distributors paid programmers approximately $37 billion in affiliate fees. Lee Decl. ¶ 137. Although small programmers can license a handful of channels for low affiliate fees, only major media companies like Defendants can supply multi-genre cable portfolios. Weingarten Decl. Ex. Q at 12 (████████ ████████████████████████████████████████████████████); Ex. O at 158 (███████████████████████████████████████████ ████████████████████████████████████████████████████).

Basic cable channels are not reasonably interchangeable with other forms of video programming. Compl. ¶ 65; Lee Decl. ¶¶ 135–141. Premium cable channels (HBO, Showtime, and Starz) are offerings that supplement, but do not replace, basic cable channels; distributors market them as optional add-ons or as part of "premium" packages that already include basic cable channels. ████████████████████████████████████████████ ██████████████████████████ Compl. ¶ 64. Broadcast channels (CBS, NBC, ABC, and Fox) are also a supplement to distribution of basic cable channels. Few distributors offer a broadcast-channel-only package because consumers who want broadcast channels generally also want cable and/or premium cable channels. Finally, streaming services (Netflix, Disney+, Prime Video, and Apple TV) are direct-to-consumer subscription services that do not sell linear network feeds to distributors for redistribution. While some distributors bundle streaming services with their video programming packages as promotional benefits, ████████████████████████████ ████████████████████████████ See, e.g., Weingarten Decl. Ex. R at 38. For all these reasons, a hypothetical monopolist over all basic cable channel licensing would likely be able to increase its prices. Lee Decl. ¶ 141.

The United States is the relevant geographic market because distributors' carriage agreements with programmers are limited to distribution only in the United States. Compl. ¶ 67.

### 2.    The Transaction Is Presumptively Unlawful

Once the relevant market is defined, courts consider whether the proposed merger or acquisition "will probably lead to anticompetitive effects in that market." *Saint Alphonsus*, 778

F.3d at 785*. Proof that a merger is reasonably likely to have an anticompetitive effect in *any* market suffices to prove a violation of Section 7. *Kroger Co.*, 2024 WL 5053016, at *17 (citing *RSR Corp v. Fed Trade Comm'n*, 602 F.2d 1317, 1321 (9th Cir. 1979)). Courts rely on two metrics to assess whether a transaction is presumptively illegal: market share and the Herfindahl-Hirschman Index ("HHI"). Both metrics show that Paramount's acquisition of Warner Bros. is presumptively unlawful in all three relevant markets.

First, courts assess the combined firm's market share. Plaintiff States' "prima facie case can be established simply by showing a high market share would result from the proposed merger." *Boardman*, 822 F.3d at 1021 (citation modified). A merger producing a firm with an "undue percentage share of the relevant market" that "results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it *must* be enjoined." *Phila. Nat'l Bank*, 374 U.S. at 363 (emphasis added). Although the Supreme Court in *Philadelphia National Bank* declined to "specify the smallest market share which would still be considered to threaten undue concentration," it was satisfied that 30 percent sufficed. 374 U.S. at 364. Courts have since applied the *Philadelphia National Bank* presumption to mergers resulting in market shares below 30 percent. In *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011), a district court enjoined a merger that would have given the combined firm 28.4 percent market share, *id.* at 71–72, and in *Hospital Corp. of America v. Fed. Trade Comm'n*, 807 F.2d 1381 (7th Cir. 1986), the Seventh Circuit affirmed the FTC's finding that a merger was unlawful where defendant's market share was raised from 14 percent to 26 percent and the market share of the four largest firms from 79 percent to 91 percent, *id.* at 1384.

The market shares here trigger the presumption of illegality. The merger would give the combined entity approximately 27 percent of the wide-release theatrical film distribution market—as measured by the 600+ theatre release threshold—and approximately 30 percent of the anticipated top-grossing theatrical film distribution market—as measured by the 3,000+ theatre release threshold. Lee Decl. ¶¶ 83, 88, 89, fig. 11. Just two companies—the combined entity and Disney—would control approximately 59 percent of the market for anticipated top-grossing theatrical films. Lee Decl. ¶ 89, fig. 11; Compl. ¶ 9. The combined entity also would control approximately 27

percent of the basic cable channel market as measured by 2025 affiliate fees, or 34 percent of the market as measured by viewership. Lee Decl. ¶¶ 143–145, fig 18. The combined entity and Disney would control approximately 59 percent of the market for basic cable channels. *Id.* at fig. 18.

Second, courts examine each market's HHI, a standard metric of market concentration that is the sum of each firm's squared market share percentage. A market's HHI can range from near 0 in a perfectly competitive market to 10,000 in a market with a single monopoly firm. *Merger Guidelines*, *supra*, § 2.1. Courts routinely rely on the DOJ and FTC Merger Guidelines as persuasive authority in assessing mergers.[5] Under the Merger Guidelines, mergers that increase the HHI by more than 100 points and result in a post-merger HHI exceeding 1,800 are presumed anticompetitive. *Merger Guidelines*, *supra*, § 2.1.

In all three relevant markets, the Transaction easily exceeds the HHI thresholds triggering the presumption of illegality. In the wide-release theatrical distribution market, the merger would increase the HHI by approximately 359 points, resulting in a post-merger HHI of 2,074. Compl. ¶ 71; Lee Decl. ¶ 84. In the anticipated top-grossing theatrical film distribution market, the merger would increase the HHI by 445 points, to a post-merger HHI of 2,427. Compl. ¶ 72; Lee Decl. ¶ 88. Finally, in the market for the licensing of basic cable channels, as measured by affiliate fees, the merger would increase the HHI by 321 points, resulting in a post-merger HHI of 2,007. Compl. ¶ 73; Lee Decl. ¶ 143.

### 3. The Transaction Will Enable Paramount to Raise Prices and Reduce Output

If, as here, the presumption of illegality is established, a plaintiff need not make a separate showing of anticompetitive effects. *See Phila. Nat'l Bank*, 374 U.S. at 363 (the presumption of illegality "dispens[es]" with "elaborate proof of market structure, market behavior, or probable

---

[5] *See Tapestry*, 755 F. Supp. 3d at 412 n.3 (considering "statements in the 2023 Merger Guidelines to the extent that the Court finds them persuasive"); *Kroger*, 2024 WL 5053016, at *16 (noting that "[i]n the short time in which the 2023 Merger Guidelines have been in effect, multiple courts have cited them as persuasive authority" and finding "no reason to reject the 2023 Merger Guidelines in favor of a previous edition"); *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 368 n.19 (S.D.N.Y. 2024) (describing the Merger Guidelines as "a helpful tool, in view of the many years of thoughtful analysis they represent, for analyzing proposed mergers" (quoting *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017))).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

17

Case No.: 4:26-cv-7116

anticompetitive effects"); *Penn State Hershey*, 838 F.3d at 347 (a plaintiff "can establish a prima facie case simply by showing a high market concentration based on HHI numbers."). Nevertheless, evidence here confirms that Paramount's merger with Warner Bros. is likely to substantially reduce competition. To assess whether a merger is likely to have anticompetitive effects, courts consider whether there is a reasonable probability that "the acquiring firm will have the incentive to raise prices or reduce quality." *H & R Block*, 833 F. Supp. 2d at 81; *see also Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1299 (W.D. Wash. 2019) ("Explicit or implicit evidence that the merging parties intend to raise prices, reduce output or capacity, reduce product quality or variety can be highly informative in evaluating the likely effects of a merger." (citation modified)). The evidence here shows that the merger will enable Paramount to do both.

First, the merger will give the combined entity greater leverage over theatres, enabling it to raise its rates for the licensing rights to show theatrical films. Theatres negotiate with film distributors over how to divide box office revenues, screen allocation, release dates, and booking terms, such as whether a film must be placed in premium-format auditoriums like IMAX, 4DX or ScreenX. Compl. ¶ 75; Lee Decl. ¶¶ –55–57. Licensing rights are theatres' single largest operating expense. Ex. 2 ¶ 4. When film distributors plan to release films around the same time, 

Ex. 3 ¶ 12. Conversely, 

Ex. 2 ¶¶ 12–13. 

Lee Decl. ¶¶ 64–65. When the competition between Paramount and Warner Bros. is eliminated, theatres will lose an alternative supplier of a product for which there is no substitute—namely, anticipated top-grossing theatrical films. *Id.* ¶ 95.

Second, the merger will likely reduce theatrical output. Compl. ¶ 79; Lee Decl. ¶ 104. 

Compl. ¶ 84; Lee Decl. ¶ 55–57.

Lee Decl. ¶¶ 55–57.

Weingarten Decl. Ex. S at 13. When there is more competition, film distributors have an incentive to aggressively fill premium release weekends. Lee Decl. ¶¶ 100–101, 104. It is worth assuming the risk of releasing into a crowded weekend because the alternative is losing revenue to a rival. But when major players merge, the dynamic falls apart. The combined entity is incentivized to ration and space releases of anticipated top-grossing films to avoid self-cannibalization.

Weingarten Decl. Ex. T at 15; *see also* Lee Decl. ¶ 104.

This is not a theoretical risk. When Disney acquired 20th Century Fox in 2019, Disney slashed the combined Disney-Fox's distribution of first-run wide-release films theatrical slate by more than half (approximately 52 percent), far exceeding the approximately 13 percent average decline experienced by other major film distributors over the same period. Compl. ¶¶ 81–82; Lee Decl. ¶¶ 106, 109 & fig. 15.

Ex. 3 ¶15. And "there is no reason to believe the impact of a Paramount/Warner Bros. merger would be any different." Ex. 1 ¶ 12.

Weingarten Decl. Ex. U at 2.

Although Defendants have stated that they plan to release at least thirty films annually, this self-serving assertion does not rebut the prima facie case. The commitment is unenforceable and implausible given the $78 billion in debt the combined entity will carry at closing

Compl. ¶¶ 80, 107. If recent mergers are any indication, is an underestimate. Content cuts require no integration period—they take effect the moment a greenlight decision is not made or rescinded.

█████ Weingarten Decl. Ex. K at 4.

The consequences for theatres are potentially existential. Surviving theatres will depend on a thinning supply of anticipated top-grossing films for their profitability, putting them under significant pressure to show the combined entity's films and on the combined entity's terms. But because theatres will be unable to absorb rate increases without passing costs onto consumers, ticket prices will increase. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 2 ¶ 15; *see* Ex. 3 ¶ 17; *see also* Ex. 1 ¶ 13 ("If this merger is approved, a significant number of theatres will likely have to close their doors."). █████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. 2 ¶ 15. In addition to rising costs passed on to consumers, the "combination of two of the remaining 'Big Five' legacy studios, will likely lead to fewer movies being made" and "fewer choices for American consumers." Ex. 1 ¶ 13.

Paramount may respond that the merger improves competition because the combined entity will be able to compete more effectively against Netflix, Prime Video, and Disney+ in streaming movies. But "anticompetitive effects in one market [cannot] be justified by procompetitive consequences in another." *Phila. Nat'l Bank*, 374 U.S. at 370. "[A] merger that substantially decreases competition in one place—injuring consumers there—is not saved because it benefits a separate group of consumers by creating competition elsewhere." *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012). Streaming is not in the relevant market. Streaming platforms do not depend on theatrical releases for revenue, and theatres do not depend on streaming platforms for content. *See, e.g.,* Weingarten Decl. Ex. V (████████████████████████████████ ███████████████████████████████████████████). For example,

Netflix disclaims wide theatrical releases for its films.[6] Meanwhile, ████████████████ ████████████████████████████████████████████████████████████ Ex. 2 ¶ 3. In the twelve months before August 2025, more than 200 million Americans went to see at least one movie in theatres, and North American movie theatre ticket sales reached almost $9 billion. Ex. 1 ¶ 5. As Cinemark has reported to its investors, "[t]heatrical movie-going remains one of the most convenient and affordable forms of out-of-home entertainment" and "has proven resilient during inflationary and recessionary periods and across various technological innovation." Weingarten Decl. Ex. W at 4; Compl. ¶¶ 38–39.

The Transaction is also substantially likely to harm cable, satellite, and equivalent internet-based programming distributors, and the approximately 67 million American households who subscribe to their services. Lee Decl. ¶ 120. Today, distributors negotiate separately with Paramount and Warner Bros. over per-subscriber affiliate fees for the right to carry their basic cable channels. Compl. ¶¶ 5, 87; Lee Decl. ¶¶ 119, 122, 124, 149. In those negotiations, each company's leverage derives from the threat of pulling channels from a distributor's offerings. Lee Decl. ¶¶ 129, 148. A combined entity would have the power to threaten a distributor with the loss of over fifty channels covering all genres, removing a critical competitive constraint. Compl. ¶¶ 6, 89–90; Lee Decl. ¶ 148–149, fig. 17.

The combined entity's bargaining power will far exceed the sum of its parts. Any distributor that resists the combined entity's affiliate fee demands would risk losing CNN for news viewers, Nickelodeon and Cartoon Network for family households, HGTV and Food Network for lifestyle audiences, and TNT and TBS for sports and entertainment viewers—simultaneously, in a single negotiation. Compl. ¶ 90; Lee Decl. ¶¶ 134, 149–149. No other programmer can supply a portfolio of comparable breadth. Compl. ¶ 89; Lee Decl. ¶ 127–128, fig. 17. ██████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ Weingarten Decl. Ex. X at 2.

The combined entity will simultaneously invest less in the content it charges more to

[6] Mckinley Franklin, *Netflix Film Head Says Streamer Has "Accepted" They Won't Work With "Filmmakers Who Still Want Theatrical" Releases*, Hollywood Reporter (June 5, 2026), https://perma.cc/CH9L-2N8X.

distribute. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ Compl. ¶ 93. ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ Compl. ¶ 93. The harm is substantial. Distributors paid basic cable channel providers approximately $37 billion in affiliate fees in 2025 alone. Lee Decl. ¶ 137. Higher costs for distributors will be passed through to consumers in the form of higher subscription prices. Compl. ¶ 94; Lee Decl. ¶ 156. The average monthly bill for cable or satellite television already exceeds $100, and even a modest increase of $2–5 per month resulting from higher affiliate fees would cost consumers tens of millions of dollars annually. In California alone, which has an estimated 8.2 million subscribers to cable, satellite, and equivalent internet-based services, a $3 per month increase would cost consumers approximately $295 million each year.

**B.      There Is a Substantial Risk of Imminent, Irreparable Harm**

Plaintiff States, consumers, and competition itself are likely to suffer immediate, irreparable injuries in the absence of an injunction. It is well-established in the Ninth Circuit that the "lessening of competition" itself "constitutes an irreparable injury" warranting preliminary injunctive relief. *Boardman*, 822 F.3d at 1022–23. Because Plaintiff States have established the likelihood that the merger will substantially lessen competition in at least one relevant antitrust market, they have shown irreparable harm. *See id.* at 1023 ("A lessening of competition constitutes an irreparable injury."); *Tapestry*, 755 F. Supp. 3d at 496 (denying injunctive relief would "likely cause irreparable harm to the public" because anticompetitive harm "could not be recovered" (citation modified)); *Penn State Hershey,* 838 F.3d at 352–53 ("[S]ince it is extraordinarily difficult to 'unscramble the egg,' 'it will be too late to preserve competition if no preliminary injunction has issued.'" (citation modified)). The Transaction eliminates competition between Paramount and Warner Bros. in the markets for the distribution of wide-release theatrical films, the distribution of anticipated top-grossing films, and the licensing of basic cable channels.

Without a TRO and preliminary injunction, Defendants would immediately begin

"consolidating operations, taking ownership of business-sensitive information, [and] terminating employees," and "[i]t would be very difficult—if not impossible—to unwind these actions." *United States v. Trib. Publ'g Co.*, No. 16-cv-1822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016); *see also Tapestry*, 755 F. Supp. 3d at 496–97 (same). The "inability to unscramble merged assets frequently prevents entry of an effective order of divestiture." *Fed. Trade Comm'n v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966); *accord Kroger*, 2024 WL 5053016, at *39. Once the Transaction closes, Defendants will begin combining back-office functions, rationalizing overlapping departments, and making irreversible decisions about which films and television projects to greenlight or to cancel. Should confidential competitive information, such as marketing strategies, pricing data, and content acquisition plans, pass between the merging parties, "ultimate divestiture will not fully restore competition because the acquiring company will retain" that information. *Fed. Trade Comm'n v. Weyerhaeuser Co.*, 665 F.2d 1072, 1086 (D.C. Cir. 1981) (Ginsburg, J.); *see Tapestry*, 755 F. Supp. 3d at 497.

Finally, the Transaction spells consolidation of major film distributors and corporate offices that will impact jobs. Earlier entertainment industry mergers that were smaller in scale led to thousands of layoffs, often in a matter of mere months. ███████████████████████████████, Weingarten Decl. Ex. J at 33–39, which if implemented will be difficult to reverse. *See Apr. in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Cal. 2021) (irreparable harm found where economic harm alleged was "diffuse, industry-wide and difficult to quantify as damages").

**C.    The Public Interest and Balance of Equities Sharply Favor Enjoining the Transaction Until the Court Decides the Merits**

Plaintiff States bring this action as sovereign enforcers of the federal antitrust laws to protect their residents. When a government is a party, the last two *Winter* factors merge. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). And by "establishing a likelihood" of success on the merits, Plaintiffs automatically "establish[ ] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). "[O]f all the forms of equitable relief, a simple injunction prior to consummation

of the merger transaction is the least disruptive to all concerned." *Tapestry*, 755 F. Supp. 3d at 496 (citation modified).

As the Ninth Circuit has repeatedly recognized, the preservation of competition is "*vital to the public interest.*" *Boardman*, 822 F.3d at 1024 (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000)). That interest is served here by maintaining the status quo while this Court adjudicates whether the combination of Paramount and Warner Bros. violates the law. The public equities include not only the interest in "effective enforcement the antitrust laws," but also "the public interest in ensuring" "effective relief" remains available if Plaintiff States "succeed[ ] at the merits trial." *Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 86–87 (D.D.C. 2015). If the Transaction closes before this Court can rule, effective relief may become unavailable. *BNS*, 858 F.2d at 461–62. As such, courts frequently exercise their equitable authority to prevent interim harms in suits challenging an anticompetitive merger. *See, e.g.*, *In re Nexstar-Tegna Merger Litig.,* 2026 WL 1049295, at *27–29 (issuing a TRO requiring Defendants to hold-separate order in media-merger case). The equitable nature of this proceeding also bears on the security requirement of Rule 65(c). Where a state "brings suit to enforce important federal and public interests," courts routinely waive the bond requirement. *Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1160 (E.D. Cal. 2011); *see also Colorado v. DeJoy*, 487 F. Supp. 3d 1061, 1066 (D. Colo. 2020) ("Although phrased as mandatory, in practice the Court has discretion under this Rule whether to require a bond, particularly in public interest cases involving the fundamental rights of citizens.").[7]

The balance of equities also favors Plaintiff States. When a plaintiff "demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction." *Warner Commc'ns*, 742 F.2d at 1165 (citing *Weyerhaeuser*, 665 F.2d at 1083). "Although private equities may be considered, public equities receive far greater weight." *Id.* Paramount and Warner Bros. will continue to operate as separate, viable companies competing in the marketplace while they wait for the Court to adjudicate this case. In opposition to a temporary

---

[7] In the alternative, Plaintiff States request a nominal bond of $10,000, such as the Court imposed in *In re Nexstar-Tegna Merger Litig.*, 2026 WL 1049295, at *28.

restraining order in a separate, private class action challenging this merger, Paramount cites a $7 million daily ticking fee that it must pay Warner Bros. if the transaction does not close by September 30, 2026. Opp. to Pls.' Mot. for Prelim. Inj. at 23–24, *Faust v. Paramount*, No. 4:26-cv-03790 (N.D. Cal. Jun. 3, 2026), Dkt. No. 33. But Paramount and Warner Bros. also agreed that the merger did not need to close until June 2027 if antitrust review was still ongoing, accepting the accumulated cost of the ticking fee as a foreseeable consequence of antitrust review. "[S]elf-inflicted wounds are not irreparable injury." *Epic Games*, 2020 WL 5073937, at *3 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020)). The very purpose of weighing the balance of equities would be defeated if private companies could manufacture their own harms. Paramount's broader claim that "any delay in closing would also result in continued carrying costs on committed financing" is similarly unmoving. *Id.* at 6. "Any harms defendants experience as a result of the injunction do not overcome the strong public interest in the enforcement of antitrust law, especially given the difficulty in disentangling a premature merger." *Kroger Co.*, 2024 WL 5053016, at *39.

Because Plaintiff States face the irreversible loss of competition while Defendants face, at most, a self-imposed transfer of wealth between them, under the Ninth Circuit's "sliding scale" approach, the balance of equities tips "sharply" in Plaintiff States' favor. *All. for the Wild Rockies*, 632 F.3d at 1134–35 (citation modified).

## V.    CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court enter a TRO and preliminary injunction enjoining Defendants from consummating the Transaction.

Dated:  July 13, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Daniel Ambar*

PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
DANIEL D. AMBAR (SBN 278853)
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6153
  Fax: (916) 731-3637
  Email: Daniel.Ambar@doj.ca.gov


RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice* pending)
ADAM DI VINCENZO (*pro hac vice* pending)
GRANT BERMANN (*pro hac vice* pending)
ANASTASIA PASTAN (*pro hac vice* pending)
JULIA MAY (*pro hac vice* pending)
NATALIE NOGUEIRA (*pro hac vice* pending)
MILBANK LLP
  1101 New York Ave. NW
  Washington, DC 20005
  Telephone: (202) 835-7525
  Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice* pending)
MILBANK LLP
  55 Hudson Yards
  New York, NY 10001
  Telephone: (212) 530-5871
  Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice* forthcoming)
Unit Chief Counsel
SARAH PELTON (*pro hac vice* forthcoming)
ALLISON WEBER (*pro hac vice* forthcoming)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: consumer@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice* forthcoming)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice* forthcoming)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice* forthcoming)
FRANKLIN KANIN (*pro hac vice* forthcoming)
Assistant Attorneys General
  Office of the Connecticut Attorney General
  165 Capitol Avenue
  Hartford, CT 06106
  Telephone: (860) 808-5030
  Email: Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*


FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Anthony W. Mariano*

ANTHONY W. MARIANO (*pro hac vice* pending)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice* pending)
Assistant Attorney General, Antitrust Division
  Office of the Massachusetts Attorney General
  One Ashburton Place, 18th Floor
  Boston, MA 02108
  Telephone: (781) 835-7990
  Email: Anthony.Mariano@mass.gov
       William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jon M. Woodruff*

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice*
forthcoming)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*
forthcoming)
Assistant Attorney General
  445 Minnesota Street, Suite 600
  Saint Paul, MN 55101-2130
  Telephone: (651) 300-7425
  Fax: (651) 296-9663
  Email: Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

ERNEST D. FIGUEROA
Consumer Advocate

*/s/ Samantha B. Feeley*

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice* pending)
Senior Deputy Attorney General
  Office of the Nevada Attorney General
  100 N. Carson St.
  Carson City, Nevada 89701
  Tel: (775) 684-1100
  Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

*/s/ Ana Atta-Alla*

ANA ATTA-ALLA (*pro hac vice* forthcoming)
Deputy Attorney General
  State of New Jersey
  Office of the Attorney General
  Division of Law
  124 Halsey Street – 5th Floor
  Newark, NJ 07102
  Telephone: (973) 648-6835
  Email: Ana.Atta-Alla@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*


FOR PLAINTIFF STATE OF NEW
MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Amanda Butler*

AMANDA BUTLER (*pro hac vice* forthcoming)
Senior Counsel
KALISTA M. WILSON (*pro hac vice*
forthcoming)
Assistant Attorney General
  408 Galisteo St.
  Santa Fe, NM 87501
  Telephone: (505) 490-4060
  Fax: (505) 318-1050
  Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

*/s/ Elinor R. Hoffman*

ELINOR R. HOFFMAN (*pro hac vice* forthcoming)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice* forthcoming)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice* pending)
MORGAN FEDER (*pro hac vice* forthcoming)
C. WILLIAM MARGRABE (*pro hac vice* forthcoming)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice* forthcoming)
Attorney General Fellow
  New York State Office of the Attorney
  General
  28 Liberty Street
  New York, NY 10005
  Telephone: (212) 416-8269
  Email: Elinor.Hoffman@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

*/s/ Ian Van Loh*

TIMOTHY D. SMITH (*pro hac vice* pending)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice* pending)
Senior Assistant Attorneys General
Economic Justice Section
  Oregon Department of Justice
  100 SW Market St.
  Portland, OR 97201
  Telephone: (503) 798-3297
  Telephone: (971) 239-7457
  Telephone: (503) 428-9482
  Email: tim.smith@doj.oregon.gov
  Email: ian.vanloh@doj.oregon.gov
  Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF
WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Christina M. Black*

JONATHAN A. MARK (*pro hac vice*
forthcoming)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*
forthcoming)
Assistant Attorneys General
  800 Fifth Avenue, Suite 200
  Seattle, WA 98104-3188
  Telephone: (206) 464-7744
  Fax: (206) 464-6451
  Email: Jonathan.Mark@atg.wa.gov
          Christina.Black@atg.wa.gov
          Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*