Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

*Attorneys for Defendant Paramount Skydance
Corporation*

Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY  10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

*Attorneys for Defendant Warner Bros. Discovery,
Inc.*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| THE STATE OF CALIFORNIA, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF OREGON, AND THE STATE OF WASHINGTON<br><br>Plaintiffs,<br><br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and WARNER BROS. DISCOVERY, INC.,<br><br>Defendants. | Case No. 4:26-cv-7116-AMO<br><br>**DEFENDANTS PARAMOUNT SKYDANCE CORPORATION AND WARNER BROS. DISCOVERY INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Hearing Date:   July 17, 2026<br>Time:   10:00 AM<br>Judge:   Hon. Araceli Martínez-Olguín<br>Courtroom:   5 |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

    A.    THE PROPOSED MERGER.................................................................................2

    B.    THE ENTERTAINMENT INDUSTRY ..............................................................3

        1.    Theatrical Film Distribution ........................................................3

        2.    Subscription Streaming.................................................................6

        3.    Linear Television ..........................................................................7

    C.    POST-MERGER PARAMOUNT PLANS TO INCREASE ITS INVESTMENT IN THEATRICAL RELEASES .......................................8

LEGAL STANDARDS .........................................................................................................9

    A.    TEMPORARY RESTRAINING ORDER STANDARDS....................................9

    B.    CLAYTON ACT SECTION 7 STANDARDS ......................................................9

ARGUMENT .......................................................................................................................10

    I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.........................10

    A.    PLAINTIFFS ARE NOT ENTITLED TO A STRUCTURAL PRESUMPTION OF HARM TO COMPETITION IN ANY OF THEIR ALLEGED MARKETS ............................................................................10

    B.    PLAINTIFFS DO NOT SHOW THAT THE MERGER LIKELY POSES A SUBSTANTIAL RISK TO COMPETITION IN PLAINTIFFS' PROPOSED THEATRICAL MARKETS ..................................................12

        1.    Low Barriers to Expansion by Other Film Production and Distribution Companies Preclude Any Anticompetitive Effects from the Merger in the Alleged Theatrical Markets................................................................12

        2.    Paramount's Economic Incentives from the Merger Will Drive It to Continue Increasing Its Output of High-Quality Films for Distribution to Theaters...............................15

        3.    The Merger Will Not Adversely Affect Exhibitors' Bargaining Power with Studios, Which Is Driven by Individual Film Performance, Not Slate Size..........................................................17

    C.    PLAINTIFFS CANNOT SHOW ANY LIKELIHOOD THAT THE MERGER POSES A PROBABLE RISK OF SUBSTANTIALLY LESSENING COMPETITION IN PLAINTIFFS' PROPOSED MARKET FOR THE LICENSING OF BASIC CABLE CHANNELS TO DISTRIBUTORS ..............18

i

1.     Packages of Paramount and WBD Basic Cable Channels Are Not Competitive Substitutes for Each Other, and Their Combination Under Common Ownership Is Not Anticompetitive ...........................................19

2.     Plaintiffs' Blackout Theory Ignores the Fact That a Blackout Is Far More Costly to the Basic Cable Channel Owner Than to the MVPD .......21

II.     PLAINTIFFS HAVE NOT CLEARLY SHOWN IMMEDIATE AND IRREPARABLE HARM WARRANTING A TRO ..........................................................24

CONCLUSION...................................................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) ...................................................................................................16

*Cal. v. Azar*,
911 F.3d 558 (9th Cir. 2018) .....................................................................................................9

*Demartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) ...................................................................................12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..................................................................................................................16

*FTC v. Cmty. Health Sys., Inc.*,
736 F. Supp. 3d 335 (W.D.N.C. 2024) ....................................................................................11

*FTC v. Kroger Co.*,
2024 WL 5053016 (D. Or. Dec. 10, 2024) ..............................................................................11

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023) .............................................................................15, 23

*FTC v. Owens-Illinois*,
681 F. Supp. 27 (D.D.C. 1988)................................................................................................12

*FTC v. Tapestry, Inc.*,
755 F. Supp. 3d 386 (S.D.N.Y. 2024).....................................................................................11

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ...................................................................................................24

*In re HIV Antitrust Litig.*,
656 F.Supp.3d 963 (N.D. Cal. 2023) .......................................................................................15

*Hospital Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) .................................................................................................12

*Malaney v. UAL Corp.*,
2010 WL 3790296 (N.D. Cal. Sep. 27, 2010) .........................................................................12

*Malaney v. UAL Corp.*,
434 F. App'x 620 (9th Cir. 2011) ..............................................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................................15, 16

iii

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)....................................................................................................................9

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020).................................................................................14, 15

*In re Nexstar-TEGNA Merger Litig.*,
2026 WL 1049295 (E.D. Cal. Apr. 17, 2026)......................................................................11, 19

*Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*,
762 F.2d 1374 (9th Cir. 1985) ...................................................................................................24

*Olin Corp. v. FTC*,
986 F.2d 1295 (9th Cir. 1993) ............................................................................................10, 11

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ..............................................................................................13, 14

*Reyna v. Walt Disney Co.*,
2026 WL 1785119 (N.D. Cal. June 22, 2026)............................................................................9

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) ...............................................................................................9, 10

*Spirit Tea LLC v. Utopia Oriental, Inc.*,
2019 WL 8195426 (C.D. Cal. Sep. 5, 2019)..........................................................................9, 25

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) .................................................................................................9, 10

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,
2007 WL 2318903 (N.D. Cal. Aug. 13, 2007) ..........................................................................21

*Townshend v. Rockwell Int'l Corp.*,
2000 WL 433505 (N.D. Cal. Mar. 28, 2000).............................................................................21

*United States v. Archer-Daniels-Midland Co.*,
781 F. Supp. 1400 (S.D. Iowa 1991) .........................................................................................18

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019)...................................................................................................9

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990)............................................................................................ *passim*

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974)............................................................................................................ *passim*

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................................................9, 18

iv

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) .................................................................................................................12

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984) ....................................................................................................14

*Vantage Mobility Int'l LLC v. Kersey Mobility LLC*,
    836 F. App'x 496 (9th Cir. 2020) .............................................................................................9

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ......................................................................................................................9

*Woodward v. Haviland*,
    2013 WL 5305793 (E.D. Cal. Sep. 19, 2013) .........................................................................25

**Statutes**

15 U.S.C. § 18 ...............................................................................................................1, 9, 10

**Other Authorities**

U.S. Dep't of Just. & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of
    Intellectual Prop. § 2 (2017) ....................................................................................................20

U.S. Dep't of Just. & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of
    Intellectual Prop. § 5.5 (2010) ...........................................................................................20, 21

U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.3 (2010) .........................11

# **INTRODUCTION**

Plaintiff States' Motion for a Temporary Restraining Order presents one of the weakest merger challenges in modern antitrust history. Plaintiffs seek to take the extraordinary step of preventing Paramount Skydance Corporation and Warner Bros. Discovery, Inc. from closing their $110 billion, industry-transforming merger, yet they cannot come close to establishing a likelihood of success on the merits of their Section 7 Clayton Act claim. The reason is simple: the merger is procompetitive, not anticompetitive. It will produce *more* high-quality content for consumers; it will *incentivize* investment in job-creating film production; it will *stabilize* basic cable television (which is gravely threatened by cord cutting); and it will *increase* the output of theatrical releases in a challenged entertainment landscape. The merger will also create a more formidable competitor to the largest streaming services—run by well-established companies like Netflix, Amazon, and Disney. Tellingly, Plaintiffs and their economist, Dr. Robin Lee, do not dispute that the merger will vastly improve streaming competition.

Plaintiffs identify three purported relevant markets in which they claim the merger will substantially lessen competition. Defendants dispute those gerrymandered market definitions, but for purposes of opposing the TRO, assume them *arguendo*. There is no reason to litigate market definitions on this motion because, even under Plaintiffs' proposed markets, the economic evidence and market realities foreclose any showing that the merger is likely to substantially lessen competition.

Plaintiffs' contrary arguments misapprehend the law, the facts, and the economic reality of how films are distributed for theatrical release and how basic cable channels are licensed for broadcast. First, Plaintiffs have not shown the increased market concentration needed to trigger a rebuttable presumption that the challenged merger is likely to substantially lessen competition. Plaintiffs principally rely on the 2023 Merger Guidelines promulgated by the U.S. Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"), but those enforcement Guidelines are not binding on the courts, nor have they been applied by *any* court to find a presumption of competitive harm when faced with the low concentration levels Plaintiffs allege in their claimed relevant markets here.

Second, even if the Court were to find that a presumption of competitive harm was warranted, Defendants' economic and other evidence would decisively rebut that presumption and show that the merger will not substantially lessen competition in any of the purported markets. Plaintiffs' market-

1

concentration statistics do not accurately reflect the competitive significance of the merger because of several market dynamics, especially ease of expansion by rivals. *See, e.g.*, *United States v. Baker Hughes Inc.*, 908 F.2d 981, 989 (D.C. Cir. 1990) (Thomas, J.) (applying *United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974)). Defendants have submitted the declaration of Dr. Kevin Murphy, one of the leading antitrust experts in the world, which decisively shows that the declaration of Plaintiffs' economic expert, Dr. Lee, fails to demonstrate any likelihood of competitive harm from the merger. In Plaintiffs' two alleged theatrical distribution markets, low barriers to expansion by existing competitors—including Universal, Disney, Amazon MGM, Sony, Lionsgate, A24, and NEON—make Plaintiffs' concentration figures irrelevant and ensure that competition will remain vigorous. The real-world economics of film distribution and the merger's economic incentives demonstrate that the transaction will increase, not decrease, theatrical motion picture output and will not adversely affect the price terms to theaters. In Plaintiffs' alleged market for the licensing of basic cable channels, the merging parties' channel lineups are complements, not substitutes. Cable providers and other distributors have licensed, and will license, all of these channels both before and after the merger. As a result, the merger will not increase the combined company's bargaining power over the licensing of basic cable channels. To the contrary, Dr. Murphy demonstrates that the real-world economics of cable channel licensing will preclude the merged company from exercising any increased negotiating power regarding basic cable channels, power that is already severely weakened by the mounting threat of cord cutting.

In short, Plaintiffs have not met their burden to make a "clear showing" of likelihood of success on the merits required to obtain the extraordinary relief of a TRO against the challenged merger. This failure, by itself, requires that this motion be denied.

## FACTUAL BACKGROUND

### A.    THE PROPOSED MERGER

On February 27, 2026, Paramount entered into an agreement to merge with WBD. *See* Compl. ¶ 34. WBD produces and distributes movies and television shows, owns several cable television networks (*e.g.*, HBO, CNN, TNT, TBS), and sells two different subscription streaming services (HBO Max and discovery+). *See id*. ¶¶ 33, 35; Dkt. No. 29-4, Declaration of Robin S. Lee, Ph.D. ("Lee Decl.") fig. 17. On April 23, 2026, WBD stockholders approved the merger with Paramount, subject to customary

2

regulatory clearances. *See* Goldberg Decl. ¶ 5.[1]

The merger will benefit consumers and other industry stakeholders in many ways. The combined entity will expand consumer choice, increase television and film production, and foster streaming service competition. *See id.* ¶¶ 6, 25, 28–32. These benefits are made possible in part by the significant cost savings that the combined entity will be able to achieve. *See id.* ¶ 27; *see also* Declaration of Andrew Brandon-Gordon ("Gordon Decl.") ¶ 21. Specifically, the merger is estimated to save over $6 billion in costs. Gordon Decl. ¶ 5; Goldberg Decl. ¶ 27. The sources of these savings include consolidating the different technology infrastructure underlying different streaming platforms, consolidating back-office enterprise technology, consolidating office real estate, and implementing more efficient marketing. Gordon Decl. ¶¶ 9–13. These savings will help Paramount increase its content production. Gordon Decl. ¶ 21; Goldberg Decl. ¶ 27. Indeed, Paramount has committed to increase its investment in content generation and to release a minimum of 30 films in theaters per year. Goldberg Decl. ¶¶ 23, 29; *see also id.*, Ex. 2 (Press Release); *id.*, Ex. 3 (Investor Presentation); *id.*, Ex. 4 (Shareholder Letter). Paramount will use its merger savings to invest in the content and technology that audiences care about, which will enable the merged firm's studios, streaming services, and cable channels to compete more effectively and offer greater opportunities to actors, writers, directors, and other members of the talent community. *See* Gordon Decl. ¶¶ 8, 14–15, 21–25; Goldberg Decl. ¶¶ 25–33.

## B.    THE ENTERTAINMENT INDUSTRY

### 1.    Theatrical Film Distribution

The theatrical film distribution ecosystem is built on bilateral relationships between film distributors—studios like Paramount and Warner Bros.—and exhibitors, *i.e.*, companies that operate movie theaters. *See* Compl. ¶¶ 4, 75. Distributors produce and market theatrical films; exhibitors license and screen those films in their theaters; and distributors and exhibitors share the resulting box-office revenue. *See id.* ¶ 75.

---

[1] Citations to the "Goldberg Decl." correspond to the Declaration of Dana Goldberg, submitted in support of Paramount Skydance Corporation's Opposition to Plaintiffs' Motion for Preliminary Injunction in *Faust, et al. v. Paramount Skydance Corporation and Skydance Media, LLC*, No. 4:26-cv-03790-AMO (N.D. Cal. Jun. 3, 2026), Dkt. No. 34. The Goldberg Declaration is attached as Exhibit 2 to the Declaration of Jeffrey L. Kessler ("Kessler Decl.") submitted herewith.

The commercial relationship between a distributor and an exhibitor is governed by a Master License Agreement ("MLA"). *See* Declaration of Melanie Valera ("Valera Decl.") ¶ 4. The MLA includes terms concerning the treatment of the distributor's intellectual property, the exhibitor's ticketing process, admissions tracking, and reporting of gross receipts and other statistics. *See id.* The MLA also includes a formula for calculating the license fee—known in the industry as the "film rental"—that the exhibitor pays to the distributor based on its ticket sales. *See id.* ¶ 5. The license fee is a percentage of the exhibitor's ticket sales for each film shown. *See id.* The MLA does not limit exhibitors' ability to discount ticket prices, and studios do not set minimum ticket prices or "cap" ticket discounts for exhibitors. *See id.* ¶ 6; Declaration of Jeffrey B. Goldstein ("Goldstein Decl.") ¶¶ 20–23.

█████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ *See* Valera Decl. ¶ 7; Goldstein Decl. ¶¶ 6–8. The scale is determined in two different ways, depending on the exhibitor. *See* Valera Decl. ¶ 8. ███████████ ██████████████████████████████████████████████████████████████ ████████████████████████████ *See id.* ████████████████████████████ ██████████████████████████████████████████ *See id.* ¶¶ 8, 15. ████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See id.* ¶¶ 9, 16, 18; Goldstein Decl. ¶ 9.

Distributors and exhibitors also engage in weekly negotiations to determine which films will be shown on which screens at which theaters. *See* Valera Decl. ¶¶ 20–21; Goldstein Decl. ¶¶ 14–15. Each Monday, distributors negotiate with exhibitors across the country about screening decisions for the coming week. *See* Valera Decl. ¶ 21. These negotiations address each movie separately because demand for each film differs by theater, and both parties maximize revenue by satisfying customer demand. *Id.* ¶¶ 22, 24–25. The relevant competitive interaction is therefore between an exhibitor and a particular film—not between an exhibitor and a distributor's overall slate. *See id.* ¶¶ 24–25, 27; Goldstein Decl. ¶¶ 14–15, 19. This has been Paramount's longstanding business practice, and it is not expected to change post-merger.

4

Valera Decl. ¶ 27. Exhibitors routinely reject distributors' proposals to screen films at certain theaters or on certain schedules, and national and regional theater chains have especially significant bargaining power over these issues. *See id.* ¶ 23. ███████████████████████████████████████████ ███████████████████████████████████████████████ *See id.* ¶¶ 18, 27; Goldstein Decl. ¶¶ 9, 19.

Distributors and exhibitors have a shared interest in maximizing ticket sales. A poorly performing film harms both parties: it reduces both parties' revenues and prevents exhibitors from allocating screens to more profitable films, while also damaging the distributor's credibility in future negotiations. *See* Valera Decl. ¶ 22. Distributors have extensive data about the performance of different genres of films at each theater, allowing them to project attendance at a granular level. *See id.* ¶ 24. Screen negotiations are thus a joint effort by distributors and exhibitors to make screening decisions that satisfy customer demand as much as possible. *See id.*

███████████████████████████████████████████ ███████████████████████████████████████████████ *See id.* ¶¶ 16, 18; Goldstein Decl. ¶ 9. Variations in theatrical revenues or increased film output have not resulted in higher scales for Paramount in the past. Valera Decl. ¶¶ 16, 18. Indeed, after the Paramount-Skydance merger in August 2025, Paramount nearly doubled its theatrical slate from eight films to fifteen, yet neither Paramount's split nor the duration of its films' runs in theaters increased. *See id.*; Goldberg Decl. ¶ 15; Gordon Decl. ¶ 19; Declaration of Professor Kevin M. Murphy ("Murphy Decl.") ¶¶ 56, 76–77. That result is unsurprising. Because films are licensed and negotiated individually, a larger slate does not translate into a higher percentage split or increased bargaining leverage over exhibitors. *See* Valera Decl. ¶¶ 12, 14, 19–27.

Competition for screens and customers in the theatrical marketplace is intense and growing. Murphy Decl. ¶¶ 57–58. Several developments are driving this. First, Amazon MGM—a combination of a well-funded tech company and an influential legacy player in theatrical distribution—is ramping up its theatrical output, having announced plans to release at least fifteen films each year into theaters. *Id.* ¶ 58. Second, large streaming-oriented studios, including Netflix, have begun strategic theatrical releases. *Id.* Third, studios that had previously been smaller players, such as Neon and A24, have begun releasing

5

major commercial successes, with A24's recent releases grossing several hundred million dollars. *Id.* In short, the tumultuous market environment of recent years has created opportunities for both large, established studios and once-smaller distributors to expand, and the merging parties face unprecedented competition. *Id.* ¶¶ 14, 22, 55–58, 61–64, 93.

### 2. Subscription Streaming

The largest players in the subscription streaming market are well-established technology companies with enormous scale advantages. Netflix, Amazon Prime Video, and Disney+ are the leading streaming platforms, each with vast subscriber bases, large content budgets, and global reach. *See* Goldberg Decl. ¶ 25; Gordon Decl. ¶¶ 16–19. Paramount operates Paramount+, while WBD operates HBO Max and discovery+. Compl. ¶ 35. Neither Paramount+ nor HBO Max alone has the scale—in terms of subscriber base, revenue, or content library—to compete effectively with the leading platforms. Goldberg Decl. ¶ 25. A primary driver of the merger is the need to achieve that scale. *Id.* ¶ 25. Combining Defendants' streaming platforms will place the merged firm closer to competitive parity with these larger platforms and enable it to greatly expand the content available to consumers through a single platform. *Id.*

Paramount expects that a combined streaming service will be able to invest in even more content because it can spread the cost of that content across a larger subscriber base, including more local and specialized content that becomes economically viable at greater scale. Gordon Decl. ¶¶ 21–24. The combined streaming service, even after accounting for planned cost reductions, currently plans to spend more on content than the two standalone services combined. *Id.* ¶ 24. Tellingly, the States and their economist, Dr. Lee, do not dispute that the merger will vastly increase streaming competition.

Theatrical releases also will be a critical input to the combined streaming service. Paramount has found that films released first in theaters perform significantly better once they go to streaming services compared to films released first to streaming—in part because a theatrical release functions as a large-scale marketing mechanism. Goldberg Decl. ¶ 28. And the value a film can generate for a streaming service is directly tied to the film's box-office performance, giving the merged firm a powerful economic incentive to increase, not decrease, its theatrical output. Murphy Decl. ¶¶ 13, 51–52. The merger will thus create a virtuous cycle: more theatrical content will drive engagement on the combined streaming platform, a larger subscriber base will generate revenue to fund more theatrical content, and the merged

6

firm will become a stronger competitor to the technology companies atop the streaming market. Goldberg Decl. ¶¶ 31–32; Gordon Decl. ¶¶ 21–25.

### 3. Linear Television

The basic cable television ecosystem is built on variety and breadth. Multichannel video programming distributors ("MVPDs")—cable companies like Comcast and Charter, satellite providers like DirecTV, and internet-based providers like YouTube TV—assemble packages of linear channels to meet their subscribers' demand for diverse content. *See* Compl. ¶¶ 62–63. Consumers subscribe to these packages to access an array of channels spanning news, sports, children's content, lifestyle, and general entertainment. *Id*. ¶ 65. These different genres serve different audiences with different viewing proclivities. *See* Declaration of Raymond Hopkins ("Hopkins Decl.") ¶ 10; Declaration of Scott A. Miller ("Miller Decl.") ¶ 17. No one, however, who subscribes to a cable package for The Discovery Channel would find MTV an adequate alternative if the MVPD dropped The Discovery Channel. Hopkins Decl. ¶ 10.

Basic cable programmers license their channels to MVPDs through affiliate agreements that establish per-subscriber fees and other terms. Compl. ¶ 63. These negotiations involve give and take between programmers and MVPDs, the latter of which are often large, sophisticated enterprises like Comcast and Google. *See* Hopkins Decl. ¶¶ 4–6, 8; Miller Decl. ¶¶ 5–6. Distributors negotiate aggressively and derive leverage from their scale and large subscriber bases. *See* Hopkins Decl. ¶¶ 7–8; Miller Decl. ¶¶ 7–8. A programmer's leverage in affiliate negotiations derives primarily from the quality and importance of its content to a distributor's subscribers. Hopkins Decl. ¶ 6; Miller Decl. ¶ 6.

Defendants' respective basic cable portfolios include a diverse blend of genres and audience segments which are not substitutes for each other, as MVPDs want access to all of these channels. Hopkins Decl. ¶ 10. Paramount's basic cable channels include Nickelodeon (children's programming), MTV (music and youth culture), Comedy Central (comedy), BET (programming targeted to Black audiences), CMT (country music and lifestyle), VH1 (music and pop culture), TV Land (classic television), and the Smithsonian Channel (educational and documentary content). *See* Compl. ¶ 35; Mot. at 3.[2] WBD's

---

[2] Citations to "Mot." correspond to Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Temporary Restraining Order. *See* Dkt. No. 29-21.

portfolio includes CNN (news), TNT and TBS (sports and general entertainment), HGTV (home improvement), Food Network (cooking and food culture), Discovery Channel (science and nature), Cartoon Network (children's and adult animation), Animal Planet (nature and wildlife), Turner Classic Movies (classic film), and the Travel Channel (travel and adventure). *See* Compl. ¶ 35; Mot. at 3. MVPDs have licensed both of these packages of basic cable channels before the merger and will want to do so after the merger. Hopkins Decl. ¶ 4; Miller Decl. ¶ 9. There will be no change in bargaining power with respect to these basic cable channels as a result of the merger. Murphy Decl. ¶¶ 96–116.

The basic cable marketplace is declining in the face of increased cord cutting and reduced demand for packages of cable channels. Miller Decl. ¶ 7. In this environment, every programmer's bargaining position is diminishing because the underlying asset (pay television subscribers) on which affiliate fees are calculated is eroding annually. *Id.* ¶¶ 5, 7, 11; Hopkins Decl. ¶¶ 7–8.

## C. POST-MERGER PARAMOUNT PLANS TO INCREASE ITS INVESTMENT IN THEATRICAL RELEASES

Paramount has a history of recently increasing theatrical releases and has committed to continue doing so post-merger. Gordon Decl. ¶¶ 19, 25; Declaration of Shivani Patel ("Patel Decl.") ¶¶ 10–13. Following its merger with Skydance Media in August 2025, Paramount nearly doubled its theatrical releases in 2026 compared to 2025. Goldberg Decl. ¶¶ 15, 29. When the WBD merger is complete, Paramount has committed to continue increasing its theatrical releases, which is a key part of its post-merger strategy to produce and distribute more theatrical releases in order to increase the competitiveness of its combined streaming service.  *Id.* ¶¶ 28, 31; Patel Decl. ¶¶ 12–13. Paramount has repeatedly and publicly committed to release a minimum of 30 theatrical films per year. Goldberg Decl. ¶¶ 23, 29; *see also id.*, Ex. 2 (Press Release); *id.*, Ex. 3 (Investor Presentation); *id.*, Ex. 4 (Shareholder Letter). To support the production of these films, Paramount will separately maintain WBD and Paramount film studios, along with each of their creative teams and lots. *Id.* ¶ 22; *see also id.*, Ex. 2 (Press Release). Each of the theatrical films released by the merged company will have a minimum 45-day window in movie theaters before becoming available on any other platform. *Id.* ¶ 23. With the addition of WBD, Paramount plans, post-merger, to continue growing the combined film release slate with the intention to be the producer with the most theatrical film releases in the United States. *Id.* ¶ 29; *see also* Patel Decl. ¶¶ 11–13.

8

## LEGAL STANDARDS

### A.    TEMPORARY RESTRAINING ORDER STANDARDS

"A TRO is an extraordinary and drastic remedy." *Reyna v. Walt Disney Co.*, 2026 WL 1785119, at *1 (N.D. Cal. June 22, 2026). Courts should issue a TRO "only if there is a true emergency." *Spirit Tea LLC v. Utopia Oriental, Inc.*, 2019 WL 8195426, at *1 (C.D. Cal. Sep. 5, 2019).

To obtain a temporary restraining order, Plaintiffs must make a "clear showing" that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without injunctive relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion"). Because likelihood of success on the merits "is the most important factor," when a plaintiff fails to show they are likely to succeed on the merits, the Court "need not consider the other factors." *Cal. v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018); *see also Malaney v. UAL Corp.*, 434 F. App'x 620, 622 (9th Cir. 2011) (affirming denial of preliminary injunction solely because plaintiffs failed to establish likelihood of success on the merits); *Vantage Mobility Int'l LLC v. Kersey Mobility LLC*, 836 F. App'x 496, 498 (9th Cir. 2020) (same).

### B.    CLAYTON ACT SECTION 7 STANDARDS

Section 7 of the Clayton Act prohibits mergers and acquisitions only where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Plaintiffs must establish that the harm to competition is reasonably likely or probable, not just possible. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *Baker Hughes*, 908 F.2d at 991 ("[T]he ultimate issue" is "whether a transaction is likely to lessen competition substantially.").

To establish a Section 7 violation, a plaintiff must prove by a preponderance of the evidence (1) a relevant product market, (2) a relevant geographic market, and (3) "that the merger will probably lead to anticompetitive effects in that market." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783–85 (9th Cir. 2015); *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) ("Plaintiffs have the burden of proving a violation of section 7 by a preponderance of the evidence.").

Courts apply a burden-shifting framework to analyze the legality of a horizontal merger under Section 7. *St. Alphonsus*, 778 F.3d at 783. First, the plaintiff must establish a prima facie case that a merger is anticompetitive. *Id.* If the plaintiff fails to prove its prima facie case, the Court should deny the motion without further inquiry. *Id.* Otherwise, the analysis proceeds to step two, where the burden shifts to the defendants to rebut the prima facie case. *Id.* The defendants can do so by showing that the "prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 991. A "clear showing" is not required. *Id*. at 992. If the defendants satisfy their burden, "the burden of producing additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times." *Id.* at 983.

## ARGUMENT

## I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

For purposes of this TRO motion, the Court need not resolve every defect in Plaintiffs' showing to deny relief.[3] Plaintiffs' failure to make the required "threshold," "clear showing" of likely success on the merits is more than enough to deny the motion. *See Roe*, 137 F.4th at 921–22.

### A.    PLAINTIFFS ARE NOT ENTITLED TO A STRUCTURAL PRESUMPTION OF HARM TO COMPETITION IN ANY OF THEIR ALLEGED MARKETS

Plaintiffs have not shown that they are entitled to a presumption of harm to competition in any of their alleged markets. Their contrary claim is based on an erroneous invocation of Herfindahl-Hirschman Index ("HHI") market concentration thresholds from the 2023 Merger Guidelines, jointly issued by the DOJ and FTC. But these government-issued enforcement guidelines do not change existing law and are "not binding on the courts." *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th Cir. 1993). They are merely statements of the criteria the DOJ and FTC use in deciding whether to challenge a merger. The Court must look to governing law, not the 2023 Merger Guidelines, in deciding whether Plaintiffs have established that they are entitled to a presumption in step one of the burden-shifting analysis.

Plaintiffs' reliance on the Merger Guidelines is especially suspect because they invoke the 2023

---

[3] Defendants will address the additional defects in Plaintiffs' showing in a preliminary injunction opposition (if necessary), including Plaintiffs' flawed market definitions and failure to prove irreparable harm or that the balance of equities or public interest weigh in their favor. The Court need not reach those defects on this motion because Plaintiffs and their expert have not shown probable anticompetitive effects even within the gerrymandered markets they have drawn.

10

Guidelines' new, lower HHI thresholds—not the higher 2010 thresholds that were in place for more than a decade. *See* Mot. at 9, 17. The Merger Guidelines cannot change the law. *See Olin*, 986 F.2d at 1300. Thus, to the extent the 2010 Merger Guidelines reflected the law (as several courts have opined), the 2023 Guidelines could not lower the standards for presuming competitive harm. Significantly, Plaintiffs' own analysis shows that the merger would not trigger a presumption of competitive harm under the 2010 Guidelines.

Specifically, Plaintiffs' alleged markets have post-merger HHIs of only 2,007 (licensing of basic cable channels), 2,074 (distribution of wide-release theatrical films), and 2,427 (distribution of anticipated top-grossing theatrical films). *See* Compl. ¶¶ 71–73; Lee Decl. figs. 10–11, 18. While these levels of post-merger concentration are slightly above the new thresholds for a presumption of competitive harm in the 2023 Merger Guidelines, they are all below the "highly concentrated" threshold of 2,500 for presuming competitive harm in the 2010 Merger Guidelines. *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.3 (2010).

The Ninth Circuit has not cited the 2023 Merger Guidelines in a merger case, and it has never required a presumption of competitive harm based on any version of the Merger Guidelines. Nor has any court relied on the 2023 HHI thresholds to grant a presumption of competitive harm at the low concentration levels alleged here. Instead, courts have only cited the 2023 Merger Guideline HHI thresholds to presume competitive harm in cases where the concentration levels also exceeded the higher 2010 Merger Guideline threshold—often by significant margins. *See FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 459 (S.D.N.Y. 2024) (post-merger HHI of 3,646 and increase of 1,449); *FTC v. Cmty. Health Sys., Inc.*, 736 F. Supp. 3d 335, 369 (W.D.N.C. 2024) (post-merger HHI of at least 4,886 and increase of at least 230); *FTC v. Kroger Co.*, 2024 WL 5053016, at *16 (D. Or. Dec. 10, 2024) ("numerous presumptively unlawful markets under either the 2010 or 2023 thresholds"); *In re Nexstar-TEGNA Merger Litig.*, 2026 WL 1049295, at *15 (E.D. Cal. Apr. 17, 2026) (post-merger HHI of at least 3,361 and increase of at least 413). Plaintiffs thus ask this Court to be the first in the country to apply the 2023 Merger Guidelines to presume competitive harm based on concentration levels as low as the ones claimed by Plaintiffs' economist here. The Court should decline that invitation and instead focus on whether Plaintiffs have made the clear showing required to establish that the merger is likely to substantially lessen

11

competition in any of their three alleged markets. As shown below, they have not. *See infra* pp. 12–24.

Because Plaintiffs offer no persuasive real-world evidence that the merger is likely to substantially lessen competition in any relevant market, they are not entitled to the extraordinary relief of a TRO blocking it. *See, e.g.*, *FTC v. Owens-Illinois*, 681 F. Supp. 27, 47–48 & n.58 (D.D.C. 1988) (finding HHI levels above Merger Guideline thresholds but not granting any structural presumption of harm, noting that "[t]he Merger Guidelines' suggested *application* of the HHI . . . is not binding on the Court").[4]

## B.  PLAINTIFFS DO NOT SHOW THAT THE MERGER LIKELY POSES A SUBSTANTIAL RISK TO COMPETITION IN PLAINTIFFS' PROPOSED THEATRICAL MARKETS

Plaintiffs have not made the "clear showing" of probable competitive harm required to establish a likelihood of success on the merits—or even "serious questions going to the merits"—in either of the theatrical markets identified by Dr. Lee (the alleged markets for "Distribution of Wide-Release Theatrical Films" and "Distribution of Anticipated Top-Grossing Theatrical Films"). Plaintiffs' claims instead rest on fundamental misunderstandings, or misstatements, of the economics of theatrical film distribution in the United States. For the reasons discussed below—and as Dr. Murphy explains, *see* Murphy Decl. ¶¶ 53–88—economic realities foreclose any allegation that the merger will reduce output, increase price, or cause any other anticompetitive effect in either alleged theatrical market.

### 1.  Low Barriers to Expansion by Other Film Production and Distribution Companies Preclude Any Anticompetitive Effects from the Merger in the Alleged Theatrical Markets

The law is well established that, in markets where rivals can readily expand output, a merged firm

---

[4] Plaintiffs rely on *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963) to argue that a merged firm controlling an "undue percentage share of the relevant market" thereby "trigger[s] the presumption of illegality." Mot. at 16. While this over 60-year-old decision has not been overturned, modern antitrust merger jurisprudence has widely diverged from a rigid application of market share presumptions to an analysis focused on the economic realities of the market. *See Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) ("[T]he economic concept of competition, rather than any desire to preserve rivals as such, [became] the lodestar that shall guide the contemporary application of the antitrust laws."); *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1064–65 (N.D. Cal. 2023) (rejecting reliance on "Supreme Court merger cases from the 1960's" and relying instead on subsequent Ninth Circuit law); *Malaney v. UAL Corp.*, 2010 WL 3790296, at *6–7 (N.D. Cal. Sep. 27, 2010) (rejecting reliance on same 1960s Supreme Court cases "enjoin[ing] mergers involving companies with smaller market shares than those found here"). Defendants submit that the Supreme Court is likely to reconsider and overturn *Philadelphia National Bank*'s holding to the extent it has been read to create a rigid rule of law—absent from the statute's text—that mergers resulting in over 30% market share are presumptively illegal. Defendants hereby preserve this issue for a possible appeal to the Supreme Court, if necessary.

cannot profitably reduce supply, increase prices, or otherwise suppress competition in a relevant market. *See Baker Hughes*, 908 F.2d at 989; *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (no market power as a matter of law where "competitors have expanded output in the recent past, or have the ability to expand output in the future"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 729d (5th ed. 2020) ("[I]f rivals can respond to the defendant's output reduction with a prompt, offsetting output expansion, market price will never rise above the competitive level."). This principle derives from Supreme Court guidance that market shares have little competitive meaning when "other pertinent factors," such as low barriers to entry or expansion, facilitate rapid changes in those shares. *Gen. Dynamics*, 415 U.S. at 498–503; *see, e.g.*, *Baker Hughes*, 908 F.2d at 984–85, 987–89 (applying *General Dynamics* to find ease of entry "would likely avert anticompetitive effects"). Plaintiffs' failure to even mention *General Dynamics* is indicative of their failure to appreciate the inability of the merged firm to exercise any market power in any theatrical distribution market where barriers to substantial expansion of output are very low.

In both alleged theatrical markets, the indisputable evidence shows that rival film production and distribution companies can and would expand their theatrical film slates if the merged firm were—contrary to its own economic incentives, *see infra* pp. 15–17—to reduce output or try to increase prices for theatrical films. Murphy Decl. ¶¶ 14, 22, 55–58, 61–64, 93. These low barriers to expansion would leave the merged firm with nothing to gain from reducing theatrical output or trying to increase prices to theaters. *See id.* ¶¶ 14, 56–65. Plaintiffs' assertion that the merger "will likely reduce theatrical output," *see* Mot. at 18, is therefore contrary to the economic evidence and cannot support a TRO.

The low barriers to expansion in theatrical movie distribution are a concrete reality for which Plaintiffs and Dr. Lee have no answer. Current market participants, including relatively recent entrants, have significantly increased—or are poised to significantly increase—their theatrical output. *See* Murphy Decl. ¶¶ 14, 22, 55–58, 61–64, 93. For example, after Skydance combined with Paramount in August 2025, Paramount nearly doubled its theatrical slate from eight films to fifteen films in a single year. *Id.* ¶ 56. Amazon MGM likewise had eight theatrical releases in 2025 but plans to release fifteen films theatrically this year, and it has already had one of the top box office successes this year with *Project Hail Mary. Id.* ¶ 58. Plaintiffs cite Disney-Fox, *see* Mot. at 19, as an example of a merged firm reducing its

13

theatrical film output, but one firm's business decisions made for reasons specific to its unique business model (and that occurred during the COVID pandemic, which shifted viewing habits from theaters to streaming) are irrelevant in light of the evidence of a broader market trend that existing firms can, do, and likely would expand output in response to another competitor's output reduction. *See* Murphy Decl. ¶¶ 56–58, 61–64, 89–95. Indeed, the shift from theatrical to streaming following the Disney-Fox merger was equaled or outpaced by market expansion by other firms, *see id.* ¶¶ 93–95, demonstrating that "competitors have expanded output in the recent past," *Rebel Oil*, 51 F.3d at 1441, and that they "not only can, but probably will" do so again if the merged firm were to attempt to reduce its theatrical output, *Baker Hughes*, 908 F.2d at 989. Paramount-Skydance almost doubling the number of films the combined company released after their merger last year is a much more relevant analogy to the present transaction than a transaction among independent third parties seven years ago.

Plaintiffs do not—and cannot—dispute the facts showing low barriers to expansion by existing firms. Instead, they argue only that it would be difficult to enter the market because doing so requires developing the necessary resources and relationships. *See* Compl. ¶¶ 95–98; Lee Decl. ¶ 112. But this argument concerns only hypothetical "new entrants" in theatrical distribution. Compl. ¶¶ 96, 98. It says nothing about the many existing competitors who can readily increase their output of films in response to any output reduction by the merged firm, including major studios with a long history of production (like Disney and Universal), newer entrants (like Amazon MGM, Lionsgate, and A24), and streaming companies with deep pockets (like Netflix and Apple) who have recently shown an ability to conduct a major theatrical release. Murphy Decl. ¶¶ 58, 64. Each of these competitors could offer more films for theatrical release in response to any decrease in output by the merged firm. *Id.* ¶¶ 62–63. These low barriers to expansion, alone, defeat Plaintiffs' claim that the merger is likely to produce anticompetitive effects in either of the alleged theatrical-distribution markets. *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982–83 (2d Cir. 1984) (current market shares "are not an accurate proxy for market power" when "potential competition [can] respond quickly to price increases" (citing *Gen. Dynamics*, 415 U.S. 486); *Baker Hughes*, 908 F.2d at 989 (low barriers to entry "suffice[] to rebut the government's prima facie case"); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 207 (S.D.N.Y. 2020) ("Relevant evidence may include unique economic circumstances and nonstatistical evidence that undermines the predictive

14

value of market share statistics, such as ease of entry into the market.").

### 2. Paramount's Economic Incentives from the Merger Will Drive It to Continue Increasing Its Output of High-Quality Films for Distribution to Theaters

Although Plaintiffs acknowledge that "[c]ontent is king in this industry," Compl. ¶ 91, their arguments fail to account for how this reality *incentivizes* Paramount to stand by its commitment to theatrically release at least 30 films each year after the merger. Goldberg Decl. ¶¶ 23, 29; Murphy Decl. ¶¶ 51–52. Plaintiffs argue that Paramount cannot be trusted to follow through on its commitment, *see* Mot. at 19, but they ignore the economic incentives that will drive Paramount to do so if it wants the merger— including its combined streaming service—to succeed. Gordon Decl. ¶¶ 18–19, 21–25; Patel Decl. ¶¶ 12–13. Plaintiffs and their expert do not dispute the existence of those incentives. *See* Murphy Decl. ¶ 29. Nor do Plaintiffs dispute that, if Paramount fulfills its commitment, theatrical film output will increase after the merger.

Antitrust law presumes that firms act in accordance with their rational economic incentives. *See In re HIV Antitrust Litig.*, 656 F.Supp.3d 963, 1006 (N.D. Cal. 2023) ("Antitrust cases presume the existence of rational economic behavior in the hypothetical free market."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986). Where the merged firm's rational incentive is to expand output—as it is here—Plaintiffs cannot show a likelihood of anticompetitive effects through a reduction in output or an increase in prices. *See FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023) ("If there is no incentive to foreclose, then there is no probability of foreclosure and the alleged concomitant anticompetitive effect."); *Deutsche Telekom*, 439 F. Supp. 3d at 210 (finding no substantial risk to competition where merged firm had a rational incentive to "lower its prices and advertise the higher quality of its network to attract customers away from AT&T and Verizon, thus increasing competition").

The economic evidence shows that theatrical output is not a standalone business line Paramount can rationally starve. It is central to how Defendants make money today, and it will become even more important to Paramount post-merger, as a cornerstone of the synergies Paramount intends to achieve through its combined streaming service, which will require more and higher quality theatrical content. Murphy Decl. ¶¶ 51–52; Gordon Decl. ¶¶ 19, 25; Patel Decl. ¶¶ 12–13. More theatrical films will allow

15

the merged firm to capture cultural relevance and prestige and increase the value of the movies it can offer on its combined streaming service (or through licensing) by first promoting the films via broad theatrical releases. Murphy Decl. ¶¶ 52, 88; Goldberg Decl. ¶¶ 31–32; Gordon Decl. ¶¶ 16, 19; Patel Decl. ¶ 9. This is one of the keys to enabling the merged company to compete more effectively against Netflix and other scaled streaming platforms. Murphy Decl. ¶¶ 29–36; Goldberg Decl. ¶ 25. Plaintiffs offer no evidence to dispute these facts. Indeed, Plaintiffs and Dr. Lee do not discuss the impact of streaming at all.

Moreover, Paramount's economic incentives will require the merged firm not only to put films into theaters, but also for those films to succeed there. The value a film can generate for a streaming service is directly tied to the film's box-office performance. *See* Murphy Decl. ¶¶ 52, 88; Gordon Decl. ¶ 25. That is especially true for sequels, major franchises, and other large intellectual property films—the very films at the center of Plaintiffs' alleged anticipated top-grossing theatrical films market. The idea that Paramount would invest less in those films after the merger—or jeopardize its exhibitor relationships or box-office performance by imposing counterproductive terms on theaters—makes no economic sense. Theatrical hits drive not only box office revenue, but also the performance of the combined streaming service and the value of derivative revenue streams like merchandising and amusement parks. *See* Murphy Decl. ¶¶ 52, 88; Compl. ¶ 98. Because the transaction is designed to build a stronger content engine and a more competitive streaming product, it would be irrational for Defendants to choke off the theatrical pipeline that underpins that strategy. Murphy Decl. ¶¶ 29, 52, 88. The Court should not credit a theory of harm that makes no economic sense. *See Matsushita*, 475 U.S. at 587; *see also, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992) ("economically senseless" antitrust theory requires summary judgment); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").

Paramount's minimum 30-film annual commitment is the natural outgrowth of its incentives to make theatrical distribution a pillar of the merged firm's business. Goldberg Decl. ¶¶ 23, 29. Plaintiffs call that commitment unenforceable, "self-serving," and implausible. *See* Mot. at 19. But Plaintiffs do not mention that Paramount has offered to give the States the right to enforce this commitment. So far, they have shown no interest in doing so. The reality is that the economics of the merger will compel Paramount

to fulfill its commitment to increase film production, or its business will not succeed[5].

### 3. The Merger Will Not Adversely Affect Exhibitors' Bargaining Power with Studios, Which Is Driven by Individual Film Performance, Not Slate Size

There is no economic support for Plaintiffs' claim that the merger will increase Paramount's bargaining leverage over exhibitors. To the contrary, longstanding bargaining dynamics in the theatrical film industry will prevent a larger theatrical slate from translating into greater leverage over theaters. As one of Plaintiffs' own exhibitor-declarants acknowledges, ███████████████████ ████████████████████ Dkt. No. 29-2 ¶ 4. That means that each week, theaters decide whether to keep a film, how long to run it, and how many screens and showtimes to devote to it. Those negotiations are based on the performance of the individual film—pure and simple—as documented in granular data about expected and actual box-office results. *See* Valera Decl. ¶¶ 20–25. It is this film-specific, data-driven bargaining—not the merged firm's total number of films—that will determine the terms any given film gets from any given theater in any given week. *See id*. Real-world evidence confirms this: after Skydance merged with Paramount and grew its slate from eight films to fifteen, neither Paramount's take rate nor the duration of its films' runs in theaters increased. Murphy Decl. ¶¶ 76–77. Plaintiffs have provided no evidence to the contrary.

The commercial reality of film-by-film bargaining destroys Plaintiffs' contention that, by virtue of having a larger combined theatrical slate of films, the merged firm will have "greater leverage over theatres." Mot. at 18. Plaintiffs' theory is that the merger could result in less competition for "desired release date[s]," which they contend "allows theatres to negotiate better rates," *id*., but that claim finds no support in the evidence. The exhibitor declarations Plaintiffs cite do not say that competition for release dates results in "better rates" for exhibitors, nor does that comport with commercial realities. Each film must earn its screens, showtimes, and run-lengths on the merits, and the only "leverage" a studio has is how well its individual films can attract audiences, which is exactly as it should be in a competitive marketplace. *See* Valera Decl. ¶¶ 18–23. Similarly, Plaintiffs' repeated claim that the merger will result

---

[5] Plaintiffs misleadingly cite a Paramount synergy analysis to claim Paramount ███████████ ████████████ Mot. at 5, but as the document Plaintiffs cite shows, there are no cuts planned to spending on creating linear television content or studio content, and the cited savings come from other business segments. Gordon Decl. ¶ 15.

17

in "more onerous caps on discounts" for theaters, Compl. ¶ 7; *see id*. ¶¶ 75–77, is bereft of any factual support. Studios do not "cap" ticket discounts at all. *See* Valera Decl. ¶ 6. The merged firm will thus have no power or ability to cap discounts to theatergoers.

In sum, there is no evidence that the merged firm will have the power or the incentive to reduce output of films or to increase prices or impose any other onerous terms on theaters. Nor is such an exercise of supposed power plausible against theater owners who themselves have substantial power over the studios in deciding whether to devote screens to individual movies and for how long. Where, as here, a firm's customers are "sophisticated and knowledgeable," a merger is unlikely to harm competition for those customers' business. *Oracle*, 331 F. Supp. 2d at 1171; *see also Baker Hughes*, 908 F.2d at 986 (merger unlikely to harm competition because of "sophistication" of customers who "examine available options and typically insist on receiving multiple, confidential bids for each order," which "was likely to promote competition even in a highly concentrated market"); *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991) ("The existence of large, powerful buyers of a product mitigates against the ability of sellers to raise prices."). Exhibitors are equipped with high-quality market data and dedicated personnel who negotiate continuously with studios. If a studio attempted to impose unfavorable terms on an exhibitor for a given movie, the exhibitor has the sophistication to know the terms are unfavorable and the power to dynamically reallocate that movie's screens to more competitive alternatives. *See* Murphy Decl. ¶¶ 79–80.

C.     **PLAINTIFFS CANNOT SHOW ANY LIKELIHOOD THAT THE MERGER POSES A PROBABLE RISK OF SUBSTANTIALLY LESSENING COMPETITION IN PLAINTIFFS' PROPOSED MARKET FOR THE LICENSING OF BASIC CABLE CHANNELS TO DISTRIBUTORS**

Plaintiffs' argument that the merger will substantially lessen competition in the licensing of basic cable channels to distributors (*i.e.*, MVPDs) rests on two critical—and false—assumptions: (1) Paramount's and WBD's channels are substitutes whose combination will meaningfully increase the merged firm's bargaining leverage because previously a distributor could choose one firm's package of basic cable channels as a substitute for the other's; and (2) that the threat of a post-merger blackout would be more frequently used, or used more impactfully, by the merged firm to coerce distributors into accepting higher affiliate fees. Neither assumption has any support in the economic evidence. Plaintiffs

18

offer no evidence that Defendants' packages of basic cable channels are currently substitutes that constrain one another's pricing, *see* Compl. ¶¶ 86–90; Lee Decl. ¶ 151, and their increased blackout theory ignores the commercial reality that a blackout is far more harmful to the channel owner than to the distributor and will be even more harmful to the merged firm with a larger number of channels being blacked out. *See* Murphy Decl. ¶¶ 114–16. For these reasons, Plaintiffs have not demonstrated—and cannot demonstrate— that they are likely to succeed on the merits of their basic cable channels licensing market claim.[6]

**1. Packages of Paramount and WBD Basic Cable Channels Are Not Competitive Substitutes for Each Other, and Their Combination Under Common Ownership Is Not Anticompetitive**

Plaintiffs' theory of harm in the basic cable licensing market depends on the premise that Paramount's and WBD's packages of basic cable channels are competitive substitutes—that is, that a MVPD facing higher licensing fees from one company can turn to the other as an alternative source of equivalent programming. But the evidence demonstrates the opposite: the two companies' channel portfolios are overwhelmingly complementary in the sense that MVPDs want to license all of them to provide the broadest combination of basic cable stations to consumers. As a result, their combination under a single owner is the kind of integration between non-substitute products that economic principles of bargaining indicate will not lead to an increase in bargaining power or other anticompetitive effects. *See* Murphy Decl. ¶¶ 98–100.

Paramount's package of channels occupies distinctive programming areas that have no analogue in WBD's portfolio, and vice versa. *See* Lee Decl. ¶ 128, fig. 17 (listing channels owned by each company). Paramount owns MTV, BET, Comedy Central, and Nickelodeon—channels built around music, Black culture, stand-up comedy, and children's programming, respectively. WBD owns CNN, TNT, TBS, HGTV, Food Network, and Discovery Channel—channels dedicated to news, sports and

---

[6] Although the Complaint cites *In re Nexstar-TEGNA Merger Litig.*, 2026 WL 1049295 as an analogue, Compl. ¶ 69, that transaction bears little resemblance to this merger: *Nexstar-TEGNA* involved local markets for "Big Four" (ABC, CBS, FOX, and NBC) affiliate broadcast-station retransmission-consent licenses, while this case involves a national market for basic cable channels. *Nexstar-TEGNA*, 2026 WL 1049295, at *2–3; Compl. ¶¶ 36, 62–68. In *Nexstar-TEGNA*, the local network affiliates were substitutes for each other, so the merger was more likely to increase bargaining power over the MVPDs because it eliminated competition between these substitutes. *Nexstar-TEGNA*, 2026 WL 1049295, at *10–12. The transaction in *Nexstar-TEGNA* was also found to have created duopolies or triopolies in some markets, producing post-merger market shares above 50%, and yielding HHIs as high as 7,422. *Id*. at *2, *14–16. None of those facts exist here.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 4:26-CV-7116

general entertainment, home improvement, cooking, and factual entertainment. No reasonable consumer or distributor would treat these different packages of channels as being competitive substitutes for one another, as MVPDs would want to license both packages to provide a broad array of different types of channels to consumers. These packages of channels serve different audiences and fulfill different programming needs. *See* Lee Decl. ¶ 126 (basic cable channels "typically focus on specific genres, such as news, sports, entertainment, and family/children's programming"). Their combination will thus not lead to an increase in bargaining power. Murphy Decl. ¶¶ 98–100.

Dr. Lee's declaration makes no real effort to demonstrate that these packages of channels are substitutes. He notes that certain of Defendants' channels fall within the same broad "content categories" based on a single Paramount board presentation identifying some overlap in genres, *see* Lee Decl. ¶ 151, but having some channels fall within the same broad content category is not the same as having packages of channels which are competitive substitutes for each other. Dr. Lee offers no analysis of whether Paramount's package of channels currently constrains the pricing of WBD's package of channels, no evidence that MVPDs have ever played WBD's portfolio against Paramount's in negotiations (or vice versa), and no empirical assessment of cross-price elasticities or diversion ratios between the companies' package of channels. *See* Lee Decl. ¶¶ 149–51. If—as Dr. Lee acknowledges—members of a household demand access to different channels spanning different content categories, *see* Lee Decl. ¶ 151, then those channels are understood as mutually desired complements rather than substitutes. A household that values both children's programming and news programming does not view Nickelodeon and CNN as interchangeable; it wants access to both. This is precisely the kind of complementary relationship that antitrust law recognizes will not lead to anticompetitive effects when non-substitutable products are bundled together.

The analogy to patent pools offering a licensing package of patents that are not substitutes for each other is instructive. The DOJ and FTC have long recognized that "intellectual property licensing allows firms to combine complementary factors of production and is generally procompetitive." U.S. Dep't of Just. & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Prop. § 2 (2017) ("IP Guidelines"); *see also id.* § 5.5 (discussing procompetitive benefits of patent pools combining complementary technologies that do not compete with each other). The government has endorsed the

20

aggregation of complementary patents under common licensing arrangements as long as the patents are not competitive substitutes for each other. Courts have followed suit, recognizing "the many pro-competitive benefits and efficiencies of patent pools, including integrating complementary technologies.'" *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *15 (N.D. Cal. Aug. 13, 2007), *aff'd*, 301 F. App'x 959 (Fed. Cir. 2008); s*ee also Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505, at *8 (N.D. Cal. Mar. 28, 2000) ("Generally, cross-licensing is considered a pro-competitive practice because it can facilitate the integration of complementary technologies.").

As the DOJ explained in its business review letter approving the DVD-Video and DVD-ROM patent pool, the "potential benefit of a patent pool" is that it "may provide competitive benefits by integrating complementary technologies," among other things. Ltr. from Joel I. Klein, Assistant Att'y Gen., U.S. Dep't of Just., to Gerrard R. Beeney, Esq. at 10 (June 10, 1999) (citing IP Guidelines § 5.5). The DOJ found this patent pool "reasonably likely [to] contain only complementary patents without foreclosing competition" and that "the proposed arrangement would serve the procompetitive purpose of combining complementary technologies into a package that will be likely to lower costs" for manufacturers. *Id*. at 13, 16.

Similar economic principles apply here. Because Paramount's and Warner Bros.' packages of basic cable channels are complementary, and not substitutes, MVPDs want to license both of these packages rather than treat one package as a competitive substitute for another. As a result, there is no competitive harm or potential for increased bargaining power from the combination of these complementary channels into one merged package. *See* Murphy Decl. ¶¶ 98–100. While both Paramount and Warner Bros. had desirable packages of basic cable channels before the merger, the negotiation power of those packages will not increase because they are owned by the merged firm. *See id.* ¶¶ 100–11, 114–16. Plaintiffs and their expert, Dr. Lee, offer no evidence to support their contrary claims.

### 2. Plaintiffs' Blackout Theory Ignores the Fact That a Blackout Is Far More Costly to the Basic Cable Channel Owner Than to the MVPD

Plaintiffs' alternative theory of competitive harm in their basic cable channel licensing market—that the merged firm will more readily wield the threat of "blacking out" its combined channels as a cudgel to extract higher licensing fees from distributors—gets the economics of blackouts backwards. A blackout

21

is not a weapon that a channel owner deploys from a position of strength. It is a mutually harmful outcome in which the channel owner bears the greater financial harm. Murphy Decl. ¶ 115. This harm would be even greater to the merged firm because it would have many more basic cable channels that would be blacked out. *See id.* ¶¶ 115–16.

When a channel owner "goes dark," *i.e.*, withdraws its channels from a distributor's platform, the channel owner immediately loses all affiliate fee and advertising revenue from that distributor's subscriber base. *See* Miller Decl. ¶ 13. The channel owner's costs, however, would remain the same because programming costs are fixed regardless of how many viewers have access to the programming. *Id*. These losses start on the first day of the blackout and continue for its duration. *Id.* If Paramount goes dark and loses carriage with a major distributor, it would likely lose more than ▮▮▮▮▮ per month or more in subscription and advertising revenues. Hopkins Decl. ¶ 13. The MVPD, by contrast, does not suffer comparable immediate losses in a blackout. Miller Decl. ¶ 13. While the MVPD may lose some subscribers who value the blacked-out channels, the MVPD continues to earn subscriber revenue from its remaining customer base and continues to operate its business. *Id.* The MVPD may also offer credits to affected subscribers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮, but these costs are modest relative to the channel owner's total revenue loss. *See* Hopkins Decl. ¶ 13; Murphy Decl. ¶ 115. The fundamental asymmetry is clear: the channel owner loses its revenue immediately and entirely, while the MVPD suffers an attenuated and gradual erosion of its subscriber base.

Plaintiffs' theory that the merger will enhance the merged firm's leverage over MVPDs by allowing it to threaten the loss of over 50 channels simultaneously, *see* Compl. ¶¶ 11, 89–90; Lee Decl. ¶ 150, makes the problem worse for the merged firm, not better. Post-merger, a blackout would expose the combined company to the loss of affiliate and advertising revenue across both Paramount's and WBD's entire channel portfolios—a catastrophic financial event for the merged firm that would far exceed the already-devastating impact of blacking out Paramount's or WBD's channels alone. The notion that the merged firm would be more willing to risk this outcome to gain leverage over the MVPDs, at a time when the value of linear networks and fees is declining, defies economic logic.

Moreover, MVPDs possess significant countervailing leverage that Plaintiffs and their expert, Dr.

22

Lee, ignore entirely. Distributors can prevent the merged firm from aligning contract expiration dates so that all 50-plus channels come up for renewal at once and already have shown that they can do so. ████

████████████████████████████████████████████████████████████████████, Hopkins Decl. ¶ 15, ████████████████████████████████████████████████ *See* Miller Decl. ¶ 10. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

While Dr. Lee disputes or ignores these industry facts, *see* Lee Decl. ¶¶ 149–151, he does not conduct any empirical analysis to support his *ipse dixit* assertion that the combined cable channel owner will be more likely to wield blackouts even though this conduct would inflict huge losses on the merged firm. This is not the first time that Dr. Lee has made industry assumptions that are devoid of support or detail. *See*, *e.g.*, *Microsoft*, 681 F. Supp. 3d at 1094–95 (criticizing "several . . . weaknesses" in Dr. Lee's merger analysis, including that he "simply assumed a concession rate for his model . . . but there is no evidence to support that assumption").

Plaintiffs point to four historical blackout examples (the Disney-Charter dispute in 2023, the Disney-DirecTV dispute in 2024, and the Disney-YouTube TV disputes in 2021 and 2025) as evidence that the increased blackout threat from a merged firm is real. *See* Compl. ¶ 88; Lee Decl. ¶ 130.[7] But none involved Defendants or the channels at issue in this merger, and all were driven by a factor largely absent from Defendants' cable channel portfolio: time-sensitive, popular live sports programming. All four disputes involved channels like ESPN and the SEC Network, whose value derived from live sporting events that occur on fixed dates. *See* Compl. ¶ 88. For example, an MVPD that loses ESPN during the first week of college football season faces an acute, time-limited crisis: its subscribers will cancel immediately to find alternative access to games that are happening right now. Any bargaining advantage for the cable channel owner in that scenario is inherently tied to the specific content on a specific channel, not to the combined number of channels in the owner's portfolio. Here, there is no evidence that the

---

[7] Dr. Lee also cites a dispute in 2024 between Fubo and WBD, *see* Lee Decl. ¶ 130, but in that situation there was no "blackout." Rather, after the parties were unable to reach mutually acceptable terms, Fubo decided to drop WBD's channels. *See* Miller Decl. ¶ 15.

23

combination of the cable channels in the merged company will give it any power based on time-sensitive sports programming that the individual firms do not already possess without the merger.

Finally, Plaintiffs simply ignore the fact that basic cable channels' position in the marketplace is diminishing every day because of increased cord cutting. Murphy Decl. ¶¶ 27, 116, 119 n.99. As noted, basic cable subscribership has experienced dramatic declines, and that trend will continue. *See* Miller Decl. ¶ 7; Hopkins Decl. ¶ 7. Plaintiffs cannot credibly contend that the merged firm's basic-cable-channel business will have greater bargaining leverage when demand for basic cable channels is shrinking rapidly and the threat of cord cutting makes it even more damaging and dangerous for the merged firm to engage in a blackout which could lead to even more cord cutting. Plaintiffs' failure to even mention this economic reality demonstrates that their claims of increased bargaining power in the alleged basic cable channel licensing market are wholly at odds with economic reality and cannot support their request for a TRO.

## II.    PLAINTIFFS HAVE NOT CLEARLY SHOWN IMMEDIATE AND IRREPARABLE HARM WARRANTING A TRO

The purported need for emergency relief through a TRO is of Plaintiffs' own making. Defendants have made clear to Plaintiffs that they would agree not to close the merger until after a preliminary injunction could be decided, provided that Plaintiffs agree to a reasonable schedule that would allow the Court to hold a live evidentiary hearing on the preliminary injunction by the end of August so that Paramount can obtain a judicial resolution before it begins incurring ticking fees of approximately $7 million per day after September 30. Gordon Decl. ¶ 28; Dkt. No. 64 at 1–2. Plaintiffs refused to agree to such a schedule, and instead filed suit seeking this TRO.

Plaintiffs also waited months to bring this action and delayed until the doorstep of Defendants' planned closing date to request a TRO. Plaintiffs' own lack of urgency and the resulting manufactured delay undercuts their claim of irreparable injury. *See Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) ("Garcia waited months to seek an injunction[.] . . . The district court did not abuse its discretion by finding this delay undercut Garcia's claim of irreparable harm.").

Plaintiffs cannot manufacture irreparable harm and insist that the Court grant emergency relief by

24

rejecting a prompt preliminary injunction schedule and live evidentiary hearing that would preserve the status quo. Where the alleged harm can be avoided through an orderly preliminary injunction hearing to which Defendants are willing to stipulate, Plaintiffs have not shown that this is a "true emergency," *Spirit Tea*, 2019 WL 8195426, at *1, or carried their burden to show that extraordinary temporary relief is necessary. *See Woodward v. Haviland*, 2013 WL 5305793, at *1 (E.D. Cal. Sep. 19, 2013) ("[F]or a TRO, a movant must show that he will suffer irreparable harm prior to the time the court can hear and decide a motion for preliminary injunction."). This Court can order the prompt preliminary injunction schedule, with a live hearing, that Defendants have proposed so that they can agree to postpone their closing until after that preliminary injunction is decided on a full record, thereby rendering Plaintiffs' request for a TRO moot.

## CONCLUSION

For all the reasons set forth above, Plaintiffs' extraordinary request for a temporary restraining order against the Paramount-Warner Bros. merger should be denied.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 4:26-CV-7116

Dated:  July 16, 2026

Respectfully submitted,

By:  */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

26

Marguerite Sullivan (*pro hac vice forthcoming*)
Christopher J. Brown (*pro hac vice forthcoming*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
christopher.brown@lw.com

*Attorneys for Defendant Paramount Skydance Corporation*

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY  10019-6022
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC  20006-4061
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice*)
Henry Liu (*pro hac vice*)
Ross A. Demain (*pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

27

Bernard A. Nigro Jr. (*pro hac vice forthcoming*)
Kathleen S. O'Neill (*pro hac vice forthcoming*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
Barry.Nigro@friedfrank.com
Kathy.Oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 4:26-CV-7116