UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

PARAMOUNT SKYDANCE CORPORATION, et al.,

Defendants.

Case No. 26-cv-07116-AMO

**ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER**

Re: Dkt. No. 27

This is an antitrust case.  Plaintiffs, the State of California, State of Arizona, State of Colorado, State of Connecticut, Commonwealth of Massachusetts, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, and State of Washington (collectively, the "Plaintiff States"), bring this lawsuit under the Clayton Act to halt a merger between Defendants Paramount Skydance Corporation ("Paramount") and Warner Bros. Discovery, Inc. ("Warner Bros.").  The Plaintiff States advance that this merger (the "Transaction") will eliminate competition between two of the remaining five major Hollywood studios in addition to combining two of the nation's largest cable television programmers.  Before the Court is the Plaintiff States' motion for a temporary restraining order ("TRO") prohibiting Paramount and Warner Bros from consummating the Transaction or otherwise acting to consolidate their operations.  Defendants oppose the motion.  The Court heard oral argument on the motion on July 17, 2026.  Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, and good cause appearing, the Court **GRANTS** the motion for TRO for the following reasons.

United States District Court
Northern District of California

## I.    BACKGROUND

Due to the expedited nature of the motion for TRO and the parties' desire for speedy resolution of the motion, the Court only summarizes the facts relevant to disposition of the motion.[1]

Paramount is a global media conglomerate registered in Delaware and headquartered in New York.  Paramount's portfolio includes Paramount Pictures (one of the "big five" Hollywood film studios); the CBS broadcast network; basic cable channels (including Nickelodeon, Comedy Central, MTV, and BET); the Showtime premium cable channel; and the Paramount+ streaming service.  Compl. ¶¶ 32, 35.  Warner Bros. is a global media conglomerate also registered in Delaware and headquartered in New York.  Warner Bros.'s portfolio includes Warner Bros. Pictures studio (another of the "big five" Hollywood film studios); basic cable channels; the HBO premium cable channel; and the HBO Max and Discovery+ streaming services.  Compl. ¶¶ 33, 35.  Both Paramount and Warner Bros. maintain studio lots and production facilities in California, where they also employ thousands of California residents.  Compl. ¶ 17.

On February 27, 2026, Paramount and Warner Bros. agreed that Paramount would acquire all Warner Bros.'s outstanding shares for $31 per share for a total transaction value of approximately $110 billion.  Compl. ¶ 34.  The combined entity would control two of the "big five" film studios (Paramount Pictures and Warner Bros. Pictures), more than fifty basic cable channels spanning every major programming genre, leading premium cable television channels (HBO and Showtime), the most-watched broadcast network (CBS), three subscription streaming services (Paramount+, HBO Max, and Discovery+), and three of the most prolific television production studios (Paramount Television Studios, CBS Studios, and Warner Bros. Television Studios).  Compl. ¶ 35; Lee Decl. ¶¶ 9, 42-43, 127-128, fig. 17.

The Plaintiff States filed this lawsuit, as well as the instant motion seeking a TRO, on July 13, 2026.  Dkt. Nos. 1, 27.  The Plaintiff States move to enjoin Paramount and Warner Bros

---

[1] The parties submitted certain materials related to both the pleadings and the briefing of the instant motion provisionally under seal in accordance with Civil Local Rule 79-5.  *See* Dkt. Nos. 6, 29, 105, 113.  The Court will rule on the motions to seal after receiving a proposed omnibus sealing order, due in the course of the preliminary injunction briefing.

from closing or otherwise consummating the Transaction before this Court decides whether it is unlawful.  Dkt. No. 27.

## II.    DISCUSSION

Federal Rule of Civil Procedure 65 authorizes a trial court to grant a temporary restraining order "to preserve the status quo and the rights of the parties until a final judgment issues in the cause."  *See Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020) (quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).  The status quo in this context "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy[.]' "  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).  "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction."  *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where the government is a party, courts merge the analysis of the final two *Winter* factors, the balance of equities and the public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large."  *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted).  The *Winter* factors may be evaluated on a sliding scale, such that preliminary relief may be issued when the moving party demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

3

In support of their Clayton Act claim, the Plaintiff States identify three relevant United States markets for the (1) distribution of wide-release theatrical films, (2) distribution of anticipated top-grossing theatrical films, and (3) licensing of basic cable channels to distributors. Compl. ¶ 36; Lee Decl. ¶¶ 11, 13-15, 38.  While Defendants dispute the market definitions, they assume them for purpose of argument for the instant motion.  *See* Dkt. No. 114 at 7.  Because the Plaintiff States are entitled to a TRO if they make a sufficient showing in only a single relevant market, the Court evaluates the factors for preliminary injunctive relief focusing on the market for distribution of wide-release theatrical films.[2]

### A.      Likelihood of Success

The Plaintiff States bring a single claim for violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  To determine the likelihood of success on the merits of a Section 7 claim, courts employ a burden-shifting framework.  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.* ("*St. Alphonsus*"), 778 F.3d 775, 783 (9th Cir. 2015); *see also Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993); *United States v. Baker Hughes Inc.,* 908 F.2d 981 (D.C. Cir. 1990).  Under this framework, "the plaintiff must first establish a prima facie case that a merger is anticompetitive," and then the burden shifts to the defendant to rebut the prima facie case before "the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion[.]" *St. Alphonsus*, 778 F.3d at 783.

At the first step, a merger that would result in "a significant increase in the concentration of firms in that market" establishes a presumption that the merger "is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."  *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963).  Demonstrating that a merger would result in "a significant increase in the concentration of firms in that market" establishes a presumption that the merger will substantially lessen competition.  *Philadelphia Nat'l Bank*, 374 U.S. at 363; *Baker Hughes*, 908 F.2d at 982.  Courts rely on two metrics to assess market concentration – the proposed

United States District Court
Northern District of California

---

[2] The Court may revisit its reliance on this sole market in evaluating the anticipated motion for preliminary injunction.

combined firm's anticipated market share and the Herfindahl-Hirschman Index ("HHI"). *DIRECTV, LLC v. Nexstar Media Grp., Inc.*, No. 2:26-CV-00976-TLN-CKD, 2026 WL 851401, at *6 (E.D. Cal. Mar. 27, 2026); *see also* Fed. Trade Comm'n & U.S. Dep't of Justice, Merger Guidelines § 2.1 (2023). A merger that creates a firm with a combined market share of 30 percent or more is presumed likely to violate the antitrust laws. *Philadelphia Nat'l Bank*, 374 U.S. at 364. ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). Relatedly, "[m]ergers that increase the HHI more than 200 points and result in highly concentrated markets are presumed to be likely to enhance market power." *St. Alphonsus*, 778 F.3d at 786 (internal quotation marks & citation omitted).[3] Where plaintiffs demonstrate a presumption of illegality by way of undue market concentration, they need not offer "elaborate proof of market structure, market behavior, or probable anticompetitive effects." *Philadelphia Nat'l Bank*, 374 U.S. at 363; *see also Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016) (a plaintiff "can establish a prima facie case simply by showing a high market concentration based on HHI numbers.").

Here, Plaintiffs present compelling evidence that the combined firm resulting from the transaction will possess substantial market share in the wide-release theatrical distribution market. *See* Lee Decl ¶¶ 83, 88, 89 (anticipating 27% market share for wide-release theatrical distribution market). On this combined firm market share alone, the Court is persuaded that it can presume the proposed merger is likely to violate antitrust laws. *See Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1021 (9th Cir. 2016) (a "prima facie case can be established simply by showing" that such "a high market share would result from the proposed merger"); *see also United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (concluding plaintiffs established a presumption of anticompetitive effects where the combined firm would hold a 28.4 percent market

---

[3] HHI is "calculated by summing the squares of the individual firms' market shares," which "gives proportionally greater weight to the larger market shares." *St. Alphonsus*, 778 F.3d at 786 (citing *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001)). The HHI analysis considers "both the post-merger level of the HHI and the increase in the HHI resulting from the merger." *Id.*

United States District Court
Northern District of California

share).  Plaintiffs additionally show the transaction would result in significant market concentration based on market HHI along with a significant change in HHI.  *See* Lee Decl. ¶ 84 (showing an increase in HHI by approximately 359 points, resulting in a post-merger HHI of 2,074 for the wide-release theatrical distribution markets).  Though Defendants highlight that the market-concentration thresholds represented in HHI and the merger guidelines are not binding on courts, Defendants present no countervailing evidence related to market concentration.[4]  *See* Dkt. No. 114 at 16-18.  The Plaintiff States thus make a strong showing that the Transaction will substantially lessen competition.

Defendants focus their opposition to Plaintiff States' motion on the second stage of the burden-shifting analysis.  Defendants present the expert opinion of a competing economic expert for the premise that Plaintiff States' showing falls short regarding both theatrical film-focused markets due to fundamental misunderstandings and incorrect assumptions regarding the economics of theatrical film distribution in the United States.  *See* Dkt. No. 114 at 18-24 (citing Murphy Decl.).  Defendants further argue that the absence of significant entry barriers in the theatrical market undermines the Plaintiff States' showings regarding market concentration.  *Id.* Moreover, Defendants rely on the expert for the premise the Plaintiff States' showing similarly fails because it rests on false assumptions regarding activity in the market for licensing basic cable channels to distributors.  *Id.*  Defendants' proof, contrary to the matter of *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974), on which they rely so heavily, Dkt. No. 114 at 19, does not establish that the merger would not substantially lessen competition.  At best, Defendants' proof regarding these robust, dynamic markets creates disputes regarding the facts and legality of the Transaction's market effects.  At this stage, crediting Defendants' evidence and stopping short of

---

[4] "Although the Merger Guidelines are 'not binding on the courts,' . . . they 'are often used as persuasive authority.' " *Saint Alphonsus*, 778 F.3d at 784 n.9 (quoting *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th Cir. 1993); *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 431 n.11 (5th Cir. 2008)).

United States District Court
Northern District of California

completing the entire burden-shifting analysis in the absence of a full record, the Court recognizes that Plaintiff States have raised serious questions about the merits of their antitrust claim.[5]

Plaintiff States' showing at least demonstrates that serious questions going to the merits remain, weighing in favor of preliminary injunctive relief.

### B.    Irreparable Harm

Under Ninth Circuit law, "[a] lessening of competition constitutes an irreparable injury." *Boardman*, 822 F.3d at 1023.  Because the Plaintiff States make a strong showing that the Transaction will substantially lessen competition in the wide-release theatrical distribution market, they demonstrate irreparable harm would result if a TRO does not issue.  The Transaction would also be difficult, if not impossible, to unwind if permitted to proceed given the anticipated consolidation of operations, sharing of business-sensitive information, and potential termination or reassignment of employees.  *See United States v. Trib. Publ'g Co.*, No. 16-cv-1822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016); *Penn State Hershey*, 838 F.3d at 352-53 ("since it is extraordinarily difficult to 'unscramble the egg,' 'it will be too late to preserve competition if no preliminary injunction has issued.' " (citations and footnote omitted)).  The Plaintiff States have sufficiently established that irreparable harm would result in the absence of a TRO.

### C.    Balance of Equities & Public Interest

The public interest and the balance of hardships inquiries are interrelated and both weigh in favor of an injunction.  The Ninth Circuit recognizes that appropriate enforcement of the antitrust laws for the protection of competition is "vital to the public interest." *Boardman*, 822 F.3d at 1024 (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000)).  Indeed, "[i]n a Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief." *California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990).  Further, the public interest includes ensuring the practical availability of "effective relief" remains

---

[5] The Court notes separately that it cannot accept Defendants' argument that the Transaction will produce efficiencies in the streaming market.  *See* Dkt. No. 114 at 21-22.  Courts have expressly and repeatedly rejected the defense that a challenged merger will result in economic efficiencies ancillary to competition in the relevant market.  *St. Alphonsus*, 778 F.3d at 789 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967)).

United States District Court
Northern District of California

available if Plaintiff States "succeed[] at the merits trial." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 86-87 (D.D.C. 2015). Here, Plaintiff States seek a TRO to preserve the status quo and ensure that Defendants do not effectuate the Transaction while the Court evaluates the proposed merger. Dkt. No. 27 at 29-30. Because the Plaintiff States demonstrate at least serious questions regarding the merits of their antitrust claim, the public equities of preserving competition and ensuring a practical remedy remains available weigh in favor of granting preliminary injunctive relief. *See FTC v. Kroger Co.*, Case No. 3:24-CV-00347-AN, 2024 WL 5053016, at *38 (D. Or. Dec. 10, 2024) ("Because plaintiffs have established a likelihood of success on the merits, the public equities weigh in favor of granting the motion for preliminary injunction to effectively enforce the antitrust laws.").

Defendants did not offer a countershowing of private equities in opposition to the Plaintiff States' motion. Defendants will suffer no apparent harm in the near term if enjoined from consummating the Transaction – they concede that they will not begin to incur carrying costs for a delayed merger until the end of September 2026. *See, e.g.*, Dkt. No. 64 (proposing August hearing schedule); Dkt. No. 65-2. Even if Defendants argued that they would suffer economic harm as a result of delaying the merger, the equities do not weigh in their favor when contrasted with the potential public harms that would result from consummation of the Transaction, including the loss of competition. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) ("Although private equities may be considered, public equities receive far greater weight.") (citing *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)). Paramount and Warner Bros. will continue to operate as separate, viable companies competing in the marketplace while they wait for the Court to adjudicate this case. The balance of equities, combined with the public's vital interest in antitrust enforcement, therefore tips sharply in favor of the requested injunctive relief.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Plaintiff States' motion for a temporary restraining order. Because the Plaintiff States raise serious questions on the merits of their Clayton Act claim and because the balance of equities and public interest tip sharply in favor of

United States District Court
Northern District of California

United States District Court
Northern District of California

the Plaintiff States, the Court ultimately finds the public interest favors their requested TRO to stay the merger in the interim.  *All. for the Wild Rockies*, 632 F.3d. at 1131-34.

The Court **ORDERS** as follows:

- Defendants are temporarily **enjoined and restrained** from closing or consummating the Transaction or taking any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the Transaction.  This Order extends to Defendants' agents, officers, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

- The Court waives the security requirement under Federal Rule of Civil Procedure 65(c) and Local Civil Rule 65-1 because Plaintiffs have demonstrated that Plaintiff States bring suit to enforce important public interests.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (noting a "district court retains discretion as to the amount of security required, *if any*" (emphasis in original) (internal quotation marks and citation omitted)).

- This Order shall remain in effect for 14 days.  Under Federal Rule of Civil Procedure 65(b)(2), a TRO must expire no later than 14 days after the time it is issued unless the Court extends it for good cause.  Therefore, the Court **SETS** the following schedule:
  - Plaintiffs' motion for preliminary injunction due by July 23, 2026;
  - Defendants' opposition brief due by July 27, 2026;
  - Plaintiffs' reply due by July 30, 2026;
  - Parties' joint proposed omnibus sealing motion (see below) due by July 31, 2026;
  - Hearing on Plaintiffs' preliminary injunction motion at 3:00 p.m. on Monday, August 3, 2026, in Oakland.
  - The parties may stipulate to an extended briefing schedule and later hearing date, provided that the parties also stipulate that the temporary restraining order will continue in effect until that hearing date.

- The Court **ORDERS** the parties to prepare a single proposed order that brings together in one chart all the documents or portions of documents sought to be sealed through the

pending administrative motions to seal. The chart should be organized in the following format:

| Document or Portion of Document Sought to be Sealed | Evidence offered in Support of Sealing | Objections | Ruling |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

The Parties' joint proposed omnibus sealing motion shall be filed on the docket and submitted as a Word version to amopo@cand.uscourts.gov.

**IT IS SO ORDERED.**

Dated: July 20, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**

United States District Court
Northern District of California

10