Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: +1 212 326 2000
Facsimile: +1 212 326 2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW #10
Washington, DC 20006-4061
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414
jschiller@omm.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

THE STATE OF CALIFORNIA, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF OREGON, and THE STATE OF WASHINGTON,

*Plaintiffs,*

v.

PARAMOUNT SKYDANCE CORP., and WARNER BROS. DISCOVERY, INC.

*Defendants.*

Case No. 4:26-CV-07116-AMO

Hon. Araceli Martínez-Olguín

**DECLARATION OF LEAH C. MONTESANO IN SUPPORT OF JOINT OMNIBUS MOTION TO SEAL**

Action Filed: July 13, 2026
Trial Date: Not set

I, Leah C. Montesano, declare as follows:

1. I submit this Declaration in support of the Parties' Omnibus Motion to File Under Seal filed in the above-referenced action on July 31, 2026 (the "Motion"). This Declaration is based on my personal knowledge, having worked for Warner Bros. Discovery, Inc. ("WBD"), and Discovery, Inc. before that, for over 11 years. If called upon as a witness, I could and would testify competently to the facts set forth in this Declaration.

2. I am currently the Senior Vice President of Litigation at WBD. In my role, I oversee complex legal matters across several aspects of WBD's business, including television, streaming, film production, and theatrical distribution. My responsibilities include managing and advising WBD on the legal risk associated with its business endeavors. I am familiar with a broad range of issues at WBD through my ordinary course responsibilities, including WBD's potential business deals, internal restructuring decisions, relationships and negotiations with linear network distributors and theatrical exhibitors, financial data and analyses, WBD's proprietary film release strategies, and WBD's financial and business strategies, including its considerations and decisions on operations and investment.

**THE DOCUMENTS**

3. In connection with this Declaration, I have reviewed the following documents filed in this action: the States' Complaint (ECF 1); the Memorandum of Law in Support of the Motion for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "TRO Motion") as well as certain documents attached as exhibits (ECF 27); and Defendants Paramount Skydance Corporation and Warner Bros. Discovery, Inc.'s Opposition to Plaintiffs' Motion for a Temporary Restraining Order (the "TRO Opposition Brief") as well as certain declarations attached thereto (ECF 114). WBD seeks to maintain narrow redactions of the Complaint (ECF 1), the TRO Motion (ECF 27-2), and the TRO Opposition Brief (ECF 114). WBD seeks to replace the complete sealing of the following documents with narrow redactions: the Declaration of Robin S. Lee, Ph.D. (the "Lee Declaration") (ECF 27-6); Exhibits F, H, and U to the TRO Motion (ECF 27-13, -15, -28); the Declaration of Scott A. Miller (the "Miller Decl.") (ECF 114-1); and the Declaration of Jeffrey B. Goldstein (the "Goldstein Decl.") (ECF 114-2).

WBD seeks to maintain the complete seal over Exhibit R (ECF 27-25). This Declaration does not address Exhibit Q (ECF 27-14), which contains no confidential business information of WBD.

4. ***States' Complaint***. I have reviewed the States' Complaint (ECF 1). WBD seeks to redact this document in part. As further described below, the States' Complaint contains certain confidential, non-public information, including references to and quotations from competitively sensitive documents which would reveal trade secrets or proprietary technical information, or information likely to be used improperly by competitors, customers, or suppliers. Public disclosure of such material would specifically harm WBD by causing potential damage to business opportunities, its internal business operations, and its competitive standing. WBD seeks narrowly tailored redactions of only the specific portions of documents implicating these issues as the least restrictive means of protecting this information while leaving the vast majority available for public viewing.

5. The States' Complaint quotes internal confidential communications from WBD's CEO regarding a potential transaction. These communications took place before the current pending deal was signed. Compl. ¶ 6, Page 3:23–27. Ordinarily, WBD does not make public its internal and confidential communications regarding expectations for potential business deals. If made public, WBD's competitors would be able to use this confidential statement improperly against WBD to hurt its competitive position, including in discussions regarding potential future transactions.

6. The States' Complaint references WBD's confidential communications and documents regarding WBD's assessment of financial patterns in theatrical distribution. Compl. ¶ 57, Page 16:9–11. The statements include internal depictions of revenue patterns in theatrical distribution and WBD's competitive assessment of those patterns. Ordinarily, WBD does not make public its internal and confidential communications regarding such assessments. If made public, competitors, suppliers, and/or customers may capitalize on this insight into WBD's internal assessments to improperly gain a competitive advantage over WBD in negotiations.

7. The States' Complaint references trade secrets or proprietary technical information as to WBD's business operations and strategy. Compl. ¶ 84, Page 23:21–22. The proprietary

information that would be revealed includes WBD's practices for deciding when to release films. Ordinarily, WBD does not make public its film release strategy and practices as doing so could damage its competitive standing. Disclosure of the information described in this paragraph would provide WBD's competitors or customers with confidential information on WBD business operations and practices, which could in turn give them an unfair opportunity to preemptively adjust their own practices and strategy for deciding when to release films based on non-public information regarding WBD's practices.

8. The States' Complaint references confidential financial data, information, and projections related to WBD's operations. Compl. ¶ 93, Page 25:20–27. The confidential data includes specific financial figures related to WBD's projected alterations to investment strategy and related underwriting projections. WBD does not release commercially sensitive projections and financial assessments in the ordinary course of business. If disclosed, such information may be subject to improper use by competitors, suppliers, or customers to gain an unfair advantage in future negotiations with WBD or in setting their own practices based on non-public information regarding WBD's practices.

9. ***States' TRO Motion.*** I have reviewed the States' TRO Motion and exhibits attached thereto (ECF 27-2, -13, -15, -25, -28). WBD seeks to redact this document in part. As further described below, the TRO Motion and exhibits contain confidential, non-public information, including references to and quotations from competitively sensitive documents, sensitive financial disclosures, and confidential non-public information related to WBD's relationships with its partners, its business plans, and the pending transaction. Public disclosure of such material would specifically harm WBD including by causing potential damage to business opportunities, internal business operations, and its ability to compete. WBD seeks narrowly tailored redactions of only the specific portions of documents implicating these issues[1] as the least restrictive means of protecting this information while leaving the vast majority available for public viewing.

[1] WBD seeks to seal Exhibit R in its entirety because a less restrictive alternative is not sufficient, as explained *infra*.

10. Specifically, the TRO Motion references financial data related to strategic plans following closure of the pending transaction. Mem. at 2:9–11, 9:15, 19:24–26. This data includes dollar valuations for content spend and categories of jobs, dollar valuations for changes to content, dollar valuations for synergies that have not been publicly disclosed, and dollar valuations for future investments in films. WBD does not release sensitive strategy or planning documents in its ordinary course of business. WBD compiled these projections specifically for the assessment of a potential merger with Paramount. Disclosure of such information would cause substantial prejudice to WBD as the information reflects sensitive financial details regarding the merger. Disclosure would provide an opportunity for competitors to see WBD's financial position and leverage that information to gain an unfair competitive advantage, and would provide an opportunity for suppliers or exhibitors to gain an unfair advantage in negotiations.

11. Second, the TRO Motion contains information regarding workforce-restructuring decisions. Mem. at 4:20–21. If made public, this information could be used by competitors to gain an unfair advantage over WBD. For example, competitors could exploit this information to recruit WBD employees, replicate WBD's staffing and operations models, question WBD's capacity, or anticipate shifts in WBD's production capacity before they become public.

12. Third, the TRO Motion reveals confidential plans regarding WBD's planned film releases in a given year. Mem. at 5:2–4, 13:6–7. These confidential plans include the number of film releases WBD would target, what types of releases would be favored, and WBD's relationships with exhibitors. It is not WBD's practice to publicly disclose such sensitive information related to its film release strategy. Disclosure of WBD's film release strategy could disadvantage WBD and allow competitors or exhibitors to gain undue insight into WBD's strategic decision-making.

13. Fourth, the TRO Motion reveals WBD's assessments, evaluations, and projections of the financial condition of film exhibitors. Mem. at 19:18–21. Release of this information could lead to substantial harm and prejudice to WBD by giving its competitors and/or negotiating partners insight into its non-public competitive intelligence.

14. Fifth, the TRO Motion reveals information related to WBD's proprietary business assessment of certain contractual terms' impact on negotiation dynamics. Mem. at 15:20–21. This information would provide counterparties with an unfair advantage in negotiations and allow competitors could learn WBD's preferred contractual terms. WBD does not typically publicly disclose proprietary business practices and information that would give strategic advantages to its competitors. Disclosure of such information would cause harm to WBD and the future combined company as competitors would have unfair insight into WBD's business practices and strategies.

15. Lastly, the TRO Motion reveals information related to WBD's proprietary business practices and information and competitive intelligence practices. Mem. at 18:26–27. The proprietary information that would be revealed includes WBD's practices for deciding when to release films. Ordinarily, WBD does not make public its film release strategy and practices as doing so could damage its competitive standing. Disclosure of the information described in this paragraph would provide WBD's competitors or customers with confidential information on WBD business operations and practices, which could in turn give them an unfair opportunity to preemptively adjust their own practices and strategy for deciding when to release films based on non-public information regarding WBD's practices.

16. ***Exhibit F to the TRO Motion.*** I have reviewed Exhibit F to the TRO Motion, the "WBD Organization & Talent Review" presentation dated February 27, 2024 (ECF 27-13).[2] WBD seeks to redact this document in part. Portions of pages 9, 19–35, 37–50, 52, and 54–74 contain sensitive information regarding numerous WBD employees, including names, job titles, termination decisions, contract expiration dates, performance metrics, employee rankings, demographics, and other sensitive information. Slides 76–85 contain information regarding trends in WBD employee hiring and demographics. Portions of pages 9–10, 13–15, and 17 contain information regarding WBD's confidential business plans, including strategic hiring and workforce-restructuring decisions. If made public, this information could be used by competitors to gain an unfair advantage over WBD. For example, competitors could exploit this information to target and recruit WBD's personnel, replicate WBD's staffing and operations models, question

[2] This paragraph refers to PDF pagination.

WBD's capacity, or anticipate shifts in WBD's production capacity before they become public.

17. ***Exhibit H to the TRO Motion.*** I have reviewed the April 4, 2024, email from Jeff Goldstein to Pam Abdy and Michael De Luca and the related email thread (ECF 27-15). WBD seeks to redact this document in part. The email thread includes contact information in the form of email addresses. Releasing this information publicly would expose high-level WBD employees' contact information to the public, subjecting the employees to a high probability of annoyance, embarrassment, harassment, and undue burden. The April 4, 2024, email also references a non-public comment from a third-party theater owner regarding the exhibitor's claimed dependence on WBD's production output, citing their specific estimate of impact. Unsealing this information would reveal details about the relationship between WBD and its exhibitors, which could give competitors or exhibitors unfair insight into WBD's business strategy and operations.

18. ***Exhibit R to the TRO Motion.*** I have reviewed the Member - Raptor Content License Standard Distribution Terms ("Standard Distribution Terms") draft dated March 7, 2024 (ECF 27-25). WBD seeks to redact this document in full. This document includes confidential information relating to WBD's preferred licensing and contractual terms, which WBD's competitors or counterparties in negotiations could use to gain an unfair advantage against WBD in future licensing discussions or litigations. The agreement reflects specific terms negotiated between WBD and a third party, disclosure of which could provide an unfair advantage to WBD's competitors or other counterparties in any future negotiations or litigations with WBD or its distributors.

19. ***Exhibit U to the TRO Motion.*** I have reviewed the "2023 Warner Bros. Year-End Theatrical Talking Points" (ECF 27-28). WBD seeks to redact this document in part. Portions of page 2 contain specific figures regarding WBD's revenues, projections, and predictions regarding trends in domestic box office revenues and theatrical exhibitor consolidation. Page 6 and portions of page 7 include specific figures regarding WBD's financial performance in various countries outside the United States. If made public, this information could be used by competitors or counterparties in negotiations to gain an unfair advantage against WBD. Specifically, this

information could allow WBD's competitors to understand where WBD is gaining or losing ground internationally, potentially allowing them to adjust their own distribution and marketing strategies preemptively. Further, WBD's predictions reflect the company's proprietary assessments of future trends. Competitors our counterparties in negotiations could use these predictions to adjust their own strategies and unfairly disadvantage WBD or the companies discussed in WBD's proprietary assessments.

20. ***Declaration of Robin S. Lee, Ph.D. in support of the States' TRO Motion.*** I have reviewed excerpts of the Lee Declaration (ECF 27-6) containing WBD's confidential information. WBD seeks to redact this document in part. As further described below, the Lee Declaration contains confidential, non-public information, including references to and quotations from highly confidential documents produced in this litigation, sensitive financial disclosures, and confidential non-public information. Disclosure of such material would specifically harm WBD by providing a competitive advantage to WBD's competitors. WBD seeks narrowly tailored redactions of only the specific portions of documents implicating these issues as the least restrictive means of protecting this information while leaving the vast majority available for public viewing.

21. The Lee Declaration includes references to WBD's film release and date selection strategies. Lee Decl. ¶¶ 57–58 and nn.51, 52, 86. This information includes specifics on the strategy and information WBD employs when choosing dates for film releases. In its ordinary course, WBD does not make public its film release strategies and practices as doing so would damage its competitive standing. Disclosure of the information described in this paragraph would provide WBD's competitors or customers with confidential information on WBD business operations and practices, which could in turn give them an unfair opportunity to preemptively adjust their own practices and strategy for deciding when to release films based on non-public information regarding WBD's practices.

22. The Lee Declaration also refers to confidential rental rate information for WBD's theater chain customers and related financial information. Lee Decl. ¶¶ 67–68 and n.64. This

information includes detailed information regarding revenue shares for several exhibitors of WBD films and how they have changed over time, as well as WBD's assessment of different factors that can impact rental fees. WBD does not make this information public in the ordinary course and considers information regarding rates negotiated with specific exhibitors highly confidential. If made public, WBD's competitors and exhibitors would understand how WBD adjusts its rental rates based on various factors. Disclosure would cause harm to WBD and exhibitors, because WBD's competitors or other exhibitors could use this information to gain an unfair advantage in negotiations.

23. The Lee Declaration includes descriptions of to WBD's assessments of cable, broadcast, and streaming viewership trends and affiliate fees. Lee Decl. ¶¶ 139.1–.2 and n.157. WBD does not publicly disclose this information in the ordinary course. Disclosure of this information would cause harm to WBD as its competitors would have access to WBD's competitive intelligence practices and proprietary analysis, allowing competitors to replicate WBD's practices and strategies to WBD's competitive disadvantage. Counterparties could also use this information understand WBD's strategies for negotiating with MVPDs, harming WBD's negotiating position.

24. ***TRO Opposition Brief.*** I have reviewed the TRO Opposition Brief (ECF 114). WBD seeks to redact certain non-public, commercially sensitive information discussed in the Goldstein and Miller Declarations described *infra*, including the size of WBD's revenue split with distributors and exhibitors and the factors driving that split, the nature of scale deals and the timing and frequency of negotiations, and the details of WBD's negotiations with a specific network distributor, including the positions each side adopted and the factors influencing WBD's responses. WBD seeks narrowly tailored redactions of only the specific portions of documents implicating these issues as the least restrictive means of protecting this information while leaving the vast majority available for public viewing. Specifically:

25. The TRO Opposition Brief includes confidential information from the Goldstein Declaration. TRO Opp'n at 4:10–12. As explained further below, the Goldstein Declaration discusses the size of WBD's split with distributors and factors that affect the split. *See* Goldstein Decl. ¶¶ 6–8. If made public, this information could be used by competitors, suppliers, or exhibitors to gain an advantage against WBD in future licensing negotiations, potentially giving them an unfair advantage in future deals with WBD and to WBD's disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships. This risk is particularly acute because scale deals are individually negotiated based on transaction-specific factors, such that public disclosure of the criteria WBD applies would compromise WBD's ability to calibrate terms on a case-by-case basis

26. The TRO Opposition Brief includes additional confidential information from the Goldstein Declaration. TRO Opp'n at 4:19–20, 5:3–4, 13–14. As explained further below, the Goldstein Declaration discusses certain factors driving the revenue split between WBD and exhibitors, the nature of scale deals, and the timing and frequency of negotiations between WBD and exhibitors. *See* Goldstein Decl. ¶ 9. If made public, this information could be used by competitors, exhibitors, or litigants to gain an advantage against WBD in future business dealings or in future litigations. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships. This risk is particularly acute because scale deals are individually negotiated based on transaction-specific factors, such that public disclosure of the criteria WBD applies would compromise WBD's ability to calibrate terms on a case-by-case basis.

27. The TRO Opposition Brief includes confidential information from the Miller Declaration. TRO Opp'n at 23:5–6. As explained further below, the Miller Declaration discusses

the details of WBD's negotiations with a specific network distributor, including the specific positions that distributor adopted, WBD's responses, and the factors influencing WBD's response. *See* Miller Decl. ¶ 10. If made public, this information would alert WBD's competitors to highly sensitive and non-public issues regarding WBD's negotiations with its distributors. Disclosure could also harm WBD's negotiating position with its distributors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage.

28. ***Declaration of Scott A. Miller in support of the TRO Opposition Brief***. I have reviewed the Miller Declaration (ECF 114-1). WBD seeks to redact this document in part. The Miller Declaration discusses certain non-public, commercially sensitive information regarding WBD's revenue from network distribution agreements, the primary issues involved in WBD's negotiations with network distribution partners, and the key points of negotiation. WBD seeks narrowly tailored redactions of only the specific portions of documents implicating these issues as the least restrictive means of protecting this information while leaving the vast majority available for public viewing. Specifically:

29. The Miller Declaration discusses the shares of WBD's linear network revenue that it expects to receive from specific sets of its networks in 2026 and further identifies the networks that represent WBD's top revenue sources. Miller Decl. ¶ 4, Page 2:16–19. If made public, this information would alert WBD's competitors, suppliers, and exhibitors to real-time, sensitive, and non-public information regarding WBD's top linear revenue sources and give them a competitive advantage to the detriment of WBD. Because the information reveals which networks are most lucrative to WBD, competitors could use this information to unfairly harm WBD's business interests and business dealings. Competitors could also attempt to replicate the same content strategies through insight into which networks are associated with WBD's highest revenues. Finally, suppliers or exhibitors could use this information to gain an unfair advantage in negotiations.

30. The Miller Declaration discusses the primary points of negotiation that influence WBD's negotiations with its distribution partners, including their relative importance; the details of WBD's negotiations with one distributor, including the specific positions the distributor

adopted, WBD's responses, and the factors influencing WBD's response; and sensitive information regarding WBD's historic negotiations and terms of agreement with distributors. Miller Decl. ¶¶ 6, 8, 10, 12, Pages 2:26–3:3, 3:7–8, 12–16, 20–22. If made public, this information would give WBD's competitors, suppliers, and competing distributors highly sensitive and non-public insights into the key issues in WBD's negotiations with distribution partners. Disclosure could also harm WBD's negotiating position with distributors or suppliers, potentially enabling them to gain an unfair advantage in future dealings to WBD's direct disadvantage.

31. The Miller Declaration discusses the share of WBD revenue that it receives from its top distribution partners. Miller Decl. ¶ 13, Page 3:26–27. If made public, this material would give WBD's competitors, suppliers, and distribution partners non-public and sensitive information regarding WBD's revenue sources and give them an unfair competitive advantage to the detriment of WBD. Because the information reveals which relationships and networks account for the greatest portion of WBD's linear network revenues, competitors could use this information to harm WBD's business interests and dealings with its partners. Disclosure of this information would also allow competitors to target the distributors responsible for the greatest portion of WBD's linear network revenues. Finally, suppliers or distribution partners could use this information to gain an unfair advantage in negotiations.

32. ***Declaration of Jeffrey B. Goldstein in support of the TRO Opposition Brief.*** I have reviewed the Goldstein Declaration (ECF 114-2). WBD seeks to redact this document in part. The Goldstein Declaration discusses certain non-public, commercially sensitive information regarding WBD's licensing relationships and negotiations with exhibitors, the primary issues involved in WBD's negotiations with exhibitors, and the key points of negotiation. WBD seeks narrowly tailored redactions of only the specific portions of documents implicating these issues as the least restrictive means of protecting this information while leaving the vast majority available for public viewing. Specifically:

33. The Goldstein Declaration discusses confidential information relating to WBD's licensing and contractual terms with exhibitors. Goldstein Decl. ¶¶ 4–5, Pages 2:22–27, 3:1–3. If

made public, this information could be used by competitors or litigants to gain an unfair advantage against WBD or its exhibitors in future negotiations or litigations by revealing competitively sensitive information regarding the confidential contractual terms that they have accepted from other partners.

34. The Goldstein Declaration contains headers that, if left unredacted, would disclose the nature of different types of "scale deals" that WBD negotiates with exhibitors. Goldstein Decl. Pages 3:4, 4:11. And considered with the paragraphs below each heading, if left unredacted, the heading language would disclose how specific provisions and the structure of WBD's scale deals with exhibitors differ between different types of scale deals. Disclosure of these categories could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships. This risk is particularly acute because scale deals are individually negotiated based on transaction-specific factors, such that public disclosure of the criteria WBD applies would compromise WBD's ability to calibrate terms on a case-by-case basis.

35. The Goldstein Declaration discusses the specific provisions, structure, and timing of certain scale deals negotiated between WBD and exhibitors, including the scope of the agreement, length of the agreement, revenue split, and information regarding the frequency of negotiations. Goldstein Decl. ¶¶ 6–9, Page 3:5–16, 20–26. If made public, this information could be used by competitors, exhibitors, suppliers, or litigants to gain an unfair advantage against WBD in their business dealings or in future litigations. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships. This risk is particularly acute because scale deals are individually negotiated based on transaction-specific factors, such that public disclosure of the criteria WBD

applies would compromise WBD's ability to calibrate terms on a case-by-case basis.

36. The Goldstein Declaration discusses the pricing for exhibitors associated with certain scale deals, including the factors that WBD considers when offering a scale deal and the structure of the revenue split. Goldstein Decl. ¶¶ 11–12, Page 4:12–17, 19–21. It also includes WBD's considerations when negotiating certain scale deals. This information is not public knowledge and draws upon Mr. Goldstein's personal knowledge in his role as President of Global Distribution at WBD. If made public, this information could be used by competitors or litigants to gain an unfair advantage against WBD in future business dealings or in future litigations. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships. This risk is particularly acute because scale deals are individually negotiated based on transaction-specific factors, such that public disclosure of the criteria WBD applies would compromise WBD's ability to calibrate terms on a case-by-case basis.

37. The Goldstein Declaration discusses a specific provision related to WBD's screen-placement agreements with distributors. Goldstein Decl. ¶ 15, Page 5:15–16. This information reflects WBD's internal, non-public scheduling and release strategy, which WBD does not make available to the public and treats as confidential in the ordinary course of its business dealings with exhibitors. If made public, this information could be used by competitors or litigants to gain an unfair advantage against WBD in future business dealings or in future litigations. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. Competitors could use this information to calibrate their own agreements with exhibitors to WBD's direct disadvantage.

38. The Goldstein Declaration quotes a specific provision from WBD's licensing agreements with exhibitors. Goldstein Decl. ¶ 20, Page 6:20–21. This document includes confidential information relating to WBD's preferred licensing and contractual terms, which

competitors, exhibitors or other litigants could use to their advantage against WBD in future licensing discussions or litigations. The agreement also reflects terms negotiated between WBD and third parties, disclosure of which would provide an advantage to WBD's competitors or other litigants in any future distributor agreements or litigations with WBD. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships.

39. The Goldstein Declaration discusses WBD's treatment of specific deal terms in its licensing agreements with exhibitors. Goldstein Decl. ¶ 23, Page 7:6. This information reflects confidential and non-public information regarding WBD's contractual terms and its strategy behind setting those terms. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships.

40. The Goldstein Declaration describes specific revenue-splitting provisions in WBD's ticket-pricing agreements with exhibitors. Goldstein Decl. ¶ 24, Page 7:7–15. If made public, this information could be used by competitors or litigants to gain an advantage against WBD in future business dealings or in future litigations. Disclosure could harm WBD's negotiating position with exhibitors, potentially giving them an unfair advantage in future dealings to WBD's direct disadvantage. And because these terms reflect WBD's internal strategic and financial decision-making regarding how it structures and allocates value across its exhibitor relationships, their disclosure would provide competitors with a direct window into WBD's business relationships.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 30th day of July, 2026, at Silver Spring, Maryland.

Signed by:

Leah Montesano

378786E199A04AD...

Leah C. Montesano