Marguerite Sullivan (*pro hac vice*)
Anna Rathbun (SBN 273787)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com
christopher.brown@lw.com

Danielle R. Sassoon (*pro hac vice* pending)
Philip Hammersley (*pro hac vice*)
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
danielle.sassoon@clementmurphy.com
philip.hammersley@clementmurphy.com

[additional counsel on signature page]
*Attorneys for Defendant Paramount Skydance Corporation*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

THE STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

PARAMOUNT SKYDANCE CORPORATION, et al.,

Defendants.

---

WRITERS GUILD OF AMERICA, WEST, INC., et al.,

Plaintiffs,

v.

PARAMOUNT SKYDANCE CORPORATION, et al.,

Defendants.

Case No. 4:26-cv-07116-AMO
Case No. 4:26-cv-07212-AMO

**PARAMOUNT'S MOTION TO MODIFY THE STIPULATION AND ORDER NOT TO CLOSE TO REQUIRE BOND**

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... I

TABLE OF AUTHORITIES ..... II

NOTICE OF MOTION AND MOTION ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

INTRODUCTION ..... 1

FACTUAL AND PROCEDURAL BACKGROUND ..... 3

ARGUMENT ..... 5

I. This Court Has Authority To Require Plaintiffs To Post Bond ..... 5

A. The No-Close Order Is an Injunction ..... 5

B. The Court Has Authority to Modify the Injunction to Require A Bond ..... 7

II. Paramount Is Legally Entitled To A Bond ..... 10

A. The Clayton Act Makes Bond A Condition Precedent To An Injunction ..... 10

B. Rule 65(c) Independently Requires Security ..... 14

III. The Court Should Set Bond At $1.88 Billion ..... 16

A. Bond Exists to Provide a Make-Whole Remedy for an Erroneous Injunction ..... 16

B. The Make-Whole Remedy is, at Minimum, $1.88 Billion ..... 18

CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Cases**

*Ahmad v. City of St. Louis*,
995 F.3d 635 (8th Cir. 2021) .......... 9

*Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*,
139 F.4th 773 (9th Cir. 2025) .......... 11

*Apple, Inc. v. Samsung Elecs. Co.*,
877 F.Supp.2d 838 (N.D. Cal. 2012) .......... 19

*Ass'n for Accessible Meds. v. Bonta*,
2022 WL 463313 (E.D. Cal. Feb. 15, 2022) .......... 7

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 10

*Buckeye Coal & Ry. v. Hocking Valley Ry. Co.*,
269 U.S. 42 (1925) .......... 16

*Buddy Sys., Inc. v. Exer-Genie, Inc.*,
545 F.2d 1164 (9th Cir. 1976) .......... 12

*Burlington N. & Santa Fe Ry. Co. v. United States*,
556 U.S. 599 (2009) .......... 21

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) .......... 13, 15

*Carondelet Canal & Navigation Co. v. Louisiana*,
233 U.S. 362 (1914) .......... 11

*Chatz v. Freeman*,
204 F.2d 764 (7th Cir. 1953) .......... 15

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003) .......... 7, 14

*Credit Suisse First Boston Corp. v. Grunwald*,
400 F.3d 1119 (9th Cir. 2005) .......... 7

*Diaz v. Brewer*,
656 F.3d 1008 (9th Cir. 2011) .......... 13

*Edelman v. Jordan*,
415 U.S. 651 (1974) .......... 19

*Estate of Cowart v. Nicklos Drilling Co.*,
505 U.S. 469 (1992) .......... 16

*Fleisher Eng'g & Constr. Co. v. United States ex rel. Hallenbeck*,
311 U.S. 15 (1940) .......... 11

*Friends of the Earth, Inc. v. Brinegar*,
518 F.2d 322 (9th Cir. 1975) .......... 15, 16

*FTC v. Warner Commc'ns Inc.*,
742 F.2d 1156 (9th Cir. 1984) .......... 6

*Gates v. Shinn*,
98 F.3d 463 (9th Cir. 1996) .......... 5

*Georgia v. Penn. R.R. Co.*,
324 U.S. 439 (1945) .......... 10

*Gon v. First State Ins. Co.*,
871 F.2d 863 (9th Cir. 1989) .......... 6

*H. E. Fletcher Co. v. Rock of Ages Corp.*,
326 F.2d 13 (2d Cir. 1963) .......... 2, 10

*Hallstrom v. Tillamook County*,
493 U.S. 20 (1989) .......... 11

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 21

*Houghton v. Cortelyou*,
208 U.S. 149 (1908) .......... 17

*In re Nexstar-Tegna Merger Litigation*,
2026 WL 1049295 (E.D. Cal. Apr. 17, 2026) .......... 20

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) .......... 14

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) .......... 14, 15

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994) .......... 6

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .......... 11

*Las Vegas Sun, Inc. v. Adelson*,
147 F.4th 1103 (9th Cir. 2025) .......... 6, 7, 8, 14

*Marquis of Downshire v. Lady Sandys*,
6 Ves. Jr. 107 (1801) .......... 17

*Mead Johnson & Co. v. Abbott Lab'ys*,
201 F.3d 883 (7th Cir. 2000) .......... 19

*Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*,
834 F.Supp.2d 29 (D. Mass. 2011) .......... 19

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
16 F.3d 1032 (9th Cir. 1994) .......... 13, 18

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005).......... 19

*Ring v. Spina*,
84 F. Supp. 403 (S.D.N.Y. 1949).......... 16

*Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*,
646 F.3d 424 (7th Cir. 2011) .......... 18

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992).......... 9

*Russell v. Farley*,
105 U.S. 433 (1881).......... 17

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006).......... 19

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) .......... 14, 16

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990).......... 19

*Sharp v. Weston*,
233 F.3d 1166 (9th Cir. 2000) .......... 9

*Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.*,
2008 WL 2570850 (E.D. Tenn. June 25, 2008).......... 21

*Sprint Commc'ns Co. v. CAT Commc'ns Int'l, Inc.*,
335 F.3d 235 (3d Cir. 2003).......... 9

*Sys. Fed'n No. 91 v. Wright*,
364 U.S. 642 (1961).......... 7

*TNT Mktg., Inc. v. Agresti*,
796 F.2d 276 (9th Cir. 1986) .......... 6

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
672 F.3d 1160 (9th Cir. 2012) .......... 5

*United States v. Cal-Almond Inc.*,
102 F.3d 999 (9th Cir. 1996) .......... 6

*United States v. Nishiie*,
996 F.3d 1013 (9th Cir. 2021) .......... 12

*United States v. Swift & Co.*,
286 U.S. 106 (1932).......... 7

*United States v. Zucca*,
351 U.S. 91 (1956) ........ 11

*Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985) ........ 14, 15

*W.R. Grace & Co. v. Loc. Union 759*,
461 U.S. 757 (1983) ........ 19

**Statutes**

15 U.S.C. §15(a) ........ 16

15 U.S.C. §25 ........ 12

15 U.S.C. §26 ........ *passim*

28 U.S.C. §1292(a)(1) ........ 6

Act of June 1, 1872, ch.255, §7, 17 Stat. 196 ........ 11

Clayton Act, ch.323, §17, 38 Stat. 730 (1914) ........ 12

Judiciary Act of 1911, ch.231, §263, 36 Stat. 1087 (1911) ........ 12

**Rules**

Fed. R. Civ. P. 54(b) ........ 3

Fed. R. Civ. P. 65(c) ........ *passim*

**Other Authorities**

Black's Law Dictionary (2d ed. 1910) ........ 16

James L. High, *A Treatise on the Law of Injunctions* (1905) ........ 17

Letter from Russell Hollander, Nat'l Exec. Dir., Dirs. Guild of Am., & Matthew D. Loeb, Int'l President, Int'l All. of Theatrical Stage Emps., to Rob Bonta, Cal. Att'y Gen., & David Ellison, Chairman & Chief Exec. Officer, Paramount Skydance Corp. (Aug. 12, 2026), https://perma.cc/6557-HTVV ........ 5

H.R. Rep. No. 63-627 (1914) ........ 18

Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* (1909) ........ 17

Off. of Pub. Affairs, Dep't of Justice, *Statement of the Department of Justice Antitrust Division on the Closing of Its Investigation of the Merger of Paramount Skydance and Warner Bros.* (June 12, 2026), https://perma.cc/K2V3-94B7 ........ 3

Paramount, *Paramount Skydance Satisfies All Regulatory Conditions Under the Merger Agreement to Close Warner Bros. Discovery Acquisition, Securing*

*Clearances in Nearly 70 Countries Worldwide* (Aug. 14, 2026), https://perma.cc/RKN4-X25X ........................................................................................ 1

Paramount Press, *UK Competition and Markets Authority Approves Paramount Skydance Corporation Acquisition of Warner Bros. Discovery* (Aug. 6, 2026), https://perma.cc/E4CQ-K2T8 ........................................................................................ 3

S. Rep. No. 63-698 (1914) ........................................................................................ 12

Noah Webster, *Webster's Practical Dictionary* (1910) ........................................................... 11

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Defendant Paramount Skydance Corporation, on September 21, 2026, at 10:30AM P.T., hereby moves this Court for an order modifying the Stipulation and Order Not to Close, Dkt.170, to require dissolution of that order unless Plaintiffs post a $1,884,726,092.73 bond by September 30, 2026.

Paramount's motion to modify the Stipulation and Order Not to Close is made under Federal Rules of Civil Procedure 54(b) and 65(c), §16 of the Clayton Act, 15 U.S.C. §26, and this Court's inherent power. It is supported by the Memorandum of Points and Authorities below.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Twelve states, along with the Writers Guild of America, West, Inc., and the Writers Guild of America, East, Inc. (together, the "WGA"), have sued to permanently enjoin a merger that has been given the green light by 68 antitrust regulators around the globe. After this Court entered a TRO, Paramount agreed to a stipulated order not to close the merger between Paramount Skydance Corporation and Warner Bros. Discovery, Inc. (the "No-Close Order"), until it has an opportunity to demonstrate at trial what antitrust regulators around the world have already determined: The challenged merger does not threaten harm to competition in any market.

But the court-approved order not to close, which operates as the equivalent of a preliminary injunction, inflicts substantial costs on Paramount, which is otherwise poised to consummate the merger. *See* Paramount, *Paramount Skydance Satisfies All Regulatory Conditions Under the Merger Agreement to Close Warner Bros. Discovery Acquisition, Securing Clearances in Nearly 70 Countries Worldwide* (Aug. 14, 2026), https://perma.cc/RKN4-X25X. While Paramount initially agreed to a No-Close Order without a bond, that stipulation was "without prejudice" to Paramount's "claims, defenses, arguments, or positions in this action." Dkt.170 at 2. Now that trial is scheduled for March 2027, roughly four months after the trial date proposed by Defendants, and more than half a year from now, Paramount seeks the bond to which it is statutorily entitled. Each day that passes after September 30th without the merger closing, Paramount must pay

roughly $7 million in "ticking fees" to Warner Bros. stockholders and yet more fees to its financing sources for maintaining their commitments, and it is forestalled from realizing technology and marketing synergies, among many other transaction benefits. By the time trial concludes and the parties submit their final briefs, Paramount will have paid Warner Bros. shareholders an unrecoverable $1.3 billion in ticking fees alone. Delay also threatens to nullify the regulatory approvals that Defendants have already spent months securing. If the transaction remains unclosed by the end of trial, Defendants will have to take additional steps to obtain regulatory approval, once again at substantial expense. Absent security, even a complete victory on the merits would not restore a dollar of those extraordinary losses.

That is precisely why federal law requires plaintiffs to provide security as a condition for receiving preliminary relief such as the court-approved order. If Plaintiffs are to impede a merger that was otherwise on track to close with worldwide regulatory approval, they are required to post a bond to ensure that, if Defendants ultimately prevail, Paramount is compensated for the damage inflicted by being wrongfully delayed. Section 16 of the Clayton Act—the very provision that Plaintiffs invoke to enjoin the merger—expressly conditions preliminary injunctive relief, including the court-approved No-Close Order here, "upon" executing a "proper bond" that sufficiently guards "against damages for an injunction improvidently granted." 15 U.S.C. §26. Consistent with that unambiguous text, Judge Henry Friendly wrote long ago that the Clayton Act "specifically require[s]" antitrust plaintiffs to post bond in exchange for a "temporary injunction." *H. E. Fletcher Co. v. Rock of Ages Corp.*, 326 F.2d 13, 16 (2d Cir. 1963). That statutory bond requirement exists to ensure that defendants have an opportunity to recover damages caused by a wrongful injunction; because an action against the bond is the only remedy that defendants have for those injuries, it is vital that courts abide by the statute's text and require meaningful security regardless of whether the plaintiffs purport to act on behalf of the public interest.

Federal Rule of Civil Procedure 65(c) likewise independently requires plaintiffs to provide security before receiving a preliminary injunction. Because Paramount can prove with certainty

that it will suffer severe financial harm from the No-Close Order, this is a textbook case for requiring bond.

The Court should exercise its inherent authority, and the authority granted by Federal Rule of Civil Procedure 54(b), to modify the Stipulation and Order Not to Close, Dkt.170, to require dissolution of that order unless Plaintiffs timely post a joint-and-several $1.88 billion bond.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 27, 2026, Paramount entered into an agreement to merge with Warner Bros. That merger will benefit consumers and industry stakeholders by increasing television and film production, fostering streaming service competition, and thereby expanding consumer choice. *See* Dkt.114-11, ¶¶6, 25, 28-32. Recognizing the benefits that the merger will provide consumers, regulatory entities representing over 68 countries—including the United States, the United Kingdom, Australia, Brazil, Canada, New Zealand, Germany, France, Italy, Spain, South Korea, the European Commission, and dozens of others—have approved or declined to challenge the merger after reviewing it. *See* Paramount Press, *UK Competition and Markets Authority Approves Paramount Skydance Corporation Acquisition of Warner Bros. Discovery* (Aug. 6, 2026), https://perma.cc/E4CQ-K2T8. The United States, for its part, approved the merger after "a rigorous eight-month investigation led by the [Department of Justice's] career staff" that involved "over two million documents" from dozens of custodians. Off. of Pub. Affairs, Dep't of Justice, *Statement of the Department of Justice Antitrust Division on the Closing of Its Investigation of the Merger of Paramount Skydance and Warner Bros.* (June 12, 2026), https://perma.cc/K2V3-94B7 ("DOJ Statement"). No reviewing federal or foreign regulator has rejected the transaction.

Despite that resounding worldwide regulatory consensus, California and a handful of other states seek to halt the merger. They do so not as regulators wielding their authority to exercise antitrust review, but as *parens patriae* ostensibly on behalf of the very citizens who stand to benefit from the "increase[d] competition across the media and entertainment ecosystem" that the merger will create. DOJ Statement, *supra*; *see* Dkt.1, ¶15. They are now joined by the WGA, representing its own private interests and those of its members. *See* Dkt.1, ¶111; *see also* Compl. ¶226, *Writers*

*Guild of Am., W., Inc. & Writers Guild of Am. E., Inc. v. Paramount Skydance Corp.*, No. 4:26-cv-07212 (N.D. Cal. July 14, 2026), Dkt.1.

The State Plaintiffs sought and obtained a temporary restraining order on July 20, 2026, that forbade Defendants from closing the merger for 14 days. Dkt.141 at 9. Although Defendants opposed that motion, they did not request the Court to set a bond to cover any damage incurred during the brief duration of the temporary restraining order, which preceded the start of any ticking fees. *See generally* Dkt.114. The Court waived "the security requirement under Federal Rule of Civil Procedure 65(c) and Local Civil Rule 65-1 because Plaintiffs have demonstrated that Plaintiff States bring suit to enforce important public interests" and set a briefing schedule for a preliminary injunction. Dkt.141 at 9. The Court did not address the Clayton Act's independent bond requirement, which applies in instances involving a preliminary injunction rather than a TRO.

The WGA Plaintiffs then moved for a preliminary injunction. *See Writers Guild of Am., W.*, No. 4:26-cv-07212, Dkt.58. In an effort to facilitate prompt resolution of Plaintiffs' claims at trial, Defendants agreed to enter an agreement with Plaintiffs not to close the transaction until "the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027," and WGA agreed to withdraw its motion for a preliminary injunction. Dkt.170 at 2. The parties likewise agreed that the stipulation was made "without prejudice to any party's claims, defenses, arguments, or positions in this action." *Id.* Consistent with that agreement, the Court entered an order instructing that "the transaction at issue … shall not close, be consummated, or otherwise be completed and Defendants will not take any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the transaction until the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027." *Id.* at 10.

Several days later, the parties submitted competing proposals about when this time-sensitive antitrust suit should be set for trial. Plaintiffs requested that trial begin on April 5, 2027. Dkt.193 at 2. Defendants requested that trial begin on November 4, 2026. *Id.* Defendants requested that date in part because, starting October 1, 2026, Paramount must pay Warner Bros. stockholders approximately $7 million every day that the transaction does not close—a contract

term that Paramount accepted as part of the bargain necessary to secure the merger agreement and because the fees were set to start beyond the anticipated timeline for securing regulatory approvals. *See id.* at 12 & n.6. On August 4, 2026, this Court scheduled trial from March 2 to March 19, 2027, with post-trial submissions due to the court on April 5, 2027. Dkt.197 at 2. As noted above, by the time the parties submit their post-trial briefs, Paramount will have paid out to Warner Bros. shareholders an unrecoverable $1.3 billion in ticking fees alone as well as incremental financing fees, and it will also have foregone significant unrealized synergies. Even parties that share concerns about the merger have publicly urged Plaintiffs to move the March 2027 trial to an earlier date to avoid the harm that will result from continued uncertainty about the future of the transaction. *See* Letter from Russell Hollander, Nat'l Exec. Dir., Dirs. Guild of Am., & Matthew D. Loeb, Int'l President, Int'l All. of Theatrical Stage Emps., to Rob Bonta, Cal. Att'y Gen., & David Ellison, Chairman & Chief Exec. Officer, Paramount Skydance Corp. (Aug. 12, 2026), https://perma.cc/6557-HTVV.

## ARGUMENT

### I. This Court Has Authority To Require Plaintiffs To Post Bond.

Although styled as a stipulated order, the No-Close Order qualifies as a preliminary injunction because it instructs Defendants not to close the merger until the Court has an opportunity to complete judicial review. And because that order is an injunction, the Court may (and for the reasons explained below, must) modify the stipulated injunction to require Plaintiffs to provide a bond in exchange for continuing preliminary relief that will extend for more than half a year.

#### A. The No-Close Order Is an Injunction.

An injunction is simply a judicial "decree" that "commands or prohibits conduct." *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996). Whether that decree is nominally styled as an "injunction" or something else does not matter. *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012) (looking to "substantial effect rather than … terminology" and agreeing that the court's label "is not dispositive"). An order acts as an injunction if it is "[1] directed to a party, [2] enforceable by contempt, and [3] designed to accord

or protect some or all of the substantive relief sought by a complaint in more than temporary fashion." *Gon v. First State Ins. Co.*, 871 F.2d 863, 865 (9th Cir. 1989) (footnote omitted).

The No-Close Order without a doubt "satisfies [those] three factors." *United States v. Cal-Almond Inc.*, 102 F.3d 999, 1002 (9th Cir. 1996). First, the order is "directed to a party" because its obligations "extend to Defendants' agents, officers, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants." Dkt.170 at 10. Second, the order is "enforceable by contempt" because it creates a specific and definite command from the court that "the transaction at issue … shall not close." *Id.* Although the order arose from the agreement of the parties rather than adversarial litigation, that does not matter here because—once agreed-upon obligations are incorporated into a judicial order—"a breach of the agreement [is also] a violation of the order." *Cf. Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994). So a violation of the stipulation would be a violation of the court's order and thus punishable by contempt. *See TNT Mktg., Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986) (agreeing that courts may use contempt to punish violations of judicially approved private agreements that command or enjoin particular conduct). And third, the order protects the substantive relief sought by the complaints because it prevents the transaction from closing without judicial approval. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).

That the parties stipulated to the order's operative provisions does not alter its injunctive character. In *Las Vegas Sun, Inc. v. Adelson*, 147 F.4th 1103 (9th Cir. 2025), a plaintiff alleged that a newspaper's conduct "amounted to an attempt to monopolize the Las Vegas newspaper market in violation of … the Sherman Act." *Id.* at 1111. The plaintiff informed the defendants that it intended to seek a preliminary injunction. But the parties agreed to a "joint stipulation to maintain the status quo" to avoid litigating a preliminary injunction. *Id.* The defendants later moved to dissolve the "stipulated preliminary injunction." *Id.* at 1112. The district court denied that motion, and the defendants immediately appealed that denial under 28 U.S.C. §1292(a)(1), which grants courts appellate jurisdiction to review "[i]nterlocutory orders … refusing to dissolve or modify injunctions." *Id.* The Ninth Circuit rejected the plaintiff's argument that the court

lacked appellate jurisdiction, explaining that "there can be no doubt that the October 2019 stipulated order was an injunction: on its face, the order was entered by agreement of the parties '[i]n lieu of litigating' [the plaintiff's] anticipated 'motion for preliminary injunction,' and the order provisionally granted the exact relief that that motion would have sought." *Id.* at 1112. Moreover, that order "explicitly clarified that Defendants could take judicial steps to [engage in the allegedly anticompetitive conduct] and that, in all events, both sides reserved their respective 'rights [and] arguments' notwithstanding the stipulation agreeing to the order." *Id.* Here too, the parties entered the agreement in an effort to avoid litigating a preliminary injunction, the stipulation expressly reserves the "claims, defenses, arguments, or positions" of any party, and the order in substance grants the same relief that would have been sought in a motion for a preliminary injunction. *See* Dkt.170 at 2, 10. Thus, as in *Las Vegas Sun*, the order qualifies as an injunction.

**B. The Court Has Authority to Modify the Injunction to Require A Bond.**

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, … may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Rule 54(b) empowers district courts to modify or dissolve preliminary injunctions, *see Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1123-25 (9th Cir. 2005); *see, e.g.*, *Ass'n for Accessible Meds. v. Bonta*, 2022 WL 463313, at *1 (E.D. Cal. Feb. 15, 2022), including to require a bond, *see Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003) (explaining that a party is "free to petition the district court to require a bond" in connection with a preliminary injunction even though the party failed to make that request at an earlier stage in the proceedings). That authority extends equally to an order "entered by consent." *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932)). Although modifications sometimes require changed circumstances, that is not true when (as here) the initial order is a stipulated injunction that defers judicial resolution of disputed issues. *See Las Vegas Sun*, 147 F.4th at 1113 n.2. Even if changed circumstances were required, however, they are present here and warrant

modification. This litigation, scheduled for trial in March 2027, inflicts substantial additional financial harm on Paramount.

1. Even without a demonstration of changed circumstances, the requested modification is warranted. In *Las Vegas Sun*, the parties entered a "stipulated preliminary injunction." 147 F.4th at 1112. The Ninth Circuit held that the defendants did not need to show "a significant change in facts or law" to justify modification of the injunction because in the injunction, "both sides reserved their respective 'rights [and] arguments' notwithstanding the stipulation agreeing to the order." *Id.*; *see also id.* at 1113 n.2.[1] Thus, it was not "a situation in which the existing injunctive order was based on a judicial resolution of a disputed issue, thereby requiring the party seeking dissolution to make a threshold showing that this already-resolved issue should be revisited." *Id.* "On the contrary, the stipulated order … effectively *deferred* resolution of the [disputed issue] until a later date." *Id.* (emphasis in original). And for that reason, the defendants "were not required to make any further showing of a change in the facts or the law before requesting that the district court dissolve the injunction based on a resolution of this deferred issue." *Id.*

*Las Vegas Sun* controls this motion and obviates the need for Paramount to prove changed circumstances. The stipulated preliminary injunction expressly preserves Paramount's "claims, defenses, arguments, [and] positions in this action." Dkt.170 at 2. In the injunction, the court did not resolve *any* of the disputed issues—much less the propriety of requiring bond. Thus, as in *Las Vegas Sun*, the injunction merely "defer[s] resolution" of the disputed issues "until a later date." 147 F.4th at 1113 n.2 (emphasis omitted). There is therefore no need to show changed circumstances. To conclude otherwise would, contrary to the terms of the No-Close Order, prejudice Paramount's claim and argument that it is entitled to bond.

---

[1] There, the parties also "explicitly clarified that Defendants could take *judicial* steps to terminate" the allegedly anticompetitive agreement being kept in place by the injunction, *Las Vegas Sun*, 147 F.4th at 1112, but the Ninth Circuit made clear that "in all events" the defendants could seek to amend the injunction because they "reserved their respective 'rights [and] arguments,'" which necessarily preserves the ability to seek judicial relief. *Id.*

2. Even if changed circumstances were required to support modification, *see Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000), Paramount easily clears that bar because the scheduling order issued after the parties entered the stipulated injunction makes compliance with the injunction "substantially more onerous," *cf. Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992) (applying the more rigorous modification standard that applies to post-final judgment modifications). An "[i]ncrease in costs of compliance" with an injunction qualifies as "changed circumstances" that support modification or elimination of a preliminary injunction, *see, e.g.*, *Sprint Commc'ns Co. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 242 (3d Cir. 2003), including costs that arise as a result of delays in bringing the case to trial, *see, e.g.*, *Ahmad v. City of St. Louis*, 995 F.3d 635, 640-42 (8th Cir. 2021).

At the time Paramount entered the stipulated preliminary injunction, the financial burden from delay was uncertain given the possibility of a trial in late 2026. *See* Dkt.193 at 9-15. With the current schedule, however, Paramount will have incurred $1.3 billion in unrecoverable financial losses as a result of ticking fees by the time post-trial briefing concludes, to say nothing of incremental financing fees and delayed synergies. *See infra*, pp.18-19. While the financial loss from even a several-month delay is substantial, the loss Paramount faces became all the more extraordinary once the case was scheduled for a March trial, after the No-Close Order was entered. In addition, it is now clear that regulatory approvals necessary to consummate the transaction will start to expire even before the trial begins. *See* Dkt.193, at 12-13; Decl. of Andrew Brandon-Gordon In Support of Paramount's Motion to Modify the Stipulation and Order Not to Close to Require Bond, ¶10 ("Brandon-Gordon Decl."). Paramount will therefore be forced to restart the regulatory-approval process in certain jurisdictions—including the United States, whose approval expires on February 19, 2027—thereby incurring additional expenses and delay. *See id.* That additional consequence independently confirms that the scheduling order has made compliance with the injunction substantially more onerous such that Paramount may seek its modification.

## II. Paramount Is Legally Entitled To A Bond.

Once the No-Close Order is recognized as an injunction, two independent sources of law require Plaintiffs to provide security. Section 16 of the Clayton Act makes a proper bond an express condition of preliminary relief. Separately, Rule 65(c) permits an injunction to issue only if the movant gives security.

### A. The Clayton Act Makes Bond A Condition Precedent To An Injunction.

Plaintiffs brought this antitrust action "under Section 16 of the Clayton Act, 15 U.S.C. §26." Dkt.1, ¶15. Section 16 empowers "[a]ny person"—including states, *see Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 447 (1945)—to "sue for … injunctive relief … against threatened loss or damage by a violation of the antitrust laws," 15 U.S.C. §26. As relevant here, §16 provides that a preliminary injunction "may issue" "upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate." *Id.* Statutory text, context, and precedent all confirm that courts *must* require the plaintiffs to provide a bond in order to receive preliminary relief. Because Paramount now moves to require Plaintiffs to satisfy that necessary condition, the Court should modify the injunction to require a bond sufficient to protect Paramount against projected damages.

By its plain text, the Clayton Act mandates that antitrust plaintiffs provide a "proper bond" in order to obtain preliminary relief. Although the district court retains discretion about whether to issue an injunction, *see* 15 U.S.C. §26 (an injunction "may issue"); *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("the word 'may' *clearly* connotes discretion"), Congress made the exercise of that discretion expressly contingent on two prerequisites. First, the injunction cannot issue unless the movant has made "a showing" of "immediate" irreparable harm. 15 U.S.C. §26. Second, the injunction can issue only "upon the execution of proper bond against damages for an injunction improvidently granted." *Id.*; *see H. E. Fletcher Co.*, 326 F.2d at 16 (Friendly, J.) (stating that a "bond" is "specifically required by" §16 of the Clayton Act). Both are necessary to obtain or maintain preliminary relief in the antitrust context.

The ordinary meaning of "upon," reinforced by the statute's syntax, confirms that execution of a proper bond is a condition precedent to preliminary relief under §16. "Upon," in early twentieth century parlance, was used interchangeably with "on," Noah Webster, *Webster's Practical Dictionary* 480 (1910), which meant "in dependence or reliance upon," *id.* at 272. Preliminary relief therefore "depende[d]" or "reli[ed]" on the plaintiff supplying the necessary financial security. Consistent with that ordinary meaning, the Supreme Court has regularly interpreted "upon" to create a conditional relationship between two events. When presented with a statute that obligated district attorneys, "*upon* affidavit showing good cause …, to institute [certain legal] proceedings," the Court had "no difficulty" in treating the "filing of the affidavit [as] a procedural prerequisite to maintenance of the suit." *United States v. Zucca*, 351 U.S. 91, 94-95 (1956) (emphasis added). Likewise, for a statute that allowed property to revert to the state "*upon* due compensation," the "payment of compensation" acted as a "condition precedent of the reversion." *Carondelet Canal & Navigation Co. v. Louisiana*, 233 U.S. 362, 388 (1914) (emphasis added). And when federal law granted a cause of action "*upon* giving written notice," the Court treated notice as a "condition precedent to suit." *Fleisher Eng'g & Constr. Co. v. United States ex rel. Hallenbeck*, 311 U.S. 15, 18-19 (1940). As in those cases, the use of "upon" here creates a contingent relationship; by conditioning an injunction "*upon* the execution of proper bond," Congress made bond "a mandatory, not optional, condition precedent" for preliminary relief. *Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989).

Statutory context points the same direction. "Statutory history," which "refers to the changes in the text of a statute when it is subsequently amended by Congress," *Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*, 139 F.4th 773, 786 n.11 (9th Cir. 2025), "corroborates [Paramount's] reading of the text" that a bond is mandatory, not discretionary, for injunctions issued under the Clayton Act, *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 720 (2018). Congress first addressed bond requirements for injunctions issued by federal courts in 1872, when it made clear that courts could issue injunctive relief "with or without security." Act of June 1, 1872, ch.255, §7, 17 Stat. 196, 197. The Judiciary Act of 1911 reaffirmed that courts retained

discretion over whether to require bonds. *See* Judiciary Act of 1911, ch.231, §263, 36 Stat. 1087, 1162 (authorizing courts to grant injunctions "with or without security"). The Clayton Act, however, repealed that exact provision, *see* ch.323, §17, 38 Stat. 730, 737 (1914) (repealing §263 of the Judiciary Act of 1911); *see Buddy Sys., Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1168 n.8 (9th Cir. 1976), and replaced it with a regime that makes bond a mandatory precondition to the issuance of an antitrust injunction, *see* Clayton Act, §16, 38 Stat. at 737; *see supra*, p.10. "Because sequential changes in predecessor statutes best reflect congressional intent," *United States v. Nishiie*, 996 F.3d 1013, 1025 (9th Cir. 2021), the shift from authorizing injunctions "with or without security" to authorizing them only "upon the execution of proper bond" confirms that the Clayton Act withdrew courts' discretion to waive security entirely.

The Clayton Act's legislative history removes any doubt that a bond is a mandatory, rather than a discretionary, precondition to injunctive relief. Against a backdrop where courts retained discretion to enter injunctions without bond, "[t]he too ready issuance of injunctions or the issuance without proper precautions or safeguards has been called to the attention of the Congress session after session for many years." S. Rep. No. 63-698, at 18 (1914). In response to those concerns, Congress acted. "Section 16" of the Clayton Act, the Senate Report explains, "provides that no restraining order or interlocutory order of injunction shall issue except on the giving of bond by the applicant." *Id.* at 50. The Clayton Act changed the law so that it was "no longer within the discretion of the courts whether any such security or none shall be given." *Id.* at 21; *see also id.* (explaining that the Clayton Act "takes the matter of requiring security out of the category of discretionary matters, where it was found by the Committee on Revision and permitted to remain"). Congress considered it "clearly just and salutary that the extraordinary writ injunction should not issue in any case until the party seeking it and for whose benefit it issues has provided the other party with all the protection which security for damages affords." *Id.*

That is especially appropriate when it comes to injunctions barring a merger already approved by federal regulators. While the United States is expressly exempt from any bond requirement under the Clayton Act, *see* 15 U.S.C. §25 (authorizing the U.S. Attorney General to

seek injunctive relief under the Clayton Act without posting bond), no such exemption applies to state attorneys general or trade unions, who—like all other private litigants—are bound by the Clayton Act's requirement that a preliminary injunction may issue only upon the execution of a proper bond. 15 U.S.C. §26. While §16 permits private suits, the bond requirement is an important safeguard against meritless private party suits that hold otherwise-approved mergers hostage, inflicting substantial damage during protracted litigation. *Cf. California v. Am. Stores Co.*, 495 U.S. 271, 298 (1990) (Kennedy, J., concurring) (expressing concern about a state lawsuit that unreasonably delays consummation of a merger already reviewed by the federal government). The bond is mandatory even without regard to the Court's assessment of Plaintiffs' likelihood of success, although Defendants have advanced substantial arguments—that will be further developed and proved at trial—that Plaintiffs' claim is meritless. *See* Dkt.114 at 10-24.[2] Whether an injunction arises from consent or a preliminary adjudication from the court, the Ninth Circuit has explained that "a party has been wrongfully enjoined … when it turns out the party enjoined had the right all along to do what it was enjoined from doing." *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994).

The Court's prior ruling, which waived any security requirement for the fourteen-day TRO, without objection from Paramount, does not suggest otherwise. In their motion for a temporary restraining order, the State Plaintiffs argued that courts "routinely waive the bond requirement," but cited only two cases that did not involve the Clayton Act. Dkt.27-2 at 24. In its TRO ruling, this Court "waive[d] the security requirement under Federal Rule of Civil Procedure 65(c) and Local Civil Rule 65-1," citing *Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011), which also did not involve the Clayton Act. Neither the parties nor the Court has yet addressed the Clayton Act's bond requirement.

Plaintiffs cannot escape the Clayton Act's bond requirements on the theory that Paramount consented to whatever financial harm arises from the stipulated injunction. Plaintiffs agreed that

---

[2] Paramount reserves its right to provide further argument why Plaintiffs are unlikely to succeed on the merits, in the event that the Court either considers that relevant to the bond request or dissolves the stipulated injunction.

the stipulation was "without prejudice" to Paramount's claims and arguments. Dkt.169 at 2; Dkt.170 at 2. Paramount therefore did not forfeit its right to a bond that will permit Paramount to recover for the staggering financial harm that Paramount will incur while it seeks to vindicate the merger at trial. And Plaintiffs are not insulated from fulfilling the conditions that are legally necessary to maintain the injunction while the case proceeds to a March 2027 trial date. As the Ninth Circuit has recognized, a party is "free to petition the district court to require a bond" in connection with a preliminary injunction even though the party failed to make that request at an earlier stage in the proceedings. *See Conn. Gen. Life Ins. Co.*, 321 F.3d at 883. All the more so here, where the No-Close Order "effectively *deferred* resolution" of the disputed issues, *Las Vegas Sun*, 147 F.4th at 1113 n.2, Paramount may ask the Court to dissolve the injunction absent Plaintiffs posting a bond upon which the injunction should be conditioned.

**B. Rule 65(c) Independently Requires Security.**

Federal Rule of Civil Procedure 65(c) provides that a federal court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite that "mandatory language" permitting an injunction "only" when adequate security is provided, the Ninth Circuit has in narrow circumstances permitted courts to deviate from Rule 65's text by waiving the security requirement. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Security may be waived when "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct," *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003), when requiring security would "effectively deny access to judicial review," *California ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), and in certain litigation brought to vindicate the public interest, *see Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). To be clear, these exceptions do not apply to the Clayton Act, which independently imposes a bond requirement.

Regardless, even under Rule 65(c), none of those limited exceptions apply here. So the "genera[l]" rule governs and security is therefore mandatory. *Tahoe Reg'l Plan.*, 766 F.2d at 1325.[3]

First, this is not a case where "there is no realistic likelihood of harm to the defendant from enjoining [its] conduct." *Jorgensen*, 320 F.3d at 919. At minimum, Paramount will incur $1.3 billion in otherwise unrecoverable financial harm from ticking fees as a result of the injunction and the newly scheduled trial date. *See supra*, p.5. The price tag will exceed $1.88 billion, considering additional ticking fees and incremental financing fees if judicial review stretches until June 2027. *See infra*, p.18. That figure does not even include the financial harm from delayed synergies and uncertainties associated with U.S. and foreign regulatory approvals expiring or requiring new authorizations. *See* Brandon-Gordon Decl., ¶¶7-10. Regardless of when the judicial process concludes, Paramount is certain to suffer serious financial loss.

Second, requiring Plaintiffs to post security will not "deny access to judicial review." *Tahoe Reg'l Plan.*, 766 F.2d at 1325. The State Plaintiffs collectively represent jurisdictions that generate trillions of dollars in economic output and collect hundreds of billions in tax revenue annually. Accordingly, the public plaintiffs here, unlike other organizations with more limited resources that have obtained nominal bonds, have "ample resources to post" even a large bond. *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) (agreeing that "the State of California … has ample resources to post bond").

Finally, that Plaintiffs have purportedly brought "suit to enforce important public interests" does not authorize waiving security. Dkt.141 at 9. Section 16 authorizes the states to sue as private parties, not as a government regulator or enforcer of the national interest. *See Am. Stores*, 495 U.S. at 285, 294, 296 (referring to California as a "private part[y]" and California's suit as a "private suit"). That is all the more true for WGA, which is suing because of purported harm to itself and its own members. *See* Compl. ¶¶219-20, *Writers Guild of Am., W.*, No. 4:26-cv-07212.

---

[3] Paramount preserves the argument that Ninth Circuit precedent allowing courts to dispense with Rule 65(c)'s security requirement should be overruled. Rule 65(c)'s text is "plain, definite[,] and unmistakable," *Chatz v. Freeman*, 204 F.2d 764, 768 (7th Cir. 1953); it allows a preliminary injunction to issue "only if the movant gives security," Fed. R. Civ. P. 65(c). Insofar as the Ninth Circuit has dispensed with security requirements in select cases, that cannot be squared with Rule 65(c)'s text or history.

In antitrust cases brought under federal law, it is the "United States which must alone speak for the public interest." *Buckeye Coal & Ry. v. Hocking Valley Ry. Co.*, 269 U.S. 42, 49 (1925); *see also Ring v. Spina*, 84 F. Supp. 403, 406 (S.D.N.Y. 1949) ("The United States is the proper party to protect the interests of the general public under the anti-trust laws."). The United States has already concluded that the merger serves the public interest.

As a categorical matter, therefore, a private antitrust suit does not resemble those cases where the Ninth Circuit has waived the bond requirement for "public interest" litigation, particularly because, unlike in those cases, Congress specified that a consequential bond is a necessary precondition for injunctive relief under §16. *See, e.g.*, *Save Our Sonoran, Inc.*, 408 F.3d at 1126 (environmental lawsuit). Moreover, the Ninth Circuit generally reserves such waiver for cases where the plaintiff has limited resources, and here, the "situation is materially different" because Plaintiffs have "ample resources to post bond." *Friends of the Earth*, 518 F.2d at 323.

## III. The Court Should Set Bond At $1.88 Billion.

### A. Bond Exists to Provide a Make-Whole Remedy for an Erroneous Injunction.

1. Section 16 of the Clayton Act conditions receipt of a preliminary injunction "upon the execution of proper bond against damages for an injunction improvidently granted." 15 U.S.C. §26. The plain text of that provision requires a consequential rather than nominal bond. Section 16 instructs that a bond exists to provide "damages" for improper injunctions, *id.*—meaning, the bond supplies "compensation for the injury done [to the defendants] by the opposite party" through the injunction. Black's Law Dictionary 313 (2d ed. 1910).[4] And by a "proper" bond, Congress directed courts to set bond at an amount that would be "suitable" to accomplish its compensatory purpose. *Id.* at 955. A nominal bond that comes nowhere close to covering the damages inflicted

---

[4] That interpretation is bolstered by the interpretive presumption of consistent usage. Elsewhere in the Clayton Act, Congress authorized antitrust plaintiffs to recover "threefold the damages by him sustained" from the unlawful conduct. 15 U.S.C. §15(a). There, "damages" plainly references a monetary remedy measured by the injuries the plaintiff actually sustained. Section 16's reference to "damages" should be read the same way. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992). Just as courts cannot substitute a nominal award in place of treble compensatory damages to plaintiffs under §15(a), they likewise cannot rewrite §16's bond requirement by merely requiring a nominal amount instead of an amount designed to protect against the harm that the defendants would suffer from a wrongful injunction.

by an injunction in an ultimately meritless lawsuit is not a "proper" bond at all. *See also Houghton v. Cortelyou*, 208 U.S. 149, 157 (1908) (agreeing that bonds exist "to secure the defendant against loss" caused by temporary injunctions).

That conclusion finds further support from background equitable principles which Congress expressly incorporated into §16 of the Clayton Act. *See* 15 U.S.C. §26 (authorizing injunctive relief under the "conditions and principles" that govern "courts of equity"). At equity, the security requirement was understood as "the price of an injunction." I Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* §159 (1909). The "general purpose and object" of a bond was therefore "to protect defendant from any wrongful interference with his rights, and to reimburse him for all damages and costs incurred by reason of an injunction improperly issued." II James L. High, *A Treatise on the Law of Injunctions* §1619 (1905); *see Russell v. Farley*, 105 U.S. 433, 440-41 (1881) (recounting the influential New York rule that injunctions cannot be issued until the plaintiff provides sureties to "pay such party all damages he might sustain by reason of such injunction if the court should decide that the complainant was not entitled to the same"). Courts considered it an objective of equity to put "the party … in the position he would have stood" absent interference with his rights. *Russell*, 105 U.S. at 439. In *Marquis of Downshire v. Lady Sandys*, 6 Ves. Jr. 107 (1801) (Eng.), the plaintiff sought to restrain the defendant from cutting down certain trees, and the chancery court ordered the plaintiff to "undertake to pay the value" of the timber "if the decision should be against him." *Russell*, 105 U.S. at 438-39. By incorporating the equitable principle that bonds should be sufficient to reimburse the enjoined party for the losses caused by an improvident injunction, and by abrogating the common law rule that bonds were discretionary, *see supra*, pp.11-12, Congress made meaningful security—not nominal relief—a mandatory condition of preliminary relief under the Clayton Act.

The states cannot object to the Clayton Act's bond requirement on the basis that it unnecessarily burdens antitrust plaintiffs. That argument finds no support in either the statutory text or contemporaneous equitable practice, *see supra*, pp.11-13, and in all events that concern was squarely considered and rejected by Congress. Legislative opponents to the Clayton Act's bond

requirement argued that bonds should remain discretionary rather than mandatory: "To require an independent to give a bond sufficiently large to compensate … against possible damages will often prevent him from securing relief" in the first place. H.R. Rep. No. 63-627, pt. 3, at 7 (1914). That view did not carry the day in 1914, so it cannot carry the day now. And it also makes sense that the Clayton Act requires meaningful bond. Absent a mandatory and consequential bond, private parties would be able to hold hostage mergers approved by regulators worldwide, with no meaningful downside to bringing a suit that may not ultimately prevail and no incentive to engage in timely settlement discussions. By imposing a mandatory bond requirement, however, Congress enacted an important safeguard and constraint on private suits that may thwart the decisions of national and international regulators or delay mergers ultimately deemed procompetitive.

2. The result is no different if viewed through the lens of Rule 65(c). The Ninth Circuit has expressly held in the Rule 65(c) context that "there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the bond executed and recover provable damages up to the amount of the bond," *Nintendo*, 16 F.3d at 1036, which reaffirms both that the purpose of security under Rule 65(c) is the same as under the Clayton Act (compensation for injuries from improvidently granted injunctions) and that it is critical for the district court to require security (because that is the only remedy for damages), *see Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011) (explaining that judges "should take care that the bond is set high enough to cover the losses that their handiwork could cause" because "damages payable to a person injured by an erroneously issued injunction cannot exceed the amount of the bond" and "[a] party injured by an erroneous preliminary injunction is entitled to be made whole").

**B. The Make-Whole Remedy is, at Minimum, $1.88 Billion.**

To provide Paramount an opportunity to recover the damages that it will inevitably incur if the court approves the merger, this Court should order Plaintiffs to provide a $1.88 billion bond as a condition for the continuation of the injunction. If Plaintiffs do not supply that bond, the injunction should be dissolved, and the transaction should be allowed to close.

The financial harms that Paramount will suffer fall into, at minimum, the following categories. First, Paramount will be responsible for paying Warner Bros. shareholders a $0.25 per share "ticking fee" for each quarter (measured daily) until closing. *See* Brandon-Gordon Decl., ¶2. Based on the number of Warner Bros. shares outstanding, the ticking fee will be approximately $6.97 million per day, or $1.69 billion for the period from October 1, 2026, to June 1, 2027. *Id.* ¶¶3-4. Second, Paramount would incur $190 million in incremental financing costs that arise from delaying consummation of the merger until June 2027. *Id.* ¶¶5-6.

A $1.88 billion bond is "proper" because it will preserve Paramount's ability to recover the damages for "an injunction improvidently granted." 15 U.S.C. §26. Because "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond," *W.R. Grace & Co. v. Loc. Union 759*, 461 U.S. 757, 770 n.14 (1983), and because states are separately immune from suits for damages, *see Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1039-40 (2d Cir. 1990) (explaining that defendants are "without recourse" if the party that obtained the wrongful injunction is "protected by sovereign immunity"), the bond ordered by the court provides the only mechanism for defendants to recover for financial harm inflicted by an injunction in an ultimately meritless lawsuit. District courts "should err on the high side" when setting bond for preliminary relief because the bond determination does not entitle Paramount to that amount; it just provides a cap on the amount of liability the plaintiffs can incur. *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000).

That bond, though unquestionably sizable, is proportionate to the magnitude of the harm. District courts have elsewhere imposed sizable bonds in cases where the anticipated harm was large, albeit smaller than the established harm here. *See, e.g.*, *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1384-85 (Fed. Cir. 2006) ($400 million bond); *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005) ($200 million bond); *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 834 F.Supp.2d 29, 31 (D. Mass. 2011) ($100 million bond); *Apple, Inc. v. Samsung Elecs. Co.*, 877 F.Supp.2d 838, 918 (N.D. Cal. 2012) ($95 million bond). The size of

the bond requested here is a function of the severity of the financial injury that Paramount faces and the certainty with which it will suffer that injury. In that sense, this case is distinguishable from *In re Nexstar-Tegna Merger Litigation*, 2026 WL 1049295 (E.D. Cal. Apr. 17, 2026), a case that the State Plaintiffs cited in their TRO motion to argue for a nominal bond of $10,000. Dkt.27-2 at 24 n.7. The parties in *Nexstar-Tegna* were not prohibited from closing and therefore did not face extraordinary losses. And there, unlike here, the defendants "offer[ed] no financial analysis or documentary evidence to support a bond in [the requested] amount" of $150 million. 2026 WL 1049295, at *28. Paramount has provided irrefutable evidence that it will suffer $1.88 billion in damages from the ticking and financing fees, along with evidence that it will miss out on significant additional cost savings from delayed synergies and will incur fees associated with renewed regulatory filings. *See supra*, p.19; Brandon-Gordon Decl. ¶¶2-10.

It bears emphasis that the pursuit of this lawsuit by the State Plaintiffs has created a substantial delay in closing although all regulators who have analyzed the deal have cleared it. The State Plaintiffs have maintained that they cannot prepare for a trial any sooner than next spring, even though such a prolonged schedule between the time of the complaint and trial is unusually long for merger litigation of this nature—to say nothing of the fact that state attorneys general had more than six months to investigate the transaction prior to filing the complaint, and so were not starting from scratch. Given that Plaintiffs insist upon this delay while standing as the lone parties around the world objecting to the transaction, a bond is required to protect Paramount against the financial harm wrought by the circumstances.

Plaintiffs cannot evade the requested bond amount by characterizing the $7 million ticking fee that begins on October 1, 2026, as a "self-imposed" injury and thus outside the scope of compensable damages. *Contra cf.* Dkt.27-2 at 25. That daily fee was part of the bargain struck between Paramount and Warner Bros., forming an indispensable part of the consideration necessary to secure the transaction and representing an allocation of risk beyond the anticipated timeline for regulatory approval and closing. Once the injunction prevents the merger from closing after September 30, Paramount has no unilateral means of avoiding the fee while preserving the

benefit of its bargain: it must either pay the contractually required amount or abandon the transaction. That fee arises entirely from this litigation and its timeline, not from any action within Paramount's control.

Finally, the Court should order that the security be provided jointly and severally by the State Plaintiffs. *See, e.g.*, *Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.*, 2008 WL 2570850, at *4 (E.D. Tenn. June 25, 2008). Both groups of plaintiffs sought and received the benefit of the No-Close Order. Moreover, even if one group of plaintiffs agrees to settle with Defendants, the No-Close Order would still prevent the merger from consummating. Each group of plaintiffs is an independent cause of the harm that arises from the stipulated injunction, thus making joint-and-several security appropriate. *Cf. Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) ("[W]here two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm."); *accord Honeycutt v. United States*, 581 U.S. 443, 447 (2017) ("[i]f two or more [parties] jointly cause harm, each [] is held liable for the entire amount of the harm").

**CONCLUSION**

For the foregoing reasons, the Court should enter an order modifying the Stipulation and Order Not to Close, Dkt.170, to require dissolution of that order unless Plaintiffs post a joint-and-several $1,884,726,092.73 bond by September 30, 2026.

Dated: August 17, 2026

Respectfully submitted,

Marguerite Sullivan (*pro hac vice*)
Anna Rathbun (SBN 273787)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com
christopher.brown@lw.com

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

*<u>/s/ Danielle R. Sassoon</u>*

Danielle R. Sassoon (*pro hac vice* pending)
Philip Hammersley (*pro hac vice*)
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
danielle.sassoon@clementmurphy.com
philip.hammersley@clementmurphy.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

*Attorneys for Defendant Paramount Skydance Corporation*

**FILER'S ATTESTATION**

I, Philip Hammersley, am the ECF User whose ID and password are being used to file this Motion, the supporting Declaration, and the [Proposed] Order. In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from Danielle R. Sassoon, on whose behalf this document is being filed. I hereby confirm that I have on file the original signature corresponding to the confirmed signature of Danielle R. Sassoon and that Danielle R. Sassoon has concurred in the filing of this document.

By: /s/ Philip Hammersley
Philip Hammersley