# United States Senate

WASHINGTON, DC 20510

September 24, 2026

The Honorable Araceli Martínez-Olguín
United States District Court for the Northern District of California
Ronald V. Dellums Federal Building & United States Courthouse
1301 Clay Street
Oakland, California 94612

**Re: *State of California, et al. v. Paramount Skydance Corp., et al.*, No. 4:26-cv-07116-AMO - Proposed Consent Decree**

Dear Judge Martínez-Olguín:

I write as Ranking Member of the Senate Judiciary Subcommittee on Antitrust, Competition Policy, and Consumer Rights, in advance of the Court's scheduled status conference, to urge the Court to subject the proposed consent decree to an independent public-interest review before entering it. I have urged courts to conduct the same review of proposed antitrust settlements in other cases, including *United States v. Live Nation Entertainment, Inc.*, No. 1:24-cv-03973-AS (S.D.N.Y.), ECF No. 1415, and *United States v. Hewlett Packard Enterprise Co.*, No. 5:25-cv-00951-PCP (N.D. Cal.), ECF No. 23. Both the courts entered the letters on the docket.

I have scrutinized the sale of Warner Bros. Discovery (WBD) since the company put itself up for sale in October 2025. Past media mergers counsel caution. In 2019, Disney's $71-billion purchase of 21st Century Fox's entertainment assets eliminated a major Hollywood studio, cost more than 4,000 jobs, and shrank the studio's film slate. Discovery's 2022 acquisition of WarnerMedia, which created WBD, triggered rounds of layoffs in 2023 and 2024 that cut roughly 10 percent of the workforce.

In February, when Netflix was the apparent buyer, the Antitrust Subcommittee held an oversight hearing on the proposed Netflix-WBD merger, which raised the same antitrust concerns, titled *Examining the Competitive Impact of the Proposed Netflix-Warner Brothers Transaction*. After Paramount launched its hostile bid, I sent oversight letters to the Department of Justice, the Treasury Department, the Federal Communications Commission, Paramount, WBD, and the transaction's advisory firms. On April 15, 2026, I held a congressional spotlight forum with media professionals, artists, and labor representatives to examine the antitrust risks and labor impacts of the proposed merger. They warned that the merger threatens media pluralism, democracy, and tens of thousands of jobs. That record compels me to ask the Court to hold the decree to the standard the law requires, apply that standard to a full factual record, and ensure that any decree it enters fully remedies the potential harms to competition, workers, and the public. I take no position on the merits beyond what the plaintiff States themselves pleaded.

This decree carries unusual weight. The Antitrust Division of the Department of Justice closed its investigation of this transaction on June 12, 2026, without seeking any remedy.[1] Press reports indicate that senior Department officials cleared the merger before the career staff who investigated the

[1] U.S. Dep't of Justice, Antitrust Div., Statement on the Closing of Its Investigation of the Merger of Paramount Skydance and Warner Bros. (June 12, 2026).

transaction, and who were reportedly leaning toward a challenge, could object.[2] Because no federal consent decree exists, the proposal before the Court is the only enforceable instrument that will govern the combination of two of the nation's five major film distributors, leaving only four to control over 85 percent of all wide-release theatrical films, and two of the five major owners of basic cable channels, leaving only two to control 59 percent of all basic cable, in the United States. And unlike a federal antitrust consent judgment, it has reached the Court without a competitive impact statement, without a public comment period, and without any formal opportunity for theaters, distributors, workers, or consumers to be heard.

**I. The Governing Standard**

A consent decree is a judicial act, not merely a private contract. Before entering one, a court must satisfy itself that the decree is "fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir. 1990); *see United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). The decree must "spring from and serve to resolve a dispute within the court's subject-matter jurisdiction," "come within the general scope of the case made by the pleadings," and "further the objectives of the law upon which the complaint was based." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). Because a decree affects not only the parties but the public interest as well, a court has a heightened responsibility "to protect those who did *not* participate in negotiating the compromise, not those who negotiated." *Oregon*, 913 F.2d at 581(citing *Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982)).

Deference to the parties' agreement is not absolute. The Ninth Circuit has held that a district court must independently scrutinize a consent decree's terms before approving it, and approving a decree without the information needed to evaluate whether it is fair and adequate is in fact an abuse of discretion. *United States v. Montrose Chem. Corp.*, 50 F.3d 741, 746-47 (9th Cir. 1995). In other words, a court must have the necessary information to evaluate whether the decree remedies the harm it purports to remedy.

The Tunney Act, 15 U.S.C. § 16(b)-(h), governs only consent judgments proposed by the United States, but its factors supply a well-developed framework for evaluating any antitrust decree. They direct a court to consider the decree's competitive impact, including whether it terminates the alleged violations; its provisions for enforcement and modification; its duration; the alternative remedies the parties actually considered; whether its terms are ambiguous; and its effect on the public generally and on those who allege specific injury. 15 U.S.C. § 16(e)(1). I urge the Court to apply those factors here by analogy.

Finally, because the States alleged the merger violates Section 7 of the Clayton Act, that statute supplies the measure of adequacy. A consent decree must "further the objectives of the law upon which the complaint was based," *Local No. 93*, 478 U.S. at 525, and relief in a Section 7 case must be effective to "restore competition." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 (1961)). Section 16 authorizes States to seek divestiture as a remedy for a Section 7 violation. *California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990). The Supreme Court has called divestiture "the most important of antitrust remedies" because it is "simple, relatively easy to administer, and sure." *E. I. du Pont de Nemours*, 366 U.S. at 326. A decree

---

[2] Todd Spangler, Variety, Top DOJ Officials Cleared Paramount-Warner Bros. Merger Before Staff Lawyers, Who Were 'Leaning' Toward Antitrust Lawsuit, Could Object (2026).

such as the one before the Court that substitutes time-limited conduct commitments for structural relief bears the burden of showing it will accomplish the same result.

## II. Questions the Court Should Resolve Before Entering the Decree

### A. *The Decree Must Remedy the Harms the States Pleaded*

The States alleged that the merger would substantially lessen competition in three markets: distribution of wide-release theatrical films, distribution of anticipated top-grossing theatrical films, and licensing of basic cable channels to distributors.[3] They alleged that after the merger, three firms would control 75 percent of wide-release distribution, and that WBD and Paramount, the second- and third-largest licensors of basic cable channels, would combine for a 27 percent share of that market.[4] The decree contains no structural relief in any of those markets. It instead relies on conduct commitments. The Department of Justice's Merger Remedies Manual states that "[s]tand-alone conduct relief is appropriate only when the parties prove: (1) a transaction generates significant efficiencies that cannot be achieved without the merger; (2) a structural remedy is not possible; (3) the conduct remedy will completely cure the anticompetitive harm, and (4) the remedy can be enforced effectively."[5] The Court should apply that test to determine whether the decree's conduct commitments will restore the competition the States said the merger would eliminate.

*Theatrical output.* The decree requires the combined company to release at least 30 films per year for the first two years and 32 per year for the next three. Of those, at least 15 and 16, respectively, must be produced or jointly produced by the combined company. § III.A. The decree does not distinguish a release from a production, and the parties have not disclosed how many films each studio currently releases and produces. The Court should require the parties to report how many films Paramount and WBD released and produced, separately and combined, in the years preceding the merger. If the minimums do not exceed pre-merger output, the decree requires nothing the companies were not already doing. If they fall below the studios' combined output, the decree authorizes the very reduction in output it purports to prevent.

*The penalty structure.* A shortfall triggers a payment of $30 million per missing film, and an uncured shortfall after six months triggers divestiture of the company's interest in Miramax, which it can reacquire after the five-year commitment period. § III.A. A fixed $30 million penalty gives the combined company a financial incentive not to comply whenever a film's projected loss exceeds that amount. This is precisely the type of loophole the Merger Remedies Manual warns "might lead to attempted circumvention of the decree,"[6] and it renders the remedy inadequate. The Court should also scrutinize whether divesting an interest in Miramax, a specialty studio, can restore competition lost in the markets for wide-release and top-grossing films, and whether the combined company's ability to reacquire Miramax after five years renders the divestiture illusory.

---

[3] Compl. ¶ 36, State of California, et al. v. Paramount Skydance Corp., et al., No. 4:26-cv-07116-AMO (N.D. Cal. filed July 2026) [hereinafter "Compl."]; Press Release, Cal. Dep't of Justice, Attorney General Bonta Files Lawsuit to Block $110 Billion Warner Bros./Paramount Merger (July 2026).

[4] Compl. ¶ 73.

[5] Dep't of Just., Antitrust Div., Merger Remedies Manual (Sept. 2020) (citing Makan Delrahim, Assistant Attorney General, U.S. Dep't. of Justice, Antitrust Div., Antitrust and Deregulation, Remarks as Prepared for Delivery at American Bar Association Antitrust Section Fall Forum (Nov. 16, 2017)).

[6] Merger Remedies Manual at 5.

*Exhibitor protections.* For three years of the decree's five-year term, the combined company must honor the film rental terms and rates Paramount and WBD offered each exhibitor before closing and may not offer any exhibitor less favorable terms. § III.A. The Court should ask what protects exhibitors in years four and five, and after the decree expires. The merger would create what the complaint calls a "media behemoth,"[7] and that combination is permanent; the decree's constraints on its conduct are not. Paramount and WBD have each made films for more than a century. Three years of rate protection cannot address harms that will last for decades. Once the protections lapse, exhibitors will face the very harms the decree purports to cure.

*Basic cable.* The decree prohibits bundling and cross-conditioning of the two companies' basic cable channels, and bars the combined company from using confidential information about one company's channels in carriage negotiations for the other's. § III.B. These are classic conduct remedies, and they are difficult to police: carriage negotiations are confidential, and a distributor that accepts unfavorable terms has little ability or incentive to complain about a supplier it cannot replace. The Court should determine whether the listed Divestiture Channels are the assets whose combined leverage caused the harm alleged in the complaint: the elimination of alternative sources of basic cable programming, the heightened threat of blackouts, and the loss of distributors' bargaining leverage.

### B. *The Decree Must Be Enforceable*

A remedy is only as strong as its enforcement, and several of the decree's provisions warrant the Court's attention.

*Monitoring.* The Monitoring Trustee reports to a committee of the plaintiff States, not to the Court. § VII.B. The only requirement to notify the Court of a breach is for a violation of the basic cable commitments. § III.B. Disputes proceed to a meet-and-confer and then to non-binding mediation. § II.C. And while the proposed decree preserves the court's jurisdiction to enforce, the Court will learn of noncompliance only if the parties choose to bring it forward. If they do not, the Court cannot, as a practical matter, enforce the decree.

*Force majeure.* The decree excuses performance for events beyond the parties' reasonable control, including strikes, labor disruptions, or economic recessions. § VIII.C. The film industry experienced simultaneous writers' and actors' strikes as recently as 2023. A carve-out that suspends output obligations during labor disputes would relieve the combined company of its central commitment at precisely the moment its bargaining leverage over workers is greatest.

*Modification.* After two years, the decree permits the combined company to seek modification under Federal Rule of Civil Procedure 60(b) upon a showing that the decree impairs its business operations and that modification would not substantially lessen competition. § VIII.C. The Supreme Court's standard requires a "significant change in circumstances" and that the change have been "unforeseen and unforeseeable."[8] The decree should make clear that the parties' agreement cannot lower that bar.

*Duration.* The conduct commitments expire after five years; the merger does not. The complaint made this point bluntly: "The merger will end . . . competition permanently."[9] The Merger Remedies Manual

---

[7] Compl. ¶ 1.
[8] Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 384-85 (1992).
[9] Compl. ¶ 6.

agrees: "A consent decree temporarily regulating conduct . . . does not effectively redress persistent competitive harm resulting from an indefinite change in market structure."[10] Five years of conduct commitments cannot "completely cure" a permanent loss of competition.[11] The Court should ask what remains of the remedy in year six.

### C. *The News Provision's Relation to the Case*

The decree creates a five-member News Editorial Independence Board to oversee editorial standards at CBS News and CNN. § III.D. The concern that animates this provision is serious: when one company controls the news outlets consumers rely on, it narrows the information available to them as both consumers and participants in a democratic society. But complaint did not plead editorial independence, and the Court must determine whether the provision comes "within the general scope of the case made by the pleadings." *Local No. 93*, 478 U.S. at 525. The Court should also examine whether the provision can be enforced as written: the combined company's own board appoints the members, the members report to the board, and the decree specifies no remedy for a breach. At least one plaintiff State's Attorney General has stated publicly that his State sought divestiture of CNN and CBS News and was "deeply disappointed" the settlement did not secure it.[12] Whatever its merits, the Board cannot offset any shortfall in the competitive remedy for the basic cable market the States actually pleaded.

### D. *The Payments Must Remedy Competitive Harm*

The decree directs up to $40 million to the States for fees and costs, a share of shortfall payments to the National Association of Attorneys General, and additional sums to community, workforce, and independent-film funds. §§ III.A, III.C, III.E. Many of these purposes are worthy. The Court should nonetheless require the parties to explain how each payment redresses the competitive harms alleged, so that the Court can distinguish remedial relief from consideration for settlement.

### E. *The Decree Must Reflect the Remedy the Evidence Supports*

The parties reached this settlement after the defendants sought a $1.88 billion bond from the States, a demand the Department of Justice supported, and ahead of financial deadlines that bear on the transaction.[13] The States are entitled to weigh litigation risks, including the cost of litigating an antitrust case that can run an upwards of $30 million.[14] But the Court's task is to determine whether the decree adequately remedies a Section 7 violation, not whether it was the best bargain available under pressure. A complete record will allow the Court to make that determination.

---

[10] Merger Remedies Manual at 4.
[11] Id. at 16.
[12] California Attorney General Bonta Says States Made Demands in Paramount-Warner Deal, NPR (Sept. 22, 2026) (quoting Connecticut Attorney General William Tong).
[13] David Shepardson, Reuters, Paramount Seeks $1.88 Billion Bond in Warner Bros. Merger Antitrust Case, (Aug. 2026); Gene Maddaus, Variety, DOJ Takes Paramount's Side Against States in Fight Over $1.9 Billion Bond (2026).
[14] See Assistant Attorney General Jonathan Kanter Delivers Farewell Address (Dec. 17, 2024) (noting that the DOJ can "accrue expert fees of up to 30 million dollars—just for a single case").

**III. Conclusion**

I respectfully urge the Court, before ruling on the joint motion, to direct the parties to file a statement, modeled on the competitive impact statement required by 15 U.S.C. § 16(b), that explains how each provision remedies each harm alleged in the complaint, sets out the pre-merger baselines against which the output and spending commitments were calibrated, and describes the structural alternatives the States considered and why they rejected them. The Court should also consider appointing an independent economic expert under Federal Rule of Evidence 706 to assess whether the decree's commitments restore competition in the pleaded markets. Finally, the Court should measure the proposed remedies against the relief the States originally sought: an injunction blocking the merger altogether. The decree does not address the core of the case—that the merger is anticompetitive and will eliminate jobs. Indeed, California Attorney General stated plainly, that the "settlement is not a vote of support for this merger. It is not a blessing of the broader merger . . . we believe further consolidation in markets that are central to American economic life doesn't serve the American economy, consumers, or competition well."[15]

The States brought this case to prevent a substantial lessening of competition in markets that shape what Americans watch and what they pay to watch it. The decree the Court enters will be the only remedy those markets receive.

Thank you for your consideration.

Sincerely,

Cory A. Booker
United States Senator
Ranking Member,
Subcommittee on Antitrust,
Competition Policy, and
Consumer Rights

[15] PBS News Hour, What the Paramount-Warner Bros. Merger Settlement Means for Hollywood (Sept. 2026).