MATTHEW A. SELIGMAN (SBN 288980)
GRAYHAWK LAW, P.C.
3015 Main Street, Suite 330
Santa Monica, CA 90405
Telephone: (310) 571-5993
matthew@grayhawklaw.com
*Counsel for Amici Curiae*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA, *et al.*,
*Plaintiffs*,

v.

PARAMOUNT SKYDANCE CORP., and WARNER BROS. DISCOVERY, INC.,
*Defendants*.

Case No. 4:26-cv-07116-AMO

**BRIEF OF AMICI CURIAE IN OPPOSITION TO PROPOSED CONSENT DECREE**

Judge: Hon. Araceli Martínez-Olguín

## INTERESTS OF AMICI CURIAE

The League of United Latin American Citizens ("LULAC") brings a distinct institutional and community perspective to the adequacy of the proposed consent decree. Founded in 1929, it advocates for the economic, political, and cultural rights of Latinos throughout the United States. Its interest in this transaction predates the proposed settlement: in an August 23, 2026, letter to Attorney General Bonta, LULAC supported the challenge to the merger and raised concerns about its effects on Latino storytellers, journalists, and audiences. The letter connected the loss of competing studios to fewer potential buyers and distributors for independent projects and fewer choices for audiences. *See* LULAC Letter to Attorney General Bonta (Aug. 23, 2026), at 1–3, *available at* https://lulac.org/images/LULAC_Bonta_Letter_Final_-_8-23-26.pdf.

Reverend Dr. Boise Kimber, joining in his individual capacity, is President of the National Baptist Convention, USA, Inc. As a religious leader whose ministry includes advocacy for social justice, Dr. Kimber brings a distinct perspective on the importance of independent news programming and cultural expression to Black communities. His interest concerns whether the proposed decree adequately addresses the loss of competition alleged in the complaint, including

the resulting risks to the range of voices, viewpoints, and experiences reflected in news and entertainment, and the threats to Black small businesses and workers.

Reverend Dr. Xavier L. Thompson, joining in his individual capacity, serves as Senior Pastor of Southern Missionary Baptist Church in Los Angeles, Saint Paul Baptist Church in Pacoima, and Calvary Baptist Church of Pacoima. His pastoral leadership brings a local perspective on the importance of independent news sources and programming to the communities he serves. His participation addresses whether the decree adequately protects against the diminished programming quality, variety, and range of viewpoints alleged in the complaint. He is deeply concerned that reduced competition in film and television production could diminish employment for Black and Latino writers, performers, production workers, and other members of the communities he serves, and that reduced competition will harm Black and Latino small businesses.

**INTRODUCTION**

The States alleged that this merger would permanently eliminate competition between Defendants over the films and television programming Americans can watch. The proposed decree leaves that loss of independent decision-making largely intact. Its temporary film commitments measure releases and spending without preserving competition over which projects receive support. Its cable provisions regulate negotiations without preserving competition over the perspectives that are broadcast. And its news board, appointed by and reporting to the merged company, cannot replace the independent sources of programming the transaction eliminates. These defects concern the competitive harms the States pleaded, including diminished quality, variety, and viewpoints. Compl., ECF No. 1 ¶¶ 2, 74, 91–94, 107. The impact of those antitrust harms will fall with particular force on minority communities. Their voices and perspectives are at particular risk of losing out when competition for audiences withers. The stories and information minority communities prefer to consume are at particular risk of being canceled when media companies no longer have to compete for every viewer. A decree that fails to meaningfully address this loss of competition leaves minority communities to bear the very harms the States sued to prevent.

The Court should decline to approve the decree in its present form. Instead, it should order a full evidentiary hearing to decide on a well-developed record whether the proposed consent decree adequately addresses the alleged antitrust harms and thus is fair, reasonable, and equitable.

**GOVERNING STANDARD**

The Court must determine that the decree is "fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990). Settlement permits compromise; approval does not require the optimal outcome or every obligation available after trial. *United States v. Oregon*, 913 F.2d 576, 580–81 (9th Cir. 1990). But the decree must further the objectives of the underlying law. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). For the States' claim under the Clayton Act § 7, 15 U.S.C. § 18, that means protecting competition in the pleaded markets. *See NCAA v. Alston*, 594 U.S. 69, 95 (2021) ("statutory policy" of Sherman Act is "competition").

Meaningful review requires information connecting the remedy to the alleged harm. Litigation risks and negotiations matter, but they cannot replace independent evaluation. *See, e.g.*, *United States v. Montrose Chemical Corp. of California*, 50 F.3d 741, 746–48 (9th Cir. 1995) (vacating approval of a government-negotiated settlement because the district court lacked the damage estimates necessary to assess its adequacy). The court must have a sufficient factual basis to reach an "informed, just and reasoned decision." *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990) (citation omitted). That obligation requires both an adequate record and independent judicial evaluation of the evidence; a district court may not simply accept the settling parties' assurances in an "informational vacuum" where there is "no evidence at all on an important point." *Arizona v. City of Tucson*, 761 F.3d 1005, 1012-13 (9th Cir. 2014) (vacating district court approval of state-negotiated consent decree). Moreover, a district court "must actually engage with that information and explain in a reasoned disposition why the evidence indicates that the consent decrees are procedurally and substantively fair, reasonable, and consistent with [the statute's] objectives." *Id.* at 1012 (quotation marks and citation omitted).

## ARGUMENT

The proposed consent decree fails to adequately address the serious harms the Plaintiff States alleged the transaction poses. The Plaintiff States' complaint alleged antitrust harms in three markets: distribution of wide-release theatrical films, distribution of anticipated top-grossing theatrical films, and licensing of basic cable channels to distributors. Compl. ¶ 36. In the theatrical film markets, the States alleged that the merger would increase distributors' bargaining leverage over theaters, reduce output of creative and distinctive films, and facilitate coordination among remaining distributors, resulting in higher prices, lower quality, and diminished audience choice. *Id.* ¶ 74. In the basic cable market, the States alleged both increased prices and diminished investment in programming, resulting in reduced quality, less variety, and fewer viewpoints. *Id.* ¶¶ 90–94. Those concerns take on particular significance in a transaction that would bring CNN and CBS's news programming under common ownership. *See id.* ¶ 35.

The proposed consent decree requires no divestiture as a condition of closing. Instead, it relies on conduct commitments that leave important pleaded harms unaddressed even when the combined company fully complies. The conduct commitments in the proposed consent decree appear untethered to the competitive harms the States alleged in the complaint. The joint motion, in turn, lists those commitments without making any effort to explain how they adequately address those harms. For this Court to approve this consent decree on the underdeveloped record before it would be precisely to "abdicate its responsibility to independently determine that the agreements are fair, reasonable, and consistent with [the statute's] objectives." *City of Tucson*, 761 F.3d at 1015.

### I. The film provisions do not adequately preserve competition and audience choice, particularly for minority communities.

Competition between Paramount and Warner Bros. helps determine which films get made and reach theaters. The Plaintiff States alleged that Paramount and Warner Bros. "compete fiercely to create and disseminate new, different, and innovative film and television content," that this competition promotes investment in "new, creative, and distinctive theatrical films," and that the transaction threatens the "breadth of voices and viewpoints that reach the public." Compl. ¶¶ 2, 4, 7. Common ownership would eliminate competition between the two studios, thus undermining the

incentive to produce variety in programming. *See* DOJ & FTC, Merger Guidelines § 4.2.E (2023). The alleged harm thus extends beyond fewer releases to diminished investment in quality and a narrower range of choices for audiences. Compl. ¶¶ 7–8, 74.

The remedies in the proposed consent decree addressing the competitive harms to the theatrical film market focus on the combined company's quantitative output through aggregate release and spending commitments without explaining how those commitments would prevent the reduction in quality and variety of productions alleged by the States in their complaint. The distribution requirements measure how many films are released and how much money is spent; they do not preserve competition over which films get made, a crucial component of the Plaintiffs' antitrust claims. A merged studio could satisfy these requirements while reducing investment in documentaries and other nonfiction works, films by and about Black and Latino communities, or other distinctive projects that might have been greenlit by one of two independently competing studios. An additional $300 million in spending could be concentrated in selected productions without preserving the range of films offered. The theatrical windows and marketing requirements likewise govern the exploitation of films selected for release, leaving the selection of those films under common control. Decree, ECF No. 244 §§ III.A.2–4. The parties have not explained how these provisions address the loss of competition over quality and variety.

This is not an idle concern. The theatrical landscape already paints a bleak picture for Black and Latino voices. *Hollywood Diversity Report 2026: Featuring Film, Part 01, Theatrical*, UCLA ENTERTAINMENT & MEDIA RESEARCH INITIATIVE (Mar. 12, 2026), *available at* https://socialsciences.ucla.edu/wp-content/uploads/2026/03/UCLA-Hollywood-Diversity-Report-2026-Theatrical-Film-3-12-2026.pdf. In 2025, Black actors held 6.5 percent of lead roles in top theatrical films, against 13.7 percent of the population, while Latino actors held just 2.8 percent; Black directors accounted for 3.3 percent of directors and Black writers for 2.2 percent of writers; and no Black, Latina, or multiracial woman directed a top film that year. Latino characters occupied only 5 percent of speaking roles across 1,300 top films, and as many as 44 percent of those films had no Latino speaking character at all. Ariana Case, Zoily Mercado & Karla Hernandez, *Hispanic and Latino Representation in Film: Erasure On Screen & Behind the Camera Across 1,300 Popular*

*Movies*, USC ANNENBERG INCLUSION INITIATIVE (Sep. 2021), *available at* https://assets.uscannenberg.org/docs/aii-hispanic-latino-rep-2021-09-13.pdf.

Competition between studios is what lets Black and Latino storytellers break through those structural barriers and reach audiences who want to hear their voices. The merger will narrow this already diminished path to representation. The merged company would become the nation's largest buyer of original film and television programming, with the power to reduce output, employ fewer workers, and depress pay. Black and Latino producers will lose the leverage of competing bidders and lose an independent potential buyer and distributor for their projects. Audiences will lose the choices those producers would have supplied, and Latino and Black audiences risk losing access to the content that would have been available to them from competing companies. For amici, that is a concrete consequence of the diminished audience choice the States alleged: an aggregate release total can remain unchanged while the range of communities and experiences represented in those films sharply contracts.

Reduced production also particularly threatens the livelihoods of Black and Latino writers, performers, and crew. Los Angeles County estimates that the merger could eliminate approximately 4,500 film and television jobs over three years and endanger another 2,661 jobs at businesses supporting production. *See* L.A. Cnty. Dep't of Econ. Opportunity, Protecting Entertainment Jobs: Final Report (Aug. 18, 2026), *available at* https://opportunity.lacounty.gov/wp-content/uploads/2026/08/Paramount_Warner_Merger_August18_2026_120-day_Motion_ReportBack_Final_KL_REVISED.pdf. For communities already underrepresented in the industry, fewer production opportunities threaten both economic advancement and the ability to bring their stories to audiences. Aggregate release and spending commitments do not ensure that those opportunities survive. Those losses would also threaten minority-owned small businesses: nearly half of the 363 entertainment-supporting small businesses receiving County business-interruption grants in 2024 were owned by Black, Indigenous, or other people of color. *See* L.A. Cnty., *360+ Small Businesses Awarded $4.0M through LA County's Entertainment Business Interruption Fund Grant Program* (Aug. 28, 2024).

The provisions directed specifically to independent films leave the same problem unresolved. Although the decree requires four "Independent Films" annually, a film qualifies if it

is based on an original screenplay or originates with producers outside the combined company and three other major studios. Decree §§ II.O, III.A.1.c. All four could therefore be internally produced original-screenplay films, without guaranteeing any distribution opportunity for an outside filmmaker. The $5 million annual Independent Film Fund is also formed and operated by the combined company. *Id.* § III.C.6. Those provisions may support particular projects, but neither preserves an independent distributor able to back a filmmaker whom the combined company turns away. The decree offers no answer to amici's concern that filmmakers and audiences from already underrepresented communities will lose opportunities that competition between studios provides.

The relationship between competition and creative production is illustrated by *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022). The court explained that competition among commonly owned imprints could not substitute for competition between independent publishers in securing the highest advances for authors. *Id*. at 49–51. The court also noted the undisputed consequence if advances fell substantially: some authors would be unable to write professionally, reducing the number and variety of books published. *Id*. at 23. *Bertelsmann*'s reasoning illustrates why competition to finance creative work matters for what ultimately reaches the public. Here, the States expressly alleged that eliminating competition between Paramount and Warner Bros. would reduce investment in new, creative, and distinctive films—even if the combined company honored its numerical release commitments. Compl. ¶¶ 7, 107. The parties must therefore explain how the decree's aggregate release and spending requirements address the loss of competition over *which* creative projects receive support and reach audiences.

The proposed consent decree's provisions suffer from still further flaws. The decree provides for $30 million penalties for missing films and, after an uncured shortfall, divestiture of the company's interest in Miramax. Decree §§ III.A.9–10. Those remedies purport to enforce the release obligation. They do not address the loss of quality or variety that can occur while the company meets that obligation. The Court must assess whether compliance adequately protects competition, not simply whether the decree can compel compliance. Even the decree's quantitative protections against reduced output and deleterious terms for theaters expire—while the loss of competition continues. The release and spending commitments apply for five calendar years

following the closing year; the rental-term protections apply for only the first three. Decree §§ II.G–H, III.A.1, III.A.6, III.A.8. The joint motion identifies no basis to infer that competition will prevent the alleged harms after the protections the proposed consent decree provides expire.

And even during the term of the proposed consent decree, the durability of its quantitative commitments warrants scrutiny. Section VIII.C excuses nonperformance when events beyond the parties' reasonable control—including strikes, labor disruptions, and even economic recessions—prevent compliance. This is a critical gap in the proposed consent decree's enforcement mechanism that will also allow the combined entity to leverage its consolidated power at moments of maximum destabilization for workers and other impacted communities within the industry. Moreover, although the States may challenge invocation of the clause, the decree does not expressly extend the five-year commitment period to compensate for excused interruptions or explain how those interruptions affect the shortfall remedies. Decree §§ II.G–H, III.A.9–10, VIII.C. The parties have not explained whether an interruption would permit some of the proposed consent decree's protections to disappear while the merger's elimination of competition remains permanent.

**II. The decree does not adequately protect against diminished cable programming variety, particularly for minority communities.**

The proposed decree appears still less responsive to the threatened loss of competition in basic cable programming, and news programming in particular. The Plaintiff States alleged that reduced competition among basic-cable programmers would cause not merely higher prices, but diminished investment in programming, leaving consumers with "less original programming, fewer series, and access to less variety and fewer viewpoints." Compl. ¶¶ 91–94. Those concerns are especially consequential here because the transaction places CNN and CBS News under common ownership, replacing independent economic and editorial decision-making with control by a single company. The decree fails to address two mechanisms through which that harm can occur, each with particularly serious consequences for Black and Latino communities.

First, the merger increases the combined company's leverage over distributors, weakening their ability to resist reductions in programming variety. A distributor negotiating with independent programmers can turn to competing suppliers when one offers an inadequate lineup. Combining the

companies' portfolios makes that alternative less effective and the prospect of a blackout more costly. The combined company can therefore reduce investment or eliminate programming with less fear that distributors will take their business elsewhere. Compl. ¶¶ 87–94.

That loss of bargaining leverage places programming serving Black and Latino communities at particular risk. Local distributors serving those communities need content responsive to their subscribers' interests. Their ability to secure that content depends in part on competition among suppliers. As consolidation reduces their alternatives, those distributors will have less ability to resist the cancellation of programs or reductions in investment serving their audiences. The resulting harm is concrete: a reduced supply of programming for communities whose needs may receive less attention within a consolidated national portfolio.

The decree's negotiation rules do not recreate the competition that constrains those decisions. They require separate negotiations for the legacy portfolios, restrict cross-conditioning and the use of confidential affiliate-fee information, and generally preserve existing renegotiation schedules. Decree §§ III.B.1–5. But separate negotiating teams still serve the same owner. They do not restore independent incentives to develop competing programming or prevent the common owner from reducing investment across both portfolios. In *Saint Alphonsus Medical Center–Nampa Inc. v. St. Luke's Health System, Ltd.*, the Ninth Circuit affirmed rejection of a similar proposal to substitute separate bargaining groups for independent competitors. 778 F.3d 775, 793 (9th Cir. 2015). And the decree's conditional divestiture provision responds to an uncured material breach of the negotiation rules—not a reduction in programming variety accomplished in full compliance with them. Decree § III.B.7. The combined company could thus comply with the purported remedy while inflicting the very harm the States allege.

Second, common ownership threatens to narrow news programming, and the Editorial Independence Board leaves the company in control of selecting its own overseers. Every member, including every replacement, is appointed by the combined company's board of directors. Decree §§ III.D.3–4. Subject to the decree's eligibility requirements, the company chooses who will exercise editorial oversight; the decree supplies no independent approval mechanism for those choices. The eligibility requirements provide little protection against that problem. The company

can select an entire board of otherwise eligible journalists because it expects them to support its priorities. No later interference or threat of removal would be necessary. The good-cause removal provision therefore misses the central vulnerability. Protection against dismissal may help an independently minded appointee resist pressure after appointment. It does nothing to ensure that independently minded members are appointed in the first place. The board thus fails to restore the economic incentives of separately owned news organizations to fund different investigations, pursue distinctive stories, and compete for underserved audiences. Its authority over editorial principles and disputes does not give it control over separate competitive budgets or require preservation of distinct reporting operations. *Id.* § III.D.5.

For Black and Latino audiences, further narrowing would compound an existing shortage of responsive coverage. A 2023 Pew survey found that only 40 percent of Black adults and 37 percent of Hispanic adults said their news outlets often covered issues important to them, compared with 54 percent of White adults. PEW RESEARCH CENTER (Jan. 23, 2024), *available at* https://www.pewresearch.org/short-reads/2024/01/23/fewer-than-half-of-black-americans-say-the-news-often-covers-the-issues-that-are-important-to-them/. Latino communities depend on a news ecosystem that is particularly thin and that demands bilingual programming: 54 percent of Hispanic adults get their news mainly in English, 21 percent mainly in Spanish, and 23 percent in both languages. PEW RESEARCH CENTER (Mar. 19, 2024), *available at* https://www.pewresearch.org/journalism/2024/03/19/how-hispanic-americans-get-their-news/. Independent editorial decision-making creates more opportunities for a news organization to recognize and serve those unmet needs. Common control risks extending one owner's omissions across multiple outlets, while a hand-picked board offers little protection. Neither separate negotiators nor company-selected editorial overseers preserve the competitive incentives that produce varied programming.

## CONCLUSION

The Court should decline to enter the proposed decree on the present record and maintain the no-close order pending resolution of the joint motion; require evidence explaining how the decree addresses the alleged losses of output, quality, and variety; and hold an evidentiary hearing before deciding whether the decree adequately remedies those harms.

Dated: September 24, 2026

Respectfully submitted,

Matthew A. Seligman (SBN 288980)

/s/ Matthew A. Seligman

Grayhawk Law, P.C.
3015 Main Street, Suite 330
Santa Monica, CA 90405
(310) 571-5993
matthew@grayhawklaw.com

*Counsel for Amici Curiae*