Jessica J. González (SBN 251376)
FREE PRESS
1401 21st Street #11439
Sacramento, CA 95811
(310) 809-2577
jgonzalez@freepress.net

Brendan Benedict (*pro hac vice*)
BENEDICT LAW GROUP PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022
(212) 287-9501
brendan@benedictlawgroup.com

*Counsel for* Amici Curiae *Committee for the First Amendment, Free Press, Freedom of the Press Foundation, Future Film Coalition, and International Documentary Association*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>PARAMOUNT SKYDANCE CORP. and WARNER BROS. DISCOVERY, INC.,<br><br>*Defendants*. | Case No. 4:26-cv-07116-AMO<br><br>**BRIEF OF BLOCK THE MERGER COALITION MEMBERS AS *AMICI CURIAE* OPPOSING PROPOSED CONSENT DECREE**<br><br>Hon. Araceli Martínez-Olguín |

## PRELIMINARY STATEMENT

Just over two months ago, Plaintiff States brought suit to block the proposed merger of Paramount Skydance and Warner Bros. Discovery, the largest Hollywood combination in history. The States said the tie-up would "extinguish competition" between the two and raise prices, reduce output, lower quality, and lessen choice. In the time since, Plaintiff States won a temporary restraining order to prevent closing, and the Court found they "raised serious questions about the merits of their antitrust claim" in at least one market. (TRO Op. 6-7.) The Attorney General for the lead Plaintiff State, California, publicly criticized the very behavioral remedies that the parties now ask the Court to approve.[1] But whatever the reasons for the States' about-face, neither time nor circumstance changes the fact that this merger lessens competition.

These *Amici*, through their own work and as part of the Block the Merger coalition, have been on the firing line. Their interests are identified in the prior motion for leave. (ECF No. 248.) The proposed consent decree (ECF No. 244) represents more than a difference of opinion between *Amici* and the parties. Although the proposed consent decree does little to address *Amici*'s concerns, it nevertheless may extinguish individual antitrust claims for injunctive relief against the merger through the *res judicata* effect of *parens patriae* consent decrees in the Plaintiff States. In exchange for giving those claims up, these residents get virtually nothing, while the Plaintiff States' preferred partners are earmarked payments for tens of millions of dollars. The Court should deny the Joint Motion to enter the proposed consent decree (ECF No. 243) ("CD") because it is both procedurally and substantively unfair to third parties and the public.

*First*, the consent decree was reached in an unfair process. The *res judicata* effect of

---

[1] "A promise to make a certain amount of movies . . . in a given year. That's a behavioral remedy. Those are typically not enforceable in the way that we like. Not particularly good at solving the problem." Jill Goldsmith*, California AG Rob Bonta Open to Structural Remedies in Paramount-WBD Suit but Calls 30 Movies a Year an "Old, Stale Promise,"* Deadline (Aug. 11, 2026), https://shorturl.at/9Mtxy.

*parens* consent decrees raises due process concerns, which in turn require the absent residents to be adequately represented by Plaintiff States. But the proposed consent decree codifies structural conflicts of interests between different constituents, such as provisionally guaranteeing penalty payments to certain union pension funds for the failure to meet film release guarantees at the expense of independent contractors who will not benefit from the payments but would from greater output. These conflicts confirm procedural infirmities.

*Second*, the consent decree's provisions are substantively unfair and potentially unconstitutional. The proposed editorial oversight provisions pose similar First Amendment issues that Paramount itself raised in response to consumer litigation. Now the parties propose amplifying them with the Court's oversight and contempt powers. The film distribution guarantees appear to lock in fewer films post-closing than the parties are committing to produce in 2027 on their own. Even worse, the release window provisions give judicial approval to conduct that seems collusive. And the fig leaf thrown to independent filmmakers is so definitionally overbroad that any original screenplay from any major studio counts. Finally, the cable carriage requirements create separate basic cable negotiations but permit new leverage from premium cable, streaming, and broadcast assets. The residents of the Plaintiff States deserve better.

## LEGAL STANDARD

"[A] decree is not exactly a contract; it is an exercise of federal power, enforceable by contempt." *Kasper v. Bd. of Election Comm'rs of Chi.*, 814 F.2d 332, 338 (7th Cir. 1987). As a consequence, a district court's review of a proposed consent decree cannot merely be "rubber stamp approval". *United States v. Montrose Chem. Corp.*, 50 F.3d 741, 747 (9th Cir. 1995) (citation modified). Rather, the Ninth Circuit "require[s] a district court to review a proposed consent decree for the purpose of determining whether it is fair—not only procedurally, but also substantively." *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014). And the Ninth Circuit has "recognized" that "a consent decree that affects the public interest or third parties imposes a

heightened responsibility on the court to protect those interests." *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). "In addition, because it is a form of judgment, a consent decree must conform to applicable laws." *Id.* at 580.

To remedy unfairness, courts cannot "rewrite the settlement agreed upon by the parties." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 630 (9th Cir. 1982) (quoted at ECF No. 252 at 1.) That means that where a settlement is procedurally or substantively unfair—including to the public—a court cannot redline it; it must reject it.

## ARGUMENT

### I. Plaintiff States' Picking of Winners and Losers with Conflicting Interests Through Shared *Parens Patriae* Representation Is Procedurally Unfair.

The proposed consent decree could prevent consumers and workers in the Plaintiff States with their own potential Clayton Act claims from seeking a future divestiture or breakup. Those nonparties could have their claims for injunctive relief extinguished through the preclusive effect of entry of a consent decree in a *parens patriae* action. While most will receive $0 and no relief for this, nonparties like IATSE, DGA, the Teamsters, and NAAG may receive millions of dollars. (CD § III.A.10.) There is nothing fair about that.

*First*, it is possible that the consent decree will preclude private claims seeking injunctive relief that arise from the fact of the merger, notwithstanding language that may suggest the contrary. The general rule is that "[w]hen a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment." *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993). "If the claims are for injuries to interests which all citizens hold in common, and for which the State has already recovered," those claims "are barred by the consent decree." *Id.* Conversely, actions that enforce private rights—like actions for damages that the *parens* action did not seek—are not precluded. *See In re Exxon Valdez*, 270 F.3d 1215, 1228 (9th Cir. 2001).

The Plaintiff States brought this action in their *parens patriae* capacity. (*See* Compl. ¶ 15.) That allows a State to sue "to prevent or repair harm to its 'quasi-sovereign' interests." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 258 (1972), *superseded in part by statute on other grounds by* 15 U.S.C. § 15c. Economic harm to a State's citizenry is one such interest that qualifies. *See In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991), *rev'd in part on other grounds sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993). But "[s]uch suits blur the line between public and private [rights], raising difficult questions about their effect on subsequent private litigation." Margaret H. Lemos, *Aggregate Litigation Goes Public: Representative Suits by State Attorneys General*, 126 Harv. L. Rev. 486, 535 (2012). So when States release claims in a *parens* action to protect their citizens' economic well-being, they may give up their citizens' claims as well, at least if they are not wholly private. In one of the few litigated cases raising the issue of the preclusive effect of a *parens* antitrust judgment on private claims, under Illinois state law, that's exactly what a court found: "the action filed by the Attorney General barred plaintiff from thereafter maintaining the same action against the defendants." *Bonovich v. Convenient Food Mart, Inc.*, 310 N.E.2d 710, 711 (Ill. App. Ct. 1974).[2]

The text of the proposed consent decree gives cold comfort that nonparty injunctive claims will not be released. It does state "that nothing in this Consent Decree shall be construed to deprive any person, corporation, association, agency, or other entity of any right provided by law, regulation, or administrative pronouncement independent of this Consent Decree." (CD § VII(J).) Language like that has weighed against preclusion of subsequent *damages* claims. *Exxon Valdez*, 270 F.3d at 1228 (noting consent decree language that it was not "intended to affect legally the claims, if any, of any person or entity not a Party to this Agreement"). But suits seeking injunctive

[2] And while an antitrust consent decree with the federal government does not preclude private claims on the same grounds, *see Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 689 (1961), that holding did not reach *parens* actions. *See* Lemos, *supra,* at 538 n.240.

relief in the future to restore competition may overlap with "the same public interest" that "was represented by the State in the Consent Agreement," creating privity. *N. Cal. River Watch v. Humboldt Petroleum, Inc.*, 162 F. App'x 760, 764 (9th Cir. 2006). Whether or not future claims are precluded, the benefits for some constituencies and failure to remedy harms for others is unfair.

*Second*, when nonparties are bound by consent decrees, due process is implicated. It is axiomatic "that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). The class action exception to that rule requires absent class members to be "adequately represented by a party who actively participated in the litigation." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008). To be sure, in *parens* actions, "[t]here is a presumption that the state will adequately represent the position of its citizens." *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773 (9th Cir. 1994). But that is just a presumption. A "global compromise" must have "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627 (1997); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016). Where the agreement favors the "known plaintiffs" over those who may sue in the future, the structural conflict can be "egregious," and representation, inadequate. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 853 (1999). Adequate representation is "quite independent[] of the required determination . . . that any settlement is fair in an overriding sense." *Id.* at 858.[3]

The consent decree is not the product of adequate representation because it picks winners and losers among competing interest groups. Workers that could have won divestitures on

---

[3] While most of these cases discuss FRCP 23 class actions, the adequate representation standard is the same because federal courts have used Rule 23 as "a standard by which proposed *parens patriae* settlements are approved". *California v. eBay, Inc.*, No. 5:12-CV-05874-EJD, 2014 U.S. Dist. LX 121349, at *13 (N.D. Cal. Aug. 29, 2014).

monopsony grounds get a contingent promise: if the Combined Entity fails to make good on the Annual Film Release Commitment, and workers are members of WGA, IATSE, DGA, the Teamsters, or other unions—those "selected by the State Committee"—they get a modicum of "health care and retirement trust funds." (CD § III.A.10.) But small business owners and independent contractors like those that populate the independent and documentary industries—the very groups that would stand to potentially gain from greater production and distribution in competitive markets—get nothing. The structure of the proposed consent decree itself creates this conflict: union workers may well root for the Annual Film Release Commitment to fail, knowing they will reap the benefits if the Combined Entity does not meet it. Plaintiff States have little incentive to enforce that Commitment given that the proposed consent decree already provides the remedy for breach in the form of penalties. But independent workers would want the Combined Entity to keep its promises. The structure of the proposed consent decree puts Plaintiff States in the position of simultaneously representing two sets of stakeholders whose fundamental interests trade off. That is precisely the kind of conflict that makes representation inadequate and a settlement procedurally unfair.

## II. The Proposed Relief Is Substantively Unfair Compared to Fair Competition.

The proposed consent decree is also unfair in the limited relief that it does offer. *Amici* highlight several categories of concern below:

*News Editorial Independence* (§ III.D). California's Counsel stated at today's hearing that this antitrust suit was not about the merger's potential to change news coverage. But the proposed consent decree addresses this topic anyway. To be sure, there are serious questions about editorial independence following reports that the Ellisons offered President Trump what were described as "sweeping changes" and an "overhaul" at CNN in exchange for federal regulatory approval of this

merger.[4] But conditioning the States' approval of the merger on agreeing to create an oversight board on news content is constitutionally fraught. "[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions . . . to achieve the suppression of disfavored speech." *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (citation modified). And "the decision to exclude certain content or to prioritize specific messages constitutes an exercise of protected editorial control." *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024). Indeed, in the related consumer action, Paramount claimed "it would violate the First Amendment for a court to enjoin a merger on the basis of how an acquiring party is likely to exercise . . . editorial control". (No. 4:26-cv-03790, ECF No. 33 at 9 (citation modified).) But if regulating content cannot be done through injunction, it cannot be done by decree. After all, Paramount has explained in this action that a so-ordered agreement is an injunction. (*See* ECF No. 204 at 5-7.)

The proposed consent decree memorializes this government intrusion into editorial decisions. Presumably, if the Combined Entity allegedly breaches its vague editorial independence obligations, Plaintiff States may return to the Court to enforce these terms. That would place the Court in the position of superintending content and viewpoint choices by newsrooms with its contempt power. It has "yet to be demonstrated how governmental regulation" of "editorial control and judgment" can "be exercised consistent with First Amendment guarantees of a free press". *Mia. Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also Newspaper Guild of Greater Phila., Loc. 10 v. N.L.R.B.*, 636 F.2d 550, 560 (D.C. Cir. 1980) (rejecting collective bargaining for "editorial control," which fell "within the First Amendment's zone of protection"). That the Combined Entity will indemnify the Plaintiff States "for any claims

---

[4] *See* Emily Glazer *et al.*, *How A $45 Million Donation Brought Larry Ellison Deeper Into Trump's Circle*, Wall St. J., *available at*: https://shorturl.at/QLXvK (June 23, 2026); Joe Flint *et al.*, *Behind Paramount's Relentless Campaign to Woo Warner Discovery and President Trump*, Wall St. J. (Dec. 8, 2025), *available at* https://shorturl.at/thnAj.

and litigation related to this section of the Consent Decree" is proof positive that all involved understand it will lead to First Amendment litigation. (CD § III.D.8.) But the Court cannot enter a consent decree that violates the First Amendment to begin with.

*Annual Film Release Commitment* (CD § III.A). Plaintiffs States brought this action because the merger would "reduce aggregate output of creative and distinctive theatrical films". (Compl. ¶ 74.) But that is what the proposed consent decree does. If the Court were to approve the consent decree this year, the first Commitment Year would be 2027, in which the consent decree would then require the Combined Entity to generate 30 films for theatrical release in the United States. (CD § III.A.1.) But those are fewer films than what the companies have together forecasted to investors for 2027 as independent companies. In their Q2 2026 earnings statements, Warner Bros. Discovery projected it was "ramping up to 19 next year"[5] and Paramount, "15+"[6]—a combined total of at least 34 films. After Paramount nearly doubled its "theatrical slate from 8 to 15 films in 2026," *id.*, the consent decree obligates the Combined Entity to increase output over 5 years by a paltry 6.7% (from 30 to 32 films). (CD § III.A.1.)

The component committing the Combined Entity to release four "Independent Films" annually (CD § III.A.1.c) turns on a definition of "Independent Film" that is both overbroad and underinclusive. The proposed consent decree defines "Independent Film" as a "Film" "that is either (i) based on an original screenplay or (ii) originated from Film producers outside of the Combined Entity, Disney, Universal, or Sony." (CD § II.O.) The first prong can encompass a wholly studio-developed, studio-financed, and studio-owned production merely because it is based on an original screenplay. Such a film is not "independent" in any economically meaningful sense. The second

[5] *Warner Bros. Discovery (WBD) Q2 2026 Earnings Call Transcript*, Motley Fool (Aug. 13, 2026), https://shorturl.at/T2Ufu.

[6] Letter from David Ellison, Chairman & CEO, Paramount Skydance Corp., to Shareholders 2 (Aug. 4, 2026), *available at*: https://shorturl.at/PnHh9.

prong counts Amazon/MGM, Apple, and Netflix—the very firms that Paramount has contended are its major competitors (*see, e.g.*, ECF No. 114 at 14)—as indie outfits. On the flip side, the definition of "Film" is underinclusive, counting movies of 75 minutes or more "intended for initial release in commercial movie theaters" (CD § II.N), which leaves out many unscripted and documentary productions, even as the merger combines major acquirers of that content and holders of archival footage (CNN, HBO, CBS, Showtime) under one roof. In any event, this Release Commitment misses the point: independent filmmakers do better when they have more buyers to choose from and worse when two buyers become one. The consent decree decreases output at the same time it expands buyer power to the detriment of independent filmmakers, whose livelihoods depend on having distributors to license to.

Finally, the Annual Film Release Commitment codifies a 45-day Theatrical-Release Window (CD § III.A.2) that Paramount has invited its competitors to agree to. Days after the States brought this suit, Paramount Pictures co-chair Josh Greenstein declared that it was "incredibly important for the industry to unify around a theatrical window so there's no confusion," and that audiences need "to understand the only place they can see a film for the first 45 days is in a movie theater."[7] Disney and Universal agreed. *See id.* That kind of invitation to agree on a theatrical window, instead of competing over them, may represent "the supreme evil of antitrust: collusion." *Verizon Commc'ns., Inc. v. Law Offs. of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004). Seen in this light, the Theatrical-Release Window would actually give this potential collusion "protection by allowing it, with a judicial imprimatur (because it's part of a settlement approved by the district court)". *Pearson v. NBTY, Inc.*, 772 F.3d 778, 785 (7th Cir. 2014). Indeed, the Complaint alleged that the merged entity would be incentivized to release fewer films "into windows already occupied by its own titles" to avoid cannibalizing sales from those other releases. (Compl. ¶ 79.) Little

[7] Variety (@Variety), X (July 15, 2026), https://x.com/Variety/status/2077459178885410854?s=20.

surprise, then, that the proposed consent decree embodies that incentive in the Film Catalogue Access term, which lets the Combined Entity take "certain Films" out of release for up 120 days, "so as not to cannibalize box office in close proximity to the larger theatrical release that will be supported by marketing efforts." (CD § III.A.7.) What the Plaintiff States once called proof of likely anticompetitive harm, they now seek to endow with antitrust immunity.

*Cable*. In this market for licensing of basic cable channels, the proposed consent decree likewise falls short of substantive fairness. (CD § III.B.) The consent decree would require carriage negotiations over Paramount Basic Cable and Warner Bros. Basic Channels to be functionally separate, not structurally separate. But the Combined Entity still would be free to use its power in other offerings—a combined HBO and Showtime (premium cable channels), a combined HBO Max and Paramount Plus (streaming services), and CBS (broadcast)—to extract higher prices in basic cable negotiations, as this form of leveraging is carved out. (*See* CD § III.B.)

And the Complaint's concerns with cable consolidation were not limited to carriage negotiations. Plaintiff States alleged that combining the two companies' cable portfolios would lead the Combined Entity to "reduce its investments in basic cable channels" because there would be fewer higher-quality and greater-variety alternative packages to turn to that would incentivize more investment. (Compl. ¶ 92.) But no provisions protect consumers from these harms at all. Unlike the groups that may receive 401(k) contributions if the Combined Entity breaches certain of its commitments, consumers are left with "less original programming, fewer series, and access to less variety and fewer viewpoints, even as they pay higher fees." (*Id.* ¶ 94.) This is yet another example of a tradeoff between stakeholders with conflicting interests represented by Plaintiff States.

## CONCLUSION

The Joint Motion to enter the proposed consent decree should be denied.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Brendan Benedict*

Jessica J. González (SBN 251376)
FREE PRESS
1401 21st Street #11439
Sacramento, CA 95811
(310) 809-2577
jgonzalez@freepress.net

Brendan Benedict (*pro hac vice*)
BENEDICT LAW GROUP PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022
(212) 287-9501
brendan@benedictlawgroup.com

*Counsel for* Amici Curiae *Committee for the First Amendment, Free Press, Freedom of the Press Foundation, Future Film Coalition, and International Documentary Association*