Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M St NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4046
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com

*Attorneys for Defendant Paramount Skydance Corporation*

Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick *(pro hac vice)*
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

THE STATE OF CALIFORNIA, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF OREGON, AND THE STATE OF WASHINGTON,

*Plaintiffs*,

v.

PARAMOUNT SKYDANCE CORP., AND WARNER BROS. DISCOVERY, INC.,

*Defendants.*

Case No. 4:26-cv-7116-AMO

**DEFENDANTS' RESPONSE TO SENATOR BOOKER'S SEPTEMBER 24 LETTER**

As requested by the Court in the September 24 hearing, *see* ECF No. 256, Defendants Paramount Skydance Corporation ("Paramount") and Warner Bros. Discovery, Inc. ("Warner Bros.") provide this response to Senator Booker's September 24, 2026 letter, ECF No. 255 ("Letter").[1]

## I. GOVERNING STANDARD

### A. Ninth Circuit Law Applies

The proposed consent decree here, like every settlement, "is [a] compromise, a yielding of absolutes and an abandoning of highest hopes." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). When evaluating it, the Court does not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute." *Id.* Nor does the Court resolve whether the proposed decree "adequately remedies a Section 7 violation," Letter at 5. Indeed, no Section 7 violation has been found here.

Instead, the Court's task is to ensure "that it is fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990). "Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984). That inquiry has two parts: procedural fairness and substantive fairness. *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005).

#### 1. Procedural Fairness

A decree that is the product of "good faith, arms-length negotiations" is "presumptively valid." *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). This decree easily meets that standard. It was negotiated at arm's length by twelve state attorneys general and Defendants, all represented by experienced counsel, after two months of hard-fought litigation that included a contested temporary restraining order, a negotiated consent order not to close, and the early stages

---

[1] Defendants do not separately respond to the briefs filed by amici (ECF Nos. 259, 261-1) because they do not require a response. To the extent they raise arguments regarding the relevant standard of review or certain provisions of the proposed consent decree contained in the Letter, Defendants respond to those arguments herein. Both briefs largely argue for the amicus' preferred terms instead of those reached by the parties to this litigation and the proposed consent decree. Defendants' decision not to address any particular argument is not a concession of that argument.

of contentious discovery. Both sides bore real litigation risk, and the decree reflects each side's assessment of that risk.

The participation of government enforcers reinforces the presumption of validity. Courts "pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment," *Randolph*, 736 F.2d at 529, and a governmental entity's consent to injunctive relief "weighs in favor of approving the settlement," *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2019 WL 343472, at *5 (N.D. Cal. Jan. 28, 2019). That deference carries particular force here. Twelve attorneys general, each accountable to their own electorate, judged this relief to be a fair compromise sufficient to resolve the claims they asserted in the complaint.

**2. Substantive Fairness**

The Ninth Circuit has made clear that a consent decree satisfies the substantive fairness prong if the court determines that it is a "reasonable factual and legal determination." *Oregon*, 913 F.2d at 581. The Court's review does not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," nor does it judge the proposed consent decree "against a hypothetical or speculative measure of what might have been achieved by the negotiators," because "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Just.*, 688 F.2d at 625. The question is not whether the Court—or a nonparty—might have drafted different terms or considers some terms less than ideal, and the Court is not "empowered to rewrite the settlement agreed upon by the parties." *Id.* at 630. The question is whether the proposed consent decree is targeted at issues raised in the complaint. *Sierra Club*, 909 F.2d at 1355 (proposed consent decree need only come "within the general scope of the case made by the pleadings" and further "the objectives upon which the law is based").

The Letter suggests a different standard, arguing that the consent decree must "remedy the harms the States pleaded," Letter at 3 (cleaned up), and be "effective to restore competition" under *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972). *See* Letter at 2.[2] But *Ford Motor* is

[2] In contrast, the Letter makes clear that Sen. Booker takes "no position on the merits beyond what plaintiff States themselves pleaded." ECF No. 255 at 1.

not relevant to the proposed consent decree at issue here. *Ford Motor* addressed the standard that applies to evaluate remedies *after* a court has found a Section 7 violation on the merits, 405 U.S. at 562, not the standard for reviewing a negotiated resolution of disputed claims prior to such decision.

Where no violation has been established, the substantive reasonableness of a consent decree is not measured against a hypothetical world in which the plaintiffs succeeded in blocking the merger after a full trial. And the Court need not, as the Letter suggests, find that the proposed consent decree "accomplish[es] the same result" as "structural relief" through the proposed "conduct commitments." Letter at 2-3. To argue that Plaintiff States should have obtained structural relief is to argue that they should have obtained more—the very "highest hopes" that a settlement, by definition, compromises. *Officers for Just.*, 688 F.2d at 625. If the benchmark for substantive reasonableness were the maximum relief a plaintiff might theoretically have won after a trial, no pretrial settlement could ever be approved—a result that would be entirely inconsistent with the strong policy favoring negotiated resolution of disputed claims.

The adequacy of the decree must therefore be assessed against the risk of continued litigation—including the substantial prospect that Plaintiff States would have recovered nothing at all—rather than against an assumed permanent injunction that Plaintiff States did not obtain. *See id*. Accordingly, the relief Plaintiff States secured is substantively reasonable.

**B. The Tunney Act Does Not Apply**

Defendants agree with Senator Booker that the Tunney Act, 15 U.S.C. § 16(b)-(h), does not apply in this case. For that reason, its framework also does not apply as a matter of law. Congress limited application of the Tunney Act to the narrow context of "consent judgment[s] submitted by the United States" in civil proceedings "brought by or on behalf of the United States under the antitrust laws," 15 U.S.C. § 16(b). Importantly, Congress did not extend this review authority to settlements by the Federal Trade Commission or even criminal settlements with the United States. More germane to the settlement here, Congress did not extend its application to claims brought by Plaintiff States (or any person) under 15 U.S.C. § 26. There is no legal basis for

the Court to conduct an independent public interest review, to review a comprehensive competitive impact statement, or to test the decree against alternative remedies considered.

There is also no basis to apply different review standards from other types of cases, such as Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") cases or class actions. In cases involving CERCLA, a court must assess "the adequacy of settlement amounts to be paid by [settling parties] . . . with the proportion of liability attributable to them." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995); *see also Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (holding that "a district court must" assess comparative fault "in order to approve a CERCLA consent decree"). No such determination is required here. This case is also not a class action, and Plaintiff States did not bring this action to secure monetary relief on behalf of their citizens pursuant to 15 U.S.C. § 15c. *See* Compl. ¶ 15 ("Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26.").

Consent decrees filed by state attorneys general in cases brought pursuant to 15 U.S.C. § 26 are not subject to any provisions under the Tunney Act or other mandatory procedures, and they are typically entered without the court engaging in significant further analysis. *See, e.g., California v. DaVita, Inc.*, No. 2:05-cv-07190-RSWL-PJW, ECF Nos. 4, 5, 7 (C.D. Cal. 2005) (entering consent decree in Section 7 case without further proceedings); *California v. Marquee Holdings, Inc.*, No. 3:05-cv-05306-MEJ, ECF No. 13 (N.D. Cal. 2006) (same); *see also United States v. RealPage, Inc.*, No. 1:24-cv-00710-WO-JGM, ECF Nos. 198, 199 (M.D.N.C. 2026) (entering consent decree with state attorneys general without further proceedings in antitrust case); *Pennsylvania v. EQT Corp.*, No. 2:23-cv-01483-NBF, ECF Nos. 1, 3, 6 (W.D. Pa. 2023) (same, but with a single attorney general involved).

The proposed consent decree, ECF No. 244 ("Consent Decree"), is fair, reasonable, and equitable, and Defendants respectfully request that the Court enter it.

## II. RESPONSES TO THE QUESTIONS PRESENTED

At the Court's request, we respond as follows to each of Senator Booker's questions below.

**A. Questions Regarding The Adequacy Of The Proposed Decree**

***Theatrical Output.*** The Letter asks whether the theatrical output commitment "authorizes the very reduction in output it purports to prevent." Letter at 3. It does not.

In 2025, Defendants collectively released 19 films, and in 2026, Defendants combined have released or anticipate releasing 27 films, as defined by the Consent Decree.[3] Pursuant to the proposed consent decree, the Combined Entity[4] must release at least 30 films for the first three years and 32 films for the subsequent two years.[5] This is a floor, not a ceiling, and it represents an expansion of output.

Moreover, the relevant question is not whether the consent decree *increases* the anticipated number of films released; the question is whether it is a reasonable compromise of Plaintiff States' claims. It is. The Plaintiff States' principal concern about the proposed merger's impact on exhibitors is about output, and whether the Combined Entity could reduce output in the same way that Plaintiff States allege Disney reduced output after acquiring Fox. *See* Compl. ¶¶ 81–82. ("Audiences have seen this movie before. In 2019, Disney acquired 20th Century Fox. . . ."). The proposed consent decree eliminates that risk of post-merger output reductions. Consent Decree § III.A.1 provides certainty for exhibitors and the broader industry: a guaranteed, enforceable pipeline of new releases every year. This aligns with Paramount's stated goals and past conduct.

***Penalty Structure.*** The Letter queries whether (1) the $30 million financial penalty is a large enough sum of money to incentivize compliance and (2) the divestiture of Miramax "can restore competition lost in the markets for wide-release and top-grossing films." Letter at 3. The substantive fairness standard does not require either. *See supra* § I.A.2. But even if it did, the answer is yes, the penalty provisions provide robust support for the Decree.

First, the Combined Entity is already incentivized to comply with the consent decree; it does not need a monetary penalty to accomplish that result. Moreover, $30 million is, indeed, a

---

[3] One of these 27 films was co-produced by Paramount, with Paramount distributing it internationally and another entity distributing it domestically.

[4] The "Combined Entity" refers to the anticipated merged entity of Defendants post-closing.

[5] At least half of those films must be produced by the Combined Entity itself. *See* Consent Decree § III.A.1.d.

high enough sum. It is enough to fund multiple films or a substantial share of a larger production, which in turn could earn box office and licensing revenue and add lasting value to the Combined Entity's library. The Letter questions whether the penalty incentivizes non-compliance. It does not. Today, if Paramount anticipated losing more than $30 million on a film, it would not greenlight it; nothing about the consent decree changes that calculus. And if the loss only becomes apparent after a film has been released, there would be no incentive to pull that film only to incur a $30 million penalty on top of that loss. Instead of "shelving" the film, the Combined Entity would be better off feeding that film into its streaming library, where it would help attract and keep subscribers well after its theatrical run. A released film, even one that is unprofitable in theaters, adds to the catalog, thereby increasing its value. Thus, the Combined Entity has no commercial incentive to shelve films.

Second, the Letter's question regarding Miramax assumes a standard that does not apply. As explained *supra* § I.A.2, the Court need not determine whether any provision of the consent decree will "restore competition" allegedly lost by the merger, Letter at 3. The cases the Letter cites regarding that requirement all involve situations where a violation of Section 7 had been established. Nevertheless, a loss of Miramax would have a significant impact on the Combined Entity. Miramax is a prized asset—one with a demonstrated ability to sustain itself as an independently viable competitor in the market. Its library includes iconic titles such as Pulp Fiction, Good Will Hunting, No Country for Old Men, and Chicago, alongside consistently profitable franchises such as Bridget Jones' Diary and Scary Movie. Indeed, of the 3 films that Defendants have released in 2026 that are in the top 20 of box office receipts, 1 of those films—Scary Movie—was a Miramax-produced film that earned gross box office receipts of over $230 million against a budget of approximately $30 million. Miramax's strong theatrical library also will attract subscribers to the Combined Entity's streaming service. Thus, a divestiture of Miramax would mean the loss of an established catalog and a studio that is still producing hits. The Combined Entity will have a strong incentive to prevent that from happening.

***Exhibitor Protections.*** The Letter questions why the proposed consent decree contains a three-year term for price ceiling restrictions for film exhibitors instead of a longer duration. The reason is that the three-year price ceiling gives exhibitors an enforceable protection while respecting a basic market reality: no one can reliably predict price years in advance, particularly in an industry that is transforming as quickly as the film industry is. A look at films released in 2026 alone shows how fast the industry is shifting: Amazon MGM, Lionsgate, A24, Netflix, and Apple have all announced plans to expand their theatrical output with more films. All of these firms are capable of major theatrical releases alongside other industry players such as Disney, Universal, and Sony. This competition will discipline pricing and continue to expand exhibitors' options after the consent decree's three-year term expires (as well as during it). Indeed, the President and CEO of Cinema United (the largest exhibition trade association representing more than 31,000 movie screens), who had been critical of the deal, praised the consent decree, stating that its "conditions will enable our industry to adapt and succeed in a rapidly changing media environment."[6] A three-year price ceiling is a substantively fair outcome.

***Basic Cable.*** The Letter questions the enforceability of the proposed consent decree's requirement that the Combined Entity separately negotiate affiliation agreement terms for the Paramount Basic Cable Channels and the Warner Bros. Basic Cable Channels, and separately asks whether the divestiture channels "are the assets whose combined leverage caused the harm alleged in the complaint." Letter at 4. Both of these concerns are based on the faulty premise that the proposed consent decree must contain structural remedies.

With respect to the first, the Combined Entity's behavioral commitment has clear enforcement mechanisms: an internal compliance monitor and an independent monitoring trustee that reports directly to the state committee. Additionally, the Combined Entity's negotiation counterparties—sophisticated, well-resourced cable companies—will also keep the Combined Entity in check with no fear of retaliation. *See* Consent Decree § III.E.3 (prohibiting any adverse

---

[6] Cinema United, *Cinema United Releases Statement On Paramount Settlement* (Sept. 22, 2026), https://cinemaunited.org/2026/09/22/cinema-united-releases-statement-on-paramount-settlement/.

action against parties for reporting compliance concerns). They are aware of the proposed consent decree and its terms—if any issues arise, Defendants have no doubt that they will raise them.

With respect to the second, the question is not whether the Divestiture Channels (which include BET, VH1, Comedy Central, and others) "are the assets whose combined leverage caused the harm alleged in the complaint," Letter at 4. Instead, it is whether the Combined Entity's behavioral commitments are "within the general scope of the case made by the pleadings." *Sierra Club*, 909 F.2d at 1355. They are. *See* Compl. ¶ 90 (raising concerns related to joint negotiations for Paramount and Warner Bros.'s Basic Cable Channels). Regardless, to the extent the Combined Entity does breach its obligations and is forced to divest the Divestiture Channels, such a sale would decrease the Combined Entity's bargaining leverage as alleged in the Complaint (even though Defendants contest that it creates any difference in leverage at all).

**B. Questions Regarding The Enforceability Of The Proposed Decree**

The Letter questions the impact of four provisions of the consent decree on its enforceability. As discussed below, the enforcement mechanisms of the proposed consent decree provide for rigorous oversight, including through two monitors.

***Monitoring.*** The Letter questions whether noncompliance can be addressed because issues will only be raised to the Court "if the parties choose to bring it forward." The answer is yes. First, all annual compliance reports will be submitted both to the State Committee and this Court, allowing the Court to be advised as to ongoing compliance (or noncompliance, if applicable). Consent Decree § VI.C. Second, the monitoring process is designed to enhance efficiency and allows the parties to resolve issues while minimizing the burden on the Court—as parties in litigation are encouraged to do. There is no reason to bring issues to the Court when they can be resolved by the parties without court intervention. In addition to the annual compliance reports, the Court also acts as a valuable backstop to the extent the parties cannot resolve a dispute, and the States will be incentivized to bring an issue forward to the Court if it is not resolved to their satisfaction.

***Force Majeure.*** The Letter questions why the force majeure provision applies to labor strikes. The force majeure provision is a standard provision in commercial agreements and only applies to the extent the articulated events are "beyond the Parties' reasonable control." Consent Decree § VIII.C. If the Combined Entity cannot meet its obligations under the proposed consent decree based on circumstances within its own reasonable control, the force majeure provision excuses nothing. And to the extent the clause is exercised, it only excuses performance of the specific provisions impacted by that force majeure event. Both the State Committee (through prompt notice) and the Court (through the Combined Entity's annual compliance report) will be aware of any claimed force majeure events. To the extent the Plaintiff States disagree about the claimed exercise of the force majeure provision, the State Committee can seek court intervention to resolve the dispute.

***Modification.*** The Letter questions whether the language regarding modification of the proposed consent decree is intended to amend the requirements for modification pursuant to Federal Rule of Civil Procedure 60(b). It is not. Indeed, the proposed consent decree permits modification only for good cause shown on a petition to the Court "pursuant to Federal Rule of Civil Procedure 60(b) or as otherwise permitted by law." Consent Decree at V.A. The subsequent description of what the parties view as good cause cannot, and does not, change the legal standard that the Combined Entity must meet to secure any modifications under the applicable law.

***Duration.*** The Letter asks why the conduct commitments contained in the proposed consent decree expire after five years. Letter at 4-5. The reason is that the Combined Entity operates in a fast-changing industry, and a five-year term represents a negotiated, and substantively fair, resolution that balances the interests of the settling parties. *See supra* at I.A.2. It is also an appropriate compromise to address the allegations in Plaintiff States' Complaint. None of the parties know what consumer demand will look like six years from now or how competition will change in the intervening years in this dynamic industry. In fact, implementing a term any longer could hamper the Combined Entity's ability to compete in the future because of changing

consumer demand or new innovations, which would undermine the purpose of the antitrust laws to maintain and enhance competition.

**C. Question Regarding The News Provision**

***The News Provision's Relation to the Case.*** The Letter asks three questions about the news provision in the proposed consent decree: (1) whether it is beyond the scope of the complaint; (2) whether it is enforceable; and (3) whether it remedies the allegations about the alleged basic cable market.

First, the News Editorial Independence Board fits within the scope of the case because the Complaint alleges that "the breadth of voices and viewpoints that reach the public" depend on the "competitive health of markets." Compl. ¶ 2. The News Editorial Independence Board is designed to advance precisely that goal. Paramount is committed to the core journalistic principles of accuracy, independence, fairness, and integrity. And even if this provision addressed an issue not raised in the Complaint, the law is clear that a settlement is not strictly limited to addressing only case allegations. *See Sierra Club*, 909 F.2d at 1355 ("As long as the consent decree comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the statute upon which the complaint was based, the parties' agreement may be entered by the court.") (cleaned up); *Sweet v. Cardona*, 641 F. Supp. 3d 814, 827 (N.D. Cal. 2022) (quoting *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986)) ("[A] federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial.").

Second, the Board was structured to be as self-executing and efficient as practicable in order to ensure independence and avoid any claims related to government-control of the Board. The Board makes its decisions independently, without intervention from the Combined Entity or the Plaintiff States. At the same time, the Board retains the ability to escalate any concern to the Combined Entity's Chief Compliance Officer. And like every provision of the consent decree, the Plaintiff States may seek enforcement of this provision if the Combined Entity violates its obligations. Consent Decree § VII.B. In short, its provisions are enforceable.

Third, Consent Decree § III.B addresses the Plaintiff States' concerns related to the alleged basic cable market, while the News Editorial Board is intended to address other allegations in the complaint. The Letter also states that "[a]t least one plaintiff State's Attorney General has stated publicly that his State sought divestiture of CNN and CBS News and was 'deeply disappointed' the settlement didn't secure it." Letter at 5. The fact that a proposed consent decree does not contain every outcome that one party may have wanted in a multilateral negotiation does not make it substantively unfair. This is the very essence of a negotiated agreement that includes compromises on behalf of all of the parties involved.

### D. Question Regarding The Payments Included In The Proposed Decree

***The Payments Must Remedy Competitive Harm.*** The Letter questions whether the payments in the proposed consent decree "remedy competitive harm." Letter at 5. This question is based on a faulty premise. This case is neither a class action nor one where state attorneys general sought monetary relief under 15 U.S.C. § 15c, and there has been no finding of competitive harm here. Instead, Plaintiff States sought injunctive relief under 15 U.S.C. § 26 to "protect their general economies and the health and welfare of their residents." Compl. ¶ 15. There is no requirement in the law that the payments in Sections III.A, III.C, and III.E "redress[] the competitive harms alleged," Letter at 5. They are terms that the parties bargained for and accepted to resolve the litigation. Nevertheless, Defendants provide additional information regarding their understanding of the relation of each referenced provision. The payments in III.A.10 are a financial penalty that ensures that the Combined Entity will fulfill its theatrical commitments under the consent decree. The payments in III.C.5 and III.C.6 are consideration for settlement and relate to alleged harms to workers and independent film creators. And the payment contemplated in III.E.2 relates to the Plaintiff States' costs to prosecute this action. This payment of attorneys' fees and expert costs is a common feature of antitrust settlements.

### E. Question Whether The Proposed Decree Is Based On The Evidence

***The Decree Must Reflect the Remedy the Evidence Supports.*** Finally, the Letter raises two questions regarding procedural and substantive fairness: (1) whether the potential costs facing

Plaintiff States caused them to accept a somehow deficient settlement, and (2) whether the Court must independently "determine whether the decree adequately remedies a Section 7 violation." Letter at 5.

With respect to the first question, the fact that the parties negotiated in the face of risks and costs is consistent with every settlement in litigation. As discussed *supra* § I.A.1, the parties in this case are represented by talented and sophisticated counsel who are more than capable of evaluating the relevant legal concerns. The parties negotiated over multiple weeks after six-plus months of investigation and two months of litigation. And there is no question that the States had substantial resources at their collective disposal to prosecute this action. There is also no suggestion that the proposed consent decree was the result of collusion, fraud, or corruption, which are the hallmarks of procedural unfairness. *See Officers for Just.*, 688 F.2d at 625 (finding an agreement procedurally fair when it was "not the product of fraud or overreaching by, or collusion between, the negotiating parties"). This is because the proposed decree is the product of an arm's length negotiation between litigation adversaries acting as such.

The final question raised in the Letter appears to focus on substantive fairness by stating, without reference to any authority, that the Court must "determine whether the decree adequately remedies a Section 7 violation, not whether it was the best bargain available under pressure," Letter at 5. As discussed *supra* § I.A.2, there is no basis in the law for the application of such a standard here. There has been no determination that there is a violation of Section 7, and Defendants vehemently disagree that there is one. The Court's task is to ensure that the consent decree is "fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club*, 909 F.2d at 1355. Contrary to the assumption underlying this final question, the Court's review does not include "reach[ing] any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute[.]" *Officers for Just.*, 688 F.2d at 625. If courts needed to evaluate and determine whether every proposed consent decree remedied every alleged violation, it would strongly discourage any settlement because the "very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *See id.*

Dated: September 28, 2026

Respectfully submitted,

By: /s/ Marguerite Sullivan
Marguerite Sullivan (*pro hac vice*)
Anna Rathbun (SBN 273787)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M St NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4046
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com

Danielle R. Sassoon (*pro hac vice*)
Philip Hammersley (*pro hac vice*)
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
danielle.sassoon@clementmurphy.com
philip.hammersley@clementmurphy.com

*Attorneys for Defendant Paramount Skydance Corporation*

Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice*)
Henry Liu (*pro hac vice*)
Ross A. Demain (*pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

Bernard A. Nigro Jr. (*pro hac vice*)
Kathleen S. O'Neill (*pro hac vice*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
barry.nigro@friedfrank.com
kathy.oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*