ROB BONTA
Attorney General of California
PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
ANDREW MCCREARY (SBN 338704)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
455 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 510-4400
Fax: (916) 731-3637
E-mail: Paula.Blizzard@doj.ca.gov

*Attorneys for Plaintiff State of California*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs*,

v.

PARAMOUNT SKYDANCE CORP., and WARNER BROS. DISCOVERY, INC.,

*Defendants*.

Case No.: 4:26-cv-07116-AMO

**PLAINTIFF STATES' RESPONSE TO LETTER OF THE HONORABLE CORY A. BOOKER, UNITED STATES SENATOR, AND BRIEFS OF AMICI CURIAE**

Judge: Honorable Araceli Martínez-Olguín

Magistrate Judge: Honorable Thomas S. Hixson

Plaintiff States, by and through their respective Attorneys General ("Plaintiff States"), respectfully address the letter from The Honorable Cory Booker, United States Senator, to the Court and the briefs submitted by amici curiae. Senator Booker asks the Court to "subject the proposed consent decree to an independent public-interest review." Letter from Sen. Cory A. Booker at 1 (ECF No. 255) ("Letter"). The letter refers to the Tunney Act and the U.S. Department of Justice's Merger Remedies Manual, but the standard that applies to the Court's review of the Proposed Consent Decree (ECF No. 244) ("Decree") is that the settlement be fair, reasonable, equitable, and lawful. The Decree was vigorously negotiated at arm's length between Paramount Skydance Corporation ("Paramount") and Warner Bros. Discovery, Inc. ("Warner Bros.") and experienced counsel from twelve separate sovereigns. The Decree reflects a reasonable compromise that addresses the competitive issues posed by the proposed merger in the markets alleged in the Complaint. And the Decree's enforcement provisions have teeth. Thus, as explained more fully below, the Decree meets the applicable standards and it should be entered.

## ARGUMENT

### I. The Governing Standard

Approval of consent decrees "is entrusted to the sound discretion of the district court." *Arizona v. City of Tucson*, 761 F.3d 1005, 1015 n.10 (9th Cir. 2014). A consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). "Because of the unique aspects of settlements, a district court should enter a proposed consent judgment if . . . it is fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990).

Courts assess both procedural and substantive fairness. *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005). Procedurally, if a "decree was the product of 'good faith, arms-length negotiations,' it is 'presumptively valid and the objecting party has a heavy burden of demonstrating the decree is unreasonable.'" *Id.* (quoting *Oregon*, 913 F.2d at 581). Substantively, the standard is not "whether 'the settlement is one which the court itself might have fashioned, or considers ideal.'" *Id.* (citation omitted). "The court need only be satisfied that the

decree represents a 'reasonable factual and legal determination.'" *Oregon*, 913 F.2d at 581 (citation omitted). "As long as the consent decree comes 'within the general scope of the case made by the pleadings,' furthers 'the objectives upon which the law is based,' and does not 'violate[] the statute upon which the complaint was based,'" the court may enter it. *Sierra Club*, 909 F.2d at 1355 (alteration in original) (quoting *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 475 U.S. 501, 525–26 (1986)).

Senator Booker asks the Court to apply the standard of the Antitrust Procedures and Penalties Act (the "Tunney Act"). Letter at 2. The Court should decline. The Tunney Act framework applies to review of consent decrees proposed by the U.S. Department of Justice ("DOJ"). It does not apply to state antitrust settlements. *See id.* ("The Tunney Act . . . governs only consent judgments proposed by the United States . . . .").

The Ninth Circuit has declined to extend the review standard of the Tunney Act to judgments other than antitrust consent decrees entered by the federal government. *See SEC v. Randolph*, 736 F.2d 525, 529–30 (9th Cir. 1984). In *Randolph*, the district court had analogized a securities law to antitrust law, looked to the Tunney Act, and "closely scrutinize[d] the proposed decree to see if it was in the public's best interest." *Id.* at 529. The Ninth Circuit concluded that the district court had applied the incorrect standard and erred by "condition[ing] approval of the consent decree on what it considered to be the public's *best* interest." *Id.* (emphasis in original). Instead, the court "should have deferred" to the SEC's decision that the decree was "appropriate and simply ensured that [it] [wa]s reasonable." *Id.* A similar standard applies here, too. And as described below, the Decree meets that standard.

## II. The Remedies Address the Alleged Harms

The Decree addresses potential competitive harms in all three markets alleged in the Complaint. It supports the goal of the Clayton Act, which is to prevent substantial reductions in competition caused by mergers. *See* 15 U.S.C. § 18.

### A. Theatrical Film Distribution

Section III.A of the Decree addresses the harms Plaintiff States alleged in the markets for theatrical film distribution. The Complaint alleged that the merger would reduce the combined

company's incentive "to create and market new theatrical films." Compl. ¶ 79 (ECF No. 1); *see id.* ¶¶ 78–82. "This harm to competition" would "increase the bargaining leverage of film distributors over theatres" and "reduce aggregate output of creative and distinctive theatrical films," resulting in "higher prices, lower quality, reduced output, and diminished choice." *Id.* ¶ 74.

The Decree addresses that potential harm by requiring the combined company to release to theatres at least thirty films annually for two years and thirty-two films annually in the following three years. Decree § III.A.1.a–b.[1] Twenty percent of these films must be "tentpoles." *Id.* § III.A.5. The combined company must support each film with "a marketing spend consistent with typical practice." *Id.* § III.A.4. Putting a floor (not a ceiling) on film releases preserves the combined company's incentives to release new films.

Backstopping the release requirement, the Decree requires the combined company to spend at least $300 million more annually on United States production than Defendants collectively spent in 2025. Decree § III.A.8. It also requires the combined company to "produce[] or jointly produce[]" at least half of the required films. *Id.* § III.A.1.d. Requiring a minimum production expenditure and participation in production helps to ensure that the combined company will appropriately fund and participate in its film projects, keeping films competitive in the market and desirable for theatres. *See* Compl. ¶ 42 (theatres' "'ability to operate successfully' depends on the 'availability, diversity, and appeal of motion pictures'"). The requirement that at least four of the films each year be "Independent Films," Decree § III.A.1.c, helps maintain the "consistent flow of new film content with varying genres and appeals" that theatres need and consumers demand, Compl. ¶ 42.

Other provisions of the Decree provide additional support for theatrical distribution. Defendants' commitments to invest in "workforce training,"[2] "film programs and community arts," and to establish a fund for purchasing independent films are geared toward maintaining a steady

[1] Defendants released a total of nineteen films in 2025 and project releasing fewer than thirty films in 2026. *See* Brent Lang, *Paramount Says It Will Release 15 Warner Bros. Movies a Year in Theaters, Reaffirms 45-Day Theatrical Window*, Variety (Mar. 2, 2026, 6:45 a.m. PT), https://perma.cc/ZWL9-Y4JV.

[2] *See* Compl. ¶¶ 16, 95, 105 (discussing effects of content reduction on labor).

supply and broad range of films. Decree § III.C.5–6. Defendants have agreed to maintain their film lots, honor commitments to develop new facilities, engage in good faith in collective bargaining with labor groups, and consider reapplications of terminated employees. *Id.* § III.C.1–4. All these terms are intended to protect the vitality of the market and guard against content reduction or degradation.

The Decree also addresses allegations that the merger would reduce the combined company's incentives to negotiate and offer competitive pricing to theatres. It requires the combined company to "maintain" its "Film rental terms . . . consistent with the best practices" of each Defendant, and to continue to license both Defendants' "film catalogues" under "similar . . . terms" to those available in 2025. Decree § III.A.6–7. The Decree provides additional protection for negotiations of "theatrical exclusivity windows," Compl. ¶ 4—guarantees by distributors that films will remain in theatres and not on streaming services for a certain period. For films counted in the annual commitment, the Decree holds the combined company to a minimum theatrical release window of forty-five days, Decree § III.A.2 (and ninety days for subscription-based streaming services, *id.* § III.A.3). Keeping films in theatres promotes demand for the big-screen experiences that theatres offer. *See* Compl. ¶¶ 38–39 (discussing rise in domestic box office earnings and unique characteristics of theatergoing).

Finally, the Decree addresses the concerns the Complaint raised with Defendants' pre-litigation commitment to release at least thirty films annually. *See* Compl. ¶ 107. The Decree makes the commitment "legally enforceable." *Id.* Defendants have agreed to judicial enforcement, including penalties for non-compliance; monitoring; and significant enforcement mechanisms including the possibility of divesting a significant studio. *See* Decree §§ III.A.9–10, VI, VII.

### B. Basic Cable Channel Distribution

#### 1. Negotiations and Content Investment

The Decree addresses the Complaint's allegations that the merger would increase the combined company's leverage in negotiations with basic cable distributors and would reduce investment in basic cable content. *See* Compl. ¶ 86. These harms to competition include "higher

fees throughout the United States," "reduced investment in content," *id.*, and the risk of "blackouts" of channels for certain distributors, *see id.* ¶¶ 87–88.

Senator Booker suggests that the Decree fails to address "the heightened threat of blackouts," Letter at 4, but the provisions of Section III.B do just that. The Decree requires separate negotiations of affiliate fees for each Defendant's set of channels, Decree § III.B.1, III.B.3, and prevents the combined company from rescheduling its negotiations to occur at the same time, *id.* § III.B.2. Section III.B also precludes the combined company from using confidential information from negotiations over affiliation agreements for one set of basic cable channels in negotiations over the other. *Id.* § III.B.1, III.B.4. Separate negotiations mean the combined company cannot leverage all its channels in carriage negotiations; it cannot threaten to black out the entire combined portfolio during one negotiation. And the remedy provision requires the combined company to make distributors whole for damages caused by any breach—along with other forms of relief, including the possibility of divestiture. *See id.* § III.B.7. These provisions help to preserve Defendants' existing incentives to offer competitive terms and content, addressing the Clayton Act's goal of preventing a lessening of competition.[3] *See id.* § III.B.1–4.

**2. Programming Quality[4]**

As to news channels, Senator Booker asserts that Plaintiff States "did not plead editorial independence." Letter at 5. To the contrary, Section III.D is "within the general scope of the case made by the pleadings." *Loc. No. 93*, 475 U.S. at 525 (citation omitted). The Complaint alleged that the merger would "[l]ikely reduce output, quality, innovation, and choice," Compl. ¶ 110(c), because competition for news and other media determines "the breadth of voices and viewpoints that reach the public," *id.* ¶ 2. The creation of an Editorial Independence Board to establish "editorial principles" for "accuracy, independence, fairness, and journalistic integrity" in "news and

---

[3] Amici note that premium cable, streaming, and broadcast offerings are excluded from these provisions, Br. of Block the Merger Coalition Members as Amici Curiae Opposing Proposed Consent Decree at 10 (ECF No. 260) ("Block the Merger Br."), but the products are outside the basic cable market alleged in the Complaint.

[4] The States of Colorado and Washington do not join this section of the brief because their states do not propose to join or be bound by Section III of the Proposed Consent Decree.

editorial content" will help to protect against reductions in output, quality, innovation, and choice. Decree § III.D.5, III.D.7. The Board will be composed of qualified, seasoned journalists, removable only for cause. *Id.* § III.D.1–4.

The Editorial Independence Board does not raise First Amendment concerns. Parties to a consent decree are at liberty to place restrictions on their own speech. *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993). Those restrictions are enforceable. *Powell v. SEC*, 149 F.4th 1029, 1040–41 (9th Cir. 2025). In any case, this Court will never be in the "position of superintending content and viewpoint choices by newsrooms." Block the Merger Br. at 7. The Decree defines the Board's structure, not its speech, and editorial principles established by the Board will reflect private conduct. Decree § III.D.5.1. Contrary to amici's argument, neither Plaintiff States' part in the Decree nor the prospect of judicial enforcement transforms the Board into a state actor. *See, e.g.*, *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1297 (2d Cir. 1991) ("[O]versight of a private institution does not convert the institution's decisions into those of the State."); *contra* Block the Merger Br. at 7 (citing *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024) (state legislation compelling private editorial choices); *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (state legislation requiring newspapers to publish political speech); *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (regulatory leverage used to compel speech)).

**C. Duration**

The Decree lasts five years. Decree § II.G. Citing the DOJ's Merger Remedies Manual, Senator Booker questions what happens afterwards. Letter at 4–5. The parties bargained for a five-year term. It reflects a balance between preserving present levels of competition, requiring additional years of oversight, and the potential alternative of Warner Bros. seeking to merge with a different competitor. Given the substantive fairness of the negotiations, opponents of the Decree bear "a heavy burden of demonstrating that" the duration "is unreasonable." *Oregon*, 913 F.2d at 581. The Commitment Period reflects the parties' reasoned, bargained-for judgment about a reasonable term.

### III. The Decree Is Enforceable

The Decree includes clear, robust enforcement provisions. It establishes a two-tiered mechanism for compliance. First, a Compliance Monitor will be responsible for internal compliance training and annual reporting to a committee of Plaintiff States and the Court. *See* Decree § VI.A. Second, a Monitoring Trustee will oversee and report on compliance and any alleged violations. *See id.* § VI.B. The Decree also envisions theatrical film exhibitors, basic cable distributors, employees, and others "report[ing] . . . compliance concern[s] to the Monitoring Trustee or Plaintiff States" and guarantees that the combined company may not retaliate. *Id.* § III.E.3. These provisions address Senator Booker's concern that violations of the Decree in private negotiations are "difficult to police" because they are "confidential" and the distributor "cannot replace" the combined company as a supplier. Letter at 4. Any affected distributor could report, without fear of retaliation, to the Monitoring Trustee, Decree § III.E.3, who would elevate the issue to Plaintiff States, *id.* § VI.B.2.d, who would be empowered to act.

Should the parties' efforts at monitoring and compliance reporting fail, the Decree provides recourse. If the combined company fails to release the requisite number of films in a particular year, it must pay a $30 million per-film penalty to labor groups and the National Association of Attorneys General Fund, regardless whether the shortfall is later cured. Decree § III.A.10.[5] Defendants would pay ninety percent of any penalty to entities that provide direct assistance to industry workers—a group that would be harmed by reduced output. *See* Compl. ¶¶ 16, 95, 105. The remainder would support state antitrust enforcement, directly protecting competition.

The penalty does not set up "a financial incentive not to comply whenever a film's projected loss exceeds that amount," Letter at 3, because the penalty does not stand alone; it is backstopped by the divestiture remedy. If the combined company does not cure its failure within six months, it must divest its interest in Miramax Studios, Decree § III.A.9, a formerly independent production company with a long history and the second-largest-grossing Paramount release in 2026, *Scary*

[5] This penalty does not introduce a "loophole." Letter at 3. Paying the penalty would result in no economic return for the combined company. But releasing a film—even if its revenue falls short of the $30-million threshold for profitability—would generate at least some benefit.

*Movie*. And on the basic cable side, any breach of Section III.B that is not cured within six months requires divestiture of eleven channels. *Id.* § III.B.7; *see id.* § II.J.

For any breach, Section VII sets out an additional path to resolution, whether privately between the parties, *see* Decree § VII.C–D, or in an extraordinary circumstance, through intervention by the Court. All terms of the Decree are "enforceable by any Plaintiff State . . . through any action or proceeding" before the Court. *Id.* § VII.A. Because a breach "may cause irreparable harm," Plaintiff States are "entitled to seek specific performance, injunctive relief, or any other equitable remedy . . . in addition to any other remedies." *Id.* § VII.B. The same path applies to resolution of other issues Senator Booker identifies, including interpretation of the force majeure[6] and modification provisions. *See* Letter at 4. In sum, the Decree is reasonable, fair, and enforceable.[7]

**CONCLUSION**

For the foregoing reasons and those set forth in the Joint Motion to Enter Consent Decree and Dissolve Stipulation and Order Not to Close, Plaintiff States respectfully request that the Court grant the Motion and enter the Decree.

---

[6] As Senator Booker acknowledges, this provision is limited to "events beyond the parties' reasonable control." Letter at 4. It requires the combined company to "promptly notify" Plaintiff States and clarifies that judicial intervention is available. Decree § VII.C. Consistent with well-settled contract law, the provision only suspends performance, and it applies only to provisions rendered impossible. *See, e.g.*, *OWBR LLC v. Clear Channel Commc'ns, Inc.*, 266 F. Supp. 2d 1214, 1224 (D. Haw. 2003); *Shelter Forest Int'l Acquisition, Inc. v. COSCO Shipping (USA) Inc.*, 475 F. Supp. 3d 1171, 1192 (D. Or. 2020).

[7] The Decree does not "preclude private claims seeking injunctive relief," as suggested by amici. Block the Merger Br. at 3–4. The preclusive effect of a consent decree is limited to the terms of its release. *See, e.g.*, *FTC v. Garvey*, 383 F.3d 891, 898 n.7 (9th Cir. 2004); *Norfolk S. Corp. v. Chevron U.S.A., Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004). The Decree's discharge provision is expressly limited to Plaintiff States. *See* Decree § III.E.4.

Dated: September 28, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Paula L. Blizzard*

PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
ANDREW MCCREARY (SBN 338704)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
455 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 510-4400
Fax: (916) 731-3637
E-mail: Paula.Blizzard@doj.ca.gov

RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*)
ADAM DI VINCENZO (*pro hac vice*)
GRANT BERMANN (*pro hac vice*)
ANASTASIA PASTAN (*pro hac vice*)
ALEXIS BROWN-REILLY (*pro hac vice*)
JULIA M. MAY (*pro hac vice*)
NATALIE NOGUEIRA (*pro hac vice*)
ALLISON CHESKY (*pro hac vice*)
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7525
Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice*)
EMME TYLER (SBN 341797)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5871
Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice*)
Unit Chief Counsel
SARAH PELTON (*pro hac vice*)
ALLISON WEBER (*pro hac vice*)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: robert.bernheim@azag.gov
sarah.pelton@azag.gov
allison.weber@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice*)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice*)
FRANKLIN KANIN (*pro hac vice*)
Assistant Attorneys General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Anthony W. Mariano*

ANTHONY W. MARIANO (*pro hac vice*)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (781) 835-7990
Email: Anthony.Mariano@mass.gov
William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jon M. Woodruff*

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice*)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101-2130
Telephone: (651) 300-7425
Fax: (651) 296-9663
Email: Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

*/s/ Samantha B. Feeley*

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ Ana Atta-Alla

ANA ATTA-ALLA (*pro hac vice*)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Email: Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

/s/ Amanda Butler

AMANDA BUTLER (*pro hac vice*)
Senior Counsel
KALISTA M. WILSON (*pro hac vice*)
Assistant Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4060
Fax: (505) 318-1050
Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ Elinor R. Hoffmann

ELINOR R. HOFFMANN (*pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice*)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice*)
MORGAN FEDER (*pro hac vice*)
C. WILLIAM MARGRABE (*pro hac vice*)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice*)
Attorney General Fellow
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

/s/ Timothy D. Smith

TIMOTHY D. SMITH (*pro hac vice*)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice*)
MIKAELA BOCK (SBN 335089)
Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (503) 798-3297
Telephone: (971) 239-7457
Telephone: (503) 428-9482
Email: tim.smith@doj.oregon.gov
Email: ian.vanloh@doj.oregon.gov
Email: alex.delorenzo@doj.oregon.gov
Email: mikaela.bock@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

*<u>/s/ Christina M. Black</u>*

JONATHAN A. MARK (*pro hac vice*)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*)
Assistant Attorneys General
800 Fifth Avenue, Suite 200
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Christina.Black@atg.wa.gov
Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**FILER'S ATTESTATION**

I, Paula L. Blizzard, am the ECF User whose ID and password are being used to file this Response to the Letter of Senator Cory A. Booker and Briefs of Amici Curiae. In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: *<u>/s/ Paula L. Blizzard</u>*
Paula L. Blizzard