**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br>*Plaintiffs,*<br>v.<br>PARAMOUNT SKYDANCE CORP., and WARNER BROS. DISCOVERY, INC.,<br>*Defendants.* | Case No.: 4:26-cv-07116-AMO<br><br>**[~~PROPOSED~~] CONSENT DECREE**<br><br>Judge: Honorable Araceli Martínez-Olguín |

This Consent Decree ("**Consent Decree**") is entered into by and between the State of California, the State of Arizona, the State of Colorado, the State of Connecticut, the Commonwealth of Massachusetts, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, and the State of Washington, by and through their respective Attorneys General (collectively, "**Plaintiff States**"), on the one hand, and Paramount Skydance Corporation ("**Paramount**"), Warner Bros. Discovery, Inc. ("**Warner Bros**." or "**WBD**"), the Combined Entity (as defined below), and their respective affiliates, (collectively, the "**Defendants**" or the "**Companies**"), on the other. "**Parties**" refers collectively to the Companies and the States, and "Party" refers to any one of the Parties, as the context requires.

The Parties, by and through their respective counsel, in consideration for and subject to the promises, terms, and conditions contained in this Consent Decree, hereby warrant, represent, acknowledge, covenant, stipulate and agree, subject to Court approval pursuant to applicable federal and state law, as follows:

## I. RECITALS

A. **WHEREAS**, on February 27, 2026, the Companies announced that they had entered into an agreement and plan of merger, pursuant to which Paramount will acquire Warner Bros. upon closing of the Merger;

B. **WHEREAS**, on July 13, 2026, after conducting an investigation of the Companies' proposed Merger and its potential effects on competition under federal and state antitrust laws, the Plaintiff States filed a complaint in the Federal District Court for the Northern District of California alleging that the effect of the proposed Merger may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. §18, in three alleged markets, and on that basis the Plaintiff States sought an order to permanently enjoin the proposed Merger amongst other relief;

C. **WHEREAS**, the Defendants deny that the Merger violates any applicable law but recognize the Plaintiff States' legitimate interest in protecting competition and consumers, and the Defendants desire to resolve the Plaintiff States' Complaint without the further cost, delay, and uncertainty of litigation;

D. **WHEREAS**, the Parties have engaged in good-faith negotiations and have agreed to the terms and conditions set forth herein to address the Plaintiff States' concerns regarding the competitive effects of the Merger alleged in the Complaint;

E. **WHEREAS**, this Consent Decree is for settlement purposes only and does not constitute an admission by the Companies that any law has been violated;

F. **NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, the Parties agree as follows:

## II. DEFINITIONS

A. **"Consent Decree"** means this Consent Decree, including any amendments or modifications made in accordance with Section VIII.A hereof.

B. **"Attorneys General"** means, collectively, the Attorneys General of the Plaintiff States and their respective authorized designees.

C. **"Closing" or "Close"** means the closing of the Merger.

D. "**CBS News**" means the CBS Network News division within Paramount.

E. "**CNN**" means the CNN Worldwide division within Warner Bros.

F. **"Combined Entity"** means Paramount Skydance Corporation, a Delaware corporation, together with its subsidiaries, controlled affiliates, successors, and assigns, after the Merger Closes.

G. "**Commitment Period**" means the period of time that commences on the Closing and concludes on the fifth (5th) calendar year that follows the Closing. (For illustration purposes only, if the Closing occurs on September 30, 2026, the Commitment Period would run from September 30, 2026, to December 31, 2031.)

H. "**Commitment Year**" means each of the five consecutive calendar years following the calendar year in which the Closing occurs. (For illustration purposes only, if the Closing occurs at any time during calendar year 2026, then the Commitment Years would be 2027, 2028, 2029, 2030 and 2031.)

I. **"Distributor"** means any U.S. multichannel video programming distributor, including any virtual multichannel video programming distributor excluding any virtual multichannel video programming distributor that (1) is not affiliated with an MVPD and has never offered traditional MVPD services; and (2) as of the Effective date has more than five million (5,000,000) subscribers.

J. "**Divestiture Channels**" means collectively, BET (Black Entertainment Television, including BET, BET Gospel, BET Her, BET Hip-Hop, BET Jams, and BET Soul), VH1, Comedy Central, Smithsonian, Destination America, and Science, including all tangible and intangible assets reasonably necessary for a Divestiture Buyer to operate effectively, including the Divestiture Channels' copyrights, trademarks, other intellectual property rights, and licenses. For the avoidance of doubt, where a Divestiture Channel licenses content for distribution, the ownership rights of the underlying content remain the property of the license-granting entity and are not Distribution Channel assets to be divested, provided that the existing content license agreements with the Divestiture Channel will remain in place for the remainder of the license term.

K. "**Compliance Monitor**" has the meaning defined in Article VI.A of this Consent Decree.

L. **"Effective Date"** means the date on which this Consent Decree is entered by the Court.

M. "**Exhibitor**" means a person or legal entity that, as of the Effective Date, operates one or more theaters or cinemas in the United States for the primary purpose of publicly screening first-run Films for audiences.

N. **"Film"** means a feature-length motion picture (of at least seventy-five (75) minutes in running time) produced or distributed by the Combined Entity or its subsidiaries and intended for initial release in commercial movie theaters in the United States.

O. "**Independent Film**" means a Film that is either (i) based on an original screenplay or (ii) originated from Film producers outside of the Combined Entity, Disney, Universal, or Sony.

P. "**Lot**" means, with respect to Paramount, the studio lot Paramount operates at 5555 Melrose Avenue, in Los Angeles, California; and, with respect to Warner Bros., the

studio lot that Warner Bros. operates at 4000 Warner Boulevard in Burbank, California.

**Q.** **"Merger" or "Transaction"** means the Agreement and Plan of Merger entered into on February 27, 2026, between Paramount and Warner Bros., pursuant to which Paramount will acquire Warner Bros. upon Closing.

**R.** **"Miramax Studios"** means Miramax, LLC, and all of its subsidiaries, assets, and affiliated operations in which the Combined Entity holds a direct or indirect ownership interest.

**S.** **"Monitoring Trustee"** has the meaning defined in Article VI.B of this Consent Decree.

**T.** **"Motion Pictures & Television Fund"** means the Motion Picture & Television Fund, a California nonprofit corporation, or any successor organization.

**U.** "**National Association of Attorneys General Fund**" means a fund that is administered by the National Association of Attorneys General and that is designated for antitrust enforcement, as identified by the State Committee.

**V.** "**Paramount Basic Cable Channels**" means the basic cable channels owned by Paramount at the time of the Closing.

**W.** **"PVOD" or "Premium Video-on-Demand"** means access to audiovisual content for on-demand streaming via the internet or other digital distribution platforms immediately after Theatrical Release for a limited period of time for a one-off fee.

**X.** **"State"** means any one of the Plaintiff States, acting by and through its Attorney General, as the context requires.

**Y.** "**State Committee**" means a group of no more than five (5) Attorneys General offices appointed by the States, as modified from time to time. The State Committee will consult with and provide regular updates to the Plaintiff States.

**Z.** **"SVOD"** means subscription video-on-demand, being any service that provides access to audiovisual content on a subscription basis for on-demand streaming via the internet or other digital distribution platforms, including but not limited to Paramount+ and any successor service operated by the Combined Entity.

**AA.** **"Theatrical-Release Window"** means the period commencing on the date of a Film's initial public exhibition in commercial movie theaters in the United States (such exhibition, a "**Theatrical Release**") and during which such Film is made available exclusively through theatrical exhibition and is not to be made available on any SVOD or home entertainment platform.

**BB.** **"Warner Bros. Basic Cable Channels"** means the basic cable channels owned by Warner Bros. at the time of the Closing.

**CC.** "**Wide Release Film**" means a Film that is released on at least two thousand (2,000) screens.

## III. COMMITMENTS

### A. Theatrical Film Exhibition Commitments

1. **Annual Film Release Commitment.** During each Commitment Year, the Combined Entity shall cause to be released for Theatrical Release in the United States a minimum of thirty (30) Films for the first and second Commitment Years and thirty-two (32) Films for the third, fourth, and fifth Commitment Years (the "**Annual Film Release Commitment**"). Of those Films:

   a. For the first and second Commitment Years, at least twenty (20) of the thirty (30) Films must be Wide Release Films;

   b. For the third, fourth, and fifth Commitment Years, at least twenty-one (21) of the thirty-two (32) Films must be Wide Release Films;

   c. For each of the Commitment Years, at least four (4) of the Films subject to this Section must be Independent Films; and

   d. For each of the Commitment Years, at least fifty percent (50%) of the Films subject to this section shall be produced or jointly produced by the Combined Entity.

2. **Theatrical-Release Window.** For each Film counted toward the Annual Film Release Commitment, the Combined Entity shall maintain a Theatrical-Release Window of not less than forty-five (45) days from the date of initial theatrical exhibition in the United States and shall not market or promote the Film as being available on any PVOD, SVOD, or other streaming platform prior to the thirtieth (30th) day of the Theatrical Release Window.

3. **SVOD Holdback Period.** For each Film counted toward the Annual Film Release Commitment, the Combined Entity shall not make such Film available on any SVOD platform, including Paramount+ or any successor service, for a period of not less than ninety (90) days from the date of the Film's initial theatrical exhibition in the United States.

4. **Marketing Budget Requirement.** The Combined Entity shall support each Film counted toward the Annual Film Release Commitment with a marketing spend consistent with typical practice for similar films and release patterns.

5. **Tentpole Films Requirement.** At least twenty percent (20%) of the Combined Entity's Films for each Commitment Year shall have aggregate

production and acquisition budgets of the equivalent of at least Fifty Million Dollars ($50 million) in September 2026, adjusted for inflation using the CPI-U based on the prior calendar year, and those Films must be released on a minimum of three thousand (3,000) domestic screens within the first four (4) weekends of initial release.

6. **Rental Rate Terms.** For the first three (3) Commitment Years of the Commitment Period, the Combined Entity shall maintain Film rental terms with Exhibitors for new Film releases that are consistent with the best practices followed by Paramount and Warner Bros. as of the Closing for such Exhibitor. For purposes of this paragraph, best practices include but are not limited to: (i) honoring Paramount's current terms and rental rates as of the Closing for current and planned Paramount Theatrical Releases; (ii) honoring Warner Bros.'s current terms and rental rates as of the Closing for current and planned Warner Bros. Theatrical Releases; and (iii) not offering any terms for Film Theatrical Releases that are less favorable than the higher of the rental rate schedule and associated terms offered by either Paramount or Warner Bros. to the same exhibitor as of the Closing.

7. **Film Catalogue Access.** During the Commitment Period, the Combined Entity will continue to make the film catalogues of both Paramount and Warner Bros. available for license by Exhibitors under similar Film rental terms as have been offered by each Company during the 2025 calendar year for similar grossing titles and situations. From time to time, certain Films may be taken out of release up to ninety (90) days before and up to thirty (30) days after a larger-scale re-issue, including but not limited to anniversary celebrations, so as not to cannibalize box office in close proximity to the larger theatrical release that will be supported by marketing efforts.

8. **United States Production Levels.** During the Commitment Years:

   a. The Combined Entity will spend at least Three Hundred Million Dollars ($300,000,000) more annually (totaling at least One Billion Five Hundred Million Dollars ($1,500,000,000) more across the Commitment Period) in production in the United States as compared to the level that the Companies spent on production in the United States in 2025.

   b. In the event that, during the Commitment Period, the United States enacts into law an uncapped federal film tax incentive of at least twenty percent (20%) (a "**Federal Film Tax Credit**"), then, for each remaining full calendar year within the Commitment Period for which the Federal Film Tax Credit applies, the Combined Entity's annual average production-day levels in the United States must be at least twenty percent (20%) of all Film production for the first and

second years, and must be at least thirty percent (30%) for the third, fourth, and fifth years.

c. In the event that, during the Commitment Period, the United States enacts into law a Federal Film Tax Credit as described in Section III.A.8.b, and either the State of California or the state of New York passes an uncapped state film tax incentive, inclusive of both above- and below-the-line expenses, of at least forty-three percent (43%), stackable with the Federal Film Tax Credit (a "**State Film Tax Credit**"), then, for each remaining full calendar year within the Commitment Period for which the State Film Tax Credit and Federal Film Tax Credit applies, the Combined Entity's annual average production-day levels in the United States must be at least forty percent (40%) of all Film production.

**9. Divestiture Remedy for Breach.** In the event that the Combined Entity fails to meet the Annual Film Release Commitment in any Commitment Year:

a. The Combined Entity shall have a cure period of six (6) months from the end of such Commitment Year (the "**Theatrical Cure Period**") in which to release a sufficient number of additional Films to bring the total to the required minimum of Films under the Annual Film Release Commitment for that Commitment Year. A Film may only be counted toward the Annual Film Release Commitment for one Commitment Year.

b. If, upon the expiration of the Theatrical Cure Period, the Combined Entity has failed to cure the shortfall, the Combined Entity shall divest its entire direct and indirect ownership interest in Miramax Studios ("**Miramax Divestiture Assets"**), on commercially reasonable terms, to a bona fide acquirer approved by the State Committee (such approval not to be unreasonably withheld or delayed) within twelve (12) months of the expiration of the Theatrical Cure Period (the "**Miramax Divestiture**").

c. The Combined Entity may not reacquire any part of or interest in the Miramax Divestiture Assets during the Commitment Period.

**10. Fund Contributions for Shortfalls.** In addition to and independent of the divestiture remedy set forth in Section A.9 of this Article, for each Film by which the Combined Entity falls below the Annual Film Release Commitment in any Commitment Year, the Combined Entity shall contribute thirty million dollars ($30,000,000), split fifty percent / forty percent / ten percent (50%/40%/10%) to (i) health care and retirement trust funds for the WGA, IATSE, DGA, International Brotherhood of Teamsters, and other unions that work on production of Films (as selected by the State

Committee), (ii) the Motion Pictures & Television Fund, and (iii) the National Association of Attorneys General Fund (collectively, the "**Contribution Funds**"), respectively. Such contributions shall be made within sixty (60) days of the end of the applicable Commitment Year (or the Theatrical Cure Period, whichever is later) and shall be non-refundable. The Contribution Fund obligations under this paragraph shall apply regardless of whether the Combined Entity subsequently cures the shortfall during the Theatrical Cure Period.

**11.** **Counting Methodology.** For purposes of this Article, a Film shall be counted toward the Annual Film Release Commitment for the Commitment Year in which its initial date of theatrical exhibition in the United States occurs, except that a Film released during the Cure Period shall be counted toward the Annual Film Release Commitment for the Commitment Year prior to its initial date of theatrical exhibition in the United States occurs. Films that receive a limited release (defined as fewer than six hundred (600) screens in the United States) shall not be counted toward the minimum unless they are subsequently expanded to one thousand (1,000) screens within thirty (30) days. For the avoidance of doubt, any re-releases of previously released films, commemorative editions, or otherwise repackaged versions of previously released intellectual property shall not count towards the Annual Film Release Commitment described in Section III.A.1.

**B.** **Basic Cable Commitments**

For the duration of the Commitment Period:

**1.** In negotiations between the Combined Entity and a Distributor concerning affiliation agreement terms for the Combined Entity's basic cable network portfolio, the Combined Entity shall separately negotiate affiliation agreement terms for the Paramount Basic Cable Channels and the Warner Bros. Basic Cable Channels. For the avoidance of doubt, this paragraph does not apply to other Combined Entity offerings (*e.g.*, premium cable channels, streaming services, or broadcast).

**2.** The Combined Entity will not alter the existing schedules for renegotiation of affiliate fee agreements covering basic cable channels, except at the written request of a Distributor, which the Combined Entity will not unreasonably reject or deny.

**3.** The Combined Entity shall not make any affiliation agreement or its terms for the Warner Bros. Basic Cable channels contingent on the Distributor's agreement to terms for the affiliation agreement for the Paramount Basic Cable Channels; or vice versa.

**4.** In separately negotiating affiliation agreement terms under this Section, the Combined Entity will not use confidential Paramount Basic Cable Channel affiliate fee data in any way to determine, influence, or impact negotiating Warner Bros. Basic Cable Channel affiliate fees, or vice versa.

**5.** Within 60 days after the Effective Date, the Combined Entity shall implement procedures and protections to ensure that the Combined Entity complies with the requirements of this Section III.B., and will provide those policies and protections to the Monitoring Trustee and the State Committee.

**6.** This commitment shall not apply where a Distributor affirmatively requests, in writing, that the Combined Entity negotiate basic cable affiliation agreement terms together for the Paramount Basic Cable Channels, Warner Bros. Basic Cable Channels, or any product or service offering from the Combined Entity; provided however, the Combined Entity may not solicit, encourage, or condition other terms on a Distributor making such a request.

**7.** **Divestiture Remedy for Breach.** In the event that the Combined Entity materially breaches the cable negotiation provisions in this section:

a. The Combined Entity shall have a cure period of six (6) months from the date the State Committee and the Monitoring Trustee notify the Court that they believe a material violation has occurred (the "Cable Cure Period") in which to re-negotiate and come into compliance with those provisions. The Combined Entity must make any revised agreements retroactive to the date of the violation and take any other steps necessary such that the Distributor is put in the same position as if the violation had not occurred.

b. If, upon the expiration of the Cable Cure Period, the Court has found that the Combined Entity has violated this Section III.B and has failed to cure said violation as determined by the Court in a final order, the Combined Entity shall, in addition to any remedies necessary to put the Distributor in the same position as if the violation had not occurred, divest its entire direct and indirect ownership interest in the Divestiture Channels.

1. The Combined Entity shall, within one hundred and twenty (120) days after the expiration of the Cable Cure Period, divest the Divestiture Channels to a bona fide divestiture buyer approved by the State Committee (such approval not to be unreasonably withheld or delayed) (a "**Divestiture Buyer**") in a manner consistent with this Consent Decree. The Combined Entity will use their best efforts to divest the Divestiture Channels as expeditiously as possible. In exercising the State Committee approval authority described in this paragraph, in the event that multiple bona fide entities bid to acquire the Divestiture Channels, the Combined Entity presumptively may

sell the Divestiture Channels to the highest bidder; however, the State Committee may direct the sale to a Divestiture Bidder that is within five percent (5%) of the highest bidder's bid price.

2. **Transition Services** (at Divestiture Buyer's Option). At the option of the Divestiture Buyer(s), on or before the closing date of any divestiture, the Combined Entity shall enter into one or more transition services agreements to provide any transition services reasonably necessary to operate any Divestiture Channels as viable, ongoing programming assets.

3. The Combined Entity may not reacquire any part of or interest in the Divestiture Channels during the Commitment Period.

**C. Entertainment Industry Investment Commitments**

**1.** **Lot Operations.** For the duration of the Commitment Period, the Combined Entity shall not sell or close the Paramount or Warner Bros. Lots and shall use commercially reasonable efforts to operate the Lots in a manner consistent with past practices, including leasing use to third parties and producing films and television shows.

**2.** **Committed Development Operations.** To the extent that either Paramount or Warner Bros. entered into contracts prior to the Effective Date to lease or develop studio facilities within a Plaintiff State ("**Development Agreements**"), and the development efforts described by those Development Agreements had not been completed prior to Closing, the Combined Entity shall honor the terms of those Development Agreements during the Commitment Period.

**3.** **Collective Bargaining.** During the Commitment Period, the Combined Entity shall honor existing collective bargaining agreements in the United States in accordance with their terms and shall bargain in good faith with applicable recognized labor organizations with respect to successor agreements, in each case subject to applicable law, the terms of those agreements, and commercially reasonable efforts. In furtherance of the foregoing:

a. The Combined Entity shall not unilaterally change any mandatory subject of bargaining affecting represented employees and covered by an existing collective bargaining agreement, except as permitted by such agreement or as otherwise agreed to in writing by the applicable labor organization.

b. The Combined Entity shall credit employees with all service, seniority, and accrued status recognized under applicable collective bargaining agreements for all purposes—including but not limited

to layoff, recall, promotion, benefits eligibility, and vacation accrual—subject to the terms of such agreements.

c. The Combined Entity shall not unlawfully interfere with employees in the exercise of rights to union representation and collective bargaining and shall respect the role of recognized labor organizations throughout the integration process.

**4. Employee Reapplication**. During the Commitment Period, Company employees who are displaced, laid off, or otherwise terminated as a result of the Transaction ("**Affected Employees**") shall have the right to apply for any open, vacant, and available positions within the Combined Entity's organization for which they are qualified, and the Combined Entity shall consider those applications in good faith.

**5. Community Investment.** The Combined Entity shall make an aggregate annual financial commitment of Nine and a Half Million Dollars ($9,500,000.00) each year for five (5) years following the Closing Date for investments in (1) workforce training and career development programs in film and television production communities at qualified educational institutions; and (2) film programs and community arts organizations.

**6. Independent Film Fund.** Within thirty (30) days of Closing, and for the duration of the Commitment Period, the Combined Entity will form and operate a fund for purchasing independent films (the "**Independent Film Fund**"). The Combined Entity will make an annual contribution to the Independent Film Fund of Five Million Dollars ($5 million) per annum for each Commitment Year.

**D. News Editorial Independence Board Commitments**

**1. Formation.** Within one hundred eighty (180) days following Closing, the Combined Entity shall establish the News Editorial Independence Board (the "**Editorial Independence Board**") and appoint Editorial Independence Board Members in manner that is consistent with this Section III.D.

**2. Composition.** The Editorial Independence Board shall be made up of five (5) established journalists (active or retired), each of whom shall have practiced journalism for a minimum of ten (10) years (including with credentials for at least three (3) years) ("**Journalist**"). ("**Editorial Independence Board Members**"). No more than two (2) Editorial Independence Board Members may be affiliated with the same political party.

**3. Appointment.** Editorial Independence Board Members shall be appointed by the Combined Entity's Board of Directors (the "**Combined Entity's Board**").

a. No member of any government or governmental entity may be appointed to the Editorial Independence Board.

b. No member of any government or governmental entity, including federal, state, and local governments, may approve or have approval rights over members appointed to the Editorial Independence Board.

c. No officer, director, shareholder or non-Journalist employee or contractor of the Combined Entity may be appointed to the Editorial Independence Board.

4. **Board Member Term.** Editorial Independence Board Members are expected to serve for three (3) years from the date of their appointment. The Combined Entity's Board can remove an Editorial Independence Board Member only for good cause, which for purposes of this paragraph shall mean fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary, or capricious, unrelated to business needs or goals, or pretextual. When an Editorial Independence Board is vacated, the Combined Entity's Board will fill that vacancy in a manner consistent with this Section III.D.

5. **Role.** The Editorial Independence Board will have the following responsibilities during the Commitment Period:

a. Establishing a set of guiding editorial principles based on CBS News and CNN's Standards & Practices policies and principles in effect as of the Effective Date of accuracy, independence, fairness, and journalistic integrity (collectively, "**News Editorial Principles**").

b. Resolving any disputes between CBS News employees, CNN employees, and management of the Combined Entity regarding alleged violations of the News Editorial Principles.

c. Resolving any disputes between CBS News employees, CNN employees, and management of the Combined Entity regarding alleged reporting bias or failure to meet agreed reporting fairness standards.

d. Establishing and monitoring adherence to ethical journalism as defined by journalism industry best practices and to editorial independence, including from the Combined Entity's ownership and shareholders.

6. **Reporting.** The Editorial Independence Board shall report to the Combined Entity's Board through the Combined Entity's Chief Compliance Officer.

7. **Scope.** The Editorial Independence Board's above-described responsibilities are limited to news and editorial content produced principally for distribution in the United States.

8. **Indemnification.** The Combined Entity shall indemnify and hold harmless Plaintiff States for any claims and litigation related to this section of the Consent Decree.

**E. Other Commitments**

1. **Pluto TV**. For the Commitment Period:

   a. The Combined Entity shall continue to maintain and make available a free, ad-supported streaming service under the Pluto TV brand or a successor or substantially equivalent replacement brand or service.

   b. The Combined Entity will, at a minimum, maintain this service with service and quality levels at or above the service and quality for the service as provided on the Effective Date, and shall make all product and content improvement and additions as contemplated on the Effective Date.

2. **Costs and Attorneys' Fees.** Defendants shall reimburse the Plaintiff States for reasonable attorneys' fees and reasonable economic expert fees (including reasonable expert firm support costs) incurred through the Effective Date, not to exceed Forty Million Dollars ($40,000,000), subject to review for reasonableness. The amount may be used for any one or more of the following purposes, by the Plaintiff States' Attorneys General as they, in their sole discretion, see fit and for any lawful purpose, including: antitrust or consumer protection law enforcement, including fees and expenses; for deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account), for use in accordance with the state laws governing that account; for deposit into a fund exclusively dedicated to assisting state attorneys general to enforce the antitrust laws by defraying the costs of (a) experts, economists, and consultants in multistate antitrust investigations and litigation, (b) training or continuing education in antitrust for attorneys in state attorney general offices, or (c) information management systems used in multistate antitrust investigations and litigation; or for any other purpose as the attorneys general deem appropriate, consistent with, or required by, the various states' laws.

   a. Any payment the Companies make pursuant to this Consent Decree to the Colorado Department of Law is to be held, along with any interest thereon, in trust by the Attorney General to be used in the Attorney General's sole discretion for reimbursement of the State's actual costs and attorney's fees, the payment of restitution, if any,

and for future consumer fraud or antitrust enforcement, consumer education, or public welfare purposes.

3. **Anti-Retaliation.** The Combined Entity shall not take any adverse action against any exhibitor, distributor, employee, contractor, or other person in retaliation for reporting a compliance concern to the Monitoring Trustee or Plaintiff States, for cooperating with any investigation or inquiry related to compliance with this Consent Decree, or for cooperating with the investigation of or litigation challenging this Merger.

4. **Discharge.** The Plaintiff States affirm that this Consent Decree discharges as to the Defendants all competition claims, related consumer protection claims, and known related investigations by the Plaintiff States arising from the Merger and the related transactions. Related transactions include agreements that are ancillary to the Merger, for example equity commitments made in order to provide funding for the merger.

## IV. REPRESENTATIONS AND WARRANTIES

A. **Representations of the Plaintiff States.** The Plaintiff States represent and warrant that each of their respective Attorneys General has the authority to enter into this Consent Decree and to bind the applicable Plaintiff State to the terms hereof, provided, however, that the (1) State of Colorado does not join and does not bind its State to Section III.C.1 or III.D of this Consent Decree and (2) State of Washington does not join and does not bind its State to Section III.D of this Consent Decree.

B. **Representations of the Defendants**. Each Defendant represents and warrants that:

1. It is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and is qualified to do business in the each of the Plaintiff States;

2. It has full corporate power and authority to execute, deliver, and perform this Consent Decree;

3. The execution, delivery, and performance of this Consent Decree have been duly authorized by all necessary corporate action; and

4. This Consent Decree constitutes a valid and binding obligation of the Defendants and the Combined Entity (as applicable), enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and to general principles of equity.

## V. TERM AND DURATION

**A.** **Term.** This Consent Decree shall become effective on the Effective Date and shall remain in full force and effect for the Commitment Period, unless earlier terminated or extended by mutual written agreement of the Parties (the "**Term**"). Upon valid termination, this Consent Decree shall forthwith become null and void and there shall be no liability or obligation on the part of the Parties (other than as set forth in Section V.B. below). Notwithstanding the foregoing, at any time after the completion of the second full Commitment Year of the Commitment Period, the Combined Entity may, for good cause, petition the Court, by motion pursuant to Federal Rule of Civil Procedure 60(b) or as otherwise permitted by law, for relief from or modification to the requirements of this Consent Decree (a "**Petition**"). In such Petition, the Combined Entity bears the burden to show that, absent relief or modification, the Consent Decree impairs the Combined Entity's ability to successfully operate the business and to compete effectively, and that the requested relief or modification is not substantially likely to lessen competition. Prior to submitting a Petition, the Combined Entity will meet and confer with the State Committee in good faith to determine whether the Plaintiff States will consent to the requested relief or modification.

**B.** **Survival.** The representations, warranties, covenants and agreements in this Consent Decree shall not survive the termination of this Consent Decree, except that any obligations of the Combined Entity under this Consent Decree that by their nature are intended to survive termination, including completing the Miramax Divestiture (if required), any ongoing cure obligations, any accrued Contribution Fund contribution obligations, shall survive the termination of this Consent Decree until fully performed or discharged.

## VI. COMPLIANCE MONITORING AND REPORTING

**A.** **Internal Compliance Monitor.** Within twenty-one (21) days of Closing, Defendants shall: (i) appoint a "**Compliance Monitor**" who is an internal employee or officer of the Combined Entity and who reports directly to the Combined Entity's Chief Compliance Officer, and (ii) identify to the State Committee and the Monitoring Trustee the Compliance Monitor's name, business address, telephone number, and email address. Within forty-five (45) days of a vacancy in the Compliance Monitor position, the Combined Entity shall appoint a replacement, and shall identify to States Committee the replacement Compliance Monitor's name, business address, telephone number, and email address. During the Commitment Period, the Compliance Monitor shall:

**1.** Within one hundred twenty (120) days of the Closing, and annually thereafter for the duration of the Commitment Period, provide a report to the Combined Entity's Chief Compliance Officer describing the efforts the Combined Entity has made to comply with this Consent Decree.

**2.** Provide annual compliance training to employees of the Combined Entity whose day-to-day work responsibilities are directly affected by this Consent Decree ("**Relevant Personnel**") regarding the Combined Entity's obligations under this Consent Decree.

**3.** Provide supplemental compliance training to newly hired Relevant Personnel regarding the Combined Entity's obligations under this Consent Decree.

**4.** Semiannually communicate to Relevant Personnel that they may disclose to the Compliance Monitor or the Chief Compliance Officer, without reprisal or adverse consequence for such disclosure, information concerning any violation or potential violation of this Consent Decree by the Combined Entity.

**B. Monitoring Trustee.**

**1.** Within ninety (90) days of the Closing, the Combined Entity and the State Committee shall jointly select a mutually agreed-upon "**Monitoring Trustee**" to monitor the Combined Entity's compliance with this Consent Decree (excluding Article III.D) during the Commitment Period. The Combined Entity shall bear the reasonable costs of the Monitoring Trustee and any consultants reasonably retained by the Monitoring Trustee.

**2.** The Monitoring Trustee shall:

a. Have the powers and authority reasonably necessary to monitor the Combined Entity's compliance with the terms of this Consent Decree;

b. Serve as an independent third party and not as an employee or agent of either the State Committee or the Combined Entity;

c. Employ any reasonably necessary consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities (as mutually agreed with the State Committee and the Combined Entity, that agreement not to be unreasonably withheld);

d. Submit semiannual reports to the State Committee regarding the Combined Entity's compliance, as well as any ad hoc reports of its conclusions regarding the Combined Entity's alleged failure to meet any term of this Consent Decree, including the Annual Film Release Commitment in any Commitment Year. These reports shall receive a proper confidentiality designation, if any, consistent with the Modified Stipulated Protective Order in force in this case, and shall not disclose business secrets or documents marked business confidential of the Combined Entity.

e. The Monitoring Trustee and any reasonably necessary agents or consultants retained by the Monitoring Trustee shall, and upon reasonable notice to the Combined Entity, have full and complete access to the relevant personnel, records, and facilities that the Monitoring Trustee reasonably needs to ascertain the Combined Entity's compliance with this Consent Decree (provided, that this shall not imply that the Monitoring Trustee shall be permitted to access any document that would likely jeopardize legal privilege (including attorney-client privilege)).

**3.** The Combined Entity shall:

a. Cooperate with and assist the Monitoring Trustee in performing his or her duties for the purpose of reviewing compliance under this Consent Decree;

b. Not interfere with the ability of the Monitoring Trustee to perform any duties pursuant to this Consent Decree;

c. Not require the Monitoring Trustee to disclose to the Combined Entity the substance of the Monitor's communications with the State Committee or any other person, or the substance of any reports submitted pursuant to this Consent Decree provided, however, that the Monitoring Trustee shall keep the State Committee and the Combined Entity apprised of the scope and substance of the Monitoring Trustee's investigations or reviews, consistent with due process;

d. Indemnify and hold the Monitoring Trustee harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connect with, a claim concerning the performance of the Monitoring Trustee's duties pursuant to this Consent Decree, unless the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitoring Trustee.

**4.** The Combined Entity may require the Monitoring Trustee and each of its consultants, accountants, attorneys, and other representatives and assistants to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access personnel, information, and facilities, to provide information to the State Committee, or to otherwise observe and report on the Combined Entity's compliance with this Consent Decree.

**5.** If the Monitoring Trustee resigns or the State Committee determines that the Monitor has ceased to act, has failed to act diligently, or is otherwise unable to continue serving as the Monitoring Trustee, the State Committee may require a new Monitoring Trustee be appointed in the same manner as

the initial appointment of the Monitoring Trustee. The substitute Monitoring Trustee shall be afforded all rights, powers, and authorities and shall be subject to all obligations of the Monitoring Trustee section of this Consent Decree. The Monitoring Trustee shall have no role or authority in day-to-day operations of the Combined Entity.

**6.** The Monitoring Trustee shall have no role or authority relating to the Combined Entity's news operations.

**7.** The Monitoring Trustee shall have no role or authority in the selection or production of content by the Combined Entity.

**C.** **Annual Certification.** The Combined Entity shall cause its Chief Executive Officer and General Counsel to certify to the State Committee, on an annual basis and within ninety (90) days of the end of each calendar year during the Term, that the Combined Entity is in compliance with all material terms of this Consent Decree, or shall identify any areas of non-compliance and the steps being taken to cure such non-compliance. On the same day the Combined Entity certifies compliance to the State Committee, the Combined Entity shall cause that certification to be filed on the docket in the United States District Court for the Northern District of California (the "**Court**") in Case No. 4:26-cv-7116.

## VII. ENFORCEMENT AND DISPUTE RESOLUTION

**A.** **Enforcement.** This Consent Decree shall be enforceable by any Plaintiff State, acting by and through its Attorney General, through any action or proceeding in the Court in Case No. 4:26-cv-7116. The Court shall retain jurisdiction to enforce this Consent Decree, and the Combined Entity consents to the jurisdiction of that Court for such purposes.

**B.** **Equitable Relief.** The Parties acknowledge that a breach of this Consent Decree may cause irreparable harm for which monetary damages would be an inadequate remedy. Accordingly, any Plaintiff State, acting by and through its Attorney General, shall be entitled to seek specific performance, injunctive relief, or any other equitable remedy available at law or in equity, in addition to any other remedies provided herein or available at law.

**C.** **Meet and Confer.** Prior to commencing any enforcement action, the complaining Party shall provide written notice to the other Party specifying the alleged breach or dispute in reasonable detail. The Parties shall meet and confer in good faith within thirty (30) days of receipt of such notice in an effort to resolve the dispute without resort to litigation.

**D.** **Mediation.** If the dispute is not resolved through the meet-and-confer process within thirty (30) days, either Party may submit the dispute to non-binding mediation before a mediator mutually agreed upon by the Parties. The costs of mediation shall be shared equally by the Parties.

**E. Reservation of Rights.** Nothing in this Article shall limit, waive, or otherwise affect the authority of any Plaintiff State, acting by and through its Attorney General, to enforce the Clayton Act, including Section 16, 15 U.S.C. § 26, or any applicable state antitrust, unfair competition, consumer-protection, or other statute, regulation, or common-law principle.

## VIII. GENERAL PROVISIONS

**A. Modification and Waiver.** No amendment, modification, or supplement to this Consent Decree shall be valid or binding unless (i) made in writing and signed by both Parties and (ii) approved by the Court. No waiver of any provision of this Consent Decree shall be effective unless in writing and signed by the Party granting such waiver. No failure or delay by either Party in exercising any right, power, or remedy under this Consent Decree shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

**B. Severability.** If any provision of this Consent Decree is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, such provision shall be modified to the minimum extent necessary to make it valid, legal, and enforceable, and the remaining provisions shall continue in full force and effect. If such modification is not possible, the invalid provision shall be severed from this Consent Decree, and the remaining provisions shall remain in full force and effect, provided that the fundamental purposes of this Consent Decree can still be achieved.

**C. Force Majeure.** The Combined Entity shall not be considered in breach of this Consent Decree to the extent that performance of its obligations is prevented by force majeure events beyond the Parties' reasonable control, including but not limited to war, rebellion, hurricanes and other major storms, earthquakes, fires, terrorism, pandemics, strikes, labor disruptions, economic recessions, riots, insurrections, civil commotions, blockades, law or order of any federal government body exercising jurisdiction over the Parties, significant interference by or significant failures of state or local governmental authorities, significant interruptions in the supply chain, or acts of God. The Combined Entity shall promptly notify the Plaintiff States if this Force Majeure provision is invoked. For clarity, Plaintiffs States may petition the Court with respect the invocation of the Force Majeure provision.

**D. Governing Law.** This Consent Decree shall be governed by and construed in accordance with applicable federal law. To the extent federal law does not govern a procedural or other ancillary matter, the laws of the State of California shall apply, without regard to its conflict-of-laws principles.

**E. Conflicts.** If any statute or regulation pertaining to the subject matter of this Consent Decree is enacted, promulgated, or modified after the Effective Date and a court of competent jurisdiction holds that such statute or regulation is in conflict

with any provision of this Consent Decree, the Companies' compliance with such statute or regulation shall not be deemed a breach of this Consent Decree to the extent of the conflict.

F. **Jurisdiction and Venue.** The Parties consent to the exclusive jurisdiction and venue of the United States District Court for the Northern District of California for any action or proceeding arising out of or relating to this Consent Decree, including enforcement, and acknowledge that the Court shall retain jurisdiction for those purposes.

G. **Entire Agreement.** This Consent Decree, together with any exhibits, schedules, or attachments hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, between the Parties relating to the subject matter hereof.

H. **Successors and Assigns.** This Consent Decree shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. The Combined Entity may not assign its rights or delegate its obligations under this Consent Decree without the prior written consent of the Attorneys General, which consent shall not be unreasonably withheld. None of the Plaintiff States may assign its rights or delegate its obligations Consent Decree without the prior written consent of the Combined Entity, which consent shall not be unreasonably withheld.

I. **Counterparts.** This Consent Decree may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery of this Consent Decree by electronic means, including by facsimile, PDF, or other electronic signature, shall be valid and sufficient.

J. **No Third-Party Beneficiaries.** The Parties agree and acknowledge that this Consent Decree is solely for the benefit of the Parties, and that no person or entity is intended to be a third-party beneficiary of any provision of this Consent Decree for any reason, including for the purposes of any civil, criminal, or administrative action in any court or before any other authority. No other person or entity shall be permitted to assert any claim or right as a beneficiary or protected class under this Consent Decree, provided that nothing in this Consent Decree shall be construed to deprive any person, corporation, association, agency, or other entity of any right provided by law, regulation, or administrative pronouncement independent of this Consent Decree.

K. **Notices.** All notices or other communications under this Consent Decree shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For Plaintiff States:

Each Plaintiff State can be contacted via the offices and personnel listed in the signature blocks.

For Paramount, Warner Bros. or the Combined Entity, as applicable:

Paramount Skydance Corporation
5555 Melrose Avenue
Los Angeles, CA 90038
Attention: Chief Legal Officer
Email: md@paramount.com

**L.** **No Admission of Liability.** This Consent Decree does not constitute an admission by the Combined Entity that it has violated any federal or state antitrust law, unfair competition law, or any other applicable law. The Combined Entity enters into this Consent Decree solely for the purpose of resolving the joint investigation conducted by the Attorneys General and avoiding the cost, delay, and uncertainty of litigation.

**M.** **Construction.** This Consent Decree shall be construed without regard to any presumption or rule requiring construction against the Party causing it to be drafted. The headings and captions of the Articles and Sections of this Consent Decree are inserted for convenience of reference only and shall not affect the interpretation or construction of this Consent Decree.

**N.** This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by DocuSign or emailed "PDF") shall have the same effect as an original.

**SO ORDERED.**

Dated: September 30, 2026

The Honorable Araceli Martínez-Olguín
United States District Judge

**IN WITNESS WHEREOF**, the Parties have caused this Consent Decree to be executed by their duly authorized representatives.

[Signatures follow]

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

/s/ Ashley Kaplan

PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
ANDREW MCCREARY (SBN 338704)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6000
Fax: (916) 731-3637
Email: Ashley.Kaplan@doj.ca.gov

RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*)
ADAM DI VINCENZO (*pro hac vice*)
GRANT BERMANN (*pro hac vice*)
ANASTASIA PASTAN (*pro hac vice*)
ALEXIS BROWN-REILLY (*pro hac vice*)
JULIA M. MAY (*pro hac vice*)
NATALIE NOGUEIRA (*pro hac vice*)
ALLISON CHESKY (*pro hac vice*)
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7525
Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice*)
EMME TYLER (SBN 341797)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5871
Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice*)
Unit Chief Counsel
SARAH PELTON (*pro hac vice*)
ALLISON WEBER (*pro hac vice*)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: robert.bernheim@azag.gov
sarah.pelton@azag.gov
allison.weber@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice*)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice*)
FRANKLIN KANIN (*pro hac vice*)
Assistant Attorneys General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ Anthony W. Mariano

ANTHONY W. MARIANO (*pro hac vice*)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (781) 835-7990
Email: Anthony.Mariano@mass.gov
William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

/s/ Jon M. Woodruff

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice*)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101-2130
Telephone: (651) 300-7425
Fax: (651) 296-9663
Email:
Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

/s/ Samantha B. Feeley

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ Ana Atta-Alla

ANA ATTA-ALLA (*pro hac vice*)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Email: Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

/s/ Amanda Butler

AMANDA BUTLER (*pro hac vice*)
Senior Counsel
KALISTA M. WILSON (*pro hac vice*)
Assistant Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4060
Fax: (505) 318-1050
Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ Elinor R. Hoffmann

ELINOR R. HOFFMANN (*pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice*)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice*)
MORGAN FEDER (*pro hac vice*)
C. WILLIAM MARGRABE (*pro hac vice*)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice*)
Attorney General Fellow
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

/s/ Timothy D. Smith

TIMOTHY D. SMITH (*pro hac vice*)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice*)
MIKAELA BOCK (SBN 335089)
Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (503) 798-3297
Telephone: (971) 239-7457
Telephone: (503) 428-9482
Email: tim.smith@doj.oregon.gov
Email: ian.vanloh@doj.oregon.gov
Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

/s/ Christina M. Black

JONATHAN A. MARK (*pro hac vice*)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*)
Assistant Attorneys General
800 Fifth Avenue, Suite 200
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Christina.Black@atg.wa.gov
Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

FOR DEFENDANT PARAMOUNT
SKYDANCE CORP.:

/s/ *Beth A. Wilkinson*
Beth A. Wilkinson (*pro hac vice*)
Rakesh Kilaru (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Fl.
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com

Marguerite M. Sullivan (*pro hac vice*)
Anna M. Rathbun (SBN 273787)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com

Joshua N. Holian (SBN 211772)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
joshua.holian@lw.com

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation*

FOR DEFENDANT WARNER BROS. DISCOVERY, INC.:

By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice)*
Henry Liu (*pro hac vice)*
Ross A. Demain (*pro hac vice)*
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

Bernard A. Nigro Jr. (*pro hac vice*)
Kathleen S. O'Neill (*pro hac vice*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
barry.nigro@friedfrank.com
kathy.oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*